# Appendix 2

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA ) | |
| v. ) | Criminal Case No. 3:92CR68-02 |
| CORY JOHNSON ) a.k.a. "O," a.k.a. "CO" ) | |



**VERDICT**

WE, THE JURY, FIND as follows:

Count 1:        Conspiracy to Distribute Controlled Substance

_____Guilty_____
(Guilty or Not Guilty)

Count 2:        Continuing Criminal Enterprise

Question:  Do you find that the government has proven, beyond a reasonable doubt, that a Continuing Criminal Enterprise existed as charged in the indictment?

Yes: ___Yes___                No: _____

If you indicated above that a Continuing Criminal Enterprise did not exist, you must find the defendant, CORY JOHNSON, Not Guilty as to Count 2.

If you indicated that a Continuing Criminal Enterprise did exist, you must now determine whether defendant CORY JOHNSON is Guilty or Not Guilty of the crime of engaging in that continuing criminal enterprise as charged in Count 2, and enter your finding below:

_____Guilty_____
(Guilty or Not Guilty)

Defendant CORY JOHNSON is not charged in Counts 3-7 of the indictment.

Count 8:          Killing of Peyton Maurice Johnson while Engaged In or Working in Furtherance of a Continuing Criminal Enterprise

(If you indicated, in response to the Question set forth under Count 2 above, that a Continuing Criminal Enterprise did <u>not</u> exist, you must find the defendant Not Guilty as to this Count).

_____Guilty_____
(Guilty or Not Guilty)

Count 9:          Use of Firearm in Relation to Killing of Peyton Maurice Johnson

_____Guilty_____
(Guilty or Not Guilty)

Count 10:          Killing of Peyton Maurice Johnson to Maintain or Increase Position in Racketeering Enterprise

_____Guilty_____
(Guilty or Not Guilty)

Count 11:          Killing of Louis J. Johnson, Jr., while Engaged In or Working in Furtherance of a Continuing Criminal Enterprise

(If you indicated, in response to the Question set forth under Count 2 above, that a Continuing Criminal Enterprise did <u>not</u> exist, you must find the defendant Not Guilty as to this Count).

_____Guilty_____
(Guilty or Not Guilty)

39a

**Count 12:**   Use of Firearm in Relation to Killing of Louis J. Johnson, Jr.



_____Guilty_____
(Guilty or Not Guilty)

**Count 13:**   Killing of Louis J. Johnson, Jr., to Maintain or Increase Position in Racketeering Enterprise



_____Guilty_____
(Guilty or Not Guilty)

**Count 14:**   Killing of Torrick Brown, Jr., to Maintain or Increase Position in Racketeering Enterprise



_____Guilty_____
(Guilty or Not Guilty)

**Count 15:**   Use of Firearm in Relation to Killing of Torrick Brown, Jr., and Maiming of Martha McCoy

_____Guilty_____
(Guilty or Not Guilty)

**Count 16:**   Maiming of Martha McCoy to Maintain or Increase Position in Racketeering Enterprise

_____Guilty_____
(Guilty or Not Guilty)

**Count 17:**   Killing of Bobby Long while Engaged In or Working in Furtherance of a Continuing Criminal Enterprise

(If you indicated, in response to the Question set forth under Count 2 above, that a Continuing Criminal Enterprise did <u>not</u> exist, you must find the defendant Not Guilty as to this Count).

_____Guilty_____
(Guilty or Not Guilty)

40a

Count 18:          Killing of Anthony Carter while Engaged In or
                   Working in Furtherance of a Continuing Criminal
                   Enterprise

(If you indicated, in response to the Question set forth under
Count 2 above, that a Continuing Criminal Enterprise did <u>not</u>
exist, you must find the defendant Not Guilty as to this
Count).

_____Guilty_____
       (Guilty or Not Guilty)

Count 19:          Killing of Dorothy Mae Armstrong while Engaged In
                   or Working in Furtherance of a Continuing Criminal
                   Enterprise

(If you indicated, in response to the Question set forth under
Count 2 above, that a Continuing Criminal Enterprise did <u>not</u>
exist, you must find the defendant Not Guilty as to this
Count).

_____Guilty_____
       (Guilty or Not Guilty)

Count 20:          Use of Firearm in Relation to Killing of Bobby
                   Long, Anthony Carter and Dorothy Mae Armstrong

_____Guilty_____
       (Guilty or Not Guilty)

Count 21:          Killing of Bobby Long to Maintain or Increase
                   Position in Racketeering Enterprise

_____Guilty_____
       (Guilty or Not Guilty)

Count 22:          Killing of Anthony Carter to Maintain or Increase
                   Position in Racketeering Enterprise

_____Guilty_____
       (Guilty or Not Guilty)

**Count 23:**    Killing of Dorothy Mae Armstrong to Maintain or Increase Position in Racketeering Enterprise

<u>         Guilty        </u>
(Guilty or Not Guilty)

**Count 24:**    Killing of Curtis Thorne while Engaged In or Working in Furtherance of a Continuing Criminal Enterprise

(If you indicated, in response to the Question set forth under Count 2 above, that a Continuing Criminal Enterprise did <u>not</u> exist, you must find the defendant Not Guilty as to this Count).

<u>         Guilty        </u>
(Guilty or Not Guilty)

**Count 25:**    Killing of Linwood Chiles while Engaged In or Working in Furtherance of a Continuing Criminal Enterprise

(If you indicated, in response to the Question set forth under Count 2 above, that a Continuing Criminal Enterprise did <u>not</u> exist, you must find the defendant Not Guilty as to this Count).

<u>         Guilty        </u>
(Guilty or Not Guilty)

**Count 26:**    Use of Firearm in Relation to Killing of Curtis Thorne and Linwood Chiles and Maiming of Priscilla Green and Gwendolyn Green

<u>         Guilty        </u>
(Guilty or Not Guilty)

**Count 27:**    Killing of Curtis Thorne to Maintain or Increase Position in Racketeering Enterprise

<u>         Guilty        </u>
(Guilty or Not Guilty)

Count 28:    Killing of Linwood Chiles to Maintain or Increase Position in Racketeering Enterprise

<u>Guilty</u>
(Guilty or Not Guilty)

Count 29:    Maiming of Priscilla Green to Maintain or Increase Position in Racketeering Enterprise

<u>Guilty</u>
(Guilty or Not Guilty)

Count 30:    Maiming of Gwendolyn Green to Maintain or Increase Position in Racketeering Enterprise

<u>Guilty</u>
(Guilty or Not Guilty)

Count 31:    Distribution of Controlled Substance

<u>Guilty</u>
(Guilty or Not Guilty)

Count 32:    Possession of Controlled Substance with Intent to Distribute  (on or about 2/2/92)

<u>Guilty</u>
(Guilty or Not Guilty)

Defendant CORY JOHNSON is not charged in Count 33 of the indictment.

SO SAY WE ALL.

_____    2/3/93
FOREPERSON'S SIGNATURE        DATE

43a

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

-----------------------------------------

UNITED STATES OF AMERICA,

                              Plaintiff;

    v.                                    CRIMINAL ACTION
                                              92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                              Defendants.

-----------------------------------------
                    VOLUME XV

                 February 1, 1993
                 Richmond, Virginia
                   10:00 a.m.

BEFORE:        HONORABLE JAMES R. SPENCER
               United States District Judge


APPEARANCES:   HOWARD C. VICK, JR., ESQ.
               WILLIAM H. PARCELL, III, ESQ.
               Office of the United States Attorney;
                   Counsel for Government;

               ROBERT P. GEARY, ESQ.
               ERIC D. WHITE, ESQ.
                   Counsel for Defendant Tipton;
               CRAIG S. COOLEY, ESQ.
               JOHN F. McGARVEY, ESQ.
                   Counsel for Defendant Johnson;
               DAVID P. BAUGH, ESQ.
               ARNOLD R. HENDERSON, V, ESQ.
                   Counsel for Defendant Roane;
               ROBERT J. WAGNER, ESQ.
                   Counsel for Defendant Reavis.
                   JEFFREY B. KULL
               OFFICIAL COURT REPORTER

        THE CLERK:  92CR68:  United States of
America versus Richard Tipton, Cory Johnson, James H.
Roane, Jr. and Sandra Reavis, the fifteenth day of

trial.

MR. VICK:  Government is ready.

MR. GEARY:  Tipton is ready.

MR. McGARVEY:  Johnson is ready.

MR. BAUGH:  Does the Court have the instructions, does the Court have them?

THE COURT:  My package has been prepared and you all can make whatever suggestions you like.

MR. BAUGH:  We will take that as a warning.  We have plagarized the PITERA instructions.

THE COURT:  All right.  Let's bring in the jury.

MR. VICK:  While the jury is coming in, we will note our objection to the double, triple hearsay by Detective Dalton.  I won't say anything more about it.  I know the Court has seen the report so you know what it is we are objecting to.

THE COURT:  All right.

(The jury entered the courtroom.)

All right, Baugh, call your witness.

MR. BAUGH:  We would call  --  I thought they were going to call Mr. Dalton first.  I thought

2921

it was Mr. Geary's witness.

THE COURT:  Mr. Geary?

MR. WHITE:  We will call Detective Dalton.

**Concerning the two wounds that penetrated the brain, Dr. Fierro testified that it "would take moderate to severe force to penetrate the skull."  JA 2901.  Including these two wounds, six of the stab wounds penetrated through the brain (bone??) of the skull.  *Id.* at 2896Steve A. Dalton (2921)**

STEVE A. DALTON, called as a witness by and on behalf of defendant Tipton, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. WHITE:

Q    Good morning, Detective Dalton.

A    Good morning.

Q    State your name, please.

A    Steve A. Dalton.

Q    How are you employed, sir?

A    Detective with the Richmond Police department.

Q    How long have you been so employed?

A    22 years.

Q    Were you so employed in January of 1992?

A    Yes, sir, I was.

Q    To what unit were you assigned in that time frame?

A    At that time frame I was assigned to the midnight cruiser unit.

Q    Did you have occasion to be involved in the investigations of the murders of Peyton Maurice

2922

45a

Johnson and Katrina Rozier?

A    Yes, I was.

Q    And pursuant to that investigation, sir, do you recall having a meeting with a Priscilla Greene?

A    Yes, sir, I do.

Q    Do you recall when that meeting was, sir?

A    That was approximately right around January 28th, I believe.

Q    Could you please tell the ladies and gentlemen of the jury where that meeting occurred?

A    The meeting occurred at police headquarters on January 28th at 10:55 a.m.

Q    And can you tell the ladies and gentlemen of the jury who was present?

A    Myself and Detective Blaylock and Detective Reid was in and out during the interview.

Q    And of course Ms. Greene was present?

A    Yes, that's correct.

Q    On that date you had occasion to serve a Circuit Court capeas on her; is that correct?

A    That is correct.

Q    Now, Detective Dalton, do you recall a conversation between yourself and Priscilla Greene specifically about the murder of Katrina Rozier?

A    Yes, sir.

Q    Sir, do you have that statement in front of you?

A    Yes, sir, I do.

Q    If I could direct your attention to page 14 of that interview, sir.

A    Yes, sir.

Q    Directing your attention, Detective Dalton, to your question "How about Katrina..." can you please --

MR. VICK:  Your Honor, "Pepsi" Greene did not testify in this trial about that.  I don't see how this comes in as any rebuttal.

THE COURT:  Come on up.

(At Bench.)

MR. WHITE:  If the Court please, when we attempted to elicit information from Ms. Greene while on the witness stand, she did not recall her conversation with Detective Dalton.  She did not recall the interview at all.  She does not recall anything she said.

MR. VICK:  Didn't ask about "Nat" Rozier?

MR. WHITE:  How could we if she could not recall anything she said about the interview or having been served with the capeas?

MR. VICK:  She didn't testify about "Nat" Rozier.

MR. BAUGH:  One, Mr. White attempted to

46a

press her on the issue and you told him to stop repeating himself, even though he tried to get her to recollect it.

THE COURT: How many times can you ask about this? "Can you recall?" The fact that a witness doesn't know or can't recall doesn't make a person like this witness admissible. If he had something to impeach her on, all right.

MR. WHITE: She said on pages 14 and 15 that when Katrina Rozier was killed, that "Whitey" was not in town.

THE COURT: No. Denied.

MR. BAUGH: There is one other matter. It is conceded by all, and I think it is that her recollection has been impaired as a consequence of her injury. Then of course, that would make her unavailable as a matter of law. The question would then turn on whether or not there is indicia of reliability to get around the hearsay exception. Inasmuch as there are other portions of that statement on which the United States has relied, we would submit that there is -- granted, a de minimis indicia of reliability -- and therefore, subject to

2925

her injuries she is unavailable.

THE COURT: No. That was not my ruling. You should understand this as well. If you have something on which she makes a statement that is different than what she had said, that's one thing. But you can't increase her knowledge of something through the use of hearsay. You are absolutely right as to what the standard one considers this evidence would be. But there is no indicia of that.

MR. WHITE: We would suggest that the reliability is certainly more than her testimony would be here today given the fact she was severely injured.

THE COURT: I'm not going to allow it. The objection is sustained.

MR. GEARY: 14 and 15 for the appellate record?

THE COURT: Yes.

(In Open Court.)

MR. WHITE: If I can have a moment with Mr. Geary, please?

THE COURT: Sure.

(Counsel conferring.)

MR. WHITE: We have no further questions of Detective Dalton.

2926

THE COURT: All right. Mr. McGarvey?

DIRECT EXAMINATION

BY MR. McGARVEY:

Q    With respect to that same interview you

47a

conducted with Priscilla Greene back on January 28th, do you recall asking her about the Douglas Moody killing?

A    Yes, sir, I do.

Q    All right.  If you would refer to page three of the transcript of that interview?

A    Yes, sir.

Q    About three-quarters of the way down, question by Detective Blaylock:  "You saw "J.R." stab him."  Greene:  "He had the knife."  You asked her what type of knife.  She said, "We left and went around the corner.  He was the only one left around there."  You asked her once again, "What type of knife was it?"  She replied "I don't know."  Is that correct?

A    That's correct.

Q    She did not know what type of knife it was.

A    That's her response.

Q    Do you recall after the murder of Peyton Maurice Johnson going to interview Stanley Smithers?

A    Yes, sir.

Q    And did you come in contact with someone you

2927

later found out to be Stanley Smithers?

A    That's correct.

Q    At the time you first tried to interview him, did he give you his correct name?

A    No, sir, he did not.

        MR. McGARVEY:  Thank you, sir.  That's all I have.

        THE COURT:  Mr. Baugh?

            DIRECT EXAMINATION

BY MR. BAUGH:

Q    Detective Dalton, as part of your duties for the Richmond Bureau of Police, were you assigned any part of the investigation concerning the death of Kareem A. Hakim, also known as Douglas Moody?

A    Yes, sir, I was the investigator.

Q    As a consequence of your investigation, did you meet a Ms. Gina Taylor?

A    Yes, sir, I did.

Q    Additionally, did you interview other witnesses?

A    Yes, sir, I did.

Q    As a consequence of your conversations with witnesses, did you identify an initial suspect?

A    Yes, sir, I did.

Q    Am I correct that that initial suspect was a

2928

gentleman known as Mr. Keith Barley or Barkley?

A    Keith Barley, B-A-R-L-E-Y.

Q    And Mr. Barley is a juvenile?

A    That's correct.

Q    Kind of a short little juvenile?

A    I recall him being sort of tall and lanky.  Not

48a

over six foot or anything, a small-featured type person.

Q   Did you get a physical description of him?

A   Yes, sir.

Q   All right.  Did you put it in your notes?

A   I'm sure I put it in there if I got one.

Q   We will come back to that, if I might.

Now, when you identified Keith Barley, was that predicated in part upon statements given to you by Gina Taylor and statements given to you by Mr. Moody's mother, Ms. Catherine Wallington?

A   Keith Barley came into the picture through Ms. Wallington.  Ms. Taylor did not know anybody by names or descriptions.

Q   All right.  The description of the person that you were looking for given to you by Ms. Taylor, was that person described as the smaller black male in the dark clothing who was on top of the victim?

A   Yes, sir.

2929

Q   And you know, of course, that Mr. Moody, as per the autopsy reports, the decedent was only five-foot-six.

A   Yes, sir.

Q   Based on that, did you get the impression that the assailant was smaller, either in weight or height, than the victim?

A   I don't recall whether there were two parties involved or just the two, the victim and the suspect.  I would have to review my notes.

Q   Please take your time.  I'll refer you to your first page of your handwritten notes.  Excuse me, if I might.  "She then observed two males out of her window facing the alley.  Both were on the ground and the smaller black male in dark clothing was on top of the victim."

A   That would be the accurate statement she gave me that date.

Q   So based on that, am I correct in assuming that she only saw two people, one the victim, one the assailant?

A   Yes, sir.

Q   All right.  Now, did Ms. Wallington give you information that led you to identify Keith as the suspect?

2930

A   Yes, sir.

Q   And in her statement that she gave that led or contributed to your identifying Keith, did she tell you that someone named Keith had been by the house two hours before her son was killed looking for the victim?

A   Yes, sir.

Q   All right.  Did she also give you information,

other information, concerning Keith coming by the house earlier?  Referring to page three of your notes.

A    Which paragraph?

Q    Let me put it this way.  Without knowing the truth or falsity of her statement, did you receive information that someone, or friends of Keith, had kicked the door in while armed with machine guns?

A    Yes, sir.

Q    All right.

MR. VICK:  I would just note that Mr. Baugh has Detective Dalton on direct and not cross.

MR. BAUGH:  I have him on cross.

THE COURT:  Go ahead and ask your questions.  Finish up.

BY MR. BAUGH:

Q    I'm sorry, without knowing the truth or falsity, did she tell you that some friends of this young man named Keith had been to her house several weeks before armed with machine guns?

A    The way I have it written, "Approximately a week ago she came home to find the front door open.  Later a neighbor told her it was some friends of Keith that kicked in the door while armed with machine guns."

Q    Of course you didn't know if that was truthful or not?

A    No, sir.

Q    Additionally, did you receive information that her son had been hiding under a house next-door all that day?

A    Yes, sir.

Q    And that he was hiding out of concern for someone named Maurice?

A    That's correct.

Q    And that Maurice thinks that the victim had killed Maurice's brother a year earlier?

A    That's correct.

Q    Now, am I correct also then that Keith was cleared as a suspect or removed from the category of suspect because approximately two weeks later, Ms. Priscilla Greene, also known as "Pepsi" Greene, said she saw James Roane stab the man?

A    That's correct.

Q    Now, when Ms. Priscilla Greene told you that James Roane killed Douglas Moody and stabbed him, did you take a picture of James Roane back to Gina Taylor and ask her "Does this look like the person that killed Douglas Moody?"

A    I don't recall anything like that.

Q    All right.  So then am I correct that based on your recollection, without further reference to Gina Taylor, the eyewitness, the word of Priscilla Greene

cleared Keith Barley as a suspect?

A    Yes, sir.

MR. BAUGH:  Thank you.  Pass the witness. No further questions.

THE COURT:  Mr. Wagner, do you have any questions?

MR. WAGNER:  No questions, Your Honor.

THE COURT:  All right.  Government?

CROSS-EXAMINATION

BY MR. PARCELL:

Q    Detective Dalton, when you talked to Ms. Greene about the knife, you asked what type of knife it was; is that correct?

A    That's correct.

Q    You didn't ask her to physically describe the knife, did you?

A    No, sir.

Q    You indicated that you eliminated Keith Barley as a suspect.  When you talked to Wallington, she never saw Keith at her house, did she?  Everything she knew was something told  --

MR. BAUGH:  Objection.

THE COURT:  Ask one question at a time.

BY MR. PARCELL:

Q    When she related to you the incident about people coming by for Keith with machine guns, she didn't see that herself; that's what somebody told her?

A    I believe so.

Q    Do you want to confirm with your notes?

A    You are talking about the time the door was kicked in by friends?

Q    Yes, sir.

A    That's second-hand information she received from a neighbor.

Q    In regards to Maurice looking for Doug, that's not Peyton Maurice Johnson, is it?

MR. BAUGH:  Objection, unless there is a basis for his knowing.

THE WITNESS:  The only thing I have is the "Maurice."  Never were able to identify the exact Maurice.

BY MR. PARCELL:

Q    Never able to confirm that it was Peyton Maurice Johnson?

A    No, sir.

Q    Gina Taylor told you she did not identify or physically describe anyone in relation to the other person she saw in the alleyway with "Little Doug" Moody; is that correct?

A    That's correct.

Q    In fact, she didn't tell you she even saw him

stabbing anyone.  She said she saw someone over top of the body; is that also correct?

A    That's correct.

MR. PARCELL:  No further questions.

MR. WHITE:  May I have a minute with Mr. Baugh, please?

THE COURT:  Go ahead.

(Counsel conferring.)

REDIRECT EXAMINATION

BY MR. BAUGH:

Q    The information that someone named Keith came by the house two hours before the killing, Ms. Wallington told you that of her own knowledge; am I correct?

A    Yes.  That's correct.

Q    And she indicated by that statement that she had seen this person, Keith, when he came by?

A    That's correct.  As far as I can tell from my notes.

MR. BAUGH:  Thank you, sir.

THE COURT:  All right, sir.  You may stand down.

(Witness stood aside.)

MR. WHITE:  Defendant Tipton rests.

MR. McGARVEY:  Defendant Johnson as well rests.

MR. BAUGH:  James Henry Roane, Jr. would rest.

MR. WAGNER:  Defendant Reavis would rest.

THE COURT:  Any rebuttal from the government?

MR. VICK:  No rebuttal, Your Honor.

THE COURT:  All right.  The taking of evidence has been concluded on the merits portion of the trial.  And what will happen for the rest of today is as follows:  Right now I'm going to let you all go out to the jury room.  We will be involved in instructions conference.  That's when the lawyers and I get together and I decide what instructions on the law will be given to you.  They will know and I will know when we come back in here.  At that time, the parties will then commence closing arguments.  The government will go first, the defendants will each individually follow with closing arguments, and then the government will have an opportunity for what's called rebuttal.  After that, I would instruct you in the law.  And when that is concluded, the jury would be released to begin its deliberations.

Let me say this by way of explanation to the alternates so you will understand what your role will be in this process as we go along.  When I complete my instructions and send the jury out to begin its

deliberations on the merits, the alternates will be temporarily excused.  You all will not go in to deliberate with the rest of the jury.  If indeed we proceed to a second stage of this trial, and that's definitely not a given, you all still have it to decide and deliberate on that point.  If it proceeds to a second stage, then the alternates will come back and we will call you.  We will bring you back, you will sit and hear the second phase of the trial as well, and you will be with us until the end, when I send them out to deliberate on sentencing, if that becomes necessary.  And we would let you know.

Obviously, the reason we do this, of course, is that just in case, God forbid, something was to happen to some member of the jury, illness or something, we would still have an alternate available.  You all have heard all of the case and you will hear all of the sentencing phase if it becomes necessary.  So you know what your roles will be.

All right, everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

MR. GEARY:  I'd like to offer the appellate exhibit from Detective Dalton.

THE COURT:  Oh, sure.  Mr. Marshal, would you remove the defendants?

MR. McGARVEY:  On behalf of defendant Johnson, we would join in the motions as expressed at the bench and also join in with respect to the appellate exhibit.

MR. BAUGH:  Before you take the defendants, we have to waive their appearance even for the instruction conference.

THE COURT:  I thought they had been waived for all purposes.

MR. BAUGH:  That's been continued.  Okay, fine, Your Honor.

(Defendants removed from courtroom.)

MR. BAUGH:  Do you want us to renew our motions at this time or do it after we find out what the instructions look like?

THE COURT:  Let's do that after we have the conference.  If you all will come down in 10 or 15 minutes to my chambers, stuff is being copied now, it might be ready.  But give me ten minutes at least.

(Recess taken from 10:30 a.m. to 10:40 a.m.)

(In Chambers.)

MR. BAUGH:  Might I suggest we take these and go back and discuss them before we start the conference?

THE COURT:  These are, I think -- I don't

think we will have too much controversy about any of these. But I think it would save time. Go look through them, note the ones that you have got a problem with, and that will save us some time. Give us again 10 or 15 minutes. That should be enough. Really, these aren't, but for a couple that will require some explanation from me, they aren't much different from what we would normally do in a drug case. Go take a look at them and then come back.

(Recess taken from 10:43 a.m. to 11:00 a.m.)

MR. VICK: The government has no problem whatsoever with the instructions. I had no problem with my supplemental instruction about leading questions in Grand Jury not being included, but if it is argued in the defendant's case, I do think it would then be proper to include that instruction.

THE COURT: All right.

MR. BAUGH: As to 21, Your Honor, a couple of objections. Number 21 is the statute defining offense and elements, instruction number 21. Our problem, Your Honor, is that I guess it is primarily with the second element. This instruction does not indicate that the killing must occur in furtherance of. The first one indicates that the defendant was engaged or working in furtherance and that while engaged he killed someone. It is our reading of 848 that the killing must be performed in furtherance of the illegal activity. It can't just be some other purpose while he is engaged in activity in furtherance of the illegal activity. Additionally, as to paragraph three, that the killing must actually result, there must be nexus language there as well.

THE COURT: I don't see the need for that.

MR. COOLEY: As to killing while he is engaged in the Continuing Criminal Enterprise, that would fall under the language that you have in this instruction.

MR. VICK: And the case law on that specifically addresses that and indicates that indeed they have not rendered -- that the statute is written just the way the Judge has it and that there has been no decision rendered. Indeed, that could be the case as we argued on the 1959 language.

THE COURT: I don't have a problem with the language the way it is. Your objection will be noted.

MR. WHITE: On behalf of Tipton.

MR. McGARVEY: Johnson as well.

THE COURT: All right.

MR. BAUGH: As to instruction 37, Your Honor, it has to do with actual or exact amount of controlled substance need not be proven. As to the

conspiracy count, they do have to prove the amount.

MR. McGARVEY: As it applies to 32 and 33, it is fine. As it applies to the conspiracy --

MR. COOLEY: After the word "case," probably ought to insert "as to Counts Thirty-two and Thirty-three."

MR. VICK: Actually, I don't think that's the case, either, but then I think we would need a special verdict.

THE COURT: No, I think that's worthy. I'll put that in. "Relating to Counts Thirty-two and Thirty-three."

Anything else?

MR. GEARY: In regard to the verdict forms, are you going to have verdict forms for each defendant, each count?

THE COURT: Each defendant, each count. We will get to that in a minute.

MR. GEARY: Could I ask you about time for closing?

MR. BAUGH: I don't think we have any objections.

THE COURT: Any other objections as to the instructions?

MR. GEARY: No.

THE COURT: All right. Do you all have any additional instructions you want to offer?

MR. BAUGH: Yes, we would submit and group the entire PITERA package.

THE COURT: Obviously, I've already been through that. If I was going to put some of that in, I already did.

MR. BAUGH: We are just preserving the record, that's all. Some of these we have trouble with. Now we need some game plan on how we are going to do it today. How long do you want to go today?

MR. GEARY: How long do we get to talk?

THE COURT: I would like to finish the closings today. And depending on what time we get through, I will instruct. If it is, you know, if it is late, I'll wait until tomorrow morning.

MR. BAUGH: What do you call "late," if I could be so pushy?

THE COURT: If they sit all afternoon -- let me tell you, I have the lunch coming for the jury at 11:45. So I want to let them have their lunch and then we will get started so we won't have any interruption for lunch. So I would think we would be getting started at, let's say, 12:45 with the closings.

MR. BAUGH: That will take us to 4:30 easily.

MR. WHITE: That will probably take us past five.

THE COURT: All right. Well, I don't see any necessity for putting time restraints on you. I didn't do it in the opening and I don't see any need for it now. The way I look at it, you know, it will probably be about like it was in opening. The government will take a fairly lengthy time in its first opening, and then you all will follow with your 30 to 40-minute responses.

MR. BAUGH: I think it will be a little bit longer than that.

THE COURT: I was about to say "giving Mr. Baugh an hour."

MR. BAUGH: I object to the laughter in the room.

THE COURT: So that will probably get us into the afternoon. If we were lucky and got through around four or something like that, I might take a brief break and then instruct them. If it is after five, I will bring them back, because they will be as tired as I am listening.

MR. BAUGH: Yes. That's true.

MR. VICK: We are taking two complete days off between, let's say, if the jury verdict comes back, just for purposes of figuring out what we are doing, say, 1 o'clock tomorrow afternoon on this portion and let's say we need a second phase, will we then begin the second phase Friday morning?

THE COURT: Yes. I was about to say, with the volume of evidence I'm going to have them set that video equipment up in the jury room. These people are conscientious. I would be very surprised if they would have a verdict by 1 o'clock tomorrow afternoon, especially if I instruct in the morning.

MR. VICK: I understand. Or at any point tomorrow?

THE COURT: Wednesday and Thursday would be off. And then we would get started on Friday.

MR. VICK: So if we go into Wednesday for a jury verdict, we are looking to start with the second case on Monday?

THE COURT: Right.

MR. WHITE: Will you give them the instructions to take back into the jury room?

THE COURT: Absolutely.

MR. GEARY: Excellent.

MR. BAUGH: And the indictment as usual.

MR. WAGNER: I would object to the instructions.

THE COURT: The instructions are going to go. Objection noted.

MR. HENDERSON:  During the trial, Mr. Vick made a motion to amend the indictment.  I don't know if the Court ever ruled on that.

2945

THE COURT:  Well, I'm going to grant it.  In fact, I've taken out Count Thirty-two.  I took out the more than 50 grams, and I will read that as a mixture of a substance.

MR. WHITE:  It is still in there.

THE COURT:  It is in yours.  I've taken it out.  You can strike it out in yours.

MR. BAUGH:  Even though we haven't argued this officially, is Torrick Brown and Martha McCoy going to the jury or not; can you tell us that?  Now we are in a new posture.

THE COURT:  I know we are.  You can make your arguments, but it is going to go to the jury.  In fact, I think probably the best policy, once we get through here, we will go back upstairs, bring your people out, let you all make your arguments, and they will be ruled on and then we will stop.  The verdict forms, I need to go through this.  I have one for each of you.  Cory Johnson.  And Sandra Reavis.  And this one is Tipton.

All right.  Just kind of going through, I guess I'll use Tipton in this example.  I have Count One, you know, just the standard.  Going to Count Two, and it should be on all the forms that anybody has anything to do with Count Two, I am first going to

2946

have the jury answer the question "Do you find that the government has proven beyond a reasonable doubt a Continuing Criminal Enterprise existed as charged in the indictment?"  Yes, no.  Then "If you have indicated above that a Continuing Criminal Enterprise did not exist, you must find the defendant Richard Tipton not guilty as to Count Two.  If you indicated that a Continuing Criminal Enterprise did exist you must now determine whether defendant, Richard Tipton, is guilty or not guilty."  As we go on, each one of the death penalty counts, there is a parenthetical that will follow it, follow the recitation of the count.

"If you indicated in response to the question set forth in Count Two that a Continuing Criminal Enterprise did not exist, you must find the defendant not guilty as to this count."  And that recurs.  Look through your forms  --

MR. BAUGH:  I have a question.  Number two, and only because Mr. Vick argued this under Rule 29, is it the position of the Court that if, say for instance, Mr. Tipton was running a Continuing Criminal Enterprise and our clients, the other clients do not have at least five or more people with

whom they whatever, that these defendants can still

be -- our clients can still be found guilty because they were in some kind of way helping another defendant's CCE?

THE COURT: Yes. If they find the Continuing Criminal Enterprise --

MR. BAUGH: At least five or more.

THE COURT: Let's say Tipton is running a Continuing Criminal Enterprise. On each one of the death penalty counts they can decide that a defendant killed in furtherance of that Continuing Criminal Enterprise. Okay?

MR. BAUGH: The problem I have there is that each -- is that the defendant, Roane, need not commit a murder while he has at least five -- okay, we will use the term "kingpin" which is not a word of art.

THE COURT: He doesn't have to be a kingpin to be guilty of the death penalty statute.

MR. WHITE: As your verdict forms show, unless the jury finds that there was a CCE, none of the death penalty statutes kick in.

THE COURT: That's right. No Continuing Criminal Enterprise.

MR. VICK: It need not even be any four of these people charged in this indictment. They could

find, for example, that "Light" ran a Continuing Criminal Enterprise.

THE COURT: The question is, was there a Continuing Criminal Enterprise.

MR. GEARY: How about Noriega?

MR. BAUGH: Don't you guys start that.

MR. COOLEY: Can we note our objection to that ruling?

THE COURT: Objections are noted.

MR. BAUGH: The other issue, Your Honor, is not pertaining to instructions. Do you want to say something?

MR. COOLEY: No.

MR. BAUGH: The problem is this, Your Honor: Yesterday, there was an extremely prejudicial drawing and article in the newspaper.

THE COURT: I thought it was just wonderful.

MR. BAUGH: There were some statements made in the paper, particularly concerning the death of Katrina Rozier. The government has told us under the table several times, that Katrina Rozier was allegedly killed while performing an unnatural sex act on one of the defendants. We have always taken exception to that, but it never came out in

evidence.  But it is in the article.  Which means that she died on her knees.  That flies in the face of a number of things, which means that there is information going to the papers outside of the record.

THE COURT:  No, this information about her dying on her knees, maybe I read it in something.

MR. BAUGH:  You read it in the paper.

THE COURT:  No, it didn't strike me as new news.

MR. COOLEY:  That's one of the Greenes in the opening statement was told to get on her knees.

THE COURT:  Oh.

MR. BAUGH:  Information is being given to the press outside of the evidence presented in trial.  For that reason, Your Honor, we have some concerns about sequestration of the jury.  That article coming when it did, with extra information, is bad.

THE COURT:  Let me tell you what I planned along those lines.  I had no plans to sequester them at this point.  I've been thinking very seriously -- in fact I have the Marshals on alert and we have the hotel space -- about putting them up once they start to deliberate after the sentencing phase.  A couple of these people have young children.  If I saw the necessity, and I understand your concern, but that doesn't drive me to just immediately put these people in sequestration.  They have been diligent and I think they are following my directions as best they can.  But I do think I may want to remove them from the pressure at the sentencing phase.

MR. COOLEY:  I have an objection to doing it at the sentencing phase, but would make a request it be done now.

MR. BAUGH:  It was a bad article.

MR. McGARVEY:  If Mr. Baugh's motion was that on behalf of defendant Johnson, we would join in that position and object to the Court's ruling.

THE COURT:  All right.  Well, your objection is noted.  We will close them out today, and I will continue to emphasize.  They will get back in and deliberate.

MR. McGARVEY:  Can I bring up a relatively minor issue?  We talked about the phone records the other day and the Court order that they be redacted.  I haven't seen them.

THE COURT:  Have you all done that?

MR. VICK:  I don't know.  I have not personally done that.  We will make sure it is done.

THE COURT:  Before anything goes back, make sure.

MR. BAUGH: You have Mr. Fleming's report.

MR. COOLEY: That was done this morning.

THE COURT: As always, check everything.

MR. VICK: I'll to say it out for what it's worth. Would the Court entertain at least asking the jury if we get to the second phase whether they would want to go Saturday to get this moving?

THE COURT: No. I'm satisfied with the way we are moving along.

MR. PARCELL: Are you talking about redacting the identification of those numbers?

MR. McGARVEY: Yes.

MR. VICK: Like "C.O.'s" boyfriend.

MR. WHITE: Motions made on behalf of Mr. Baugh, we adopt the motions.

(Chambers conference ended at 11:15 a.m.)

(In Open Court - 11:25 a.m.)

THE COURT: All right. Defendants, do you care to renew your motions?

MR. GEARY: We renew motion for judgment of acquittal made on January 28th. There are now 26 counts against him and we would urge, for the same reasons we did on the 28th, and because of the

2952

heightened burden of proof at this point, for the Court to dismiss those charges.

THE COURT: All right. Mr. Cooley?

MR. COOLEY: Your Honor, on behalf of defendant Cory Johnson, we would renew the arguments and the issues raised in our motion pursuant to Rule 29 made on the 28th of this month. We would reiterate and adopt those arguments as made at that time.

THE COURT: All right. Mr. Baugh?

MR. BAUGH: Your Honor, on behalf of defendant James Roane, we would reurge our motions on the Rule 29. We would also adopt the arguments and motions of co-counsel. Particularly as to Torrick Brown, however, in light of the position put forward by the United States as to James Roane, not to the other defendants, but as to James Roane, we would submit that while the logic of the United States may pertain to people who may have gone along on that homicide for some reason, that the authorities cited by the Court, the Illinois case, that the defendant, James Roane still, we would submit, even with the inferences, that the killing of Torrick Brown shouldn't go to the jury as to defendant James Roane. The rationale put forward for other people

2953

being involved would not apply to Mr. Roane, and as such, it should not go. Also, we renew our objections previously made.

THE COURT: All right. Mr. Wagner?

MR. WAGNER: Thank you, Your Honor. Ms. Reavis would also renew her Rule 29 motion. We renew based on the argument presented at the close of the government's case. In addition to that, on the letter received into evidence from James Roane to Sandra Reavis and the testimony of Mr. Rodney Tucker. Because of the heightened burden at this stage, we would ask the Court to grant that motion.

THE COURT: All right.

MR. VICK: Does the Court care for a response?

THE COURT: No, we don't need a response. The motions will be denied.

MR. WHITE: One last thing, if we could. There was one remaining issue regarding a piece of evidence, telephone records. On behalf of defendant Tipton, Your Honor, we are objecting to the use of any subscribers' names in these telephone records. I believe the Trenton Police Department was one which was brought out on direct. I don't know if the Court wants to allow that in. Any other civilian, individual, or person whose name appears on those records, we would ask that they be redacted.

THE COURT: I thought they were going to be redacted.

MR. VICK: In there are the notation "'O's' girlfriend." We will redact all of that. The other subscriber information is telephone company subscriber information as to particular names of people who had that telephone number. It is innocuous. It won't tell the jury anything.

MR. WHITE: Innocuousness, like beauty, is in the eye of the beholder. There are references to "Whitey's" grandmother.

MR. VICK: Anything like that that is an editorial comment, "'O's' girlfriend," '"Whitey's grandmother," will be out.

THE COURT: Get the redaction done and get it to me and I'll look at it. I'm going to bring the jury in and tell them what we are going to do.

(The jury entered the courtroom.)

All right, ladies and gentlemen, we have completed our instructions conference and the case is now in a posture where both sides are ready to argue. What I have decided to do is this, because I don't want the arguments broken up. I have ordered lunch for you, and they tell me it will be here at quarter to 12, somewhere in that range. I'm going to recess you now, let you all have lunch, and bring everybody back. Let's say 1 o'clock. At that point we will get started, and for the rest of the afternoon we will be hearing arguments. I just

61a

didn't want to have to break it up with lunch.  So we will let you eat first.  So let me release you now. And let me say this:  If you all want to take a walk or whatever, you don't have to be confined to the room during this period.  The lunch will come in, and if you want to take a walk or do whatever, that's fine, as long as you are back in time to start at 1 o'clock.  You will notice as we go on, we will become a little bit more restrictive.  You won't be allowed to come and go.  I will feed you where you are and that kind of thing.  But today, I think it will be all right if you want to take a walk or something.  1 o'clock.  Your lunch will be there by, hopefully, between a quarter of 12 and 12.

        (The jury left the courtroom.)

        All right, remove the defendants.

        (Defendants removed from courtroom.)

        Mr. Vick, after we get started in the argument, at some point in the afternoon I think we need to get

2956

the video set up in the jury room.  You can either use ours or  --

            MR. VICK:  We have the signal TV here that plays  --  if the Court thinks a single TV is enough, that plays the videotape correctly.

            THE COURT:  That's fine.  As I say, we have smaller equipment than that as well.  Just so it is set up.

        All right, 1 o'clock for arguments.

        (Luncheon recess taken from 11:35 a.m. to 1:00 p.m.)

            MR. VICK:  Your Honor, I believe Government Exhibit 149, the telephone toll records summary, has been redacted to everyone's satisfaction.

            THE COURT:  All right, fine.  Let's bring in the jury, please.

        (The jury entered the courtroom.)

All right, Mr. Vick?

## Vick Closing (2956)

            MR. VICK:  Thank you, Your Honor.  Good afternoon, ladies and gentlemen.  As you know from the Judge, this is the government's opportunity to give its closing statement.  Closing statement is intended much like opening statement, to give you an outline of what we feel the evidence has shown and to give us an opportunity to argue to you what we

2957

believe, what inferences we believe you should draw from the evidence that has been presented to you from the witness stand.  Remind yourself as we stated in opening that evidence is just that.  It is what has come to you from the witness stand.  It is not what I

say, it is not what any defense counsel says.  It is not what any argument that has gone on in the courtroom is.  It is what has come from that witness stand.

And the purpose of my closing is to recount for you the evidence that has come before you in the last several weeks from that witness stand, and to summarize it in a fashion that I hope will allow you to go back to the jury room and make it easier for you to render your verdict.

But first I'd like to thank you.  I'd like to thank you on behalf of all the lawyers involved.  Your attention over the last few weeks has been admirable.  We know we have taxed you at times.  We know that the process of getting to this point is indeed a frustrating process to you people at some points.  It is a very important chore that you are doing.  We apologize if indeed at certain times it seems like we have stood in the way of that chore.  But believe me, we are all trying to do our job and make it for you most possible to render the right jury verdict.

I told you at the beginning of this trial that the fact that this was a death penalty case would permeate the entire process.  And I'm sure for you, just like for everyone else in this case, that fact has permeated the entire process.  It would be humanly impossible for you to sit there and listen to the evidence that we have put on and think about that evidence and not to be considering the fact that we are seeking to put to death certain defendants in this courtroom.

But as I told you in opening, I'll remind you again now.  Now is the time that you must put that aside.  The fact that we are going to ask you to put to death certain defendants based upon their conduct need be set aside at this point.  As you know from the voir dire and as you know from the Court's instructions to you, this is a bifurcated trial process.  We are now entering into your decision-making process on the guilt phase alone.  That is, are these defendants guilty as charged in the indictment.  And until you render verdicts of guilty against these defendants on the particular capital counts involved in the indictment, you need not even worry about what the possible punishment should be.  So put that aside to the extent that you can and concentrate only on the evidence and whether the evidence is sufficient to allow you to find each and every one of these defendants guilty.  Is the evidence sufficient to prove to you beyond a reasonable doubt that each one of these defendants is

guilty as charged in the indictment.

I submit to you, ladies and gentlemen, that based upon the evidence that's been put forth from that witness stand over the last several weeks, that indeed your decision should be a fairly simple one as to the guilt of each one of the defendants. I don't suggest to you that that will make your job easy. I don't suggest to you that that makes your job less than important. I just suggest to you that the government has proven, well beyond any reasonable doubt -- again we don't have to prove it beyond all doubt, but beyond any reasonable doubt -- that these men and that woman are guilty as charged

Once you have found that, then we will go on to the second phase. But for this portion, ladies and gentlemen, remember that you must find only that the defendants have been proven beyond a reasonable doubt to be guilty of the crimes charged in the

indictment.

I suggest to you that the evidence has been clear and unequivocal. That Richard Tipton, also known as "Whitey," is a ruthless murderer; that Cory Johnson, also known as "C.O.," is a ruthless murderer; that James Roane, also known as "J.R.," is a ruthless murderer. That 11 people lie dead in the streets of Richmond, Virginia because those men with others, including "V," wanted to make themselves rich selling drugs, wanted to protect their drug business. 11 bodies bled on the streets of Richmond, Virginia because of those men and their actions. I suggest to you also, ladies and gentlemen, that as to Count One of the indictment, the conspiracy count, that those gentlemen haven't truly argued to you, in either opening or in the questions presented to witnesses during the trial, that they are not guilty of Count One. They have implicitly conceded that indeed they have sold drugs, that indeed they sold drugs together. Count One in this case has been implicitly conceded by defendants James Roane, Cory Johnson --

MR. BAUGH: I must object on that issue.

THE COURT: Objection overruled. This is argument, Mr. Baugh.

MR. BAUGH: Note our exception.

MR. VICK: What you must find to find that they are guilty of conspiracy is very simple. The Court will instruct you as to what the law is. What I say is the law, what any one of these counsel says is the law, is not necessarily what the law is. What the Court instructs you that the law is is what the law is. What the Court tells you is the law is the law that you must follow. I will tell you that the

Court will instruct you that the law as to conspiracy is fairly simple.  That is, ladies and gentlemen, if two people come together and agree to commit a crime together, if two people come together and agree to sell drugs together, they have indeed committed the crime of conspiracy.  And I suggest to you that through opening and through the questioning of the witnesses that have been put on in this case, there can be no great issue as to the guilt of James Roane, Richard Tipton, and Cory Johnson as to Count One of the indictment, the conspiracy count.  Each of them has admitted tacitly, if not implicitly, that they sold drugs.  Each of them have admitted tacitly, if not implicitly, that they were together often.  Each of them has admitted tacitly, if not implicitly, that they sold those drugs together in concert one with

2962

each other.  So I suggest to you that your verdict as to Count One is a fairly simple verdict to render as to those three gentlemen.  They indeed conspired.  That is, they agreed, very simply, with each other to sell crack cocaine.

Remind yourself in rendering your decision on Count One of the testimony of Greg Scott.  He told you from the witness stand about the existence of the New York Boyz, a group of people who grew up at 155th and Amsterdam Avenue -- and others who joined them -- but a group of people who grew up at 155th and Amsterdam Avenue in New York decided in 1989 to go to New Jersey and sell drugs.  Included in that group was "Whitey" and "C.O."  That because of a string of events that occurred in Trenton, New Jersey, a number of the New York Boyz got arrested.  And unfortunately for the people of the City of Richmond, and particularly unfortunately for the 11 people who died as a result of their actions, Richard Tipton chose to bring some of the New York Boyz south.  He brought with him Cory Johnson, "C.O.," Lance Thomas, "V," "Hess" came south with him.  Paul, the Jamaican from Blackwell, came south with him.  And the New York Boyz continued their actions here in the City of Richmond.

2963

The question you need to render as to James Roane is whether indeed he chose to join that conspiracy and the New York Boyz here in the City of Richmond.  And indeed, the evidence was clear and unequivocal that he did choose to join that conspiracy.  The question as to Sandra Reavis is whether indeed she chose to join that conspiracy.  Now, you will be instructed by the Court that to find someone guilty of a conspiracy, to find someone guilty of joining that conspiracy, you must have the mental agreement, that is, the agreement to join

together in crime.  But that mental agreement must result only in one small transaction.  A single event is enough to make one guilty of the conspiracy.  So you need not find that each one of these defendants joined in each one of the conspiratorial acts in order to find them guilty of Count One, the conspiracy.  You need not find that Sandra Reavis joined in each and every one of the murderous acts of this conspiracy in order to find her guilty of Count One.  You need only to find that she agreed to help these people sell drugs, and that she indeed did help these people in some way.

When you receive a copy of the indictment in the jury room, you will see that the trial has proceeded in about the same fashion as the indictment is drawn.  So I'll outline the specific evidence as to each count through my closing, and hopefully to aid you when you go back in the jury room to deliberate as to your rendering of the verdict on each particular count.

First, however, I would like to digress for a bit.  In opening and throughout the questioning in this case, counsel for the defendants have openly attacked, at times in an inappropriate and personal manner, the government's witnesses.  Remind yourselves, ladies and gentlemen, of Mr. Baugh's calling Dennis Moody a lying little man, an inappropriate and personal attack upon Dennis Moody.  That same sort of personal attack was done again against Johnny Lee Byrd and a number of the other government witnesses in this case.

Some of our witnesses unfortunately let these personal attacks affect them and responded in kind in their responses to defense counsel.  Perhaps they should have been a bit more thick-skinned, but I think any of you who sat here and saw those personal attacks would know that they were calculated to elicit just such a response.  They were calculated to get the people on the witness stand mad, and

hopefully get the sort of responses that Johnny Lee Byrd and Dennis Moody gave to defense counsel.  That does not mean that those people weren't telling the truth.  It just means that perhaps they weren't as thick-skinned as they should have been.

It has been implied throughout this trial, and indeed was stated openly in opening, that the witnesses of the sort the government has put on cannot be believed, and that therefore, your jury verdict shouldn't be rendered guilty based upon their testimony.

I suggest to you, ladies and gentlemen, that that is preposterous.  There is no way, absolutely no

way that you can look inside the inner workings of a criminal conspiracy and fully outline for the fact finders, fully outline for the jury, what is going on inside that criminal conspiracy without receiving the testimony from participants in that criminal conspiracy. It is necessary. Conspiracies, by their very nature, are secretive. They don't invite Detective Ralph Fleming in to see what they are doing. They don't invite Detective C.T. Woody or anyone of the other detectives that you have heard testify here in to see what is going on inside that conspiracy. They keep a dark veil over their

actions. And that dark veil can only be peeled back through the testimony of the participants in the conspiracy. So the suggestion in opening and the implicit suggestion throughout the questioning of our witnesses that somehow this case cannot be proven with testimony of participants is wrong.

Now the Court will instruct you that you must look very closely at such testimony. You must scrutinize very closely testimony from witnesses of that sort. And we invite that, too. As I said in opening, and as I say again, I suggest to you that if you indeed scrutinize the testimony of the witnesses who have come forth for the government, you will see that they have told you the truth.

I remind you what I said in opening. Take their testimony and watch how it meshes one with the other. Watch how it meshes with the unimpeachable testimony from the police officers, from the custodians of the records which have been stipulated, from the other evidence that we know to be true. And I will suggest to you again that it shows that those witnesses who were participants in this conspiracy were indeed telling you the truth.

There is no evidence, ladies and gentlemen, with the exception of Hardy, Sterling Hardy and Gaiters,

that any of the people brought forth by the government and placed on this witness stand to provide evidence to you knowingly and willingly engaged in a murder. And I ask you to consider that when making your decision as to whether or not to believe the witnesses brought forth by the government.

Now, as I said in opening, you are brought here for a very simple reason; and that is to apply your common sense to the facts that you hear from that witness stand and to determine, based upon your common sense, whether those people are telling you the truth. We as lawyers tend to get caught up in things that aren't commonsensical. We as lawyers tend to look at things through somewhat jaded vision

sometimes. But apply your common sense to each and every witness that took that stand and say were they telling me the truth? Even though they are criminal participants, many of them, were they telling me the truth? And I suggest to you that when you do that, you will find that they were telling you the truth, that they are not murderers. That the government has indeed cut deals, as you will hear from the defense attorneys, for their testimony; that the government indeed has told these people that the words that they

give to you from that witness stand will not be used to prosecute them, with the exception of Hardy and Gaiters, who were knowingly involved in murders by their own testimony, who are facing sentencing in this Court, by this Judge, for their involvement in those murders. Ladies and gentlemen, again I remind you, you cannot penetrate a conspiracy without some of the participants in the conspiracy cooperating with you. It is not an exact science. Use-immunity agreements had to be given. We feel like we gave use-immunity agreements to only those people who were not murderers in this case. There has been no evidence that anyone other than Richard Tipton, Cory Johnson, James Roane, Lance Thomas, Sterling Hardy, and Jerry Gaiters were involved in the murders.

Ask yourself again to apply your common sense to the giving of use-immunity to these witnesses. We have told these witnesses that if you come in and if you tell us the truth, each and every one of them predicated their testimony upon telling the truth. That's the condition upon which they received use-immunity. If you come in and if you tell us the complete truth, we won't use those words against you. Think if you were them. Think if you were sitting in their shoes what you would do. Would you

hold something back from the government knowing that the government is speaking to a number of other people who are also getting use-immunity, or would you be fearful that the other people were telling them about your involvement, that portion of the involvement that you were holding back and not telling the government about. You wouldn't do that. It makes no sense. If you are going to be given use-immunity for what you are going to testify about, it is in their best interest to tell the government each and every thing that they have done criminally. Because then they won't be prosecuted for it. To withhold that information could subject them to prosecution. And again, remember, they don't know what the others are telling us about their involvement. It is in their best interest. And I'm not suggesting to you that many of these people came

forward through some sense of magnanimous citizenship. They came forward because they cut a deal. But that deal made it in their best interest to tell the complete truth. Apply your common sense to that.

It has been openly argued that the government has bought witnesses' testimony and that each witness in turn has been told how to testify. There has been

2970

absolutely no evidence about that presented in the courtroom. Each witness has unequivocally stated that their testimony has been the result of their own participation, as a result of their own knowledge. Each witness, without exception, said that the government did not provide them with the answers to their testimony. That's proven by the nature of the testimony itself.

Again, apply your common sense to what you have heard from that witness stand. For example, look at the testimony of Sterling Hardy and Jerry Gaiters concerning the murder of Louis Johnson on January 29th, 1992. Sterling Hardy said that when the car in which James Roane was driving pulled up and "V" and "C.O." got out of the car, that all three men walked around, surrounding Louis Johnson, and all three men fired, killing him. Jerry Gaiters, on the other hand, testified that the car pulled up just as Sterling said, that all three men got out of the car, just as Sterling said, but unlike Sterling, that James Roane walked over, put a gun to Louis Johnson's head, pulled the trigger, and it misfired. He said "V" then fired a single shot into Louis Johnson, and that Cory Johnson fired the rest of the shots into Louis Johnson. Does that mean that one of those

2971

gentlemen is lying? No, it doesn't mean that one of those gentlemen is lying. Indeed, it is indicative of the truth. If we had indeed orchestrated the testimony as has been argued by counsel, don't you think we would have orchestrated such inconsistencies out? You have seen those inconsistencies from other witnesses. "Man Man," Charles Townes, testified as to the amount of cocaine coming into town on a weekly basis, which was not consistent with the testimony given by Denise Berkley as to the amount of cocaine coming into town each week. Does that mean that they are lying? No. Ask yourselves, ladies and gentlemen, if anyone of you went out of here and described what had gone on in here the last three weeks, do you really think you would describe it in exactly the same way as the person sitting next to you? I don't think so. That's human nature. Each of us sees things a little differently. It doesn't mean that Sterling Hardy was lying, but it does

indeed prove to you that we have not orchestrated the testimony. We would have orchestrated such inconsistencies out of the testimony. We have brought you our witnesses, warts and all, ladies and gentlemen. It is a necessary thing to peel back the cover of this conspiracy.

One last thought on that. Sterling was completely justified, if indeed he is wrong, as to how it happened and Gaiters is right. He is completely justified in thinking that when three men get out of a car and surround a fourth man, who they clearly want to kill, and gunfire emanates from that very location, that all three of them fired if all three of them had guns. Is that a man who is trying to lie or is that a man who is trying to recount for you what he believes happened that day?

Ladies and gentlemen, your common sense, when applied to the testimony, indeed tells you that our witnesses were telling the truth. Another interesting note about that particular piece of testimony. Mr. Baugh in his argument and in cross-examination made a great point of the fact, indeed I would say conceded, that James Roane had indeed been there and tried to fire and kill Louis Johnson, but his gun had misfired. That makes not a whit's bit of difference. If indeed that is what happened, James Roane is guilty of that murder. Do you think because his gun misfired when he intended to fire into the head of Louis Johnson that that absolves him of that murder? No, all three of those men were there with the pure and simple intent to kill Louis Johnson. If Roane's gun misfired, it does not mean that he is not guilty of that. Listen to the Court's instructions. See what the law is, and you will see that that was an attempt to mislead you as to what the law is in an effort to confuse you as to the guilt or innocence of James Roane on that particular instance.

MR. BAUGH: I must object to this. That is a personal attack and that is not what happened.

THE COURT: Overruled.

MR. VICK: It was argued, as I stated earlier, that we have bought testimony. Let me back up a second. I would suggest to you, too, ladies and gentlemen, that despite the minor inconsistencies of testimony in this case from the government's witnesses, there has been no inconsistency whatsoever concerning the crucial aspect of what this case is all about. There has been no inconsistency whatsoever concerning the involvement of these individuals, one with another, in the sale and distribution of cocaine. There has been no

inconsistency whatsoever concerning the fact that these men operated a murderous, treacherous conspiracy, laying bodies in the streets of Richmond, Virginia. Don't lose sight of that. Don't lose

sight of the forest for the trees, so to speak. Don't lose sight of the fact that it has been remarkably consistent testimony from each and every one of the witnesses concerning the overall scheme of this conspiracy.

Now, moving on, as to the argument that we bought the testimony in this case, there has only been evidence elicited from that witness stand of money given to witnesses in this case in one regard and one regard only: Money has indeed been given to certain witnesses who testified here as a necessary expense for their relocation in the Witness Protection Program.

Think about what it costs to relocate somebody. Think about what it means to take somebody from a city, put them in another city, find them an apartment and get them back on their feet, having ripped them from their place of residence. Indeed, that costs money. That's not big testimony, ladies and gentlemen. We would be an irresponsible government if we asked witnesses of the sort who came forward and testified in this case to testify against people like these and not offer them protection. Does that make them bounty hunters? No, it doesn't.

We would be an irresponsible government, ladies

and gentlemen, to expect that Martha McCoy and Montez McCoy would come forward and testify as they testified and then be patted on the behind and sent outdoors and told take care of yourself. You heard the testimony of Valerie Butler, that they wanted to go back and kill all the survivors to that shooting. We would be an irresponsible government to allow those people to stay in their place where these people could get their hands on those witnesses. Does that make Montez McCoy a bounty hunter, because we have paid for his relocation? Does that make Stanley Smithers a bounty hunter, because we have paid for his relocation? No. That simply means that we have acted responsibly as a government in order to bring forth the sort of testimony that's necessary to peel back the cover of this conspiracy.

You ultimately must decide whether such witnesses told you the truth. Again, listen to their testimony, apply your common sense, listen to how it meshes one with the other, and listen to how it meshes with the testimony from unimpeachable sources. And I suggest to you that when you do that you will render a very clear choice that indeed the witnesses

brought to you by the government were telling the truth.

2976

Now, let me talk as to the specific testimony as to each count. Count One, as I've already spoken about shortly, deals with the conspiracy to distribute more than 50 grams of crack cocaine. That is, the knowing coming together, the knowing agreement of these people and other people to get together in concert, one with the other, to aid each other in the sale and distribution of more than 50 grams of crack cocaine. I would suggest to you that there is not an issue in this case as to what the substance was. Each and every witness said it was crack cocaine, cook-'em-up, that was sold. Counsel, I would suggest again, has not argued the fact that Richard Tipton, "Whitey," Cory Johnson, "C.O.," James Roane, "J.R.," sold crack cocaine. They have not argued otherwise.

As to the 50-gram amount, ladies and gentlemen, you have heard testimony of kilograms of cocaine. I remind you of Maurice Saunders' testimony. You have heard testimony of ounce after ounce of cocaine being cooked up and sold on a weekly basis here in the City of Richmond. There is absolutely no issue concerning whether there was more than 50 grams of crack cocaine sold by these people.

Again I suggest that each one of the defendants,

2977

with the exception of Sandra Reavis, has implicitly conceded to you their guilt on Count One of the indictment. So let's concentrate for Count One of the indictment on Sandra Reavis.

You need to determine whether Sandra Reavis indeed joined the remnants of the New York Boyz when they came south and set up shop here in Richmond, Virginia, set up shop with James Roane. You need to determine whether indeed Sandra Reavis decided that she would join them in the sale of cocaine. I'll remind you of the testimony about the New York Boyz, 155th and Amsterdam Avenue, went to Trenton, and came then south through "Whitey" and set up shop in Richmond. And I'll show you how the testimony meshes in that regard, and is an example of how you should go back and weigh the testimony that you received from the witness stand and see how it meshes. Remember what Greg Scott told you about that, 155th and Amsterdam Avenue, the New York Boyz, "Whitey" and "O" got cocaine, and this is very important, "Whitey" and "O" got cocaine. Their primary source of cocaine was from a fellow named "Light." Remember that testimony? Maurice Saunders later testified he doesn't know Greg Scott from Adam. Has never met Greg Scott. But Maurice Saunders testified to you

that indeed he went to 155th and Amsterdam Avenue in New York with Hess and "Whitey" to get cocaine. And who did they get cocaine from? "Light."

Again, that clearly rings true, that testimony. It shows you that those people are telling you the truth, and the only way they wouldn't be telling you the truth is if you indeed believed that we got together and orchestrated their testimony in some way, told them how to testify. If you don't believe that, then indeed that proves their testimony to be true. How could two people testify about the same thing when they have not had an opportunity to talk to each other, don't know each other? The only way they could is if that is indeed a fact.

As to Sandra Reavis, there have been a number of witnesses who have come forward and testified to her joining that conspiracy, her joining the New York Boyz. You have heard testimony from Denise Berkley, Robert "Papoose" Davis, Valerie Butler, Jerry Gaiters, Priscilla Greene, and others that indeed said that she sold cocaine for James Roane, "Whitey," and "O." Indeed, Valerie Butler accounted to you on February 11th, 1992 that she took a packet of cocaine from "O" to Sandra Reavis and delivered it to her at Willow Lawn. Let me stop for a second and tell you, Sandra Reavis is only charged in the first count. That's all you need to determine about her, whether she indeed did join the conspiracy. She is not charged with any of the murders, only with the conspiracy count. So as to her guilt or innocence, you need only concentrate on deciding Count One of the indictment.

Later witnesses have told you that she indeed delivered a handgun to Richard Tipton. You got that testimony from the reluctant Greg Noble, who had to be led through his testimony because he didn't want to testify against his cousin, "Whitey," and you got it from Leroy Slater and Valerie Butler, that Sandra Reavis, indeed when "Whitey" came back from New York and set up shop in Blackwell, delivered him a .38. Remember, Leroy Slater said it was wrapped in plastic. Remember what Detective Rodriguez testified to you; that on April 9th, 1992 he went to that residence that "Whitey" had set up shop at and seized a .38 revolver which was wrapped in plastic. Again, it tells you Lee Roy Slater is telling you the truth, unless you think we got together and orchestrated his testimony and told him "Leroy, tell us it was wrapped in plastic." Unless you believe that, then J. Rodney Rodriguez confirms that Leroy Slater was telling you the truth about that. And ask yourselves to apply

your common sense to that testimony. Why would "Whitey" allow Sandra Reavis to bring him a .38 for use, a .38 that had a dead body on it, a .38 that had been used to kill Katrina "Nat" Rozier, unless she was one of the initiated.

Criminals do not knowingly associate with the uninitiated. Criminals, conspirators, do not allow the uninitiated to look inside their criminal empire. They would not have allowed Sandra Reavis to have the knowledge that she had unless she were a member of the conspiracy.

Remind yourself of the testimony, when rendering the verdict against Sandra Reavis, of Denise Berkley; that at the time just prior to the murder of "Mousey" Armstrong, that "O" summoned her to 1212 West Moore Street to tell her that she had problems because of the drug debt, and that she better kill "Mousey." Remind yourself of the testimony of Denise Berkley that "O" said to her, "If you don't kill 'Mousey,' Sandra is going to kill 'Mousey.'" Sandra Reavis. Excuse me, "Sandra is going to kill you." Remind yourself of that testimony, ladies and gentlemen.

And all of that testimony, the repetitive testimony about her involvement in the sale and

2981

distribution of cocaine, is proven true by a single thing. When you go back, look at the government exhibit, the Western Union wire transfers, march 5th, 1992. Money was transferred from the City of Richmond to New York City in the amount of several thousands of dollars, about $1,400 or so, to get "O" out on bond. And look at the name on those wire transfers. Look at the name, and those records are -- have been stipulated to as true and accurate. Who sent that money? Sandra Reavis sent that money. Apply your common sense to that. And it tells you that indeed she is guilty as charged in Count One.

"O" is in jail not under his real name, Cory Johnson, but in jail under his name Kevin Hill, having been caught with the Glock in his waistband that was used to kill Linwood Chiles and Curt Thorne. He was anxious to get out of jail before the ballistics tests came back on that gun. And who does he get in touch with but Valerie Butler and Sandra Reavis? Would a man in that situation get in touch with the uninitiated in an effort to get himself out before the ballistics tests came back? No. Would he contact someone other than a member of the conspiracy to help him get out of that situation? No. That single piece of evidence, ladies and gentlemen,

2982

proves to you that what all the witnesses said about Sandra Reavis was true. She is guilty of Count One of that indictment. She is guilty of providing

"Whitey" the gun that was used to kill Katrina Rozier. She is guilty of holding that gun, that gun that the conspiracy used -- we are not sure which one -- but that the conspiracy used to kill Katrina Rozier came from Sandra Reavis.

Apply your common sense and you will have no problem, I suggest to you, rendering a verdict of guilty against Sandra Reavis on Count One of the indictment.

Count Two of the indictment charges "Whitey," "C.O.," and "J.R." with operating a Continuing Criminal Enterprise. Now, the Court is going to apprise you of what the law is, but a Continuing Criminal Enterprise is also a fairly simple concept. A Continuing Criminal Enterprise means that you have an ongoing series of felony violations of the drug laws of the United States. And that's simple. Each and every sale of crack cocaine perpetrated by these people was a felony. Each and every one of them. So clearly, you would have no problem determining that there was an ongoing series of felony narcotics violations. You need the instructions to show --

we will show you, you need to find that there have been at least three. You had three sales of crack cocaine given in the testimony probably in a ten-minute period on any particular day during the life of this conspiracy. I would suggest to you there is no issue as to the series, the continuing series of violations of the felony drug laws of the United States. Remind yourself that each and every distribution of crack cocaine is a felony violation.

The next thing we must have proven to you in order to find them guilty of a CCE is that it was undertaken with five or more people acting in conjunction. And in deciding this, remind yourself of the testimony of Greg Scott about the New York Boyz. There were 30 or so New York Boyz operating in Trenton, each of whom recruited to themselves workers. In Richmond, when the New York Boyz came south with "Whitey," you had the following people, at least, who were working with them in the sale or distribution of cocaine. You had Denise Berkley, Priscilla Greene, Curt Thorne, Linwood Chiles, Jerry Gaiters, Sterling Hardy, "Papoose" Davis, Hussone Jones, Charles Townes, "Man Man," Maurice Saunders, Antwoine Brooks. You had the people from Charles City that were testified about. You had Pam

Williams, Charlotte Moore, Greg Noble, Sam Taylor, and a number of others you have heard testimony about. Well in excess of five people just here in the City of Richmond who these people recruited to sell crack cocaine with them.

So that aspect of the CCE is also very clearly proven in this case. That is not an issue.

What is an issue -- let me back up as to the five or more people. You need not find that each and every one of these people charged with the CCE, and charged with the CCE are "Whitey," "C.O.," and James Roane, you need not find that each and every one of these people supervised five or more people themselves. You need find only that as a group, there were five or more people involved. And I suggest to you it is clear from the evidence that there were five or more people involved in the distribution of cocaine, just here in the City of Richmond.

But what will be an issue and what you do need to determine in order to determine that indeed a CCE was operated by these people, Continuing Criminal Enterprise was operated by these people, is whether "Whitey," "C.O." and "J.R." occupied a position of organizer or supervisor. And I suggest to you in that regard, the testimony is also clear and unequivocal. They came down with their source of supply from New York, their source of cocaine, and they orchestrated, organized the people we have already mentioned to you in a distribution outlet, a distribution network. Each and every witness who took that stand testified remarkably consistently concerning their relationship one with another; that "J.R.," "O," "Whitey," "V" were partners or bosses; that they were the people who organized the workers, who went out and recruited the workers, who supplied the workers with the cocaine, and that those workers went forth and sold their cocaine on the streets of the City of Richmond. That's all that is required by the law. It is not required by the law, as will be argued, I suggest, that they needed to provide explicit directions in and orders to each and every one of the people that sold cocaine for them. Although there has been testimony that indeed they supplied directions and orders to these people, that is not necessary in order for you to find them guilty of operating a Continuing Criminal Enterprise. The language is clear there. All you need to find is that they organized people. And indeed the evidence is clear and unequivocal that they organized a number of people here in the City of Richmond to sell drugs.

The final thing that you must determine in order to find them guilty of Count Two, that is, operating the Continuing Criminal Enterprise, is that indeed they received substantial income. I told you in opening that substantial income is a fairly nebulous

term.  It is a subjective standard which you must render in determining the verdict here.  The law and the instructions will show you that it must be ample income; that these people supported themselves doing that.  I suggest to you there is no contest whatsoever that that's exactly how these people supported themselves; that indeed they generated enough money selling crack cocaine to live on.  That's all that's necessary to prove substantial income.  We don't need to prove, as was implicitly suggested to you through the questioning by defense counsel, that they were rich, that they had Rolls Royces, that they had mansions.  We do not need to prove that under the law.

Now, I don't know how these men came about choosing what they wanted to spend their money on.  But it is clear that they had enough money if they wanted to buy a car, had enough money if they wanted

2987

to take fancy trips or have gold jewelry.  But they didn't choose to do that.  Denise Berkley told you that their money went back to the New York Boyz.  But it is clear that thousands of dollars a day changed hands because of their crack distribution.  Remind yourself of the testimony about "Mousey" Armstrong selling to as many as 50 people a day.  If she sold only one $20 rock to each one of those people, she has generated a thousand dollars of income a day for that conspiracy.  It is not net income, it is just the amount of money that's generated.

Remind yourself of the testimony of Maurice Saunders; that on one occasion he took $18,000 to New York to purchase cocaine, and on the another occasion he took $40,000 to New York to purchase cocaine.  The money came from "Whitey."  $40,000 is a lot of money, ladies and gentlemen.  And from unimpeachable sources we know that they generated substantial money.

Remember the $3,000 that was seized in New Jersey by Officer Jeanne Keim.  Remember on March 20th, 1992 when she stopped "Whitey" and "Man-Man" and Hussone together, they had $3,000 cash that they were going to New York and buy cocaine with.  Look at the firearms purchases, the thousands of dollars spent on firearms, cash.  Look at the rental car

2988

agreements.  There was substantial money spent on the rental car agreements.  Look at the wire transfers to New York to get "O" out on bond, thousands of dollars.  That in and of itself is ample income from a continuing series of drug violations.  We don't need to prove that these men made themselves rich.  We need to only prove that they made ample income, and indeed the evidence is clear and unequivocal that they made ample income.

The next group of charges deals with Count Two, the Continuing Criminal Enterprise. The next group of charges are predicated upon the Continuing Criminal Enterprise. And that is the murder charges. They are predicated upon two things, the murder charges. There are a number of charges outlined in here that are charged under 21 U.S.C. Section 848. That is, murder in furtherance of a Continuing Criminal Enterprise. Each and every one of those murders, with the exception of Torrick Brown -- we will speak about that later -- all of the murders with the exception of Torrick Brown are charged under 21 U.S.C. 848, murders in furtherance of Continuing Criminal Enterprise. And each of the murders is charged also under Title 18 United States Code Section 1959, violent crimes in aid of

2989

racketeering. So for the Title 21 murder charges, you need to find that there was in existence a CCE, a Continuing Criminal Enterprise, as a predicate for finding these defendants guilty on those murder counts. Let me talk about that for a second.

That does not mean that you must find that "Whitey" was guilty of operating a Continuing Criminal Enterprise. It does not mean that you must find that "C.O.," or that James Roane, was guilty. I tell you that indeed the evidence is clear and unequivocal that they were indeed guilty of that, of operating a Continuing Criminal Enterprise. But you don't need to find that each one of them is guilty of operating a Continuing Criminal Enterprise in order for the murder charges to flow therefrom. You need only find that the murder charges were done in furtherance of or during a Continuing Criminal Enterprise. You might indeed find that indeed "Light," the head of the New York Boyz, ran the Continuing Criminal Enterprise. If that is your finding, then indeed you could acquit -- and don't get me wrong, I think each one of these defendants is guilty of Count Two with the exception of Sandra Reavis; she is not charged -- but you could still find them guilty of the murder charges that flow from

2990

the murder in furtherance of the Continuing Criminal Enterprise.

The murders are also charged as violent crimes in aid of racketeering. In order to prove that, we must show there was a racketeering enterprise. A lot of this is duplicative, ladies and gentlemen. If you find a conspiracy to sell and distribute drugs, then in essence the law will tell you you have found a racketeering enterprise. Because racketeering is defined as drug distribution. So if you find there is a conspiracy, then you have got a racketeering

enterprise, if another technical requirement is met, if you show it affected interstate commerce. That's easily dismissed. You know about the trips to New York to get cocaine. That affects interstate commerce. They go back and forth in interstate commerce. And indeed, you have the gun purchases, which are guns flowing in interstate commerce. So you have the necessary prerequisites for the 1959 charges. You don't need to find them guilty of violent crimes in aid of racketeering to find that a CCE was operated.

Don't get me wrong. Very clearly, the evidence has shown that each one of these gentlemen are guilty of operating a Continuing Criminal Enterprise, but you don't need that to find them guilty of 1959.

Let's move now to the specific counts in the indictment that flow -- the specific murder counts that are a result of the CCE and the racketeering enterprise. Count Three charges the incredibly brutal murder on January 5th, 1992 of Doug Talley. Remind yourself that you heard the testimony from Charles Townes, "Man Man," and Hussone Jones, and Johnny Lee Byrd about that murder. That man, Doug Talley, was brutally murdered by that man, with the aid of James Roane -- by "Whitey" with the aid of James Roane -- because they thought he was "5-0." They thought he was a snitch. They thought he was cooperating with the police. They did it to protect the Continuing Criminal Enterprise. It was a murder during a Continuing Criminal Enterprise.

So they are guilty, if you believe they committed that murder, of an 848(e) murder. Richard Tipton is guilty of an 848(e) murder if you believe he indeed committed the murder of Doug Talley. And I suggest to you, ladies and gentlemen, that the testimony of Charles Townes, Hussone Jones, and Johnny Lee Byrd about his involvement in that murder, about the stabbing of Doug Talley more than 80 times, many of them to the head, about the stabbing that

Hussone Jones told you about that resulted in the knife getting stuck in his head by Richard Tipton, I suggest to you that that testimony, too, was all proven true by a single item, a single damning piece of evidence: Richard Tipton's bloody fingerprint on the door of that car. Cross-examination by defense counsel tried to mislead you there, also, asking could that fingerprint have been there, sir -- in questioning the FBI fingerprint expert -- how long could that fingerprint of blood have been there? That fingerprint in blood came from the blood of Doug Talley. Your common sense tells you only that. That single piece of evidence tells you that what Hussone

Jones witnessed did indeed occur. Richard Tipton's bloody fingerprint was found on that car door.

There was another piece of interesting cross-examination that flowed from that particular murder testimony. You might remind yourself and remember the testimony of the doctor who testified in the defense case about the fact that James Roane had no gashes, no puncture wounds in his hand. Who said he did? Hussone Jones never testified that he had a puncture wound. Nobody ever testified he had a puncture wound. Again, it was an attempt to mislead you from the truth. Because the brutal truth, these defendants can't stand up to. The brutal truth is that "Whitey" stabbed that man in the head over 80 times because they thought he was police, to protect the conspiracy. Hussone Jones told you that James Roane put his arm around Doug Talley's neck and then removed it once Tipton started stabbing him and came back to his car. Remember his testimony? Check your notes. "Man, he almost got me, 'cuz almost got me." He didn't say he had been punctured. They tried to mislead you in another regard about that particular murder, crossing Dr. Fierro about what kind of cut in the body would be left by a serrated knife. Nobody from the government's witnesses ever testified anything about a serrated knife. Hussone Jones didn't say the knife was serrated. "Pepsi" Greene, who identified the knife later, did not say it was serrated. In fact, she drew a picture showing you it wasn't. Yet there was cross-examination of Dr. Fierro about a serrated knife. "Wouldn't that leave a different kind of imprint?" Again, an attempt to mislead and misdirect you, because the facts are damning.

Count Four is the 1959 murder of Doug Talley. That is, a murder in aid of racketeering. I won't belabor that as to each count. Each one of these murders, again with the exception of Torrick Brown, has charged a murder in violation of the Continuing Criminal Enterprise, an 848 murder, and a 1959 murder. They are guilty if you believe that they murdered them, based upon the recitation of the law, as to each one of those counts, if you believe that the people who are charged in there did indeed commit those murders.

Also charged, beginning with the Doug Moody murder which we will talk about next, is use of a firearm during a drug trafficking crime or a crime of violence. It couldn't be any more simply stated than that. If you find them guilty of murdering the people as the evidence and as the government has argued, through the use of a firearm, they are guilty

of that. So each one of these counts that follow hereafter also have firearms charges with them. I won't belabor that issue.

Counts Five through Seven deal with the murder of Doug Moody. He was shot and stabbed. Count Six, by the way, deals with the use of a firearm. Moody was killed over drug turf. Remind yourself of the testimony on January 13th, 1992. He was killed in the house there on Clay Street, shot in the back room, went out the window, and was stabbed repeatedly by James Roane over drug turf. "Pepsi" Greene told you that. And the other witnesses' testimony meshes in that regard. Remember, Doug Moody worked for Peyton Maurice Johnson. They didn't want anyone else operating in their territory, consistent with the testimony of Greg Scott. They would kill anybody who came in their way in order to take over turf. He didn't say "kill," he said "harm." Remind yourself of what they did to Anthony Howlen in New Jersey, with all the cuts in his face because he tried to sell cocaine on the same corner that "Whitey" and "O" were selling cocaine. That is the motive for the killing of "Little Doug" Moody. That makes it an 848 murder. That makes it a murder in furtherance of the Continuing Criminal Enterprise.

Remember the testimony of "Pepsi" Greene, that she indeed disposed of the knife that had been used to stab Doug Moody, and that she had been given that knife by James Roane. Remind yourself of the testimony of Robert "Papoose" Davis, that he heard James Roane and "Whitey" when they came to his house after the killing of Doug Moody brag about how they really fucked up Doug. Remember that? They came back and bragged about how they really messed up "Little Doug."

Ask yourself why "Pepsi" Greene, Denise Berkley, and Robert Davis would come forward and testify that way if it is not the truth. What do they have to gain by testifying that way? What does "Pepsi" Greene have to gain by testifying that way if it is not the truth? She only wants justice done, ladies and gentlemen. She is paralyzed for the rest of her life. She only wants justice done. Denise Berkley and "Papoose" Davis have received use-immunity if they tell the truth. What do they gain by lying about this? They gain absolutely nothing. They have no motive to lie. They have every motive to be telling the truth.

The testimony put on by the defense concerning that particular murder underscores the fact that their complaints about our witnesses ring hollow. If you will remember, they put on Ms. Gina Taylor to

testify that she indeed had looked at out her back window and saw the person, saw some person kneeling over the body of "Little Doug" Moody.  She didn't say that she had seen the person stabbing, so we don't even know if she was looking at the person who stabbed him or someone who came up afterwards.  But think about her testimony anyway.  She didn't tell you in direct examination that she had a relationship with "Whitey."  She didn't tell you in her direct examination that she was "Whitey's" girlfriend.  Mr. Baugh didn't tell you about that.  He wanted you to believe that there was an unimpeachable witness here who had seen it and was going to tell you that James Roane was not the murderer.  An unimpeachable witness who just happens to be "Whitey's" girlfriend.  And she told you that she couldn't even tell the police whether it is a guy or a girl who was over that body.  Yet she is sure it wasn't James Roane based upon some course she took at the College Training Center.  It makes no sense.  Her testimony makes no sense.

She said in a very telling statement that her boyfriend, "Whitey," that she didn't even know that her boyfriend, "Whitey," or James Roane had been charged with these murders.  She didn't come forward and tell anybody about the fact that it couldn't have been James Roane before taking the stand.  She didn't know they had been charged?  An absolutely incredible statement, ladies and gentlemen.  She knew they had been charged.  She told you she didn't know until she came in here that day.  She lied to you.  Reject her testimony.

Counts Eight, Nine, and Ten deal with the murder of Peyton Maurice Johnson on January 14th, 1992.  Remind yourself about the testimony of Pam Williams that on January 14th, 1992 she went to Southern Police Equipment here in the City of Richmond and bought them three guns.  You have seen them.  The Tec-9, the Intratec, and the 9mm Glock.  You have seen those any number of times.  I don't need to pull them out and show them to you now.  As soon as that conspiracy got their hands on those weapons, they set about their murderous chore with dispatch.  As soon as they got those guns they went after Peyton Maurice Johnson.

Remind yourself of Denise Berkley.  They bought the guns, she gave them a tote bag, they took the guns.  Who was there for the purchase of the guns?  "O," "J.R.," and "V."  When they got back to 1212 West Moore, what did they do with the guns?  "Whitey" and "E.B.," the other core group participants, came together and all played with the guns.  They were

quite happy.  They now had their murder instruments. They gave them to "Papoose."  That very night they came back and got those guns from "Papoose" and went and killed Peyton Maurice Johnson.  Why?  Because he was selling drugs in Newtowne and they wanted that turf themselves.  That testimony is clear from Ronita

Hollman, that "Whitey" and "J.R." had come in an effort to recruit her and she had rejected them on two occasions.  "Whitey" said, "We will lay bodies in the street if we have to.  You don't think we are serious?  We will lay bodies in the street."

The first body that they laid in the street because of that rejection was Peyton Maurice Johnson.  They burst into Stanley Smithers' house and shot Peyton Maurice Johnson a number of times. Stanley Smithers corroborates the testimony of Ronita Hollman.  He is not a participant in this conspiracy.  Use-immunity is of no use to him.  He did nothing wrong.  Stanley Smithers, as you know, is also in the Witness Protection Program.  Is he a bounty hunter because he has had to be relocated to protect his own life?  What reason does he have to come in and testify as he testified about who killed Peyton Maurice Johnson?  He has only the motivation of the truth.  He has placed his life on the line. Do you think he placed his life on the line so we could orchestrate testimony?  Or do you think he is telling you the truth?

Remind yourself of the testimony of "Papoose" Davis that after the murder of Peyton Maurice Johnson they came to his house with those weapons and "O"

asked him to wipe the fingerprints off, and that he put those guns away for them.  Remind yourself of the testimony of Denise Berkley, that about a half-hour after that murder, shortly after the murder she saw them run out, saw "J.R.," "V," and "O" and "E.B." running together with the guns in their hands.  Does that tell you that "J.R." just wandered in the house aimlessly, as has been suggested by defense counsel Baugh, and then wandered out and the murder happened to follow from that?  Or does that tell you that he walked in to make sure that Peyton Maurice Johnson was there so he could kill him?  That's exactly it. Your common sense tells you that.  "J.R." went into Stanley Smithers' house just to make sure that indeed Peyton Maurice Johnson was there.  Gaiter's testimony tells you that, also.  An hour-and-a-half later, he saw James, and James Roane was asking him if he had seen Stanley Smithers.  They knew they had left a witness alive.  They were looking for Stanley Smithers to go back and kill Stanley Smithers.  And we are criticized for having paid money to put that

man in the Witness Protection Program, the only responsible thing we could have done. The ballistics confirm that indeed that conspiracy, those criminals, committed that murder. Remember, you have a positive ballistics match on this murder and each murder after this that was testified to by Anne Jones. You have two guns, the Glock and the AA Arms, that have been positively matched as being used to kill Peyton Maurice Johnson. Remind yourself again, where were those guns seized? They were seized from 1212 West Moore on February 2nd, 1992 in that same blue tote bag that Denise Berkley had given them. Denise Berkley testified that only "J.R.," "V," "C.O.," "Whitey," "E.B.," had access to that tote bag. Only they could use those guns. And those guns were used in each of the murders after that point after their purchase on January 14th, 1992 until they were seized on February 2nd, 1992.

So that unimpeachable testimony proves that indeed the testimony of the people who came before that were telling you the truth. That conspiracy killed that man, killed Peyton Maurice Johnson.

Counts Eleven, Twelve, and Thirteen deal with the murder and the use of the firearm concerning Louis Johnson. Again, we have drug turf. Now, you haven't had anyone state explicitly to you in this regard that they were killing him over drug turf. You have had several people testify that "O" didn't like him, that "J.R." didn't like him because they had seen Louis Johnson up in the Newtowne area with a shotgun, and Jerry Gaiters testified that Louis Johnson indeed had been protection for other drug dealers in the neighborhood. The Court will instruct you that circumstantial evidence is just as strong as direct evidence. And although you have not heard direct evidence that that's why they killed Louis Johnson, I submit to you that circumstantially, and use your common sense again, proves to you that that's exactly -- that they killed him because of drug turf. They were making good their claim that "We will lay bodies in the street to take over this area."

Remember you heard from a number of witnesses that they were going to take over up there. Well, he is somebody that had to be killed in order to take over up there, circumstantial proof of the fact that indeed he was killed because of the operation of the Continuing Criminal Enterprise.

Three people intended to kill Louis Johnson that night, on January 29th, 1992: "J.R.," "V," and "C.O." I spoke a little while ago about how defense counsel would have you believe that if indeed the gun

of "J.R." did not go off, he is not guilty of that murder. That's preposterous. That's not the law.

If indeed "J.R." was there intending or aiding or counseling or helping in any way the murder of Louis Johnson, then he, too, is guilty of that murder. And the evidence is clear that he got out, intended to kill him. Some would say he did indeed fire the first shot; others would say his gun misfired. It doesn't matter. It is legally insignificant. He is guilty. "C.O." finished that man off with a number of shots to his body. It was ballistically proven that the guns seized at 1212 West Moore were used to kill Louis Johnson. Again, confirmation from unimpeachable sources about the testimony that you have received from that witness stand.

I would suggest to you that in regards to the testimony about the killing of Louis Johnson there has been no real contest by defense counsel concerning the facts; that the only contest they made is whether "J.R.'s" gun misfired or not. There has been no contest about the fact that "C.O." and "J.R." were present there intending to murder that man. And whether his gun misfired or not, he is guilty of those murders.

Counts Fourteen, Fifteen, and Sixteen deal with the murder of Torrick Brown and the wounding of Martha McCoy. There is no 848 murder charged here, no murder in furtherance of the Continuing Criminal Enterprise charged here, because we know it was a murder over a woman. We know that Robin Cooper was the cause of that murder of Torrick Brown. Why it is charged as a violent crime in aid of racketeering is because we also know that despite the fact that that murder occurred, as admitted to by Mr. Baugh on behalf of James Roane, despite the fact that that murder occurred and was done by James Roane over a woman, other members of the conspiracy joined him to help that murder. Remember, "C.O." and "V" had no domestic dispute with Torrick Brown. They had no problem with Torrick Brown over Robin Cooper. They could have cared less I would guess, since they didn't know Robin Cooper or have any relationship with her. Yet they joined James Roane in that murder. Why? It is clear why. Remind yourself again of the testimony of Greg Scott. Remember what he told you about the New York Boyz? They got together for protection and for going back to New York and re-upping cocaine. And when they got together for protection, each and every member of the New York Boyz had to go in on a crime of violence or they were no longer a member of the New York Boyz. 1959 says that you must find that the murder was

3005

either paid for or done to maintain one's position within an organization.  And I suggest to you that's the critical language in that statute as to each one of these murders.  Those murders were done to maintain the individual defendants' stature within the conspiracy.  They were done so that "C.O." and "V" could help James Roane kill Torrick Brown and prove what a macho drug dealer, what a macho, murdering drug dealer they were.  Remember, they would have been ostracized had they not.

Another little telling piece of evidence here: Greg Scott told you that the workers didn't have to go in with the crimes of violence.  Remember that? Only the New York Boyz themselves, the bosses, the partners, had to agree and follow up on the agreements to commit violence.

That's what they did with Torrick Brown.  Remind yourself of this:  Charles Townes, when he was in the car prior to the triple homicide on Church Hill, prior to going to kill "Mousey" Armstrong, they let him get out of the car.  He did not have to go with them to commit that murder.  Remember, they called him a pussy for not going, but he didn't have to go. He was a worker.  It proves that the story that is being told is true.  The New York Boyz, the partners,

3006

bosses, the heads of this Continuing Criminal Enterprise, had to help each other commit murders to maintain their position.  That's why Torrick Brown was shot and killed.  That's why Martha McCoy, who had absolutely nothing to do with this, was shot in front of her seven-year-old son, Montez McCoy.  Those bounty hunters.  Those people who we were being criticized for paying money to hide because they witnessed the murder of Torrick Brown.

And remind yourself again about the testimony of Valerie Butler that these murderous people, "Whitey," "C.O.," "V," and "J.R.," talked about going back and finding Martha McCoy and killing her and all the other witnesses so their conspiracy wouldn't be found out.  There is also proof of 1959 violation.  They intended to hide the conspiracy.  They didn't want the veil to be rolled back on this conspiracy through the murder of Torrick Brown.  It wasn't simply a domestic dispute.  It was another murder done by this conspiracy for whatever reasons they defined to be the goals of the conspiracy, to protect the conspiracy.  "Whitey" is charged in that count, although he wasn't there.  We haven't put on evidence that put "Whitey" in that shooting.  He is charged in that count because if you will remember the testimony

3007

of Valerie Butler, he aided at the end of all of

that.  They talked about "Yeah, we will go back.  We will find those people, Martha and Montez.  We will kill them, the survivors.  We will help the conspiracy, hide this thing up.  We will kill all the witnesses."  So he is charged in that count.

Remember, you mess with one of the New York Boyz, you mess with them all.  That's what Greg Scott told you.  That's what Torrick Brown's murder proves to you.

The testimony of Martha McCoy and Montez McCoy meshes with the testimony about that murder that you heard from Sterling Hardy and Jerry Gaiters.  Remember the testimony of Martha and Montez.  And I suggest to you, what possible reason in the world do these people have to come in here and tell you a lie?  They have none.  Their brother and uncle were killed.  She was shot a number of times.  The only thing she could be motivated by is making sure that the right people go to jail for that.  What reason would she have to send the wrong people to jail for that?  And their testimony corroborates what Gaiters and Hardy said.  Remember how they both testified the others were dressed?  One in a black hoodie, the other with a big black coat on.  Hardy and Gaiters both testified that that was the way "V" and "O" were dressed.  Martha and Montez, remember, weren't asked to identify "V" and "O" particularly, but they were able to describe how the others were dressed.  The ballistics match also confirms the testimony.  The ballistics show that a Glock and an Intratec, those guns seized from 1212 West Moore, were used to kill Torrick Brown and shoot Martha McCoy.  That's completely consistent with the testimony of Sterling Hardy and Jerry Gaiters.  Remind yourself of the testimony of Sterling Hardy, what "J.R." said when he got back, when "V" asked him -- "V" said, "The bitch ain't dead."  Sterling said, "Yes, I know she is.  I know I can shoot straight."

Unbelievable testimony, ladies and gentlemen, concerning the violence of these people to kill anybody or anything that stood in their way, to hide up the conspiracy, the existence of the conspiracy so that they could make more money selling drugs.

The violence continued on February 1st, 1992.  Remember, Torrick Brown was shot that day.  And later that evening, in the early portion of that evening -- Torrick Brown was shot over in Lynhaven.  Later that evening, Cory Johnson, "C.O.," "Whitey," and Jerry Gaiters went to Church Hill where they perpetrated the triple homicide of "Mousey" Armstrong, Tony Carter, and Bobby Long.  Why?  Because "Mousey" Armstrong owed them a drug debt.  This was told to

you by Denise Berkley.  And because, as you heard from "Man-Man" and Jerry Gaiters, "the bitch knew too much," according to "C.O."  She had to be killed.  He couldn't wait until 10 o'clock.  She had to be killed.  That's Count Seventeen, Eighteen, Nineteen, Twenty, Twenty-one, Twenty-two, and Twenty-three of the indictment.  That triple homicide gives rise to all of those counts.  Some are use of a firearm in the commission of that offense; the others are 848 murders; and the others are 1959 murders.

There has been a suggestion here that indeed Jerry Gaiters as to this particular murder must have been lying to you because in his Grand Jury testimony he said that "C.O." had a gun behind him and that's why he went over on that murder.  Jerry took the stand and testified for you and said that "Look, if I said that, if that's what I said, then yeah, yeah, that was a lie."  But what he said here is completely consistent with that.  What he said in this courtroom is completely consistent.  He told you the whole time they are driving there, "C.O." indeed sat right behind him with a gun and he was completely convinced

3010

that had he not gone through with showing them where his cousin lived, he would have been killed.  We are talking about semantics here, trying to make him a liar over semantics.  Whether the gun is actually held to his head or figuratively is a matter of semantics and it doesn't matter.  It doesn't mean that Jerry Gaiters was lying to you.  He felt fearful for his life if he didn't go through with that.  That doesn't absolve him of his crime.  Indeed, he has pled guilty of those murders and he will be sentenced because he knowingly aided those people in the killing of "Mousey" Armstrong, Bobby Long, and Tony Carter.  And he will pay for that.  But he came in here and told you what happened that night based upon his own involvement.  Again, you have to have people like Jerry Gaiters to pull back the veil of this conspiracy.

His testimony is proven consistent and truthful by the ballistics.  There was one shooter in that house, according to ballistics.  The Glock was used to kill all three of those people.  Cory Johnson had the Glock that night.  They will say that indeed, this eyewitness who hasn't testified, but who was in Detective Woody's notes, shows that perhaps Jerry Gaiters was wrong.  The eyewitness said that there

3011

were four people, and that Jerry Gaiters and "C.O." both went in the house and firing started.  Tell yourself, does that show that Jerry Gaiters is lying?  No, it doesn't show that at all.  Put yourself in that man's position across the street.

The house gets burst into, you see two people go in, which is what Jerry Gaiters told you was what had happened. Firing starts. Do you look? Are they both shooting? No. You just assume both are shooting. Four people he sees at that house. That could be completely consistent with what Jerry Gaiters told you. Remember, three of them went up there together: Gaiters, who went to the door, "C.O.," who came in after him, and "Whitey," who was in the car. Gaiters doesn't know where "Whitey" was. "Whitey" could have come right up to witness the whole thing. There was a fourth person who came out of that house, too. Bobby Long. Poor, old Bobby Long mowed down on the outside by Cory Johnson as he tried to get away. Four people. That doesn't mean Jerry Gaiters is lying. It is completely consistent with what Jerry Gaiters stated.

Bobby Long and Tony Carter, ladies and gentlemen, were killed that evening, ruthlessly murdered by "C.O.," because they happened to be in the wrong place at the wrong time. He had learned his lesson from earlier in the day where they left witnesses and from earlier in the conspiracy where Stanley Smithers had been allowed to escape. They didn't leave any witnesses on Church Hill. Tony Carter and Bobby Long were simply innocent bystanders who were caught up in this murderous web by Cory Johnson and Richard Tipton and "J.R." so that they could put more money in their pockets dealing crack cocaine.

Counts Twenty-four, Twenty-five, Twenty-six, Twenty-seven, Twenty-eight, Twenty-nine, and Thirty deal with the February 19th, 1992 stalking and killing of Curt Thorne, Linwood Chiles, and the maiming of "Pepsi" Greene and Priscilla Greene. You saw their testimony. You saw the testimony of "Pepsi" and Gwen. They told you who was there when they shot them. They told you that the last memory that they had, the last memory "Pepsi" has is when "C.O." told Linwood, "Put your head on the wheel." And indeed that's exactly the way Linwood was found dead, shot in the back of the head. Gwen tells you the last thing she saw was when this man said, "Gwen --" when "Whitey" said, "Gwen," and she turned around and that's the last thing she remembers. Look at the ballistics, the Medical Examiner testimony there. A terrible, terrible, terrible photograph of Curt Thorne with sewing needles through his neck showing the crossfire. Two people were there, ladies and gentlemen. Two people were firing guns. Walter Tuck confirms that. Walter Tuck and Gwen's testimony, again, meshes perfectly. And unless you

believe we have orchestrated this whole thing, it shows you that indeed "Whitey" was there and perpetrated that crime, along with "C.O." Walter Tuck said the person he saw leaving that scene was dressed in a brown leather coat with a scarf. How did Gwen say "Whitey" was dressed that night? Brown leather coat with a scarf. How did Walter Tuck describe the skin color of that man who walked away? He described it as this skin color, the color of the wood on this piece of chair. Look at him. It is exactly the same skin color as "Whitey." How did Valerie Butler tell you that "C.O." was dressed that evening? "C.O." was dressed in his usual black hoodie. In fact, you have seen it introduced into evidence. That black hoodie was what he wore that night when he killed his victim and retrieved his bounty of his coat. Remember that? Disgusting. He took the coat of Curt Thorne and left it in the

backseat of her car. That testimony meshes, ladies and gentlemen. It shows you that Gwen is telling the truth about who was there. What possible reason does Walter Tuck have to come in here and lie? What possible reason does "Pepsi," or Gwen have to come in here and lie? Gwen wants the people who put her in the condition you saw her in to get justice. That's what is driving her, ladies and gentlemen. Is she a bounty hunter? I suggest to you not. I suggest to you it is irresponsible of the government not to protect those people, also.

Remember that there were the guns seized on February 2nd, 1992 at 1212 West Moore Street. The Glock, the Intratec, and the AA Arms weapons were seized, leaving those people who were left in there -- you have to remember, also, it is important, that arrested there that night at 1212, or in the early morning hours of February 2nd at 1212, were "J.R.," "V," Sterling Hardy, Sandra Reavis, and "E.B." and the guns were seized, leaving "Whitey" and "C.O." out on the street without a gun. So what did they do? They repeated themselves as they did with Pam Williams. They got Charlotte Moore to buy guns for them. She testified she bought them two Glocks and she gave them those Glocks on February 5th, 1992,

three days after the seizure at 1212 West Moore Street.

Her testimony is proven true by the unimpeachable testimony of Officer Santo Gutierres from the New York Transit Police. Officer Gutierres arrested Cory Johnson on February 29th, 1992 in the subway in New York with that Glock bought by Charlotte Denise Moore in his belt, showing you that indeed what she said is true. She gave that Glock to

"C.O." and another one to "Whitey."  He was in New York with it.  That's the same Glock that ballistics have shown you unequivocally, unimpeachably, without a doubt, to be the gun that was used to kill Curt and Linwood and to shoot and maim "Pepsi" and Gwen.  Unimpeachable testimony that proves the other testimony that you have received from the government's witnesses is true.

Apply your common sense to that, and you have absolutely no doubt that Cory Johnson was there and killed those people.  And apply your common sense to what you heard from Gwen and Walter Tuck and you have no doubt that "Whitey," too, was there to kill those people.  They wanted to kill Linwood because they thought he was a snitch.  Remember C.T. Woody's testimony.  He told them that Linwood had made some statements.  Sterling Hardy said "V" was going to get that taken care of, "Don't worry about Linwood snitching.  I've helped "Whitey" and "O" before, I'll take care of this."  Curt Thorne was killed for a couple of reasons.  One, he had a drug debt to them.  But two, he was killed because he was there.  Why are "Pepsi" and Gwen in the shape they are in now?  Because they were there.  Again, they learned their lessons well at the shooting at Lynhaven of Torrick Brown and the shooting of Peyton Maurice Johnson where witnesses escaped.  They weren't going to let any other witnesses escape.  That's why Gwen will be in this that chair for the rest of her life.

The defense witness called as to this particular case is also an example of why the defense complaints about the government's witnesses ring hollow.  They called Gloria Bridges to say that "Whitey" was with her every evening, every night, from January through March, there on February 11th, 1992 when Valerie Butler said he rented a car and had gone to New York; there on February 22nd when Valerie Butler said he had rented a car and gone to New York.  Perhaps you don't believe Valerie in that regard, but how could you possibly not believe Officer Jeanne Keim, who said she had arrested "Whitey" in Trenton, New Jersey on March 20th, 1992?  Remind yourself that I specifically asked Gloria Bridges "Was he there on that date?"  "Yes, he was there, each and every night, including March 20th, 1992."  She lied to you.  He couldn't possibly have been there that night.  She was going to come in here and say whatever it took to protect "Whitey," including that he couldn't have been there on February 19th, 1992 for the murder of Curt and Linwood.  Notice in her testimony she didn't even say what time of night he came there that evening.  She didn't even

91a

successfully establish an alibi funneled her. The murder took place at 10:17, according to Walter Tuck. We don't know when it was "Whitey" showed up at her house. There was no testimony establishing what time of night he showed up at her house. But I suggest she lied anyway. It is pretty clear from her testimony, she is a liar.

I will touch briefly on the murder of "Nat" Rozier. No defendant has been charged, but the evidence is telling. "Nat" Rozier was shot right between the eyes with a .38, that same .38 that was recovered from "Whitey" over in Blackwell wrapped in plastic. Remind yourself of the testimony about the bullets used to kill her. A particular grain of

bullet that Anne Jones, Dr. Anne Jones, in all her years of testing firearms, had never seen before. But that same type of ammunition was found in the blue tote bag seized from 1212 West Moore Street on February 2nd, 1992. We don't know who pulled the trigger. But we do know that that conspiracy, that that gun that had been held by Sandra Reavis and given to "Whitey," was the murder weapon and we know that there was a motive. She owed them money for drugs. And they believed her to be snitching to the police.

Count Thirty-three of the indictment deals with the January 15th, 1992 distribution by "C.O." to "Papoose" of cocaine. Remember, "Papoose" said it pretty simply. He said, "I got a rock of crack cocaine from "Whitey" when I wiped the fingerprints off the guns the night they were returned from the Peyton Maurice Johnson murder." That's the distribution count. Count Thirty-two deals with possession by the conspiracy of cocaine at 1212 West Moore Street on February 2nd, 1992.

The lab report shows it, Exhibit 85, that there were 18-point-some grams of crack cocaine seized that day in 120 different vials, crack cocaine that the partnership possessed together. You will receive an

instruction on that, joint and several ownership of property, mutual control over that possession of that cocaine. And that's what that is. That conspiracy, the testimony is pretty clear, used to go to New York, re-up together, resupply themselves with cocaine, give it to their workers. Some of that happened to be caught when the police caught that bag on February 2nd, and that's why they are charged. Under the conspiracy law -- it is important to remember this throughout the case -- each one of those conspirators were guilty if they knowingly joined that conspiracy of the possession of that cocaine, whether they actually knew it was there or

not. By virtue of joining the conspiracy, they were guilty of the possession of that cocaine because they knew that's what that conspiracy was all about.

Count Thirty-three deals with the drugs seized on April 10th, 1992 from South Richmond by Detective Richard Farmer. After "Whitey" was arrested they went back in and searched. Remember, according to the stipulation, they found drugs and the .38, the firearm seized by Detective Rodriguez, wrapped in plastic. Count Thirty-three deals with just the cocaine seized from that location, which cocaine belonged to "Whitey" and was distributed by him.

Remember when you go back what I have told you that I think you should concentrate on. Apply your common sense to what you have heard; the meshing of the testimony here from 70-some different witnesses. It all goes hand in hand. That tells you that the government's witnesses were telling you the truth, unless you truly believed that we orchestrated that testimony in some way. Indeed, if you believe that, I suggest you will probably go back there and just dismiss this indictment. But unless you don't think we orchestrated this whole thing, then it is clear that the meshing of the testimony proves that these people have been telling you the truth.

I note one other thing. Look at the plea agreements of Sterling Hardy and Jerry Gaiters and the language that's built into that plea agreement to ensure their providing truthful testimony here. And ask yourself, were we intending to structure a case or were we looking for the truth to be presented from that witness stand? Read that plea agreement. Look at what the government is seeking to get from these people. And I suggest to you that it will show that all the government wants in this case is to present truthful testimony.

Again, I thank you. I'm sure you are sick of hearing from me. I have been up here for an hour-and-a-half now. And you have got many more arguments to go. It is an important chore. It is a very important chore. I know it has been frustrating, and at times I'm sure you would have liked to have yelled and told all of us to sit down. And I will in just a second.

It is a tough job you are about to undertake. You have taken an oath and you can't shirk from that oath. That oath says you will truly render the facts to a verdict. When you do that, you have no choice but to find these defendants guilty of each and every count in that indictment. We have proven each one of these defendants guilty beyond a reasonable doubt of each and every count in that indictment. Ladies and

gentlemen, eleven human beings have lost their lives to this murderous conspiracy.  You owe it to them to go back and render the proper verdict.  Thank you.

THE COURT:  All right.  We are going to take a brief break before we get started with the defense closings, in the neighborhood of ten minutes.  Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

(Recess taken from 2:30 p.m. to 2:45 p.m.)

3022

THE COURT:  Let's bring in the jury, please.

(The jury entered the courtroom.)

All right, Mr. Geary?

## Geary Guilt Phase Closing (3022)

MR. GEARY:  May it please the Court, ladies and gentlemen of the jury:  We don't know who shot. That's what the government tells you about Katrina Rozier.  If you look in the indictments, and you will have the indictment back in the jury room with you, it provides a real guide on the front page, sort of an index.  When you go through there you find that there are ten people's names who were murdered.  You don't find eleven.  You don't find Rozier in the indictment because we don't know who shot her.  The government tells you they don't know who shot Katrina Rozier.  Detective Blaylock doesn't know who shot Katrina Rozier.  C.T. Woody doesn't know who shot her.  When you are in the back in the jury room deliberating, the Court is going to give you a videotape showing an interview by Detective Woody of Jerry Gaiters in regard to the Church Hill murders. You can see the interaction between the detective and informant, detective and informant, being told what to say.

The government had a severe problem in the

3023

bringing of this case, in the bringing of a conspiracy, stretching all the way back, as Mr. Vick likes to point out, to New York City, to Harlem, to Central Gardens, to Newtowne, Blackwell.  The problem is this:  If you have a Continuing Criminal Enterprise charge as set forth in Count Two, and you wish to have executed two New York Boyz out of their teens, how do you deal with the jury when the jury is told to forget Jerry Gaiters?  Forget Jerry Gaiters, who killed Katrina Rozier.  The government can say, "Well, we will just have Jerry plead to that murder because he pleads to everything."  He is an informant.  He can plea to that.

But then in the second phase of the case it will

be very difficult to get a jury to say, "We will execute these boys from New York but we won't do it to a 39-year-old man from Richmond who is the informer of Detective Woody and who killed Katrina Rozier." That's why I suggest to you that the government doesn't know who shot her. When the government lawyer gets up here today or tomorrow to tell you why you should believe them, rebut everything the defense says, ask yourself a question: Why isn't Rozier in the indictment? Because they hang "Hitman" Gaiters, Jerry "The Enforcer" Gaiters,

3024

Jerry who walks. Detective Woody said he walks on what? Robbery, rape, attempted murder. That's his sheet over the past ten years. "The best informer I ever had. 35 to 40 times he gave me information." Jerry says no, it is two. He lies repeatedly. He lies to you. He lies to the Grand Jury. He lies to Detective Woody. Woody has to pound it out of him in this interrogation because Jerry knows how to do this. He is out in the streets. He is a hit man, an enforcer. And he walks out of this. He is one of the "made men" for the government. He can do what he wants. He knows how the game is played. He is one of the bounty hunters Mr. Cooley talked about. He is the chief bounty hunter in this case. He lied to you. He insults your intelligence by lying to you, as among many government witnesses.

Mr. Vick told you in his opening statement they had four categories of witnesses: participants, police, experts, forensic, and that they all sort of complemented each other and corroborated each other. Baloney. What they did is took a witness who was a participant, put him on the stand, put in somebody behind him who is a civilian, i.e., somebody not in the drug world, in either New Jersey or Trenton or New York or Richmond. And that's how they say this

3025

stuff is corroborated. Some of this stuff is corroborated, but much of it isn't. Much of this case relies upon, or all of it relies upon these people from Newtowne, these people from New York and New Jersey that you have to believe beyond a reasonable doubt. Mr. Vick talked to you on the Thursday of the opening week and today for almost three hours. He mentioned reasonable doubt once then and once today. Judge Spencer is going to mention it a lot. The defense lawyers are going to mention it a lot. When someone in this country is charged with a minor traffic charge, they are not convicted unless it is proven beyond a reasonable doubt. In this case as well.

In addition to the indictment, you are going to have and Judge Spencer is going to read these

instructions to you, but you will have a copy of the instructions of law.  The first one starts out "Court Instructions to the Jury."  The instruction of reasonable doubt tells you that unless you are convinced beyond a reasonable doubt on every charge, on every element in the charge, that you find that person not guilty.  Richard Tipton, "Whitey," sits here charged with 26 counts, and within those 26 counts are various elements.  Each of those elements

3026

in that count must be proven and proven beyond a reasonable doubt before you can sign that verdict form that says guilty of a particular charge.  That's the government's burden.  That's not my burden, Eric White's burden, or Richard Tipton's burden.  That's their burden.

And they have, as you can see, as you have seen over the last three weeks, they have the resources to do that.  They have police, prosecutors, paralegals, marshals, sheriffs.  You name it, they have got it.  Videotapes.  They can do all those things and they have been doing that in this case.  So they have the resources.  They have the burden of proof.  That's why they get to go last, because the Court tells you they get to speak last because their burden is to prove this case, and each element of it, beyond a reasonable doubt.  And they have to prove it individually, not just "they."  Mr. Vick used the word "they" so much in talking about what happened, I looked in the indictment to see if somebody named "They" was charged.  There is no "They" charged.  They are individual people.  Richard Tipton, Johnson, Roane, and Sandra Reavis.

When you have this indictment, and the one thing I would say to you as I think Mr. Vick would say to

3027

you and the other defense lawyers will tell you, is when you get back there, whenever you start your deliberations, that's the time you take control of the case.  The time for us and the witnesses and Judge Spencer is over.  The 12 of you who decide this case have it.  And it is at your speed and your deliberation.  You can take all the time you need.  You are going to have a long indictment, going to have long jury instructions.  You have some of the exhibits that the Clerk has over here, some exhibits here.  You have the videotape.  There is no rush to judgment involved in this case.  Take your time.

If you look at the cover page of the indictment, it shows you in regard to Richard Tipton, who is named first, the various counts that he is charged with.  Then it goes over to the right side and describes what some of those counts are as Mr. Vick indicated to you.  There is a conspiracy count, a

96a

CCE, murder, firearms, distribution of crack. But study this. This is the charging document. This is what the government says. These are what Judge Spencer will read to you and give to you. This is the beginning of the case in my left hand, and this is the end of the case right here as far as we are concerned. Then everything goes to you. What's in between are the exhibits and the testimony of the witnesses.

This side is what the government says they are going to prove. This side is what the law is. And everything in the middle is what the government claims it has proven in this case.

And just because the government tells you something doesn't make it so. Just because Mr. Vick will stand up here for an hour-and-a-half and talk about unimpeachable sources, and something is simple, and these are technical requirements, that doesn't mean that's what it means. You have to look at these, look at the instructions, listen to what Judge Spencer has to tell you, and make up your mind for yourselves. Because the oath you took says that. I will decide based on what I hear and what I see and what I read and what I listen to. I will decide this case myself as 12 people. That's the obligation you have taken, all 12 of you. And as Mr. Vick indicates, it is a very serious obligation. This is not a minor case, as you well know. This is a CCE murder case. This means that if you find in Count Two, if you return a verdict that there was in fact a Continuing Criminal Enterprise, and in regard to that Continuing Criminal Enterprise, if you say that any

of the nine murders -- because Torrick Brown is not a CCE murder -- any of those nine murders you attribute beyond a reasonable doubt to any defendant, that defendant goes to phase two, i.e., the penalty phase, the phase to determine whether the sentence will be life without parole or the death penalty. So it is a very serious matter.

If you will look at Count One and look at the indictment when you get back there, that charge is what Mr. Vick says is a very simple thing, which I don't think is very simple at all. It charges, and the dates from the charge are from January of 1989, the very first sentence of Count One, up until the time of the filing of the indictment -- well, this indictment is dated July 20, 1992, but it is also called the second superseding indictment, which means that there were two indictments before it. The original indictments were filed at the end of April, 1992. That's when the big publicity took place. That's when people like Johnny Bird and Hussone Jones

had the opportunity to read the paper and find out what was going on. But this one was filed in July. So the government claims that from January of 1989, up until and including July of 1992, a drug conspiracy was being carried out in violation of

Title 21 841. That conspiracy was to distribute crack cocaine. Pages two and three talk to you about the ways, means, and manners of the conspiracy. And there are two places that are mentioned: New York City, and Richmond, Virginia. There is no mention in the indictment anywhere -- including the ways, means, overt acts -- of Trenton, New Jersey. Nothing whatsoever. They are saying in the indictment that cocaine was in New York and imported from somewhere else, brought down to Richmond on various occasions, and then was distributed in Richmond. No mention of Trenton, New Jersey.

The government's first witness was a person by the name of Greg Taylor Scott. You later found out from cross-examination he was called "Sweets." And he was asked what he expected to get out of his testifying. He told you "a sweet deal." Greg Taylor Scott was arrested in Trenton, New Jersey on June 4th, the 1991 in a raid by Trenton Police on a house on Martin Luther King Boulevard. He and five other people were charged in an indictment much like this one, but without the CCE, in Federal District Court in New Jersey. Gred Scott has forced those people to plead guilty because he was going to testify against them. He comes down here, and as Mr. Baugh indicated

when he asked him a question, "You are looking at 20 to life and you are on bond?" Greg Scott was lock, stock, and barrel owned by the government. He is getting a great deal. He is looking for a sweet deal. He tells you about Upper Manhattan, Harlem, and a particular block, 155th Street and Amsterdam Avenue. He tells you, if you listen to him real carefully, about this concentric circle which is what the New York Boyz are, he claims. The inner circle is those people born and raised on the block, 155th and Amsterdam. "Whitey" is not from the block. Cory Johnson is not from the block. They are from the upper part of Manhattan, from Harlem, but they are not from the block. They are, if Mr. Vick wanted to differentiate it, the second level of New York Boyz. One of them goes to Trenton, has relatives, and they start to sell crack cocaine. That's a way of life. That's what these guys do. They sell drugs. They sell drugs for the price, in an amount which is probably less than two six-packs of beer. They sell $10, and in some places it is called a bottle, in other places it is called a vial, in other places it

98a

is called a rock. Very small amount of crack cocaine, sells for $10. Gives you a quick high, as Denise Berkley testified to. Much quicker than beer

3032

and wine, and apparently with no hangover. They are salesmen, selling on the street.

Scott tells you that New York is big time and Trenton is small-time. New York is where the big dealers are and Trenton is where the street dealers are. "I'm the weight man." He would sell weight for the government. But he, like Mr. Cooley said, is one of those good criminals. He can sell weight, and he told you how much he sold, but he is going to walk the streets because he is cooperating. When they say a cooperating and truth-testifying witness, the emphasis is on cooperation. Because neither Mr. Vick or Mr. Woody or anyone else is on the block when things happen. They don't know what the truth is. I don't know. None of us do. The witnesses, they can say whatever they like, i.e., Jerry Gaiters, i.e. Denise Berkley, Johnny Lee Byrd. Did you believe Johnny Lee Byrd, Denise Berkley when I said to her "Ms. Berkley, you are telling this jury you knew everything Richard Tipton did; is that right?" "Yes." "Who did you buy drugs from the day before he got here to New York?" "I don't know." "The entire year before then?" "I don't know. I don't remember."

She sat there and laughed. That's the kind of

3033

witness the government wants to put on, to insult you. The biggest one of them all is "Sweets" Scott, who ran the Trenton operation. He was selling weight, coming down from New York to Trenton. That's the government's witness. That's who they want you to believe, the guy who is going to get a free ride. He comes down and tells you this big litany of these meetings and retaliations. Baloney, folks. He told you one thing that was true, which was corroborated by Officer McMillian. "Whitey" Tipton is nothing but a street-corner seller of crack. He sells dimes. That's where he is caught. He is caught in a candy store on the corner of Clinton Avenue in Trenton, New Jersey selling dimes. This is the big man that Mr. Vick makes out, "Whitey." What's this case about, folks? Get "Whitey." Does he look like Manuel Noriega sitting here, John Gotti sitting there? He is a little street drug dealer in Trenton who, when that deal blows up on 6-4-1991, comes here.

Did he scout out the Eastern Seaboard looking for a place to sell drugs? He is from here. His father was here. His parents were married. They separated very early. His father is here. He came here because he has people here. He has been in

99a

Central Gardens before. It was obvious to you he was

here before June of 1991, according to Antwoine Brooks. He was coming back and forth. Tipton, the ultimate floater. It was interesting in the case when some of the Newtowne people would be asked, in Mr. Vick's inimitable way, "Where did "Whitey" live? Did he live on Hancock Street, in the yellow house on Norton Street?" I suggest to you that nobody knew where he lived because he floated. He was in one house one night, in Sandy Lane, on Leigh Street, he was on Moore Street, he was in Blackwell on two or three different occasions. He had no furniture, no car, floated around. But this is the man that Mr. Vick would say to you, "Folks, this is the biggest drug dealer in the world, bigger than all of them, the Medellin Cartel."

            MR. VICK: Nobody has said that and it has nothing to do with this case.

            THE COURT: Overruled. Let Mr. Geary say what he has to say.

            MR. GEARY: He is one of the notorious New York Boyz? How do you inflame the jury against these 21 or 22-year-old guys? Make them foreigners. They are bad. They come down here to peaceful Richmond, Virginia, which doesn't know violence, and look what they stirred up? We have to punish them, give them

the electric chair. That's what the government tells you. Greg Scott.

     Then they bring in the other guy from Trenton who was a rival of theirs, clearly. They got into a fight, had a beef. But that's the beginning of the, quote, violence. Where was all this other violence in Trenton? Scott told you they had a ton of guns on Martin Luther King Boulevard, but nobody ever got shot. In 1989, he would have been 18 or 19-years-old. Then they bring the evidence down here. You get the Central Gardens people, the brothers, the brothers Jones, Saunders, and I forgot the third one. Hussone Jones, Charles Townes, and Maurice Saunders. Plus their good friend, Antwoine Brooks. They testify to what in effect was going on. They tell you that Tipton comes here, Tipton has a source in New York, Tipton can get crack. Tipton goes to New York, Tipton comes back to Central Gardens, and they sell crack.

     This worker-partner stuff is baloney. He was the supplier of their crack. He wasn't their boss. You heard all of them say, "Well, we could do whatever we wanted to, didn't make any difference." You get two-for-one. And as long as you give the guy supplying the crack $200 back, they could care less.

You can eat it as long as you give the $200 back. That's what happened in Central Gardens off and on for a considerable period of time, maybe two years if you listen to Antwoine Brooks. And then in terms of history in terms of the conspiracy, the key date apparently is around Thanksgiving to Christmas of 1991, where "Whitey" comes here, ostensibly either from New York, or from Trenton, "O" comes here, and some others come here. And according to one of the Central Gardens testifiers, "Whitey" at some point is playing basketball in Newtowne, "O" is there, and they meet people from Richmond. That's where the second part of this case comes from for "Whitey."

Of course for Roane, nothing has happened yet, or for Reavis. But at this point we are down to where "Whitey" and "O" were together in Richmond, Virginia. I suggest to you what you have at this point proven by the government is that, one, Richard Tipton was selling small amounts of crack cocaine in Trenton, New Jersey. So that if that indictment were proper, then he is probably part of that conspiracy. Then you have him selling drugs, crack cocaine, in Central Gardens during that same period of time, so he would be guilty of a conspiracy to sell drugs in Central Gardens. And then the evidence clearly is,

and we don't dispute this, we don't agree that Count One is proven beyond a reasonable doubt, but we do not dispute that for a period of time from Thanksgiving or Christmas of 1991 until sometime perhaps in March of 1992, Richard Tipton was selling drugs, crack cocaine, in Newtowne. And then for a short period of time, perhaps from mid-March until April 10th when he was arrested in the 400 block, 413 East 15th Street in South Richmond, he was selling drugs there. So he is involved in a number of different conspiracies, none of which, I suggest to you, ladies and gentlemen, if you read Count One, none of which is the allegations of the count of conspiracy charged in Count One.

Count Thirty-three charges that Richard Tipton possessed cocaine with intent to distribute at 413-D East 15th Street on 4-10-92. You recall, that was the day he was arrested. You might recall also the next day Detective Rodriguez told you that they conducted a search of 413 E 15th Street. You have heard the evidence on that charge. Count Thirty-two claims that on February 2nd, 1992, at 1212 West Moore Street, that Richard Tipton possessed cocaine with the intent to distribute. This must have been a flight of fancy for the government to put this

indictment in here. 2-1-92 was when the incident involving Torrick Brown took place and the murders on

Church Hill. The evidence in regard to that date is very simply that Charles "Man-Man" Townes told you that he and Richard Tipton were in a car which they had borrowed from a guy named Kenny; that they had driven from Central Gardens in the evening hours of February 1st going to Newtowne for marijuana or for crack cocaine; that no one was at 1212 West Moore Street; that in going through Newtowne -- and the government has provided an aerial, 17-1, which shows some of the streets over there, and it is not much bigger, really, than this. Somewhere on Harrison Street, I think he said, they saw "O" and Gaiters; that there was no beeping, they just happened to meet by chance. That next morning was when the raid took place on 1212 West Moore Street when the guns and the cocaine was seized, as Detective Rodriguez told you, when he was going in the back by the fence. Right by Interstate 95 is where he found them. There is absolutely no connection in this case to those drugs with defendant Tipton. The government must prove that charge beyond a reasonable doubt. They have absolutely failed to do that.

Douglas Talley died a horrible death. Nobody can dispute that. And the witnesses that you have in regard to that case, I don't know which one of these is the unimpeachable source that the government talks about: Johnny Lee Byrd, Charles Townes, Hussone Jones. Detective Hines, if you recall, was the forensics man who went and dusted the car and got all the items out of it. The FBI fingerprint expert named Wynn. We called, the defendant called Detective J.J. Cox, and there are two witnesses that were not called by the government. That is a person that they called **"Wildman,"** the one that Hussone Jones said they drove to his apartment after the murder and brought the knife and had the knife cleaned. He was not called by the government as a witness in this case. Also not called by the government as a witness was the girl from Blackwell. I'll go over Hussone Jones' testimony with you in a minute. That murder was on January 8th, I believe, and it was -- it was the one in South Richmond at the corner of 13th and Stockton. Government Exhibit 8 is a daytime picture. And it shows Stockton Street here, 13th Street here. They have a red arrow pointing to where the car was, according to Townes. Over here about two blocks away from Stockton is Hull Street. Johnny Lee Byrd told you that on -- he told you a lot of things. He told you that Doug Talley was his best friend, but he didn't go to his funeral; that he knew Doug Talley since August or

September of the year before, which means about four months; that they smoked crack cocaine together; and that they began selling crack cocaine together. And that on January 3rd, 1992, that he, Johnny Lee Byrd, had messed up Doug Talley's money, and that he saw the next day, on January 4th outside of 213 West Clay Street where Johnny Lee Byrd lived, a car which he identified as the Talley car, a picture of which is in evidence. He said that he saw three people, including Talley, in the car; that Richard Tipton was in the right front passenger's seat, the same passenger's seat where this bloody fingerprint, supposedly -- that's what Mr. Vick called it -- was found. Of course, the police never did an examination to see if in fact that smear was blood. But that's what Johnny Lee Byrd told you. The only person who had a motive to kill Doug Talley was Johnny Lee Byrd, because he had messed up Talley's money.

The evidence about Talley being a snitch or being "5-0," there is no evidence. There is allegations that somebody said that somebody said that he was. But there is absolutely no evidence that Talley, who was a driver at most, was involved in snitching on the police. The police haven't come in here and said, "Yes, this guy talked to us any number of times." No evidence of that. Johnny Lee Byrd.

When Detective Cox testified about this coat, you recall the coat, Detective Hines said the coat was in the backseat of the car in the 200 block of East 13th Street; that the forensics people dusted the fingerprints inside and out, found no prints on the inside, found a print on the outside right passenger. What was in the coat? I think he told you some sunglasses, a vial of medicine from the VA, and some dog tags. That's what was in the coat. Until the defense called Detective Cox. What did Detective Cox say? Well, lo and behold in the scabbard of the coat, somewhere over here on the left side, was this thing. Do you recall a diagram being done by one of the witnesses in this case? How does that knife compare to the diagram?

And then on cross-examination, Detective Cox says "Well, we showed that that knife wasn't involved in the murder." Well, how do you show that, folks? When you listen to Dr. Fierro testify, well, obviously that knife could have caused those wounds. What test did they run on the knife? You heard Ms. Jones testify in this case item to item. Whenever they had ballistics or any kind of report done, she did them. What test did the United States of America

run on that knife to show it wasn't involved?  None. Johnny Lee Byrd didn't fit into the "Get 'Whitey'" theory.  He is not a New York Boy.  Johnny Lee Byrd doesn't fit into our theory of the case.  When Johnny Lee Byrd is interviewed by Detective Cox, bird tells you in this Court that I gave the coat to Tipton. That's what he said.  I gave that coat to "Whitey." January 3rd or January 4th, a day or two before the murder of Doug Talley.  That's very convenient, Mr. Byrd, because that coat winds up in the car.  Sure Tipton did it.  But he tells Detective Cox the first time he is interviewed, and remember the man hunt that was going on for Johnny Lee Byrd, Chesterfield police put him on the top ten, Henrico, the State Police, the Richmond Police are looking for him, and he turns himself in.  J.J. Cox goes to see him and says, "All right, Byrd, what did you do with that coat, who did you give it to?"  He says, "An unidentified black male."  That's the first lie, or maybe it is not a lie.  Maybe he didn't give it to anybody.  Maybe he was wearing it the night he killed Doug Talley.

The secondly, about a month later Cox is talking to him again with a State Police officer present.  He says, "What about the coat, who did you give the coat to?"  He says, "I gave it to Skip Talley."  Then he comes in here under oath, the government parades him in, maybe he is one of Mr. Vick's unimpeachable sources.  He says, "I gave it to Tipton."  Well, that's good, because that squares the government  -- the government says, "We are glad Tipton has that coat.  Maybe he has it that night because we have got another guy who can come in here and really burn "Whitey," one of the drug-dealing partners from Central Gardens, Hussone Jones."  What does Jones say?

Jones says that on that night, 1-5-92, he takes a girl from Blackwell, picks her up, brings her to 1212 West Moore Street.  He says he takes her back at some point in the evening.  Before he brings her back, a guy named Doug or Talley, he is not real sure, he has never met this guy, but he thinks he hears this name, comes to the house.  And three people get into one car and he gets into his car. And he says "Whitey" said, "Follow us."  And the girl from Blackwell, "J.R.," and he get in one car.  And they come down 95 to the Blackwell section of Hillside Court, South Richmond.  The girl from Blackwell is dropped off at her house.  That's twice Hussone Jones has been to this woman's house on this night, so he knows where she lives.  According to him, he pulls around the block.

Well, if the murder took place at 13th and Stockton, the girl from Blackwell, who would be a corroborating witness, one of these non-participants that Mr. Vick is always telling you he has got, here is a woman who would be a non-participant corroborating witness that would put "Whitey," "J.R.," and Doug Talley together just before he was killed. But she is not here. And Hussone Jones then begins to tell you this incredible story of what he said he saw. He says, "Well, 'Whitey' says snitches don't live." "But Hussone, you are sitting there two car lengths behind there and you are still alive." He says, "I wasn't afraid of 'Whitey.' I dealt with him almost every day after that." Does that sound like an incredible story to you? That you would witness somebody doing this brutal murder and yet you wouldn't have any fear of this person? You wouldn't, because it didn't happen.

How could how Hussone Jones know all of these people? The same way the government suggests to you that Johnny Lee Byrd knew that Doug Talley was stabbed with a knife. "Did you tell Byrd that Talley had been stabbed with a knife?" "No, but he knew it." They said, "Well, he could have read it in the newspaper. Hussone Jones read it in the newspaper." He was able to confirm what Johnny Lee Byrd, this excellent witness, was telling the government. Because it fit their theory: the New York Boyz. The New York Boyz, the plague on Richmond coming from New York that's got to be terminated. Where is **"Wildman**?" All the detectives were here. The uniformed police. Hussone knows where he lives. According to Hussone, he took Tipton to his house that night. **"Wildman"** is not here. If this were a simple murder case and we didn't have all these other charges, the evidence would be clearly not guilty. The government has the mechanism to prove it; the government failed to prove it.

This charge is like all the others, beyond a reasonable doubt. And the Talley murder, the evidence is more that Johnny Lee Byrd did it than Richard Tipton or James Roane did it.

Douglas Moody is perhaps one of the pivotal events in this case that took place on January 13th. The evidence, the testimony from Ms. Berkley and "Pepsi" Greene, if you can credit it, is that at some point Richard Tipton is in a house, maybe with James Roane, maybe with some other people, and according to Denise Berkley, later on that night at 1212 West Moore Street, Tipton says to the assembled people, "Moody tried to kill me." That's the evidence that

you have.  That Tipton says to Berkley or to those people that "Moody tried to kill me."  There is no evidence that Richard Tipton is involved in anything outside of the house.  He may or may not have been inside the house when the shots were fired.  The evidence is that Moody was there to kill him.  What evidence do you have that there was any intentional killing, murder, inside that house?  You have none.  None whatsoever.

In regard to Richard Tipton, on the Moody counts, which are Five, Six, and Seven, they have failed to show a murder by Richard Tipton; they have failed to show any murder, again, in the course of a Continuing Criminal Enterprise.  Again, you can shut the door on the death penalty.

Peyton Maurice Johnson is that murder and the firearm and the 1959 counts, Counts Eight, Nine, and

3047

Ten of your indictment.  Richard Tipton has never been charged in those counts.

Peyton Maurice Johnson's murder was January 14th.  The next one in the indictment is Louis Johnson, January 29th.  In between those is the Katrina Rozier murder, which is not charged in the indictment.  In addition to what I told you before about Jerry Gaiters, remember that Denise Berkley told you that the night this happened that Jerry Gaiters had a gun.  That's another fact you can consider when you say to the government, "Why is it you can't tell us who shot Katrina Rozier?"

Richard Tipton was charged with the murder of Louis Johnson, and during this trial the government has moved, and Judge Spencer has granted a motion to dismiss the charges against Richard Tipton in Counts Eleven, Twelve, and Thirteen.  You ask yourself how could that happen, charge a guy with murder in a big case like this and come in here and dismiss the charges?  That's how the government operates.

Torrick Brown, this is one of the most amazing stretches of legal juggling I've ever seen.  Mr. Vick tells you Tipton wasn't involved, he wasn't there, but he talked about it later on so we can charge him with murder.  That's what it comes down to.  2-1-92.

3048

That's the day that Charles "Man-Man" Townes and Tipton come from Central Gardens to Newtowne, and they go to 1212 West Moore and nobody is there.  Shortly thereafter, they see "O" and Gaiters on the corner.  At that point, whatever happened in South Richmond has already happened.  There is absolutely no evidence other than Mr. Vick's fertile legal imagination to connect Richard Tipton with the Torrick Brown murder, the Martha McCoy maiming, which took place on 2-1-92, which are Counts Fourteen,

Fifteen, and Sixteen of the indictment.

Counts Seventeen through Twenty-three are the three Church Hill murders, the CCE murders, the 848 murders, three violence in drugs, and one gun charge.

Charles Townes told you that when they got to the corner that night, when they saw "O" and Gaiters on, I think it was, Catherine and Harrison Street, which is in the pictures here, "O" said in Townes' hearing, "I've got to take care of some business." The four of them get into the car. Again, this is Charles Townes is driving this car, I think it was a white Pontiac 6000 which they had borrowed from a kid named Kenny. They drive from Newtowne to Central Gardens. Charles Townes tells you during that drive there is no discussion about any murder; that he gets dropped off, and that "Whitey" kids him, chides him about not coming, which I imagine he can tell you that "Whitey" does all the time. From that point on, there are three people left: "O," "Whitey," and Gaiters are in the car. And from there, according to Gaiters, they go from Central Gardens to park somewhere I guess on 28th Street, maybe Clay Street, near 2817 East Clay Street.

It is there that you have to determine how believable Jerry Gaiters is. It is there you have to listen and watch the video with Detective Woody to see what Gaiters really is telling you. Because he is the person that you can say, in regard to what Detective Woody read to you the other day, a concerned citizen who lives close to that house told Detective Woody that "Mousey" Armstrong had come to him two days before and said to this concerned citizen, "I'm worried, I'm worried about the person who killed Katrina Rozier; that he is looking for me." That's what the evidence is in this case. You have to believe Jerry Gaiters beyond a reasonable doubt in regard to that. There is absolutely no evidence that "Whitey" Tipton left the car. There is absolutely no evidence, if you find Jerry Gaiters a less than credible witness, that he knew what was going to happen other than what Charles Townes told you: that "O" had said at Catherine and Harrison, "I am going to take care of some business." It is not unusual in drug dealing for them to be taking care of business, going around collecting drug debts. Nothing unusual at all.

The last murder case is February 19th down here about 15 blocks from here. Stony Run is a street that connects Government Road and Williamsburg Avenue in the East End of Richmond. And you have a number of people that have information about that. Mr. Vick

107a

suggests to you that Walter Tuck corroborates whatever it is that the government's version is. I suggest to you very strongly that he does not. That he, in fact, assists the defense. This is the aerial photograph, Exhibit Number 65, of Stony Run. Here is the water culvert over here, the railroad tracks. The street is here. And you have this vacant land down a slope, down a hill here.

Mr. Tuck was on his way to the 11 p.m. shift at Reynolds Metals in South Richmond. He comes down Government Road, makes his turn. He told you there were a series of turns and it starts to straighten out. And what he says after he straightens out is he

sees someone, a body, in the air. He tells you he sees a medium brown-complected black male standing over here and going down the hill this way, walking. There is no suggestion from Mr. Tuck that there is a second car. He tells you about the station wagon that's there.

Within a few seconds, he is over here on Williamsburg Avenue, which is not more than a couple hundred yards from there. He says at that point there is a police car coming down the hill, lights and siren. The police car would have made the left-hand turn there. There is no evidence of a second car. There is no evidence of a second shooter. The evidence is that a Glock did the shooting. The evidence Mr. Vick told you about in this gruesome picture about these needles simply means that maybe somebody moved, walked around. There is absolutely no evidence in regard to Richard Tipton except Gwen Greene says Richard Tipton. There is no evidence that she even knew him. They never brought that out on direct examination. He knew "Pepsi" Greene because she was in the business, she was in Newtowne using and selling drugs. No evidence that Gwen Greene was involved in that. None whatsoever. She describes a person as having on a

brown coat, brown hood. Tuck said it was a brown scarf. But what does Charles Townes tell you? Townes tells you that he was with Tipton that night, another guy named John Knight was with them, and "Studie" Green, who didn't testify, were with him. He tells you that "Whitey" was beeped by "O," and that later on, a few minutes later, they took "Whitey" and "Studie" to Gloria's house, Gloria Bridges. That's the woman that Mr. Vick laughs at and ridicules because she thought maybe "Whitey" had been at her house on March 20th when he was in New York or Trenton, so she is a confirmed liar. I wonder why Mr. Vick didn't have that same feeling about his witnesses, Johnny Lee Byrd or some of these

other people?

Our witness corroborates their witness. They were together. He was not over on Stony Run. And, more importantly, he tells you, Charles "Man-Man" Townes says Tipton was wearing bluejeans and a gray hood that night. Bluejeans and a gray hood. Not anywhere near the clothing description of the potential shooter in this case. So you have Tipton's alibi corroborated by one witness of his and one witness of the government's.

I would say that probably the most important charge in terms of the government in this case is Count Two, which is the Continuing Criminal Enterprise count, which you will hear about ad nauseam. You will hear about it because it is so important. The indictment tells you, and the Judge will instruct you about what the indictment means, but it says -- and there are different dates here now. When you look at the Continuing Criminal Enterprise, it has a significantly different date than the date of Count One. Count One, the conspiracy, says from January of 1989 up until the filing. Count Two, the CCE, says from January of 1991 until the filing of the indictment. The government has never introduced any evidence as to what the significance of January, 1991 is. You know in June of 1991 the Trenton bust took place, and we know in late November, early December, "Whitey" arrives on the scene. What the relevance of the January date is hasn't been made known to us. But what the indictment tells you is that these defendants had to act in concert with five other people and they had to occupy positions of an organizer, a supervisor, and a manager, and that they had to receive substantial income and resources from the CCE.

When you have the jury instructions back there after Judge Spencer reads them to you, you will have Instructions Number 18, 19. Like the other instructions, read those very carefully. 18 says the term organizer and the term supervisory position and position of management are to be given their usual and ordinary meanings. These words imply the exercise of power and authority by a person who occupies some position of management or supervision. Did the government introduce evidence in regard to Richard Tipton that he exercised supervision and control over other people?

This again was the manner in which the government presented its witnesses, a very tight script. They were not allowed to say on direct examination other than organizer, worker, partner.

Until they were asked on cross-examination, "Well, what do you mean you were a worker, what do you mean Tipton was a partner?"  Hussone Jones, for instance, said, "He was the guy I got my drugs from."  "Oh, that makes you a worker and him a partner."  "Yeah.
"  That doesn't make it, ladies and gentlemen. All that does is to show that Tipton was a supplier of crack cocaine.  CCE requires much more than that. It requires, I suggest to you, a Mafia-like

3055

organization, which is totally missing from this case.

MR. VICK:  Objection.

THE COURT:  The objection will be sustained.  Mr. Geary, you know better than that. That's a total misstatement.

MR. GEARY:  You don't have what the instruction tells you.  You don't have power.  What power did Tipton exercise over them?  Well, according to these witnesses, Antwoine Brooks:  "He told us what we would get and they would get.  We would just go out selling and that's it.  We could do anything we wanted to do."  Hussone Jones, Charles Townes: "We were free to do whatever we wanted to do in regard to drugs."

You get to the Central Gardens people, the Newtowne people, they tell you the same thing.  He was one of the people, one of the many people who he got drugs from.  That does not make him an organizer, a supervisor, or manager of a CCE.  And that's the key count.  That's the count that you must find beyond a reasonable doubt in order to satisfy what the government wants in this case, and that is, to get to the penalty phase in this case.  Because the government says it, doesn't make it so.

3056

The government likes to give people nicknames or use their nicknames.  You can see on here the various nicknames, and you have heard them  --  there must have been a couple of nights when I woke up with nightmares hearing Mr. Vick saying "Whitey," "C.O.," "J.R."  It is a litany to get them all grouped together.  But I suggest to you that if you want to think of some other people in this case that you may want to think of a lot when you think of "Whitey" and "C.O." and "J.R.," you might think of people like Greg Scott, who is skating.  A heavyweight dealer from New York City, a seller of weight, skates out of here.  High fives all around.  "Sweets."  "I'm going to get a sweet deal."  Bought and paid for by the government.  Hussone Jones, this brutal murder:  "Oh, I was shot shocked, sort of shocked."  "Would you be afraid of Tipton?"  "No.  Saw him every day.  Went to New York with him."

This substantial income that they have? $3,000. That's how big this gang was. They had $3,000. The only time you ever corroborated money in this case is $3,000. That's the big Newtowne drug gang. Johnny Lee Byrd, take a look at that coat and knife. Think of how many lies that man told you on this witness stand. Lie after lie after lie after lie. One of Mr. Vick's unimpeachable sources, a bald-faced liar.

And the last one, ladies and gentlemen, Jerry Gaiters, the hit man, the enforcer. The government of the United States wants you to convict the two New York Boyz, give them some murders, give them a CCE, and then come back and send them to the electric chair, death penalty, lethal injection, based on the testimony of Jerry "The Hit Man" Gaiters. I don't have to say any more. Thank you.

THE COURT: Mr. Cooley or Mr. McGarvey?

MR. COOLEY: Thank you.

May it please the Court, good afternoon to you, ladies and gentlemen. Gentlemen and lady of the government: Dr. Norman Vincent Peale, a somewhat renowned minister, was asked sometime ago how he decided on how long his sermons should be, when he should bring them to the end. And he said he relied upon one theorem, and that theorem was that the mind can absorb only as long as the bottom can endure. And my suspicion is that at this point, we are taxing in both areas. I do thank you for your patience. I thank you for the concern that you have shown through this trial. And I thank you for your endurance and for what I hope will be your absorption for the remaining portion of these arguments.

At daybreak this morning, a Wonder Bread delivery truck pulled up to the back of a Safeway. The delivery man got out, he unloaded the racks of his bread, and he resupplied that Saveway store for today. He charges Safeway $.25 for that bread, the going wholesale price. He expects to be paid for each and every one of those loaves of bread. He doesn't care, and he does not direct Safeway in how much they charge for those loaves of bread. He doesn't care whether they make a tremendous profit or they use his loaves as a loss leader. He doesn't direct them or supervise or manage them in price. In fact, he doesn't even care if Safeway sells that bread at all. He doesn't care where they sell it. He doesn't care if they move it to another Safeway store, or they discard it, or they sell it from a street corner. All Safeway has to answer to the bread man is to pay him his money, his wholesale price. He does not organize, he does not supervise.

He does not oversee, direct, or control Safeway, because he supplies them with bread.

His supplying that bread does not make him a manager of Safeway. Now, he has done this. He has conspired with Safeway. He has agreed with Safeway

3059

that they will redistribute his loaves of bread. They have agreed to take his bread and try to sell it at their retail price. And they work to sell his bread, and they hope they make money. But he gets his money either way. And while Safeway is in that sense a worker for the bread man, as to the bread man, Safeway is neither his employee nor in his chain of command.

Now, if you understand the analogy that I have just laid before you, then perhaps you can better understand the indictment that has been laid before you. If instead of loaves of bread the delivery man is delivering cocaine; instead of just a legal contract, a legal conspiracy or agreement, we have a criminal drug conspiracy: simply, the agreement to deliver a narcotic and to redistribute it. And that is exactly what Count One of the indictment alleges. And it alleges that as to all four of the folks who are seated here.

Now, I would suggest to you, ladies and gentlemen of the jury, that in this indictment there are two predicate charges. One of them is that count I just spoke of, the conspiracy count. Count Two, however, is the other predicate charge. It is the Continuing Criminal Enterprise charge. And we,

3060

because we have dealt with this case for so long, have a tendency to shorten that Continuing Criminal Enterprise and call it CCE. And so if you hear that term, and you have heard it, what we are talking about is the allegation of a Continuing Criminal Enterprise. Three folks here, these two gentlemen and Mr. Roane, are charged with being engaged in a Continuing Criminal Enterprise. These two predicate offenses, conspiracy and Continuing Criminal Enterprise, are separate and distinct charges. They arise out of separate and distinct statutes. But in this trial, the distinctions between them have become somewhat obscured in the presentation of evidence and perhaps in the presentation of argument.

And the reason they have become obscured is that the government has alleged that the basis, the underlying criminal action of each, is the dealing of drugs. Dealing of drugs makes a drug conspiracy. A Continuing Criminal Enterprise must show that there was a violation of the narcotics act as one of the elements, one of the elements.

The biggest distinction between the two,

however, is this:  Conspiracy merely requires agreement to supply and resell.  Count Two, however, Continuing Criminal Enterprise, goes further.  It

3061

requires that there be management, supervision, control, direction, or organization; and that there be substantial income or resources to each particular defendant charged with that count.  That is what is required by the statute.

Now, I will tell you, ladies and gentlemen, that there have been significantly different statements of interpretation of this statute than what I believe it to be in the argument presented this morning and this afternoon.  I am not going to attempt to tell you that my interpretation is correct.  I am going to tell you that in the instructions that will be read to you at the conclusion of these arguments by the Court, and which will be sent to you, sent along with you to your deliberations, there are certain instructions, they are number 13 through number 19, which tell you exactly what a Continuing Criminal Enterprise is and what the government has to prove in order to satisfy you as to that count.

I ask you to rely on that law as stated to you by the Court and stated to you in these instructions, not on that that was supplied to you in the statement by Mr. Vick, and for that matter, not what I might say.  Base it on that.

Just as there are two predicate offenses,

3062

conspiracy and Continuing Criminal Enterprise, there are other groups of offenses within this indictment that fall related to each of those two predicate offenses.  There are, I suggest to you, a first group.  And that first group are the counts which allege that a defendant caused the murder of someone for a purpose of maintaining or increasing his position in a racketeering activity.  And they have defined racketeering activity as drug dealing.  These are the alleged murders and one malicious wounding -- excuse me, three malicious woundings -- that require the government prove the drug conspiracy.  You can find the existence of a drug conspiracy and the commission of murders pursuant to that drug conspiracy, and that is the distinction between those offenses that are alleged to be part of the Continuing Criminal Enterprise.  You can find guilt of the drug conspiracy and murders pursuant to that, and if you do that, you may convict any of these three young men that you choose to of those offenses that you think the government has satisfied you with beyond a reasonable doubt.

Let me give you an example of what that might be.  The Wonder Bread man, desiring to enhance his

113a

position in the sale of bread around the City of

3063

Richmond, kills the Merita bread man so that the Merita bread man cannot make his deliveries, cannot make his bread, cannot supply. He has improved his position. He has killed. He is guilty under those counts to enhance his position in the conspiracy. He is not guilty of a Continuing Criminal Enterprise or acting in furtherance of a Continuing Criminal Enterprise unless and until the government shows that in the course of his supplying to Safeway, he has exercised control, management, supervision, or those other things that have been outlined to you.

For Cory Johnson, those counts are Count Ten, Count Thirteen, Fourteen, Twenty-one, Twenty-two, Twenty-three, Twenty-seven, and Twenty-eight. The other group of alleged killings: These are counts which allege that a defendant, while engaged in and/or working in furtherance of Continuing Criminal Enterprise, killed or procured the killing of someone. To convict of these counts, the government must prove the existence of a Continuing Criminal Enterprise. If they fail to do that, then they fail to prove the underlying predicate to these CCE murders.

They must prove more than just that drug conspiracy or drug dealing. It must demonstrate in

3064

its evidence control, management, overseeing, organization, or supervision. And these, ladies and gentlemen, these CCE murder counts are the capital counts. Absent a finding of killing in furtherance of a CCE, we do not reach the second stage that's been constantly referred to in this trial.

Absent that demonstration of management, et cetera, the convictions, if any, are murders related to racketeering, the drug conspiracy, and drug dealing. Now I suggest to you that the government's evidence has totally, and I mean totally, failed to establish a Continuing Criminal Enterprise. And don't let the manner of presentation obscure that, ladies and gentlemen. Cory Johnson may be a bread man. He may be a supplier of a narcotic. He is not a manager any more than the bread man in that analogy I gave you is the manager of Safeway.

Of the government's witnesses, not a single soul told you that Cory directed him or her where to sell, how to sell, how much to sell for. Any profit they made was theirs. All they had to do was bring back that specific amount, two-for-one, or 70-30, or 60-40, whatever the figure agreed upon. That's all they had to concern themselves with. Just like Safeway gives a wholesale price to the bread man,

3065

that's what Hussone Jones and anybody else told you they did with any of these three defendants: Bring back only the money to which they were entitled. He supplied and they paid him.

Is there an agreement between them when you do that? Give them 30 pieces, 30 rocks of cocaine, and they go sell it at $10 apiece and bring you $200 back? Is there an agreement, a conspiracy? Yes. Is there control and management? No. Conspiracy? Yes. Continuing Criminal Enterprise? No. And that answer, to each one of those folks who testified before you in this courtroom about drug sales by them and by others, told you exactly the same thing. They told you that from Mr. Tipton, they told you that from Mr. Johnson, and they told you that from Mr. Roane. Now, if I wanted to sell McDonald burgers, I would have to go see McDonald's management and I would talk to McDonald's about what the price would be for me to be able to sell McDonald burgers. And then they would tell me where my McDonald's had to be because they don't want it in competition, don't want it a block away from another McDonald's. They would tell me it is going to be here or nowhere; you will sell here. They would tell me what I could sell. I'm going to sell Big Macs, not Whoppers. I'm going to sell their product and no one else's. They are going to tell me whether I can serve Pepsi, or I can serve Coke. They are going to tell me how much I have to sell my product for at McDonald's, and they won't let me deviate from that. They will tell me what hours I must be open and tell me what kind of uniforms my people and I must wear. That, ladies and gentlemen, is control. That, ladies and gentlemen, is supervision. That, ladies and gentlemen, is organization and management. And that, McDonald's, in the control, McDonald's, is a perfect example of a continuing enterprise. It exercises control. It exercises the power that Mr. Geary read to you from that instruction.

Contrast that, if you will, with this scenario. You and I have our own separate retail stores. We want to sell a product from our own separate retail stores. We are looking for the best price, the best wholesale price. So we pool our money. I give you my $100, you put your $100 with it. And we go to Price Club and we go up to Price Club and we buy a package of things. And once we have bought it, we have used our pooled money. We open it up, as best I can, we open it up and we divide it up. And you take a portion. And in this particular organization or this particular alleged conspiracy, he took a portion, he took a portion, and he took a portion.

115a

And what we sold it for was our business. He didn't answer to him. He didn't answer to him. None of them answered to each other. They just sold it for the best price they could. That's the difference. We pool our money, we split it up, and we buy a product from a supplier. We sell it where we want and for what we want, and if we don't want to sell it, we don't even have to do that.

Price Club, and our dealings with Price Club, are not a Continuing Criminal Enterprise. All Price Club wants is to be paid its wholesale price. We got the money, we take the package. We don't have the money, Price Club keeps the package. Price Club exercises no control whatsoever, no management, no supervision, no organization. None. Price Club is our bread man. Price Club is a supplier. And where does Price Club get its inventory? It gets it from the main Price Club distribution center in New York. So the fact that the supplier goes to New York to a bigger supplier doesn't make it a Continuing Criminal Enterprise. They are still suppliers, not exercising control or supervision over the ultimate seller.

I hesitate to mention the other element, because I fear it will obscure the real issue of management in this case. But also for a Continuing Criminal Enterprise, there must be a demonstration for each person alleged to be part of that Continuing Criminal Enterprise of substantial income. And contrary to the description that Mr. Vick gave to you, the instruction of law which you will read, instruction -- I believe it is Number 18, says that income, that income is such income that a reasonable person would consider to be considerable or ample economic benefit. And in this case, ladies and gentlemen, there has not been an iota of description of lavish living or spending by any of these folks. And when you judge credibility, ladies and gentlemen, and what the government has told you today, think back about what Maurice Saunders told you. Gosh, one time he went to New York with $40,000, and once he went with $18,000. And golly, they were selling a kilo a month. A kilo a month, ladies and gentlemen, is $100,000 gross sale price on the street. $100,000, Maurice Saunders told you. He took this big money to New York and they were selling $100,000 worth a month. And if you believe that, then ask yourself this: How come Maurice and the other five or six people he was sharing this rented house with fought each month over having to contribute their $100 apiece for rent? Now, that's the person, the unimpeachable source, the government wants you to rely upon.

Charles Townes told you, "Oh, yes, we were doing a half kilo twice a week." Mr. Baugh incredulously says, "A half a kilo twice a week?" That's 15 kilos a month. That's $1.5 million worth of money, cocaine, a month. And they were arguing over having to put up that $100 for their rent?

I suggest to you, ladies and gentlemen, in this case we have heard of two cars. One of them belonged to Antwoine Brooks. I asked him, "Did you have a car?" "Yes. I had a Cadillac." "What year?" "1976. My grandma gave it to me." One witness made reference to Richard Tipton, "Whitey," having a car. What year was that? It was a 1972. Cory Johnson had no car. He had no house. He had no gold. He had no diamonds. He had no jewelry. And when we talk about considerable or ample economic benefit, I suspect it is a matter of perspective. For the homeless person, anything someone has might be ample and considerable economic benefit. For the chairman of one of our Fortune 500 corporations, having a half-million dollars income a year might not seem so considerable or ample. What person in this courtroom told you anything about Cory Johnson having things of value? One person. Valerie Butler. "What did he have?" "Oh, he had expensive things." "Such as?" "He had a pair of Guess jeans and a pair of Timberland boots. And I saw him with over $100, I don't think it was a thousand, might have been a thousand. But he had more money than most people who don't have jobs." And that was true.

Now remember, ladies and gentlemen, that we in this courtroom as attorneys are advocates. The attorneys for the government and the attorneys for the defendants, all of us are advocates. We are trained to present our position in the best possible light. And one of the things that we are taught in doing that is that when you have an area of weakness in your case, an element that we can't quite prove, then you attempt to hide that weakness by presenting your strongest point and trying to do so with visually-overwhelming evidence and hope that that wave, that overwhelming wave of strength from your good point will wash over and obscure the weakness of that other point. Here in this case, the government has failed to prove the Continuing Criminal Enterprise as to Cory Johnson or as to any other defendant.

So what does the government do? It covers this lack of participation, management, and control by the defendants by phrasing the question in the words "They," or "What did you get from them?" as Mr. Geary made reference to. There isn't a "they" in the

indictment. And on direct examination, everything was done by "them." Why, "they" did it all. And when we got up, when we got up on cross-examination and said to them, "Well, excuse me, Mr. Witness, Ms. Witness, I would like for you to tell me specifically what did Cory Johnson do?" Well, more often than not he didn't do anything. Or one of the others did or didn't do something. Overwhelm the weakness if you can by showing your strength.

In this case, the government tried to overwhelm you and show you their greatest strength and to avoid you seeing their greatest weakness. They held up to you blown-up pictures showing results of violent acts. And they are entitled to do that. And they hope that you will be so repulsed by this show of gore that you will recoil from the evidence and thus lose sight of their failure to establish these elements of control and management.

The government in this case has rested its

3072

evidence on what I called in opening argument their bounty hunters. I make no apology for that label. There are 21 felons who have been paraded in front of you. They were surrounded by 29 officers who saw no commission of crime, only the result. And they were surrounded by eight citizen identifiers. I say there are three groups of folks here: officers, felons, and identifiers. The identifiers were brought in to identify the particular deceased. And these were the folks -- and I ask you to recall this -- to whom, in order to maximize the emotional effect of their dramatic presentation of their case, the government's case, the government handed instead of a school picture, or one of those pictures that was up here during the course of the government's opening statement, instead of handing to these loved ones a picture such as that, in order to maximize the emotional effect they hand to them a picture from the bloody crime scene. And they get the effect that they want. And they try to influence you in that manner. And they try to overwhelm you in that manner and cause you to recoil and not to see that they have failed in their effort to establish management, control, and supervision. 21 felons. What did they say about getting drugs from Cory? Not one of the 21

3073

ever testified Cory managed them, directed, organized, supervised them. None of them did. Just the opposite: They told you he did not.

As important as what these bounty hunters say is why do they say it. What motivates them to be here? Is there an interest for them, a benefit to them to be here and to testify? How do you gauge their credibility, their believability? The credibility of

118a

these bounty hunters is tainted by three things in this case, ladies and gentlemen. First of all, the promise of immunity. Second, the hope of a 5K.1 motion being filed by the government, exclusively at the decision of the government; and thirdly, the effect of suggestive questioning. Now, what I call "suggestion" Detective Woody calls "investigative technique."

Each of these 21 bounty hunter witnesses has come in here to testify before you tainted by one, two, or three, of those three situations.

There was a commercial that used to be on television in which they came on and to sell their product they said, "How do you spell relief?" The answer was R-O-L-A-I-D-S, Rolaids [AIDS|aids]. In this courtroom, when these witnesses came in before you, you could get one of three answers to this question: "How do you spell truth?" Some of them spell it 5K.1. Some of them spell it immunity. And some of them spell it L-E-A-D-I-N-G, leading. And you saw a great example of that through the course of this trial. And you can look, and I ask you to look at this tape. This is Exhibit Number 1 for Cory Johnson. It is cued up to exactly the place where I questioned Mr. Woody, Detective Woody, about how he got certain things to be said by Jerry Gaiters. Push it into your VCR. It is going with you. Watch the suggestive -- I'm sorry, investigative -- technique used by the detective. That is how you spell truth for Jerry Gaiters: L-E-A-D-I-N-G.

Do you remember, and I hate to keep going back to the Old West, but do you remember Palladin? He had a card that said "Have Gun - Will Travel." Well, these bounty hunters have a card, too. This one says, Have Immunity - Will Tattle." And they, just a few of them, not all of them, but the major ones in this trial, they have another card. It is a very valuable card. I carry credit cards, a couple of them, in my wallet. I don't have this one. They have it. It has the bounty hunter's name embossed on it. It is called the 5K.1 card. "Don't leave jail without it." You have got to have this card given to you by the government for you to get a reduction in your sentence. And when you are gauging the credibility of these witnesses, one other thing I would like for you to remember or to recall: These are the witnesses that I refer to as the nonrememberers. The nonrememberers. Our Forefathers wrote into our Bill of Rights a right to confrontation, a right to confront and to question one's accusers; a right to make a government witness answer your questions, not just theirs. Not just

regurgitate the government line, but answer pointed questions by you or your counsel.

How many of the government's witnesses answered only the questions they wanted to answer, the ones they thought they had to answer to qualify for immunity or 5K.1 motions?

Denise Berkley, like Mr. Geary said, remembered every detail about one defendant, but couldn't remember the name of the person who supplied her with her crack money for two-and-a-half years before she ever met Richard Tipton, at roughly $30 a week. Couldn't remember his name, or wouldn't remember his name. Wouldn't answer defense questions. Wouldn't name other people from whom she purchased hundreds of times.

3076

All the government's crime scene men forgot to tell you that they found a knife in the coat of Johnny Lee Byrd in the car where Mr. Talley was stabbed to death. And only when the defense calls Detective Cox do you find out that in the very car with the stabbed body of Mr. Talley is there a knife which matches in physical characteristics the wounds on Mr. Talley's body. Why? Like Mr. Geary said, it doesn't comport with their case. It points the finger at Johnny Lee Byrd.

And Mr. Byrd, now that we are to him, refused to answer about his felony conviction. "Well, they don't mean anything. Those felony convictions, they are none of your business." He answered only what he thought the government wanted him to answer. And by the end, instead of saying he wasn't going to answer, he couched his refusals to answer in the terms "I don't know; I don't remember." By golly, by the time we got to the end of that meaningful cross-examination of Johnny Lee Byrd, he couldn't remember his birthdate. He couldn't remember his birthdate. "I don't know."

Robert "Papoose" Davis and Dennis Moody, exactly the same. Wouldn't or couldn't. And they did refuse to answer questions of the defense.

3077

And finally, we get to Detective Fleming, chief investigator in this case. He won't answer the question that is asked. It is kind of like being in a presidential debate. You ask a question, Detective Fleming answers whatever he wants to. Finally, even the Court has to scold him. "Mr. Fleming, you have been through this before. The answer can be yes or no. Explain it if you want, but answer the question." He doesn't want to answer the question.

Now, I ask you, ladies and gentlemen, he told you and we heard from Denise Berkley, who said, "Yes, I came in to talk to -- immediately to talk to

Detective Fleming." Now this is, I suppose, such a small case that the detective, knowing that this lady is telling him that she has been in constant contact with his suspects for the last two months, has overheard everything they have ever said, watched them do everything they have ever done, and it only involves 11 deceased, that he is not going to take contemporaneous notes. He is not going to tape-record what she has to say. He is not going to videotape what she has to say. And then the government has the audacity, after she is finished, to call Mr. Fleming back to the stand and say yes, quite smugly, "Everything she said is consistent with

the notes that I put in my report."

Denise Berkley --

MR. VICK: Objection, he did not so testify. He said it was consistent with what she had stated.

MR. COOLEY: I will allow the jury to recall what they will.

THE COURT: Go on.

MR. COOLEY: And his notes, ladies and gentlemen, that so accurately reflect the consistency of her some hour-and-a-half to two-hour testimony are contained in this report which was put into evidence. It is marked Government 142. And we have redacted things that had no relation to Denise Berkley. This is the entirety. These two little tiny paragraphs that Mr. Fleming says tell him that everything she testified to you was consistent with what she said to him. It will be back there with you, ladies and gentlemen, 142. You read it and you see if we don't have another nonrememberer.

Now, ladies and gentlemen, the right to confront and question your accusers has to be a meaningful one for the system of justice to work. Was it, in your opinion, at this trial? Or did these government witnesses answer only what they wanted to answer?

Like the surly warden in the movie "Cool Hand Luke," after he had just beaten a manacled prisoner into submission, "As I said, what we have here is a failure to communicate." That's exactly what we have here, ladies and gentlemen. We have a failure of the government's witnesses to answer anything but the questions they think the government wants them to answer. And I ask you to remember that failure to communicate when you judge the credibility of these unimpeachable sources Mr. Vick makes reference to.

When you judge credibility, I ask you, also, to consider the motivation of immunity. Now, the government introduced each of its witnesses by saying, "We have only given you use-immunity, have we

121a

not?" And they did that to enhance the believability of these witnesses, as they called them. Use-immunity means what you say, tell them yourself, can't be used to prosecute you. Transactional immunity is much broader. It is an immunity that no matter what anybody tells them, it can't be used to prosecute you if you have talked to them. The government says, "You have only got use-immunity, isn't that right? We get information from anybody else, it can be used to prosecute you." But each witness that came up here when asked said that he or she understood and believed that they will never be charged. Each one of them had given to the government the names of all these other witnesses, and the government could have used their testimony. Hussone Jones to convict Antwoine Brooks. Or "May-May," Charles Townes. But they haven't even charged them. And the witness says, "I haven't been charged, and I'm not going to be charged."

Now, is the government's representation correct? Or is the witness' understanding correct? The plea agreement says that if their witnesses lie, if they become aware of them lying, they will be charged with perjury. And the government says that as each witness takes the stand to enhance their credibility, their believability, with you.

Well, Jerry Gaiters lied to the Grand Jury, he admitted that. In fact, he admitted it was perjury. Charles Townes lied to the Grand Jury; Hussone Jones lied to the Grand Jury. But as Gaiters said, ain't no one suggested he was going to be charged with perjury. The government wasn't going to charge him with perjury. In fact, he gave us an entirely new version when he took the stand here. Even this, then, even this the detective that he spent 18 hours with knew about. He is not going to be charged with perjury? So is the government's representation to you correct, or is the witness' understanding correct? Or is it just another failure to communicate?

You see, immunity saves these folks, every one of them, from exposure to Count One of the indictment. Count One of the indictment says that if you agree with somebody else to receive and to redistribute drugs, then you are part and parcel of that conspiracy. And as each one of them said, they understood they could be exposed up to the maximum of life in prison without parole if they didn't have immunity. So understand use-immunity when you gauge the interest of these folks.

And finally, I ask you to consider the effect of the 5K.1 motion. What does it mean? It means simply

what we told you at the beginning.  If these people are convicted of an offense to which they pled guilty, they must be sentenced.  As Jerry Gaiters said, he is going to get the maximum.  He is going to get several life sentences if he doesn't come in here and testify the way he is expected to.  If he gets a 5K.1 motion, his sentence can be reduced out of those mandatory sentences, out of those maximum sentences, and if necessary, and if the Judge decides, all the

way down to zero.  Who got the 5K.1's?  Greg Scott.  What did he tell you he was doing?  He was doing weight.  They weren't.  He was doing one-and-a-half kilos a week.  He is going to get a sweet deal.  He is on bond.  He doesn't think he is going to serve another day.  And he told you the New York Boyz ended in June of 1991 when he was arrested.  There was no Virginia conspiracy involved in that New York Boyz group.  He doesn't know anything about Virginia.  He has never been to Virginia.  And he never mentioned these two fellows when he was arrested and getting the benefit of a 5K.1 motion in New Jersey.  He tattled on all the other people arrested in that house and, according to him, never mentioned them.  How surprising.

Pamela Williams, 5K.1, charged with gun charges, has been pending sentencing since last year.  Almost a year she has been waiting for sentencing.  What do you think she is waiting for?  She is waiting to be sure that she can perform for you in this courtroom so the government can then decide how hard to push for a 5K.1 to allow her to walk, and that's what she is hoping for.

Sterling Hardy, 5K.1, pled guilty to murder, one of these causing murder in the course of

racketeering.  He pled guilty to conspiracy to commit murder  --  pled guilty to the malicious wounding.  5K.1 if he testifies in here.  And last, Jerry Gaiters killed "Nat" Rozier, and I think the evidence is clear on that.  He killed "Mousey," killed Bobby Long, killed Tony Carter.  Maximum if he doesn't testify.  What do you think he might get?  Oh, maybe 20 years.  "Where did you get that from?"  "Oh, just pulled it out of the air."  He is a liar, ladies and gentlemen.  You cannot rest a verdict on the testimony of Jerry Gaiters.

You see, for these people with the 5K.1 motion, the 5K.1 is their unholy salvation.  Instead of bringing them in here individually, we should have brought them in and have them in unison raise their voices.  It is not an Amazing Grace.  It is an Amazing Disgrace, the 5K.1.  5K.1, how sweet the sound that saved a wretch like me.  Once I was lost,

but now I'm found. I was blind but now, after talking with Detective Woody, I can see. Led by a person who asked them leading question after leading question after leading question. Consider the power of suggestion. When you consider the credibility of these folks, consider suggestion. You start with the bogeyman from New York. You know, being from the South, we kind of get taught early that everything from New York must be bad. And I think probably the only thing worse than these folks from New York is that secret ingredient of the competitor of Pace Picante Sauce. That's the only thing I know of that's alleged to be worse than these two young men.

Now, I ask you to look at what Mr. Woody calls investigative techniques. Watch that. It is ten minutes where it is cued up. If you want to watch the whole tape, start there. Remember that this tape is part of 18 hours of working with Jerry Gaiters. We don't know whether this tape represents the fifth or the fifteenth hour of working with him. We don't know what was suggested before or after.

MR. VICK: Completely outside any evidence that's been heard in this courtroom.

MR. COOLEY: It is not.

THE COURT: I'll sustain that, Mr. Cooley. Go on.

MR. COOLEY: There was a previous videotape Mr. Woody testified to on February 3rd, 1992, of Jerry Gaiters that was roughly two hours long, according to Detective Woody. This is the second of those tapes. There may not be any testimony about how many discussions there were in between.

Now, Mr. Gaiters told you, and he answered a question from Mr. Geary, every time he gave an answer the detective didn't agree with, he was corrected. Mr. Woody says, "Yes, I would confront the person I was interviewing and I would confront them with what I believed to be the information from another witness and see if they would conform their version to that. Hit them in the head with what I thought to be the truth and see if they wouldn't then admit that."

It worked real well with Mr. Gaiters. It worked real well with Mr. Hardy, who on his second interview, after telling them "I don't know anything about any of this, I haven't done anything," twice, one full interview, and halfway through the other, when Mr. Woody says, "Well, I don't believe you. And this is why I don't believe you. This is what we think happened," and he tells him what Mr. Chiles had told them. And then and only then Mr. Hardy conforms his version to that of Mr. Woody's.

Mr. Byrd was locked up with Sterling Hardy.

124a

They read the newspaper together. And then in September, 1992, Mr. Byrd decided to write the United States Attorney, Mr. Cullen, and advise him that he had all this valuable information and was prepared to testify or to help. And of course, the fact that he

had pending state charges certainly wouldn't have had anything to do with that.

Perhaps the most difficult area for me to address in this trial, certainly the most delicate of areas, is the suggestability of the Greene sisters. And I tell you, it is with great trepidation that I attempt to speak to you about it. But it is important for you to look at that and to address that issue as well.

Everyone on the prosecution team denies that they did anything to attempt to suggest anything to the Greene sisters. As their memories, which were total blanks at one point, began to come back, it was purely on their own. Certainly, those 25 or more visits by the prosecution team had nothing to do with the recollection of these two ladies. Mr. Scott said, Detective Scott, said, "We used our normal investigative techniques in dealing with the Greene sisters." "Pepsi" Greene said in her testimony, "I can't recall if they told me what questions would be asked." But perhaps the most telling demonstration in this trial of the government's ability to suggest the answer it wants comes from "Pepsi" Greene. Today, this morning, early, you heard Detective Dalton tell you about an interview he

had with "Pepsi" Greene on January 28th of 1992. "Pepsi" Greene was in perfect health. This predates by a month her injury. She had no problem with memory or recollection at the time. She was asked about that knife, and she said, "I don't know what the knife looked like." But in her testimony before you, she is able to describe and to point out --

MR. VICK: Your Honor, I hesitate to rise again, but in black and white in evidence, it says, "I don't know what kind of knife it was." It is a misstatement of the evidence.

THE COURT: Go on, Mr. Cooley. The jury will recall about that.

MR. COOLEY: She didn't know what kind of knife it was. But when she got here today, excuse me, several days ago, she was able to identify this previously-marked Government Exhibit Number 146. And when did she first see this? The night before she testified for you. Do you think that might have been suggestive, the fact that she did not know what kind of knife it was on January 28th, 1992 when she was in perfect health, but the government shows her this

picture, the night before, and says, "Which one did it look like?"  And now they bring it in to you the next morning.  And gosh, we asked, "Well, who drew this for you?"  And we find out that it is the multi-talented "Vincent Van Gogh" Vick who has drawn this and handed it to her.  Suggestive?  I ask you, ladies and gentlemen, is there a better example in this trial of suggestive technique than this document?  It is in evidence.

I ask you to take these things, the videotape, take the Grand Jury testimony that's in evidence, and read it.  And look at it and see how it was presented.  Take these exhibits, this yellow page with the knife drawing.  And get a glimpse of what happened, what really what happened, in the 18 hours with Jerry Gaiters and the hours and hours of those 25 visits with the Greene sisters.

This combination of 5K.1 motion, immunity, and its suggestive investigative techniques, breeds inherent disregard for the truth.  These modern-day bounty hunters, these 21 felons, have no more regard for the truth or for actual innocence than their predecessors did.  They focus on coming in here, nailing their particular nail in the coffin of one of these accused, just so they can get their 5K.1.  "Get them dead or alive, guilty or innocent, just give me my reward."

And just who are the principals in this?  I'm going to try to speed through these because I know that your endurance is being tested, and I thank you for your continuing patience.

Sterling Hardy, leader of part one of the leaders of the pack.  Convicted felon, convicted prior to any of these things occurring.  Had a ten-year state penitentiary sentence over his head.  First interview, knew nothing about anything, nothing about the specific murder, and specifically, he knew nothing about the killing of Louis Johnson.  Second interview, he says the same thing all the way through, until Detective Woody says, "Well, wait a minute.  I know you are lying, and here is how I know: Because somebody else told us it happened this way."  And then and only then Sterling changes his testimony, conforms it to the version that Detective Woody has just given him.  Woody says, "I can't put words in your mouth," and then after telling him what their version is, Mr. Hardy regurgitates it back to him.  5K.1 motion for this man.  All the state charges dropped.  Certainly, this must be the man on whose credibility we can rely in order to justify the execution of a person.

Johnny Lee Byrd.  He is introduced to you as a

military man, 13, 14 years.  No promises.  He is here because he is a good citizen.  Well, we find out he says that he turned himself in in Henrico.  All those things were designed to enhance his credibility for you by the government.  What did we find out on cross-examination about Mr. Byrd?  Well, when he would answer, we found out he had five burglaries and a number of other felonies, which means he spent most of those 13 years in the military either incarcerated or committing felonies.  He turned himself in.  What a noble thing to do, right after being declared one of Chesterfield's Ten Most Wanted men.

The State Police were looking for him and the Henrico Police were looking for him.  The Richmond Police were looking for him.  He is their principal suspect, but he lies to the detective about the coat and about the car.  He lies to you about the knife.  Says that knife wasn't there, no.  No.  "I didn't have any knife in my coat."  And Detective Cox tells you on the defense case that the knife was right there.  He is hostile.  He refuses to remember.  He contacts the United States Attorney in September from the City Jail after being locked up with Sterling Hardy and reading the newspaper.  He wants help with his state charges.  And finally, we discovered that the minimal offense that he is currently serving time for, forgery, involves theft of checks from his own church.  Certainly, here then must be the man, that impeccable source, that Mr. Vick tells you about.  This man must be the man upon whose credibility we should rely in seeking the execution of another person.

Ronita Hollman, convicted felon, drug moll with Peyton Maurice Johnson, fully involved with the distribution of crack by her own admission, not charged, not going to be.  Had her third child at age 19, used crack throughout all three of them.  Agrees that others consider her to be the enforcer.  When she was arrested, she had hidden the quantity of crack that she was storing so the police would not find it in the Pamper of her newborn child.  Certainly, here then must be that impeccable source.  Here must be the person on whose credibility we must rely in order to execute another person.

Stanley "Stinker" Smithers, convicted felon, gives the detective a false name when he is first approached in the investigation.  He has a Virginia penitentiary sentence about to be imposed on him in a show cause hearing.  He is a nip joint operator.  He didn't tell the police.  He waited for them to come.  Virtually true of every one of their witnesses.  When

his case comes forward, when he needs help with that Virginia penitentiary sentence, then he becomes the most reliable, impeccable source. Surely, here then is the person on whose credibility you should rely in order to achieve a conviction of a count which could carry the death penalty.

MR. VICK: I object. He has continued to argue about the execution. As the Court knows, as the jury knows, as Mr. Cooley knows, that is not properly before the jury at this point.

THE COURT: All right. That's true, Mr. Cooley. I just wrote a note that commented on it. Don't do that.

MR. COOLEY: Valerie Butler. Valerie is a felon. She knew Cory a total of five weeks. She says he took her into the inner sanctum.

MR. VICK: Objection. Misstatement. She has never been convicted of a felony.

MR. COOLEY: She has admitted a felony, a multiple number of felonies to you in the use of and distribution of crack cocaine in her testimony before you in this courtroom.

MR. VICK: Objection. Mr. Cooley knows a felon is someone who has been convicted by a Court.

THE COURT: Sustained. Mr. Cooley, you can say what you just said, but don't call her a felon. She hasn't been convicted.

MR. COOLEY: I'm sorry. She is an unconvicted person who could have been charged by the government with each and every one of those felonies. And she would have been charged with a participation role in the conspiracy to distribute drugs had the government chosen to do so. She knew, by her testimony, Cory Johnson for five entire weeks. In about the second week of that, he took her into the inner sanctum of this conspiracy. Do you remember what Mr. Vick said in his opening statement this afternoon? That criminal conspirators do not let the uninitiated into the inner circles of their conspiracy. And he argues that as to why, and it being the most damning evidence as to why Sandra Reavis should be tied to this conspiracy. He says unless she was already part and parcel, fully into this conspiracy, they never would have let her in the door to the inner sanctum. But now, when it is Valerie Butler we are concerned with, then of course one week into her friendship with Cory Johnson he took her into the inner sanctum. She has gotten immunity. She was an addict. She never approached the police until they came to her in the John

Marshall Courts Building, the state courts building up the street. When? June of 1992. Not January,

not February, not March, or any intervening month did she go to them and say, "I know some things about this." Only when they came to her and they tell her, "We know about your involvement, and we are going to give you immunity," and, as she says, "I began cooperating that day."

Lastly, we have Jerry Gaiters, a felon, a liar, and a murderer. He is a 39-year-old man who says he was only doing things because these youngsters told him to. He is a liar. He admitted lying to the Grand Jury. He gave a new version to you folks when he testified. He gave about ten versions to Detective Woody in the course of these individual videotaped interviews. He gave, according to Detective Woody, six interviews. He spent 18 hours of time with Jerry and he still couldn't get it right when he came into this courtroom.

Detective Woody says, under oath, "Jerry Gaiters always lies. Until I confront him and show him that I know the truth, only then will he conform his testimony." He has been snitching for ten years. Woody said, "I only helped him with petty things over the past ten years." What are the only things he was charged with in the last ten years? Only these petty things of robbery, nol prossed; rape, nol prossed; attempted murder, nol prossed.

MR. VICK: Misstatement.

MR. GEARY: I brought it out.

MR. BAUGH: That was not a misstatement.

THE COURT: All of you shut up. The objection will be overruled. Wrap it up, Mr. Cooley.

MR. COOLEY: Thanks, Judge. He is a murderer. He killed Katrina Rozier. How do we know that? Timing. Denise Berkley, one of the government's witnesses, tells you on the morning that "Nat" Rozier's body was discovered that Jerry Gaiters told her between 9 o'clock a.m. and 9:30 a.m. that "Nat" had been killed. Now, how did he know that? Because Officer Wanda Brown tells you the first initial call, the initial call, came in at 8:43 a.m. Detective Blaylock arrived at the scene at 9:05. And he is the investigative detective. He says the press didn't even arrive for several hours. Well, no one else was there. But Jerry Gaiters manages to know between 9:00 and 9:30 that "Nat" has been killed. Remember, the police didn't determine that this was even a female until the body was taken to the Medical Examiner's Office.

We have a concerned citizen who tells us about Jerry Gaiters on Church Hill. He is not brought forward by the government. Told Woody in a

conversation that "Mousey" Armstrong was hiding out from the person who killed "Nat" Rozier. "Who was that person?" "It was Jerry Gaiters." Rozier was killed with a .38, the same type of gun Hardy testified that Gaiters had in his possession the night of the Johnson killing a few days later -- just a few days before the killing of Rozier. So also says Jeanette Pauley, "Pea Sue." Gaiters killed the three folks on Church Hill. There were two witnesses that were not brought forward by the government. We have a second one, Delores Jean Calvin, who says she was inside the house. She heard only Gaiters announce himself. He was the only voice that she heard before the shots began. Jerry is the worst of the folks brought before you, ladies and gentlemen. And yet, for his cooperation, instead of facing the potential of a death penalty for his acts, he --

MR. VICK: Objection again.

MR. COOLEY: It is before the jury.

THE COURT: Overruled. Just go ahead and wrap it up, Mr. Cooley.

MR. COOLEY: Thank you, Judge. Certainly, Jerry Gaiters must be the man on whose credibility you should rely.

And now, ladies and gentlemen, that they have ridden through, were you impressed with the government's bounty hunters and their most recent versions of the truth? Remember, after all, that they put their right hands up and swore to you to tell the truth. They gave their word. And the bounty hunters ride off into the sunset, their eyes firmly focused on that great 5K.1 on the horizon. And back here on the floor of this courtroom, the truth lies trampled in the hooves of their deceit.

You and you alone must decide the fate of Cory Johnson, whether he is to be convicted of offenses involving Continuing Criminal Enterprise, offenses that involve causing murders in the course of racketeering, in a drug conspiracy, or whether he is to be found not guilty.

To make your choice among those options, you and you alone must gauge the credibility of these fill-in-the-blank bounty hunters.

I urge you, ladies and gentlemen, the government has failed to demonstrate the necessary requisite elements of the Continuing Criminal Enterprise, period. They have not shown control. They have not shown management. They have not shown organization or supervision.

On behalf of Cory Johnson, I thank you for your attentiveness to the evidence, for your patience, and your courtesy to me. And I ask you to remember when

you gauge each of these folks and their credibility, remember those words that Sterling Hardy so sincerely and genuinely said to the detectives after his first interview when he had told them absolutely the contrary of the version to which he testified to you: "I swear to God, I have told you everything I know. You have my word on it."

Thank you, ladies and gentlemen.

(At Bench.)

MR. VICK: How long are you going to be?

MR. WAGNER: Half-hour to 45 minutes.

MR. VICK: Mr. Baugh said he will be at least an hour. I don't know about everybody else, but in looking through the instructions, I do have something I would like to bring to the Court's attention before time runs out today.

THE COURT: All right.

(In Open Court.)

THE COURT: All right. I've decided to stop here now. It is clear we have got at least a couple of hours left of argument. And it would be cruel to ask you to sit here for another couple of hours to handle this, so we might as well stop at this juncture. Unless this will cause a particular problem for somebody, I'd like to start at 9:30. If it is a problem, I will stay true to my word and start at ten. But unless there is a particular problem for any one of you, I prefer starting at 9:30. Is that all right? All right, fine. If you all will come in tomorrow morning at 9:30 a.m. Remember my admonition, please, especially at this stage: Don't look at any news reports, listen to radio, or view any newspaper coverage of the events in this trial. Tomorrow morning at 9:30. Everyone remain seated while the jury leaves the courtroom.

(The jury left the courtroom.)

Mr. Vick, do you want to discuss this?

MR. VICK: I think we should up there.

(At Bench.)

MR. VICK: I would just note that going through the Court's instructions, I didn't pick it up -- on Count Eighteen as to the instruction concerning the CCE, it does not outline what the case law in the Fourth Circuit very clearly is from the BUTLER decision and from the RICKS decision as to what the supervisor or organizer. I just want that language in there, too. As you know, it is in the disjunctive. That is what we are going to be arguing primarily, and it would hamstring us not to have that language which the case law very clearly calls for, and it is not in here.

MR. GEARY: The statute of limitations has

run on that.  He should have said that downstairs.
We have read that to the jury.

THE COURT:  That won't stop me from adding something else to it.  No, put your objections on the record.

MR. GEARY:  Is this going to be given the way it is now?

THE COURT:  I'm going to review BUTLER and I'll add what I think is appropriate.

MR. VICK:  I have BUTLER here.

MR. GEARY:  Will you let us know tomorrow?

MR. VICK:  We can do that right now.

(Document proffered to Court.)

THE COURT:  Have you highlighted the language?

MR. VICK:  Yes, sir.  That has been consistently cited by the Fourth Circuit as the CCE linchpin.

THE COURT:  I've given it before.  All right.  We will start 9:30 tomorrow morning.  I'll let you know.  I can tell you right now, I will incorporate some segments of that language.

MR. BAUGH:  After this I'm having them work on a multiple conspiracy.  Did you know this was there?  We have a multiple we will give you tomorrow.

MR. COOLEY:  I would raise an objection. When the Court gave to us the instructions and advised us that this is what the Court was going to give, and each side had an opportunity to make an addition or correction, none was made by the government.  We have been through an argument in which we raised, apparently, something on this very point based upon the instructions the Court advised us it would give to the jury.  It will now damage our credibility if the Court gives a different instruction, and it will change the theory of the argument.

THE COURT:  The objection is overruled.

MR. WHITE:  Tipton would join.

(In Open Court.)

All right, Mr. Marshal, you can remove the defendants.

(The defendant left the courtroom.)

All right, we will be in adjournment until 9:30.

(Proceedings were adjourned.)

3103

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

-----------------------------------------

UNITED STATES OF AMERICA,

                          Plaintiff;

    v.                                    CRIMINAL ACTION
                                             92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                          Defendants.

-----------------------------------------
VOLUME XVI

February 2, 1993
Richmond, Virginia
10:00 a.m.

BEFORE:        HONORABLE JAMES R. SPENCER
               United States District Judge


APPEARANCES:   HOWARD C. VICK, JR., ESQ.
               WILLIAM H. PARCELL, III, ESQ.
               Office of the United States Attorney;
                   Counsel for Government;

               ROBERT P. GEARY, ESQ.
               ERIC D. WHITE, ESQ.
                   Counsel for Defendant Tipton;
               CRAIG S. COOLEY, ESQ.
               JOHN F. McGARVEY, ESQ.
                   Counsel for Defendant Johnson;
               DAVID P. BAUGH, ESQ.
               ARNOLD R. HENDERSON, V, ESQ.
                   Counsel for Defendant Roane;
               ROBERT J. WAGNER, ESQ.
                   Counsel for Defendant Reavis.
                   JEFFREY B. KULL
               OFFICIAL COURT REPORTER

3104

                   P-R-O-C-E-E-D-I-N-G-S
         THE CLERK:  Case Number 92CV68:  United
States of America versus Richard Tipton, Cory

134a

Johnson, James H. Roane, Jr., and Sandra Reavis, the sixteenth day of trial. Are counsel ready to proceed?

MR. VICK: The government is ready to proceed.

MR. GEARY: Defendant Tipton is prepared.

MR. McGARVEY: Defendant Johnson is prepared.

MR. BAUGH: Defendant Roane is ready, Your Honor.

MR. WAGNER: Defendant Reavis is ready.

MR. GEARY: At the conclusion of the arguments yesterday, Mr. Vick indicated rather belatedly that he wanted additional jury instructions based on UNITED STATES v. BUTLER. I would like to know, before Mr. Baugh starts arguing, what changes if any the Court proposes to Instruction Number 18, the significant part of which I read to the jury yesterday and which Mr. Cooley spent a good deal of time on.

THE COURT: All right. 18 as you have it will not be changed. There will be an addition. The addition will read as follows, new paragraph: "An organizer can be defined as a person who puts together a number of people engaged in separate activities and ranges them in their activities in one essentially orderly operation or enterprise. A supervisory position can be defined as one who manages or directs or oversees the activities of others. For purposes of this element, a person may occupy a position of organizer, a supervisory position, or any other position of management without having direct personal contact with each of the persons he is organizing, supervising, or managing. It is not required that a defendant have had personal contact with five or more subordinates in order to satisfy the organizer, supervisor, or position of management element. It is entirely possible for a single Continuing Criminal Enterprise to have more than one organizer, supervisor, or other person in a position of management."

MR. GEARY: I would like to point out for the record that that language the Court quoted comes from Proposed Government Jury Instruction Number 18, which was tendered to all of us on January 7th of this year. And further, there is no UNITED STATES v. BUTLER citation. That language goes back almost eighteen years to UNITED STATES v. SPARLING, as indicated in the instruction proposed by the government. I think at this point, Judge, I know that the Court has a lot of authority in terms of jury instructions. This count, Count Two in the

proposed, and the proposed addition, deals with the death penalty predicate in this case. Both Mr. Cooley and I, on behalf of Mr. Johnson and Tipton, yesterday argued significantly about our claim that the government failed to show a CCE and relied upon the language which the Court indicated yesterday morning.

THE COURT: Let's shortstop this. I have told you I'm going to give it. The language that you relied upon is in the instruction that I am going to give. The addition is supported by law. And beyond that, as I will instruct the jury in the strongest terms, whatever the lawyers have to say is not evidence, right? So, as far as I'm concerned, let's not waste any more time with this.

MR. GEARY: I don't think we are wasting Mr. Tipton's time with this.

THE COURT: You are wasting my time, because I've already told you I am going to do it. You have made your arguments. I understand them. It is over.

MR. GEARY: With all respect, my job here is not to waste anybody's time.

THE COURT: Absolutely your job is not to waste any time, and my job is to make sure you don't waste mine. All right?

MR. COOLEY: Would you note our objection as well?

THE COURT: Your objections were noted yesterday.

MR. BAUGH: We would join in that as well, Your Honor.

(The jury entered the courtroom.)

All right, Mr. Baugh?

MR. BAUGH: May it please the Court, ladies and gentlemen of the jury: I'm getting too old for this. There is too much evidence in this case. I'm having a hard time sorting it out. First, before I begin, I want to thank, as everyone pointed out, all of you for being so attentive through this. I also want to thank the other attorneys in this case. Whenever you hear people say bad things about court-appointed attorneys, remember this group of people, because they have done their clients proud, and they have done the profession proud with the amount of work and energy they have put into this case.

The Court has instructed you on a number of things. And one of those things is the presumption of innocence. And that's not just an idle theory. There is a valid reason for it. I want to digress from the order of evidence to show you the importance

of it.

Yesterday morning, Detective Dalton testified that after the killing of Mr. Douglas Moody, he was the young man shot and stabbed in the alley at 810 North Harrison Street, Detective Dalton said he received information from the mother that a week before the killing a boy named Keith and some other people had come to the house with machine guns.  He also testified the mother said that her son had hidden under the house all that day and came out with cobwebs because someone named Maurice was trying to kill him.  Someone up in Central Gardens.  He also testified that two hours before the young man was killed, that this person, Keith, came to the house looking for the victim.  He also testified that Gina Taylor was an eyewitness and she had seen someone on top of the victim and had gone out to render aid.

And I asked him, did you ever take a picture of

3109

James Roane back to Ms. Taylor and say, "Is this the person you saw?"  He said no, he didn't.  The reason being is that he presumed, because "Pepsi" Greene said James Roane did it.  So he stopped his investigation because he had pre-judged the guilt of James Roane.  He never took the picture over there, because he had made up his mind, he had shut his mind to all other variables and had pre-judged James Roane.  And that is not the presumption of innocence.  So when you go back there, you can't do what the United States is asking you to do:  View things in the light most favorable to the United States.  When you go back there and you analyze the evidence, you must take the perspective of the presumption of innocence and measure that evidence with that presumption in mind.

Now, the United States has also made a lot of hoopla about the term "common sense."  And the Court will instruct you, you may use common sense.  But don't allow common sense to substitute or to be a false name for prejudice.  You argue common sense when you don't have facts.  Common sense at one time said the world was flat.  Common sense said women could not run countries.  Common sense said certain elements  --  well, that's what common sense does.

3110

"If you don't have facts, resort to common sense."

But in this case, we have facts.  And I ask you to consider those facts.  Additionally, I represent James Roane, along with Arnold Henderson.  And even though I admire these attorneys, our job is only to see that you consider the guilt or innocence of our client individually.  You are not allowed, and the Court will instruct you, you can't consider the guilt of "they."  You have to consider Roane's case as

though no one else were sitting up here.  Just him. And further, you must consider each allegation individually as if it were being tried by itself. And only when you are convinced of his guilt beyond a reasonable doubt as to each offense beyond a reasonable doubt can you convict.

Mr. Roane is charged with several offenses.  He is charged with Count One, which is conspiracy to distribute drugs.  I will tell you briefly that we do not concede the guilt of Mr. Roane, because in order to be a conspiracy there must be interdependence of the parties.  The people must be dependent upon one another's success.  And the government's own witnesses have said, in fact the most illustrative witness was Jerry Gaiters, who said, "I initially worked a deal with Mr. Roane that was 70-30.  And then I worked a deal with Mr. Johnson that was 75-25.  And then I worked a deal with Mr. Tipton that was 60-40."  If there was interdependence, there would not be a difference in the arrangements.  And all of you heard him say that.

Further, all their witnesses said Mr. Roane can sell his drugs for whatever he wants to.  He can do whatever he wants to with them.  He is not dependent upon what other people might do with theirs.  That lack of agreement, that lack of interdependence, means he may have conspired with people to whom he gave or sold drugs, but there is no interdependence with these others.

Additionally charged in Count Two, the Continuing Criminal Enterprise.  My father told me when I was young that a brilliant person is a person that can simplify any complex issue so that anyone can understand it.  Yesterday in this courtroom, and I have been a lawyer for years, and I have been a federal prosecutor, and the most brilliant definition I have ever heard of Continuing Criminal Enterprise was given by that lawyer right there.  That is what Continuing Enterprise is.  And I would submit to you that Mr. James Roane did not participate in a Continuing Criminal Enterprise.  The structure that is required is not there.  The direction is not there.

He is also charged in Count Five.  Count Five charges the murder of Mr. Douglas Moody in furtherance of the Continuing Criminal Enterprise. Note, he is not charged with the murder of Douglas Talley.  Now, why if Hussone Jones knew back in July that he was there and participated, why the United States did not charge him with that offense, I don't know.  But he is not charged in the murder of Douglas Talley.  But he is charged in Count Five with the

murder of Douglas Moody in furtherance of Continuing Criminal Enterprise. He is also charged in Count Six with use of a firearm in furtherance of that Continuing Criminal Enterprise in the death of Mr. Moody. He is also charged in Count Seven with killing Douglas Moody in furtherance of racketeering.

If you find that my client did participate in the murder of Douglas Moody, and you find a CCE, you can find him guilty of Count Five. Additionally, you can find him guilty of Count Six. If you find a series of racketeering activity, you can find him guilty of Count Seven, if you find he participated in the murder. And we would submit that is a significant question.

Mr. Roane is charged in Count Eight as well. Count Eight charges the murder of Peyton Maurice Johnson, who was shot in the nip joint on the corner of North Harrison Street, 1200 block of West Clay Street. He was shot several times. He is charged in Count Eight with the murder of Peyton Maurice Johnson in furtherance of the Continuing Criminal Enterprise. In Count Nine, he is charged with the use, or aiding and abetting the use of a firearm in that homicide.

Count Ten charges Mr. James Roane with the murder, or participating in the murder, of Peyton Maurice Johnson in furtherance of racketeering activity, the same as Count Seven charges as to Douglas Moody.

Count Eleven charges Mr. Roane with participation in the murder of Louis Johnson in furtherance of a Continuing Criminal Enterprise. Louis Johnson was the gentleman who was shot on Kinney Street just at the intersection of Kinney and Catherine. He is also charged in Count Twelve with the use, or aiding and abetting the use by another, of a firearm in the murder of Louis Johnson.

He is charged in Count Thirteen with the murder of Louis Johnson in furtherance of racketeering activity. Mr. Roane is charged in Count Fourteen with the murder of Torrick Brown on Lynhaven, on Southside. And he is charged in that murder in furtherance of racketeering activity. He is also charged in Count Fifteen with use of a firearm during the commission of the murder of Torrick Brown.

He is also charged in Count Sixteen with the murder of Martha McCoy -- I'm sorry, with the maiming of Martha McCoy in furtherance of racketeering activity. And he is charged with use of a firearm during that maiming.

One year ago today, February 2nd, 1992, James

139a

Roane was arrested. And he has been in custody continuously. All violations occurring after February 2nd, 1991, he has not been charged with except those that are overt acts attendant to the conspiracy. And now we need to analyze each of them.

I'm going to talk about, even though he is not charged with the murder of Mr. Douglas Talley, mr. Douglas Talley was stabbed a number of times over on Southside. And you saw the extremely gruesome photographs. You also heard the story by Mr. Hussone Jones. And Mr. Hussone Jones said that "I witnessed the killing and that I saw the knife." And the knife was a large government black-handled-type thing which most people would describe it, I'm not saying you are bound to this, but as a military fighting-type knife. The United States has alleged that Hussone Jones must be telling the truth because the weapon that was described by Priscilla Greene that she received from James Roane matched that description. And how could two people who didn't even really know each other that well coincidentally describe the same weapon?

Remember, Priscilla Greene said that immediately after the killing of Talley, James Roane brought her a bloody knife, and she kept it and returned it to him just before Douglas Moody was killed. And he gave it back to her again bloody and she was asked to dispose of it. Hussone Jones said that he saw the killing, and the United States has asserted, "Wait a minute, he must be telling the truth because Priscilla Greene saw it."

But one witness says they are liars. Now, during opening I stood up and I made a mistake. I said, "The United States knows what happened, because they found the murder weapon in the back of the car." And they said, "No, you know that's not true." Now, that was an assumption on my part. And here is what I predicate that assumption upon. Here is who says -- Hussone Jones may have seen something. But he is lying about that knife. And here is why.

Dr. Marcella Fierro sat in that chair, and even though she did not do the autopsy, she reviewed Dr. Wiecking's autopsy report. Remember that? She said, in response to my question, "The murder weapon had a blade approximately three-quarters of an inch in width." Now, you can take a small knife and stick it into something and make a big wound by slashing. But you can't take a big knife and make a small wound. The knife that was described by Priscilla Greene, the knife that was described by Hussone Jones, remember

what Priscilla Greene said?  It was approximately 18 inches long.  And the blade was three inches thick. The weapon that killed Mr. Talley was three-quarters of an inch in width.  Take a ruler back with you and measure the width of this blade.

Now, the United States has said, "No, we will prove this is not the murder weapon."  And I assumed again, as I'm getting older, that there will be a report that they tested this and there is no blood, that no one washed this off; that they tested it and

there were no fingerprints.  But those reports are not here.  But I don't know if this is the knife that killed Douglas Talley or not.  But the blade that killed Douglas Talley is the same size as this weapon.  And if you are doubting me, you can look in the autopsy reports which have been offered.  In fact, the autopsy report as to Mr. Talley has been offered as Government Exhibit 3.  And you will recollect the testimony of Dr. Fierro.  She described the weapon.  And Dr. Weicking in his autopsy did not do what we call wound measurements or a location chart as to where the wounds are, how deep each wound is, how wide.  But she was able to say, based upon the photographs, and they lay a scale next to the wounds, she says the knife could have been no wider up to the point that it penetrated of approximately three-quarters of an inch.

Now, by that, Dr. Fierro is saying, one, Hussone Jones is lying about the knife.  Number two, Priscilla Greene is lying about the knife.  And Johnny Lee Byrd is beyond  --  I mean, that's ridiculous.  I won't even discuss it.

Now, the United States has said, "Well, who is going to get up and call these people liars?"  Their witness does.  I'm not asking you for an issue of

credibility.  I'm telling you Dr. Fierro has done a scientific analysis of these wounds and she has put her reputation on the line.  And she has said that's the size of the knife.  There is not one wound in that body that could match the weapon described by Priscilla Greene, who allegedly corroborates Hussone Jones.  It cannot have happened.

The killing of Douglas Moody:  My client is charged with participating and aiding in the killing of Douglas Moody in furtherance of a Continuing Criminal Enterprise.  Now first, the United States has no evidence, none, that this was in furtherance of any drug-related activity.  They have put forth the argument, "Wait a minute, Douglas Moody was involved in drugs, these people were involved in drugs, if they murdered him, it must be over that."

Use your common sense.  No, it is not a question

of common sense.  Where is the evidence?  If one judge beats up another judge, is it a judicial issue?  No, it is not.  The question is, where is the evidence?  And you can sit here and say, "Well, I think it was; it must have been."  No, where is the evidence?  You have sworn an oath that if the evidence is there, hunch is not enough.  And where is it?  Did you hear one  --  we heard some evidence from Trenton about a fight over turf.  Did you hear one person come in and say that any of these defendants told someone "If you don't move off this block we will hurt you"?  Did anyone come in and say that?  No.  Did anyone say, "I overheard a confrontation between any of these defendants and Mr. Douglas Moody, saying we understand you are biting into our turf"?  No.  They said, "We want you to assume, use your common sense, and assume that, one, there is a murder; and number two, it was in furtherance of some drug activity."  I would submit there is no evidence.

But let's get into the Douglas Talley murder first.  The United States yesterday  --  Mr. Robert Davis gave some discussion about "I heard them talking about it" and all that sort of stuff.  And we also heard from Ms. Denise Berkley.  Denise Berkley said, "We were in the place, we were doing drugs, we heard the gunshot or the boom.  We thought that the police were coming.  We cleaned up all the drugs, went outside.  And when I got outside, I saw James Roane stab Mr. Moody."  I sat there and I asked her this.  She said, "I stayed out there until the ambulance came, and the police.  But I didn't tell them anything.  I stood out there and watched until then."

"Did you see someone bent over to save his life?"

"No, I didn't."

Robert Davis said the same thing.  But Denise Berkley said she did.  She said, "I saw him stab Douglas Moody."

Now, the United States has said no, that we have cheated.  We brought Ms. Gina Taylor in.  They said no, we have cheated.  We have brought Gina Taylor in and we didn't tell you that Gina Taylor was Mr. Tipton's girlfriend.  That's a lie.  No one said she was a girlfriend.  That was a lie.  She said she had gone out with him.  More importantly, I don't care if she is having his baby.  Did Ms. Taylor come in here and alibi Mr. Tipton?  No.  Did she mention Mr. Tipton's name?  No.  She said James Roane didn't stab him.  Did she offer one bit of evidence?  No, because she didn't see that part.

And, more importantly, reading along, we know that Ms. Taylor was out there because Detective Tuttle, the forensic gentlemen, said he received information she was out there. In fact, they found a knife out there that they thought might have been the murder weapon that was used to cut his clothes off to try to resuscitate him. And they come in here and say she is a liar. She has lied under oath. The only person in this whole damn case that has done anything to help of any of these victims, the only person who sat out there, gave her name to the police that night, gave her address. And shame. And we know she was there. But because she doesn't fit with the plan, she is a liar. She told them that night what she saw. She said it. She told Detective Dalton. She told everyone out there what she saw.

Now, she must be a liar because she knows Mr. Tipton. Obviously. She is his girlfriend. Who was Dr. Fierro sleeping with? Because Dr. Fierro describes the weapons and she said in her autopsy report, referring to Exhibit Number 11 -- you can take it back there, I'm on the third page -- "Stab wounds were of a single sharp-edged type with knife width of five-eighths to three-quarters of an inch and depth of at least three inches."

Now, this was not the knife that killed Mr. Moody, because the police had it in their possession. But you take a ruler back and measure three inches up this blade and measure the width. The knife that killed Douglas Moody was shaped like this. Now, is Marcella Fierro dating Mr. Tipton? Because she says that anyone who says that that young man was stabbed with a fighting knife like Priscilla Greene said is lying. This is the shape of the blade.

Now, I'm not sitting here and saying you can't believe these people because they are scummy. I'm just saying Dr. Fierro, in her scientific analysis which is written in there, describes a blade that could not match the -- I will never use the term "Vincent Van Gogh" Vick, but could not match the drawing which she identified. It is impossible. You can't take a blade like that and make a wound that small.

And by the way, Dr. Fierro is not commenting on Dr. Wiecking's report. She did it herself. In fact, not only does she describe the weapon, she actually did a wound chart detailing each wound and number, and when you read down here, Section 4, it has wound size in inches, width, length, and depth. I should warn you, where it says width, it would be, remember, you are talking about in a surface. So width would

be this distance.  Length of the wound would be this distance.  And depth would be here.

(Counsel indicating.)

She did a chart on each wound.  Some of the wounds are bigger because you can make a slice.  But she said that the blade is five-eighths to three-quarters of an inch.  This is not the weapon that killed Douglas Moody.  But it was shaped like this.  And if Denise Berkley  --  well, if Priscilla Greene said she saw the knife that killed him, she is wrong.

Now, Detective Dalton told you that "The reason I stopped this person named Keith from being considered a suspect is because Priscilla Greene told me that she saw James Roane stab Douglas Moody to death."  And on the stand on direct examination, she said the same thing.  But on cross-examination, she said, "I saw James Roane bending over him slapping his face trying to wake him up on the porch."  And he wasn't stabbed on the porch.  She did not see James Roane stab anyone.

But let's go a little bit further.  Gina Taylor said, "I did not recognize the person who did the stabbing.  In fact, I couldn't tell you if it was a man or a woman at the time.  I can't tell you if it was a man or a woman."  But she can tell you  --  I mean, if you saw someone in the distance, can you tell it is a man or woman?  You might not be able to.  But she said, "I can tell you this:  It wasn't him."  And look at the description she gave Mr. Dalton.  She said one, the person that was on top doing the jabbing was the smaller black male.  On page one of the autopsy report of Mr. Douglas Moody, here is the name of Kareem Abdul Hakim.  Height or length of the body, 66 inches.  Weight, 160 pounds.  Whoever killed him was smaller than that.  She said that that night.  I don't know if it was a small woman.  I don't know if it was a small man.  But they were dressed in dark clothes and they were smaller than the victim.  She said that that night.  Look at the autopsy report.

Has the United States convinced you that Gina Taylor is a liar?  What motivation does she have to come in and say, "That was not the person I saw"?  Some relationship she might have had with Mr. Tipton?  She said, "I went out with him."  She didn't say girlfriend.  He tried to get her to say that.  She didn't.  Anyone who gets up there and says that she said she was a girlfriend, that's a lie.  Now true, I understand that sometimes in the heat of battle people might hear things a certain way.  But it is still wrong.  The government may have their own

reason for lying about this woman. But it is still a wrong reason. People have reasons for doing wrong things all the time. That doesn't justify it.

There should be shame for making fun of that woman, or trying to. She sat out there and she tried to save a stranger's life. She had blood on her from a stranger. She stayed until the police came and she came forward like a citizen. The only person I have seen in this case who is not a police officer that should be admired is her. Shame. And I will apologize to her for somebody in the profession.

And remember this: Did the United States put Detective Dalton on the stand to give you this story about Keith? No, they did not. And do you know why? Because it didn't jive with the plan to get "Whitey." And that's why. Did you see Mr. Dalton last week at all? No, you didn't. Detective Dalton spoke with the mother. Now, of course, she might be having an affair with one of these defendants, too, and might be trying to cover who murdered her son. But she told Detective Dalton over a year ago that this man, Keith, and his friends came there with guns. And Keith was looking for him two hours earlier, because somebody named Maurice thought that Doug Moody had to die.

And remember this, I cannot overly emphasize this: Detective Dalton stopped his investigation into Keith's involvement because "Pepsi" Greene said she saw the stabbing and it wasn't Keith. But now we know from the stand she did not see the stabbing. And we also know that Gina Taylor did. And we also know that Dr. Fierro describes a knife different from that which Priscilla Greene said she received. Priscilla Greene in her own mind might believe that James Roane stabbed that person, just like she got on the stand and said initially "I saw him." But somewhere in there, somebody told her something. I don't know if it was the government, street talk, or whatever. But she is now convinced in her own mind that he did. But the objective evidence, the evidence that cannot be cross-examined, the lab report, the autopsy report on the weapon, says it could not be as she said it was.

Now, if you want to start off with the presupposition that Mr. Roane is guilty, you can probably come up with some common-sense logic, maybe the certain way he held the knife a certain way. But if you start off with the presumption of innocence, and you look at Dr. Fierro's report, "Pepsi" Greene cannot be telling the truth. Period. And I will say this, by the way: Doug Moody died, and all these young people died horrible deaths. All of them, the

145a

majority of them, were drug users.  Mr. Moody had fresh injection marks in his antecubital space when he died.  But he did not deserve to die that way.  And Gina Taylor did try to comfort him.  And for that, she should be lauded, not called names.

Peyton Maurice Johnson.  Oh, back up a minute.  Denise Berkley says she came in here and told a lot of things.  Remember Denise Berkley?  She said a lot of things.  And then because she didn't stand up too well under cross-examination the United States put Detective Fleming back on the stand.  The detective got up there and said, "She testified consistent with what she gave me from our reports or what she told me."  Remember that?

Now, this is the redacted version that co-counsel has offered.  On 2-21-92, which was several weeks after the death, and in fact, it was 19 days after my client's arrest, and some time after the death of Mr. Peyton Maurice Johnson, and also after the death of Doug Moody, these are Detective Fleming's words.  "I interviewed an informant on 2-21-92 at 2100 hours in the A-Squad interview room.  This informant advised me of their knowledge of the homicides in the Hancock, Norton, and Clay Street area.  This informant advised me of the suspects in the homicide at 2817 East Clay Street.  The source pointed out 2710 Catchpenny Road as the place where "O" and "Whitey" stayed.  They are also responsible for some of the recent homicides.  There is a description."

You heard Ms. Denise Berkley talk about James Roane.  Did you hear Roane's name in here?  Did you hear any mention of James Roane?  There are not even that many J's in this paragraph.  James Roane was not mentioned.  She did not testify consistent with the information.  Maybe she told Detective Fleming that James Roane was a big crack dealer up in that area and the detective, out of some sense of sportsmanship decided not to put his name in the report.  Was that added later?  The government must convince you beyond a reasonable doubt that it was not.

Peyton Maurice Johnson.  No wait, let's back up again for a second.  If my client did not stab Douglas Moody, then he could not  --  and I haven't heard anyone that put him there that is credible.  Because Denise Berkley's testimony, you can't accept her testimony and accept Dr. Fierro's testimony.  You can't accept Robert "Papoose" Davis' testimony and Marcella Fierro's testimony.  You cannot except "Pepsi" Greene's testimony and accept Marcella Fierro's testimony.  Who but those three even said

they saw him that night?  Who can even put James Roane in that neighborhood?  He probably was.  Hell, he was living over there.  But they are the only ones who put him anywhere in that neighborhood that evening.  We would submit there is no evidence before this Court at this time, credible evidence, consistent with Dr. Fierro, that would indicate that James Roane participated in the murder of Doug Moody.

Number two, even if he did, and believe me, I am not conceding that point, there is no evidence that it was in furtherance of drug activity.  Period, dot, whether it be racketeering activity or Continuing Criminal Enterprise.  You have to make it up.  You have to allow any prejudice that is created to run rampant.  A moment about prejudice:  As you sit here now, some of you may actually hate these young people.  Some of you may view them as a scourge.  Others may look at them as in saying, "What went wrong?"  But if you do recognize that, if you recognize in yourself that feeling, then you have the duty to suppress that feeling and handle their cases as you would handle the most important person you have ever met.  You are not allowed to have your prejudice manifest itself.  And if you feel that now,

and you should search your conscience now, if you feel that way, then you should recognize you have a higher duty; that you have an obligation to suppress that, and view them with the presumption of innocence.  The United States is going to try and make you hate them.  They have with these photographs.  I can understand that.  And the pictures of Douglas Moody are horrible.  The picture  --  they show these pictures to these people, these loved ones.  But because the killing  --  I mean, the United States has the theory these killings are so horrible, let's kill someone.  No.  Convict the person that has been proven guilty.  No one else.  No one else.

Peyton Maurice Johnson.  Peyton Maurice Johnson was shot in the nip joint.  The United States put on Mr. Smithers.  Mr. Smithers came to Court and said, "I run the nip joint."  Mr. Smithers said, "I have the nip joint, it is the only club up there, the phone is a half-block away.  It is not uncommon to find Peyton Maurice Johnson in my nip joint.  He is there two to three times a week," I believe he said.  Your recollection controls.  I have heard a lot of evidence.  But I believe he said two to three times a week.  Additionally, he says it is not uncommon to

find James Roane there two to three times a week.  He comes in there and he drinks.  So it is not uncommon to see him there.  He said that on the night that

Peyton Maurice Johnson was killed, James Roane came in and said "'Stinker,' are you open yet?" He looked right at Peyton Maurice Johnson, and "Stinker" said, "No, not yet." And James left.

Now sometime, either two minutes or five minutes later, people burst in and shot Peyton Maurice Johnson. Now the United States says use your common sense. Obviously, James Roane went out and told these people that Peyton Maurice Johnson was in there so they could jump in and kill him.

Now, they have offered some witnesses who said, I believe it was Denise Berkley, who said James Roane was looking for Peyton earlier. Well, that's the only evidence of that. And quite candidly, I don't know if he did or not. But I'll tell you this: The United States says to use your common sense. Those people knew he was in there and they went in there to kill him. But recollect the testimony of Mr. Smithers. Mr. Smithers said that when the shooters came in -- remember Anne Jones first. This is an automatic. The bullets are inserted into the stock. When you pull the slide back and let it go, the top bullet is stripped off and put in the chamber so it can be fired. Until that happens, the gun can't be fired. Mr. Smithers testified, under oath, that when the people came in, in his presence, they pulled the slide back. The weapon was not ready to fire when they came in.

Now, and far be it from me to use the term "common sense," that's a government term. But does it follow that if you know someone is inside, and your purpose is to kill him, why do you wait to get inside before you arm the weapon?

(Counsel distracted by noise in courtroom.)

I'm sorry, I didn't hear the whisper. Did I miss something?

THE COURT: Mr. Baugh, continue with your argument.

MR. BAUGH: I thought it might be important, Your Honor.

And you heard Mr. Smithers say that. Now, does it -- is that evidence that Mr. Roane warned someone? Now Mr. Smithers, I would concede, he said five minutes one time, he said two minutes another time. That's fine. We all know that with the passage of time -- I'm not saying he is a liar, but with the passage of time everybody's story gets a little better. The fish gets bigger, the woman more attractive, the play more spectacular. He was probably frightened, as he should be. But the bottom line is, the weapon was not armed when they came in. And that's the evidence that Mr. Roane tipped, like

148a

some bird dog, pointed out Mr. Peyton Maurice Johnson to be killed. Now, of course, we also have the testimony of a person in protective custody who says Mr. Roane was looking for Mr. Johnson earlier. There is no corroboration for that.

Now, "Papoose" Davis said, "Well, James Roane came and got the weapons and all that stuff." Number one, no one saw James Roane with a weapon that night. Not any of their other snitches say that. We know about Ms. Berkley, about Mr. Robert "Papoose" Davis, because they told you that they watched James Roane stab Doug Moody. And Marcella Fierro says they are liars. The weapon was not armed. And if I am wrong, that's fine. Your recollection controls. In fact, I know I irked the Judge because I asked the guy about pulling the slide back about three times.

We would submit -- oh, wait a minute. I'm getting old. I'm forgetting all of this. Peyton Maurice Johnson was a drug dealer. Peyton Maurice Johnson had a friend he lived with, and I believe

3134

somebody testified it was a girlfriend, but I don't know, Ronita Hollman. But did anyone tell you, did Ronita Hollman tell you that James Roane or Mr. Tipton or Mr. Johnson had come to her and said, "You better tell Peyton to stop selling drugs here"? Did anyone overhear a conversation where someone said, "You are interfering with our turf"? There was a conversation about Ronita: "You are kind of heating up the area here. You know, you are going to get everybody busted because you are just getting a little rampant." But was there any conversation, any evidence that there was some rival activity? There was some discussion about a tape, which of course we never heard. It was never fully developed. But has anyone heard anything about that tape having something about rival drug activities.

Under the cross-examination by counsel, Mr. McGarvey, we heard that Mr. Peyton Maurice Johnson was a bad dude. But there is no evidence of a drug war. There is no evidence. Now true, Peyton Maurice Johnson was a drug dealer, my client sold drugs, these other defendants sold drugs. These two gentlemen over here. I don't know about this lady over here. She goes out with Mr. Roane.

Where is the evidence? Common sense? You can

3135

make it up. But that's not evidence. If you want to presume guilt, you can probably see it that way. But if you follow your oath, I submit you go back there and you ask your fellow jurors, "Where is the evidence? Show me the objective evidence that if this killing did occur," and obviously it did, somebody killed the young man, and no matter what

that young man might have been, if he had drugs in his system or he was a drug dealer, he did not deserve to die. "Where is the evidence?"

Now, absent that -- well, first, in order to convict my client of participating in the murder of Peyton Maurice Johnson, you must be convinced beyond a reasonable doubt that my client knew what was going to happen and aided and participated in some way. Now, "Papoose" says they came back and had all these guns. "They told me to wipe them off." Well, that's fine. There is no corroboration for that. If you want to accept Mr. Davis' testimony, you can.

In fact, let's talk about Mr. Davis for a minute. Which probably is why I got so angry when I woke up this morning thinking about Gina Taylor. That man sits there and says that he couldn't find his family for 26 years. He doesn't remember the day that his brother and sister were murdered. He

doesn't remember the day they were buried. That is shocking. That should make people cry, that someone can be so insensitive. Now wait, I'm not saying he is the only insensitive person in this case by any stretch of the imagination. But contrast what he did with what Ms. Taylor did. It is dreadful.

There is no evidence that Mr. James Roane participated in the murder of Peyton Maurice Johnson. And further, if there is evidence to that effect, there is no evidence that it was involved in drug activity or because of drugs.

Now, the United States has put forward the theory the reason these people were killed is that because up in Trenton, New Jersey, they said, "People who mess with us must die." And further, Ronita Hollman said that Mr. Tipton and Mr. Roane came and said, "We are going to take over, even if bodies have to fall or bodies have to be laid" or something to that effect.

Where is the evidence that this murder involved drugs? It is not there. Period. In fact, Ronita Hollman testified it was a personal thing. She did. There is no evidence of participation in CCE, no participation in murder, no participation in use of a firearm, no evidence of participation in the murder

involving racketeering activity.

Notice, I'm not talking about you can't believe these people because they are scumbags or because they are under witness protection. I'm talking about the evidence.

Louis Johnson was on the corner of Catherine and Kinney street when he was shot. Three witnesses came in: Dennis Moody, Sterling Hardy, and Jerry Gaiters. Now first, Jerry Gaiters: It is a sin that

Jerry Gaiters is not in custody, under arrest.

MR. VICK:  He is, Your Honor.

MR. BAUGH:  I have misspoken.  It is a shame that he is not sitting at this table being tried for the killing of Katrina Rozier.  You heard Denise Berkley say that Katrina Rozier was her best friend.  In fact, I believe she used the word "lover."  And you heard Denise Berkley say what time Jerry Gaiters told her that Katrina had been killed.  Now, unless Detective Blaylock checks with Jerry Gaiters before he responds to a murder scene -- in fact Detective Blaylock didn't know a name and didn't even know the sex of the victim.  And in Katrina Rozier's  --  I don't know if they introduced the autopsy or not, but the time is on there from the Medical Examiner as to when the call came in and when the police responded and when the M.E. responded. How did Jerry Gaiters know about the murder before it happened, before the police found out?  How did he know?

Katrina Rozier was a drug addict.  She died with a crack pipe in her glove and a condom in her pocket.  But she did not deserve that death.

Jerry Gaiters comes to Court and he says -- I got mixed up now.  One of them says that the car pulls up and that three people jump out with guns. And one of them says that my client, Mr. Roane, fires his gun and that the victim, Mr. Louis Johnson, falls and that another defendant stands over him and pumps bullets into him.  But Anne Jones comes in and says that all the bullets recovered  --  now, all the bullets that were fired were not recovered.  I'll concede that.  But all the bullets that were recovered, both in the body and on the scene, came from a Glock.  One gun.

Further, you can take those bullets back with you.  I don't know if Anne Jones told you this or not, but a Glock has a very unique firing pin.  It is shaped like a rectangle.  You can look in the back of the brasses and you can tell whether or not it was fired with a Glock.  All the brasses that were found out there, and there were like 15, are Glock.  Now, of course there is a possibility that Mr. Roane fired a shot, picked the brass up, put it in his pocket and left with it.  Or possibly, a shot was fired, the round ejected, and they didn't find it.  But statistically, the implications of some 16 brasses, and the only one they can't find is that one, is rather odd.  Particularly in light of the fact that  --  well, the next witness says that Mr. Roane got out and put the weapon directly against the man's head, or within inches of his head, and it misfired.

Now, did Mr. Moody say that Mr. Roane got out, walked over, put the weapon against his head, and fired a shot and then he fell? No, we don't have him that close. We have him jumping out of the car firing a shot. So the stories are different there. Mr. Gaiters said, I believe, "All three people were standing around and I saw fire come from all three weapons."

Now, absent Mr. Gaiters, Mr. Moody, or Mr. Hardy, is there any evidence that James Roane was there? What corroboration? What corroboration on Louis Johnson?

Would any of those people, would they convince you beyond a reasonable doubt to believe their word? Of course, if you are convinced beyond a reasonable doubt that those three people are telling the truth, then of course you can convict. There is one other problem, though. My client isn't charged with aiding and abetting or participating in the murder of Louis Johnson. He is charged with aiding and abetting and participating in the Louis Johnson murder in furtherance of either a CCE or a racketeering activity. What evidence? Now, we know that Louis Johnson sold drugs. True. In fact, I believe that someone testified that most people over there do. One witness said 95 percent. I believe Ronita Hollman said everybody did. On cross-examination she said a few old people don't.

What evidence is there that if my client did participate in that killing, and I am not conceding that he did, that it was in furtherance of drug activities?

If you find the evidence, fine. Convict. But if it is not there, if you have to make it up, you can't. And if you do, you are violating your oath.

Torrick Brown. We have conceded the shooting of Torrick Brown and Martha McCoy. You have heard the evidence that the defendant, James Roane, got out of prison in November; that the mother of his children told him that she was having an affair with Torrick Brown, who lived six doors down; that there was a confrontation between the two; that in January, she told James Roane that it was time to change their relationship, and that she was seeing Torrick Brown again, and Torrick Brown was killed.

Now, true, it is alleged that other people involved in the conspiracy, in fact it is almost conceded that other people involved in the conspiracy were there and participated in the shooting. But the United States says, "Well, that's part of this macho thing about 'We have to kill.' That's common sense." This is an indirect drug involvement. If my

car doesn't start when I leave here today, and the Judge gives me a boost, is that a judicial act? No. The same thing in this killing. Because people involved in the activity participated in it, is it a drug activity? No. There must be evidence of this. And it is not there.

And by the way, I want to bring this out. The other killings all occurred in Newtowne, with the exception of Mr. Talley, who was killed over in Blackwell, on Southside. But we already know that Mr. Talley had driven the car and all this sort of stuff. Is there any evidence that Torrick Brown had anything to do with these people? No. Any evidence that he had anything to do with drugs? Well, he had drugs in his system, but they didn't bring it out. Look in the autopsy report. It is in there. No. Was he even killed in an area nearby? No. In fact, as the evidence is here, was this a domestic shooting? It makes no difference to the victim. You are just as dead and it is just as wrong. But we are talking about man's law, and it is not in furtherance of any racketeering activity.

And further, look at Mr. Roane's reaction. According to Mr. Hardy, Mr. Roane left that murder scene, went to Whitcomb Court, and consumed so much heroin that he threw up and was sick all that night, into the next day, when he was arrested one year ago today. And also remember this -- well, moving along.

The same would apply to the shooting of Martha McCoy. Why she got shot, I don't know. Now, we do know from Martha McCoy that James Roane had come over to the house and there had been some kind of discussion between James Roane, Martha McCoy, and Torrick Brown's wife. And she said, "I was trying to keep her from finding out about this." And maybe that had something to do with it. I don't know. But the burden is not on us. The burden is on these people to convince you beyond a reasonable doubt that that killing or that wounding had something to do with drugs. And I would submit to you that you have to violate your oath rampantly in order to come to that finding.

There is conversations allegedly with Ms. Butler, who said after all of this, James Roane called her and said he was being held for the shooting of Torrick Brown and Martha McCoy. He said, "I should have killed her" or "If I had killed them all, I wouldn't be in jail." And he was concerned about witnesses against him to that murder. And further, he told Valerie Butler, according to the United States' evidence, that he was concerned that

"Stinker" knew that he was in that house prior to the killing of Peyton Maurice Johnson. But did Mr. Roane indicate that he had a concern about Talley? No. I mean, Hussone Jones had to have seen the murder. Did he indicate any concern about that? No. Why? Because he didn't know. Was there a concern about Doug Moody? I mean, everybody in the world sat out there and said they watched what happened; they watched the ambulance pull up, watched the police pull up. Did he indicate any concern about all the witnesses over there? No. Why? Because he didn't do it. Did he indicate he had a concern about witnesses coming forward on Louis Johnson? No. Because he didn't to do it. That's right.

Now, the United States would say, "Well, we have to take these witnesses the way we find them." Mr. Hussone Jones, Ms. Denise Berkley, and Ms. Priscilla Greene  --  Ms. Priscilla Greene admitted it on the stand -- embellished their testimony. They went a little bit further than the facts would permit. That's called perjury. That's called perjury. Dr. Fierro says that's perjury.

They say, "Well, if that's perjury, you can believe them on some other things." No, the wounds could not have been imparted the way they say. Did Ms. Denise Berkley improve upon her story with time? Yes. Did Ms. Priscilla Greene improve upon her story in time? Yes. She said, "I saw him kill him. I saw him stab him." It got better.

My client has done some things that are illegal. And he has done some things that are morally bad. And you are being asked to pass judgment on him. And if he did those things which are illegal and it can be proven beyond a reasonable doubt, you should convict him. But if the acts were bad and there is no evidence that they were his, you cannot. No matter how strong a hunch you might have, or how strong your sense of common sense, you should be able to point to the evidence. I expect that each of you back there will remind each of the others that you can't make things up to convict anyone, no matter how you feel about them.

The United States said this is a serious case because we are going to ask you to put these people to death. That's what they told you. Even if this were not a potential death penalty case, you should treat this case with all the seriousness of the most important decision you have ever made in your life.

I hope that concerning the murder of Doug Moody, you acquit all these defendants so that someone will go find out who killed him. For no matter who he was, his life was worth justice and someone should

care.

My client is entitled to have 12 people determine his guilt or innocence. Oh, wait; back up a second. Oh, I forgot about this. Where is the evidence that my client knew of, managed, organized, or supervised anybody? I don't remember hearing that. I do remember he sold drugs. I remember he gave drugs to people to be sold. But I have not

heard anything about him being a kingpin. And further, this guy has to go to Ronita Hollman's house to use a stove to cook some crack. Is that evidence of lavish spending? It is not there. You talk about income. Any evidence he had on Guess jeans? Any evidence he had anything? He had a car. It is a Regal. I don't even know what year it is. Any evidence of money? Income? No. Nothing.

My client is entitled to have 12 independent jurors determine his guilt or innocence. Not 11 of you speaking for 12, not one big strong one, but 12 independent minds. Each of you has sworn an oath independently to assess the evidence and follow the law. Not any prejudice, not any moral code, but the law. If you disagree morally with what my client did, he will answer to God for that. Right now he is answering for man's law before this Court. And believe me, no matter what you do, God will get his.

But if the evidence is not here and each of you individually, if you are not convinced beyond a reasonable doubt to the point where five years from now you see us and you think I remember that evidence and I still know in my heart that the evidence was there to support that conviction and I didn't fall back on prejudice, I didn't fall into the game the

United States wants to play, the game of "paint them with a broad brush, view them as different from us." Yes, let's call them something different so we can lower the standard to jam them. Let's create an atmosphere like the Salem witch trials. Except instead of witch trials, we will call them drug dealers, because then we don't have to treat them like Nancy Reagan. But no, they are not. As they sit here now before you, they are not drug dealers. Even if I say they are, they are not. They are citizens. They are entitled to the same rights as any other citizen. Period.

Now, when this is over, if you want to strip them of that right, you may. But you can't do it now to justify what you are going to do later. And if you can't do that, if as you sit here now you have a doubt as to your ability to see these people as citizens, you should stand up now and tell the Judge, "I don't think I can do this. Because I am not

living up to my oath." And if, when you are back in that room, one of you weakens and stops being a representative of the law, the others owe you the obligation to remind you.

I tell this in all the cases, I've been doing it this for a long time. I'm older than most of these

3148

folks, except for Mr. Geary. I have been a trial lawyer for a long time. I have never seen a jury cheat. I have seen juries do the most complex and the most brilliant resolution of facts you can imagine. I have disagreed with a few. But I've never seen them make stuff up. I have every confidence you won't do it, either. If you don't like my tactics, if you don't like the way I do things, don't take it out on Mr. Roane. Later, you can punch me if you want to. It doesn't matter. But he is entitled to have his guilt determined based upon his acts, that which he did, and the law.

If you allow prejudice to control your actions, you will have done a disservice to the law, you will have done a disservice to the country, and you will have done a disservice to yourselves. If the evidence is there, convict. I'm not telling you that you cannot. But justice is not the result. I'm sure the United States will get up and say, "If there is justice you are going to convict these people." Justice is not the result. Justice is the process. If you play by the rules through the process, the end is just. If you practice justice, the result will be justice. It is the process that counts.

People say, "Oh, no, Mr. Baugh, that is so jive;

3149

that's a technicality. You lawyers get up and talk about technicalities." It is wrong to murder in the Soviet Union, what used to be the Soviet Union. It is wrong to murder in Iran. It is wrong to murder in the United States. What makes us different from those people is how we treat citizens who are accused of crimes. That's not a technicality. That's our morality. And all I'm saying is, stick by the rules.

This has been a long case.

MR. BAUGH: Can I have a moment, please, Your Honor?

THE COURT: Sure.

(Counsel conferring with co-counsel.)

I often rely on the younger lawyer. This is a serious, serious case. The measure of a person, as my father told me, is how you treat someone who can do nothing for you. The measure of a person is how you treat people you don't like or people who are not worthy of your friendship. If you can bring yourself to resist the rabble-rousing and call to prejudice of

the United States and follow the law, you will have done something that will have made you stronger. I'm not talking about the result. If after applying those standards you find my client guilty, I can ask for no more. I'm not talking about the result, I'm talking about the process.

You have been very, very attentive. I want to thank Mr. Vick and the Court for allowing me to participate in a case like this. This is what this is all about. It is not about fighting wars. It is about how we treat people that perhaps everyone else hates. If we give them their due, if we give them that which every citizen is entitled to, I trust, and I pray with all the seriousness in my soul, that you are up to that task. And if you are, I will submit to you that as to a significant number of these charges, specifically the killing of Douglas Moody, Peyton Maurice Johnson, and Louis Johnson, you will find the defendant not guilty.

As to the shooting of Torrick Brown, it is going to be very difficult. Because remember, my client is not charged with just killing Torrick Brown. He is charged with killing him in furtherance of drug activity. The murder charge, just killing someone, that's a state violation. And he might have to be -- maybe he should have been tried by the state.

Now, I know you are going to find him guilty of dealing drugs, because he did. But we would submit that if you follow the law given to you by the Court and you follow your oath that you have sworn, you must find the defendant, James Roane, not guilty of many, many, many of these charges. Thank you.

THE COURT: Mr. Wagner?

MR. WAGNER: May it please the Court, ladies and gentlemen: After hearing all the evidence in this case involving Sandra Reavis, you now know that she is not guilty of the conspiracy charge that she faces here. She is not guilty for three very important reasons. First, because of the reliability of the witnesses that have testified. Second, because she was very separate from the criminal activity of the others charged in this conspiracy. And third, she did nothing in furtherance of the criminal activity.

Before I go into those three points, I'd like to review the facts a little bit. Sandra Reavis met James Roane in December of 1991. They started their romantic relationship then and it lasted until February 1st of 1992 when James Roane was locked up on these charges. Now during that time period, it is important for you to decide how much contact Sandra Reavis had with the people in this conspiracy. Well,

perhaps the best person to tell you how much contact she had was Denise Berkley. Denise Berkley was living with these people at Moore Street and at Norton Street, and she told you that she saw Sandra Reavis maybe two or three times at the Norton Street house. She also told you that she saw her maybe two or three times at the Moore Street house. Remember, Denise Berkley was the one who was cooking for these people, cleaning for these people, and doing groceries for these people, living with these people. That's the first segment of time that I ask you to concern yourselves with in relationship to Sandra Reavis.

The second period of time is from February 1st of 1992 to April 24th of 1992 when Sandra Reavis was locked up on this charge. During that period of time, but for three incidents alleged by the government, they have shown you no evidence of any contact between Sandra Reavis and Cory Johnson, and no contact except for one of those three incidents between Sandra Reavis and Richard Tipton.

Based on this evidence, they ask you to find that Sandra Reavis is a member of this organization. But she is not. The first reason why she is not is because you have heard no reliable testimony to prove her guilt.

Co-counsel has explored the reliability of the witnesses here in great depth, and I'm not going to repeat what they had to say. But I would like you to look at this concept, the concept of perception versus proof. The government, through their witnesses, has tried to give the perception that Sandra Reavis was a drug dealer for this organization. But they have not provided you with sufficient proof of that.

But what was the perception based on? What was the perception of these government witnesses based on in saying that she was a drug dealer for these people? Well, first of all, she was involved in a romantic relationship with James Roane. Second, James Roane was a drug dealer. Third, on occasion you have heard testimony that Sandra Reavis was selling drugs. So the perception was Sandra Reavis was selling drugs for James Roane, Sandra Reavis was selling drugs for the organization. Again, the perception.

Well, let's look at the proof. Let's look at the facts and the details they have provided you with to show that she was a member of this organization. There is very little evidence of any distribution by Sandra Reavis. You have heard from Ronita Rochelle Hollman. She said she was selling drugs every day on

the street out in Newtowne during the year preceding her arrest.  She said she saw Sandra Reavis sell drugs on one occasion.  Stanley Smithers, "Stinker," says he saw her sell drugs on a couple of occasions. Jeanette Pauley, she said that Sandra Reavis was selling drugs, saw her selling drugs a couple of times.

The problem here, ladies and gentlemen, you haven't heard what time frame it was that they say Sandra Reavis was selling drugs.  You haven't heard if it was before she met James Roane or after she met James Roane.  And also, you haven't heard that any of the drugs that she may have been distributing out there were from anyone charged in this conspiracy. There is no evidence.

Also, you have heard very little evidence that anyone charged here gave drugs to Sandra Reavis. Very few particular circumstances of her ever getting drugs from anyone here.  But, of those very few circumstances, of that little evidence that you have heard, there has been absolutely no evidence of any quantities of drugs that Sandra Reavis received.  You haven't heard if quantities distributed or given to her were for her personal use or for distribution. No testimony of any quantities that she received.

There was no testimony regarding any money that she transferred to anyone for drugs.  Nothing whatsoever about Sandra Reavis and money for drugs.

But beyond that, ladies and gentlemen, you have heard nothing of any financial arrangement, of any financial structure, between Sandra Reavis and anyone charged in this conspiracy involving drugs.  You have heard a lot of testimony about two-for-one, how someone gets $300 worth of drugs and they have to pay back $200 for those drugs, keep $100 for themselves. You heard about a 60-40 split, 70-30 split, 75-25 split.  But as to Sandra, you heard nothing, nothing about any financial arrangement for drugs.

So when you peel back the veil of this conspiracy, with all of the government witnesses that testified here, you have no details, no facts, no proof of Sandra Reavis selling drugs for this conspiracy.

But beyond that, the government has told you that they have corroborating evidence, physical evidence, unimpeachable government witnesses, police officers, who have been able to support every bit of the evidence they have presented from their witnesses here.  In Sandra's case, there is no corroborating evidence.  You have heard that she was taken down to the police station five or six times, taken off the

street, taken from her home.  Each of those times she was picked up, no drugs were found on her, no money was found.  No corroborating evidence.

So the perception of the witnesses here, there is a big gap here between the perception of these witnesses and the proof that the government has offered you.  The government cannot fill that gap.  The reliability of their witnesses tells you that Sandra Reavis was not selling drugs for this organization.

But Sandra was also very separate from the criminal activity of this organization.  She was first separate from the violence.  There is no evidence whatsoever that she was involved in any way in any of the violence that you have seen here.  James Roane wrote a letter to Sandra Reavis.  That letter is in evidence, and I urge you, when you go back in the jury room, to look carefully at the letter.  In the letter, he says, "You didn't know about the killings.  You didn't know what I was doing out there."

If you look carefully at this letter, if you look at those statements in the context of the letter, you will see that those statements are true.

3157

What he is saying in that letter is the truth.  He is apologizing to Sandra, apologizing to Sandra for having her get locked up on a charge that she had nothing to do with, for having her being implicated in a conspiracy that she really wasn't involved with.  Please, read the letter.

But the testimony of Sterling Hardy also supports what James Roane says in that letter.  The night of the Torrick Brown murder, Sterling Hardy told you that when they left the scene of the murder, they went out and got some heroin.  Then they went to West Moore Street, over to Sandra Reavis' house, but Sandra wasn't home.  They went over to West Moore Street and later went over to Sandra's house.  When James Roane got out of the car to go into Sandra's house to get her, he put the gun underneath the seat in the car.  Please, recall that testimony from Sterling Hardy.  What he was doing here, by putting that gun underneath the seat of the car, he was hiding the violence from Sandra.  He took Sandra back to West Moore Street.  They spent the night there, and Sandra was awakened by the police, who broke in at 9 o'clock that morning.  James Roane was hiding the activity of the conspiracy from Sandra Reavis.

Now, I ask you to ask yourselves this question:

3158

The government has told you in this case that the drug activity here went hand in hand with the violence.  They have told you that the drug activity

here accompanied the violence. How can someone who was not involved in any way with the violence in this case truly be a member of this organization? How can Sandra Reavis, who was not involved in any violence here, how can she really be a member of this organization? She can't. She can't. But Sandra was also separate from the drug activity here.

You have never heard any testimony about Sandra going to New York to get any drugs. You haven't heard any testimony about Sandra being in possession of any large quantities of drugs. In fact, you haven't heard any testimony of any quantities of drugs that Sandra Reavis was in possession of. You have heard no testimony about any money, no testimony of any financial arrangements she may have had with drugs with people in the conspiracy.

Cory Johnson made a statement to a man named Rodney Tucker, who testified here. Back in August of 1992, he told Rodney Tucker that Sandra Reavis wasn't involved in this conspiracy; that she was not selling drugs for the conspiracy; and that he never gave her drugs to sell.

Well, what did the government present to impeach that testimony? What did they ask Rodney Tucker to question the truthfulness of that statement? Nothing. Absolutely nothing. So that statement stands as presented to you. You have now two people charged here who have told you that Sandra Reavis didn't know what was going on with that conspiracy, wasn't involved with it.

Cory Johnson also said to Rodney Tucker that Sandra Reavis was in the wrong place at the wrong time. This is a very important statement that I ask you to consider. Here was Sandra Reavis, at the Moore Street house, brought there late at night after some murders were committed. The police come in the next morning. They arrest her, bring her to the police station, or pick her up, bring her to the police station. They ask her questions about what was going on. She didn't know about the murders. She didn't know about the dealings of the conspiracy, the drug conspiracy. She didn't have anything to tell the police officers. So they bring her in five or six more times and ask her the same questions. And still, she couldn't tell them about the murders, and she couldn't tell them about the intricacies of this drug operation. So they indicted her, and they bring her before you here on trial.

Sandra Reavis was separate from the criminal activity of this organization. She was separate from their violence and separate from the drug activity.

So ladies and gentlemen, Sandra Reavis did

nothing in furtherance of this conspiracy.

Now, in order to evaluate this question, you have to know what exactly a conspiracy is. Mr. Vick told you that a conspiracy is a very simple thing. Well, the Judge is going to instruct you between five and ten minutes as to what a conspiracy is. You are going to have those instructions back with you in the jury room. And you will see seven or eight pages explaining, or trying to explain, what a conspiracy is. You will hear terms such as a conspiracy is a partnership in criminal purposes, that it is an agreement to further criminal activity. You will also hear that it is important to consider whether someone had a stake in the outcome of the conspiracy. But most importantly, you are going to see an instruction about membership in the conspiracy. In order for someone to be guilty of a conspiracy, they must be a member of that conspiracy.

I suggest to you that these instructions are

3161

technical and that the law regarding conspiracy is very complicated. But you can be the judge of that. You will look at the evidence. You will look at the instructions that you will have about conspiracy, and you will decide that.

Now, what have the government witnesses told you about Sandra Reavis acting in furtherance of the conspiracy? Well, several witnesses said that their perception was that she was selling drugs for the conspiracy. And as you have seen, there is this gap between the perception and the proof that the government has presented to you.

"Papoose" told you about that, Priscilla Greene told you about that. But they had no proof, no details, no facts to support what they said.

Jerry Gaiters also talked about Sandra Reavis and her involvement with the conspiracy.

Now, co-counsel has dealt with Jerry Gaiters, and you have heard that he was a liar and a murderer, and you certainly can't rely on his testimony in convicting Sandra Reavis or in evaluating Sandra Reavis' guilt. But you also heard from Denise Berkley. And the other counsel in this case, they have talked about Denise Berkley, too, and about her credibility. Let's look at the specific situation

3162

that Denise Berkley described to you, which the government has indicated has placed Sandra Reavis in this conspiracy.

Talk about a night of fear, where a threat was given Denise Berkley by Cory Johnson, a threat which she admitted was an idle threat, a threat which she admitted he did not really mean. She said she was

put in great fear that night, great fear one night before "Mousey" Armstrong was killed. Well, the day after "Mousey" Armstrong was killed, you heard testimony that Denise Berkley was out on the street talking to Sandra Reavis. They were getting along. In fact, Denise Berkley got in a truck with Sandra Reavis. You have also heard that Denise Berkley that very same day, the day after "Mousey" was killed, she moved into an apartment next-door to Sandra. She didn't avoid Sandra. She wasn't afraid of Sandra.

How does this align with what the government says about Denise Berkley being in fear? She was not in fear of Sandra Reavis. She did not perceive Sandra Reavis to be a part of this conspiracy.

Now, after James Roane got locked up, February 1st, 1992, that period of time between February 1st and April 24th, the government has pointed to three isolated incidents of Sandra Reavis. They allege Sandra Reavis had something to do with members of this conspiracy, this drug conspiracy.

After "J.R." got locked up, Sandra Reavis' contact with these people essentially stopped. There was no reason to continue. The man that she loved was in jail. Over this two-and-a-half-month period, only three incidents that they present to you, three incidents separated by between three weeks and a month. The first incident involved testimony of Valerie Butler.

Now, Valerie Butler testified that she saw Sandra Reavis four or five times over this period of time. And but for this first incident, she never saw her with any drugs, never saw her with any money. That was her testimony. She said that on February 11th, 1992, she delivered drugs to Sandra Reavis. Well, she gave no facts about the quantity of the drugs. But remember, Cory Johnson said that he never gave drugs to Sandra Reavis to sell. So this contradicts what Valerie Butler had to say.

MR. VICK: I don't remember Cory Johnson testifying, Your Honor.

THE COURT: Sustained.

MR. WAGNER: I'm sorry, Cory Johnson told Rodney Tucker, who testified here, that he never gave

3164

Sandra Reavis any drugs.

MR. VICK: The jury's recollection will control.

THE COURT: Go ahead.

MR. WAGNER: By this fact alone, the government has failed to prove beyond a reasonable doubt that this transaction ever took place. But it is also important to look at Valerie Butler's credibility. The second incident occurred three weeks later, early March of 1992, three weeks after

the first incident. This is the incident that Mr. Vick points to as proving Sandra Reavis' guilt: a transfer of money to New York. Valerie Butler testified that Cory Johnson asked her to send him some money in New York. First, she said that she sent him $1,500. Then she saw the Western Union document. She corrected herself. It was $1,200. Please, go back through your notes and look at Charles Townes' testimony, look at Hussone Jones' testimony. They said that they gave Valerie Butler $5,000. So what we have here is a $3,800 mistake somewhere.

The Western Union records will show -- and please, look at those Western Union records when you go back to the jury room. The Western Union records show that the money was sent on two separate dates, one date to Priscilla Hodges, one date to a Priscilla Williams. Valerie Butler never testified about two separate dates. So Valerie Butler has $5,000 from Charles Townes that she is supposed to send to Cory Johnson in New York. Why does she call Sandra Reavis then? Why does she want Sandra Reavis to help her send this money? Valerie Butler is very calculating. By her own testimony, she is a drug dealer; she used drugs; she was involved in a lot of criminal activity.

She calls in Sandra Reavis to send $1,200 so that she can pocket the other $3,800. If anyone comes to her and asks her what happened to the other $3,800, she points to Sandra Reavis and says, "I don't know, I gave her the money. I told her to send it." You can see that from the documents from Western Union. Valerie Butler used Sandra. Sandra was never contacted by Cory Johnson. Sandra was doing a favor for Valerie Butler.

Look at the evidence. Look at the Western Union documents. Consider the testimony of Charles Townes and decide if Sandra Reavis was acting in furtherance of the conspiracy or if she was being used by Valerie Butler.

The third incident, early April of 1992, one month after that second incident. Something about Sandra Reavis and a gun. She gave a gun to "Whitey." The government said that Greg Noble testified about this incident. I ask you to think back to Greg Noble's testimony. He was an uncooperative witness. He was asked, "Do you know Sandra?" He said, "No, I don't." "Have you ever heard of Sandra?" He said, "No, I haven't." And the government got upset with him. So he provided no information about Sandra Reavis. The only person who really provided information about that was Leroy Slater. I ask you

to recall the testimony of Leroy Slater. He was the one who talked were -- I asked him "When did this trip to the Amoco station happen?" He said, "Well, it was in the evening." I said, "Well, was it light or dark out?" "It was light out. In the evening it was light out." "What time did it happen?" "12 or 1 o'clock." "12 or 1 o'clock in the evening? It must have been dark." He said no. He was confused about night and evening. He was also asked about whether he sold any drugs. First he said no. I said, "Weren't there drugs in your apartment?" He said yes. "Didn't you know about those drugs?" Yes. Then he turned his testimony around and finally he admitted that he sold drugs. Then he was asked about the identification of Sandra Reavis. He was shown one picture by the government; that he saw Sandra's picture in the newspaper. This is the identification that he gave of Sandra Reavis. And I tell you, this is an identification that was --

MR. VICK: Your Honor, I hesitate to rise, but he stated he was shown several pictures. There has been several misstatements of his testimony here.

THE COURT: All right. Go on, Mr. Wagner. The jury's recollection will control.

MR. WAGNER: Very well. Now, the government must prove beyond a reasonable doubt each and every element of their case. And for this incident, they rely on the testimony of Leroy Slater. You can't find, based on any reliable testimony, that this ever occurred. You can't find beyond a reasonable doubt this particular fact.

So over this two-and-a-half month period, the government only alleges three possible isolated incidents where Sandra had any contact with the people involved in this conspiracy.

In none of these situations have they proven that Sandra Reavis acted in furtherance of the conspiracy. They have shown no contact with Sandra Reavis over this time with Cory Johnson, and except for that one situation that they tell you about, no contact with Richard Tipton.

Now, is that, ladies and gentlemen, proof of being a member of this organization? No.

What the government has tried to do with their testimony in this case, through the government witnesses that they have presented to you here, they have tried to present you with a package, a neat, tidy, tight package that represents the guilt of Sandra Reavis. And they tell you that these government witnesses have put together this package.

Well, let's look at those government witnesses

that put this package together.  First, we know that virtually every single one of those witnesses were drug addicts.  They were using cocaine; they were using marijuana; they were using alcohol.  The Judge is going to instruct you as to drug addict testimony.  He is going to tell you that that testimony must be examined and weighed by the jury with greater care than the testimony of a witness who does not abuse drugs or alcohol.  So that's the first thing you know about these people who have presented this package to you.  This neat and tidy package is starting to look a little rumpled.

Then they have told you or then you know that the people who put this package together, not only were they drug addicts, but they are convicted felons, many of them, and many of them convicted of crimes involving lying, cheating and stealing.  The Judge is going to instruct you on this particular point, too, on the testimony of convicted felons.  He is going to tell you that this is a circumstance to take into account in determining the weight of the testimony.  Scrutinize the testimony of these convicted felons.

Well now, not only are these people who have put together this package drug addicts, but they are also convicted felons.  Now the paper on the package is starting to look a little ripped, and the tape is starting to come off the sides.  But in addition to those two things, you know that each and every one of those witnesses cooperated with the government.  In exchange for their cooperation, no charges would be brought against them.  And in the case of a couple of the people, they get the 5K.  The Judge will also instruct you about these witnesses; that these witnesses' testimony should be received with caution and weighed with great care.  So now the package is falling apart.  The package to prove Sandra Reavis' guilt beyond a reasonable doubt is looking awfully shabby.

But finally, finally, they have provided no corroborating evidence for these witnesses who are drug addicts and felons and have cooperated with the government.  Absent any corroborating evidence, the package doesn't even look like a package anymore.  That's the evidence that the government has presented you against Sandra Reavis.

Now, Mr. Vick told you in his closing argument that every person who testified for the government that received immunity in this case had nothing to do with the murders.  Every witness who received immunity who testified here had nothing to do with the murders.  That's not true, ladies and gentlemen.

That's absolutely not true.  Hussone Jones, Hussone Jones took the stand here, told you about trips he took to New York, told you about selling large quantities of drugs.  And based on the government's theory, based on what they have told you, he drove the getaway car from the Douglas Talley murder.  In any court that Hussone Jones would go to in the United States, that would be first degree murder.  Hussone Jones gets  --

3171

MR. VICK:  Misstatement of the law.

THE COURT:  All right.  Just finish up, Mr. Wagner.  As I'll tell the jury over and over again, what the lawyers say are not evidence.  Their statements are not what the law is.  Don't listen to it because I'm telling you what the law is.  Go on, Mr. Wagner.

MR. WAGNER:  Hussone Jones spent no time in jail.  Hussone Jones had no charges brought against him.  Sandra Reavis sits here, having been involved in no violence here.  She sat in jail for the past nine months on this charge.  She faces ten years to life on this conspiracy charge, with no parole.

The government tells you that one occurrence is sufficient to prove Ms. Reavis guilty as being a member of this organization.  Well, that occurrence, that one occurrence, if you find it, has to make you sure beyond a reasonable doubt, has to make you that certain that she was a member of the conspiracy.  There has been no occurrence like that.  There has been no combination of occurrences like that to convince you beyond a reasonable doubt that Sandra Reavis was guilty of selling drugs for this conspiracy.  You don't have the details.  You don't have the facts.  You don't have the proof that you

3172

need to find her guilty.

The government has failed to provide reliable testimony to prove Sandra Reavis' guilt.  The government has failed to overcome the fact that Sandra Reavis was separate from the criminal activity here.  The government has failed to show you that Sandra Reavis acted in furtherance of this conspiracy.

Because they have failed to prove these things, you must find her not guilty.  So please, when you go back to that jury room, I urge you:  Get together collectively, look over your notes.  Look carefully at the evidence in this case.  Look carefully at the instructions that you are provided.  From these notes, from this evidence, from those instructions, you will see very clearly that Sandra was not guilty.  Please, do what's right here, do what's just.  Find Sandra Reavis not guilty.  Thank you.

THE COURT:  All right.  Rebuttal?

## Parcell Guilt Phase Rebuttal (3173)

MR. PARCELL:  I've been listening to these lawyers tell you yesterday and today all their reasons why their clients didn't do anything, aren't guilty.  And I've been listening to the funny stories that Mr. Cooley told you, and the renditions of a hymn.

3173

MR. GEARY:  I object to the characterization of the closing arguments.  It is highly personalized.

THE COURT:  Mr. Geary, you say you object to personalization of closing argument?

MR. GEARY:  Yes, sir.  You told me in the beginning that I didn't object to Mr. Vick in the opening statement.  Now I object.

THE COURT:  That's overruled.

MR. PARCELL:  The only thing they haven't done yet is bring Ray Charles and his chorus line and say, "You've Got The Wrong One, Baby."  That's the only thing they haven't done.  That's not going to happen, because the government does have the right ones.

You heard about probably the only thing we agree as lawyers about, that there is a conspiracy that you have been listening to.

MR. GEARY:  That's a misstatement of the evidence.  I did not concede on behalf of my client there was a conspiracy.

THE COURT:  Overruled.

MR. PARCELL:  Their argument is the conspiracy is by the government.  Mr. Vick, myself, Detective Fleming, Detective Woody, the rest of the

3174

police officers, Anne Jones, Dr. Fierro.  The government's contention is that the conspiracy lies here with Mr. Johnson, Mr. Tipton, Mr. Roane, and Ms. Reavis.  It is amazing to listen to their arguments.  They pointed a finger repeatedly at the United States Government and accused us, the government, of setting all these people up.  Let's walk through first the raw basic physical evidence of the murders.  Then we will get back to the drug angle.

January 5th, 1992, 13th and Stockton, South Richmond.  The police find Mr. Talley stabbed 84 times in his car.  What did they find?  Detective Hines finds a bloody shoe print in the backseat of Talley's automobile.  In the right passenger window, he finds this finger and this finger in red body fluid, blood  --

MR. GEARY:  Objection.  Misstatement of the

evidence.

THE COURT: Overruled.

MR. PARCELL: And what does he do? He lifts that print. And he takes a photograph of that shoe print in the backseat of that automobile indicating two people. And lo and behold, no witnesses, lo and behold, who do those prints belong to? That killer, Richard Redfield Tipton, III. We don't need anyone to tell us that because Hines pulled the prints and the gentleman, Mr. George Wynn from the FBI laboratory, said those prints belong to him, nobody else in the United States, the world, the universe. Him.

Hussone Jones helps you with that crime, because unfortunately he saw it. And he was afraid to tell anyone because he knew they would kill his family.

MR. GEARY: I object again. That's not the evidence.

THE COURT: The objection is overruled.

MR. GEARY: Misstatement of the evidence.

THE COURT: Overruled.

MR. PARCELL: We go to January 13th, 1992. "Little Doug" Moody dives through a window as he is shot twice in the back by Tipton, again with a .38.

MR. GEARY: That's a misstatement of the evidence. There is no testimony about that.

THE COURT: Overruled.

MR. PARCELL: What happens next? James Roane comes to his aid and there is a confrontation on the porch. Three witnesses told you that. And as Moody runs for his life, he gets to that fence and Roane continues to stab him 18 times and he dies on the way to MCV. I take argument with what Mr. Baugh says, the government scorns the witness after she assisted him. She deserves praise, too, as well as by the government. Only thing she told Detective Dalton was, "I couldn't tell if it was a male or female. I couldn't tell if he was being stabbed. All I saw was motions towards the chest." She didn't even see the man stabbed. We praise her, too, for trying to help another human being. But that's what she said. She couldn't even tell Dalton it was a man or a woman.

Then we go to January 14th. What happens on January 14th? James Roane, Cory Johnson, and Richard Tipton and "V" Mack get Pam Williams to go buy this, the Intratec, and the AA Arms handguns. What do they do with these guns next? They take them to "Papoose" Davis' house.

MR. GEARY: I object to the use of "they" in closing argument. That's clearly improper now.

THE COURT: Overruled.

MR. PARCELL:  They took them to "Papoose's" house for storage.  They come up there that day on January 14th, get the guns, and go take a life, that of Peyton Maurice Johnson.  They come back and brag about their marksmanship.

MR. GEARY:  My client is not charged in

3177

that murder.  He is using the word "they."  He just said Tipton bought the gun.  That's the problem in this case.  They have done it throughout, "they."

THE COURT:  Overruled.

MR. PARCELL:  Roane, Johnson, and "V" Mack go back to "Papoose" Davis' house to get the fingerprints of off of these guns.  Mr. Baugh makes much merit of the fact that the guns weren't loaded. He talked about his knowledge about how a Glock works.  When you bring a Glock back, a Glock has no safety.  You put a bullet in the chamber.  You put a bullet in that chamber.  If it is touched, it fires. I know something, too, about a Glock and how it works.  That's important.

After Peyton Maurice Johnson is shot -- he said "numerous times."  He was shot 15 times.  It wasn't a one or two-wound type case or killing as these cases are.

At the crime scene, there were 12 casings found.  Not 15, 12.  Ten of them were a Glock and two of them were the AA Arms.  This weapon.  From his body, there were removed five bullets, two Glocks and three AA Arms.  It is important.  It is in the lab report.  It is important you understand what that means, because at the crime scene we found two

3178

casings from this weapon.  Just two.  But in his body we found three bullets that came from this gun.  My point is, forensic science, or our recovery, is not a perfect one because obviously we lost some casings at that crime scene as we did other crime scenes.  The ballistics will bear that out.  And those two guns which these folks got Pam Williams to buy killed Peyton Maurice Johnson.

Mr. Baugh asks how do we prove that has anything to do with the Continuing Criminal Enterprise?  Ms. Hollman told you about it, and so did "Pepsi" Greene.  Because Ms. Hollman was selling drugs for Peyton Maurice Johnson.  James Roane and Mr. Tipton came to Hollman and said, "Start selling drugs for us.  You are too busy in the neighborhood.  The heat is going to come in on us.  We want you to start pushing our product, not Peyton's."  She refused. Tipton says, "We are going to get ours, our drug business.  If we don't, a lot of bodies are going to fall."  What does that mean, Ms. Hollman?  It means they are going to start killing people.  And what did

they do?  As "Pepsi" Greene told you, they killed "Little Doug" Moody because he worked for Peyton Maurice Johnson, and they killed Peyton Maurice Johnson because he was a competitor in Newtowne.  And

3179

they told numerous people "We are going to take over the drug business in Newtowne."  That's what they tried to do as they continued their criminal enterprise, as they went from New Jersey, to Central Gardens, to Newtowne, to Blackwell, where he was ultimately arrested on April 9th, 1992.

Then we go to Louis Johnson, another drug dealer.  Where was he a drug dealer?  Newtowne.  They are getting rid of the competition again.  Roane, Cory Johnson, "V" Mack, Sterling Hardy, Jerry Gaiters, and Dennis Moody were all out there.  Moody told you what he saw, Sterling told you what he saw, and Jerry Gaiters told you what he saw.  He told you Roane was the driver.  He stopped his automobile, got out, said something to Johnson, made him stop.  After he stopped is when the shooting began.  And one of those fellows told you how they put the gun right next to his head and fired, and he went down.

Why is that significant?  And it was a Glock that they used at the back of his head.  Why is that significant?  Because Dr. Fierro told you there was stippling or powder burn on his stocking cap, on his skin where these heroes shot him in the back of the head.  And she told you how the wounds went, left to right, left to right, and in the back from back to

3180

front, just as those witnesses told you.  He was surrounded from the back side and they fired at him from three different directions and he fell dead. After he fell on the pavement, Cory Johnson, this hero, continues to shoot him in the head until he empties his gun.  They get in the car and speed away with Sterling Hardy driving.  Those three guns, once again -- correction, those two weapons are ballistically matched up to that killing.

MR. BAUGH:  Your Honor, excuse me.  That is a gross misstatement.

THE COURT:  The objection is sustained.

MR. BAUGH:  Thank you.

MR. PARCELL:  Then we go to Lynhaven avenue, Torrick Brown and Martha McCoy.

Mr. Baugh's stipulating that his client killed Torrick Brown because of a romantic interest in Robin Cooper makes no sense for two reasons.  Reason number one, he has a one-on-one beef with another person. Why does he get "C.O.," Sterling Hardy, "V" Mack, Linwood Chiles to bring him the guns to Lynhaven? Why does he get "C.O." and "V" Mack to go with him to the door when they knocked on the door?  Martha McCoy

comes to the door, and they shoot Torrick Brown 20-some times.  They shoot her six times as she dives over the couch.  Her three kids, two, four, and seven, watch Romeo shoot someone else and kill him, and shoot their mother.  And he, James Roane, is so disturbed by this romantic thing with he and Robin Cooper, being Torrick Brown, that he goes home and in less than 12 hours is arrested in bed with Sandra Reavis.  Is that a romantic killing or an act in furtherance of the conspiracy?  I submit to you it is the latter.  Because it doesn't make sense.  He leaves Robin Cooper, kills her lover, then goes home and gets in bed with Sandra Reavis.  It doesn't make sense.  And he gets the conspiracy to assist in that killing.  Why?  And once again, those guns are matched up to that killing.

Then we go to West Clay Street.  Cory Johnson, "C.O.," is looking for "Mousey."  He says, "I treated the bitch like a queen.  Where is she?  She messed up my package."

What does he do?  They go back to West Moore Street.  They had to reload these weapons.  Why?  Because they had unloaded those weapons in two human beings in South Richmond.  After they reload their weapons, where do they go?  Jerry Gaiters, Charles Townes, "Whitey," and "C.O." go to East Clay Street.  Enroute they drop off Charles Townes or "Man-Man" in Central Gardens.  "Whitey" is driving.  Gaiters gets out of the automobile, "C.O." behind him with a gun.  He knocks on the door.  Bobby Long opens the door.  "Mousey" comes down the hall.  Cory Johnson burst into the door and shoots her nine times.  She falls with fatal wounds in that hallway.  You saw that hallway.  Next, he shoots Anthony Carter.  They called him "Papa."  He receives two to the left neck.  Wrong place at the wrong time, as Mr. Wagner indicates to you that his client Sandra Reavis was.  I don't think so.

If you want to see somebody at the wrong place at the wrong time, look at Anthony Carter's crime scene video.  Drunk, passed out, stocking cap on at the kitchen table.  Cory Johnson shoots him like an animal for no reason.  Wrong place, wrong time.  Bobby Long runs for his life.  Cory Johnson shoots with the 9mm Glock.  He falls in the alley behind the garage.  He walks up and shoots him in the head again.

Then what happens?  They all get back in the car driven by "Whitey" and go back to West Moore Street.  You heard the evidence that the police were looking everywhere for them because James Roane had three houses.  He hung out with his gang at Norton Street,

3183

Hancock, and West Moore. And they were frantically trying to find these killers as the night progressed through until February 2nd. They did a raid at 1212 West Moore Street, and what did they find? They found the guns that killed Peyton Maurice Johnson, Louis Johnson, Bobby Long, Anthony Carter, Dorothy Armstrong, Torrick Brown, and shot Martha McCoy. With what? 120 individually-wrapped packages of crack cocaine, their dope. And what else do they find in that bag along the fence that separates that yard from I-95? They found a box of.3838 silvertipped 95 grain hollowpoint Winchester bullets. Anne Jones had only seen that kind of ammunition twice before. The first time, the bullets that came out of Katrina Rozier's body. They were 95 grain .38 hollowpoint silvertipped bullets. The second time was when she got his gun that he got from Sandra Reavis and the police did a search warrant April 10th, 1992 at 15th Street in South Richmond. It had five Winchester 95 grain hollowpoint silvertipped bullets. Anne Jones has been in the firearms business for years. All these lawyers stipulated her expertise. She is qualified to give you an expert opinion. Whatever she tells you, you can believe.

3184

She told you folks the only time she has ever seen that ammunition was those three times, because of its flat bottom as she described it to you, those combination of factors on one series of bullets. They came from "Nat" Rozier, "Whitey's" gun he got from Sandra, and West Moore Street. We can't tell you, as Mr. Vick told you in the beginning of the government's case, we cannot tell you who killed "Nat" Rozier. But we can tell you the conspiracy had the bullets at West Moore Street and we can tell you that the conspiracy had the gun, because the gun went from Sandra Reavis to Richard Tipton, "Whitey." And he was arrested with it just as Leroy Slater told you it was, wrapped in plastic and buried in the yard. That's exactly how it was found on April 10th.

Then we go to Stony Run. Let me back up one second. At that point in time the guns were seized, the three guns from the January 14th purchase. That was a Glock, Intratec, and the AA Arms. So on February 4th, 1992, Charlotte Denise Moore goes to the same gunshop at the direction of "Whitey" and "C.O.," because Roane is in jail now, and so is Reavis. She purchases not one, but two more Glocks, because their guns have been seized. So what do they do.

3185

On February 19th, Cory Johnson is in the

backseat of Linwood Chiles' station wagon.  It was called a cab.  And what happened next?  You have "Pepsi" Greene in the front seat, you had Gwendolyn Greene in the middle.  You had Curt Thorne in the passenger right back seat.  That human being, Cory Johnson, takes another Glock and puts it to Linwood Chiles' head and says, "Put your head on the steering wheel" and shoots him twice.  He dies at that steering wheel.  He turns and shoots "Pepsi" Greene in the left ear.  It comes out her right cheekbone.  You saw her.  She is paralyzed for life because of him, and him.  What does Gwen tell you?  Same seating arrangement.  She looked over to her right and saw "Whitey," Richard Tipton, coming to her from her right behind a tree.  Look in that diagram and you will see the tree she described.  He had on jeans and a tan coat.  That's the last she remembers, because now she carries for the rest of her life a Glock bullet from one of those two people's guns between her fifth and sixth vertebrae in her spinal cord.  She is paralyzed for life by these two killers.  They shoot Curt Thorne in the crossfire.  You saw the knitting needles showing the angle of the bullets.  He dies at the crime scene.

3186

What happens next?  On February 29th in the City of New York, Officer Gutierres arrests Kevin Hill.  It is not Kevin Hill.  It is "C.O.," Cory Johnson.  He arrests him with that same Glock that killed those two people and wounded the other two.  We didn't find Tipton's gun.  But they told you he was there.  What happens next?  He gets out of jail.  How does he get out of jail?  Because Sandra Reavis, the lover and girlfriend of James Roane who has been in jail since February 2nd, 1992, wires him $1,200 in U.S. currency.  And Mr. Wagner misleads you once again and says on two different dates.  Look at the Western Union receipts.  Both of them were mailed on March 5th, 1992.  One was for $800, another one for $400.  That is a fact.  He misled you.  Look at the evidence.  What happens next?  Hill is bonded from jail with Reavis' money.  The conspiracy continues.  And he is finally picked up based on Valerie Butler's cooperation with the police on June 23rd, 1992 in New York City.  Mr. Geary and Mr. Cooley both misled you about how Mr. Cory Johnson was apprehended.

MR. GEARY:  I object to him telling anybody that I misled them.

THE COURT:  Overruled.

MR. PARCELL:  They told you that the police

3187

met her in the John Marshall Courts Building, and she told you her mother and her aunt took her to John Marshall Courts Building to meet with the police

174a

because they wanted her to do the right thing and tell the police and the prosecution what she knew. That's what she did.

The police didn't roust her. She came to us and told us what she knew and what she could tell us. And she was so accurate, she told you she came to us on Monday, June 22nd. And she told us how she got in touch with "C.O." Uptown, in New York. And what does she do? She makes a phone call. That detective goes to New York City and arrests him at 8: 23 p.m. on 6-23-92, just as she had assisted the police in doing it. If not, he wouldn't be here. They say she is a liar, or she can't be trusted. Well, she came forward and cooperated with law enforcement. She did the right thing and helped us apprehend that killer.

Now for a few minutes, I'd like to go over a few things about Count Number Two, the Continuing Criminal Enterprise. My colleagues have told you and told you and told you how there is no organization here. There is no management. There is no supervision. They say all of those things have to be done. It is not true. Judge Spencer will tell you what the law is and I will suggest to you the law is that it only requires a person to organize, to supervise, or to manage five or more people in a criminal activity. Mr. Cooley's little cute Wonder Bread-Safeway joke was interesting yesterday, but it didn't have anything to do with what we are about. Because we are talking about illegal crack cocaine. We are talking about killings. And we are talking about the furtherance of that killing that was done for the furtherance of the conspiracy. The conspiracy is to distribute crack cocaine and to make money. It is not about the legal bread business or Safeway. It is a good analogy, but it doesn't make any difference. We are talking about apples and oranges. We are talking about a criminal enterprise and a criminal nature. He is talking about a legitimate business.

Let me go through with you the people that were directed, managed, or organized by this conspiracy. When I refer to the conspiracy, I'm talking about Tipton, Johnson, and Roane. Ms. Reavis to my far right was just charged with Count One, that being the conspiracy to distribute crack cocaine or possession with intent to distribute.

Let's talk about Denise Berkley. She was the conspirators' housekeeper. They told her watch for the "5-0" or the police when they were cooking crack cocaine. They paid her money to do that. They gave her crack cocaine to do that. She ran errands for them. "Papoose" was given crack cocaine by Tipton,

175a

Roane, and Johnson to clean their prints off their weapons and to store them for them. Linwood Chiles was given crack cocaine to drive them to New York City and drive them back to the Richmond metropolitan area to distribute crack cocaine. "Man-Man" and Hussone were told by Tipton and Johnson and Roane where they could sell and how much for. In fact, Tipton eventually made him a lieutenant. He sent Maurice Saunders to New York City with Hess to purchase some crack cocaine. They bring back kilos at a time at the direction of Tipton and Johnson. When they went to Newtowne, James Roane told them where they could and couldn't sell their product. "Studie," Charlotte Denise Moore, and Pam Williams, were directed by Roane, Tipton, and Johnson to purchase the weapons that the police recovered that did these killings. Valerie Butler was directed to send money by Sandra Reavis to New York to bond Cory Johnson out of jail. She was also told to take crack cocaine in the amount of $1,200 to Willow Lawn to Sandra Reavis. She didn't show up with the money. She gave her the crack cocaine anyway.

Hess, as I said before, went to New York City to get pounds of powdered cocaine to bring back to make crack cocaine. Sterling Hardy was a driver, was told to drive away from the Louis Johnson killing, was told to drive "C.O." to South Richmond to meet James Roane so they could kill Torrick Brown and shoot Martha McCoy. Greg Noble was instructed to sell crack cocaine on 15th Street by Tipton, prior to his arrest. Leroy Slater was directed by Tipton to meet Sandra Reavis over here for the purpose of picking up that .38 that killed Katrina Rozier because his guns were seized, too. That gun was seized from him on April 10th, 1992. "Wildman" cleaned up the knife that was used to kill Douglas Talley. And why was Talley killed? Because they thought, Tipton and Roane, that he was "5-0" or an undercover police officer. They directed Priscilla Greene on several occasions to deliver cocaine and to throw away the knife that was used to kill "Little Doug" Moody. They directed Douglas Talley prior to his death, because he drove to New York City to purchase cocaine to be brought back to Richmond.

According to the government's account, there are 22 people they have directed during a six-month time period to further their criminal enterprise. And the reason that my colleagues are attacking that count so severely is because if you don't convict them of criminal enterprise, the murder offenses fall, too. That's why they are trying to discredit those witnesses.

The United States Government does not apologize to you for the photographs you have had to see.  We don't owe to you the apology.  We didn't kill them.  It is part of our job to produce those photographs so you will see how horrendous and horrible these people were and are.

I, too, appreciate you listening on behalf of the United States Government.  The government would also want to encourage you to go through all of these exhibits and evidence.  You go through your notes.  What I have said, Mr. Vick said, or the defense lawyers say, is not fact.  It is not law.  The facts are what you recall.  Judge Spencer will give you the law.

One other thing about Judge Spencer:  These lawyers have been saying 5K.1, 5K.1, 5K.1.  There is only one human being in the whole world that can cut a sentence in this case, and that's that man.  You

3192

heard Gaiters and Hardy both tell you they pled in front of Judge Spencer.  The government can make the motion.  But it is in that man's discretion.  And you go back and look at Gaiters' and Hardy's plea agreements, and what do they tell you?  They have to be truthful in their cooperation with the government, all the people that are getting 5K's.  That man knows it, these men know it.

MR. GEARY:  I object.  Greg Scott is a key witness in this case.

MR. PARCELL:  Ladies and gentlemen, thank you very much.

MR. GEARY:  Another misstatement by Mr. Parcell.

THE COURT:  Objection overruled.  We are going to take about 10 or 15 minutes, then we will get started with the instructions.  They are going to take awhile, and you have been sitting awhile.  So we will give you a break.  Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

(Defendants removed from courtroom.)

(Recess taken from 11:50 a.m. to 12:05 p.m.)

## Court Instructions to Jury re Guilt (3192)

THE COURT:  All right, let's bring in the jury.

3193

(The jury entered the courtroom.)

Members of the jury:  You have now heard all of the evidence in the case as well as the final arguments of the lawyers for the parties.  It becomes my duty therefore to instruct you on the rules of law that you must follow and apply in arriving at your

decision in this case.

In any jury trial there are, in effect, two judges. I am one of the judges. The other is the jury. It is my duty to preside over the trial and to determine what testimony and evidence is relevant under the law for your consideration. It is also my duty at the end of the trial to instruct you on the law applicable to the case. You as jurors are the judges of the facts. But in determining what actually happened in this case, that is, in reaching your decision as to the facts, it is your sworn duty to follow the law I now am in the process of defining for you. Unless otherwise stated, you should consider each instruction to apply separately and individually to each defendant on trial. And you must follow all of my instructions as a whole. You have no right to disregard or give special attention to any one instruction, or to question the wisdom or correctness of any rule I may state to you. That is,

3194

you must not substitute or follow your own notion or opinion as to what the law is or ought to be. It is your duty to apply the law as I give it to you regardless of the consequences. By the same token, it is also your duty to base your verdict solely upon the testimony and evidence in the case without prejudice or sympathy. That was the promise you made and the oath you took before being accepted by the parties as jurors in this case, and they have the right to expect nothing less.

The indictment, or formal charges against a defendant, is not evidence of guilt. Indeed, the defendants are presumed by law to be innocent. The law does not require a defendant to prove his or her innocence or produce any evidence at all. The government has the burden of proving him or her guilty beyond a reasonable doubt. And if it fails to do so, you must acquit him or her.

Thus, while the government's burden of proof is a strict or heavy burden, it is not necessary that the defendants' guilt be proved beyond all possible doubt. It is only required that the government's proof exclude any reasonable doubt concerning the defendants' guilt.

Now, as I've stated earlier, it is your duty to

3195

determine the facts. And in so doing, you must consider only the evidence I have admitted in the case. The term "evidence" includes the sworn testimony of the witnesses and the exhibits admitted into the record, and any stipulations or agreements between the parties.

Remember that any statements, objections, or arguments made by the lawyers are not evidence in the

case.  The function of the lawyers is to point out those things that are most significant or most helpful to their side of the case; and in so doing, call your attention to certain facts or inferences that might otherwise escape your notice.

In the final analysis, however, it is your own recollection and interpretation of the evidence that controls in this case.  What the lawyers say is not binding upon you.

Also, during the course of the trial I occasionally make comments to the lawyers or ask questions of a witness or admonish a witness concerning the manner in which he or she should respond to the questions of counsel.  Do not assume from anything I may have said that I have any opinion concerning any of the issues in this case.  Except for my instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own findings as to the facts.

Now, while you should consider only the evidence in the case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience.  In other words, you may make deductions and reach conclusions which reason and common sense lead you to draw from the facts and which have been established  --  facts which have been established by the testimony and evidence in the case.  You should not be concerned about whether the evidence is direct or circumstantial.  Direct evidence is the testimony of one who asserts actual knowledge of a fact such as an eyewitness.  Circumstantial evidence is proof of a chain of facts and circumstances indicating that the defendant is either guilty or not guilty.  The law makes no distinction between the weight you may give to either direct or circumstantial evidence.

Now, I have said that you must consider all of the evidence a number of times.  This does not mean, however, that you must accept all of the evidence as true or accurate.  You are the sole judges of the credibility or believability of each witness and the weight to be given to his testimony.  In weighing the testimony of a witness, you should consider his or her relationship to the government or the defendants; his or her interest, if any, in the outcome of the case; his or her manner of testifying; his or her opportunity to observe or acquire knowledge concerning the facts about which he or she testifies; his or her candor, fairness, and intelligence, and the extent to which he or she has been supported or contradicted by other credible evidence.

You may in short accept or reject the testimony

of any witness in whole or in part.

Also, the weight of the evidence is not necessarily determined by the number of witnesses testifying as to the existence or nonexistence of any fact. You may find that the testimony of a smaller number of witnesses as to any fact is more credible than the testimony of a larger number of witnesses to the contrary.

A witness may be discredited or impeached by contradictory evidence by a showing that he or she testified falsely concerning a material matter, or by evidence that at some other time the witness has said or done something, or has failed to say or do something, which is inconsistent with the witness' present testimony. If you believe that any witness has been so impeached, then it is your exclusive province to give the testimony of that witness such credibility or weight, if any, as you may think it deserves.

The fact that a witness has been previously convicted of a felony or a crime involving dishonesty or false statement is also a factor you may consider in weighing the credibility of that witness. The fact of such a conviction does not necessarily destroy the witness' credibility, but is one of the circumstances you may take into account in determining the weight to be given to his or her testimony.

In this case, the government called as some of its witnesses an alleged accomplice named as a co-defendant in the indictment with whom the government has entered into a plea agreement providing for the dismissal of some charges or providing that the government may in its discretion file a motion informing the Court that the witness has provided substantial assistance to the government in its investigation or prosecution of the defendants in this case or of other persons. If such a motion is filed by the government, the court may elect to impose a lesser sentence than the witness would otherwise have received for the offense to which he pled guilty.

Such plea bargaining, as it is called, has been approved as lawful and proper and is expressly provided for in the rules of this Court.

An alleged accomplice, including one who has entered into a plea agreement with the government, is not prohibited from testifying. On the contrary, the testimony of such a witness alone may be sufficient weight to sustain a verdict of guilty. However, the jury should keep in mind that such testimony is always to be received with caution and weighed with

great care. You should never convict a defendant upon the unsupported testimony of an alleged accomplice unless you believe that testimony beyond a reasonable doubt. The fact that an accomplice has entered a plea of guilty to the offense charged is not evidence in and of itself of the guilt of any other person.

The testimony of an alleged accomplice and the testimony of one who provides evidence against a defendant as an informer for pay or for immunity from punishment, or for personal advantage or vindication, must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses. You the jury must decide whether the witness' testimony has been affected by any of those circumstances or by the witness' interest in the outcome of the case, or by prejudice against the defendant, or by the benefits that the witness has received, either financially or as a result of being immunized from prosecution. You should keep in mind that such testimony is always to be received with caution and weighed with great care. You should never convict any defendant upon the unsupported testimony of such a witness unless you believe that testimony beyond a reasonable doubt.

The testimony of a drug or alcohol abuser must be examined and weighed by the jury with greater care than the testimony of a witness who does not abuse drugs or alcohol. The jury must determine whether the testimony of a drug or alcohol abuser has been affected by drug or alcohol use or the need for drugs or alcohol.

Now we come to the offense instructions, starting out with Count One. Title 21 of the United States Code Section 846 makes it a separate federal crime or offense for anyone to conspire or agree with someone else to do something which, if actually carried out, would be a violation of Section 841(a)(1). Section 841(a)(1) makes it a crime for anyone to knowingly distribute, dispense, and/or possess a controlled substance with the intent to distribute.

So under the law, a conspiracy is an agreement or a kind of partnership in criminal purposes in which each member becomes the agent or partner of each other -- of every other member. In order to establish a conspiracy offense, it is not necessary for the government to prove that all of the people named in the indictment were members of the scheme or that those who were members had entered into a formal type of agreement. Also, because the essence of a conspiracy offense is the making of the scheme

181a

itself, it is not necessary for the government to prove that the conspirators actually succeeded in accomplishing their unlawful plan.  What the evidence in the case must show beyond a reasonable doubt is this:  First, that two or more persons in some way or manner, positively or tacitly, came to a mutual understanding to try to accomplish a common and unlawful plan as charged in the indictment.  And second, that the defendant knowingly and willfully became a member of such conspiracy.

A person may become a member of a conspiracy without knowing all of the details of the unlawful scheme and without knowing who all of the other members are.  So if a defendant has an understanding of the unlawful nature of a plan, and knowingly and willfully joins in that plan on one occasion, that is sufficient to convict him or her for conspiracy, even though he or she did not participate before, and even though he or she played only a minor part.  Of course, mere presence at the scene of a transaction or event, or the mere fact that certain persons may have associated with each other and may have assembled together and discussed common aims and interests, does not necessarily establish proof of a conspiracy.

Also, a person who has no knowledge of a conspiracy, but who happens to act in a way which advances some purpose of one, does not thereby become a conspirator.

The first element which the government must prove beyond a reasonable doubt to establish the offense of conspiracy is that two or more persons entered the unlawful agreement charged in the indictment.  In order for the government to satisfy this element, you need not find that the alleged members of the conspiracy met together and entered into any express or formal agreement.  Similarly, you need not find that the alleged conspirators stated in words or writing what the scheme was, its objective or purpose, or every precise detail of the scheme, or the means by which its object or purpose was to be accomplished.  What the government must prove is that there was a mutual understanding, either spoken or unspoken, between two or more people to cooperate with each other to accomplish an unlawful act.  You may of course find that the existence of an agreement to disobey or disregard the law has been established by direct proof.  However, since conspiracy is, by its very nature, characterized by secrecy, you may also infer its existence from the circumstances of this case and the conduct of the parties involved.

In a very real sense, then, in the context of

conspiracy cases, actions often speak louder than words.  In this regard, you may, in determining whether an agreement existed here, consider the actions and statements of all of those you find to be participants as proof that a common design existed on the part of the persons charged to act together to accomplish an unlawful purpose.

It is charged in Count One of the indictment that the conspiracy distributed and possessed with

3204

intent to distribute a particular amount or quantity of narcotic controlled substance.  The evidence in the case need not establish the exact amount or quantity of the substance containing cocaine, except you must find beyond a reasonable doubt that the conspiracy distributed or possessed with intent to distribute, or attempted to possess with intent to distribute at least 50 grams or more of crack cocaine.

The second element which the government must prove beyond a reasonable doubt to establish the offense of conspiracy, the first count of the indictment, is that the defendant knowingly, willfully, and voluntarily became a member of the conspiracy.  If you are satisfied that the conspiracy charged in the indictment existed, you must next ask yourself who the members of that conspiracy were.  In deciding whether the defendant whom you are considering was in fact a member of the conspiracy, you should consider whether the defendant knowingly and willfully joined the conspiracy; did he or she participate in it with knowledge of its unlawful purpose and with the specific intent of furthering its business or objective as an associate or worker.

In that regard, it has been said that in order

3205

for a defendant to be deemed a participant in a conspiracy, he or she must have had a stake in the venture or its outcome.  You are instructed that while proof of a financial interest in the outcome of the scheme is not essential, if you find that the defendant has such an interest, that is a factor which you may properly consider in determining whether or not the defendant was a member of the conspiracy charged in the indictment.

As I mentioned a moment ago, before the defendants can be found to have been a conspirator, you must first find that he or she knowingly joined in the unlawful agreement or plan.  The key question, therefore, is whether the defendant joined the conspiracy with an awareness of at least some of the basic aims and purposes of the unlawful agreement.

It is important for you to note that the defendants' participation in the conspiracy must be

established by independent evidence of his or her own acts or statements and the reasonable inferences which may be drawn from them.

A defendant's knowledge is a matter of inference from the facts proved. In that connection, I instruct you that to become a member of a conspiracy, the defendant need not have known the identities of

3206

each and every other member. Nor need he or she have been apprised of all of their activities. Moreover, the defendant need not have been fully informed as to all of the details or the scope of the conspiracy in order to justify an inference of knowledge on his or her part. Furthermore, the defendant need not have joined in all of the conspiracy's unlawful objectives.

The extent of a defendant's participation has no bearing on the issue of a defendant's guilt. A conspirator's liability is not measured by the extent or duration of his or her participation. Indeed, each member may perform separate and distinct acts and may perform them at different times. Some conspirators play major roles while others play minor parts in the scheme. An equal role is not what the law requires. In fact, even a single act may be sufficient to draw the defendant within the ambit of the conspiracy.

I want to caution you, however, that the defendant's mere presence at the scene of the alleged crime does not by itself make him or her a member of the conspiracy. Similarly, mere association with one or more members of the conspiracy does not automatically make the defendant a member. A person

3207

may know or be friendly with a criminal without being a criminal himself or herself. Mere similarity of conduct, or the fact that they may have assembled together and discussed common aims and interests, does not necessarily establish proof of the existence of a conspiracy.

I also want to caution you that mere knowledge or acquiescence without participation in the unlawful plan is not sufficient. Moreover, the fact that the acts of a defendant without knowledge may happen to further the purposes or objectives of the conspiracy does not make the defendant a member. More is required under the law. What is necessary is that the defendant must have participated with knowledge of at least some of the purposes or objectives of the conspiracy, and with the intention of aiding in the accomplishment of those unlawful ends.

In sum, the defendant, with an understanding of the unlawful character of the conspiracy, must have intentionally engaged, advised, or assisted in it for

the purpose of furthering the illegal undertaking. He or she thereby becomes a knowing and willing participant in the unlawful agreement; that is to say, a conspirator.

Now, let me move on to Count Two. Count Two of

3208

the indictment charges that in at least January, 1991 and continuously, beginning at least January, 1991 and continuously up to the date of the indictment, in the Eastern District of Virginia and elsewhere, the defendants Richard Tipton, Cory Johnson, James H. Roane, and Vernon Lance Thomas engaged in a Continuing Criminal Enterprise, in that those defendants committed a violation of certain narcotic laws as part of a continuing series of such violations; and that further, this series was done in some type of agreement with at least five other persons who were managed or supervised or organized by those defendants, and that from this continuing series of narcotics violations, those defendants received substantial income or resources.

You are instructed that Title 21 of the United States Code Section 848 reads in pertinent part: Any person who engaged in a Continuing Criminal Enterprise shall be guilty of an offense against the United States. The statute also provides as follows: For the purpose of Subsection (a) of this section, a person is engaged in a Continuing Criminal Enterprise if he violates any provision of this subchapter or Subchapter 2 of this chapter, the punishment for which is a felony; and two, such

3209

violation is a part of a continuing series of violations of this subchapter or Subchapter 2 of this chapter. When I talk about subchapter, it relates to narcotic felony violations, which are undertaken by such person in concert with five or more persons in respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and from which such person obtains substantial income or resources.

Now, in order to sustain its burden of proof for the crime of engaging in a Continuing Criminal Enterprise as charged in Count Two of the indictment, the government must prove the following five essential elements with respect to each individual defendant charged beyond a reasonable doubt: One, the defendant committed a felony violation of the federal narcotics laws; two, such violation was part of a continuing series of related violations of federal narcotics laws; three, the continuing series of violations was undertaken by the defendants in association or in concert with five or more other persons; four, the defendant was an organizer of

these five or more other persons, or occupied a management or supervisory position with respect to these five or more other persons; five, the defendant obtained substantial income or resources from the continuing series of narcotic violations.

I will now discuss in more detail and define for you the meaning of certain terms used in the Continuing Criminal Enterprise statute and in these instructions relating to the elements of the Continuing Criminal Enterprise offense charged in Count Two.

The first phrase:  "Felony violation."  The phrase "felony violation of the federal narcotics laws" as used in these instructions means the commission of any act specifically prohibited by certain sections of the United States Code for which a defendant could be imprisoned for more than one year.  The distribution or possession with intent to distribute cocaine or crack cocaine in violation of 21 U.S. Code Section 848(a)(1) is a felony violation of the narcotics laws.

What is a continuing series of violations?  A continuing series of violations means at least three violations of the federal drug laws as charged in Counts One, Three, Five, Eight, Eleven, Seventeen, Eighteen, Nineteen, Twenty-four, Twenty-five, Thirty-one, Thirty-two, and Thirty-three of the indictment before you.  It also requires a finding that those violations were connected together as a series of related or ongoing activities as distinguished from isolated and disconnected acts.

The phrase "in concert with five or more other persons" means some type of agreement or joint action, whether direct or indirect, with at least five other persons who were involved in the continuing series of narcotics violations.  The phrase "in concert with five or more other persons" does not require proof from the government that the five or more other persons actually had contact with each other or knew each other, or committed each violation together or operated together continuously at the same time.  The government is not required to prove that the defendant managed, supervised, or organized these five or more persons at the same time.  The government must prove beyond a reasonable doubt, however, that the defendant and at least five or more other persons were part of an agreement or joint action to commit the continuing series of violations of the federal narcotics laws alleged in the counts I've outlined: One, Three, Five, Eight, Eleven, Seventeen, Eighteen, Nineteen, Twenty-four, Twenty-five, Thirty-one, Thirty-two and/or

186a

Thirty-three of the indictment.

The term "organizer" and the terms "supervisory position" and "position of management" are to be given their usual and ordinary meaning.  These words imply the exercise of power and authority by a person who occupies some position of management or supervision.  This person need not be the sole or only organizer, supervisor, or manager of the activities in question.

An organizer can be defined as a person who puts together a number of people engaged in separate activities and arranges them in their activities in one essentially orderly operation or enterprise.

A supervisory position can be defined as one who manages or directs or oversees the activities of others.  For purposes of this element, a person may occupy a position of organizer, a supervisory position, or any other position of management without having a direct personal contact with each of the persons he is organizing, supervising, or managing.  It is not required that the defendant have personal contact with five or more subordinates in order to satisfy the organizer, supervisor, or position of management element.  It is entirely possible for a single Continuing Criminal Enterprise to have more than one organizer, supervisor, or other person in a position of management.

You are further instructed that the term "substantial income or resources" as it appears in Title 21 United States Code Section 848 is defined as money or other material resources or property received or gained directly from illegal dealings in controlled substances by the defendants.  Controlled substances are a material resource for purposes of this definition of income.

Furthermore, the term "income" does not necessarily mean net income.  That is to say, it could mean gross receipts or gross income.  It would follow that the phrase "substantial income or resources" should be construed as far as possible in an objective manner; that is to say, that the defendant would have to have  --  would have to receive what any reasonable person would consider to be considerable or ample economic benefit from engaging in a Continuing Criminal Enterprise.  In determining income, you may consider a defendant's position in the enterprise, the quantity of controlled substances involved, and the amount of money that changed hands.

Now, in a moment I'm going to begin to instruct you on the law governing those counts in the

indictment that involve homicide.  When I do so, you will notice that defendants Richard Tipton, Cory Johnson, and James H. Roane, Jr. have been charged with two very specific, very distinct types of homicide:  Killing while engaged in or in furtherance of a Continuing Criminal Enterprise in violation of Title 21 Section 841(e) of the United States Code, and killing for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity in violation of Title 18 Section 1959 of the United States Code.

The reason you are being asked to limit your deliberations to these two very specific types of killings is that you are sitting as a jury in a federal court.  In criminal cases, federal courts may try a defendant only for violations of federal law. Most types of homicide, that is, murder in the first degree or the second degree, voluntary manslaughter, are crimes under state law, not federal law.  And therefore, they cannot be tried by this Court.

As I am about to explain to you, if in your deliberations you find that a particular defendant has killed another person, that would not be enough for you to find that defendant guilty of a federal crime.  Instead, you must be convinced beyond a reasonable doubt that each of the specific elements of a federal crime charged in the indictment has been proved by the government.

The indictment charges that defendants Richard Tipton, Cory Johnson, James Roane, Vernon Lance Thomas, and Jerry Gaiters, between January 5th of 1992 and February 19th, 1992, within the Eastern District of Virginia, while engaged in or working in furtherance of a Continuing Criminal Enterprise, intentionally killed, counseled, commanded, induced, procured, or caused the intentional killing of certain individuals.

Note however that no defendant is charged with all the murders discussed in the indictment. Specifically, the following defendants face these charges with respect to the following killings.  With respect to the killing of Douglas A. Talley, the defendant, Richard Tipton, is charged.  With respect to the killing of Douglas Moody, defendants Richard Tipton and James H. Roane, Jr. are charged.  With respect to the killing of Peyton Maurice Johnson, defendants James H. Roane and Cory Johnson are charged.  With respect to the killing of Louis Johnson, Jr., defendants James H. Roane and Cory Johnson are charged, along with defendant Vernon Lance Thomas.  With respect to the killings of Bobby Long, Anthony Carter, and Dorothy Mae Armstrong,

defendants Richard Tipton and Cory Johnson are charged, along with defendant Jerry Gaiters. With respect to the killings of Curtis Thorne and Linwood Chiles, defendants Richard Tipton and Cory Johnson are charged, along with defendant Vernon Lance Thomas.

Again, I emphasize that in your deliberations you must give individual consideration to each defendant with respect to each separate count charged against that defendant. The verdict forms which will be provided to you by the Court, and which I will discuss with you in more detail in a few minutes, will list the specific charges in the indictment which you must consider with respect to each of these defendants.

Title 21 United States Code Section 848(e)(1)(A) provides in pertinent part that any person engaging in or working in furtherance of a Continuing Criminal Enterprise who intentionally kills, or counsels, commands, induces, procures, or causes the intentional killing of an individual, and such killing results, is guilty of an offense against the United States.

Before you can find an individual defendant guilty of this offense, you must be convinced beyond a reasonable doubt of each of the following elements: First, that the defendant was engaged in or working in furtherance of the continuing enterprise charged in Count Two of the indictment; second, that while the defendant was so engaged, the defendant either intentionally killed, or counseled, commanded, induced, procured, or caused the intentional killing of the individual victim named in a particular count; and three, that the killing of that victim actually resulted.

The indictment charges that defendants Richard Tipton, Cory Johnson, James H. Roane, Jr. and Vernon Lance Thomas, and Jerry Gaiters, and Sterling Hardy, between January 5th, 1992 and February 19th, 1992, within the Eastern District of Virginia, murdered or maimed certain individuals as consideration for the receipt of or as consideration for a promise or agreement to pay anything of pecuniary value and engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

Now, this is the 1959 counts. These are the 1959 counts. They are Four, Seven, Ten, Thirteen, Fourteen, Sixteen, Twenty-one, Twenty-two, Twenty-three, Twenty-seven, Twenty-eight,

189a

Twenty-nine, and Thirty. Again, however, no single defendant is charged with all of the killings and maimings discussed in the indictment.

Specifically, the following defendants face these charges with respect to the following killings and maimings: With respect to the killing of Douglas A. Talley, the defendant Richard Tipton is charged. With respect to the killing of Douglas Moody, defendants Richard Tipton and James H. Roane, Jr. are charged. With respect to the killing of Peyton Maurice Johnson, defendants James H. Roane and Cory Johnson are charged. With respect to the killing of Louis J. Johnson, Jr., defendants James H. Roane, and Cory Johnson are charged, along with defendant Vernon Lance Thomas. With respect to the killing of Torrick Brown, defendants Richard Tipton, James H. Roane, Jr., and Cory Johnson are charged, along with defendants Vernon Lance Thomas and Sterling Hardy.

With respect to the maiming of Martha McCoy, defendants Richard Tipton, James H. Roane, Jr., and Cory Johnson are charged, along with defendants Vernon Lance Thomas and Sterling Hardy. With respect to the killings of Bobby Long, Anthony Carter, and Dorothy Mae Armstrong, the defendants Richard Tipton and Cory Johnson are charged, along with defendant Jerry Gaiters. With respect to the killings of Curtis Thorne and Linwood Chiles, and the maiming of Priscilla Greene and Gwendolyn Greene, defendants Richard Tipton and Cory Johnson are charged, along with defendant Vernon Lance Thomas.

Again, I emphasize that in your deliberations you must give individual consideration to each defendant with respect to each count charged against that defendant. The verdict forms, as I mentioned, will assist you in this respect.

You are instructed that Title 18 United States Code Section 1959 reads in pertinent part as follows: Whoever, as consideration for the receipt of or as consideration for a promise or agreement to pay anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any state or the United States, or attempts or conspires to do so, is guilty of an offense against the United States.

To find a defendant guilty under this statute, you must find that the government has proven each of

the following elements beyond a reasonable doubt: First, that a racketeering activity actually did exist; second, that the racketeering activity affected interstate commerce; third, that an individual defendant did knowingly and intentionally commit or conspire to commit the crime charged in the particular count under consideration.  Fourth, that the defendant acted for the purpose of gaining entrance to the racketeering activity or for the purpose of maintaining or increasing his position in the racketeering enterprise; or that the defendant received or was promised that he would receive something of pecuniary value from the racketeering enterprise in exchange for his acts.

I will now explain and define for you the meaning of certain terms found in the statute and within these instructions relating to the elements of the 1959 murders referred to as violent crimes in aid of racketeering activity.

As I've outlined for you, those offenses are in Counts Four, Seven, Ten, Thirteen, Fourteen, Sixteen, Twenty-one, Twenty-two, Twenty-three, Twenty-seven, Twenty-eight, Twenty-nine, and Thirty of the indictment.

"Racketeering activity" means any act or threat involving murder or dealing in narcotic or other dangerous drugs.  An enterprise includes any group of individuals associated in fact which is engaged in or the activities of which affect interstate commerce. The phrase "anything of pecuniary value" means anything of value in the form of money or negotiable instrument, a commercial interest, or anything else the primary significance of which is economic advantage.

It is charged in the indictment that within the Eastern District of Virginia, between on or about January 13th, 1992 and on or about February 19th, 1992, the defendants Richard Tipton, Cory Johnson, James H. Roane, Jr., Vernon Lance Thomas, and Sterling Hardy used a firearm during and in relationship  --  or in relation to the commission of a crime of violence or a drug-trafficking crime.

Now again, as I mentioned with respect to some of the charges I discussed earlier, no single defendant is charged in each of these counts.  The verdict form will assist you in keeping track of which defendants are charged in which counts and in giving individual consideration to each defendant for each count against him or her.

Let me read the firearms statute.  And the firearms violations are contained in Counts Six, Nine, Twelve, Fifteen, Twenty, and Twenty-six.  Title

18 United States Code Section 924(c)(1) provides in pertinent part:  Whoever during and in  relation to any crime of violence or drug trafficking crime for which he may be prosecuted in a Court of the United States uses or carries a firearm shall be guilty of a crime against the United States.

In order to sustain its burden of proof of the crime of using or carrying a firearm during and in relation to a crime of violence or drug trafficking crime as charged in Counts Six, Nine, Twelve, Fifteen, Twenty, and Twenty-six of the indictment, the government must prove the following two essential elements beyond a reasonable doubt:  One, the defendant committed the crime as charged in the indictment; and two, during and in relation to the commission of that crime, the defendant knowingly used or carried a firearm.

3223

The term "crime of violence" means an offense that is a felony and has as one of its essential elements the use, the attempted use, or threatened use of physical force against the person or property of another, or an offense that by its very nature involves a substantial risk that such physical force may be used in committing the offense.

The term "drug trafficking crime" means an offense that is a felony and involves the distribution, manufacture, or importation of any controlled substances, or the conspiracy to distribute, import, or manufacture controlled substances.  The offenses alleged in Counts Three, Four, Five, Seven, Eight, Ten, Eleven, Thirteen, Fourteen, Sixteen, Seventeen, Eighteen, Nineteen, Twenty-one, Twenty-two, Twenty-three, Twenty-four, Twenty-five, Twenty-seven, Twenty-eight, Twenty-nine, Thirty, Thirty-one, Thirty-two, and Thirty-three are crimes of violence or drug trafficking crimes.

Title 18 United States Code Section 92(1)(a)(3) defines firearm is including any weapon which will or is designed to, or may readily be converted to expel a projectile by the action of an explosive, the frame or receiver of any such weapon.  You need not find that the firearm was loaded or that it was operable

3224

at the time of the offense.

The phrase "uses or carries a firearm" means a firearm or firearms available to assist or aid in the commission of a crime of violence or a drug-trafficking crime charged in the indictment.

In determining whether a defendant used or carried a firearm, you may consider all of the factors received in evidence in the case, including the nature of the underlying crime of violence or drug-trafficking crime alleged:  the proximity of the

defendant to the firearm in question, the usefulness of the firearm to the crime alleged, and the circumstances surrounding the presence of the firearm.

The government is not required to show that the defendant actually displayed or fired the weapon. The government is required, however, to prove beyond a reasonable doubt that the firearm was in the defendant's possession or under the defendant's control at the time that a crime of violence or a drug-trafficking crime was committed.

It is charged in the indictment that on or about January 15th, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendant, Cory Johnson, did knowingly and intentionally distribute a Schedule II narcotic controlled substance; that is, a mixture and substance described in Title 21 United States Code Section 841(b)(1)(A)(ii), which contains cocaine base commonly known as crack, or cook-'em-up, in violation of Title 21 United States Code Section 841(a)(1).

The prosecution on this count is based on a statute which is federal law, Title 11 U.S. Code Section 846, and Section 841(a)(1), which reads in pertinent part as follows: It shall be unlawful for any person knowingly or intentionally to distribute a controlled substance.

In order to sustain its burden of proof for the crime of distribution of a controlled substance as charged in Count Thirty-one of the indictment, the government must prove the following two essential elements beyond a reasonable doubt: The defendant, Cory Johnson, knowingly and intentionally distributed the controlled substance, crack cocaine described in the indictment; two, at the time of such distribution, the defendant knew that the substance distributed was crack cocaine, a controlled substance.

The term "to distribute" as used in these instructions means to deliver or to transfer possession or control of something from one person to another. The term "to distribute" includes the sale of something by one person to another. You are instructed as a matter of law that crack cocaine is a controlled substance. It is solely for the jury, however, to determine whether or not the government has proved beyond a reasonable doubt that the defendant distributed a substance which was crack cocaine.

The evidence received in this case relating to Counts Thirty-two and Thirty-three need not prove the actual amount of the controlled substance that was

part of the alleged transaction or the exact amount of the controlled substance alleged in the indictment as distributed by the defendant.  The government must prove beyond a reasonable doubt, however, that a measurable amount of the controlled substance was in fact knowingly and intentionally distributed by the defendant.

Count Thirty-two reads as follows:  It is charged in the indictment that on or about February 2nd, 1992 at Richmond, Virginia, in the Eastern District of Virginia, defendants Richard Tipton, Cory Johnson, James H. Roane, Jr., Sterling Hardy, Vernon Lance Thomas, and Jerry Gaiters did knowingly and

intentionally possess with intent to distribute a Schedule II narcotic controlled substance, that is, a mixture and substance described in Title 21 United States Code Section 841(a)(1)(ii) which contains cocaine base commonly known as crack or cook-'em-up in violation of Title 21 United States Code Section 841(a)(1).  And Title 18 United States Code Section 2.

It is charged in the indictment in Count Thirty-three the following:  That on or about April 10th, 1992 at Richmond, Virginia, in the Eastern District of Virginia, the defendant, Richard Tipton, did knowingly and intentionally possess with intent to distribute a Schedule II narcotic controlled substance; that is, more than 50 grams of a mixture and substance described in Title 21 U.S. Code Section 841(b)(1)(A)(ii), which contains cocaine base commonly known as crack or cook-'em-up, in violation of Title 21 United States Code Section 841(a)(1), and Title 18 United States Code Section 2.

Section 841(a)(1) of Title 21 of the United States Code provides in pertinent part that it shall be unlawful for any person knowingly or intentionally to possess with intent to distribute a controlled substance.  In order to sustain its burden of proof

for the crime of possession of a controlled substance with intent to distribute that substance as charged in Counts Thirty-two and Thirty-three of the indictment, the government must prove the following three essential elements beyond a reasonable doubt: The defendant possessed the controlled substance described in the indictment; the defendant knew that the substance was a controlled substance; and the defendant intended to distribute this controlled substance.

The law permits the jury in proper circumstances to infer intent to distribute from the quantity of the substance possessed, and/or the manner in which it is packaged.  However, the ultimate question of

intent to distribute should be resolved by the jury upon all of the evidence in the case. The law recognizes two kinds of possession: actual possession and constructive possession. A person who knowingly had direct physical control over a thing at a given time is then in actual possession of it. A person who, although not in actual possession, knowingly has both the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons, is then in constructive possession of it.

The law recognizes also that possession may be sole or joint. If one person alone has actual or constructive possession of a thing, possession is sole. If two or more persons share actual or constructive possession of a thing, possession is joint. You may find that the element of possession as that term is used in these instructions is present if you find beyond a reasonable doubt that the defendant had actual or constructive possession, either alone or jointly with others.

The guilt of a defendant in a criminal case may be established without proof that the defendant personally did every act constituting the offense alleged. The law recognizes that ordinarily, anything a person can do for himself may also be accomplished by that person through direction of another person as his agent or her agent, or by acting in concert with or under the direction of another person or persons in a joint effort or enterprise. So if another person is acting under the direction of the defendant, or if the defendant joins another person and performs acts with the intent to commit a crime, then the law holds the defendant responsible for the acts and conducts of such other persons, just as though the defendant had committed

the acts or engaged in such conduct. Notice, however, that before any defendant may be held criminally responsible for the acts of others, it is necessary that the accused deliberately associate himself in some way with the crime and participated in it with the intent to bring about the crime.

Of course, mere presence at the scene of a crime and knowledge that a crime is being committed are not sufficient to establish that a defendant either directed or aided and abetted the crime unless you find beyond a reasonable doubt that the defendant was a participant and not merely a knowing spectator.

In other words, you may not find any defendant guilty unless you find beyond a reasonable doubt that every element of the offense as defined in these instructions was committed by some person or persons,

and that the defendant voluntarily participated in its commission with the intent to violate the law.

You will note that the indictment charges that the offense or offenses were committed on a certain date. The proof need not establish with certainty the exact date of the alleged offense. It is sufficient if the evidence in the case establishes beyond a reasonable doubt that the offense was committed on a date reasonably near the date alleged.

The word "knowingly" as that term has been used from time to time in these instructions means that the act was done voluntarily and intentionally and not because of a mistake or accident. The word "willfully" as that term has been used from time to time in these instructions means that the act was committed voluntarily and purposefully with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law.

A separate crime or offense is charged against one or more of the defendants in each count of the indictment. Each offense and the evidence pertaining to it should be considered separately. Also, the case of each defendant should be considered separately and individually. The fact that you may find one or more of the accused guilty or not guilty of any offenses charged should not control your verdict as to any other offense or any other defendant. I caution you, members of the jury, that you are here to determine the guilt or innocence of the accused from the evidence in the case. The defendant is not on trial for any act or conduct or offense not alleged in the indictment. Neither are you called upon to return a verdict as to the guilt or innocence of any other person or persons not on trial as a defendant in this case.

Also, the punishment provided by law for the offenses charged in the indictment should never be considered by the jury in any way in arriving at an impartial verdict as to the guilt or innocence of the accused.

Any verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. In other words, your verdict must be unanimous. It is your duty as jurors to consult with one another and to deliberate in an effort to reach agreement if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but only after an impartial consideration of the evidence in the case with your fellow jurors.

In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight of the evidence or the effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

Remember at all times you are not partisans. You are judges, judges of the facts. Your sole interest is to seek the truth from the evidence in the case.

Now, upon retiring to the jury room, you should first select one of your number to act as your Foreperson, who will preside over your deliberations and will be your spokesperson here in open Court.

Now, I have prepared verdict forms for you, and I need to give you some explanation in that regard. There is a verdict form that relates to each individual defendant. And the way you can tell which verdict form relates to which defendant, at the top you will see the style of the case and that defendant's name. The United States of America versus Richard Tipton. And then you will have the verdict form. Now, the verdict forms will vary. They are different because each defendant is charged differently under the indictment. But there is one thing that I want to make clear, and this will relate to the verdict forms of Mr. Tipton, Mr. Johnson, and Mr. Roane.

The first thing you will do is deal with Count One, which is the conspiracy. It says, "We the jury find as follows on Count One, which is conspiracy to distribute controlled substance:" And then there will be a line where you will write in guilty or not guilty. When you are finished with Count One, you move to Count Two. Now, Count Two is the Continuing Criminal Enterprise count. And when you go down under Count Two, the first thing you see will be a question. And the question is as follows: "Do you find that the government has proven beyond a reasonable doubt that a Continuing Criminal Enterprise existed as charged in the indictment?" And there is a line, yes or no. You have got to answer that question first before you go any further. You have got to answer this question. And it says, as I say, this relates to both Mr. Johnson and Mr. Roane, that question is presented, and you have to answer that question on each verdict form.

If you indicated above that a Continuing Criminal Enterprise did not exist, you must find the defendant, Richard Tipton, Cory Johnson, or James H. Roane, as the case may be, not guilty as to Count

197a

Two.  If you indicated that a Continuing Criminal Enterprise did exist, then you must go further and now determine whether the defendant, Richard Tipton, is guilty or not guilty of the crime of engaging in that Continuing Criminal Enterprise as charged in

3235

Count Two, and you would enter your finding below, guilty or not guilty.  And you have to do this as to Mr. Johnson and as to Mr. Roane.  You see, it is a process.  Answer the question:  Was there a Continuing Criminal Enterprise?  If no, then obviously no one can be guilty of engaging in that Continuing Criminal Enterprise, so you would have to be not guilty as to Count Two.  If yes, it doesn't follow then that they are automatically guilty of it.  You have to then decide is this defendant guilty of engaging in the continuing enterprise you have found.  Does everybody understand?

(No response.)

Then as you go through the indictment, and you get to the charges which allege killings of certain individuals while engaged in or working in furtherance of a Continuing Criminal Enterprise, you will see a parenthesis after each one of those charges.  For instance, this is Mr. Tipton.  Count Three, the killing of Douglas Talley while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Beneath that is a parenthetical to remind you.  If you indicated in response to the question set forth under Count Two above that a Continuing Criminal Enterprise did not exist, you

3236

must find the defendant not guilty as to this count.  Again, it follows as the night does day.  If you all do not find a Continuing Criminal Enterprise, then you cannot find a defendant guilty of engaging in killing somebody while engaging in or working in a Continuing Criminal Enterprise.

The other counts are self-explanatory as you go through them.  The 1959 count, which I've described to you in detail, the elements there, you would consider those independently, as well as the drug counts, the firearm counts.  Consider those independently based on the evidence.  But remember that the Continuing Criminal Enterprise count is tied to the allegations of murder while engaged in or working in a Continuing Criminal Enterprise.

You go through each individual defendant, through their verdict form, and when you have completed it the Foreperson will sign the form and date it.  And you will have done your job as to that defendant.  And then you will go to the next defendant and you would go through the same process.  Make your decisions.  And you do that as it relates

to each individual defendant.

When you have reached unanimous agreement and dealt with all the defendants, you simply let us know. You will just have to knock on the door and the Bailiff, Marshal, will be standing there.

If you have some question during the course of your deliberations, do the same thing. Just knock on the door. We want you to write your question down and have your Foreperson sign the question. Knock on the door, give it to the Marshal, and he will bring it to me. If it is a question that I can't answer, and sometimes I can't, I just can't answer it. You may ask me something about the evidence. You heard it. You are going to have to determine what the evidence is. But if there is something technical or something that you want to know from me, I will usually bring you back in and then give you the answer as best I can in open Court from the bench.

Now, if during your deliberations you all have some question and need to come out here, please don't tell me how you stand as it relates to any defendant or any count. We don't want to hear from you until you have a unanimous verdict. If you come out here and you ask a question and you come out and the Foreperson stands up and says, "Judge, we are six to six on this," that would be tragic because it would result in a mistrial. We don't want to hear that from you. So don't do that.

Now, the exhibits will be going out with you. They will follow momentarily. Like I said, your first order of business, just select your Foreperson. Lunch should be waiting on you, probably. And you all can eat your lunch. The exhibits will follow. Take your time. You have as much time or as little time as you wish. It is up to you, whatever you need to do justice to this trial and the parties.

All right, counsel, any objections other than those previously stated?

MR. VICK: May we approach?

(At Bench.)

MR. VICK: I understood the way you read the verdict form, I thought it might be misleading. They need to find, one, CCE existed. If they find that the CCE existed then there is almost a two-part second question. Two, were these people charged, Roane, Tipton, or Johnson, leaders of the CCE, organizers, managers, or supervisors of the CCE, then they go to two. But the way it is written, when they say engaged in, they could indeed be found not guilty of Count Two but still be found guilty of the murders if, as I argued, there was a CCE, "Light" was the

head of it, the organizer, supervisor, or manager.

3239

The guilt would still follow under the other counts. The language in the second part said "engaged in." That's not really what Count Two is about. That's what the other counts are about.

And there is one other thing, my oversight as to Count Thirty-one. We charged, just like we did in Count Thirty, might be Thirty-two, we charged more than 50 grams. It will be less than 50 grams so it needs to be deleted. Just drug distribution.

MR. BAUGH: I thought the Court did.

MR. VICK: That was one count. There is also a second one.

MR. BAUGH: Your Honor, in light of the argument of the United States, I have prepared a multiple instruction. I'm concerned about that. We have asked for that because of the New York Boyz thing. Because there might be a question for the jury whether the New York Boyz activity led to this conspiracy. The United States argued that yesterday. I think we would ask for that.

THE COURT: I think it is clear enough.

MR. VICK: My concern as to Count Two, they need to be -- to be found guilty of Count Two, they need to be found to be managers, supervisors, or organizers.

3240

THE COURT: I don't know how much more I can say about that.

MR. VICK: Yes, sir. But my concern is not with the jury instruction, only with the verdict form. The verdict form says they need to be found guilty of Count Two only to have been engaged in. Am I making my distinction clear?

MR. BAUGH: On behalf of defendant Roane, I think you are correct. It seems to apply to Count Two if a CCE existed.

MR. VICK: Our argument is that they could find a CCE, find them not guilty of Count Two, but still find them guilty of the murder counts in furtherance of the CCE.

THE COURT: No, I explained that to them. I didn't put all the elements in the verdict form. I'm going to leave it alone.

MR. VICK: Okay. Could I show the Court the other --

THE COURT: Thirty-two?

MR. VICK: The April 10th count. That should be "less than." We didn't prove the 50 grams, so it should be just plain possession.

MR. GEARY: I offer Number 18 in regard to the five or more persons.

3241

THE COURT: Oh, sure.

(Court perusing instruction offered by Mr. Baugh.)

MR. VICK: There has been no evidence of multiple conspiracies here. There has been argument by counsel, but evidence of only one conspiracy. Certainly there has been no evidence of any conspiracy with any other goal other than murder and distribution of drugs.

MR. WHITE: On behalf of Mr. Tipton, Your Honor, we would suggest that the New Jersey information is separate as well as the separate Central Gardens information is separate. That's for the jury.

THE COURT: You can suggest all you want. I'm trying to recollect. And what's in evidence, separate conspiracy?

MR. BAUGH: I can tell you this. The United States cannot put my client in New Jersey, period, dot.

MR. WHITE: That argument could be made in regard to the Central Gardens period before Mr. Roane was arrested and also surrounding the Sandy Lane stuff. There was no violence alleged in connection with that.

THE COURT: I'm not going to give it. Your objection is noted.

MR. BAUGH: May I stick it in as an exhibit?

MR. WHITE: We object on behalf of defendant Tipton as well.

THE COURT: All right.

(In Open Court.)

All right, let me say one other thing about Count Thirty-three. The indictment will read as follows when you receive it: The Grand Jury charges that on or about April 10th, 1992 at Richmond, Virginia in the Eastern District of Virginia, the defendant Richard Tipton did knowingly and intentionally possess with intent to distribute a Schedule II narcotic controlled substance, that is, a mixture and substance described in Title 21 U.S. Code Section 841(b)(1)(A)(ii) which contains cocaine base, commonly known as crack or cook-'em-up.

All right. As I indicated to you, the alternates, the other day, we will have to excuse you for now. You will be outside of this process during the deliberations. We will, if necessary, call you back and have you sit with us and be with us during any penalty or sentencing phase that might be required. So we can't obviously give you any estimate as to when these deliberations will be

over. We will simply call you and give you a time to come when we know what that time will be.

If you would be excused now, I think we have lunch for you. Go get your lunch out of there and then be excused until we call you again. Thank you very, very much for your participation so far, and I'll thank you in advance in case we do need you again. Thank you so much. You all can be excused.

(The alternate jurors left the courtroom.)

Do we have the video in the jury room?

MR. VICK: The TV is right here. It just simply needs to be plugged in.

THE COURT: Let's go ahead and do that.

(Mr. Vick left the courtroom with television monitor.)

All right, we will excuse you now to begin your deliberations. Elect your Foreperson, have your lunch, and get to work. Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

Mr. Marshal, you can remove the defendants.

(The defendants were removed from the courtroom.)

3244

MR. VICK: I don't know how close the Court wants us to stay. Can we go back to our offices?

THE COURT: Give us a number where we can reach you and you can get here within minutes. We will be in recess.

(Recess to await call of the jury taken at 1:25 p.m.)

(Court was reconvened at 5:15 p.m.)

THE COURT: All right. Let's bring in the jury.

(The jury entered the courtroom.)

All right. I'm going to send you home now. You all have had a long day. And I'd like for you to come back tomorrow at 9:30 unless that's a problem for somebody, so you can get an early fresh start in the morning. As I've indicated to you over and over again, I really want to emphasize this now, do not discuss this case with anyone and don't allow anyone to discuss it with you. Don't review any newspaper, TV, radio items related to this case.

In the morning when you come in at 9:30, we have to do it this way. Don't start deliberating as soon as you get grouped together. I have to bring you in here and then send you right back out to begin your deliberations. So wait until I do that. You all

3245

have a good evening. Everyone remain seated until the jury leaves the courtroom.

(The jury left the courtroom.)

All right. You can remove the defendants.

202a

(The defendants were removed from the courtroom.)

We will be in adjournment until 9:30 tomorrow morning.

(Proceedings adjourned at 5:20 p.m.)

3246

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

------------------------------------------

UNITED STATES OF AMERICA,

                              Plaintiff;

     v.                                    CRIMINAL ACTION
                                              92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                              Defendants.

------------------------------------------
                    VOLUME XVII

                 February 3, 1993
                 Richmond, Virginia
                    9:30 a.m.

BEFORE:        HONORABLE JAMES R. SPENCER
               United States District Judge


APPEARANCES:   HOWARD C. VICK, JR., ESQ.
               WILLIAM H. PARCELL, III, ESQ.
               Office of the United States Attorney;
                   Counsel for Government;

               ROBERT P. GEARY, ESQ.
               ERIC D. WHITE, ESQ.
                   Counsel for Defendant Tipton;
               CRAIG S. COOLEY, ESQ.
               JOHN F. McGARVEY, ESQ.
                   Counsel for Defendant Johnson;
               DAVID P. BAUGH, ESQ.
               ARNOLD R. HENDERSON, V, ESQ.
                   Counsel for Defendant Roane;
               ROBERT J. WAGNER, ESQ.
                   Counsel for Defendant Reavis.
                   JEFFREY B. KULL
               OFFICIAL COURT REPORTER

3247

          THE CLERK:  Criminal Number 3:92CR68:
United States of America versus Richard Tipton, Cory
Johnson, James H. Roane, Jr., and Sandra Reavis.  The

204a

USCA4 Appeal: 20-8    Doc: 2-3    Filed: 05/22/2020    Pg: 169 of 375

seventeenth day of trial.  Are counsel ready to proceed?

MR. VICK:  Government is ready.

MR. WHITE:  Defendant Tipton is ready.

MR. COOLEY:  Defendant Johnson is ready.

MR. HENDERSON:  Defendant Roane is ready.

MR. WAGNER:  Defendant Reavis is ready.

THE COURT:  All right.  Let's bring in the jury.

(The jury entered the courtroom.)

All right, good morning to you.  We are going to allow you now to continue your deliberations.  All right.  Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

All right, remove the defendants.

(The defendants were removed from the courtroom.)

All right.  We will recess to await the jury's call.

(Recess taken from 9:35 a.m. to 11:20 a.m.)

THE COURT:  All right, I got a note from the jury which reads as follows:  "Instruction 43, 44, and 45, please explain further, more clarification."  Those are, 43, the aiding and abetting; 44, on or about, knowingly, and willfully; and 45, caution, punishment not relevant, multiple defendants, multiple counts.

Now, I have passed out to you a supplemental I'm giving on aiding and abetting which I think will help.  The one about knowingly and willfully, I will give an example highlighting what knowingly and willfully are.  That's the best I can do on that.  It seems to me self-explanatory.  I don't know what the problem is with it.  But perhaps the example will help.  I'll explain to them the general purpose of the multiple defendants, multiple counts instruction.  The middle paragraph, which might be the problem, which reads "I caution you members of the jury that you are here to determine the guilt or innocence of the accused from the evidence in this case.  The defendant is not on trial for any act or conduct or offense not alleged in the indictment."  Now, this sentence:  "Neither are you called upon to return a verdict as to the guilt or innocence of any other person or persons not on trial as a defendant in this case."

Taking the group of instructions that they wanted clarification on, they might be hung up on that particular language.  I don't know.  If a person is charged with aiding and abetting someone else in the commission of an offense, you would necessarily

205a

have to look at the actions of another person in making that determination.  And it is likewise with conspiracy.  In order to have a conspiracy, you have to have agreement between at least two people, so they are necessarily looking at somebody else's action.  And that sentence to some extent might negate that understanding.  Does everybody see what I am saying?

MR. BAUGH:  Your Honor, I understand.  But on behalf of defendant Roane, I don't even mean to attempt to usurp your prerogative, but I would ask perhaps our first response to them would be a note back to them asking them what paragraphs in 44 and 45 are giving them problems.  We could zero in on it.

THE COURT:  No, I think I'll do this and ask them then if that solves their problem.  If it doesn't, they will let us know.

All right, bring in the jury.

(The jury entered the courtroom.)

All right, I received a note from the jury

3250

asking for clarification to Instructions 43, 44, and 45.  I'm going to give you some additional instruction on aiding and abetting in an effort to clarify.  And if you would listen to me, it is as follows:  A person may violate the law even though he or she does not personally do each and every act constituting the offense if that person aided and abetted the commission of the offense.  Section 2(a) of Title 18 of the United States Code provides whoever commits an offense against the United States, or aids, abets, counsels, commands, induces, or procures its commission, is punishable as a principal.  Before a defendant may be held responsible for aiding and abetting others in the commission of a crime, it is necessary that the government prove beyond a reasonable doubt that the defendant knowingly and deliberately associated himself or herself in some way with the crime charged, and participated in it with the intent to commit the crime.

In order to be found guilty of aiding and abetting the commission of the crime charged in the indictment, the government must prove beyond a reasonable doubt that the defendant knew that the crime charged was to be committed or was being

3251

committed; that the defendant knowingly did some act for the purpose of aiding, commanding, or encouraging the commission of that crime, and that the defendant acted with the intention of causing the crime charged to be committed.

Before a defendant may be found guilty as an aider or abettor to a crime, the government must also

prove beyond a reasonable doubt that someone committed each of the essential elements of the offense charged as detailed to you in the instructions. Merely being present at the scene of the crime or merely knowing that a crime is being committed, or is about to be committed, is not sufficient for the jury to find that the defendant aided and abetted the commission of that crime.

The government must prove that the defendant knowingly and deliberately associated himself or herself with the crime in some way as a participant. Someone who wanted the crime to be committed, not as a spectator. One who aids, abets, counsels, commands, induces, or procures the commission of an act is as responsible for that act is if he committed it directly. There may be some confusion as to the difference between conspiracy and aiding and abetting.

3252

Conspiracy is, as I have instructed, an agreement to commit offenses of the character described in the substantive counts. Aiding and abetting has a broader application. It makes a defendant a principal when he consciously shares in any criminal act, whether or not there is a conspiracy. And if a conspiracy is also charged, it makes no difference so far as aiding and abetting is concerned whether the substantive offense is done pursuant to the conspiracy. Aiding and abetting rests on a broader base. It states a rule of criminal responsibility for acts which one assists another in performing.

Now, you all have asked about Instruction Number 44, which talks about on or about, knowingly, and willfully. The on or about, I think, should be crystal clear. That simply means that the date charged in the indictment, the government need not prove the specific date. They can prove that it happened on a date on or about or near the date actually charged.

Now, with these words knowingly and willfully: Again, they are both explained in the instruction. But let me give you an example to try to help you understand knowingly and willfully.

3253

Now, if I was out and about driving my car and pulled up to a friend's house and three guys got in my car and they were friends of mine, I knew them, and I was driving the car, and they asked me for a ride over to the bank, if I took them over to the bank not knowing what if anything they were going to do when they got there, and they subsequently robbed the bank, the act of driving the three people to the bank was done knowingly. It was voluntary. It was

intentional. It was not a mistake. I did it. I meant to do it. But not knowing what was going to happen at the bank, that would not be a criminal act.

Now, if I knew that they were going to rob the bank, and if I took them to the bank for the purpose of robbing the bank, this would be a willful act done not only knowingly, voluntarily, and intentionally, but with a specific intent to do something the law forbids. And that would be a criminal act. "Knowingly" as described in this instruction means just that, something that is done voluntarily and intentionally, not by mistake or accident. "Willful," on the other hand, is something else again. It requires that it not only be done voluntarily, which is the same as knowingly and purposefully, but with the specific intent to do something the law forbids.

Now, the last instruction you asked about is one that we give regarding multiple -- when we have multiple defendants as well as multiple counts. The primary purpose for this particular instruction is to emphasize that each defendant who is charged with a count or counts is to be given individual consideration as it relates to that count or counts. It is that simple. If you have four defendants, as we have in this case, each defendant deserves to be considered individually. And that's why we give this kind of instruction.

Now, let me say this: If a defendant is charged with aiding and abetting somebody else in the commission of a certain offense, you may have to look at the actions of that other person to determine if the defendant you are considering is indeed guilty of aiding and abetting a particular crime. It still means he gets individual attention, but you have to look at the actions of somebody else to give him that individual attention. The same may apply with conspiracy. Conspiracy involves an agreement between at least two people. So necessarily, you may have to consider the actions of another person when determining the guilt or innocence of a particular defendant on the conspiracy count.

All right. Now, does this answer your question? Okay?

(Affirmative response.)

All right. Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

You may remove the defendants.

(The defendants were removed from the courtroom.)

All right.  We will be in recess and await the jury's call.

(Recess awaiting jury verdict taken from 11 o'clock a.m. to 5:10 p.m.)

(In Open Court.)

THE COURT:  All right.  I understand we have a verdict.  Bring in the jury, please.

(The jury entered the courtroom.)

Will the Foreperson please rise?  I understand the jury has reached a verdict?

THE FOREPERSON:  Yes, it has.

THE COURT:  Would you give the forms to the Marshal, please?

(Verdict forms proffered to Court and Clerk.)

3256

All right.  The verdict forms appear to be in order and the Clerk will publish the verdicts.

THE CLERK:  Ladies and gentlemen of the jury, these are your verdicts.  If defendant Tipton will please stand.

(Defendant Tipton stood.)

Case number 3:92CR68-01:  United States of America versus Richard Tipton, also known as "Whitey."  We the jury find as follows:

Count One, conspiracy to distribute controlled substance.  Answer:  Guilty.

Question:  Do you find that the government has proven beyond a reasonable doubt that a Continuing Criminal Enterprise existed as charged in the indictment? Answer:  Yes.

Count Two, Continuing Criminal Enterprise. Guilty.  Count Three, killing of Douglas A. Talley while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Four, killing of Douglas A. Talley to maintain or increase position in racketeering enterprise.  Guilty.

Count Five, killing of Douglas Moody while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Not guilty.

3257

Count Six, use of firearm in relation to killing of Douglas Moody.  Not guilty.

Count Seven, killing of Douglas Moody to maintain or increase position in racketeering enterprise.  Not guilty.

Count Fourteen, killing of Torrick Brown, Jr. to maintain or increase position in racketeering enterprise.  Not guilty.

Count Fifteen, use of firearm in relation to killing of Torrick Brown, Jr. and maiming of Martha McCoy.  Not guilty.

Count Sixteen, maiming of Martha McCoy to maintain or increase position in racketeering

enterprise. Not guilty.

Count Seventeen, killing of Bobby Long while engaged in or working in furtherance of a Continuing Criminal Enterprise. Guilty.

Count Eighteen, killing of Anthony Carter while engaged in or working in furtherance of a Continuing Criminal Enterprise. Guilty.

Count Nineteen, killing of Dorothy Mae Armstrong while engaged in or working in furtherance of a Continuing Criminal Enterprise. Guilty.

Count Twenty, use of firearm in relation to killing of Bobby Long, Anthony Carter and Dorothy Mae Armstrong. Guilty.

Count Twenty-one, killing of Bobby Long to maintain or increase position in racketeering enterprise. Guilty.

Count Twenty-two, killing of Anthony Carter to maintain or increase position in racketeering enterprise. Guilty.

Count Twenty-three, killing of Dorothy Mae Armstrong to maintain or increase position in racketeering enterprise. Guilty.

Count Twenty-four, killing of Curtis Thorne while engaged in or working in furtherance of a Continuing Criminal Enterprise. Guilty.

Count Twenty-five, killing of Linwood Chiles while engaged in or working in furtherance of a Continuing Criminal Enterprise. Guilty.

Count Twenty-six, use of firearm in relation to killing of Curtis Thorne and Linwood Chiles and maiming of Priscilla Greene and Gwendolyn Greene. Guilty.

Count Twenty-seven, killing of Curtis Thorne to maintain or increase position in rack racketeering enterprise. Guilty.

Count Twenty-eight, killing of Linwood Chiles to maintain or increase position in racketeering enterprise. Guilty.

Count 29, maiming of Priscilla Greene to maintain or increase position in racketeering enterprise. Guilty.

Count Thirty, maiming of Gwendolyn Greene to maintain or increase position in racketeering enterprise. Guilty.

Count Thirty-two, possession of controlled substance with intent to distribute on or about 2-2-92. Guilty.

Count Thirty-three, possession of controlled substance with intent to distribute on or about 4-10-92. Guilty.

So say we all dated 2-3-93. Signed by the Foreperson, Margaret M. Griffiths. You may be

210a

seated.

(Defendant Tipton resumed his seat.)

If defendant Cory Johnson will please stand.

(Defendant Johnson stood.)

Case number 3:92CR68-02:  United States of America versus Cory Johnson, also known as "O," also known as "C.O."  We the jury find as follows:

Count One, conspiracy to distribute controlled substance.  Guilty.

Question:  Do you find that the government has proven beyond a reasonable doubt that a Continuing Criminal Enterprise existed as charged in the indictment?  Answer:  Yes.

Count Two, Continuing Criminal Enterprise.  Guilty.

Count Eight, killing of Peyton Maurice Johnson while engaged in or working in furtherance of Continuing Criminal Enterprise.  Guilty.

Count Nine, use of firearm in relation to killing of Peyton Maurice Johnson.  Guilty.

Count Ten, killing of Peyton Maurice Johnson to maintain or increase position in racketeering enterprise.  Guilty.

Count Eleven, killing of Louis J. Johnson, Jr. while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Twelve, use of firearm in relation to killing of Louis J. Johnson, Jr.  Guilty.

Count Thirteen, killing of Louis J. Johnson, Jr. to maintain or increase position in racketeering enterprise.  Guilty.

Count Fourteen, killing of Torrick Brown, Jr. to maintain or increase position in racketeering enterprise.  Guilty.

Count Fifteen, use of firearm in relation to killing of Torrick Brown, Jr. and maiming of Martha McCoy.  Guilty.

Count Sixteen, maiming of Martha McCoy to maintain or increase position in racketeering enterprise.  Guilty.

Count Seventeen, killing of Bobby Long while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Eighteen, killing of Anthony Carter while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Nineteen, killing of Dorothy Mae Armstrong while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Twenty, use of firearm in relation to killing of Bobby Long, Anthony Carter and Dorothy Mae Armstrong.  Guilty.

Count Twenty-one, killing of Bobby Long to maintain or increase position in racketeering enterprise.  Guilty.

Count Twenty-two, killing of Anthony Carter to maintain or increase position in racketeering enterprise.  Guilty.

Count Twenty-three, killing of Dorothy Mae Armstrong to maintain or increase position in

3262

racketeering enterprise.  Guilty.

Count Twenty-four, killing of Curtis Thorne while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Twenty-five, killing of Linwood Chiles while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Twenty-six, use of a firearm in relation to killing of Curtis Thorne and Linwood Chiles and maiming of Priscilla Greene and Gwendolyn Greene.  Guilty.

Count Twenty-seven, killing of Curtis Thorne to maintain or increase position in racketeering enterprise.  Guilty.

Count Twenty-eight, killing of Linwood Chiles to maintain or increase position in racketeering enterprise.  Guilty.

Count Twenty-nine, maiming of Priscilla Greene to maintain or increase position in racketeering enterprise.  Guilty.

Count Thirty, maiming of Gwendolyn Greene to maintain or increase position in racketeering enterprise.  Guilty.

Count Thirty-one, distribution of controlled substance, guilty.

3263

Count Thirty-two, possession of controlled substance with intent to distribute it on or about 2-2-92.  Guilty.

So say we all, dated 2-3-93, signed by the Foreperson, Margaret M. Griffiths.

You may be seated.

(Defendant Johnson resumed his seat.

If defendant Roane will please stand.

(Defendant Roane stood.)

Case number 3:92CR68-03:  United States of America versus James H. Roane, Jr., also known as "J.R."  We the jury find as follows:

Count One, conspiracy to distribute controlled substance, guilty.

Question:  Do you find that the government has proven beyond a reasonable doubt that a Continuing Criminal Enterprise existed as charged in the indictment?  Answer:  Yes.

Count Two, Continuing Criminal Enterprise.

Guilty.

Count Five, killing of Douglas Moody while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Six, use of firearm in relation to killing of Douglas Moody.  Guilty.

3264

Count Seven, killing of Douglas Moody to maintain or increase position in racketeering enterprise.  Guilty.

Count Eight, killing of Peyton Maurice Johnson while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Nine, use of firearm in relation to killing of Peyton Maurice Johnson.  Guilty.

Count Ten, killing of Peyton Maurice Johnson to maintain or increase position in racketeering enterprise.  Guilty.

Count Eleven, killing of Louis J. Johnson, Jr. while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Twelve, use of firearm in relation to killing of Louis J. Johnson, Jr.  Guilty.

Count Thirteen, killing of Louis J. Johnson, Jr. to maintain or increase position in racketeering enterprise.  Guilty.

Count Fourteen, killing of Torrick Brown, Jr. to maintain or increase position in racketeering enterprise.  Guilty.

Count Fifteen, use of firearm in relation to killing of Torrick Brown, Jr. and maiming of Martha McCoy.  Guilty.

3265

Count Sixteen, maiming of Martha McCoy to maintain or increase position in racketeering enterprise.  Guilty.

Count Thirty-two, possession of controlled substance with intent to distribute on or about 2-2-92.  Guilty.

So say we all.  Dated 2-3-93, signed by the Foreperson, Margaret Griffiths.

You may be seated.

(Defendant Roane resumed his seat.)

If defendant Reavis will please stand.

(Defendant Reavis stood.)

Case number 3:92CR68-07:  United States of America versus Sandra Reavis.  We the jury find as follows:

Count One, conspiracy to distribute controlled substance.  Guilty.

So say we all dated 2-3-93, signed by the Foreperson, Margaret Griffiths.

You may be seated.

(Defendant Reavis resumed her seat.)

Ladies and gentlemen of the jury, are these your verdicts?

(Affirmative response.)

THE CLERK: Do counsel wish the jury polled?

MR. BAUGH: Yes.

THE CLERK: Jurors, if these are your verdicts as I call your name please respond by answering yes.

Victor M. Catlett.

THE JUROR: Yes.

John E. Coleman, Sr.

THE JUROR: Yes.

Edward Cooke.

THE JUROR: Yes.

Debra J. Dabney.

THE JUROR: Yes.

Nina S. Eike.

THE JUROR: Yes.

Bonita S. Faircloth.

THE JUROR: Yes.

Margaret M. Griffiths.

THE JUROR: Yes.

Charles V. Guthrie, Sr.

THE JUROR: Yes.

Jerome Harrison.

THE JUROR: Yes.

Connie E. Harvey.

THE JUROR: Yes.

Frances P. Hodson.

THE JUROR: Yes.

Thomas C. Jackson.

THE JUROR: Yes.

THE COURT: All right. Ladies and gentlemen, I'm going to ask you to come back on next Monday morning at 10 o'clock. We will get started with the sentencing phase of the trial. You all may be excused now. 10 o'clock on Monday morning. Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

MR. BAUGH: Before the jury leaves the building, I have something I would like to say.

THE COURT: Have Bill hold on to them.

(Bench conference held off the record per Mr. Baugh's request.)

All right, is anybody here from probation?

(Probation Officers Gill and Ault conferred with Court off the record.)

All right, I'm going to set a sentencing date for Ms. Reavis. There is no need for the other three defendants to be held. They can be removed at this

214a

time.

MR. COOLEY:  Judge, has the counsel been given some opportunity to discuss with the Court, either with or without the defendants being present, the timing, scheduling for next week?

THE COURT:  Oh, sure.  Defendants other than Reavis can be removed.

MR. VICK:  Mr. White had filed a motion asking for the government's witness list as to the sentencing phase of this.  I don't know what the Court's pleasure is in that regard, but we can provide one by 5 o'clock tomorrow afternoon if necessary.

THE COURT:  Well, as soon as you can, get it to them.

MR. VICK:  We can probably even get it sooner than that.

MR. BAUGH:  Will we each have to file a motion?

THE COURT:  No.  Everybody should get one.  All right, Mr. Wagner, how about April 14th for sentencing?

MR. WAGNER:  That's fine, Your Honor.

THE COURT:  Mr. Vick, April 14th?

MR. VICK:  April 14th is fine with the government, Your Honor.

MR. PARCELL:  Will that be at ten?

THE COURT:  No, we will do it at 9:30.

(Defendant and counsel executing sentencing documents.)

MR. PARCELL:  Judge, may we leave our stuff here in the next two days?

THE CLERK:  Judge Merhige has a docket here in the morning.

THE COURT:  I'm sorry, you have to clear it up.  Judge Merhige has something.

MR. GEARY:  Is there any gag order in effect from now until Monday?

MR. BAUGH:  That's a good idea.  We so move.

MR. GEARY:  Yes.

MR. VICK:  We don't intend to talk about the case at all.

MR. GEARY:  We have "reliable authority" reports all the time and it can only come from the United States Attorney's Office.

THE COURT:  I don't want members of the U.S. Attorney's Office or any of the lawyers to make any comments to the press about this.  We still have a very sensitive phase to go through and you should know better than that.  And I'm on record.

THE COURT:  All right.  Ms. Reavis, could

215a

3270

you stand up a minute, please?

(Defendant Reavis stood.)

Ms. Reavis, your matter has been set for sentencing to commence at 9:30 a.m. on April 14th in this courtroom. In the interim, somebody from the Probation Office will be in touch with you. I urge you to cooperate with them as much as you possibly can. All right. That completes the matter. Ms. Reavis may be removed from the courtroom.

(The defendant was removed from the courtroom.)

All right, I'm going to adjourn Court. We can talk scheduling back here.

(In Chambers.).

THE COURT: All right, tell those folks to get in here.

(Counsel assembled in chambers.)

THE COURT: Somebody wanted to talk about scheduling?

MR. BAUGH: I was going to make the suggestion, Your Honor, that being as how it would give us one day apiece, if we break early. Ours looks like about a day, and we are number three.

MR. VICK: Judge, in aggravation, I would think that, and we will need to get together on this, but we have got a list of about six witnesses, none

3271

of whom will be very long.

THE COURT: You are talking about a day between each presentation?

MR. BAUGH: A day for each presentation.

MR. VICK: I expect we will be handing it to the defense mid-afternoon Monday, I would think.

MR. COOLEY: You are assuming opening statements?

MR. VICK: Well, that's right.

THE COURT: We will assume a full day.

MR. VICK: For us on Monday.

MR. WHITE: Because Judge, you know, we are bringing people down from New York and I just want to know, we are going to have them all here on Monday, but for purposes of making sure we are prepared and ready to go forward, we should count on Monday?

THE COURT: Tipton gets started on Tuesday. We do the openings, and if we fall short we will just put it over until Tuesday.

MR. COOLEY: How long for you?

MR. WHITE: I would say no more than a day, Judge. Six witnesses, tops.

MR. COOLEY: I think ours is three to five hours, probably, of testimony.

MR. BAUGH: Ours is a day.

3272

MR. VICK: Full day?

MR. BAUGH:  Yes.

THE COURT:  We are talking about maybe Thursday or Friday for closing up.

MR. WHITE:  Friday, probably, I would think.

THE COURT:  That's fine.  You know, if we fall short or if you go over, it is no problem.  We will adjust.  But it looks like Friday for closing.

MR. BAUGH:  Thank you.

(Proceedings adjourned at 5:35 p.m.)

3246

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

-----------------------------------------

UNITED STATES OF AMERICA,

                        Plaintiff;

     v.                              CRIMINAL ACTION
                                       92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                        Defendants.

-----------------------------------------
                    VOLUME XVII

                 February 3, 1993
                 Richmond, Virginia
                     9:30 a.m.

BEFORE:        HONORABLE JAMES R. SPENCER
               United States District Judge


APPEARANCES:   HOWARD C. VICK, JR., ESQ.
               WILLIAM H. PARCELL, III, ESQ.
               Office of the United States Attorney;
                   Counsel for Government;

               ROBERT P. GEARY, ESQ.
               ERIC D. WHITE, ESQ.
                   Counsel for Defendant Tipton;
               CRAIG S. COOLEY, ESQ.
               JOHN F. McGARVEY, ESQ.
                   Counsel for Defendant Johnson;
               DAVID P. BAUGH, ESQ.
               ARNOLD R. HENDERSON, V, ESQ.
                   Counsel for Defendant Roane;
               ROBERT J. WAGNER, ESQ.
                   Counsel for Defendant Reavis.
                 JEFFREY B. KULL
               OFFICIAL COURT REPORTER

3247

     THE CLERK:  Criminal Number 3:92CR68:
United States of America versus Richard Tipton, Cory
Johnson, James H. Roane, Jr., and Sandra Reavis.  The

seventeenth day of trial.  Are counsel ready to proceed?

MR. VICK:  Government is ready.

MR. WHITE:  Defendant Tipton is ready.

MR. COOLEY:  Defendant Johnson is ready.

MR. HENDERSON:  Defendant Roane is ready.

MR. WAGNER:  Defendant Reavis is ready.

THE COURT:  All right.  Let's bring in the jury.

(The jury entered the courtroom.)

All right, good morning to you.  We are going to allow you now to continue your deliberations.  All right.  Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

All right, remove the defendants.

(The defendants were removed from the courtroom.)

All right.  We will recess to await the jury's call.

(Recess taken from 9:35 a.m. to 11:20 a.m.)

THE COURT:  All right, I got a note from the jury which reads as follows:  "Instruction 43, 44, and 45, please explain further, more clarification."  Those are, 43, the aiding and abetting; 44, on or about, knowingly, and willfully; and 45, caution, punishment not relevant, multiple defendants, multiple counts.

Now, I have passed out to you a supplemental I'm giving on aiding and abetting which I think will help.  The one about knowingly and willfully, I will give an example highlighting what knowingly and willfully are.  That's the best I can do on that.  It seems to me self-explanatory.  I don't know what the problem is with it.  But perhaps the example will help.  I'll explain to them the general purpose of the multiple defendants, multiple counts instruction.  The middle paragraph, which might be the problem, which reads "I caution you members of the jury that you are here to determine the guilt or innocence of the accused from the evidence in this case.  The defendant is not on trial for any act or conduct or offense not alleged in the indictment."  Now, this sentence:  "Neither are you called upon to return a verdict as to the guilt or innocence of any other person or persons not on trial as a defendant in this case."

Taking the group of instructions that they wanted clarification on, they might be hung up on that particular language.  I don't know.  If a person is charged with aiding and abetting someone else in the commission of an offense, you would necessarily

219a

have to look at the actions of another person in making that determination. And it is likewise with conspiracy. In order to have a conspiracy, you have to have agreement between at least two people, so they are necessarily looking at somebody else's action. And that sentence to some extent might negate that understanding. Does everybody see what I am saying?

MR. BAUGH: Your Honor, I understand. But on behalf of defendant Roane, I don't even mean to attempt to usurp your prerogative, but I would ask perhaps our first response to them would be a note back to them asking them what paragraphs in 44 and 45 are giving them problems. We could zero in on it.

THE COURT: No, I think I'll do this and ask them then if that solves their problem. If it doesn't, they will let us know.

All right, bring in the jury.

(The jury entered the courtroom.)

All right, I received a note from the jury asking for clarification to Instructions 43, 44, and 45. I'm going to give you some additional instruction on aiding and abetting in an effort to clarify. And if you would listen to me, it is as follows: A person may violate the law even though he or she does not personally do each and every act constituting the offense if that person aided and abetted the commission of the offense. Section 2(a) of Title 18 of the United States Code provides whoever commits an offense against the United States, or aids, abets, counsels, commands, induces, or procures its commission, is punishable as a principal. Before a defendant may be held responsible for aiding and abetting others in the commission of a crime, it is necessary that the government prove beyond a reasonable doubt that the defendant knowingly and deliberately associated himself or herself in some way with the crime charged, and participated in it with the intent to commit the crime.

In order to be found guilty of aiding and abetting the commission of the crime charged in the indictment, the government must prove beyond a reasonable doubt that the defendant knew that the crime charged was to be committed or was being committed; that the defendant knowingly did some act for the purpose of aiding, commanding, or encouraging the commission of that crime, and that the defendant acted with the intention of causing the crime charged to be committed.

Before a defendant may be found guilty as an aider or abettor to a crime, the government must also

220a

prove beyond a reasonable doubt that someone committed each of the essential elements of the offense charged as detailed to you in the instructions. Merely being present at the scene of the crime or merely knowing that a crime is being committed, or is about to be committed, is not sufficient for the jury to find that the defendant aided and abetted the commission of that crime.

The government must prove that the defendant knowingly and deliberately associated himself or herself with the crime in some way as a participant. Someone who wanted the crime to be committed, not as a spectator. One who aids, abets, counsels, commands, induces, or procures the commission of an act is as responsible for that act is if he committed it directly. There may be some confusion as to the difference between conspiracy and aiding and abetting.

Conspiracy is, as I have instructed, an agreement to commit offenses of the character described in the substantive counts. Aiding and abetting has a broader application. It makes a defendant a principal when he consciously shares in any criminal act, whether or not there is a conspiracy. And if a conspiracy is also charged, it makes no difference so far as aiding and abetting is concerned whether the substantive offense is done pursuant to the conspiracy. Aiding and abetting rests on a broader base. It states a rule of criminal responsibility for acts which one assists another in performing.

Now, you all have asked about Instruction Number 44, which talks about on or about, knowingly, and willfully. The on or about, I think, should be crystal clear. That simply means that the date charged in the indictment, the government need not prove the specific date. They can prove that it happened on a date on or about or near the date actually charged.

Now, with these words knowingly and willfully: Again, they are both explained in the instruction. But let me give you an example to try to help you understand knowingly and willfully.

Now, if I was out and about driving my car and pulled up to a friend's house and three guys got in my car and they were friends of mine, I knew them, and I was driving the car, and they asked me for a ride over to the bank, if I took them over to the bank not knowing what if anything they were going to do when they got there, and they subsequently robbed the bank, the act of driving the three people to the bank was done knowingly. It was voluntary. It was

221a

intentional.  It was not a mistake.  I did it.  I meant to do it.  But not knowing what was going to happen at the bank, that would not be a criminal act.

Now, if I knew that they were going to rob the bank, and if I took them to the bank for the purpose of robbing the bank, this would be a willful act done not only knowingly, voluntarily, and intentionally, but with a specific intent to do something the law forbids.  And that would be a criminal act. "Knowingly" as described in this instruction means just that, something that is done voluntarily and intentionally, not by mistake or accident. "Willful," on the other hand, is something else again.  It requires that it not only be done voluntarily, which is the same as knowingly and purposefully, but with the specific intent to do something the law forbids.

Now, the last instruction you asked about is one that we give regarding multiple  --  when we have multiple defendants as well as multiple counts.  The primary purpose for this particular instruction is to emphasize that each defendant who is charged with a count or counts is to be given individual consideration as it relates to that count or counts. It is that simple.  If you have four defendants, as we have in this case, each defendant deserves to be considered individually.  And that's why we give this kind of instruction.

Now, let me say this:  If a defendant is charged with aiding and abetting somebody else in the commission of a certain offense, you may have to look at the actions of that other person to determine if the defendant you are considering is indeed guilty of aiding and abetting a particular crime.  It still means he gets individual attention, but you have to look at the actions of somebody else to give him that individual attention.  The same may apply with conspiracy.  Conspiracy involves an agreement between at least two people.  So necessarily, you may have to consider the actions of another person when determining the guilt or innocence of a particular defendant on the conspiracy count.

All right.  Now, does this answer your question?  Okay?

(Affirmative response.)

All right.  Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

You may remove the defendants.

(The defendants were removed from the courtroom.)

All right.  We will be in recess and await the jury's call.

(Recess awaiting jury verdict taken from 11 o'clock a.m. to 5:10 p.m.)

(In Open Court.)

THE COURT:  All right.  I understand we have a verdict.  Bring in the jury, please.

(The jury entered the courtroom.)

Will the Foreperson please rise?  I understand the jury has reached a verdict?

THE FOREPERSON:  Yes, it has.

THE COURT:  Would you give the forms to the Marshal, please?

(Verdict forms proffered to Court and Clerk.)

3256

All right.  The verdict forms appear to be in order and the Clerk will publish the verdicts.

THE CLERK:  Ladies and gentlemen of the jury, these are your verdicts.  If defendant Tipton will please stand.

(Defendant Tipton stood.)

Case number 3:92CR68-01:  United States of America versus Richard Tipton, also known as "Whitey."  We the jury find as follows:

Count One, conspiracy to distribute controlled substance.  Answer:  Guilty.

Question:  Do you find that the government has proven beyond a reasonable doubt that a Continuing Criminal Enterprise existed as charged in the indictment? Answer:  Yes.

Count Two, Continuing Criminal Enterprise. Guilty.  Count Three, killing of Douglas A. Talley while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Four, killing of Douglas A. Talley to maintain or increase position in racketeering enterprise.  Guilty.

Count Five, killing of Douglas Moody while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Not guilty.

3257

Count Six, use of firearm in relation to killing of Douglas Moody.  Not guilty.

Count Seven, killing of Douglas Moody to maintain or increase position in racketeering enterprise.  Not guilty.

Count Fourteen, killing of Torrick Brown, Jr. to maintain or increase position in racketeering enterprise.  Not guilty.

Count Fifteen, use of firearm in relation to killing of Torrick Brown, Jr. and maiming of Martha McCoy.  Not guilty.

Count Sixteen, maiming of Martha McCoy to maintain or increase position in racketeering

enterprise.  Not guilty.

Count Seventeen, killing of Bobby Long while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Eighteen, killing of Anthony Carter while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Nineteen, killing of Dorothy Mae Armstrong while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Twenty, use of firearm in relation to killing of Bobby Long, Anthony Carter and Dorothy Mae Armstrong.  Guilty.

Count Twenty-one, killing of Bobby Long to maintain or increase position in racketeering enterprise.  Guilty.

Count Twenty-two, killing of Anthony Carter to maintain or increase position in racketeering enterprise.  Guilty.

Count Twenty-three, killing of Dorothy Mae Armstrong to maintain or increase position in racketeering enterprise.  Guilty.

Count Twenty-four, killing of Curtis Thorne while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Twenty-five, killing of Linwood Chiles while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Twenty-six, use of firearm in relation to killing of Curtis Thorne and Linwood Chiles and maiming of Priscilla Greene and Gwendolyn Greene.  Guilty.

Count Twenty-seven, killing of Curtis Thorne to maintain or increase position in rack racketeering enterprise.  Guilty.

Count Twenty-eight, killing of Linwood Chiles to maintain or increase position in racketeering enterprise.  Guilty.

Count 29, maiming of Priscilla Greene to maintain or increase position in racketeering enterprise.  Guilty.

Count Thirty, maiming of Gwendolyn Greene to maintain or increase position in racketeering enterprise.  Guilty.

Count Thirty-two, possession of controlled substance with intent to distribute on or about 2-2-92.  Guilty.

Count Thirty-three, possession of controlled substance with intent to distribute on or about 4-10-92.  Guilty.

So say we all dated 2-3-93.  Signed by the Foreperson, Margaret M. Griffiths.  You may be

224a

seated.

(Defendant Tipton resumed his seat.)

If defendant Cory Johnson will please stand.

(Defendant Johnson stood.)

Case number 3:92CR68-02:  United States of America versus Cory Johnson, also known as "O," also known as "C.O."  We the jury find as follows:

Count One, conspiracy to distribute controlled substance.  Guilty.

Question:  Do you find that the government has proven beyond a reasonable doubt that a Continuing Criminal Enterprise existed as charged in the indictment?  Answer:  Yes.

Count Two, Continuing Criminal Enterprise.  Guilty.

Count Eight, killing of Peyton Maurice Johnson while engaged in or working in furtherance of Continuing Criminal Enterprise.  Guilty.

Count Nine, use of firearm in relation to killing of Peyton Maurice Johnson.  Guilty.

Count Ten, killing of Peyton Maurice Johnson to maintain or increase position in racketeering enterprise.  Guilty.

Count Eleven, killing of Louis J. Johnson, Jr. while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Twelve, use of firearm in relation to killing of Louis J. Johnson, Jr.  Guilty.

Count Thirteen, killing of Louis J. Johnson, Jr. to maintain or increase position in racketeering enterprise.  Guilty.

Count Fourteen, killing of Torrick Brown, Jr. to maintain or increase position in racketeering enterprise.  Guilty.

Count Fifteen, use of firearm in relation to killing of Torrick Brown, Jr. and maiming of Martha McCoy.  Guilty.

Count Sixteen, maiming of Martha McCoy to maintain or increase position in racketeering enterprise.  Guilty.

Count Seventeen, killing of Bobby Long while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Eighteen, killing of Anthony Carter while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Nineteen, killing of Dorothy Mae Armstrong while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Twenty, use of firearm in relation to killing of Bobby Long, Anthony Carter and Dorothy Mae Armstrong.  Guilty.

Count Twenty-one, killing of Bobby Long to maintain or increase position in racketeering enterprise. Guilty.

Count Twenty-two, killing of Anthony Carter to maintain or increase position in racketeering enterprise. Guilty.

Count Twenty-three, killing of Dorothy Mae Armstrong to maintain or increase position in racketeering enterprise. Guilty.

Count Twenty-four, killing of Curtis Thorne while engaged in or working in furtherance of a Continuing Criminal Enterprise. Guilty.

Count Twenty-five, killing of Linwood Chiles while engaged in or working in furtherance of a Continuing Criminal Enterprise. Guilty.

Count Twenty-six, use of a firearm in relation to killing of Curtis Thorne and Linwood Chiles and maiming of Priscilla Greene and Gwendolyn Greene. Guilty.

Count Twenty-seven, killing of Curtis Thorne to maintain or increase position in racketeering enterprise. Guilty.

Count Twenty-eight, killing of Linwood Chiles to maintain or increase position in racketeering enterprise. Guilty.

Count Twenty-nine, maiming of Priscilla Greene to maintain or increase position in racketeering enterprise. Guilty.

Count Thirty, maiming of Gwendolyn Greene to maintain or increase position in racketeering enterprise. Guilty.

Count Thirty-one, distribution of controlled substance, guilty.

Count Thirty-two, possession of controlled substance with intent to distribute it on or about 2-2-92. Guilty.

So say we all, dated 2-3-93, signed by the Foreperson, Margaret M. Griffiths.

You may be seated.

(Defendant Johnson resumed his seat.

If defendant Roane will please stand.

(Defendant Roane stood.)

Case number 3:92CR68-03: United States of America versus James H. Roane, Jr., also known as "J.R." We the jury find as follows:

Count One, conspiracy to distribute controlled substance, guilty.

Question: Do you find that the government has proven beyond a reasonable doubt that a Continuing Criminal Enterprise existed as charged in the indictment? Answer: Yes.

Count Two, Continuing Criminal Enterprise.

226a

Guilty.

Count Five, killing of Douglas Moody while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Six, use of firearm in relation to killing of Douglas Moody.  Guilty.

Count Seven, killing of Douglas Moody to maintain or increase position in racketeering enterprise.  Guilty.

Count Eight, killing of Peyton Maurice Johnson while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Nine, use of firearm in relation to killing of Peyton Maurice Johnson.  Guilty.

Count Ten, killing of Peyton Maurice Johnson to maintain or increase position in racketeering enterprise.  Guilty.

Count Eleven, killing of Louis J. Johnson, Jr. while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Twelve, use of firearm in relation to killing of Louis J. Johnson, Jr.  Guilty.

Count Thirteen, killing of Louis J. Johnson, Jr. to maintain or increase position in racketeering enterprise.  Guilty.

Count Fourteen, killing of Torrick Brown, Jr. to maintain or increase position in racketeering enterprise.  Guilty.

Count Fifteen, use of firearm in relation to killing of Torrick Brown, Jr. and maiming of Martha McCoy.  Guilty.

Count Sixteen, maiming of Martha McCoy to maintain or increase position in racketeering enterprise.  Guilty.

Count Thirty-two, possession of controlled substance with intent to distribute on or about 2-2-92.  Guilty.

So say we all.  Dated 2-3-93, signed by the Foreperson, Margaret Griffiths.

You may be seated.

(Defendant Roane resumed his seat.)

If defendant Reavis will please stand.

(Defendant Reavis stood.)

Case number 3:92CR68-07:  United States of America versus Sandra Reavis.  We the jury find as follows:

Count One, conspiracy to distribute controlled substance.  Guilty.

So say we all dated 2-3-93, signed by the Foreperson, Margaret Griffiths.

You may be seated.

(Defendant Reavis resumed her seat.)

227a

Ladies and gentlemen of the jury, are these your verdicts?

(Affirmative response.)

THE CLERK: Do counsel wish the jury polled?

MR. BAUGH: Yes.

THE CLERK: Jurors, if these are your verdicts as I call your name please respond by answering yes.

Victor M. Catlett.

THE JUROR: Yes.

John E. Coleman, Sr.

THE JUROR: Yes.

Edward Cooke.

THE JUROR: Yes.

Debra J. Dabney.

THE JUROR: Yes.

Nina S. Eike.

THE JUROR: Yes.

Bonita S. Faircloth.

THE JUROR: Yes.

Margaret M. Griffiths.

THE JUROR: Yes.

Charles V. Guthrie, Sr.

THE JUROR: Yes.

Jerome Harrison.

THE JUROR: Yes.

Connie E. Harvey.

THE JUROR: Yes.

Frances P. Hodson.

THE JUROR: Yes.

Thomas C. Jackson.

THE JUROR: Yes.

THE COURT: All right. Ladies and gentlemen, I'm going to ask you to come back on next Monday morning at 10 o'clock. We will get started with the sentencing phase of the trial. You all may be excused now. 10 o'clock on Monday morning. Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

MR. BAUGH: Before the jury leaves the building, I have something I would like to say.

THE COURT: Have Bill hold on to them.

(Bench conference held off the record per Mr. Baugh's request.)

All right, is anybody here from probation?

(Probation Officers Gill and Ault conferred with Court off the record.)

All right, I'm going to set a sentencing date for Ms. Reavis. There is no need for the other three defendants to be held. They can be removed at this

228a

time.

MR. COOLEY: Judge, has the counsel been given some opportunity to discuss with the Court, either with or without the defendants being present, the timing, scheduling for next week?

THE COURT: Oh, sure. Defendants other than Reavis can be removed.

MR. VICK: Mr. White had filed a motion asking for the government's witness list as to the sentencing phase of this. I don't know what the Court's pleasure is in that regard, but we can provide one by 5 o'clock tomorrow afternoon if necessary.

THE COURT: Well, as soon as you can, get it to them.

MR. VICK: We can probably even get it sooner than that.

MR. BAUGH: Will we each have to file a motion?

THE COURT: No. Everybody should get one. All right, Mr. Wagner, how about April 14th for sentencing?

MR. WAGNER: That's fine, Your Honor.

THE COURT: Mr. Vick, April 14th?

MR. VICK: April 14th is fine with the government, Your Honor.

MR. PARCELL: Will that be at ten?

THE COURT: No, we will do it at 9:30.

(Defendant and counsel executing sentencing documents.)

MR. PARCELL: Judge, may we leave our stuff here in the next two days?

THE CLERK: Judge Merhige has a docket here in the morning.

THE COURT: I'm sorry, you have to clear it up. Judge Merhige has something.

MR. GEARY: Is there any gag order in effect from now until Monday?

MR. BAUGH: That's a good idea. We so move.

MR. GEARY: Yes.

MR. VICK: We don't intend to talk about the case at all.

MR. GEARY: We have "reliable authority" reports all the time and it can only come from the United States Attorney's Office.

THE COURT: I don't want members of the U.S. Attorney's Office or any of the lawyers to make any comments to the press about this. We still have a very sensitive phase to go through and you should know better than that. And I'm on record.

THE COURT: All right. Ms. Reavis, could

3270

you stand up a minute, please?

(Defendant Reavis stood.)

Ms. Reavis, your matter has been set for sentencing to commence at 9:30 a.m. on April 14th in this courtroom. In the interim, somebody from the Probation Office will be in touch with you. I urge you to cooperate with them as much as you possibly can. All right. That completes the matter. Ms. Reavis may be removed from the courtroom.

(The defendant was removed from the courtroom.)

All right, I'm going to adjourn Court. We can talk scheduling back here.

(In Chambers.).

THE COURT: All right, tell those folks to get in here.

(Counsel assembled in chambers.)

THE COURT: Somebody wanted to talk about scheduling?

MR. BAUGH: I was going to make the suggestion, Your Honor, that being as how it would give us one day apiece, if we break early. Ours looks like about a day, and we are number three.

MR. VICK: Judge, in aggravation, I would think that, and we will need to get together on this, but we have got a list of about six witnesses, none

3271

of whom will be very long.

THE COURT: You are talking about a day between each presentation?

MR. BAUGH: A day for each presentation.

MR. VICK: I expect we will be handing it to the defense mid-afternoon Monday, I would think.

MR. COOLEY: You are assuming opening statements?

MR. VICK: Well, that's right.

THE COURT: We will assume a full day.

MR. VICK: For us on Monday.

MR. WHITE: Because Judge, you know, we are bringing people down from New York and I just want to know, we are going to have them all here on Monday, but for purposes of making sure we are prepared and ready to go forward, we should count on Monday?

THE COURT: Tipton gets started on Tuesday. We do the openings, and if we fall short we will just put it over until Tuesday.

MR. COOLEY: How long for you?

MR. WHITE: I would say no more than a day, Judge. Six witnesses, tops.

MR. COOLEY: I think ours is three to five hours, probably, of testimony.

MR. BAUGH: Ours is a day.

3272

MR. VICK: Full day?

MR. BAUGH:  Yes.

THE COURT:  We are talking about maybe Thursday or Friday for closing up.

MR. WHITE:  Friday, probably, I would think.

THE COURT:  That's fine.  You know, if we fall short or if you go over, it is no problem.  We will adjust.  But it looks like Friday for closing.

MR. BAUGH:  Thank you.

(Proceedings adjourned at 5:35 p.m.)

3273

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

-----------------------------------------

UNITED STATES OF AMERICA,

                              Plaintiff;

    v.                                      CRIMINAL ACTION
                                              92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                              Defendants.

-----------------------------------------
                    VOLUME XVIII

                 February 8, 1993
                 Richmond, Virginia
                   10:00 a.m.

BEFORE:         HONORABLE JAMES R. SPENCER
                United States District Judge


APPEARANCES:    HOWARD C. VICK, JR., ESQ.
                WILLIAM H. PARCELL, III, ESQ.
                Office of the United States Attorney;
                    Counsel for Government;

                ROBERT P. GEARY, ESQ.
                ERIC D. WHITE, ESQ.
                    Counsel for Defendant Tipton;
                CRAIG S. COOLEY, ESQ.
                JOHN F. McGARVEY, ESQ.
                    Counsel for Defendant Johnson;
                DAVID P. BAUGH, ESQ.
                ARNOLD R. HENDERSON, V, ESQ.
                    Counsel for Defendant Roane;
                ROBERT J. WAGNER, ESQ.
                    Counsel for Defendant Reavis.
                JEFFREY B. KULL
                OFFICIAL COURT REPORTER

3274
                P-R-O-C-E-E-D-I-N-G-S
        (In Chambers.)
            MR. WHITE:  The only thing we wanted to

232a

come back about was about our opening statements. We were wondering if the Court would allow us to reserve our openings until we actually began our penalty phase presentations. I know on behalf of defendant Tipton, Judge, we have no problem in telling the Court that we are going to take, we will easily be able to conclude our evidence within one day. We plan on having four, maybe five witnesses at the most. None should be terribly lengthy, and I think based on individualized consideration it would be helpful for the jury. And I would also tell the Court that there are a couple of loose ends that on behalf of our case we would like to tighten up in terms of receiving reports today and later on this evening that would help us considerably.

MR. McGARVEY: Each and every one of us, I believe all of us would join in that.

THE COURT: To reserve your openings?

MR. McGARVEY: Yes, sir.

THE COURT: I have no problem with that.

MR. BAUGH: The other thing is, I had a motion on it, but we would ask the Court before the United States commences, under 201(d), rules of evidence, the Court take judicial notice and advise the jury that Jerry Gaiters has been convicted and has pled guilty to a capital offense for which he cannot receive the death penalty. It is my understanding that as of the time he pled, there has been no notification to seek the death penalty on behalf of the United States. Under the statute, he can't get it.

MR. VICK: As you just pointed out, he was never death-eligible. He has not received a benefit. I have no problem with it being -- there was never the death penalty sought for him before he entered a plea of guilty.

MR. BAUGH: The bottom line is, he pled to a statute that carried the potential for death, but for the fact the United States did not seek it.

THE COURT: I don't care if you argue that, the fact that they didn't seek it. But I'm not going to instruct them on anything like that.

MR. BAUGH: We are going to have to call somebody from the United States, because the burden is on us. It is a mitigator. We have to put on evidence of it or the Court has to take judicial notice or we have to do it by stipulating it.

THE COURT: If you can't stipulate it, I'll explain to them the circumstances behind Gaiters.

MR. VICK: We could probably get a written statement for publication. I don't want it to look as if he didn't get the death penalty notice because

of his cooperation.  We didn't choose to charge him with the death penalty prior to knowing he was pleading guilty because he wasn't the triggerman.

THE COURT:  Let me resolve some motions before you all leave.  We had some motions in limine.

MR. GEARY:  Everything I have is in the other room.  We had filed more than ten, I think.

THE COURT:  You don't need anything but to hear what I resolved to do about it.

MR. GEARY:  Do you want me to waive oral argument?

THE COURT:  It is waived.  You filed plenty of information for me to rely on.  The evidence concerning Torrick Brown and Martha McCoy, that's a statutory aggravating factor, I don't think you can use it as a statutory aggravating factor.

MR. VICK:  In fact, it is a statutory aggravating factor  --  no, excuse me, it is not a specific statutory aggravating factor.  But it is a factor the United States intends to argue under the non-statutory aggravating factors that were enunciated in the death notices.

THE COURT:  That's fine.  It is not a statutory aggravating factor.  But it can be discussed as a non-statutory aggravating factor.  The evidence concerning Katrina Rozier, I tend to agree with the defendants on this.  What do you plan to do?

MR. VICK:  No more than I did in the first trial, in the penalty phase.

MR. GEARY:  Judge, the problem the government has is no appellate court has ever dealt with these aggravateds before, and they are limited to what they put in the death notice.

MR. VICK:  The death notice clearly contains that they conspired to kill people other than those listed in the indictment.

MR. GEARY:  If you tell the jury you don't know who killed somebody, how are you going to use that as an aggravator?

THE COURT:  I agree with the defense.  That murder will not be utilized as an aggravating factor.  I don't see any reason for any proffer by the government.  Defendant Tipton's motion to dismiss the non-statutory aggravator:  Substantial criminal history.

MR. VICK:  We have put most of that on.  His substantial criminal history is in front of this jury through his prior actions in Trenton and the other evidence that's been listed here.  We also intend to present his, in fact as to each defendant,

234a

we intend to present their incarceration records from the City Jail.

MR. GEARY: That's a violation of two of your orders for them to attempt that. Tipton goes back to April '92. They have never given stuff to us until last night. You violated the order in November, violated had another order. If you don't do it timely, you can't use it.

MR. VICK: We gave that stuff, as Mr. Baugh knows, as soon as we got the stuff and everybody knew we were going to use it.

MR. GEARY: I don't care what everybody knew.

MR. VICK: Hold on, Bob.

MR. GEARY: Your lawyer says the government has to do certain things. They don't come in and say we give it to Baugh and Cooley.

MR. VICK: We handed it to Eric.

MR. GEARY: Yesterday.

THE COURT: What are we talking about now, the jail records?

MR. VICK: They just show that they have assaulted other inmates, assaulted jailers. It goes to --

MR. GEARY: Not related to any aggravator.

MR. VICK: It is. It is related to the sentencing mechanism. The Supreme Court has been eminently clear on that, that any sentencer has the right to consider future dangerousness.

MR. GEARY: It's not --

MR. VICK: If I could talk; I don't interrupt you.

MR. GEARY: You have been doing all the talking. That's the problem. We don't get to talk. The future dangerousness is the biggest part of this case. They neglected to put it in the death notice.

THE COURT: Hold it.

MR. VICK: It is not a specific aggravating factor as enunciated by the law in this statute. Clearly, it was intended to be part of the sentencing process as an overall consideration by the sentencer. I need not in going to you specifically -- if this were being sentenced by the Judge, I need not say to you future dangerousness as a specific aggravating factor. It is something that should be considered by any sentencer, and clearly their actions indicate future dangerousness. And I intend to argue it, Judge. The Supreme Court has addressed it in JERIK v. TEXAS, specifically saying that. And it is not a specific aggravating factor of the sort laid out in that statute that they intentionally killed someone, that they did it after

235a

premeditation. Those are fact-specific things. Future dangerousness is not a fact-specific thing. It is an overall sentencing concept which the government has the right to get into, Your Honor.

THE COURT: No, I disagree. No, I think future dangerousness is just like any other non-statutory aggravating factor. If you were going to utilize it, you needed to tell them. I don't understand your logic at all.

MR. VICK: It goes to -- Your Honor, it is the general sentencing scheme. For instance, I can argue, unless I'm hamstrung as to my argument, as to the heinousness of this crime. It would make no sense that I can't argue future dangerousness. Certainly I can argue without specifying that, you know, that the killing of these people was just heinous and depraved and shows an absolute disregard for life. That's a general sentencing concept, as is future dangerousness a general sentencing concept. The fact that these people will continue to be a danger from the jail is already in evidence. They have tried to kill people from the jail. That's already in evidence. They will continue to kill people from jail, and that's something this jury has the right to -- I have the right to argue, even if I am not allowed to get into the institutional record. I have the right under law, Your Honor, as a general sentencing scheme, and I can provide the Court with the Senate Minutes, the legislative history on this statute, where it is clear that they specified particular aggravating facts. But it's clear, also, that future dangerousness, although not specified as an aggravating act, was considered just as importantly as the statutory framework concerning deterrence and punishment.

THE COURT: Let me see it.

MR. VICK: It is up in my office.

MR. BAUGH: If you are going to let it in, we might as well ask for continuances now. Because we were not noticed of it. We have not investigated these jail allegations.

THE COURT: Well, that's another point. If you gave them notice on yesterday of the jail allegations --

MR. VICK: No, sir. I told everybody, in fact I told Mr. White specifically, we talked about the scalding incident some weeks ago.

MR. BAUGH: Scalding?

MR. VICK: I handed to defense counsel the day we started trial the records we had gotten the day before from the jail. Each and every one of

these.

MR. BAUGH: No, no, wait. Time out. The only record I was handed the first day of trial was my client's rap sheet, and I was not told it was the copy. I thought it was my copy. I looked through, there was nothing in there I hadn't seen before, and it went in the piles of paper we have in this case.

MR. VICK: As a matter of fact, most of the items that we will intend to offer into evidence against Mr. Baugh's client came from the materials Mr. Baugh provided us as discovery from the defendant. I would also note, Your Honor, that as I stand here today, I have yet to receive -- we got notice of a videotape to be put on by them last night.

THE COURT: We have to resolve this other issue first. You gave this stuff about what happened at the jail to Mr. Baugh?

MR. VICK: I handed it over to the defense table in a single packet.

MR. PARCELL: If I may, we gave them -- I had certified copies of all of Mr. Roane's convictions, his rap sheet, and all his jail offenses in the same folder. And we gave it to David on Monday, the first day of trial.

MR. BAUGH: I did not get a folder. What I got was stapled and it was not in a folder.

MR. VICK: We handed that over to the defense table saying, "Look at this."

MR. BAUGH: It is still on the defense table then.

MR. COOLEY: We have all been lumped together as "they." And the statute says, and the order says, that we were to receive the things for us. We haven't seen it, period. I don't know if it ended up with David --

MR. BAUGH: I know I didn't get it.

MR. VICK: As to Cory Johnson, there is almost nothing as to institutional behavior that's of any consequence. James Roane has had several assaults. Tipton has.

THE COURT: As far as I'm concerned, you can use the stuff against James Roane if you handed it to --

MR. BAUGH: I did not get it.

MR. VICK: You provided it back to me in your discovery.

MR. BAUGH: I provided it back to you?

MR. VICK: Yes. I grabbed from your discovery copies of his institutional record.

MR. BAUGH: We got his institutional records. I didn't get it from you, but I did not

know that the United States was going to -- we did not investigate allegations of his conduct in the Richmond City Jail, period. Because I did not know until this moment that it was going to be an issue and that it was going to be offered as aggravation.

MR. VICK: It was handed over to the defense table.

MR. WHITE: We would liken it to the situation with regard to the victim impact testimony. Future dangerousness is clearly a statutory predicate under the state statute.

THE COURT: It is in the state statute.

3285

MR. WHITE: But there is no notice. If they were going to use this, they have to put us on notice. It has to be a reasonable notice in advance of trial.

MR. VICK: That's not in the statute.

MR. WHITE: It is exactly in the statute.

MR. BAUGH: Don't argue person to person, gentlemen.

MR. WHITE: The statute, Subsection 8 of 21 U.S.C. 848 clearly provides that the government has to provide reasonable notice in advance of trial. And my recollection is that the Court denied the government's intention to use victim impact testimony, indicated in its order that they were not going to be allowed to do that because they did not notice it in advance of trial. And that's what I think the hallmark of the whole situation is. Statutory, official notice that satisfies due process requirements. We don't have it. And these allegations, what concerns me as much as the notice provisions, Judge, is that we are dealing with unadjudicated criminal conduct.

MR. VICK: Which they can rebut.

MR. WHITE: Precision and reliability at the capital sentencing stage, as the Supreme Court

3286

has discussed over and over again, this proffer on the part of the government simply doesn't satisfy it. I can understand where Mr. Vick is coming from, but in terms the statute, the Supreme Court case law, it doesn't cut the mustard at this stage of the proceedings.

MR. VICK: There are two issues here. The first issue is the overall issue of ability to argue future dangerousness. There is already evidence of that before this jury. They are the sentencers in this case sitting as you would sit if you were the sentencer. It is a proper consideration for the finder of fact and the sentencer in this case. Subsection B of that same problem would in essence be what defendants decry as lack of notice on the jail,

in the institutional proceedings.  Indeed, we provided that to the defense counsel the day we got those items.  And this can't be a surprise to defense counsel.  Each and every one of them has known that their clients have institutional problems.  That's well-within the scope of their knowledge.  I do not have to provide under the general rules of discovery something to them that is within their own purview and knowledge.  Mr. Baugh has proven that by handing back to me institutional records in his discovery

3287

matters.

MR. BAUGH:  I'm not talking about the records.  I'm talking about notice.

THE COURT:  Hold up.  I'm not going to allow any presentation or argument on the issue of future dangerousness, period.  I just believe if you were going to use it, you should have given notice.

MR. VICK:  Could I provide the Court with the Senate  --

THE COURT:  No.

MR. VICK:  I just tried to rely on the law here, and the law was clear as to specific aggravating factors.  A specific aggravating factor, but a general sentencing scheme, just like the heinousness of the offense is future dangerousness.  I won't touch the jail records.  But I have the right to argue to this jury that these people will continue to try to kill people from the jail as the evidence is already before them.

THE COURT:  The evidence will have to speak for itself.

MR. VICK:  I'll stick to the evidence that's already before them.

MR. GEARY:  I want the Court to make sure you enforce this ruling.

3288

MR. BAUGH:  This is going to happen.  We have had several of these.

MR. VICK:  I'm so tired of my personal integrity being called into question.

THE COURT:  This is not about your personal integrity.  I believe that if you were going to use future dangerousness, it is an aggravating factor.  And you did not notice it.  You are not going to be able to use it.

MR. VICK:  Judge, as I bifurcated my argument, does that mean in general or as to the jail records?  I understand it is to the jail records, but general sentencing scheme, Your Honor, that's something that's properly argued to this jury.

MR. BAUGH:  It has to be relevant to one of the notices.  The only rule of evidence that applies is relevance.  That's the only rule of evidence under

the rules.

THE COURT:  I'm not going to let you do it.

MR. VICK:  I respectfully  --  I know I have no sanction here.  There is nothing I can do.  But if the Court would take the time to read the Senate Minutes concerning federal death penalty laws, it is clear that the Senate considered future

3289

dangerousness also as part of the general sentencing concept, not a specific aggravating factor.

THE COURT:  I'm not going to let you do it without notice.

MR. BAUGH:  Knowing the Court's position on instructions, our support people have prepared some penalty phase instructions which I would now tender to the Court, and maybe they can be of assistance.

MR. COOLEY:  Ours will be filed later today.

MR. BAUGH:  I think the Court will find them helpful.

THE COURT:  All right.

MR. PARCELL:  May I ask a question?

THE COURT:  Go ahead.

MR. PARCELL:  If we have witnesses who we plan to call today who will tell us that in the past six to nine months they have overheard different inmates, one of these three defendants, talking about having witnesses or police officers killed, are we prohibited from using that evidence in this phase, too?

MR. McGARVEY:  Under which aggravator?

MR. VICK:  Conspired to kill people other than the people named in the indictment.

3290

MR. COOLEY:  Past tense phrase in the notice.

MR. GEARY:  The aggravator says during this conspiracy.

MR. VICK:  The conspiracy continues.

MR. BAUGH:  Yes, please.

THE COURT:  I don't have any problem with that kind of evidence.

MR. BAUGH:  Then we would move for a continuance, because this is the first time, first -- I've never seen anything on this.  I mean, there was no packet even alleged being said about this.  Number two, we have no notice.  Under JARRETT there is a whole new standard, and if you let that in we ask for tender and we need a continuance so we can defend it and check out the people who gave this information up.  Credibility of witnesses is going to be a plea.  Possibly there are GIGLIO problems.

MR. VICK:  The Court ruled that I did not

240a

have to give the substance of the testimony of the witnesses that we were going to bring forward. There are no documents about this other than the documents that have already been provided them and the letter from Maurice Saunders, which was provided --

THE COURT: No, I would allow it and I will

3291

not grant a continuance.

MR. BAUGH: We would ask then, before we put it on, that we be tendered enough information at this time so we can depend on it. You are catching this cold. We don't know what they are talking about. And that presumption of innocence thing entitles us not to know that. We have no idea. We have asked for tender today.

MR. VICK: We will proffer it right this minute. We will call Maurice Saunders to indicate that indeed the letter which is in evidence, that that letter has a very specific threat in there that if Hussone Jones -- it was written to him by Tipton -- if Hussone Jones and "Man-Man" testify, that they will be visited; i.e., they will be killed for their testimony. We have Rodney Tucker, who will testify that based upon being in the jail cell with "C.O.," he knows that "C.O." was conspiring to kill Valerie Butler because she gave him up, and C.T. Woody because of his testimony at the bond hearing.

MR. McGARVEY: In the jail cell?

MR. VICK: Yes. I can't say the exact cell, but on the same tier.

MR. McGARVEY: I understand.

MR. VICK: We have an individual, what's

3292

his name, Buddy --

MR. PARCELL: Paris Robinson, who will tell us that he was in Henrico with James Roane back in the summer, he thinks June or July of 1992, and Roane told him, he thought he was getting out of his city charge. And Roane asked him to kill Ronita Rochelle Hollman because she was testifying against him. He offered him between $10,000 and $15,000 He couldn't remember the exact amount.

MR. GEARY: These are all witnesses now --

MR. BAUGH: They aren't even on the list.

MR. GEARY: Ten days before this proceeding we were entitled to this.

MR. BAUGH: We were given the death list last week. We met in my office yesterday and went down the list of witnesses trying to figure out who he was what so we could carve out some notice, and none of these are on the list. Tucker is on the list.

MR. VICK: Maurice Saunders is.

MR. PARCELL:  Paris Robinson is, too.

MR. GEARY:  Not on mine.  I only saw seven names on there, too.

MR. PARCELL:  After that, Robinson wrote

3293

Rochelle Hollman a letter telling her to watch her back because she might have some problems.

MR. McGARVEY:  Who wrote this?

MR. PARCELL:  Paris.  We got the letter last Wednesday.  We finally found him and interviewed him this past Friday.

(List proffered to Court.)

MR. PARCELL:  There is another one, Mr. Seward, S-E-W-A-R-D, Willie Seward.

THE COURT:  When did you get Seward?

MR. VICK:  He won't be testifying, Mr. Seward, I don't believe.

MR. PARCELL:  Seward would tell us that he was locked up in Richmond City Jail.  We talked to him last Tuesday for the first time.  He will tell us that he has a girlfriend outside who has three-way phone calls.  Richard Tipton used his phone to make three-way phone calls to different people.  He called three people: Sandy, he gave us her home and work number; Robert, Jr., and Eric White, and had all the numbers on there and he said that he overheard Tipton wanting to have Woody killed.

MR. WHITE:  What?

MR. PARCELL:  And someone else.

MR. VICK:  That came to us.  That witness

3294

approached us last week.

MR. WHITE:  Is he saying that a three-way conversation of this nature took place over my office telephone?

MR. PARCELL:  No.

MR. VICK:  No.  That you were one of the three numbers that they used.  You had nothing to do with this.

MR. WHITE:  Thank you very much.

MR. PARCELL:  We told you that last night.

MR. WHITE:  I was not aware of the details of what the conversations were all about.  Well, Judge, with respect to this kind of information, they were able to get telephone records from the jail.

MR. VICK:  That's not correct.

MR. PARCELL:  He wrote the numbers down and gave them to us on a piece of paper.

MR. VICK:  I would also note that we have, as we stand here, received nothing from the defendants, yet.  And although the Court entered its discovery order, we have not received -- Mr. Baugh handed me a packet of stuff about two or three days prior to the ending of the trial.

242a

MR. BAUGH:  That's not true.

THE COURT:  All right.  We are going to quit tit-for-tatting.  The information I have heard this morning coming just a few minutes ago, I don't have any problem with any of that.  If you all care to interview these witnesses that aren't on the list, then fine.

MR. BAUGH:  Ten-day notice.  We don't have our ten days' notice on these witnesses.  They are not on any list.  They weren't on the first list, not on the second list.

MR. VICK:  Maurice Saunders is.

MR. BAUGH:  We are not talking about Saunders and Tucker.  We were just told that Mr. Paris is on the list, and I just showed you the list and he is not there, Your Honor.

THE COURT:  This is what?

MR. BAUGH:  Paris Robinson and Seward.  They are not on the list.  There is the list right there.  We got it last week and we met on it.

(Document displayed to Court.)

THE COURT:  When did you get the list?

MR. BAUGH:  Last week.

MR. WHITE:  Faxed to us on Thursday or Friday.

MR. PARCELL:  We spent two days trying to track Robinson down through the Department of Corrections.  We didn't get his name until we talked to Ms. Hollman on Thursday.

MR. VICK:  We found him Saturday.

MR. BAUGH:  There are no faxes on my thing as of this morning, because we checked it.

MR. PARCELL:  Detective Fleming and I finally found him Friday afternoon.  We notified Pam to get him writted here.

THE COURT:  That's the best I can do for you.  If he found him on Friday, you are getting notice today.  So what would you have me do about it?

MR. BAUGH:  Move for a continuance for a week so we can investigate these allegations.  You see, because there is no Sixth Amendment notice thing in here other than what we are getting now.  We are going to have to go find the exact nature of the allegation and investigate backwards and try to get it.  What tier he was on, who else was there.  It is very difficult doing this without notice, and we need time to do it.  We are talking the death penalty phase here.

MR. GEARY:  Ronita Hollman, the government has had her for nine months.  If they wanted to get the conduct from her months ago, they could have done

3297

it and not run around and say to the defense, "We can't give it to you until today because we didn't have it until yesterday." These are people they had all along.

MR. WHITE: This is one of the reasons we filed the motion for the proffer, so we could get through all of these problems. With regard to Saunders --

MR. VICK: I got a proffer last night at 8:30.

MR. WHITE: Excuse me, please. What Mr. Vick is talking about doing is explaining a letter which, based on our objection at the trial, you sustained. In other words, they wanted Maurice Saunders to explain this letter. We objected to it and the Court sustained it saying that the letter speaks for itself. Maurice Saunders talked about this conversation about killing he had with Tipton. Anything other than that should be objectionable. He should not be allowed to go back through this at the guilt stage.

THE COURT: That objection will be overruled. We are not going to be continued. We are going forward today. These two witnesses who do not appear on the list, I'm going to require you, Mr.

3298

Vick, to wait before putting them on. Let's see, this is Monday. One day each. You are going to have to call them out of order and give them at least a few days to do whatever they can do with it. But the other folks on the list can be called and testify as they are going to testify.

MR. BAUGH: Can we have the 6's or other documents pertaining to the allegations by these guys, or somebody's notes as to what the allegations are?

THE COURT: Whatever you have, give them.

MR. VICK: The only notes we have are attorney notes.

MR. BAUGH: We will accept them.

MR. VICK: We have no obligation to give attorney notes.

MR. BAUGH: Then we would move for notice.

MR. VICK: I'll give them my witness notes.

MR. BAUGH: You are talking about investigation. Our time is sort of limited, you know? I mean, we have witnesses we have to line up. We are still working on exhibits.

THE COURT: You do the best you can. We are going to get started in a few minutes.

3299

MR. COOLEY: Can we join the motions?

244a

MR. BAUGH: I have to object.

THE COURT: The objections are noted and overruled.

MR. WHITE: I think we had some other motions there. You stopped on the future dangerousness, Judge. I think we resolved that one.

THE COURT: You had a motion to dismiss Tipton, Non-statutory Aggravator Number 1. That motion will be denied. A motion to dismiss Non-statutory Aggravator Number 3, that defendant recruited a minor to participate with him.

MR. VICK: It is already before the jury.

THE COURT: In the murders. As it relates to the capital offenses that Tipton has been accused of, there is no recruiting of a minor involved.

MR. VICK: It would come in under Count One, the overall conspiracy, and Count Two, the CCE. "E.B." was clearly one of the people. He is the juvenile, clearly one of the people who came down from New York and took part in the murders. He took part in the murder of Peyton Maurice Johnson, and that's clearly before the jury. Now, Mr. Tipton, although not charged with that specific murder, we can properly argue to the jury that this overall conspiracy caused a number -- caused the murders that flowed from all of this activity, Your Honor, including the Peyton Maurice Johnson murder.

THE COURT: All right. What about the three individuals --

MR. WHITE: Are you going to let the minor stuff in this? There is no evidence that the minor was involved in any of these three, and it sounds like the government is proceeding on an aiding and abetting theory, which has no place.

THE COURT: It is already before the jury and I don't have any problem with it. The three individual woundings --

MR. BAUGH: Where is the evidence that any of these defendants recruited "E.B." to be in the group? Remember, it has to be recruited. Some adult must lure a juvenile into activity.

THE COURT: That's what the government has to prove. They have got a burden to prove that.

MR. BAUGH: To show recruitment. All right.

THE COURT: Motion to dismiss Non-statutory Aggravator Number 5, the defendant Tipton committed the rape, that motion will be denied. Motion to dismiss Non-statutory Aggravator Number 6, that defendant Tipton was knowingly and willfully a member of the conspiracy, et cetera, that motion will be denied.

MR. WHITE:  Your Honor, if I could just make one comment on that.  If there is something other than Katrina Rozier in that, what is it that the government -- you have already indicated that they can't mention Katrina Rozier.  What else is there that there could possibly be?  There are no other murders that have been contemplated by this conspiracy.

MR. VICK:  The murders that Tipton was not charged with, Your Honor.

THE COURT:  We don't need argument on that.  Motion to dismiss Statutory Aggravator Number 1 relating to Tipton intentionally killed the victim, et cetera, that will be denied.  All right.  That's the end of that.

MR. WHITE:  Judge, I think there was one I recall about the criminal history.  You indicated they can't use future dangerousness.  What about the unadjudicated criminal conduct in terms of his having a substantial criminal history?  Seems to me that that's unadjudicated criminal conduct.  It is not something that's ever been fully tried.

THE COURT:  Mr. Vick?

MR. VICK:  It just got tried.  That's the evidence in front of the jury.  There is no  --  we have no  --

MR. GEARY:  One arrest.

MR. VICK:  He has no prior felony convictions that we will be introducing into evidence, unlike Roane and Johnson.

MR. WHITE:  What are you introducing against Mr. Tipton?  What's the evidence you offer in terms of the substantial criminal history other than that which is encompassed by this conspiracy?

MR. VICK:  That's what we will be arguing, that which is encompassed by this conspiracy, which is more than is charged in the indictment.

THE COURT:  I don't have any problem with that.

MR. WHITE:  Note our exceptions, please?

MR. BAUGH:  Yes.  Please, Your Honor.

THE COURT:  All right, let's go.

(Recess taken from 10:25 a.m. to 10:35 a.m.)

(In Open Court.)

THE CLERK:  Case Number 92CV68: United States of America versus Richard Tipton, Cory Johnson and James H. Roane, Jr., the eighteenth day of trial.  Are counsel ready to proceed?

MR. VICK:  The government is ready to proceed, Your Honor.

MR. GEARY:  Defendant Tipton is prepared, with one short matter to take up.

MR. COOLEY:  Defendant Johnson is prepared.

MR. BAUGH:  Defendant Roane would reurge his motion for continuance.  We have just been tendered another witness list with three additional people on it when we came up just now.

THE COURT:  All right.

MR. VICK:  That's what we covered in chambers.

MR. BAUGH:  Your Honor, Al Roehm, R-O-E-H-M, was not mentioned in your chambers.

MR. VICK:  He has to do with the jail records.  The Court ruled on that.

THE COURT:  Mr. Geary, you and Mr. Vick can come up if you would like.

(At Bench.)

MR. GEARY:  On behalf of Tipton, we would like to renew the severance motion filed to sever the death penalty phases from defendants Johnson and Roane for reasons previously stated, and also because

3304

of reasons given this morning in motions we filed, and also in regard to what the government plans to offer against all three this morning.  I'd like to urge the Court, the MOLINA trial is going on in Oklahoma.  That's a federal capital murder case with three defendants, also.  Preliminarily, the Judge ruled that they will be sequential until they get to the death stage.  We would ask the Court to consider sequential sentencing in this case.  Tipton first, then Johnson, and Roane.

MR. BAUGH:  In light of the information we were tendered this morning, Your Honor, and for individualized attention, we would join in that motion that we have.  One, we would reurge the motion for continuance.  Secondly, we would ask for sequential verdicts of life or death.  Yes, we would definitely.  In light of the notices, I don't know all this stuff they are going to bring out against Mr. Tipton and Johnson.  I don't think their counsel knows, and they can't tell us.  But because of the spillover effect -- this is a death penalty case in this phase -- we would strenuously reurge severance or have separate, distinct verdicts in sequential presentation.

THE COURT:  All right, the motion will be

3305

denied.

MR. BAUGH:  Also, Judy Payne, Number 8, has been added.  Lieutenant Al Roehm has been added from the Richmond City Jail.  We don't have any incident reports from Richmond City Jail.

MR. VICK:  You gave them to me.

MR. BAUGH:  If those are the only records,

no problem.  We just finished a long motion downstairs, a very emotional motion, between other counsel.  And the Court made some very specific rulings.  And they just did it again, Your Honor.  We can't defend like this.  This is a death penalty case.  This is trial by ambush.

MR. VICK:  Ms. Reid is here to authenticate the prior criminal records.  We intend to offer them without calling her.  But if we need to call her, we will.  As to Mr. Roehm, he is here to verify that the institutional records are indeed the institutional records that they keep, just a custodian witness, not to offer specific evidence.

THE COURT:  Your objection is noted.  Let's go.

MR. McGARVEY:  Defendant Johnson  --

MR. VICK:  Just so I understand, we can't get into the prior institutional conduct of Cory

3306

Johnson and Richard Tipton because of notice; is that correct?

THE COURT:  That's right.

MR. BAUGH:  James Roane?

MR. VICK:  As to Mr. Roane, we got the documents of his institutional record from Mr. Baugh.  He clearly had notice.

MR. BAUGH:  Your Honor, no, it isn't a question of whether we knew the acts occurred.  The question is had we been noticed that they were going to be issues on the death case, and we have not been.

THE COURT:  Forget about the institutional records.

All right, let's bring in the jury, please.

(The jury entered the courtroom.)

Good morning, ladies and gentlemen.  Today, we begin the second phase of this criminal trial, the sentencing or penalty phase.  As I told you when you were selected as jurors, the purpose of this hearing is to determine whether or not a sentence of death shall be imposed against any of the individual defendants: Mr. Richard Tipton, Mr. Cory Johnson, and Mr. James H. Roane, Jr., who you have convicted of the capital crime of murder while engaged in or in

3307

furtherance of a Continuing Criminal Enterprise.

It is the government that bears the burden of persuading you beyond a reasonable doubt that a sentence of death is justified as to each defendant. If the government does not so persuade each and every one of you, you must return a decision against capital punishment.

The decision whether or not to impose a death sentence as to a given defendant is, by law, left

exclusively to you, the jury. Your decision as to each defendant will be final. I will not be able to change it. You and you alone must resolve the question of whether each defendant lives or dies. Obviously, it is impossible for me to overstate the importance of the decision before you or the care and thoroughness that you must give to this matter.

Now, as I mentioned earlier, the purpose of this hearing is to consider whether or not the death penalty should be imposed. That is this hearing's only purpose.

As you recall, you also convicted these defendants of various non-capital offenses, including conspiracy, firearms charges, drug charges, and non-capital murder. The sentence to be imposed as to these non-capital offenses is left by law to the

3308

Court; that is, to me. You may have noticed that the fourth defendant in this case, Ms. Sandra Reavis, is not with us this morning. Again, this is because she was convicted only of conspiracy, a non-capital crime. She will be sentenced by the Court at a later date.

Before the parties begin their presentations, I will give you a brief overview of the applicable law. I will, of course, give you complete instructions on the law at the conclusion of the hearing.

I remind you that at the time you were selected as jurors, each of you assured me that if this case required a capital punishment hearing, you would follow the law as I will explain it to you. It is imperative that you do just that. Although Congress has left to juries the decision whether a defendant convicted of a Continuing Criminal Enterprise murder should be executed, Congress also has specifically narrowed and channeled your discretion by requiring certain findings to be made before the death penalty even may be considered. Thus, you are not free to substitute your own views about circumstances that might warrant capital punishment for those specific circumstances defined by Congress.

3309

On the other hand, you must clearly understand that even if you do make the findings required by law as prerequisites to the imposition of the death penalty, no jury is ever required to impose the death penalty.

Now, the applicable law limits consideration of the death penalty to cases in which the government can prove beyond a reasonable doubt certain aggravating factors drawn from two specific statutory categories. Aggravating factors are circumstances about a capital crime or about the character and

background of the defendant that would tend to support the imposition of the death penalty. Only if you are unanimously persuaded beyond a reasonable doubt that at least one aggravating factor for each of the two statutory categories has been proven as to a particular defendant and a particular capital crime, can you go on to consider the possibility of imposing the death penalty on that defendant.

In this case, from the first of these two statutory categories, the government alleges as an aggravating factor, first, that each of these defendants intentionally killed the victims of each capital murder for which he has been convicted. The government also alleges in this first category that each defendant intentionally inflicted serious bodily harm which resulted in the death of his victims. Third, that each defendant intentionally engaged in conduct intending that his victim be killed or that lethal force be employed against his victims which resulted in the death of the victim. And fourth, that each defendant intentionally engaged in conduct which he knew would create a grave risk of death to a person other than one of the participants in the offense and which resulted in the death of his victims.

You may have noticed that these four factors have one element in common: That the defendant or defendants acted intentionally. I remind you, ladies and gentlemen, that you are required to find that these killings were committed intentionally as a pre-condition to your finding Mr. Tipton, Mr. Johnson, and Mr. Roane guilty of the capital crimes for which you convicted them. Thus, the aggravating factors in this first category simply duplicate an element of the crime itself, the element of intent. The factors in this category do serve, however, to distinguish defendants who intentionally commit murder from those who kill another without the specific mental state.

The second statutory category of aggravating factors -- from the second statutory category of aggravating factors, there is one factor which the government alleges as to each defendant in each capital crime for which that defendant has been convicted. That factor is that the defendant killed his victims after substantial planning and premeditation. In this second category, there are also two other factors which the government alleges as to certain defendants and certain of the capital murders, but not as to all of the defendants or all of the murders. These factors are, first, that a particular murder was committed in an especially

heinous, cruel, or depraved manner in that it involved serious physical abuse to the victim; and second, that in committing certain of these murders, a defendant knowingly created a grave risk of death to one or more persons in addition to his victims.

Now the government also alleges various other aggravating factors which do not fall within the two categories specifically provided for in the statute. You may hear these referred to as non-statutory aggravating factors. You may consider these non-statutory aggravating factors only if you are first unanimously persuaded that at least one aggravating factor in each of the two statutory categories that I just mentioned has been proven as to an individual defendant and an individual capital crime beyond a reasonable doubt. Also, again, not all of these non-statutory factors are alleged against all of these defendants. I remind you that you must consider each defendant individually.

In this case, the non-statutory aggravating factors cited by the government are as follows: First, that a defendant has committed multiple murders; second, that a defendant has a substantial criminal history; third, that a defendant seriously wounded another individual or individuals in the course of committing a murder for which he has been convicted; fourth, that a defendant recruited a minor to participate with him in a murder or murders; fifth, that a defendant was knowingly and willfully a member of a conspiracy which had as one of its goals the murder of individuals other than those for which that defendant has been convicted; and six, that a defendant committed a rape during the course of the conspiracy against the person whose home that defendant had taken over to facilitate the distribution of narcotics.

By law, you may consider only the specific aggravating factors cited by the government. You may not consider any other factor not cited by the government in aggravation of the crime. This may surprise you, but it is a specific requirement of the statutory scheme enacted by Congress. Your oath as jurors obliges you to follow the law.

Now, the sole burden for proving aggravating factors rests with the government, which must persuade you unanimously and beyond a reasonable doubt of any such factor before you can consider it. A defendant does not have to disprove the existence of an aggravating factor. Indeed, the law does not require a defendant to produce any evidence at all at this sentencing hearing. It is the government that must persuade you that the death penalty is justified

as to each individual defendant.  In short, a defendant is not required to prove that he should be allowed to live.

The defendants are, however, permitted, if they wish, to introduce evidence of any mitigating factors that may be present.  Mitigating factors are circumstances that suggest that the death penalty is not appropriate as to a particular defendant.  Mitigating factors, unlike aggravating factors, need be established only by a preponderance of the evidence.  This is a lesser standard of proof under the law than beyond a reasonable doubt.  To establish a fact by a preponderance of the evidence means simply to prove that it is more likely so than not so.  Moreover, any individual juror who is persuaded of the existence of a mitigating factor may weigh it in considering the sentence to be imposed.

Unanimity is not required.  That is, you need not all agree on the existence of a mitigating factor before it can be considered.

In seeking to establish aggravating and mitigating factors, the parties may rely on your recollection of certain evidence presented in the first phase of this trial.  And they need not present that evidence to you again.  Now they may, however, present additional evidence at this hearing specifically related to your consideration of aggravating and mitigating factors.

Now, if you do find aggravating factors to have been proven by the government, whether just the statutory ones required by law, or both statutory and non-statutory aggravating factors -- and in saying this, I am not suggesting that you will or will not so find -- you each must then weigh these aggravating factors against any mitigating factors that you individually believe have been established.  Before you can sentence a defendant to death, you must be unanimously persuaded that the aggravating factors outweigh any mitigating factors sufficiently that a sentence of death is justified.

Even if you do not find that any mitigating factors have been established as to a particular defendant, you must consider whether the aggravating factors standing alone are themselves sufficient to justify a sentence of death.  Absent a unanimous agreement that a sentence of death is justified as to a particular defendant, you cannot impose such a sentence.

I note again that although you cannot return a decision imposing the death penalty absent a unanimous finding of the existence of certain aggravating factors, no jury is ever required to

impose the death penalty, even if it does make such findings. In such a case, the Court would sentence the defendant consistent with the law. In this case, that sentence would be life imprisonment without the possibility of release or parole.

Ladies and gentlemen, I will now call upon the government's representative for the government to make its opening statement. I believe that the

3316

defendants have all opted to reserve making their opening statements prior to their presentations. I remind you that these opening statements, like any other comments by counsel, are not evidence. They may, however, assist you in considering the evidence that will be presented at this hearing. I also ask that during this hearing you continue to observe all of the instructions about your own conduct as jurors that I gave you at the beginning of the trial. Mr. Vick?

MR. VICK: Your Honor, May we approach?

(At Bench.)

MR. VICK: There is, I believe, an incorrect statement that we need to clear up. Each of the defendants was charged with, in the commission of the enunciated offenses in the indictment, defendant Roane created a great risk of danger to one of the persons in addition to the victim of the offense. You said the government did not charge each to premeditation. I'll just cover it in my opening.

THE COURT: You can clear it up.

MR. WHITE: It is a minor issue.

(In Open Court.)

MR. VICK: Your Honor, we would he ask for a rule on witnesses.

3317

THE COURT: All the people anticipating being called as witnesses in this case will have to be excluded at this time.

(Witnesses left the courtroom.)

MR. VICK: Good morning again, ladies and gentlemen. You are fairly used to the routine now. This is my opportunity to give you opening statement on this phase of the trial. And as you are well aware, I'm sure as you have done much thinking, this is that penalty portion of the trial where you will determine whether indeed the imposition of the death penalty against these three defendants is the proper penalty, the appropriate penalty, given the actions that these defendants have been found guilty of.

As the Court stated to you in its instructions to you, the government's evidence here need not be reproduced. Indeed, we shall not reproduce the evidence that you heard over the last several weeks in this phase. We will move that evidence all back

in front of you so that you can consider it, and indeed that is what you shall consider. The government therefore will be putting on very few witnesses in this phase. Indeed, the government's case will be finished today.

The government's seeking of the imposition of

3318

the death penalty rests primarily upon the evidence you have already heard, the evidence of the death of ten people, the evidence of the severe wounding of others, the evidence of the conspiracy to kill even more than those who were killed and those who were wounded. That evidence is before you. It is properly considered by you. And it is the basis upon which the government suggests that you should indeed render decisions that Mr. Richard Tipton, "Whitey," should be placed to death; Mr. Cory Johnson, "C.O.," should be placed to death; and Mr. James Roane, "J.R.," should be placed to death.

I'd like to outline for you in a little more detail than the Court did the specific aggravating factors that will be enunciated as to each one of the defendants, beginning with Mr. Richard Tipton. There has been filed in this case, and Mr. Tipton has received it, a notice of the government's intention to seek the death penalty here. It is much like the indictment. It provides statements of what the government will prove in order to justify the imposition of the death penalty in this case. And Mr. Tipton has received that, and indeed you will probably receive it and can render your decision based upon it.

3319

In rendering your decision, the law is clear that you must find at least two statutory aggravating factors to be in existence here. You must find one from the first set of aggravating factors and you must find one from a second set of aggravating factors that are enunciated in the statute, 21 U.S.C. Section 848. In the death notice as to each defendant, you will see --

MR. BAUGH: I hesitate to rise, but this is not painting factual allegations, which the opening is limited to. Counsel is arguing nothing but law.

THE COURT: Overruled.

MR. VICK: As to each one of the defendants in the death notice, you will notice that it has been noticed to them that the defendant intentionally killed the victim; that the defendant intentionally inflicted serious bodily injury which resulted in the death of a victim; that the defendant intentionally engaged in conduct intending the victim to be killed or that lethal force be employed against the victim which resulted in the death of the victim; and the

254a

fourth charged under that provision, that the defendant intentionally engaged in conduct which the defendant knew would create a grave risk of death to a person other than one of the participants in the offense and which resulted in the death of a victim.

Now, when you get the death notice, understand that each one of those first four allegations in the death notice is part of that first grouping of aggravating factors that you must find as to each defendant to be in existence. The evidence before you, ladies and gentlemen, is clear and has been proven beyond a reasonable doubt, each one of those items. Remind yourself of the evidence. The evidence is clear, and you have so found that it has been proven beyond a reasonable doubt that the defendant intentionally killed a victim, each one of these respective defendants. The evidence is clear, and I will tell you that to a certain extent these provisions are duplicative. They might overlap. That doesn't matter. That's perfectly proper, and indeed the same evidence might satisfy each one of these provisions. And the evidence is abundantly clear that each of these defendants has intentionally inflicted serious bodily injury which resulted in the --

MR. WHITE: I object, because it is a misstatement of the law. I think Mr. Vick is relying on aiding and abetting, which establishes criminal liability. It does not establish proof as to a statutory aggravator.

MR. BAUGH: We reurge the objection in that he is arguing law and not facts.

MR. VICK: I'm arguing facts.

THE COURT: The objection is overruled. Let's get on to what you are going to show.

MR. VICK: This is what I am showing. This is the evidence in the case, and I am reacquainting the jury with the evidence they have heard over the last four weeks.

The third is that the defendant intentionally engaged in conduct intending that the victim be killed or that lethal force be employed. That has been proven to you as to each one of these defendants.

MR. BAUGH: Counsel is arguing conclusions. He is not asserting evidence and this is an opening.

THE COURT: Objection overruled.

MR. VICK: Again, I remind you, ladies and gentlemen, the government does not need to come forward and reprove each one of these items that we have already proven to you in the initial trial.

Those matters are matters of evidence upon which you have rendered your verdict and are matters of

3322

evidence that you can consider at this point when rendering your sentencing decision. As to the fourth, that each defendant intentionally engaged in conduct which the defendant knew would create a grave risk of death to the person other than one of the participants in the offense, each of these defendants has been shown to be guilty of such an offense. I'll remind you, for example, in the case of James Roane that he has indeed inflicted serious bodily injury upon people other than the participants in the offenses: Martha McCoy. And that's properly considered by you. As to defendant Richard Tipton and Cory Johnson, they inflicted serious bodily injury upon Gwen and Priscilla Greene.

MR. GEARY: I don't hesitate to rise. This is a closing argument.

MR. VICK: In order to satisfy the law, I must reacquaint them with how the evidence fits into the statute.

THE COURT: The objection is overruled.

MR. VICK: Those first four factors, ladies and gentlemen, you need to find the existence of at least one of those first four factors in order to render a verdict of guilty. I suggest to you that based upon the evidence that you have heard and based

3323

upon those factors, it is clear that each four of those factors have been satisfied by the evidence already presented concerning each one of the defendants.

The second set of factors the Court also read to you, and you need to find from the second set of factors, beginning with Number 5 on the death notices as to each defendant, that at least one of those factors exists in each one of the defendant's cases.

As the Court noted, each defendant has been charged with committing the offenses in the indictment after substantial planning and premeditation. We will not put on additional evidence as to substantial planning and premeditation. You heard weeks of evidence concerning substantial planning and premeditation. And the government has already satisfied its burden there, and I would remind you of the evidence that you have heard concerning substantial planning and premeditation. Remember, it began with the very first witness, who said that the New York Boyz would resort to violence in order to take over a certain area. And indeed, that came true here in the City of Richmond when the New York Boyz --

MR. GEARY: That has nothing to do with any

3324

aggravator in this case.

THE COURT:  The objection is overruled.

MR. VICK:  When the New York Boyz came here and indeed decided to take over the Newtowne area and lay bodies in the street, as Richard Tipton and James Roane told Ronita Hollman, if necessary, in order to take over the drug business in the Newtowne area.

Substantial premeditation is existing in their thought process.  Planning was existing in their thought process when they intended to take over that area.  But as to each particular murder charged in the indictment, the evidence is also clear and is already before you that they substantially planned and premeditated each one of those murders.  Remind yourself of the fact that they indeed went on January 14th and bought firearms with the aid of Pam Williams.  Why?  So they could kill people.  They were planning and premeditating.  Remind yourself that again on February 5th, 1992  --

MR. GEARY:  That's the thirteenth time he has used the word "they."

MR. BAUGH:  In light of the JERIK decision, we would object to this broad brush.

THE COURT:  That will be sustained.  Be specific.

3325

MR. VICK:  Remind yourself that on January 14th, defendant James Roane, along with Cory Johnson, went with Pam Williams and bought weapons, and that shortly after buying those weapons, that Mr. Richard Tipton showed up at the Norton Street house and played with those weapons along with the other people, and that those weapons were accessible only to the core members of this group: to James Roane, to "C.O.," to "Whitey," and that those weapons were used to kill a number of people.  Planning and premeditation.

Remind yourself that on February 5th, 1992, Mr. Cory Johnson and Mr. Richard Tipton got together with Charlotte Denise Moore to purchase more weapons because indeed their weapons had been seized by the police at 1212 West Moore Street on February 2nd, 1992.  Further premeditation and planning.  Indeed, those weapons purchased on February 5th were used for the killing down at Stony Run of Linwood Chiles and Curt Thorne and the wounding of Gwen and Priscilla Greene.  Clear planning and premeditation.  Remind yourself that prior to each and every one of these murders, they went and retrieved those weapons and they went back and killed the people that they intended to kill.

3326

Remind yourself of the evidence concerning the

shooting of Peyton Maurice Johnson and of Doug Moody, of the fact that they would go and retrieve weapons. In Doug Moody's case, they went and retrieved the knife to be used that "Pepsi" had stored, the same knife that they had gone and gotten to kill Doug Talley --

MR. GEARY:  Fourteenth time for "they," Judge.

MR. VICK:  -- that Richard Tipton had used to kill Doug Talley.  Remind yourself that Richard Tipton had planned and premeditated the murder of Doug Talley when he asked Hussone Jones to follow him, and he and James Roane together went over in South Richmond, got out of the car, went and talked, and went back to the car where Doug Talley was riding and stabbed him.  And Richard Tipton stabbed him 84 times.  Remind yourself, clear planning and premeditation.  Clear planning and premeditation as to the murder of Doug Moody.  Remind yourself of the testimony that James Roane came and got the knife from "Pepsi" that was used to kill Doug Moody.  Clear planning and premeditation as to the murder of Peyton Maurice Johnson.  Remind yourself of the testimony that indeed they came and got the guns, went and

searched down Peyton Maurice Johnson.  James Roane searched him down, found him in the residence of Stanley Smithers, and "C.O." and "E.B.," the juvenile, came in and blew Peyton Maurice Johnson away.

Remind yourself of the planning and premeditation that went into the triple homicide that occurred in Church Hill, of the clear thinking that it was necessary to find "Mousey" Armstrong and kill her, "because the bitch knew too much," according to Cory Johnson.  And the use of Jerry Gaiters to find her and mow her down, along with the two innocent victims that were there and died only because of their presence with "Mousey" Armstrong.  Clear planning and premeditation of that murder.

Remind yourself of the testimony about the February 19th  --

MR. BAUGH:  I must object.  My client has not been charged nor found guilty.  Again by inference, he was implicated in premeditation of that offense, and I object to it.

THE COURT:  The objection is overruled. Just go on.

MR. VICK:  Remind yourself of the testimony about the February 19th, 1992 killings of Linwood

Chiles and Curt Thorne, clear planning and premeditation.  Cory Johnson indeed got those people to an area that he wanted to have them in so he could

kill them.  Richard Tipton came and aided him.  Clear planning and premeditation.  Remember the testimony of Charles Townes that indeed Richard Tipton was beeped previously that day by Cory Johnson and told that he had those people with him.  Clear planning and premeditation.

Now as to other aggravating factors, and I won't enunciate them in as great detail, but they are clear here, too.  It is clear that in the commission of these offenses the defendants, each of them individually and respectively, created a grave risk of danger to one or more persons in addition to the victims of the offense.  It is clear that this conspiracy intended, which is one of the statutory non-aggravating factors that's been alleged as to each and every defendant, it is clear that this conspiracy, these men, intended and conspired to kill people other than the people that have been brought before you having shown to have been killed by these people.  It is clear that each one of them intended to kill other people to hide this conspiracy.  They intended to kill Martha McCoy and her children because they survived and were witnesses.  They intended to kill  --

MR. WHITE:  Objection to "they."

MR. VICK:  The conspiracy, ladies and gentlemen  --

MR. WHITE:  Objection to "the conspiracy," Your Honor.  This is individualized consideration.

MR. BAUGH:  That's right.

THE COURT:  The objection is overruled.

MR. VICK:  These people have been charged in the death notice with engaging in a conspiracy, one of the objects of which was to kill people other than the people enunciated in the indictment.  And you can properly consider all of those people.

Let me tell you, Torrick Brown was killed by "C.O." and by James Roane.  It is not an 848(e) murder.  Remember that.  We went through that at the initial portion of this trial.  It is not charged as a death penalty offense.  But indeed, you have found those men guilty of committing that crime, and that is perfectly permissible consideration for you to have in rendering your penalty phase decision as to whether to place those men to death or not.  It is properly before you to consider the actions that they took on February 1st, 1992 when they shot Torrick Brown and they shot Martha McCoy in front of Martha McCoy's children.  So although it is not charged as a specific death penalty offense, it is properly considered by you, as is each and every bit of other evidence that was put on from that witness stand

259a

concerning the actions of this conspiracy, the actions of these men that have been found guilty of conspiring together.

Remember under the law of conspiracy, they are guilty of each and every one of the acts that they did together.

MR. BAUGH: Objection. You cannot use -- that is a misstatement of the law in a penalty phase on a death case.

THE COURT: Overruled.

MR. VICK: Remind yourself about that. The evidence that we will put on today will be very short-lived. We will call just a few witnesses. We will call witnesses who will establish for you that in addition to the people that they killed, the evidence that you have already heard, that they intended to kill other people. We will call witnesses who will establish that they intended to kill Valerie Butler because of her cooperation with the government. That specifically, Cory Johnson

3331

intended to kill Valerie Butler because of her cooperation with the government. We will establish, call witnesses that will show that they intended to kill -- Cory Johnson and Richard Tipton, "Whitey," intended to kill C.T. Woody because of his testimony against them at the bond hearing in this matter. We will call witnesses that will establish, indeed, that they intended to kill Martha McCoy if she testified, and that they intended to kill, even, Martha McCoy's uncle, because they knew where he lived, if Martha McCoy happened to testify. And we will call a witness that will say that he, too, was threatened by these people with bodily harm if Martha McCoy testified, the boyfriend of Martha McCoy.

They conspired to kill people above and beyond those people killed as alleged in the indictment, and you can properly consider their actions in that regard when rendering your verdict here. You have heard a fair portion of that evidence already in the guilt phase of this trial where you heard that they were going to go back and kill Martha and the witnesses, where you heard that they were going to kill Hussone and "Man-Man." But they conspired to kill more than that, and you will hear evidence as to that.

3332

In reaching your verdict, you must find that the government has proved the aggravating factors alleged in the notices beyond a reasonable doubt. Again I remind you, we will not represent this case to you. We have already proven to you these aggravating factors beyond a reasonable doubt, and most of the aggravating factors listed in the death notices.

Remind yourself of the testimony and you, too, will understand that that has already been shown to you beyond a reasonable doubt.

Each one of these defendants is due individual consideration in your rendering of your verdict. You must determine individually that Richard Tipton deserves to be placed to death for his actions. You must determine that Cory Johnson deserves to be placed to death because of his actions. But I remind you, you can consider, in making that individual determination, the actions and goals of the conspiracy that they willfully and knowingly joined one with each other in rendering that individual determination. You can consider the fact that that conspiracy intended to kill more people than were killed when rendering that verdict. That is proper. You are not constrained to only those specific charges against the defendant, those that are the only charges upon which a penalty of death can be rendered. But you consider all the other facts that have come before you in determining whether a verdict of death should be rendered based upon those specific statutes.

Remind yourself in this process that you are looking at three mass murderers, ladies and gentlemen. Mass murderers.

MR. BAUGH: Objection. This is not opening.

MR. GEARY: When does it stop?

THE COURT: All right, Mr. Vick, wrap this up.

MR. VICK: Yes, sir. The human cost that has been taken by these people is immeasurable.

MR. BAUGH: Again, this is not an opening. That is a summation.

THE COURT: Sustained.

MR. VICK: Ladies and gentlemen, I would suggest to you that there are three reasons that I ask you to consider throughout the rendering of evidence this week concerning the propriety of finding a person should be sentenced to death. Those three considerations are as follows: First, does the death penalty verdict act as a deterrence?

MR. BAUGH: Objection.

THE COURT: Sustained.

MR. GEARY: Outside the aggravators.

MR. VICK: Whether it is the proper punishment.

MR. BAUGH: Objection, Your Honor. Again, that does not go to a factual allegation.

THE COURT: Overruled.

MR. VICK: Whether these defendants deserve

the sentence of death as a punishment based upon what they have done is something that you should consider when listening to the evidence that will be presented here.

Ladies and gentlemen, society has prescribed a sliding rule of sorts as to criminal behavior. Certain criminal acts are charged and punished more strongly --

MR. BAUGH: Objection. Again, this is not opening.

THE COURT: Sustained, Mr. Vick.

MR. VICK: Yes, sir.

MR. VICK: In addition to the evidence of further conspiracy, you will receive other evidence today concerning the fact that Mr. James Roane has a prior criminal record. You will see his prior felony convictions placed in evidence in front of you. You will see the fact that Mr. Cory Johnson also has a prior felony record. You will see those felony records placed in evidence before you. As I said, the government's evidence today will be fairly short. It will not last long. The defense will then proceed to putting on evidence in mitigation; that is, as reasons why you should not place these men to death.

I remind you that you have taken an oath; that your oath is indeed a very strong oath; that your duty is indeed a very strong duty. But the law is clear here: that in certain cases, the death penalty is the proper verdict to render given the actions of defendants. In this case, ladies and gentlemen, given the actions that you have already heard, given the evidence that has already been presented, and the evidence that you will hear presented in the next few days, I would submit to you that the rendering of a verdict of death as to each defendant will be appropriate.

THE COURT: All right.

MR. COOLEY: On behalf of defendant Johnson, we would ask to reserve the right to defer opening statements at this time.

MR. BAUGH: We would join in that motion.

MR. GEARY: Yes, sir.

THE COURT: Mr. Vick, call your first witness.

MR. VICK: The government would call Maurice Saunders.

He is in the Witness Protection Program now. I didn't know if the Court wanted to take the jury out.

THE COURT: There is no problem. Bring him in.

(The witness entered the courtroom.)

All right, Mr. Saunders will be sworn in.

MAURICE SAUNDERS,

called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. VICK:

Q     Could you state your name for the Court, record, and jury, please?

A     Maurice Cornelius Saunders.

Q     You previously testified in this case; is that correct?

A     Yes.

Q     Indeed, you are currently in the Witness Protection Program based upon your testimony; is that correct?

A     Yes.

Q     Now, Mr. Saunders, you obviously, from your testimony earlier, know Mr. Richard Tipton, "Whitey." Is that correct?

A     Yes.

Q     Could the record reflect the identification? Does the Court want to go back through that?

THE COURT:  No, the record will reflect he previously identified Mr. Tipton.

BY MR. VICK:

Q     Did you ever have a conversation with Mr. Richard Tipton wherein he talked to you about the art of killing?

A     Yes.

Q     Could you tell the ladies and gentlemen of the jury about that?

MR. WHITE:  Objection, because it does not relate to any statutory or non-statutory aggravating factor.

THE COURT:  Overruled.

BY MR. VICK:

Q     You may go ahead.

A     He just said there was an art to it and one day he will teach me.

MR. BAUGH:  So I don't waive the point, in the nature of this, we would have a confrontation objection as to this witness testifying with that defendant which could be used against this man.  We cannot confront that man.

THE COURT:  Overruled.

BY MR. VICK:

Q     Exactly how did he tell you he would teach you that?

A     He just said he will show me.  That was it.

Q     Did he ever talk to you about how it felt to

kill somebody?

MR. GEARY:  I object to the leading.  We went through this before.

MR. VICK:  The rules of evidence are suspended at this point.

MR. WHITE:  Asked and answered as well.

THE COURT:  Overruled.

BY MR. VICK:

Q   Did he ever talk to you about what it felt like to kill someone?

A   Sometimes he would.

Q   What would he say?

3339

A   Just was saying not too, you know.

Q   Did he describe the feeling he would get afterwards?

A   No.

Q   Did you ever hear him make a threat to his stepfather?

A   He didn't threaten him --

MR. GEARY:  Objection.  Not based on any aggravator the government has offered.

THE COURT:  Overruled.

BY MR. VICK:

Q   Did you ever hear him make a threat to his stepfather?

A   Yeah.

Q   What was that?

A   One time he got mad because they didn't want him to stay at their house, so he was staying with us.

Q   What did he say?

A   He said --

MR. WHITE:  Objection.  This is not related to any conspiracy.

MR. BAUGH:  Thank you.

MR. WHITE:  This is a personal matter, Judge.

THE COURT:  All right, Mr. Vick, Tipton's

3340

counsel, come up.

(At Bench.)

MR. VICK:  He threatened to kill his father because he put him out of the house, a personal matter like Torrick Brown was a personal matter.

THE COURT:  Sustained.  Go to something relevant.

(In Open Court.)

BY MR. VICK:

Q   If you would look at page three of Government Exhibit 96, please, Mr. Saunders.

A   Yes.

Q   In that, there is language that says  --

MR. WHITE:  Objection.  It speaks for itself.

THE COURT:  Overruled.

BY MR. VICK:

Q    "So find out if they are still hanging out together, okay, and if they are, you know what right, but tell him don't be fooled because if he was in something he will be visited, he will be visited us for good.  So don't be a dummy."  What did you understand Mr. Tipton to mean?

MR. GEARY:  Again, the prosecutor has violated this Court's order, which happened in the first part of the trial.  You sustained our objection, and he is doing it again.

THE COURT:  The objection will be sustained.

MR. VICK:  Your Honor, the language of that letter  --

THE COURT:  The language of the letter is there.  Are you asking the witness to tell you what was in the person's mind?

MR. VICK:  I'm asking, based upon his contact with Mr. Tipton, if he understood what Mr. Tipton meant there.  Yes, sir.

THE COURT:  Sustained.

MR. VICK:  No further questions of Mr. Saunders.

CROSS-EXAMINATION

BY MR. GEARY:

Q    Mr. Saunders, when did these conversations with Richard Tipton take place?

A    It took place maybe two years ago.

Q    Two years ago?  How old were you then?

A    15 going on 16, 16 years old, something like that.

Q    He was about 19 or 20?

A    I don't know his exact age.

Q    You don't know his age?

A    No, he never told me.

Q    How old do you think he is?

A    22, thereabouts, I guess.

Q    He was telling you about murders he had done two years ago, right?

A    Yes.  He would talk about them a lot.

Q    Who was the first person you told about that from the government?

A    Who was the first person?

Q    From the government, that you told about these conversations about murders.

A    I would say Buddy.  I think it was Buddy.

Q    Buddy Parcell?

A    Yes.

Q    You call him by his first name?

A    Yes.

Q    Did he come to you and say, "Maurice, did you ever hear Tipton talk about murders?"  He asked you that, didn't he?

A    Yes.

Q    When was that that he asked you?

A    He asked me that -- I'm not sure what month it was.  It was last year.

Q    Before you testified?

**3343**

A    Yes.

Q    Buddy told you if you helped him he would help you, didn't he?

A    No, he did not.

MR. GEARY:  Nothing further, Judge.

MR. McGARVEY:  No questions, Your Honor.

MR. BAUGH:  No questions, Your Honor.

THE COURT:  All right.  The witness may stand down.

(The witness stood aside.)

Call your next witness.

MR. PARCELL:  Rodney Tucker, please?

MR. VICK:  While we are waiting for Mr. Tucker, the government would move in all evidence that was presented in the guilt phase portion of this trial for the sentencing phase.

MR. GEARY:  I have a motion on that, Judge.

THE COURT:  Come up here.

(At Bench.)

MR. GEARY:  Judge, you had previously instructed the jury preliminarily that they are to consider individualized treatment.  The offering of the evidence based on the case in chief, the government must relate it to a specific aggravating

**3344**

factor.  They can't simply ask the jury to recall all of the evidence.  Most of it would not relate to a specific aggravating factor.  That's the government's burden.

THE COURT:  Overruled.

(In Open Court.)

MR. VICK:  We would move in all the evidence presented by the government in its case in chief.

RODNEY TUCKER,

called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PARCELL:

Q    Sir, would you please state your name?

A    Rodney Tucker.

Q    Are you the same gentleman who testified in this trial about two weeks ago?

A     Yes, sir.

Q     Sir, did there come a point in time that you had occasion to be on the same cellblock or same tier with Cory Johnson?

A     Yes, sir.

Q     Do you see him in the courtroom?

3345

A     Yes, sir.

Q     Would you describe how he is dressed?

        MR. McGARVEY:  I'll stipulate.

        THE COURT:  All right,

BY MR. PARCELL:

Q     Did there come a point in time when Mr. Johnson, or "C.O.," made some statements to you about his desire to harm some people?

A     Yes, sir.

Q     Would you please tell the ladies and gentlemen of the jury what those statements were, about who?

A     He was talking one time about a girl.  I don't know her name.

Q     What did he say?

A     I just know that it was a girl that turned him in because he had left the State of Virginia and went up to New York and there was a girl that turned him in to the FBI.  He just told me that he was mad at her and that he thought he was going to, you know, get out of here, out of this case, and he said he was going to get them when he get out.

Q     Did he say he was going to kill them?

A     Sir?

Q     What word did he use?

A     He told me he was going to kill her.

3346

Q     That's the lady who caused him to be arrested in New York City?

A     Yes, sir.

Q     Did he mention any desire to harm anyone else?

A     He told me that Detective Woody had found a gun on him and tried to lie.  Ballistics said the gun was used in a bunch of murders down here.  He told me it weren't used down here.  He told me he was going to kill Detective Woody, too.

Q     Is that the reason?  That was the reason, because Detective Woody testified at a bond hearing?

A     Yes.

        MR. BAUGH: Objection.

        MR. McGARVEY:  Does counsel wish to testify?

        THE COURT:  Sustained.

BY MR. PARCELL:

Q     Did he tell you what led him to realize --

        MR. PARCELL:  Do you need to address the Court, Mr. Geary?

        MR. BAUGH:  I object to counsel.  He is

267a

trying to use the witness like a meat puppet.  Now they are even again going in sidebar conferences.

THE COURT:  The objection is overruled.  Mr. Geary, if you have anything to say, say it openly

3347

and stop the undercurrent crap.  All right, Mr. Parcell, go ahead.

BY MR. PARCELL:

Q    Did he tell you why he was upset with Detective Woody?

A    He said he lied on him about the gun.  He said the gun weren't used in no murder down here.

Q    Did he tell you where this occurred?

A    Went to a bond hearing in front of Magistrate Lowe.  I think that's the name of the Magistrate.  He said when he went to the Magistrate, Detective Woody used the gun and he said that gun that he used for the ballistics came back with some murders on it, that he is trying to say he used it down here.  He said he lied on him and everything and that he was going to kill him if he ever got out.

MR. PARCELL:  No further questions.

THE COURT:  Mr. Geary?

MR. GEARY:  No questions.

CROSS-EXAMINATION

BY MR. McGARVEY:

Q    Mr. Tucker, you were housed at the City Jail back in August; is that correct?

A    Yes, August 25 through September 9th.

Q    September 9th.  Have you gone back over your

3348

records recently?

A    My records?

Q    Yes.

A    No.  I don't have no records.

Q    And during that period of time you were in isolation; is that correct?

A    Yes, I came in for  --

Q    Will you answer my question?

A    I was in isolation.

Q    Thank you.  And why were you  --  tell the ladies and gentlemen of the jury why you were in isolation.

A    Been in isolation on and off when I come back to jail.

Q    Isn't that because you have the reputation in the community of being a snitch?

MR. PARCELL:  Objection.

THE COURT:  Overruled.

BY MR. McGARVEY:

Q    Isn't that correct?

A    It is whatever you want to call it.

Q    When you came into the jail you asked to be put in protective custody, isolation, because you had

testified in other trials like this before, haven't you?

3349

A    I testified in a murder trial.
Q    Russell Gray?
A    Russell Gray.
Q    As a result of that you had some charges dismissed and suspended sentences put against you; is that correct?
A    For that trial?
Q    Yes, sir.
A    It weren't dismissed because of the testimony.
Q    Well, let me ask it to you this way, sir:  At the time you testified in Russell Gray's trial, you had a number of B&E's, a robbery, and grand larcenies pending against you; isn't that correct?
A    True.
Q    Will you tell the ladies and gentlemen of the jury on those five felonies, how much time did you get on that, active time; how much did you get?
A    Didn't get no time.
Q    Exactly.  That happened after you testified in Russell Gray's trial; is that correct?  Isn't that correct, sir?
A    Yes, that's correct.
Q    And you are telling the ladies and gentlemen of the jury that you got no dispensation as a result of testifying in that trial?

3350

A    It didn't happen because I testified in that trial.
Q    Now, let's go back to isolation.  You asked to be put in isolation because you were afraid for your safety if you were put in general population; isn't that correct?
A    When I first came there, I didn't ask to be put in isolation.
Q    You went immediately  --
A    When I first came to quartermaster's down at the jail, I asked to go somewhere besides isolation because I knew they was going to put me on C block. I always go to C block since I come to jail since that trial, so it wasn't my choice.
Q    As a practical matter, you went immediately to isolation, is that correct?
A    I went straight to isolation.
Q    Your nickname down there was "The Police"; isn't that correct?  Weren't you known as "The Police" in isolation?
A    I don't remember that nickname.
Q    Was it common for people to discuss their cases with you?
A    Was it common?
Q    Was it common for other inmates in isolation to

3351
discuss their cases with you?

A    Ain't nobody down there that's discussed their case with me.

Q    Just Cory.

A    I just was talking to them.

Q    Will you describe for the ladies and gentlemen of the jury the layout of isolation?

A    Got two sides.  You got a left side, right side.  You have 12 cells on each side.

Q    And you have got a hallway, is that correct, in between?

A    A hole?

Q    A hallway.

A    You have got a hall on the outside of the bars.

Q    The bars face out; is that correct?

A    Toward the window.

Q    Towards the window?

A    True.

Q    All the cells are side by side; is that correct?

A    Yes.

Q    Your cell was C-9, was it not?

A    It was.

Q    And Mr. Johnson's cell was C-7; isn't that correct?

3352
A    True.

Q    And so there was one cell in between you; is that correct?

A    Yes.

Q    So I presume these conversations took place from one cell to your cell; is that correct?

A    Yes.

Q    I presume that he must have had to holler to do that; isn't that correct?

A    Don't got to holler.

Q    There was a cell in between you.

A    Don't make a difference.  It ain't that much of a gap.

Q    Was there a cell in between you?

A    It is a fact there is a cell between me, but I can talk to you all day from right there without screaming.

Q    Was there another individual in the cell in between you, sir?

A    At certain times there was.  And sometimes there weren't.  In saying that, I mean that one dude would move out, one will come in.

Q    Isn't it a fact that during the entire period of time that you were there, which was a total of what, about 15 days, about 15 days, that there were other

3353
inmates along that tier; isn't that correct, sir?

Isn't that correct?

A    Yes, there was other inmates on that tier.

Q    You don't know whether they had overheard these conversations, do you?

A    I ain't asked them.

MR. McGARVEY:  That's all I have.

MR. BAUGH:  No questions of this man, Your Honor.

THE COURT:  Mr. Parcell?

REDIRECT EXAMINATION

BY MR. PARCELL:

Q    Has the government instructed you or told you of any answers to give?

MR. BAUGH:  Objection.  That is outside the scope.

THE COURT:  It is not necessary.  Objection sustained.

MR. PARCELL:  Beg the Court's indulgence.

(Counsel conferring with co-counsel.)

BY MR. PARCELL:

Q    Mr. McGarvey asked you about certain benefits that you allegedly got for testifying in another murder trial.  Has the United States Government or the Commonwealth of Virginia promised you anything for your testimony today?

A    No.

Q    Did we get in touch with you or did you get in touch with us?

A    I went back to Bland and I wrote Mr. Vick.  I didn't know his address, so I sent it to this courthouse.

Q    And we have promised or offered you nothing; isn't that correct?

A    True.

MR. McGARVEY:  May I ask one question?

THE COURT:  All right.

RECROSS-EXAMINATION

BY MR. McGARVEY:

Q    Sir, in the Russell Gray trial, were you promised anything before that, either?

A    No.

MR. McGARVEY:  Thank you.

THE COURT:  All right.  You may stand down, sir.

(Witness stood aside.)

Call your next witness.

MR. VICK:  Detective Woody.

MR. GEARY:  May we approach?

(At Bench.)

MR. GEARY:  It is 11:45.  His name isn't on the list.

MR. VICK:  He is just going to testify that

271a

he testified at the bond hearing.

MR. BAUGH:  This is the second amendment to the list of witnesses.

THE COURT:  All right.  What do you need Woody for?

MR. VICK:  To say he testified at the bond hearing.  One question.

THE COURT:  No.

MR. VICK:  Your Honor, when we came in here at 10 o'clock we had writted Doug Cunningham, the other witnesses.  As I'm sitting here, they had not gotten here at ten.  I don't know if they are here. If we could have five minutes to check?

MR. BAUGH:  No objection.

(In Open Court.)

MR. VICK:  We would call Doug Cunningham.

MR. WHITE:  We need to approach.

(At Bench.)

MR. GEARY:  I wrote you a letter.  He is presently my client on an appeal in the Virginia Court of Appeals.  I can't even find him.

MR. WHITE:  I think even though Mr. Geary can't cross-examine him, there are very serious problems with STRICKLAND v. WASHINGTON.  These are kinds of things which are almost automatic in terms of creating error, especially in this phase.

THE COURT:  I remember it.  What are you calling him for?

MR. VICK:  He will testify that he was told down at the jail in conversations with "J.R." that they were going to kill certain people.

MR. BAUGH:  Who?

MR. VICK:  It is what I specifically went into before.  Martha McCoy's boyfriend, in March of 1992 "J.R." told him to tell Martha there was a $10,000 hit on her and anyone else who would testify.  "Whitey" and "V" came and told him that he was going to get his if and when she testified.  He and "Whitey" himself said that if Martha testified -- no, that Doug was going to get his when "V" and "Whitey" got out.  He would also testify that "V" and "Whitey" both said that if Martha testified, that he would be hurt.  "J.R." threatened him about three times.  "J.R." said they would hurt Torrick Brown's uncle.  I said it in opening.

THE COURT:  I don't have any problem with Cunningham's testimony.

(In Open Court.)

DOUGLAS W. CUNNINGHAM, called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. VICK:

Q    Could you state your name for the Court, record, and jury, please?

A    Douglas Waverly Cunningham.

Q    You are currently incarcerated in the Virginia penal system; is that correct?

A    Yes.

Q    And how much time are you serving and for what are you serving time?

A    Ten years for possession of cocaine with intent.

Q    You and I have had occasion to meet and talk about your testimony here today; is that correct?

A    Yes.

Q    Has the United States Government or the Commonwealth of Virginia promised you anything in return for your testimony?

A    No.

Q    Are you testifying here of your own free will?

A    Yes.

Q    Do you know Ms. Martha McCoy?

A    Yes.

Q    How do you know Martha McCoy?

A    She is my girlfriend.

Q    You went to the City Jail in March of 1992; is that correct?

A    Yes.

Q    When you were at the City Jail, did you happen to come in contact with Mr. James Roane, also known as "J.R.?"

A    Yes.

Q    Do you see him here in the courtroom today?

A    Yes.

        MR. BAUGH:  Stipulate.

BY MR. VICK:

Q    Did you talk to Mr. James Roane about Martha McCoy?

A    Yes.

Q    Could you tell the ladies and gentlemen of the jury what James Roane told you about Martha McCoy?

A    He just told me for to tell her that he would give her $10,000 if she wouldn't testify against him.

Q    Did he say what he would do if she did testify against him?

A    Yes.

Q    What was that?

A    Stated there was a $10,000 hit on her if she testified.

Q    Did you have occasion to talk to Mr. Richard Tipton, also known as "Whitey?"

273a

A    No, I didn't talk to him.  He talked to me.
Q    Did he talk to you?
A    Yes.
Q    Do you see Mr. Richard Tipton here in the courtroom?
A    Yes.
Q    Would you point him out?
A    Right in the back.
Q    How is he dressed?
A    Got the glasses on, the blue shirt.
      MR. VICK:  May the record reflect the identification of Mr. Tipton?
      THE COURT:  The record will so reflect.
BY MR. VICK:
Q    What did he talk to you about?
A    That something was going to happen to me if I was to testify, too.
Q    Did he talk to you about Martha McCoy?

3360

A    No.
Q    Did you talk to Mr. Lance Thomas, "V?"
A    Yes.
Q    What did Lance Thomas tell you?
      MR. BAUGH:  Objection.  Confrontation.  Lance Thomas is not one of these defendants facing death, and we have a serious confrontation problem with that.
      THE COURT:  Overruled.
BY MR. VICK:
Q    What did Lance Thomas tell you?
A    The same thing Tipton told me, that something was going to happen to me.
Q    Do you know, did Mr. James Roane talk to you about Martha McCoy's uncle?
A    Yes.
Q    Who is he?
A    I know his last name only.  It is Brown.
Q    Where was he working?
A    The City Jail at the time.
Q    What did James Roane tell you about Martha McCoy's uncle?
      MR. WHITE:  Objection on confrontation grounds.
      THE COURT:  Overruled.

3361

BY MR. VICK:
Q    What did "J.R." tell you about Martha McCoy's uncle?
A    That he knew where Brown lived at, and he was going to be the next one.
Q    If what happened?  If something happened?
A    No, I think he said  --
      MR. BAUGH:  Objection to what he thinks.
      THE COURT:  Sustained.

BY MR. VICK:

Q    What did he say?

A    He said something to James Roane's brother and that's how it all started out about how he was going to do something to him.

MR. VICK:  I have no further questions.

MR. WHITE:  May I have a moment with Mr. Geary, please?

THE COURT:  Sure.

(Counsel conferring with co-counsel.)

MR. WHITE:  Defendant Tipton has no questions.

MR. COOLEY:  We have no questions.

THE COURT:  Mr. Baugh or Mr. Henderson?

CROSS-EXAMINATION

BY MR. HENDERSON:

Q    Good morning, Mr. Cunningham.

A    Good morning.

Q    Mr. Cunningham, first of all, this gentleman, Deputy Brown, he is Deputy Wayland Brown, isn't he?

A    Yes.

Q    He is no longer at the City Jail, is he?

A    No.

Q    In fact, he was removed by the Sheriff because of the fact that he threatened Mr. James Roane; isn't that correct?

A    He threatened his brother.

Q    He threatened James Roane's brother?

A    Yes.

Q    As a result of that he was moved out of the jail?

A    Yes.

Q    Now, with respect to Martha McCoy, at some point in time James Roane was dating Martha McCoy; isn't that correct?

A    Before we met.

Q    And you at that particular period of time were interested in Martha McCoy, also.  As a matter of fact, you two had somewhat of a confrontation about the fact that both of you were liking her or interested in her at the same time, correct?

A    Can you repeat that?

Q    Isn't it a fact that you and James Roane had some conversations, if you will, about the fact that the two of you were interested in her at the same time?

A    No, we didn't have no conversation about that.

Q    Did there come a point in time where you actually moved into Martha McCoy's home?

A    Yes.

Q    You in fact started selling drugs out of that home, correct?

275a

A    No.

Q    Were you not arrested for selling cocaine?

A    I was arrested for it.

Q    And is that the conviction that you are serving now?

A    Yes.

Q    At the time of your arrest, were you living in Martha McCoy's home?

A    No.

Q    When you were arrested, were you not in Martha McCoy's home?

A    No.

Q    Okay.  Did Martha McCoy  --  let me ask you this:  After the arrest of Martha McCoy, weren't you

3364

in fact selling drugs out of that home?

A    No.

        MR. HENDERSON:  That's all I have, Judge.

        THE COURT:  All right.  You may stand down, sir.

    (Witness stood aside.)

    Government?

        MR. PARCELL:  Judy Payne, please.

    (At Bench.)

        MR. PARCELL:  This is Government Exhibit P-2 which has been labeled as a Government Exhibit, certified copies of all of James Roane's prior convictions on the state level.  The government has provided Mr. Baugh with a copy of all of these and his rap sheet and the fact that this is one of the things that was misplaced between the government and Mr. Baugh, we gave him certified copies of these things about a month ago.  We have since got another set of certified copies, I have showed them to Mr. Henderson and Mr. Baugh.  I intend to proffer them for their admission, and Ms. Payne will tell us of Mr. Roane's conduct one time.

        MR. BAUGH:  The reason we are up here, there are some misdemeanor charges in here.  We don't think that should go to significant criminal record.

3365

Additionally, this right here is the first I've heard of his conduct in the Department of Corrections, because we have attempted to subpoena those records and they have been refused us.

        THE COURT:  Sustained.  I won't allow it.

        MR. PARCELL:  Mr. Baugh subpoenaed those records.  They were sent to the Attorney General's Office for review and then sent to Mr. Baugh.  He was over there Friday viewing those records.

        THE COURT:  I'll sustain the objection.

    (In Open Court.)

        MR. PARCELL:  The government would offer Government Exhibit P-2, which are certified copies of

defendant Roane's prior state convictions collectively, Your Honor.  They are certified copies.

MR. BAUGH:  No objection.  May we inspect them before they go in?

THE COURT:  All right.

(Exhibit proffered to counsel.)

MR. VICK:  We would move into evidence Government Exhibit P-1, which is the prior criminal record of Cory Johnson.  Certified copies have been provided and are in the file.

MR. McGARVEY:  May we see them?

3366

THE COURT:  Go ahead.

(Exhibit proffered to Mr. McGarvey.)

MR. McGARVEY:  Might I approach?

(At Bench.)

MR. McGARVEY:  Your Honor, I have no problem with this part but I do have a problem with the NCIC.  There are charges in here, unadjudicated. I believe I had attempted to do that earlier and the United States objected.

MR. BAUGH:  In a very timely and proper manner.

THE COURT:  You have got  --

MR. VICK:  I'll take it out.

MR. BAUGH:  P-4 is listed on their exhibit list.  It's whited out, but Mr. Henderson has been able to determine that's James Roane's name under there.  We would like to see those records.

MR. VICK:  That's a juvenile record we got from you.

MR. BAUGH:  No, disciplinary record from jail.

MR. PARCELL:  We had gotten copies of all three defendants' records: Johnson, Tipton and Roane, Pam put Roane down, should have been all three.

THE COURT:  That's all that is.

3367

MR. McGARVEY:  I have the same problem with this one.  There are charges, but there is no indication of disposition.

MR. VICK:  That's the way it came certified from New Jersey.

THE COURT:  There is no disposition on here.

MR. VICK:  We will take that off, too.

THE COURT:  All right.

MR. VICK:  Judge, while we are here, with the exception of the two witnesses that you said we will have to call out of order, we have got, once we move that in, we have got Belinda Davis.  We can't find her now.  I would move in her Grand Jury transcript.

MR. BAUGH:  Counsel, you guys might want to hear this.

(Mr. Geary and Mr. White approached the bench.)

MR. VICK:  Nobody has been able to find her since Saturday.  Belinda Davis, I will proffer to the Court, is basically a street person, in and out.

THE COURT:  I'm not going to allow a Grand Jury transcript to establish a factor.

MR. VICK:  If we can't find her by the end of lunch, we will rest.  We move Government Exhibit P-1 into evidence.

THE COURT:  All right.

MR. VICK:  We can't rest now anyway because we have these other people we need to get.  And that's it for us, Judge.

MR. BAUGH:  Are the other two people here? Because if they are, we might want to do an examination outside the presence of the jury so the Court can determine whether or not it is going to be admissible.

MR. VICK:  When they came into your office at 10 o'clock they had not arrived.  But they have been writted in and should be here.

THE COURT:  Okay.  I'm going to send them out.  Let's do this.  You have got these two people?

MR. VICK:  Belinda Davis is on the street. We don't know where she is.

THE COURT:  These two are locked up?

MR. VICK:  Yes.

THE COURT:  Why don't we  --  I'll briefly listen to what they have to say.  I'm not going to do it in here, though.  I'll do it back there.

MR. BAUGH:  Just do it there because of the fact they are inmates.

THE COURT:  That's fine.

(In Open Court.)

I'm going to send you all out.  Probably when you are out, your lunch will arrive, because this is going to be along break.  When we call you back, I'll let you know where we are and what we will be doing.

(The jury left the courtroom.)

MR. VICK:  P-1 admitted, Your Honor?

THE COURT:  It is admitted.  Mr. Vick, can I have those two names?

MR. VICK:  Paris Robinson and Willie Seward.

All right, Mr. Marshal, you can remove the defendants.

(The defendants were removed from the courtroom.)

All right, we will be in recess and I'll see you all in chambers.)

278a

(Recess taken at 12:05 p.m.)

(In chambers.)

MR. VICK:  I would note in light of defense counsel's objections to my argument about the propriety of the death penalty, I assume in their opening statements none of them can argue about the impropriety of the death penalty, that that will all be resolved for closing?

MR. WHITE:  That's not what we were objecting about, Mr. Vick.

MR. COOLEY:  There are a couple issues I would ask clarification on.  I'm assuming that the Court is allowing us to adopt the objections by other counsel at this stage as we did in the last stage?

THE COURT:  Yes.

MR. COOLEY:  Additionally, this is totally unrelated to anything we have discussed so far.  We have, as the Court knows, a psychologist that was appointed under AKE as well as the statute, and it is my understanding that he would be allowed to be present in the courtroom.  In fact, I think he could be seated at counsel table.  We are not going to ask for that.  But there may be times when he will come in and out of the courtroom.

THE COURT:  I don't have any problem with that.

MR. BAUGH:  I assume you guys have experts, too?

THE COURT:  I told them to bring them individually so they can get them up here.

MR. VICK:  We still haven't received any psychiatric reports on Mr. Tipton, although I understand they have been prepared.

THE COURT:  We will deal with it as it comes up.  If you have psychiatric reports, psychological or whatever, give them to Mr. Vick.

MR. BAUGH:  There are no reports.  We handled them like Jencks material.

MR. VICK:  We have gotten them from Mr. Johnson.

MR. BAUGH:  We gave you ours.

MR. VICK:  You didn't have any.

MR. BAUGH:  There is some in there from when he was in school.

MR. WHITE:  I'm expecting something by fax transmission when I get back to my office today.  I will get it to the government.

All right, bring Mr. Robinson on in.

(Proposed witness entered chambers.)

THE COURT:  Mr. Vick, ask Mr. Robinson the questions.

BY MR. PARCELL:

Q    Would you please tell Judge Spencer your name?
A    Paris Lamont Robinson.
Q    All these gentlemen here are either attorneys or work for the Clerk's Office or the Court.  Judge Spencer is overseeing this trial.  Would you tell him, tell Judge Spencer, what if anything you know about conversations you had with James Roane?
        THE COURT:  Did you hear the question?
        THE WITNESS:  Yes.
        THE COURT:  Tell us what you know about any conversations with James Roane.
    (Witness not responding.)
BY MR. PARCELL:
Q    Did there come a point in time when you wrote Ronita Rochelle Hollman a letter?
A    Yes.
Q    Tell us why you wrote the letter.
A    I wrote the letter because I knew that she was testifying against him.
Q    Against who?
A    James Roane.  And I was telling her that I heard that somebody was going to do something to her for testifying against him.
Q    Who did you hear that from?
        THE COURT:  Answer the question.  We don't have all day.
        THE WITNESS:  Do I have to answer this question?
        THE COURT:  You don't have to.
        MR. VICK:  We ask he be led.
        MR. WHITE:  I object to that, Your Honor.
        MR. VICK:  The jury is not in here.
        MR. BAUGH:  That's true.
        THE COURT:  He can be led all you need.  We are talking about what he is going to do in the courtroom.
        THE WITNESS:  I don't want no parts of this.  I don't want no parts of this.
        MR. VICK:  If I could, Mr. Robinson, you want no part of this because you don't want to be labeled as a snitch, correct?
        MR. BAUGH:  Objection to the relevance.
        THE COURT:  Don't be objecting in here.  Go ahead and ask all the questions you want.  The fact of the matter is, we will talk about it after he leaves.
BY MR. VICK:
Q    You have told Detective Fleming and Mr. Parcell that indeed James Roane asked you to kill Ronita Hollman, didn't you?
A    I refuse to answer that question.
Q    But you told Detective Fleming and Mr. Parcell

that, didn't you?

A   I refuse to answer that question.

Q   That James  --

THE COURT:  All right.  You can take Mr. Robinson out.

(The witness left chambers.)

MR. COOLEY:  Other than these folks, is the government finished?

MR. VICK:  We will try to find Belinda Davis, and it doesn't look like we will be able to. And that's it.  Your Honor, I'm not trying to just be obstreperous about trying to find out why my opening as to the propriety of the death penalty is objectionable, because if it is objectionable based upon the fact there was an opening statement, then it will be objectionable in their opening statements to argue the propriety of  --

THE COURT:  It was objectionable because it was argument.  It is opening statement, what you are going to demonstrate that would relate to the legal requirements that would make it appropriate, not a generalized discussion about how society has decided that in the worst cases people are going to die and all that.  You can argue that all you want in closing.  It is argument.  And it is the same for anybody else.  You don't have to ask me about that. It is the same for anybody else.  One rule, one standard.  Opening statement is not argument, and when you object, it will be sustained.

MR. VICK:  Yes, sir.

MR. GEARY:  Did you hear that, Mr. White?

MR. WHITE:  Yes, sir.

MR. HENDERSON:  I take it you are not going to call Paris Robinson?

MR. VICK:  I think it would be a waste of everybody's time.

MR. BAUGH:  I think it would be error.

THE MARSHAL:  We don't have a prisoner by that name nor do we have a writ to produce a prisoner by that name.

MR. VICK:  There goes that one.

THE COURT:  That's quick enough.

MR. BAUGH:  Lunch until when?

MR. PARCELL:  He is in the City Jail.  We can get him here.

MR. VICK:  We can have him by 1 o'clock.

THE COURT:  Let's say 1:30.  If you don't have anything, I'll send them home.

MR. BAUGH:  You want us to do the motions at 1:30 or now?

MR. HENDERSON:  Defendants aren't here yet.

MR. BAUGH: That's right, we have to do the defendants. We will do them at 1:30.

3376

THE COURT: What are your motions?

MR. COOLEY: Motion for mistrial relating to the opening statement.

THE COURT: We can do that at 1:30.

MR. BAUGH: Thank you.

(Recess taken from 12:15 p.m. to 1:30 p.m.)

(In Open Court.)

MR. VICK: Judge, I understand from the Marshals that they are on their way to get Willie Seward. We don't have Belinda Davis. She has disappeared. So that's the only witness we have left to do. I don't know what the Court wants to do in light of its ruling this morning that we would delay and put them on later. If Mr. Seward comes and the Court wants to see him, we are ready to put him on this afternoon. But that's the government's case in aggravation.

THE COURT: All right. If they get him here shortly, we will go ahead and deal with Mr. Seward. Let me hear any motions that you all need resolved.

MR. COOLEY: Thank you, Your Honor. Respectfully, Your Honor, I would ask the Court to note that during the course of the government's opening statement or argument, depending on whose

3377

view you take, I suppose, that Mr. Vick used, by my count, the term "they" or "these people" 17 times. In addition, he talked to the actions of the conspiracy, described them as three mass murderers, and concluded with starting to mention that there were three things he wanted the jury to consider.

The first of those, when he began to approach deterrence, the Court granted the objection or sustained the objection.

The second one which he stated to the jury was, and I'm quoting, I believe, whether these defendants deserve the penalty of death for the acts which they have done. And I note to the Court that the statute mandates individualized consideration. And Mr. Vick gave what amounts to a closing argument during the course of his opening statement and throughout. Instead of asking the jury to consider each of these defendants individually, he continued to lump them together and to use the same terms and phrases which, instead of individualizing them, collectivized them.

I would respectfully ask the Court to consider and I do hereby make a motion for, a mistrial. Thank you.

THE COURT: The motion for mistrial will be denied.

282a

3378

MR. BAUGH:  We join in the motion as well.

MR. WHITE:  We join also.  If the Court please, there are a couple of other motions.  You may want to wait until after the government has officially rested.  It will be the functional equivalent to a Rule 29 motion.

THE COURT:  All right.  Anything else that we need to hear short of that?

MR. VICK:  If that is concerning the aggravating factor of the Belinda Davis testimony, we understand the position we are in and we will amend the notice.

THE COURT:  Obviously, that factor will be dismissed.

MR. WHITE:  We would also respectfully submit, Your Honor, that would be the case with regard to the non-statutory aggravated relating to the juvenile as well.

MR. BAUGH:  That may be premature.

THE COURT:  We will get into discussion when we finish.  Will anybody tell me how long this is going to be?

MR. VICK:  The Marshals told me approximately five minutes ago, Mr. Newman said that they had left to go.  He said also it is usually  --

3379

I don't know how soon prior to that they had left to go.  Usually it is about a 20-minute round trip.

THE COURT:  All right.  Well, we will wait.  Hopefully they will get here shortly.  We will be in recess.

(Recess taken from 1:35 p.m. to 2 o'clock p.M.

(Witness entered chambers.)

MR. PARCELL:  This is Judge Spencer.  The rest of the folks in here are lawyers or court staff.

MR. VICK:  This is Mr. Seward.

MR. PARCELL:  All right.  We are going to ask you a couple questions and just direct your answers to Judge Spencer.  Tell him your name.

THE WITNESS:  Willie Seward.

BY MR. PARCELL:

Q    You were locked up in the City of Richmond in January of 1993; is that correct?

A    Yes.

Q    And did there come a point in time when you had occasion to meet Richard Tipton?

A    Yes, I have.

Q    And did you all use the same phone?

A    Yes, we did.

Q    Did he ever ask you to use  --

MR. WHITE:  Objection to leading.

3380

THE COURT:  Overruled.  Just go ahead.

BY MR. PARCELL:

Q    Did your girlfriend have a three-way?

A    Yes, she did.

Q    Did he ask you to use that three-way?

A    Yes.

Q    Did he make some phone calls to your girlfriend on the three-way?

A    Yes, he did.

Q    Did you make note of the names and numbers of people he called off of her three-way?

A    Yes.

Q    Is that some notes you made yourself?

(Document proffered to witness.)

A    Yes, I did.

Q    Did you do that at our direction or  --  we didn't talk to you when you made that up, did we?

A    No.

Q    Did you overhear some conversation between Mr. Tipton and somebody named Robert?

A    Yes.  Robert Jones.

Q    Tell Judge Spencer about those conversations.

A    Before the case started on the 11th or whatever, I got down to jail, on the fourth, and I went to his tier like on the 6th of January.  And the only way I can use the phone is by letting him use it, because they had a little gang on the tier or whatever.  So I let them use the phone and he called these numbers daily before the trial.  And he was telling Robert, Jr. that he wanted Detective Woody killed.

THE COURT:  "He," who?

THE WITNESS:  Tipton.  And tried to find some guy named "Wild" before the prosecutors had a chance to talk with him.

BY THE COURT:

Q    Some guy named what, "Wild?"

A    Yes.  And he wanted Robert, Jr. to find an alibi for him to witness for his whereabouts during the  --  one of the murders that he was charged with.  I think it was the stabbing.

BY MR. PARCELL:

Q    After you heard  --  did we get in touch with you or did you get in touch with us?

A    I got in touch with you.

Q    Who did you call first?

A    The FBI had the case.  I called the FBI.

Q    They gave you another number to call?

A    Yes.  They gave me a number to call and I talked to Detective Barnett.

Q    Sergeant Barnett?

A    Yes.

Q    Then last week, Detective Woody came to see you; is that correct?

A    Yes.

Q    That's when you told him, gave that information and gave him that piece of paper?

A    Yes.

MR. PARCELL:  Nothing further.

THE COURT:  All right.  Put him outside.

MR. BAUGH:  Your Honor, may I?  You said they had a gang up on this tier; who is "they"?

THE WITNESS:  Tipton and a few guys he just met up on the tier.

MR. BAUGH:  Do you know any other defendants in this case?  Do you know any of the other guys who are charged in this case?

THE WITNESS:  I know them, but they wasn't on my tier.

THE COURT:  Let's put him out on the stand.

(Witness left chambers.)

MR. BAUGH:  Your Honor, in light of the fact that Mr. Edward Cooke read the newspaper article about the shooting, we are going to object to this guy coming in in the joint penalty phase.

THE COURT:  Overruled.  He can testify about the phone call and the conversation he overheard about the killing of Detective Woody.  All this other stuff about alibi and  --

MR. VICK:  It is over.

MR. WHITE:  What the gang?

THE COURT:  He doesn't need to talk about that, either.  Just get right to the point, the phone calls made, "Did you overhear conversation," and let him tell us.  And that's it.

MR. PARCELL:  Judge, with the Court's permission, everybody else's, if I could lead him right to that point, "Did you have some conversations on the phone  --"

THE COURT:  I don't have any problem with you leading.  Get right to that point.

MR. PARCELL:  I'll get to it so I don't have to worry about this other stuff coming in.

MR. GEARY:  Objection, due to the fact it doesn't relate to an aggravating factor.

THE COURT:  Your objection is noted.

(In Open Court.)

THE COURT:  All right, let's bring in the jury, please.

MR. PARCELL:  Judge, where is the witness?

THE COURT:  They must have taken him back.

(The jury entered the courtroom.)

(The witness entered the courtroom.)

All right, the witness will be sworn.

WILLIE SEWARD,

called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PARCELL:

Q    Sir, would you please state your name?
A    Willie Seward.
Q    Where are you presently residing?
A    Richmond City Jail.
Q    How long have you been there?
A    Since January 4th, 1993.
Q    Do you know someone by the name of Richard Tipton?
A    Yes, I do.
Q    Do you see him in Court?
A    No.
Q    You may stand up if you need to and look around.
     (Witness perused the courtroom.)
A    Yes.

3385

Q    Would you describe how he is dressed?
A    A blue shirt on with his glasses.
     MR. PARCELL:  Let the record reflect identification of defendant Tipton.
     THE COURT:  The record will so reflect.
BY MR. PARCELL:
Q    Did there come a point in time, sir, that you let him use your girlfriend's three-way phone from the jail; is that correct?
A    Yes, I did.
Q    Did you hear him talking with somebody named Robert, Jr.?
A    Yes, I did.
Q    During the course of those phone conversations, did you ever hear him threaten or wish any harm on anyone?
A    Yes, I did.
Q    Would you please tell the jury about that?
A    When I first got out there, I wasn't able to use the phone  --
Q    Go right to the conversation.
     THE COURT:  Tell us what you overheard, if anything.
     THE WITNESS:  I overheard that he wanted Detective Woody killed and he wanted his friend  --

3386

     THE COURT:  All right.
BY MR. PARCELL:
Q    How about harm to anyone else?
A    Some guy named "Wild," he wanted him found before the prosecutors got to him, I guess.
Q    Did the government come to you and ask you for this information or did you reach the government

after you heard this?

A    I reached the government after I heard this.

Q    Who did you call first?

A    I called the FBI.

Q    Did they direct you to the Richmond Bureau of Police?

A    Yes, they did, to Captain Barnett.

          MR. PARCELL:  No further questions.

          THE COURT:  Any questions?

                    CROSS-EXAMINATION

BY MR. GEARY:

Q    Have you ever been convicted of a felony?

A    Yes.

Q    How many felonies have you been convicted of?

A    One.

Q    Your time in jail?  In January, what were you serving time for in January of this year?

A    Serving time for forging an arrest warrant.

3387

Q    You forged an arrest warrant?

A    And possession of two credit cards.

Q    Somebody else's credit cards?

A    Yes.

Q    When you said "forged an arrest warrant," did you write somebody else's name down after you were arrested?

A    Yes.  He instructed me to, because that's the name I gave them once I was arrested.

Q    You gave a phony name when you were arrested?

A    Yes, sir.

Q    What tier were you on in January?

A    I was on -- what was it?  It was C, to the right.

Q    The person that you heard the name Robert, Jr., do you know who that is?

A    No, I do not.

Q    What were the exact words you claim you heard Tipton say to Robert, Jr. on the phone about Detective Woody?

A    He wanted Detective Woody killed.

Q    Don't tell the jury what he wanted.  Tell the jury what you heard him say.

A    That's what I heard.

Q    He said, "I want Detective Woody killed?"

3388

A    Yes.

Q    That was how long ago when you heard that conversation?

A    It was before the trial began.

Q    When are you going to be tried on the charges you are facing right now?

A    January 26th.  Preliminary hearings.

Q    That's Richmond General District Court?

A    Yes, I think so.

Q    You will be prosecuted by the Richmond Commonwealth's Attorney's Office?

A    I think so.

Q    Did Mr. Parcell tell you he is the number two man in the Commonwealth's office in Richmond?

A    I wasn't aware.

Q    You are aware now, aren't you?

A    I'm still not aware, no.

Q    You are now.

REDIRECT EXAMINATION

BY MR. PARCELL:

Q    Have we offered you anything for your testimony?

A    No, you didn't.

Q    Have we told you what to say?

A    No.

Q    Once again, you came to us, we didn't come to you; is that correct?

A    Yes.

THE COURT:  The witness may stand down.

(The witness stood a aside.)

MR. VICK:  With the introduction of all the items from the guilt phase of this trial into evidence, the government rests in the aggravation stage in this case.

THE COURT:  All right.  Ladies and gentlemen, let me explain to you what's going to happen for the rest of the week -- if I can fight off this flu bug -- what will happen for the rest of the week.

Each of the defendants have indicated they will be putting on evidence in mitigation.  We have given them -- they have indicated that that mitigation will take about a day as it relates to each defendant.  So we would start with Mr. Tipton on tomorrow.  He will go through the day putting on mitigation.  Then we will start the next day with Mr. Johnson, and then with Mr. Roane.  I tell you this so that you will understand that if we per chance were to finish with, say, Mr. Tipton got through at 3 o'clock, that would be the end of it for that day, because in order to give them some certainty as to when to have their witnesses here and available, they each have their day to put on mitigation.  The government had the first day, and they have completed it now.

I'm going to release you to go home and return tomorrow at 10 o'clock in the morning.  Remember my admonitions against reviewing any newspaper or television or radio items related to this case.  Please do not discuss the case with anyone.  We will see you tomorrow at 10 o'clock a.m.  Again, thank you for your patience.

(The jury left the courtroom.)

All right, starting with Mr. Tipton, I'll hear any motions.

MR. WHITE:  May it please the Court:  Am I to understand before I begin that the non-statutory aggravator about the rape is dismissed now?

THE COURT:  It will be dismissed.  There is no evidence.

MR. WHITE:  Also, Judge, about the recruiting of the juvenile, there has been no evidence about recruitment.  Rather than belabor that point  --

THE COURT:  Well, I will hear argument.  I tend to agree with you, but I'll hear you.

MR. WHITE:  Your Honor, if the Court please, regarding the non-statutory aggravating factors, we would make a motion to dismiss on Numbers 1, 2, 3, 4, and 6 on the following grounds, Your Honor.  With regard to Non-statutory Aggravators Number 1, that the defendant committed multiple murders, Number 3, that the defendant recruited a minor to participate with him in the murders, and number 4, that the defendant seriously wounded three individuals in the course of committing the murders outlined in the indictment, as a preface, Judge, we would note two things.  First of all, there is really no authority that we can find to support the proposition that aiding or abetting or the concept can be used beyond the establishment of a criminal liability for the crime.  We recognize its validity in establishing beyond a reasonable doubt that someone is guilty of an offense.  We are now talking about raising that to a different level, raising this person to death eligibility.  It is not a standard instruction for capital punishment.  It should not be allowed as a concept which this jury can use to establish criminal activity.

In its non-statutory factors the government has been very, very specific that the defendant committed multiple murders.  Giving the government its due with regard to the Talley case, we would suggest to the Court that the inference certainly can be drawn that defendant Tipton committed that murder.  With regard to Church Hill, the murders of Armstrong, Long, and Carter, they are not entitled to that same inference because the evidence shows Mr. Tipton did not have the gun, did not get out of the car, did not actually inflict any violence or kill anyone or commit those himself.

The same argument would apply, Your Honor, to Stony Run and the murders of Chiles and Thorne.  "Pepsi" Greene did not even identify him as being

289a

there.  Gwendolyn Greene puts him there, but never in the car or with a gun, as the government conceded this morning, Mr. Tipton was there and aided, but did nothing more.  Ballistics certainly don't support the argument that he actually committed any murders on that particular night.

With regard to defendant recruiting a minor to participate, Your Honor, the same would apply.  We would also add, Judge, that where in the evidence has there been any suggestion that anyone actually had to recruit the juvenile, who we will assume to be "E.B."?  There is certainly no evidence that anyone was directing that individual, no evidence that anyone was controlling, soliciting, inviting, or otherwise, any other actions towards "E.B."

Finally, we would submit to the Court that there is no competent proof that "E.B." was in fact a juvenile.

With respect to Non-statutory Aggravator Number 2, that the defendant has a substantial criminal history, we would ask the Court to note that criminal history  --  that the Court should apply the plain meaning of the phrase "history."  That is a course of conduct or action which precedes that which we are now confronted with in the course of this case; that being a conspiracy and a Continuing Criminal Enterprise.  At best, Your Honor, we are talking about unadjudicated criminal conduct.  At best, Your Honor, we are talking about things which are outlined in the course of or in furtherance of a conspiracy or Continuing Criminal Enterprise.  There is absolutely no suggestion whatsoever that prior to the conspiracy or the Continuing Criminal Enterprise that Tipton had any kind of criminal history.  And I would also suggest to the Court that the phrase "criminal history" as it relates to a sentencing factor contemplates adjudicated criminal conduct, that which is more reliable.

When it comes to reliability and precision, the hallmarks of capital sentencing, we would suggest that the phrase "criminal history," unadjudicated criminal conduct, does not satisfy the government's burden in this case.

Finally with regard to Non-statutory Aggravator Number 6, the defendant was knowingly and willfully a member of a conspiracy which had as one of its goals the murder of individuals other than those for which defendant has been charged, we would suggest to the Court that the only evidence we have heard here today is discussion or a comment that was made by Mr. Tipton to Robert, Jr. over the telephone, that being that he wanted Detective Woody killed.  Well, on

January 4th of 1993, Judge, I think it is very clear that this conspiracy was over and done with. That is certainly not something that was done -- the membership in the conspiracy is certainly not something that the government can prove. And we would suggest that the government has not borne its burden of proof with regard to that.

Finally, with regard to the statutory aggravators regarding the one of substantial planning and premeditation, we would suggest to the Court that

with regard to the murder scenes at Church Hill and Stony Run, there is no evidence of substantial planning and premeditation. Certainly with regard to Church Hill, the evidence from Charles Townes was very clear; that he and Richard Tipton were out looking for drugs that night. They simply happened by 1212 West Moore Street, happened upon two individuals making plans to go somewhere, and Mr. Tipton happened to go along for the ride.

Judge, with regard to Statutory Aggravators Number 1 and 2, that the defendant intentionally killed the victim and that the defendant intentionally inflicted serious bodily injury which resulted in the death of the victim, we would ask the Court to take our arguments of aiding and abetting, Armstrong, Bobby Long, Carter, Curtis Thorne and Linwood Chiles.

Excuse me, Judge. With regard to Non-statutory Aggravator Number 4, seriously wounding three other individuals, I think it should be very clear that at best there could be only two. And when one considers the ballistics reports which are consistent with a gun other than the one which Mr. Tipton may have had, although no one puts a gun in his possession, consistent with the arguments about aiding and

abetting we would suggest that the government has not borne its burden.

THE COURT: All right.

MR. COOLEY: May it please the Court: We would have the same motion insofar as it relates to the following under our notice of the intention of the United States to seek the death penalty. The statutory aggravator listed as Number 6 is phrased in our notice that "The defendant committed the offenses charged in the indictment after substantial planning and premeditation." I believe that the only offense as to which that can relate are the murders in furtherance of the Continuing Criminal Enterprise. I don't believe that that would or should include actions within the conspiracy, the act of distributing cocaine, for instance, or crack to any specific person. Even though that might have taken

substantial planning or premeditation, that would not be properly before this jury as an aggravating factor.

Based on the opening statement or argument, it sounded as if the government was alleging that the purchasing of the firearms would in and of itself be a demonstration of substantial planning and premeditation of a murder. That may or may not flow,

3397

but if the government's intention in closing argument is to expand upon that and say, well, then if they were distributing drugs and they substantially planned or premeditated that, then it seems to me this is an inappropriate -- or that the language of that particular statutory aggravator is inappropriate, particularly as it relates to the term "offenses" charged in the indictment.

Insofar as the non-statutory aggravating factors, I would suggest to the Court that statutory -- excuse me, Non-statutory Aggravator Number 2, that being that the defendant has a substantial criminal history, the evidence before the Court is that there is a single conviction of Mr. Johnson. The only thing that is contained there shows a possession of controlled substance and a one-year sentence for that. And I don't believe even under the widest interpretation of the term "substantial" that that would be an appropriate aggravating factor for this jury to consider.

Non-statutory Aggravating Factor Number 3, that the defendant recruited a minor to participate in the murders: I believe the government has to be held to a strict construction. And at this point it seems to me that the government has had to prove to this

3398

Court's satisfaction as a matter of law that there is any evidence that someone, in particular Cory Johnson, recruited a minor. And there is no evidence that "E.B." is a juvenile, and assuming that "E.B." is the person to whom the government is relating this aggravating factor, there is no demonstration, even if you assume he participated, that there was a recruitment of him by Cory Johnson, or for that matter any of the folks who are before the Court at this point in time or by any other party, as opposed to a voluntary arrival and participation by this person who is alleged to be a juvenile. There is no evidence before the Court whatsoever of a recruitment.

Your Honor, finally, Non-statutory Aggravating Factor Number 5 in our notice says that the defendant was knowingly and willfully a member of the conspiracy, which had as one of its goals the murders of individuals other than those for which the

292a

defendant has been charged. In the indictment as it stands, there are two folks named for which Mr. Johnson has not been prosecuted. They are the victim, Mr. Talley, and the victim, Mr. Moody. While we have had allegations of Ms. Rozier, as I understand the Court's ruling at this point in time, the Rozier matters have been excluded from consideration. And that leaves Talley and Moody. There is no evidence before the Court that any entry into this alleged conspiracy was done where folks met and said, "Well, we are going to see that Mr. Talley is killed or that Mr. Moody is killed," and that the defendant had any awareness or knowledge of those things when in fact they occurred.

There is absolutely no evidence in the trial as it has been presented which ties defendant Johnson to a participation, an awareness, or any relation whatsoever to the Talley and Moody killings. And I would suggest to the Court that that being the case, that Non-statutory Factor Number 5 should fall and should be dismissed. And respectfully, I move for each of those factors to be dismissed as I have outlined them. Thank you.

THE COURT: All right. Mr. Baugh?

MR. BAUGH: Your Honor, as the Court is well aware, the jury -- and the Court has already instructed the jury during the guilt or innocence phase -- must take each count separately and assess the evidence as it pertains to each individual count and each individual defendant. We would point out, we would request that the Court direct and so find at this juncture that evidence concerning the shootings on Church Hill of Dorothy Armstrong and Anthony Carter and Mr. Long cannot be considered as aggravating factors pertaining to the trial of Mr. Roane. Mr. Roane was in custody at that time. There has been no evidence of conversations prior to that concerning that. One witness said there was some discussion about it, but there is no evidence here. And even if it is, I would remind the Court that when we were downstairs a moment ago, concerning the issue of Mr. Gaiters, the United States represented they were not seeking the death penalty against Mr. Gaiters because he was not the triggerman. There is no indication that Mr. Roane was the triggerman on these, and as such, we would ask the jury be directed they cannot consider the facts or circumstances concerning those murders as aggravating factors justifying the execution of Mr. Roane.

The same would apply, in fact would more stridently apply to Stony Run. Because while there was some evidence of possible discussions between

293a

people concerning the shootings in Church Hill, there is no evidence of discussions concerning Stony Run and this defendant. Nothing. As such, the jury should be instructed that all of the -- any

3401

planning or whatever went into the killings, or the woundings that occurred at Stony Run of Mr. Thorne or Mr. Linwood Chiles, or the two young ladies, cannot be used as aggravating factors justifying the execution of Mr. Roane.

Additionally, Statutory Factor Number 1, the defendant intentionally killed the victim, we would agree with Mr. Cooley that under JERIK we now have a strict construction of these. We would submit that Aggravating Factor Number 1 as it applies to 848(n) would certainly go to the triggerman, the person who intentionally committed the actual act, and that aiding and abetting would not justify at this stage, or at least it would not justify a finding under 1 for anyone except the actual triggerman. We would submit that that could not apply to the shooting of Louis Johnson. That was the young man shot on the street. And it would also not apply to the Peyton Maurice Johnson murder, and that the jury should be instructed that this aggravating factor could not apply to those murders.

The same would apply to Number 2, should not apply to Louis Johnson, or to Peyton Maurice Johnson. Number 3, intentionally engaging in conduct intending that the victim be killed or that lethal

3402

force be used against the victim which resulted in the death of the victim, Number 4, intentionally engaging in conduct which would create a grave risk, we have no argument at this time.

Concerning substantial planning and premeditation -- I'm sorry, as to the other mitigating factors, 2, 3, 4, 5, and 6, particularly 6, involving substantial planning and premeditation, we would also ask again that the jury be instructed that as to the killings at Church Hill or the killings at Stony Run, that they cannot find any of these aggravating factors to justify a verdict of death against defendant James Roane.

And that would also apply, of course, to the killings of Louis Johnson and Peyton Maurice Johnson. Each of those directly make reference to intentionally killed. We would submit that would go to, quote, the triggerman.

Additionally, Your Honor, we would have some objection with Non-statutory Number 3, recruiting a minor, for the same reasons that I will not waste the Court's time with. There is no indication that Mr. Roane recruited anyone. In fact, there is no

indication he even knew this person, "E.B.," until he showed up in this alleged conspiracy.

Additionally, Your Honor, we have a couple things. One, the defendant has a substantial criminal history. Number two, we would submit that at this juncture, as the Court is well aware, every defendant in a criminal case has a right to be free from arbitrary application, which is why we give very definitive jury instructions. We would submit that the word "substantial" is one of those nebulous terms that gives the jury almost unfettered discretion as to what it should do. It gives no direction.

Likewise, we would submit that the term "substantial planning" and "premeditation" in Statutory Aggravator Number 6 gives none, particularly in light of the United States' argument. The United States argued that there was evidence of premeditation because the defendant went somewhere and got a gun and came back and shot someone, or went somewhere and got a knife and came back and stabbed someone. Actually, what has been argued here, and actually what's in the law, there is no difference between premeditation and intent or manifesting intent. If an idea is formulated to kill someone, and you reach for a weapon, then that is acting on that intent. And the United States has argued that's premeditation. By putting the act into effect, by going to get the weapon, that is premeditation. Under that argument, unless you kill someone with a muffin or a soda straw, if you formulate the intent to kill and then commit any act to put it into effect, then that is premeditation. As such, we would say those are unsubstantial terms and violate the defendant's right to be free from arbitrary application of law.

And you are giving the jury unfettered discretion. If they like him, they can do what they want to do. If they don't, they can do what they want to do. That's a violation of his constitutional rights.

For those reasons we would ask that Statutory Number 6 and Non-statutory Number 2 be struck in that "substantial criminal history" is entirely too nebulous on a death penalty case, and three, that Number 6, substantial planning and premeditation, we would submit that one, the evidence falls short of it. And number two, the terms as utilized in this statute are too non-specific to pass constitutional muster.

Additionally, Your Honor, and lastly, am I correct -- and the only reason I do this is because I'm getting really tired of having to stand up and

295a

3405

object during arguments. As I understand it, and I would like an order to this effect, there is no evidence of jail conduct which would justify aggravation against my client except an alleged conversation with Mr. Roane and some people concerning the possible death of Martha McCoy. It is my understanding that that was the only evidence that was admitted, and that everything else was excluded. And if it was excluded, it can't be part of it.

Additionally, there is a question here on the threat to some uncle. I believe the government's witness testified that this Deputy Brown, the uncle of Martha McCoy, threatened the defendant's brother. And that was the reason for some threat being made. It wasn't in furtherance of this alleged activity.

I would ask the Court to enter the order at this time that as we stand here at this juncture, there is no evidence of jail conduct which would justify consideration as aggravation justifying death against the defendant Roane except the alleged telephone call concerning the death of Martha McCoy or conversation with Maurice Saunders concerning the death of Martha McCoy.

And that is all we have at this time. Anything else, of course, would be outside the record, and we

3406

would have to object. We would point out that repeatedly having to do this in face of the Court's rulings, when the Court makes these rulings the United States violates it anyway. It is starting to impact on the position of our clients. We will discuss that later. But it is having a negative effect. I would like to have an order to that effect.

(Counsel conferring with co-counsel.)

So, Your Honor, for the express statutory and non-statutory aggravating factors as I have indicated, and I can repeat them, and as to each count, we would ask that the jury be directed and limited in their application of certain aggravating factors as to certain counts.

MR. VICK: Your Honor, as to defendant Richard Tipton's motions, clearly the evidence is sufficient to allow the jury to find that the defendant, Tipton, intentionally killed the victims that he is charged with. Specifically, intentionally killed Doug Talley; intentionally killed the three people who he has been found guilty of killing on Church Hill; intentionally killed the two people that he was found guilty of killing on Stony Run on February 19th, 1992. Defense counsel's arguments,

3407

all three defense counsels' arguments basically go

into semantics. Clearly, the actions engaged in by the defendants in these cases, which has been accepted by the jury given the verdict that it has rendered, shows that they have found that these defendants intentionally killed the victims.

Unless the Court has questions, I won't go through the specifics.

THE COURT: I don't have any question about that.

MR. VICK: As to the substantial criminal history, Your Honor, as I've already stated, it is clear that each of these defendants, given the evidence that's come forth in the last four weeks, it is clear that each of these defendants have substantial criminal histories over and above what was actually charged in the indictment; that they have been virtual crime sprees in and of themselves for the last -- at least for the last four or five years for Mr. Tipton and Mr. Johnson, and for Mr. Roane, since he got out of the penitentiary on his last stay in the penitentiary. They have been virtual crime sprees, and that's something this jury can take into consideration when rendering the proper punishment that should be rendered against these defendants.

As to defendant Tipton, given the construction of the evidence as we have argued it on the Non-aggravating Factor Number 4, he has indeed seriously wounded two individuals in the course of committing the murders, Gwen and "Pepsi" Greene. He was found not guilty by the jury on the Torrick Brown murder and wounding, which would be the third person, Ms. Martha McCoy.

As to Mr. Cory Johnson, unless the Court has specific questions to me, again, I think the evidence is clear from the witness stand and fits into each one of these aggravating factors. Each and every one of these factors has been proven against Mr. Cory Johnson. The same is true with Mr. Roane. I don't know what Mr. Baugh was talking about at the end there about the United States talking about jailhouse conduct other than that which the Court has allowed. We have done nothing more than what the Court told us we could do, nothing more than the jury has heard from the witness stand.

So unless the Court has any specific questions as to their arguments, it is the position of the United States that each and every aggravating factor as to each and every one of these defendants, with the exception of the three being changed to two for Mr. Tipton, has indeed been proved.

THE COURT: All right.

MR. WHITE: We would adopt the other arguments of counsel that are applicable to ours.

THE COURT: All right. Dealing with --

MR. BAUGH: Just briefly, we would also adopt, but I would call to the Court's attention in its ruling, once again the United States said that we are talking about semantics in these cases. The jury has already found in these cases. At this juncture, each case and each aggravating factor must be considered independently. Each defendant, each aggravating, as to each count. And for those reasons, Your Honor, I agree that if you view it as a "these case" situation, we do not have a leg to stand on. However, if the Court finds that the jury must determine whether or not a defendant gets the death penalty based upon his conduct as it pertains and applies to each count for which he is indicted and convicted, rather than his total overall, that the motion should be granted and that the jury should be directed that certain aggravating factors that have not been proven as to a specific defendant cannot be applied to a given count, and that the United States be limited in its argument as to those issues.

MR. COOLEY: We adopt the arguments of other counsel.

THE COURT: All right. Starting first with Tipton: The non-statutory aggravating factors as they appear in the notice that go to Non-statutory Aggravating Factor Number 3, that would be dismissed. Related to 2, the defendant having recruited a minor to participate with him in the murder, Non-statutory Aggravating Factor Number 4, the word "three" will be amended to read "two" in that sentence.

As to Non-statutory Aggravating Factor Number 5, it will be dismissed. All other motions relating to non-statutory factors will be denied. The statutory factors, I believe arguments were made relating to 1, 2, and 6. And those motions will be denied.

Moving on to Mr. Johnson, Statutory Factor Number 6, the language in Number 6 will be changed, that the defendant committed the CCE murders after substantial planning and premeditation. Non-statutory factors going to Number 2, that motion will be denied. Number 3, that motion will be granted, and Number 3 will be dismissed. The motion relating to Number 5 will be denied.

Moving on to Mr. Roane: As a statutory factor, Number 5 will be dismissed as a statutory factor.

Moving to the non-statutory aggravating factors, Number 3 will be dismissed. All other motions relating to the other factors, statutory and

non-statutory, will be denied.

MR. GEARY:  If I may, on behalf of Mr. Tipton, could we ask the Court to amend the Statutory Aggravator Number 6 for him, also, as you have done for Mr. Johnson?  The defendant committed the CCE murders rather than the word "offenses"?

THE COURT:  This is Tipton?

MR. GEARY:  Yes.

THE COURT:  All right.  It will be similarly amended.

MR. BAUGH:  We would ask for that for Mr. Roane, too, in light of the Torrick Brown killing, Your Honor.

THE COURT:  All right.  They will all be amended similarly.  All right, we will be in adjournment until tomorrow at 10 o'clock a.m.

(Proceedings adjourned at 2:45 p.m.)

3878

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

----------------------------------------

UNITED STATES OF AMERICA,

                    Plaintiff;

    v.                              CRIMINAL ACTION
                                       92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                    Defendants.

----------------------------------------
                    VOLUME XXII

                February 12, 1993
                Richmond, Virginia
                   10:00 a.m.

BEFORE:        HONORABLE JAMES R. SPENCER
               United States District Judge


APPEARANCES:   HOWARD C. VICK, JR., ESQ.
               WILLIAM H. PARCELL, III, ESQ.
               Office of the United States Attorney;
                   Counsel for Government;

               ROBERT P. GEARY, ESQ.
               ERIC D. WHITE, ESQ.
                   Counsel for Defendant Tipton;
               CRAIG S. COOLEY, ESQ.
               JOHN F. McGARVEY, ESQ.
                   Counsel for Defendant Johnson;
               DAVID P. BAUGH, ESQ.
               ARNOLD R. HENDERSON, V, ESQ.
                   Counsel for Defendant Roane;
               ROBERT J. WAGNER, ESQ.
                   Counsel for Defendant Reavis.
                   JEFFREY B. KULL
               OFFICIAL COURT REPORTER
3879
                P-R-O-C-E-E-D-I-N-G-S
          THE CLERK:  Criminal Action Number 92CR68:
United States of America versus Richard Tipton, Cory

Johnson, and James H. Roane, Jr., the twenty-second day of trial.  Are counsel ready to proceed?

MR. VICK:  Government is ready.

MR. GEARY:  Defendant Tipton is.

MR. McGARVEY:  Johnson is prepared.

MR. BAUGH:  Defendant Roane is ready.  We submitted an instruction pursuant to ZANT v. STEPHENS.  I gave the Clerk a draft of it this morning.

THE COURT:  I've considered it.  I'm not going to give it, but I'm going to make a slight change.  I think what I have already decided to give takes care of that problem, but I'm going to add a sentence.  Come up here.

(At Bench.)

THE COURT:  At the end of instruction Number 18, I will add this language:  "Also, remember that no cited mitigation factor can ever be used by you as a reason to impose the death penalty.  Also, remember that no cited mitigation factor can ever be used by you as a reason to impose the death penalty."

3880

MR. BAUGH:  Also, while we are here we wanted to object to the Court's substantial planning and premeditation.  "Ample planning and deliberation," which is the language the Court used, it doesn't really narrow the range of murderers.  We cite GODFREY v. GEORGIA.  These definitions are all-encompassing.  I believe the purpose the statute is to specifically narrow the field of people to whom the death penalty applied.  There is too many murders.

MR. WHITE:  If I could make one comment, what concerns me, the very last sentence on the first page of Instruction 9, where it says "Substantial planning means planning which is considerable or ample for the commission of the crime at issue."  Where it starts with "or," it seems to lower the standard in terms of what we are talking about, just that enough to get through the crime itself.  "Substantial" means more than that.

THE COURT:  The objection will be overruled.

MR. BAUGH:  We renew our severance request in light of -- we are all going to have to step on each other's toes today.  In the alternative, we would ask the Court for sequential verdicts.

3881

THE COURT:  Objection overruled.

MR. McGARVEY:  Defendant Johnson would join in all motions.

THE COURT:  All right.

(In Open Court.)

All right, let's bring in the jury, please.

(The jury entered the courtroom.)

All right, this morning we are going to have the closing arguments in the aggravation and mitigation phase. Mr. Vick?

MR. VICK: Thank you, Your Honor. Good morning again, ladies and gentlemen. First, I'd like to take the time very briefly to thank you for your attention throughout this five weeks of trial. Your attention this week has also been admirable, and I'm sure that you will go back and apply that same sort of diligence to the verdict that you render on this phase of trial.

Ladies and gentlemen, now it is your time. The lawyers have had their time. The evidence has all been presented. Now it is time for you to go back and do your duty.

Each of you during the voir dire, prior to your selection as members of this jury, stated that in the appropriate case, given the appropriate circumstances, that you could indeed render a verdict of death against a defendant. Ladies and gentlemen, I submit that based upon the evidence that you have seen from this witness stand over the last five weeks, that this is the appropriate case to render a verdict of death as to each and every defendant.

You took an oath. It is an awesome responsibility. It is an awesome duty. But nonetheless, it is just that, a duty. Your duty, ladies and gentlemen of the jury, given the evidence that you have heard, requires no less verdict than death.

As I said in my opening this week, and as I remind you now, ladies and gentlemen, this is a case where you are deciding the fate of mass murderers. Each of these defendants has been convicted by you of being just that, a mass murderer. Each of these defendants comes before you for sentencing having killed a number of people.

The human cost of what these three men have done to support their drug dealing, to further their drug dealing, is immeasurable. Absolutely immeasurable. The evidence is clear, beyond a reasonable doubt, that they have laid waste to the lives of a number of people for their own personal gain, for their own personal satisfaction, for their own personal machismo. They have left ten dead people on the streets of the City of Richmond. They have left two people so seriously wounded that they will never recover. They have left one other seriously wounded person. They have shot one person in front of her children.

302a

Think of the immeasurable harm that has been done to the minds of Montez McCoy and his sisters, who saw their uncle brutally mowed down in front of them, and saw their mother shot by James Roane and Cory Johnson.  You can't quantify or qualify the amount of harm that has been caused by these people.

As I said at the beginning of this week and I remind you now, we have the burden -- that is, the United States, the government -- of proving the aggravating factors which need to be proven in order to impose the death penalty beyond a reasonable doubt.  I also told you that we would not put on a great deal of evidence this week.  And you saw.  We did not put on a great deal of evidence.  Our evidence came prior to this week, in the four weeks of testimony which led you to find these people guilty.  That evidence, as you know, has already been reintroduced and is in front of you in total this

3884

week.  That evidence is to be considered by you in total this week when rendering the appropriate sentence against these defendants.

The aggravating factors are listed in the jury's instructions, in the Court's instructions to you.  There are specific aggravating factors as to each and every defendant.  In most cases, they repeat themselves as to each defendant:

That the defendant intentionally killed the victim; that the defendant intentionally inflicted serious bodily injury which resulted in the death of a victim; that the defendant intentionally engaged in conduct intending that the victim be killed or that lethal force be employed against the victim which resulted in the death of the victim; that the defendant intentionally engaged in conduct which the defendant knew would create a grave risk of death to a person other than one of the participants in the offense and which resulted in the death of the victim.

Those four aggravating factors are repeated as to each and every defendant in this case.  And given the evidence that is presented to you, the government has shown beyond a reasonable doubt that each and every one of those factors has been satisfied.  Each

3885

and every murder committed in furtherance of the Continuing Criminal Enterprise satisfies all four of those aggravating factors.

Remember I told you at the beginning of the week that the aggravating factors are to a certain extent duplicative or overlapping?  But going back, applying your common sense, what you understand to be the normal meaning of those words, you will see that the government has proven each one of those aggravating

factors beyond a reasonable doubt as to each one of the defendants.

That is the first group of aggravating factors out of which you must find that at least one exists. I submit all four exist as to each and every defendant, each and every murder that they are being sentenced on here today.

In the second group of aggravating factors, defendant Cory Johnson and defendant Richard Tipton have been charged with, in the commission of the offenses enunciated in the indictment, the defendant knowingly created a grave risk of death to one or more persons in addition to the victims of the offense. Clearly they have done that in the case of Gwendolyn and "Pepsi" Greene. That has been proven to you beyond a reasonable doubt. You have already

3886

found that aggravating factor beyond a reasonable doubt, as you have already found the other aggravating factors beyond a reasonable doubt, shown by the verdict you returned on the guilt phase of this case.

As to each one of the defendants, it is charged that the defendant committed the murders enunciated after substantial planning and premeditation. The Court will provide you instructions on that, and I submit to you that you have already found beyond a reasonable doubt that these murders were committed after substantial planning and premeditation. Each one of these murders was premeditated. You know that from the evidence that has been presented.

And I remind you just briefly of the evidence that indeed shows premeditation. Remind yourself of the clear testimony from the mouths of "J.R." and "Whitey" to Ronita Hollman and others in the Newtowne area. "We are going to take over up here." Remind yourself of that credo following them down here from New York, from New Jersey, with the New York Boyz, where they clearly intended to take over blocks in New Jersey. They brought that mind set, that modus operandi, that way of operating, to Richmond. And indeed, they implemented it in the most violent

3887

fashion that they could. They laid waste the bodies that they promised they would lay waste in order to take over. Clear premeditation. But as to each one of the specific murders charged in the indictment, you also have clear premeditation based upon the evidence that you have heard, and substantial planning.

The Court's instruction to you as to substantial planning says that substantial planning means planning which is considerable, or ample, for the commission of the crime at issue. Ample for the

304a

commission of the crime at issue.  Clearly, as to each one of the murders perpetrated by these defendants, they put in ample enough planning to carry it out.  Start with murder number one, the murder of Doug Talley by Richard Tipton and James Roane: 84 stab wounds, most of them to the head and upper body.  84 stab wounds where they clearly intended to plan that murder by taking him to South Richmond, by recovering the knife that was used to stab him 84 times.  They got out of the car and talked about it with each other, James Roane and "Whitey," got back in the car.  James Roane grabbed him around the neck, and "Whitey" began to stab him for four or five minutes.  They then took that knife, disposed of that knife by giving it to "Pepsi" Greene to hold.

And you have the lead-in to the clear premeditation and murder of the next victim, Douglas Moody.  They went and retrieved that knife.  Why did they retrieve that knife, ladies and gentlemen?  They retrieved that knife with one thought in mind: killing Doug Moody.  Clear premeditation, substantial planning.  They intended the consequences of their actions.  They intended to kill these people to clear their way for drug dealing in Newtowne.

Go next to the murder of Peyton Maurice Johnson.  They stalked that man.  "J.R." stalked that man.  They went and retrieved the weapons, which is further planning, further evidence of premeditation and planning, as indeed the purchase of the weapons themselves is evidence of premeditation and planning.  Why do you think they purchased those weapons?  To carry out their plan of taking over Newtowne.  And they used them beginning the day they got them, January 14th, 1992.  They stalked Peyton Maurice Johnson.  "J.R." found him.  "C.O." and "E.B." walked in that house and blew that man away like he was an animal.  They then took the guns and, planning and premeditating their next murder, gave them to "Papoose" to wipe down and hide.

They went and retrieved those guns and indeed killed Louis Johnson with those guns on January 29th.  Remember the statements of Sterling Hardy and Jerry Gaiters, where "J.R." told them "Keep him in the alley."  Keep Louis Johnson in the alley.  They pulled up clearly intending to kill that man.  They got out of the car, put the guns to his head, and blew him away like an animal in the street, also.  Clear planning and premeditation as to that murder.

The triple homicide in Church Hill, "Mousey" Armstrong, again hunted down like an animal by "C.O."  He made Jerry Gaiters take him and find "Mousey"

305a

Armstrong. Could there be any question in your mind as to the premeditation and planning of that.

Could there be any question in your mind as to the premeditation and planning of the killings on February 19th, 1992, where "C.O." and "Whitey" hunted down Linwood Chiles and Curt Thorne, found them with "Pepsi" and Gwen and mowed all of them down because they had received a telephone call from "V" in the jail indicating that they might be cooperating with the police? How much more clear planning and premeditation could there be than that particular murder.

3890

The aggravating factors, ladies and gentlemen, have been proven to you already beyond a reasonable doubt. Your jury verdict on the guilt phase of this trial establishes that. There is listed, as to each of the defendants, other factors, non-statutory factors, that you can consider when rendering the proper verdict of sentence against these defendants: that the defendants committed multiple murders. Indeed, that they are mass murderers. That the defendants have substantial criminal histories. In the case of James Roane, you will see a series of convictions against him. You will see two convictions against Cory Johnson. No convictions of record have been introduced into evidence as to Richard Tipton, but I suggest to you that based upon the evidence you have heard, Richard Tipton, Cory Johnson, and James Roane were virtual crime waves in and of themselves. Wherever they went, crime followed, be it New York, New Jersey, or Richmond. They were virtual crime waves with substantial criminal histories. Remind yourself of Anthony Howlen and his mutilated face; the arrest of Richard Tipton by the police in New Jersey. They are in and of themselves crime waves.

That the defendant, each of them, has been

3891

charged with seriously wounding individuals in the course of the murders outlined. Remind yourself again of Gwen and "Pepsi," of Martha, and the woundings that they received because these people wanted to carry out their drug business. And each of them has been charged in the statutory aggravating factor with knowingly and willfully being a member of a conspiracy which had as one of its goals the murder of individuals other than those for which the defendant has been charged. And that's important. You need to remember that.

Now, you can find that a verdict of death should be entered as to each one of these defendants only on the CCE murders that they have been found guilty of. So for example, you could find that Richard Tipton

deserves to die for the murder of Doug Talley, or that Cory Johnson deserves to die for the murder of Linwood Chiles, or that James Roane deserves to die for the murder of Peyton Maurice Johnson. You have got to decide that individually as to the murders charged in the indictment.

But in rendering that decision, you are free to remember all of the evidence of other murders and crimes that were carried out in furtherance of this conspiracy. You are not constrained in making that decision as to what the appropriate punishment is for that CCE murder to limit yourself only to that murder. You can consider the goals of the conspiracy. You can consider the actions of other co-conspirators and what they did in furtherance of this conspiracy when rendering that. You cannot kill James Roane, statutorily, because of his murder of Torrick Brown. But you can indeed consider that when determining whether that's the appropriate verdict for him based upon his murder of Peyton Maurice Johnson. You can consider the fact that he, in reptillian-like coldness went in and shot Torrick Brown. That can all be considered by you. It is in evidence. It has been proven beyond a reasonable doubt.

You can consider the evidence that's been put on this week by the government concerning the fact that from jail, while incarcerated, these defendants continued to try to have people killed. Specifically, you can consider that "Whitey" wanted C.T. Woody killed and wanted "Wildman" killed. You can consider that Cory Johnson wanted C.T. Woody killed and wanted Valerie Butler killed. You can consider that James Roane wanted Martha McCoy and Montez McCoy and the other witnesses killed, and was even going to take action against Doug Cunningham and the uncle of Martha McCoy if they testified at trial. You can properly consider that in rendering the right verdict and deciding what is the proper verdict in this situation of mass murder.

Go back and look at what the government has to prove. I submit to you each and every one of the aggravating factors has been proven to you beyond a reasonable doubt. You have already found them in your guilt phase verdict.

The defense case this week -- let me back up a second. In reaching your decision, what you need to do, and the Court will instruct you about this, what you need to do is take the government's aggravating factors that have been proven beyond a reasonable doubt, take the mitigating factors that you find to have been proven, and simply weigh them. It is not a

mathematical formula. You don't have to go back there and say the government has proven 16 aggravating factors and the defense has proven 83 based upon the Court's submission to me, so therefore, the defense evidence weighs more. No. Any one aggravating factor can be found by you to outweigh the entire defense case as to the mitigating factors that you must decide. It is a weighing

decision that you must make. Given what you saw in the first four weeks of trial concerning these men's actions as opposed to given what you have seen this week concerning the mitigation, what is the appropriate sentence? What should these men be sentenced to?

And while we are speaking about that, let's talk about the evidence that you have heard this week in mitigation. The evidence that you have heard in aggravation is clear, clear beyond a reasonable doubt. What have you heard this week? From defendant Tipton, you heard that it is not his fault. His bad youth made him do it. His bad relationship with his mother made him do it. It is not his fault.

We are sorry he has had an unfortunate youth. He is not the only child who has had an unfortunate youth. Indeed, each one of these defendants has put on evidence this week about attention deficit problems, learning disabilities. I suggest that each one of you on that jury knows someone who has a learning disability. Is that an excuse for murder.

Each one of the defense counsel stood up and said to you, "We don't intend this as an excuse." That's a smokescreen, ladies and gentlemen. That's

exactly what it is intended as. It is intended as a smokescreen. It is intended as an excuse. These people cannot be forgiven their actions because they had a hard time learning. And that's in essence what you have been asked to do this week. That would substantially negate all the hard work that has been done by all those other people with learning disabilities and bad backgrounds who overcome that. People with those learning disabilities and bad backgrounds don't have a license to kill. Indeed, you remember Dr. Bright's testimony about Richard Tipton. He has worked with thousands of children with learning disabilities. Never before, ever, has he worked or seen one who has committed six murders. None of the doctors who testified here this week, despite their extensive involvement with children with these problems, has testified that they ever have seen anybody commit the amount of murders that these defendants have been found guilty of

committing. It is offered to you as an excuse. It is not an excuse.

Indeed, defendant Tipton had that loving environment in certain situations that he complained he didn't. His grandmother clearly loved him. He was welcome in that house in New York. He rejected that. He walked away from it. Brenda Williams came and testified as to the nice, loving environment she gave him. He rejected that and walked away. I'm not saying the man had a perfect upbringing. I'm not saying life couldn't have been easier or better for him. I'm just telling you that it does not excuse what he did. I would bet that if you looked at the lives of each one of the victims, you would find similarities in their background, too. Does that mean that they should be brutally mowed down in the streets? No.

Ask yourself about the story you heard from Richard Tipton's witnesses as to why it is if his background is so bad that each and every one of his cousins is productive, hold jobs. That background has produced productive people. He cannot be excused his actions because of his background.

The evidence is clear, too, presented by the defense witnesses this week, that Richard Tipton is set in his ways; that he has cognitive rigidity. He is impulsive and reacts violently to emotional stimuli. That evidence is clear, presented by the defense, that that is Richard Tipton. Given his unfortunate youth, given what went into making him what he is today is all unfortunate. But it has created a virtual killing machine. The doctors that have testified for Mr. Tipton have been clear in that regard. Ask yourself if it was a smokescreen when the defense argued that indeed perhaps he might be able to rehabilitate himself in jail, when not in a period of one year since his incarceration has one step been taken for him to change his behavior, to change the way he is. I submit to you he cannot. He is who he is.

I remind you of another important fact concerning the testimony that you have heard this week from Richard Tipton. A number of people have talked to him for hours. Hans Selvog talked to him, Dr. Evans talked to him. In fact, he has poured his heart out to these people concerning the deprivation of his youth, the unfortunate circumstances with his mother. He has gone into intimate detail in his life with these people and they have testified to you based upon what he has told them. I ask you, have you seen once from that witness stand this week an iota of remorsefulness from that man?

MR. GEARY:  I object.

THE COURT:  The objection is sustained. Mr. Vick, don't get stupid in the end of this, please.

3898

MR. VICK:  Yes, sir.  As to Mr. Cory Johnson, he, too, says, "I've had a bad youth.  I've got a learning disability.  I should therefore be excused from blameworthiness for what I have done." You can't do that, ladies and gentlemen.  The testimony of the doctors who testified for him have made it clear that he knew right from wrong; that he had a clear moral compass.  Indeed, the testimony from the people from the New York Cottage School was clear:  that he had a strong moral compass; that he has at some point in his life rejected it.

MR. BAUGH:  I hesitate to rise, but we are going to have to object and approach the bench in the middle in light of that.  We have discussed it and it has to be raised.

THE COURT:  No, you don't have to come up. I'll do an instruction, cautionary instruction, after this is over.

MR. BAUGH:  Objection.

MR. VICK:  Remind yourself about the evidence presented from the experts in his defense. I would submit to you that that evidence was one-sided.  I'll give you an example.  In his testimony, the doctor said that he had an IQ of 77, two points above mentally retarded, and submitted

3899

that to you as if it were a fact.  That's two points above mental retardation.  He therefore is two points above where the law would not allow you to assess a penalty of death against him.

That's disingenuous, ladies and gentlemen.  By the very definition given you by that same expert, it is clear that IQ goes only as to one factor of a man's mental retardation.  And his ability to socialize and communicate is another factor, as are all the others.  Cory Johnson has had absolutely no problem, based upon the evidence you have heard here in the last four weeks, in maintaining himself and keeping care of himself and keeping a home and dressing himself, in socializing, in talking.  He is not mentally retarded.  He is not close to mentally retarded.  I submit to you the more accurate IQ test was given in 1982, where it was shown he had an IQ of 88.  Remember, the last IQ test done of Mr. Johnson by Dr. Cornell was done in anticipation of testimony for this trial, done by Cory Johnson knowing that this would be the subject of that man's testimony in the penalty phase of trial.  That is disingenuous, ladies and gentlemen.  That man is not nearly

mentally retarded. All the evidence you have heard this week rejects that. Dr. Cornell told you, in essence, that he could not have run a drug organization, he could not have organized and supervised that. You found that he had. The evidence is clear that he did. Contrasted by the testing that showed he was in the superior range in structure of word fluency. He knew enough math to know that "Mousey" Armstrong owed him $400 for crack cocaine. He certainly had no problem with that. He is not mentally retarded.

Again, he might have had a learning disability and an unfortunate youth. He was offered a structured environment. He was offered everything that the State of New York had to offer him in an effort to right him. And that was rejected by him. He is, too, given the doctor's testimony, who he is. He is, too, at this point, given his unfortunate youth, a killing machine.

As to defendant James Roane: His case this week has basically amounted to it is not his fault, it is society's fault. "They let me down. They didn't take care of me the way I should have been taken care of. Those four murders that I am charged with weren't really my fault; they are society's fault." You can't accept that, ladies and gentlemen. That is not an excuse for what he has done.

The doctors said clearly about James Roane that he is intelligent, that he knows right from wrong, that he can clearly premeditate. They have also clearly testified that he rejected the help that was given him. He did not do well in the Charlottesville school. He went away. The evidence is clear in their record. He did not adjust. He left Mr. Brunson, who tried to give him a loving environment.

MR. BAUGH: I object. That is not the record.

THE COURT: Overruled.

MR. VICK: And look at Mr. Brunson's last entry. He said that the last phone call he got was from a friend of James Roane, who said that James was back into drugs. It is the last time he heard from James Roane. It is clear that James Roane walked away from Mr. Brunson. You can't believe that Mr. Brunson would have cut him off and had no contact with him had James wanted continued contact with him.

Again the evidence is clear that in the last year he has been in jail he has made no efforts to change. They will ask you to find a mitigating factor that he will make a good adjustment to jail. There has been no evidence that he has attempted to

change in any way over the last year. Indeed, the evidence has shown that from jail he has tried to orchestrate murders.

The evidence has shown that he, too, is who he is. He is impulsive and violent, with cognitive rigidity. That is James Roane. He, too, is a killing machine.

Some thoughts, ladies and gentlemen, about the propriety of the death penalty: And I know each one of you have given a great deal of thought as to whether the death penalty is ever an appropriate sanction, and if indeed the death penalty is an appropriate sanction in this case. I submit to you that the death penalty is an appropriate sanction for three reasons. The first reason is that our laws act as a deterrence.

MR. BAUGH: Objection. They cannot argue deterrent effect in a capital case. That's called billboard, and it is illegal.

THE COURT: Sustained.

MR. BAUGH: We would ask the jury be instructed that cannot be considered as an aggravator.

THE COURT: The objection is sustained.

MR. VICK: Is this the appropriate punishment given the actions of these defendants? I submit to you, ladies and gentlemen, it is indeed the appropriate punishment. As you know from the testimony that's come from that witness stand, people can get life, penitentiary terms, based only upon drug dealing. Drug dealing alone could lead you to a life of incarceration. And indeed, there are many people incarcerated for life from drug dealing alone. These defendants have gone far further than simply dealing drugs. They have killed ten people in furtherance of their drug-dealing operation. They deserve a punishment greater than those other people who are in jail for life based upon drug dealing alone.

A sentence of life in the penitentiary by you will in essence tell them and other drug dealers that you can sell drugs and kill people and you will get punished no more severely --

MR. BAUGH: That's deterrent effect again. That cannot be argued.

THE COURT: Overruled.

MR. VICK: -- than if you sell drugs only. They deserve the maximum punishment, ladies and gentlemen, because in addition to their drug dealing, they chose to kill ten people.

Ask yourself, should they be punished beyond

incarceration?  I'm not telling you incarceration is nice and a lifetime of incarceration is not punishment.  But think about each and every day of their existence in jail.  They will wake up, bathe, be fed.  They will be able to watch TV, read books. They will be able to use the telephone to talk to their loved ones.

MR. McGARVEY:  There is no evidence whatsoever of that in the record.

THE COURT:  Sustained.

MR. BAUGH:  Jesus.

MR. VICK:  They have sentenced Richard Tipton and Cory Johnson, have sentenced Gwen Greene to a life of less mobility than that.  Their punishment --

MR. BAUGH:  I thought you just sustained the objection.

THE COURT:  The objection is sustained.

MR. VICK:  Given their actions, ladies and gentlemen, the punishment in this case should indeed be the maximum punishment; that is, the death penalty.

These people have continued in jail to try to harm others.  Detective C.T. Woody, Valerie Butler, Martha McCoy, Doug Cunningham.  You can consider that when determining whether life in the penitentiary is the appropriate punishment, or whether the death penalty is the appropriate punishment.  And I suggest to you that it leads you to but one conclusion:  That in this case, given their actions, death is the only appropriate sanction for these people.

I began this by saying that this is an awesome duty that you have undertaken, and indeed it is an awesome duty you have undertaken.  But the law is clear that in certain cases, the death penalty should be imposed.  It is the will of Congress.  It is the law that you must follow.  What you must determine is, given the evidence that you have heard, is this one of those appropriate cases?  And I suggest to you, ladies and gentlemen, it is the appropriate case.  Remind yourself of the pictures that you have seen of the people that they have laid waste to. Remind yourself of the clear choices that they made on each and every occasion which led to these murders.  Each one of us make choices that could shorten our lives.  We smoke, we ride motorcycles at 80 miles an hour, hand-glide.  We make choices that might shorten our lives.  These people made ten clear choices to kill other people that should result in the shortening of their life given the law that you operate under.

Ladies and gentlemen, it is a strong duty you

have.  But it is just that.  It is a duty.  This case warrants the imposition of the maximum punishment possible, the imposition of the death penalty as to each defendant:  Cory Johnson, Richard Tipton, and James Roane.  Thank you.

THE COURT:  All right.  Ladies and gentlemen, before we get started with the first defense argument, I have to give you a cautionary instruction.  Mr. Vick, in the zeal of his argument, indicated that Mr. Tipton had spoken many times and openly to the defense experts and they took the stand and discussed that.  He then followed that up with "But you haven't seen one iota of remorse from the witness stand."

You cannot, you will not, ever require a defendant to take the stand.  The defendant doesn't have to testify.  The defendant doesn't have any burden to prove that he should not be put to death.  The burden is on the government to prove beyond a reasonable doubt that a defendant should be put to death.

As I will indicate to you in further instructions, as I've said to you earlier in the first part of the trial, the argument on the part of the counsel is just that.  It is not evidence.  And you must consider it in that light.  But under no circumstances are you to take that kind of argument as indicating that the defendant has an obligation to take the stand and tell you something, even if to indicate remorse.  Do you understand?

MR. BAUGH:  Can we reserve our motion at this time?

THE COURT:  All right.

MR. COOLEY:  Also on that and another point.

THE COURT:  All right.  Mr. Tipton's counsel?

MR. GEARY:  May it please the Court.  Back in April of 1992, Eric White and I were appointed to represent Richard Tipton.  And the point I didn't want to be at back then and through May, June, July, August, through January, February, was being here right now.  That's the point where a defense lawyer doesn't want to have to be, where his client has been convicted of capital murder, where 12 members of the jury have just heard a moral-authority argument from the prosecutor to put his client to death and he has to stand up here and try to find words to convince you that you shouldn't do that.

I have had the privilege, in over 22 years of doing this, of seeing what I consider to be two classic closing arguments.  One was in this Court

314a

about seven years ago by a prosecutor in a murder case, and the other was about 15 years ago in Richmond Circuit Court by a defense lawyer in the first capital murder case brought in Central Virginia after the statute was changed in Virginia in 1978.  I was co-counsel to that lawyer.  And he made, he and the lawyer that I talked about before, made arguments that I can close my eyes and still see them.  The other lawyer is now a judge in Richmond, and the prosecutor who made that closing argument was Judge Spencer here about six or seven years ago.  I don't have that ability.  I don't have that magic wand to wave to you to say, "Put him in prison for life."  I don't know if I can do that.  I don't know if David Baugh can do it, or John McGarvey can do it.  The problem with having a case for eight months, ladies and gentlemen, is you get to know your client.  I have been to the jail to see Richard Tipton anywhere from 70 to 90 times, and I've gotten to know him.

And this report that Mr. Selvog prepared tells

3909

you the bad background.  And believe me, that's not a smokescreen.  That's simply to tell you who that boy is over there.  Because as he sits there, he is 22 years old.  And I can tell you from what Mr. Selvog told me in here, from what Tina Wilkerson said, and Brenda Anderson, that he is about seven or eight years old.  He has the maturity of a young, young boy because of what his mother and father did or didn't do to him.

When we started this case I thought if we could get the Marshal sitting here to move over and get Cory to move over a little bit, we should put two chairs next to Richard Tipton and put two people in there -- his father and mother -- and let them hear and find out what he did in the City of Richmond, the drug dealing he did before then, and to say to those two people, When you decide to bring a child into the world you must take care of that child.  You must not abandon that child," like the Tipton family did.  I mean exactly that: his father, paternal grandmother, Ruby Tipton, his uncles.  They abandoned that boy to New York City to a very tiny apartment where a shooting gallery took place.  His mother and her series of friends and junkies shot drugs day and night.

3910

When you go through this report, take a look, for instance, at page 21 in the report.  I'm going to read some of it to you, where Mr. Selvog interviewed Martrice, his sister, and Tina Wilkerson.  And Tina on page 21 talks about when Martrice moved out of the house; she couldn't stand it anymore.  She went across the street, and the video showed you where the

grandmother lived as opposed to Charlene Tipton.  He quotes Tina saying, "I remember when Martrice moved out of Charlene and "Pimp's" apartment and came to live with us."  She was 14 years old, meaning Richard Tipton was ten.  She said, "Can I come and sleep on your floor?  If not, I'll put myself in a home.  I can't stand it there anymore."

She came across the street.  There wasn't any room for Richard to come, so he stayed with this woman that uses the term "mother."  On page 21, Tina is asked about him, what he was like when he was a young boy.  And she said Manny understood from a very early age that all he had was himself to rely on.  He would often comment on self-reliance by saying, quote, "I don't ask for anything, I'm not a burden on anyone.  I don't ask for any money."

This particularly exacerbated when grandfather died, Tina said.  Henry Wilkerson died in 1986,

3911

richard Tipton's grandfather.  He was a longshoreman, mechanic, forklift operator.  Probably the only male influence that Richard Tipton had in his life as a young boy who was in any way positive and of assistance to him.  Certainly Richard Tipton, the father, was of absolutely no weight in his life.  He was abandoned when he was two years old in Richmond when Charlene Tipton went back to New York.  This is all to point out to you in every kind of graphic detail that you could ask for in this report, which is based, as Mr. Selvog said, on numerous consultations, interviews with a lot of people.

Again, I suggest to you we are not here to put up a smokescreen on you, which the government says we are trying to do.  We are trying to show you his upbringing, that's all.  Because you have to decide between two punishments.  It is not that you are going to let him go, but two very severe punishments.  Which one should this kid get.

He is a kid.  I tell you that.  He is a kid. Because he is a child.  He may be, in fact he was, as your verdict suggested, in January and February of last year, because he was convicted of six capital murders, he may have been a killing machine, as Mr. Vick said.  But that's not the issue here.  The issue

3912

is not whether he was then.  The issue is what sentence you should give him.

The doctors in this case are not here again to offer you any excuses for Richard's behavior, but simply to indicate what his processes were.  He is learning disabled, has all these very difficult problems that existed along with the violence and drug abuse that were so integral a part of his life. And the doctors say to you with medication and the

proper structure, this kid can survive.  This 22-year-old kid can survive.  He needs to survive for another reason.  He needs to make redemption, needs to do penance.  "Papoose" had it right, Robert Davis, when he testified.  "What are you here for 'Papoose?'"  "I'm not here for revenge.  God's going to take care of that."  And that's what's going to happen.  And Richard Tipton needs redemption for what he did, his involvement in six murders.

You know what your judgments were on the six murders in regard to the Talley and Church Hill and Stony Run murders.  We don't know what degree of involvement you have found in the last series of murders.  That's something you have decided.  We don't know.  But I suggest to you when you go through these instructions and deliberation process,

3913

Instruction Number 6, you are going to have the aggravating factors that Mr. Vick talked about and then you will come to the mitigating factors which, for Richard Tipton, are about three-and-a-half pages long.  And again, I'd like to go over, talk about some of these, not again as an excuse for his behavior, because I don't excuse his behavior.  Eric White doesn't.

Judge Spencer on Instruction 14 has listed ten of these, Instruction 12 lists about eight or ten others.  I ask that you do what you did in the first portion of the case; that you take your time.  You have over here the exhibits that are going to be given to you in terms of Mr. Selvog's report.  There is also a very thick book which is not replicated, but which has the appendices to all the data that Mr. Selvog selected.  That list of appendix on the back of each one of your social histories is supported by the documentation over there that tells you something about Richard Tipton.

The ultimate decision, ladies and gentlemen, is yours, as Mr. Vick says.  You have to decide if the aggravator has been proven by the government beyond a reasonable doubt; decide whether these many mitigators have been shown by a preponderance of the

3914

evidence.  I suggest when you listen to the witnesses that we had and read the social history, you will find most if not all the mitigators were proven beyond a reasonable doubt.  You must go into the weighing process then.

I suggest if you weigh, you will weigh in favor of life without parole.  If you get past that point, if you have to go to the next stage, the 12 of you collectively do not act anymore.  You become 12 individual jurors.  As the instruction indicates, any one of you can then say for whatever reason that you

care to have -- whether that reason is published to the rest of the jury or not makes no difference -- you simply say, "I do not vote for the death penalty." It can be a reason that you can keep in your head for the rest of your life without telling anyone. You can tell the rest of the members of the jury. You can do whatever you want. Because the death penalty is never required.

In one of the many tributes paid to Arthur Ashe this week, there was an article in the Times Dispatch that dealt with a visit that he paid to a Richmond public school, I don't know, six months or a year ago. And he spoke to a group of students that were about nine or ten years old. And the focus of the

article was that Arthur Ashe told them that the best thing he could tell them was to stay off the streets. I thought about this: Suppose Arthur Ashe was in a Harlem elementary school back in 1978 when Richard Tipton was 8 or 9 years old, if he went to that school and said to him and his class, "My best advice to you is to stay off the streets." I would suggest to you as good as that advice was when Mr. Ashe gave it to these schoolchildren in Richmond and as good as that advice would have been back in 1978 to the schoolchildren in New York, for Richard Manny Tipton, it would have been bad advice. Because the streets were a far better place than his home.

You heard the testimony from Tina, who has firsthand knowledge, 32-year-old cherubic woman who came here to testify about the box that her cousin lived in, an oversized closet, of being punched in the face almost daily by his mother, having heroin parties going on endlessly. That's the environment he grew up in. That's not a privileged environment by any stretch of the imagination. That's not a perfect environment. It is horrible. It is living absolute hell. I can't imagine anybody growing up the way he did. I'm not suggesting to you, as Mr. Vick tried to tell you that I would, that that means

he is going to kill somebody. Because it doesn't. It indicates to you that he has obstacle after obstacle to overcome. He couldn't do it. He fell in with some other people who accepted him. He finally found a family. Those family that he found were not blood relatives. They were people like Cory Johnson, people that accepted him.

And you heard the evidence in the beginning of the case in the first phase of the case that they referred to each other and cousins and brothers. They weren't legally, but they did, because they became a family. They finally found somebody who could accept them for what they were. That's a

horrible commentary on growing up, that I would have to come to that stage, when Mr. Vick makes these absurd suggestions to you that Richard Tipton walked away from love and caring. He never did. He never had it. He never had the seat next to him where his father should have been, and he obviously didn't have a mother. If he had Brenda Williams, the lady who works for the Henrico County Tax Department, if he had her all his life, I'll guarantee he wouldn't be here. If he had had the father that Arthur Ashe had, he wouldn't be here. I guarantee you. It is a lot like the doctor said in answering Mr. Baugh. "It is a guarantee." If he had had C.T. Woody as a father, Richard Tipton wouldn't be here. C.T. Woody wouldn't let his children do things like that. He would have kicked butt. If he had John Thompson, the coach at Georgetown, he wouldn't be here. But he didn't. That's not to excuse him, but to tell you, "Hey, look, there is something in this little fellow here. There is something in this eight-year-old. There is redemption possible here." It is to tell you that the death penalty in this case is not the answer.

Eric White asked Tina when she was on the witness stand, the last question, he said to her, "Tina, why are you and your brother Henry here?" She said to you 12, you 15, "I'm not here to excuse my cousin. I'm here because I love him."

Where was his mother? What was her comment to Eric about Charlene Tipton? Charlene said to Tina Monday before Tina got on the train to come down here, Charlene said, "Tina, make me look good when you testify." Do you have to know anything more about the environment he had? When her son is on trial for capital murder, when he is facing the death penalty, his mother is concerned that she look good. Does that tell you why she wasn't here?

And Brenda Wilkerson, who has a very responsible position, who knows him for a six-month period as a son, she called him. He went to Highland Springs High School during that period of time, got a job. He didn't walk away from her. He felt the way she said, that things were getting to be a burden on her because she was having a bad financial problem. 16 years old, after his grandfather had died, after the Tiptons had virtually thrown him out again: "You are not staying with Vincent or your father." He did. Eric said to her, "Why did you come to this Court?" She said, "I'm a mother. I could not live with myself if I did not testify for Richard Tipton." Thank you.

THE COURT: All right. Just one brief thing before we get to the next argument. Mr. Geary

misspoke.  He was talking about considering the aggravating factors and then the mitigating factors, and he said before you have resolved what the mitigating factors are, found them beyond a reasonable doubt.  That is not the standard.  The standard that would relate to the mitigators is by a preponderance of the evidence.  I will explain this to you more in detail.  Go ahead.

MR. McGARVEY:  May it please the Court:  It has been an emotional five weeks.  And I'm going to

3919

start with asking you folks to do something.  The law says that each one of our defendants are entitled to individualized consideration.  So I'm going to ask you good folks to draw a curtain here and a curtain here.  And I'm going to ask you folks to focus on this man, my client, Cory Johnson.  I am going to ask you to tune out everything else, and I'm going to ask you to consider my client, Cory Johnson.  Mr. Geary quite artfully put it:  That when you represent someone who has been charged, and at this point convicted, of the types of crimes that he has been convicted of, we as defense counsel live with that person continuously.  We have lived with Cory, Mr. Cooley and myself, it seems like forever.  And we know what he did, but we have gotten to know him as a person.  And that person, that man, in quotes, is a man with the mind of a gradeschool child.  And you have heard that from the stand.  And that's who Cory Johnson is.

I came up here with a semi-set pat thing to say to you folks, and I found that I can't do it.  I'm going to do it the best that I can.

At the outset, I feel constrained to reply to the prosecutor in terms of what he said about the aggravation here or the aggravating factors.

3920

He talked about Cory Johnson trying to have Valerie Butler and C.T. Woody killed from the jail.  Do you folks remember Rodney Tucker?  When I stood up here in opening, I told you we are not trying to make excuses.  Cory is guilty of the crimes for which you have convicted him.  But to bring in a professional snitch in the aggravation stage to come in here and try to enhance the prosecution's case is beneath the prosecution.  Rodney Tucker was with Cory Johnson for a grand total of 14 days in the isolation section of the Richmond City Jail, the isolation section, with one cellblock in between them.  And supposedly, Cory Johnson is hollering across one cellblock to another individual one cellblock down, with guards and everybody else.  And the man, the man is a professional snitch.  There is no other way to put it.  He came in here, testified earlier in another

320a

trial, got dispensation from the government, and came in here on the coattails and tried to enhance the government's story. And by God, the government used him. It is bad enough. They didn't have to try to enhance it.

I told you, we are not trying to make Cory Johnson not responsible. We are not trying to make excuses for Cory Johnson. He talked about Dewey

3921

Cornell, Dr. Cornell, being disingenuous. Dr. Cornell, by his own testimony, has testified more for the prosecution than he has for the defense. He knew what the standard for mental retardation was. 75. And that if Cory Johnson had an IQ of 75, then by law he could not be executed. If he was coming in here to be disingenuous to you folks, do you think he couldn't hedge on two points? But the prosecution has the gall to come in here and tell you folks that. That mitigation isn't disingenuous.

If you look at Dr. Lordi's testimony, he indicated that IQ's with age, especially with someone who has a severe learning disability, diminish. They diminish simply because that person has not been able to learn. And so logically, of course, their IQ's diminish. You couple that with severe brain dysfunction, you don't have to be a doctor, you don't have to be a rocket scientist to figure out that someone with a severe learning disability, who can't learn, and we are all dependent on what we can retain, obviously is going to have a diminishing IQ. And I would suggest that it is beneath the prosecution to come in here and blow smoke at you folks like that. As I said, it is bad enough, it is bad enough. They don't need to try to enhance it.

3922

Once again, Cory's fate is in the hands of strangers. And I trust and I believe and I hope that they are compassionate strangers. There is nothing new to Cory about that. His fate has always been in the hands of strangers.

In January, early January of this year, in these batteries of tests that Cory was given by Dr. Cornell and Dr. Peck -- this is in your packet, folks -- he was asked to write a story. And when he wrote the story, he started it like this: "This is January of this year. Me and my mom went to the moon." This is the same mother who doesn't have the decency to even show up at this trial when her son's life hangs in the balance. Cory Johnson is alone. He is alone as he has been all his life. Not one family member comes here. Not one person, not even the mother who he spoke of as a goddess can come here when his life hangs in the balance. And they want to make light of that?

Cory Johnson in January of this year is still waiting for his mom to take him to the Pizza Hut.

(Counsel turns to face defendant Johnson.)

Cory, she is never going to show up. She is never going to show up.

Folks, you have heard a lot about mitigators and aggravators. You will be submitted a list of mitigators. The mitigation, as I indicated, was presented to you in the second phase of this trial. The burden is on the defense to prove those mitigators by a preponderance of the evidence, 51 as opposed to 50 percent of the evidence. I would respectfully suggest to you folks that that has happened here. The government hasn't produced an iota of evidence rebutting any of the mitigation. And as I indicated to you at the very beginning of this, the death penalty is a narrowing process by law, according to the Supreme Court of this nation. It is to narrow the class of people who can be executed. And I submitted to you folks earlier, and I submit to you again, that the death penalty is reserved for those who are totally blameworthy, who are fully responsible for those actions, for their actions. Fully.

I didn't stand before you folks and tell you that Mr. Johnson wasn't blameworthy. I didn't stand before you folks and tell you that he didn't know the difference between right or wrong. I didn't stand before you folks and tell you that he wasn't responsible. But I did stand and tell you that Cory Johnson, with that mind of a child, is not fully responsible. He is not totally blameworthy. There is mitigation before you folks that alleviates some of that responsibility. And those are factors that Cory Johnson had no control over. Cory Johnson was born into a family. That family consisted of no father, a mother, a narcissistic, selfish mother, drug-addicted mother, a mother who actually gave up her own kids when Cory was 13 years old and when his brother, who had attempted to commit suicide at the ripe old age of ten, when he was 11 years old, gave them up, put them in foster homes. She is a mother who expected of Cory to go to college. Cory, to go to college. Cory, who can't read beyond a second-grade level. Cory, who tried and tried and tried to learn to please his mother. But he couldn't do it. And that wasn't his fault. To be rejected by the only person who was family, the only semblance of family that he ever had, to be given up for adoption, what does that do to a normal, quote/unquote, person? And ask yourselves, what does that do to a person with a severe, severe learning disability,

322a

with severe brain damage, neurological impairment, with severe impairment in the way that he reasons, with severe problems in the area of problem-solving, logical thinking, severe problems in terms of

3925

understanding the consequences of what he does?  And you have heard that testimony from our disingenuous expert who testifies more for the prosecution than the defense.

What does it do to a person?  Well, I'll tell you what it did to Cory Johnson.  Cory Johnson didn't have a family.  The only family he had was his mother.  And just as Dr. Lordi said, people with disabilities don't shop in the mezzanine.  They shop in the basement.  They shop in the basement.  Cory Johnson found a family.  He found something he could do.  He could deal drugs.  He found a family.  Let me introduce you to them.  This is his cousin over here; this is James Roane.  This is his brother; this is Richard Tipton.  And Cory, with those impairments, would do anything, anything, including murder, to protect his family from a threat that he perceived, or that he was led to believe was real.

Odette Noble told you that Cory was not a leader.  Why?  Because he wasn't smart enough.  But he would have been the point man.  And within the family, he was the point man.

Don't go any further than that, folks.  That's what happened here.  That is exactly what happened here.  And is he responsible for those murders?  No

3926

two ways about it.  Absolutely he is responsible for those murders.  Did he know the difference between right and wrong?  We didn't try to come up here and throw any wool over your eyes.  Yes, he is responsible.  He knew the difference between right and wrong.  But is he totally and completely blameworthy?  Were there factors in his life that he had no control over that contributed to the actions, the ill-fated actions for all involved that he took?

I don't quite understand the dynamic here.  But I do know that if you look back on Cory's history, you see a kid who tried, despite all of those limitations.  You see a kid who wanted to please.  You see a kid who was a good-hearted kid by all accounts.  And then suddenly he finds a family and he changes.

Folks, with what we presented to you, that much compassion, that much mercy; because the difference we are talking about here is whether or not you are going to kill Cory or whether or not he is going to die in the penitentiary.  That much compassion.  Was he completely and totally blameworthy?  Or were there factors in his life over which he had no control that

contributed to this?  And I think when you look at that packet and you think about the evidence that was

3927

presented to you, the conclusion is inescapable. Certainly there were.  It doesn't excuse it.  It doesn't lessen the pain of the families who have lost people here.  It doesn't lessen anything.  But I would submit to you that if you follow the logic of the prosecution, and you don't show that much compassion and that much mercy (Counsel indicating with fingers.) then what separates the neurologically-impaired, learning-disabled Cory Johnson from us?

As I told you, once again, and maybe for the last time, Cory Johnson finds his life, his fate, his existence, in the hands of strangers.  Once again, he is alone.  I believe you are compassionate strangers and I believe that you will show that much compassion.  Don't kill Cory Johnson.  Don't kill him.  Thank you.

THE COURT:  Mr. Baugh?

MR. BAUGH:  May it please the Court, counsel:  The United States, the government, the crown, whatever you want to call them, they would have you determine the death penalty based solely upon one issue; and that is, were the acts committed by these people bad?  And they are.  And it is not disingenuous when we tell you we do not make any

3928

excuse for them.  They are bad.  The acts are bad.  A lawyer that I respect once told me the difference -- and I was a prosecutor; I prosecuted for five years, in this courtroom, in fact -- the difference between prosecutors and defense attorneys is that prosecutors prosecute acts.  They want you to look at what happened.  Defense attorneys defend people.  And therein lies the difference.

In this part of the trial, that's what you are supposed to be about.  I'm reading from what I anticipate the Judge will give you in Instruction 11.  A mitigating factor, instead, versus an aggravating factor, is intended to present extenuating facts about the defendant's life or character or the circumstances surrounding the capital crime for which he has been convicted that would suggest a sentence of death is not appropriate.

We are here in this stage of the trial, according to the jury instructions, according to what Congress gave you, to determine whether or not there is something about their lives and their individuality that should justify not killing them. We are not here to look at the acts again.  We are here to look at the people.  We are charged with

3929

putting on evidence about their character.  And the United States, if they wished, they can put on evidence about their character.  And they chose not to.  Instead, they go back to the act, the acts.  Murder is horrible.  But under the law, and you have sworn an oath to follow the law.  All murderers cannot be sentenced to death.

Secondly, the United States, the prosecution, comes in here and they say they have left these bodies out in the street.  I'm going to tell you, we gave you these books yesterday.  And at the very least -- and first, you don't owe James Roane anything.  You have sworn an oath.  But you notice that Jeff, the court reporter, he doesn't go back there with you.  When you go in that room, you all can go back there and flip coins and no one will ever know.  So if you don't want to do anything, if you want to violate your oath, you can.  But for God's sake, don't sentence someone to death until you read about his life, understand him.  That's what this is about, understanding James Roane.

The United States gets up and says he never tried to get help for himself.  He was in Adventure Bound and he left.  I'll tab it for you.  First page behind Tab 1.  Up until approximately one-and-a-half

3930

years ago James Henry Roane was being regularly seen in the Lor-Berg Clinic.  The state, which was paying for these visits, terminated payment and James Roane's participation with Dr. Lordi ceased.  Did he walk away?  No.  His family didn't have the money, so they dropped him.

You read through, I think it is, page 74 of the chronology.  The United States, Mr. Vick, just got up here and told you that he walked away from Adventure Bound.  You read pages 74, 75, and 76.  No, he went and made application at the Job Corps because he wanted to be a heavy equipment operator.  And they told him, the people at Adventure Bound, said, "You go down there and make an application."  They helped him.  But he was told he couldn't get an interview for two months.  And they sent him home.  He tried.

In these records, and you heard Mr. Brunson, he asked to be kept on probation.  A youngster says, "Keep me under the restraint of the law because I need the supervision."  There is one statement here from his Probation Officer.  "It appears that James prefers jail to his home."  Is that lazy?  Now see, laziness is a nice thing because like I say, I used to prosecute.  That's a good thing.  You see, there was a time when we were less civilized, when we

3931

thought that all evil behavior was attributable to

the devil, you see. Like for instance, epileptics. There was a time when the treatment for epileptics was to tie them to a post and we beat them with sticks to beat the devil out of them. Because they are not really sick, they are just possessed. They are just wrong. And if we hurt them enough, they can develop the strength to resist the temptation to commit crimes. Oh, drug addicts don't have an illness. No, no, no. They are just weenies. They are not strong like me. If they could stand up and just say no, their drug addiction go away. These people aren't the products of a horrible society. No. They are just morally lazy. So therefore, let's just fry 'em. And that will teach them a lesson.

We have gone beyond that. Just like Dr. Semone yesterday said, 20 years ago we didn't know the stuff we know now. And believe me, as an aside, nobody in this courtroom knows ADD better than I do. Nobody knows better the difference between him and others.

The question for you now is, are the acts committed by James Roane the acts of a free and unimpaired mind, under the control of volition? Or is it an attribute of something over which he had no control? That's the question. And I've got a

question for you that he can't answer. If it is a product of his free and unencumbered will, then how in the name of all that's good and holy could Lordi predict it 20 years ago. Lordi says, "Unless he is treated he will have emotional and behavioral problems." In there, it says, "Time is passing. He is going to be dangerous to himself and to others." It couldn't be a product of his brain. It couldn't be a free and unencumbered act. It has to arise out of the condition. Because the people that recognized the condition predicted it.

I will tell you something else. You have heard about the records of these young men. And you have heard that they were violent. But you know what's fascinating -- oh, and my client has assaultive behavior. Yes, fights with girlfriends and all kinds of stuff. The real violence doesn't begin in their lives until one or two of them get together. Individually, it wasn't there. Isn't that fascinating?

Now, does that mean that these doctors are right when they say that people with this problem gravitate to one another? Yes, it does. Now, one thing good about this trial is like most. I went to law school in Texas. We are real butch, you know. My whole

attitude toward the science of psychology and psychiatry has changed.

This was predicted. Unless Dr. Lordi has a

crystal ball hidden in that locker of his, there is a science and there is predictability to this, and that's what caused this thing. It is not because James Roane is not as strong as I am, or Mr. Vick. No. He is not weaker than we are. He was born with a birth defect. And you don't kill people because of birth defects. They say, "No, we are not going to kill him because of the birth defect. We are going to kill him because of the acts." But the acts arose from the defect, because Dr. Lordi predicted it would. Was he weak in receiving treatment? No, he was broke.

"Wait a minute, everyone who has an ADD problem doesn't go out and kill." You heard that. And everyone from James Roane's environment doesn't go out and kill. You heard that. But then you heard me ask Dr. Semone, "A person with James Roane's mental impairment, his brain damage, and that environment, what is the likelihood he would end up this in courtroom today?" He said you could make book on it. You heard that. And he didn't try to question it. It was going to happen.

Now, one of the reasons I get emotional about this is that it was partially my fault. Because I don't get upset when everybody doesn't get the education my kids get. Yes, maybe I feel a little guilty. Maybe I should have been his Big Brother.

The United States next argues that my client, our client, James Roane, is a killing machine. I believe the term was "reptillian." I love that. A reptillian killing machine, incapable of formulating or making the moral judgments to constrain himself. And then he turns around and says, "Not only is he like that, but we want you to make him your teacher. We want you to suppress and repress your civilization and act like him to punish him."

Faith is hard. It is real hard being civilized. Because when you are civilized, sometimes you have to stand up to things you don't like and remind yourself by doing what I know is right, I will eventually win. By doing what is right I will make a difference, even though the person I'm dealing with doesn't appreciate it. I am a child of the 60's. SCLC, NAACP, Legal Defense Fund, all that good stuff. It was hard getting whipped during the national sit-ins, but we were told if we had faith and if we do this, it will get better, even though these people don't deserve what we are doing.

MR. VICK: This is objectionable.

THE COURT: Sustained. Quit personalizing the argument, please.

MR. BAUGH: It is going to be very hard for

you all not to kill.  It is going to be hard. Because you are going to have to, as the law says, just think about the people.  In fact, if you sit back and say nothing in that room, if you have a feeling and you don't say it, you will probably hasten his execution.  The law says you should consider the aggravators and, if proven beyond a reasonable doubt, that weighs down on one side, the aggravators.  They already proved the aggravators. We proved them guilty.

Then you have to look at the mitigators by a preponderance, a very low standard.  51 percent? They offered no evidence in mitigation, so we must have won those.  But then the law goes on to say that once you find the existence of these, regardless of how they come out, if you have something new, even if you can't articulate it, that says, "I don't think they should die, or I don't think Mr. Roane should die," you should vote not to, even if you can't even recognize what it is yourself that you are feeling,

even if you can't articulate it to fellow jurors. And what could that feeling be?  Conscience?  I would submit it is not weakness.  And the law says in the instructions -- let's take a moment and find that. Excuse me.  It has been a long trial and I'm getting disorganized.  I can't begin to tell you how rough this is.

(Counsel perusing instructions.)

I believe the Judge will instruct you that if even one juror finds a mitigating factor present which in that juror's mind is not outweighed by the aggravating factors that you have agreed, the jury may not sentence that defendant to death.  If even one juror finds that a sentence of death is not justified, the jury cannot return a decision in favor of capital punishment.

I also remind you again that whatever the findings you make with respect to the aggravating and mitigating factors, you are never required, and it is underlined, to impose a death sentence.  For example, there may be something about this case or about one of the defendants that one or more of you are not able to identify as a specific mitigating factor, but that nevertheless creates a reasonable doubt that the death penalty is justified as to that defendant.

In such a case, the jury must, must, render a decision against the death penalty.  Moreover, even where a sentence of death is fully supported by the evidence, Congress has nevertheless given each of you the discretion to temper justice with mercy, to the high road, even for those who don't deserve it. That is going to be very hard.

It is remarkable when I sit here and realize I am asking on behalf of Mr. Roane and my co-counsel that you take a 26-year-old man and not give him death, but sentence him to life in prison without parole. These youngsters don't even understand what they are going to miss if they win that. Yesterday, Mr. Roane's seven-year-old daughter stood up. He isn't going to be there for any of the decisions. He is not going to be there when she comes home and says she met somebody. He isn't going to be there for prom night. He is not going to see that dress. He has given all that up.

You know, sometimes in the morning when you wake up, no matter how long you have been there, you are in a fog. "God, where am I?" He is going to wake up the same day at the same place. He is going to know it is never, ever, ever going to change. It is never going to get better. He will die in that room. His life is wiped out. And I don't want to say it is not his fault. God, no, I don't want to say that. Maybe it is Lordi's fault because Lordi wrote this down.

The United States also makes it sound as though my client -- and I want you to read this book. Please. If you are going to sentence somebody to death, if you are thinking about killing somebody, the least you can do is find out about them. They give the impression that my client came into this idyllic neighborhood and brought with him death and destruction and terrorized the neighborhood. My client was born of the death and destruction.

There are 30 death certificates, or about 30, in the back of this book: personal friends and acquaintances of my client, as testified to by Ms. Noakes. Look at how they died. In fact, these guys would have probably been killed in another year anyway.

To violently take their lives, to strap them into a chair and run electricity through them, is not going to bring these other people back.

I wish that I could show you, and I can't, to disassociate from the facts and talk about the things that our client wants. You have heard these other attorneys talk about meeting their clients and talking with them, seeing them as human beings. It is always easier to do things to people that we don't relate to, that are different from us. And one of the purposes of prosecution is to make these people as different from you as possible. They want you to view them as something else, because it is easier to give punishment.

We have to sit there. We get one shot, because it is the government's burden, and then we have to

sit down.  We don't get to get up here again and we don't get to rebut anything he comes up with this time.  But I do want to remind you of one or two points, and perhaps I'm reemphasizing them.  These reports are excerpts from reports that are in that book.  Read them.  Look at what was said.

I am convinced that we have proven to you that the acts that Mr. Roane committed were for foreseeable and predictable because they are a consequence of his birth defect.  The birth defect is not his fault.  In fact, the assignment of blame is for children.

I love the way the government always wants to figure out who is to blame.  But really, it doesn't matter who is to blame.  The bottom line is, did he suffer from it?  I don't care who caused it.  I know his mother tried hard with what she had.  I know Dr. Lordi is not supposed to provide services for free.  I don't know this young man's entitled to treatment.  But the bottom line is, everything that he is here for was caused by his life experience coupled with his brain defect.  We know of the seven siblings born in that house.  Five have had drug problems.  Is it coincidence, like the family got together and said, "My, why don't we all do drugs?"  Or is it perhaps something about that environment that encourages that?  We know that these three young men got together.  Was it coincidence?  Was it like the stars got crossed one day?  Or is it as these doctors say, that they gravitated?  It is a science.  It was predictable.

I know that Mr. Vick is going to get up here and argue that everybody who is ADD, everybody who has brain damage, doesn't murder.  And he is right.  And everyone who comes from this environment doesn't murder.  That is right.  Absolutely.  But Dr. Lordi said 50 percent of the people in the prison suffer from this disorder.  And even though it is redundant, and if I have to be redundant in order to save my client's life, I will:  There is only one person, or three people in this courtroom who have been found to have that environment and that birth defect.  And we know what Dr. Semone said.  You can make book on the fact they will end up in trouble with the law.  You can take it to the bank.

It has been very hard during this argument not to be emotional.  But according to these instructions, emotions are not weak.  Emotions are to be applied.  That's what the instructions say.  I hope that when you as jurors go back, emotions aren't comfortable.  I know when people get emotional, other people get uncomfortable.  I hope that when you go

back there, you feel the emotion that the law has asked you to feel; that you apply those human -- don't be like what Mr. Vick says my client is like. No.  Be like someone who should teach them.  Don't use those values that my client has.

You have been very attentive, and I know you have worked hard.  And believe me, these people have worked hard, too.  It would be very simple for you to go back there and come back with an extremely efficient and extremely quick verdict, to go back there and not read these exhibits, not look at them. But I should remind you, we are not here for efficiency.  Democracy is inefficient.  The presumption of innocence is inefficient.  Everything that is beautiful is inefficient.  As my mother told me, Michaelangelo could have done the Sistine Chapel in three days with a roller, but it wouldn't be the same.  That's what you have to do here.  Look at these people.  Not about the acts.  Look at the people.  Ask yourself "Has the government rebutted what has been proven about the people?"  And I would submit to you that if you do  --

MR. VICK:  Your Honor, we don't need to rebut anything.

THE COURT:  Sustained.

MR. BAUGH:  Look at what evidence has been offered concerning their lives.  And we would submit that at the conclusion, you will find that life in prison without ever hope of release is significant enough punishment for James Henry Roane, Jr.  Thank you.

THE COURT:  All right.  Brief rebuttal?

MR. PARCELL:  Ladies and gentlemen, you have heard our colleagues once again telling you what they think their evidence was.  And we got through the first phase of this trial and in the rebuttal, I told you then my colleagues had done a good job of trying the government, police, and their witnesses. At the conclusion of phase two in rebuttal, I find myself once again realizing that they have once again tried in their phase two evidence the parents, society, the legal system, and the doctors and social workers who missed certain points in these young men's lives.  But that's not a defense.

They talk about their records, the things that led them to be where they are today.  Let's talk about that for a moment.  Because you know from what you have heard as far as Mr. Tipton that he and his friend, Cory Johnson, to his left, stabbed with razor blades a young man in New Jersey in 1989, 169 stitches' worth.  That is a choice and a decision they made.  They chased him down, as my colleague

said, like an animal in the street and with razor blades cut him in 1989.

Of course you are aware that Mr. Tipton had two other drug arrests in New Jersey in 1989 and 1990. They talk about their inability to think, their mental deficiencies. But what did Mr. Tipton tell them his name was? He told Officer McMillian it was Robert Baker. A lie. A deception. Why did he do that? To avoid getting caught again.

Then you had the second police officer, Keim, who arrested him. And what was his name that time? Manny Wilkerson. Another lie. Another deception.

And they tried to get us to believe they don't have the abilities or facilities to make those decisions and plan ahead. Their actions have spoken louder than any words any doctor, any social worker, has told you.

Cory Johnson, you know he was convicted of a robbery and possession of a controlled substance before 1991 when he came to Richmond. And go back to his arrest in New York City at the transit station in February 29th, 1992 carrying a concealed weapon. What name did he give that police officer? Kevin West. A lie. A deception. Why did he do that? As he told Valerie Butler, "I wanted to get bonded before they realize that gun has heads on it," and that gun did have heads on it. It had four: two alive and two dead.

James Henry Roane, Jr. Mr. Baugh talks about the fact of the seven-year-old daughter not being able to see him when she meets someone in life. He talks about his record of assaults. Strangely enough, six of those assaults and trespasses are against the mother of his children. Six of them. He had an unlawful wounding, too.

These crimes were between 1989 and 1990. There are certified copies that the government introduced Monday. He wants you to believe he is this great family man. And the government asked the social worker yesterday who gave you the family tree, "Did you interview Iris Smith, the mother of his children?" No. "Did you interview Robin Cooper, the mother of his children?" No. And he has committed at least six acts of violence against those two women.

Then we graduate to where we are now and we have gone through things this week about choices and decisions. They are important. The decision-making process you folks are going to engage in is very important, too. Let's think about choices and decisions for a few moments. We have been together in this trial for five weeks, the same length of time

within a week that these three people killed ten --

MR. WHITE: Objection as to "these" and the amount of murders.

THE COURT: Sustained.

MR. PARCELL: Well, we will go over it. Mr. Tipton started on January 5th, 1992, with the assistance of James Henry Roane, Jr. This gentleman made a decision in the life of Douglas Talley, who had a family, too, who missed him at Christmas just like their families will. They made a decision.

They made 84 of those decisions, 84 stab wounds in a human being. That's a choice those two people made. Then we go to "Little Doug" Moody, shot twice, and 18 more decisions by James Henry Roane, Jr., stab wounds. Then we go next to Peyton Maurice Johnson. As Mr. Vick told you, he was stalked by Mr. Roane. Cory Johnson and "E.B." came in and made 15 decisions for him with their 9mm handguns. That was their choice, their premeditation. And every expert told you all three of these men, all three of these killers, have the ability to make premeditated decisions; they know right from wrong. And these are the choices, these are the decisions they made.

Then we go to Louis Johnson. They made seven decisions in his life.

MR. WHITE: Objection to "they."

THE COURT: Sustained.

MR. PARCELL: That's Henry Roane and Cory Johnson and Lance Thomas. Those are decisions those three people made that took another life.

And Torrick Brown. Mr. Roane, Mr. Johnson, and Mr. Thomas made 16 decisions for him as they shot him in front of his sister and her three children. They made six decisions for Martha McCoy.

MR. GEARY: I object to "they." We are right back in the beginning of the trial.

THE COURT: Sustained. Be specific.

MR. PARCELL: Thank you, Judge. Roane, Johnson, and Thomas made six decisions for her. Then we go to Dorothy Armstrong. Cory Johnson made nine decisions for her, after having left South Richmond and killing someone else and shooting him sixteen times, 16 decisions for another victim. He made three decisions for Bobby Long, that being Mr. Johnson. He made two for Anthony Carter.

Then we go to Linwood Chiles, Curt Thorne, "Pepsi" Greene, and Gwen Greene. Mr. Johnson and Mr. Tipton got their new Glocks on February 4th, 1992.

MR. GEARY: No evidence of that, Judge.

THE COURT: Objection overruled.

MR. PARCELL: And what did they do? We keep hearing this thing about decisions and ability

to think.  Before we discuss this last one, let's think a minute.  They had Pam Williams purchase their first three handguns, that being Roane, Johnson, Tipton, and Lance Thomas, purchased their first three handguns that the police seized on February 1st, 1992.  What did they tell her?  They gave her the money.  And what did they tell her when they got back from getting the guns?  They gave her an extra $30.

3948

Mr. Roane and Mr. Johnson said, "Fake a breaking and entering, here is $30 to pay for your window, and tell the police somebody stole the guns so they can't be traced back to you or back to us."  Does that sound like the mental processes that these charts lead you to believe?  No.  They knew how to do these crimes.

MR. McGARVEY:  I object to "they" again.

MR. PARCELL:  Roane, Johnson, and Tipton, all three collectively, continued discussing, planning, making decisions.  Then after Roane was arrested on February 2nd, 1992, Mr. Johnson and Mr. Tipton were still on the loose, for lack of better terms.  Then Tipton and Roane make arrangements through Charlotte Denise Moore to purchase two more Glocks.

MR. BAUGH:  I have to object.  That's not true.  Mr. Roane was in jail at that time.

THE COURT:  Sustained.

MR. PARCELL:  I misspoke.  It was Mr. Johnson and Tipton.

MR. McGARVEY:  That's not the evidence, either.

THE COURT:  Mr. Baugh's objection will be sustained.

3949

MR. PARCELL:  After the weapons were purchased, "Whitey" gave Charlotte Denise Moore $100 for purchasing two more guns for he and Cory Johnson.  And then we go to February 19th, 1992.  These people can't make decisions?  You heard the evidence of the phone call at 8:30 p.m.  "Whitey" gets back in the car and says "'C.O.' has got them."

MR. BAUGH:  Excuse me, wait, "they" again.  My client was in jail for all of this.

THE COURT:  Overruled.  That was clear.

MR. PARCELL:  And what happens at 10:17?  An independent witness goes down a highway and sees someone he describes dressed as Gwen told you he was --

MR. GEARY:  That is absolutely not the evidence.  That's a total misstatement of the evidence.

THE COURT:  Objection sustained.

MR. PARCELL:  He testified that the person

he saw was tall, thin, had on jeans and a brown coat, the same thing Gwendolyn Greene told you he had on, richard Tipton. He saw someone flying in front of the automobile. And what was that? A human body. That night, Tipton and Johnson made two decisions for Linwood Chiles, two for Curt Thorne, one for "Pepsi" Greene and one for Gwen Greene. We know the results of that decision.

The doctors and social workers have basically told you they have learning problems, low to moderate IQ's, bad upbringing, 10 to 20 percent of society has the same learning disability these folks have.

MR. McGARVEY: Once again, he is collectivizing, and that is not the evidence with respect to Mr. Johnson at all.

THE COURT: The objection will be sustained. Mr. Parcell, if you are going to refer to somebody, do it individually, please.

MR. PARCELL: But they told you Roane, Tipton, and Johnson all had opportunities as they grew up for structured environments. Mr. Tipton left his. Mr. Johnson left his. Mr. Roane left his.

Roane, Tipton, and Johnson, all three then, all three now, know the difference between right and wrong.

Tipton, Johnson, and Roane, all three are responsible for their activities or their actions. And once again, Tipton, Johnson, and Roane all had the ability then and now to premeditate their crimes. I'm sure they have taken cheap shots at the government. Two weeks ago Rodney Tucker was called as a witness for Sandra Reavis, the defense. You heard no one call him a snitch then, did you?

MR. McGARVEY: That is a mischaracterization. Ms. Reavis' counsel called her, not the rest of us.

THE COURT: The objection is sustained.

MR. PARCELL: And today, he is the snitch of the world. Take that for what it is worth.

As I said before, you do not have an easy responsibility. But contrary to what Mr. Baugh told you, you are not killing these people. You are making a decision based on the law and the evidence. And you have a choice: the death penalty or life in prison. Once again, the government would urge you to come back with a death penalty verdict, and don't let them insinuate you are making some --

MR. BAUGH: Objection to "them."

MR. PARCELL: Don't let Mr. Baugh make you believe you are making some immoral or uncivilized decision. Because that's an oath, an obligation you made to all of us five weeks ago.

I will leave you with this thought. And as you go through your deliberations, remember: No longer should the innocent suffer a punishment greater than the person who caused that injury. Thank you.

3952

THE COURT: All right. I think we will stop now for lunch. The next thing is instructions, and that's going to take awhile. We have heard a lot of talking this morning, and I'll give you a break before we hear some more. I need to say this before you go, though. I will emphasize it in my instructions, but I need to say it over and over again, and I'm sure you know it by now. This is argument that you have heard. The lawyers are putting the facts before you as they recall them and in the light that reflects best on their case. Your recollection controls in regard to the evidence, and you are to take argument in that way.

I believe your food will probably be arriving around 12:30.

THE CLERK: Yes.

THE COURT: So we will say 1 o'clock, and we will get back in and finish up. Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

All right. I'll hear your motions.

MR. BAUGH: First, on behalf of the defendant, James Roane, we have a motion for mistrial because of the United States' comment upon a defendant's failure to testify. As the Court

3953

adequately indicated, it was a stupid statement to make. I'm not asking the Court to declare -- I'm asking the Court to declare the mistrial, but the act was not committed by the Court. The United States, after a five-week trial, makes a comment on the most basic constitutional right there is to the point where the Court has to give an instruction. And the Court is well aware that when you have to do that, not only are you clearing it up, but at the same time mentioning it again. It has to be done that way. And this is a capital case.

For that reason we move for mistrial. Additionally, we move for mistrial again on the issue of severance. Mr. Parcell just got up and said that because these attorneys did not object to Mr. Wagner's witness, who was gone, because we didn't call him names and attack him on cross-examination, that in some kind of way we were accepting or condoning his credibility. He did not offer testimony against our clients. If it had been an individual trial, it would not have been an issue. And all of us had to suffer as a consequence of that.

For those reasons, Your Honor, we have urged

336a

severance all along.  We knew this was going to be a problem, and it was.  Lastly on severance, the word

they was said so often, and we have had to object to it often, and we have emphasized it inadvertently or we have to emphasize it every time we object.  As the Court pointed out during opening, "Counsel, your butt wasn't nailed to the seat."  That's what you told us.  We have to object to preserve it.  We had to. Your Honor, we would move for a mistrial and reurge our severance.

THE COURT:  All right.  Mr. Geary?

MR. GEARY:  On the point that Mr. Vick involved Mr. Tipton, it is quite unbelievable to me that a prosecutor with his experience didn't do that intentionally.  He brought up two factors which the jury was not to consider.  One, that Tipton didn't testify.  Two, he brought up an aggravating factor that the government, for whatever reason -- probably neglect, since they didn't pay that much attention to the case -- failed to put that in as an aggravator, that a defendant failed to show remorse.  Rather than give that up or ask you for cause to amend that, they do it knowingly and intentionally to let the jury know that Tipton didn't testify and that there has been no remorse by the defendant.  Clearly, that was done because they wanted the jury to know that.  This is in the fifth week of trial, in the closing

arguments on a death case.  I think the Court knows the way the appeal courts and the United States Supreme Court go over these death penalty cases from the states.  To have a prosecutor who has done as many conspiracy cases as he has done, and who knowingly violates the Code of Ethics like that, is reprehensible.

MR. COOLEY:  I would join in the comments and arguments made by both co-counsel.  And I would add to that that in the course of the opening summation by Mr. Vick, he commented throughout that "they" have killed ten people.  And "These people have to die."  Or "These people deserve to die." That flies in the face of the mandate of this statute: that we have individual consideration.

It was continued in the final summation to the point that every other sentence had to be objected to.  And the sustaining of those objections does not cure it in the eyes or in the minds of the jury. Just as Mr. Baugh said, in the opening statement, when a prosecutor stands and comments upon the failure of a defendant to testify and breaches the very gravamen of the Fifth Amendment right of each of these young men to that right, to remain where they are seated and not take the stand, and the Court's

337a

3956

only ability to cure that is to give a cautionary instruction which exacerbates the condition which the prosecutor has thrust upon the jury, is simply fundamentally unfair.

Respectfully, Your Honor, for all of those reasons, those mentioned by co-counsel and my comments, on behalf of defendant Johnson we respectfully move for a mistrial.

MR. BAUGH: We adopt the eloquent arguments of both counsel.

MR. VICK: Your Honor, I did not say -- I made it very clear in my closing. I said that the doctors had come and talked to each one of these defendants. That's the clear evidence in front of the jury. These defendants, each one of them, spoke through those doctors on repeated occasions about their background, about what they were involved in. As to Mr. Johnson, his expert said that he talked to him extensively about his criminal involvement. I predicated what I said very clearly upon they spoke to the doctors about their involvement. And not once was a bit of remorse indicated through the doctors. I didn't comment on their inability to take the stand. In the case of UNITED STATES v. CHISEM, C-H-I-S-E-M, Fifth Circuit, 1982, the Fifth Circuit

3957

addressed an issue similar to this where an attorney had made arguments and the prosecutor said, "You know, you have to believe the defendant's story as told by the attorney," which is exactly what I have done, and that was held to be proper comment upon the evidence in front of the Court, and that's what I was commenting on.

As to the "they," Your Honor, this is repeated, but they have been found guilty of Count One, conspiring together to kill all these people.

THE COURT: All right. Let me make it crystal clear, Mr. Vick, that I do not buy your argument at all. It was astonishing to me that you would even come close to making this kind of fundamental error. I have every faith that this jury -- I've been watching them closely, they are a profoundly proficient group -- that they will listen to the instructions and follow them just as they did at the first phase of the case. Therefore, I believe that any error can be relieved by the cautionary instructions.

The motion for mistrial based on the comment of the prosecutor and the motion for severance will be denied. We will be back at 1 o'clock.

MR. BAUGH: We also preserved our right to

3958

raise the motion concerning the deterrent. Do you

338a

want it now?

THE COURT: Might as well deal with that now.

MR. BAUGH: Your Honor, we preserved our right. We would also urge the motion for mistrial. The United States twice during their opening on the punishment phase -- well, when they opened they tried to bring up deterrent effect at that time. We objected and it was sustained. Again, we come in here today and the United States again raises deterrent effect in the presence of the jury, which, as the Court is well aware, is not an applicable standard for justifying the death penalty under available case law. It is calculated solely to prejudice the minds of the jurors at a critical phase of a critical trial. In fact, I believe the language is something to the effect of "It is like justification by billboard." "If we kill this guy, your life will be better." That is improper. And the United States was on notice because they did it in the opening portion. And just like the United States fascinatingly comes in today on the comment on the failure of the defendants to testify -- and by coincidence has the case law -- we would submit this was also done intentionally. There were several significant objections made during that argument on pivotal constitutional issues. And this is another one for which mistrial is required.

MR. WHITE: We join.

MR. COOLEY: We join.

MR. VICK: Your Honor, the Court, as I understand your instructions to me in opening when that was sustained, said "This is opening. This is your beginning." This is not closing. And that's why that was sustained. I believe, and I still believe -- and obviously the Court does not believe that it is proper to address such things with a jury that is going to be the ultimate sentencer for these people based upon the law -- it is as if I was addressing the Court. And certainly I would properly address that to the Court.

THE COURT: All right. The objection was made and the objection was sustained, and I will not grant a mistrial based on that. The fact is, as I read the law, there are two kinds of deterrence, general deterrence and specific deterrence. Within the range of discussion regarding general deterrence, one might be able to make an argument that could stand up. I had, at that point, not enough confidence in Mr. Vick to think that he would make the appropriate argument, and that's why I sustained the objection. I will not grant a mistrial based on

339a

that.  Let's come back at 12:15.

(Luncheon recess taken from 12:15 p.m. to 1:20 p.m.)

THE COURT:  Mr. Baugh, I understand you wanted to reurge your  --

MR. BAUGH:  The full text of it.

THE COURT:  It is there.  You can give it to the Clerk.  I'm going to do what I said I was going to do.

MR. BAUGH:  The other one was on the, even though we wrote it, on the verdict form as to 9-A, we would like to urge this in the disjunctive, take out the word "and" and put in "or," that defendant James Roane was subjected to emotional and physical sexual abuse, abandonment.  It sounds like unless you find all of them, it doesn't count.  I know we submitted it that way.  It is not your Clerk's fault.  We know that.  If the Court could pencil in "or" over the "and."

THE COURT:  I would have to change it everywhere it appears.

MR. BAUGH:  I'll do it.

3961

THE COURT:  No, that's all right.  I'll do it.

MR. WHITE:  If the Court please, just making sure that the record accurately reflects the nature of our objection to the N1 findings, it is our position that with regard to special findings on statutory aggravators that the jury should be instructed to pick one of the four and shouldn't be allowed to pick all of the four.  The last three, we would take the position, are lesser-included to the nature of the first.  We don't believe they should be allowed to do all four.

THE COURT:  Your position is noted.

All right.  Let's bring in the jury.

(The jury entered the courtroom.)

Members of the jury, you have now heard all of the evidence in this case as well as the final arguments of the lawyers for the parties.  It again becomes my duty, therefore, to instruct you on the rules of law that you must follow and apply in arriving at your decision as to the very serious question of whether or not Richard Tipton, Cory Johnson, and James H. Roane, Jr. should be sentenced to death.

Regardless of any opinion you may have as to

3962

what the law may be or should be, it would be a violation of your oaths as jurors to base your verdict upon any other view of the law than that which I give you in these instructions.

Some of the legal principles that you must apply

340a

to this sentencing decision duplicate those you followed in reaching your verdict in the first phase of the trial.  Others are different.  I have prepared a full set of instructions on the applicable law in order to insure that you are clear in your duties at this stage of the case.  I have also prepared forms that detail special findings you are asked to make in this case, and four possible decisions you can render as to each of the capital crimes for which each defendant has been convicted.

By law, Congress has expressly provided that any person who intentionally kills another while engaging in or working in furtherance of a Continuing Criminal Enterprise may be sentenced to death.  Because you have found Richard Tipton, Cory Johnson, and James H. Roane, Jr. guilty beyond a reasonable doubt of intentionally killing certain individuals while engaged in or working in furtherance of a Continuing Criminal Enterprise, you must now consider whether justice requires imposition of the death penalty for

3963

those crimes.

This is a decision left exclusively to the jury.  I will not be able to change any decision you reach in this regard.  You and you alone will decide whether or not Mr. Tipton, Mr. Johnson, or Mr. Roane should be executed.  Thus, I again stress the importance of your giving careful and thorough consideration to all evidence before you.  I also remind you of your obligation to follow strictly the applicable law.

Although Congress has left it to you to decide whether any or all of these defendants should be executed, it has narrowed and channeled your discretion in specific ways, particularly by asking you to consider and weigh any aggravating and mitigating factors present in this case.  These factors have to do with the circumstances of the crime and the personal traits, character, and background of the defendants.

Aggravating factors are those that would tend to support imposition of the death penalty as to a particular defendant and a particular capital offense.  Mitigating factors, of course, are those that suggest that some punishment less than execution is sufficient to do justice with respect to a

3964

particular defendant and offense.

Your task is not simply to decide whether aggravating and mitigating factors exist in this case.  Rather, you are called upon to evaluate any such factors and to make a unique, individualized judgment about the appropriateness of the death penalty as a punishment for each capital offense and

341a

each defendant.  In short, the law does not assume that every defendant found guilty of committing murder while engaged in or working in furtherance of a Continuing Criminal Enterprise should be sentenced to death.  The law does not assume that Mr. Tipton, Mr. Johnson, or Mr. Roane, as each sits before you, should be sentenced to death.  The burden of proving that a defendant should be sentenced to death rests at all times with the government.  It must satisfy that burden beyond a reasonable doubt.

While the government's burden of proof is a strict or heavy burden, it is not necessary that the government prove beyond all possible doubt that a defendant should be sentenced to death.  It is only required that the government's proof exclude any reasonable doubt.

If, after fair and impartial consideration of all the evidence in this case, any one of you has a reasonable doubt as to whether justice mandates a defendant's execution, then you must return a decision against capital punishment for that defendant.

In this regard, this second phase of the trial differs from the first.  In the first phase, I instructed you to deliberate with the goal of reaching a unanimous decision one way or the other as to whether the government had proven each defendant guilty beyond a reasonable doubt of the crimes charged against them.  In this phase, I instruct you that unanimity beyond a reasonable doubt is required for you to sentence a defendant to death.  But if any of you, even a single juror, is not persuaded beyond a reasonable doubt that a defendant's execution is justified in this case, then the entire jury must render a decision against his being put to death.

In short, if you find after thorough deliberation that you are not unanimous in your views, you have, nevertheless, reached a decision: namely, that the government has not met its burden of proof as to the death penalty.

Now, the defendants at this hearing do not have to present any evidence.  The defendant does not have to prove to you that he should be permitted to live. Each defendant was, however, entitled to present any mitigating facts to you.

Let me now discuss with you the deliberative steps you should follow in considering as to each individual defendant the very serious issue before you.

First, you must consider whether the government has proven beyond a reasonable doubt and to your unanimous satisfaction at least one aggravating

factor for each of the two statutory categories established by Congress as to any of the killings of which a defendant stands convicted. I will discuss these categories further in a moment.

Second, you must consider whether any non-statutory aggravating factors cited by the government are proven to your unanimous satisfaction beyond a reasonable doubt. I'll discuss this more in a minute, too.

Third, you must consider whether any of you think that mitigating factors have been established by a preponderance of the evidence.

Fourth, you must decide whether the aggravating factors which have been proven as to a particular capital crime outweigh the mitigating factors, and whether they are sufficiently serious to support a unanimous finding beyond a reasonable doubt that justice requires imposition of the death penalty as to that crime and that defendant.

Fifth, you must individually decide for yourselves whether you choose not to impose the death penalty in this case. For even if you make all of the above findings relating to aggravation or mitigation adverse to a defendant, you are never required to impose the sentence of death upon a defendant. Absent the unanimous findings as to certain aggravating factors that I have just discussed, however, you cannot vote for a defendant's execution.

You must first consider whether you are unanimously persuaded beyond a reasonable doubt that the government has proven at least one aggravating factor in each of two statutory categories established by Congress. In this case, as to each defendant and each capital offense, the government cites four aggravating factors from the first statutory category. One, that the defendant intentionally killed the victim. Two, that the defendant intentionally inflicted serious bodily injury which resulted in the death of the victim. Three, that the defendant intentionally engaged in conduct intending that the victim be killed, or that lethal force be employed against the victim which resulted in the death of the victim. And four, that the defendant intentionally engaged in conduct which the defendant knew would create a grave risk of death to a person other than one of the participants in the offense, and that such conduct resulted in the death of the victim.

Now, as you will recall, you are required to find that the killings in this case were intentional as a precondition to your finding Mr. Tipton, Mr.

Johnson, and Mr. Roane guilty of each of the capital crimes in the first phase of this trial.  In order to insure that this factor was considered by you at the first phase, or guilt phase, I ask you to indicate on the verdict forms that will be provided for you whether you are or are not unanimously persuaded beyond a reasonable doubt that each of the capital murders for which you convicted Mr. Tipton, Mr. Johnson, and Mr. Roane were committed intentionally within the meaning of at least one of the four aggravating factors that I have just discussed with you.

Now, that is the first statutory category.  You must find at least one from the first statutory

3969

category of aggravators.

Now, moving to the second category:  From this second statutory category, the government cites three possible aggravating factors.  Note, however, that not all of these aggravating factors are alleged against each of the three defendants, or in reference to each capital offense for which the defendants have been convicted.  The verdict forms will specify which statutory aggravating factors are alleged as to each individual defendant and each individual capital offense.

Now, aggravating factors that are cited:  One, that in the commission of a capital offense, the defendant knowingly created a grave risk of death to one or more persons in addition to the victim of the offense.

Two, that the defendant committed a capital offense after substantial planning and premeditation.

And three, that the defendant committed a capital offense in an especially heinous, cruel, or depraved manner in that it involved serious physical abuse to the victim.

The government must prove at least one of the statutory aggravating factors in this second category

3970

to your unanimous satisfaction beyond a reasonable doubt, as well as one of the factors from the first statutory category, for a defendant to be eligible for the death penalty for a particular capital offense.

Let me therefore explain in more detail what you must find proven with respect to these aggravating factors in the second category.

The first cited factor requires proof that in committing a murder, the defendant knowingly created a grave risk of death to one or more persons in addition to the victim.  A grave risk of death is a risk that is very serious and dangerous to life.

The second cited factor requires proof that a murder was committed after substantial planning and premeditation.  A premeditated murder is one committed upon deliberation and prior design.  In short, the government must prove that a defendant killed the victim only after thinking the matter over and deliberating whether to act.  There is no requirement that the government prove that the defendant deliberated for any particular period of time in order to show premeditation.  It must, however, show that the defendant had some period of time to become fully aware of what he intended to do and to think it over before he acted.

Now, the government must also establish beyond a reasonable doubt that the murder was committed after substantial planning for you to find this factor proved.  The words "substantial planning" should be given their ordinary, every day meaning.  "Planning" refers to the creation or development of a method of doing something or achieving some end.  "Substantial planning" means planning which is considerable, or ample, for the commission of the crime at issue in this case: murder.

The third cited factor requires proof beyond a reasonable doubt that the defendant killed the victim in an especially heinous, cruel, and depraved manner in that the killing involved serious physical abuse to the victim.  What you must recognize about this factor is that Congress has specifically limited the meaning of heinous, cruel, or depraved conduct.  It is this limiting language, "serious physical abuse," that must be the focus of your consideration.

Serious physical abuse means harm to the victim while he is alive and conscious; that is, significantly more than that necessary to accomplish an act of murder.  The evidence must persuade you beyond a reasonable doubt that such abuse was deliberately inflicted; that is, inflicted intentionally by the defendant for the express purpose of seriously abusing the victim physically while he or she was still alive.

Put another way, you must find that the defendant had as his purpose more than just committing a homicide.  As you can tell from these instructions, in considering this factor, you may look only to conduct occurring while the victim was still alive and conscious, and not to evidence of conduct occurring after death.

Section 1 of your verdict form inquiries as to your findings with respect to these statutory aggravating factors.  First, under the heading "Category 1," you are asked if you are unanimously

persuaded beyond a reasonable doubt that each crime was intentional within the meaning of the first four factors that I have explained to you.  Under Category 2, you are asked whether you are unanimously persuaded beyond a reasonable doubt that one of the second group of aggravating factors is applicable to each capital offense.  You must find both: one factor at least from Category 1, and one factor at least from Category 2, proven beyond a reasonable doubt as to the same capital offense -- that is, the same

3973

victim's murder -- for you to proceed in your deliberations as to the death penalty for that offense.  If you do not find a factor from each category proven beyond a reasonable doubt as to a particular murder, you cannot consider the death penalty with regard to that capital offense.  In such a case, you will, on the decision forms that you will be receiving, relating to that defendant and that victim, complete the decision section labeled "A."

If you do find both a Category 1 and a Category 2 aggravating factor proved beyond a reasonable doubt as to a particular capital offense, you must then consider whether any other aggravating factors cited by the government have been proven to your unanimous satisfaction beyond a reasonable doubt with respect to that defendant.

I instruct you that the law permits you to consider only those aggravating factors specifically cited by the government with respect to each defendant.  The jury is not free to consider any other facts or factors in aggravation.  The government alleges the following non-statutory aggravating factors in this case.  Note again, however, that some of these factors are not alleged against all three of these defendants.  Again, your

3974

verdict forms will specify which non-statutory factors are alleged against each defendant.

Now, the non-statutory factors:  That the defendant committed multiple murders.  Two:  That the defendant had a substantial criminal history.  Three: That the defendant seriously wounded an individual in the course of committing the murders for which he has been convicted. And four:  That the defendant was knowingly and willfully a member of a conspiracy which had as one of its goals the murder of individuals other than those for which the defendant has been convicted.

I emphasize again that because these are the only non-statutory aggravating factors cited by the government, they are by law the only additional aggravating factors you may consider.  This aspect of the law may strike you as odd, but your oath compels

you to follow the law. For example, you may not consider the effect of the murders on the victims' families. It simply is not a cited aggravating factor.

Section 2 of your verdict form asks whether you are unanimously persuaded that the government has proven these non-statutory aggravating factors beyond a reasonable doubt. I note that even if you are not

3975

so persuaded, a unanimous jury finding that the government has proven at least one aggravating factor in each of the two statutory categories which I've just discussed with you does permit you to consider the death penalty. In short, you may only consider the death penalty if the required statutory factors have been proven. But if you so find, you may then consider the death penalty, even in the absence of any proof of the non-statutory aggravating factors.

You must next consider any mitigating factors that may be present in this case as to each defendant. A mitigating factor is not offered to justify or excuse a defendant's conduct. Indeed, if the homicide was justifiable or excusable, a defendant would not be guilty of murder. A mitigating factor, instead, is intended to present extenuating facts about the defendant's life or character or the circumstances surrounding the capital crimes for which he has been convicted that would suggest that a sentence of death is not appropriate.

It is the defendant's burden to establish any mitigating factors by a preponderance of the evidence. This is a lesser standard of proof under the law than proof beyond a reasonable doubt. It

3976

means that the defendant has to produce evidence which, considered in the light of all of the facts, leads you to believe that what the defendant claims is more likely true than not. To put it differently: If you were to put the defendant's evidence and the government's evidence as to a mitigating factor on opposite sides of the scales, the defendant would have to make the scales tip slightly to his side. If the defendant fails to meet this burden, he has not proven that mitigating fact,

Congress has designed a number of specific mitigating factors. And the defendants in this case may have attempted to prove some or all of these mitigating factors with respect to their individual circumstances. These statutory mitigating factors are as follows: One, that the defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, regardless of whether the

347a

capacity was so impaired as to constitute a defense to the charge against him; Two, that the defendant is punishable as a principal in an offense which was committed by another, but the defendant's participation was relatively minor regardless of whether the participation was so minor as to constitute a defense to the charge; Three, that the defendant could not reasonably have foreseen that his conduct in the course of the commission of the murders would cause or would create a grave risk of causing death to any person; Four, that the defendant is youthful, although not under the age of 18; Five, that the defendant does not have a significant prior criminal record; Six, that the defendant committed the offense under severe mental or emotional disturbance; Seven, that another defendant or defendants equally culpable in the crime will not be punished by death, and, Eight, that the victims consented to the criminal conduct that resulted in their death.

Now, in addition to these specific statutory factors which are outlined by Congress or defined by Congress, the law also permits you to consider whether other factors in the defendant's background or character mitigate against imposition of a death penalty. Indeed, you may consider any other factor, whether specifically argued by defense counsel or not, that you believe to be mitigating if such a factor has been established by a preponderance of the evidence.

In short, your discretion in considering mitigating factors is much broader than your discretion in considering aggravating factors. This was a choice expressly made by Congress in enacting the capital punishment statute at issue in this case.

Now, each defendant has submitted to the Court a list of additional mitigating factors which they have endeavored to prove through the evidence that they put on at this hearing. I will discuss these factors as to each defendant with you now, and they will also appear on your verdict form for each defendant.

Now, with respect to the defendant, Richard Tipton, the additional mitigating factors that he has attempted to prove are the following: First, that defendant Tipton, if not sentenced to death, will be sentenced to life in prison without any possibility of parole. I now instruct you that this is factually correct; that is, you must consider this factor to be proven. The weight you give to this fact as a mitigating factor is, of course, up to each of you individually.

Second, that defendant Tipton was subjected to emotional and physical abuse and neglect as a child and was deprived of the parental guidance and protection that he needed.

3979

Third, that defendant Tipton suffers from Attention Deficit Disorder and Hyperactivity Disorder that was untreated when he was a child.

Fourth, that defendant Tipton suffers from frontal lobe brain dysfunction that was untreated when he was a child.

Fifth, that defendant Tipton has a history of birth complications, illness, disease, and head injury, and suffers brain dysfunction which has affected his ability to function and his behavior.

Six, that defendant Tipton was introduced to addictive drugs and alcohol while still a child.

Seven, that defendant Tipton is impulsive and is impaired in thinking about the consequences of his actions, and in adjusting his thinking to changing events.

Eight, that defendant Tipton's full-scale IQ is 85.

Nine, that defendant Tipton grew up in an impoverished, violent and brutal environment and was exposed to extreme violence as a child and throughout his life.

And ten, that other factors in defendant Tipton's childhood background or character mitigate against imposition of the death penalty.

3980

Now, the non-statutory mitigating factors as they relate to Cory Johnson: First, that defendant Johnson, if not sentenced to death, will be sentenced to life in prison without the possibility of parole. Again, I instruct you as I indicated before that this is factually correct. Of course, the weight due this fact as a mitigating factor is left to each of you individually.

Two, that defendant Johnson was subjected to emotional and physical abuse, abandonment, and neglect as a child and was deprived of the parental guidance and protection that he needed.

Third, that defendant Johnson suffers from neurological impairments which were identified and which were not adequately treated or addressed when he was a child or adolescent.

Fourth, that defendant Johnson suffers from brain dysfunction which has gravely impaired his ability to function in the absence of strong support and guidance.

Fifth, that defendant Johnson was introduced to addictive drugs and alcohol while still a child.

Six, that defendant Johnson has responded well

to structured environments and would likely make a reasonable adaptation to prison if he was sentenced to life in prison.

Seven, that defendant Johnson's full scale IQ is 77.

Eight, that defendant Johnson grew up in an impoverished and violent environment and was exposed to extreme violence as a child and throughout his life.

Nine, that defendant Johnson suffers from an extremely severe learning disability which impairs his ability to use good judgment, to control his behavior, and to understand and foresee the consequences of his actions.

Ten, that defendant Johnson suffers from a neurological impairment of brain damage that impairs his ability to exercise good judgment, to control his behavior, and to understand and foresee the consequences of his actions.

Eleven, that defendant Johnson was brought up in an extremely unstable, abusive, and neglectful family.

Twelve, that defendant Johnson's severe learning disability affected his intelligence, his speech, and his ability to read, write, and learn. Those limitations impaired his ability to exercise good judgment and to control his behavior.

Thirteen, that defendant Johnson had no parental involvement or support from or by his father.

Fourteen, that other factors in defendant Johnson's childhood background or character mitigate against imposition of the death penalty.

Now, the non-statutory mitigating factors as they relate to defendant James H. Roane, Jr.

First, that defendant Roane, if not sentenced to death, will be sentenced to life in prison without any possibility of parole. I have already told you that is factually correct. The weight which you will give to this fact is up to each individual juror.

Second, that defendant Roane was subjected to emotional, physical, and sexual abuse, abandonment, and neglect as a child, or was deprived of the parental guidance and protection that he needed.

Third, that defendant Roane suffers from neurological impairments which were identified and which could have been treated when he was a child or adolescent.

Fourth, that defendant Roane suffers from brain dysfunction which has gravely impaired his ability to function in the absence of strong support and guidance.

Fifth, that defendant Roane has developed a

350a

3983

paranoid mental disorder as a result of his untreated neurological impairment.

Six, that defendant Roane has responded well to structured environments and would likely make an adaptation to prison if he were sentenced to life imprisonment.

Seven, that defendant Roane's full scale IQ is 85.

Eight, that defendant Roane grew up in an impoverished, violent, brutal environment and was exposed to extreme violence as a child and throughout his life.

And nine, that other factors in defendant Roane's childhood background or character mitigate against imposition of the death penalty.

Now, on the verdict form you are asked to identify any additional mitigating factors outside of those I have discussed that any one of you considers. If, however, you think that there is some other mitigating factor present that you are simply not able to articulate it with any specificity, you may still give that factor your full consideration.

Now, any evidence relating to the mitigating factors should be fully discussed by all of you to insure that each juror considers the matter

3984

carefully. It is important to note, however, that unlike aggravating factors, which you must unanimously find proven beyond a reasonable doubt for you to consider them in your deliberations, the law does not require unanimity with regard to mitigating factors. If any one of you is persuaded of the existence of a mitigating factor by a preponderance of the evidence, even if the rest of the jurors disagree, that juror may still consider it in reaching his or her individual decision in this case. For that reason, on the section of the verdict forms relating to mitigating factors, you are asked to report the number of jurors that find each mitigating factor to have been established.

Now, once you have decided upon the aggravating and mitigating factors present in this case, the law requires you to evaluate these factors and decide whether you are unanimously persuaded beyond a reasonable doubt that the aggravating factors sufficiently outweigh any mitigating factors to justify a sentence of death. Even if you determine that no mitigating factors have been proven to exist, you must consider whether the aggravating factors that have been proven are themselves sufficient to justify a sentence of death. Passion, prejudice, and

3985

arbitrary considerations have no role to play in your

efforts to reach a just result in this case.

In carefully weighing the various factors at issue in this case, you are called upon to make a unique, individualized judgment about the appropriateness of executing each of these individual defendants. This is not a mechanical process. Neither is it determined by raw numbers. You do not simply count factors. Instead, you must consider them qualitatively. Any one aggravating factor proven by the government, if sufficiently serious in your mind, may outweigh several mitigating factors. Thus, even if you were to find only the two required statutory aggravating factors proven to a particular defendant, and no other aggravating factor, you will still have to weigh those two aggravating factors carefully against the mitigating factors.

On the other hand, you must also recognize that a single mitigating factor may outweigh several aggravating factors. In short, what is called for in weighing the various factors is not mathematical skills. You must use your careful, considered, judgment. At this final stage in the weighing process you are not simply called upon to find relevant factors. You are called upon to decide whether each individual defendant shall live or die. Only if you are unanimously persuaded beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors sufficiently that a sentence of death is justified may you return a decision in favor of capital punishment.

Each individual juror must decide whether the law requires that each defendant be put to death for a particular capital crime. If even one juror finds a mitigating factor present which in that juror's mind is not outweighed by the aggravating factors that you have agreed were proven, then the jury may not sentence the defendant to death. If even one juror finds that a sentence of death is not justified, the jury cannot return a decision in favor of capital punishment.

I also remind you again that whatever the findings you make with respect to the aggravating and mitigating factors, you are never required to impose a death sentence. For example, there may be something about this case or about one of the defendants that one or more of you are not able to identify as a specific mitigating factor, but that nevertheless creates a reasonable doubt that the death penalty is justified as to that defendant. In such a case the jury must render a decision against the death penalty.

Moreover, even where a sentence of death is

352a

fully supported by the evidence, Congress has nevertheless given each of you the discretion to temper justice with mercy. Also remember that no cited mitigation factor can ever be used by you as a reason to impose the death penalty.

You are instructed that in your consideration of whether the sentence of death is justified as to each of these defendants, you shall not consider the race, color, religious belief, national origin, or sex of the defendant or of the victims. You are not to recommend a sentence of death unless you have concluded that you would recommend a sentence of death for the crimes in question no matter what the race, color, religious belief, national origin or sex of the defendant or the victims may have been. Whatever decision you return, each of you is required by law to sign a certificate as to each defendant attesting to the fact that you have followed this instruction.

I recognize that these instructions are complex and provide you with a variety of conclusions that you can reach as to each defendant. Because your

3988

decisions in this phase of the case, unlike the first, cannot be reported by pronouncing as simple a conclusion as guilty or not guilty, I have prepared with respect to each defendant a form on which your Foreperson will report your findings as to the existence of aggravating and mitigating factors, a form which each of you must sign, certifying that you have reached your decision without considering unlawful discriminatory factors, and several alternative decision forms that you will complete depending upon your findings. Now, let me go through this verdict form. And they are more involved.

Now, the first thing that you will see, they will come to you in three packets, one for each defendant. At the top of the packet is a document entitled "Special Findings." And you have to go through this. Just to give you an example, special findings, the first part of it has to do with the statutory aggravating factors. It says, "We the jury find as follows: That defendant Richard Tipton," using Tipton as an example, "intentionally killed the victim of a capital crime proven to the jury's satisfaction beyond a reasonable doubt." And below that would be the name of each victim of a capital offense. And you would have to answer Question 1-A

3989

as it relates to each victim. That is, "That defendant, Richard Tipton, intentionally killed the victim of a capital crime." The answer is yes or no. That he intentionally killed the victim of a capital crime is one of the first categories of

statutory aggravators. And you would go through this as it relates to all of the first category statutory aggravators. When you finish that, the Category 1 statutory aggravators, you will see these words at the bottom of that consideration: "At this point, review your findings on the Category 1, aggravating factors, as to each individual victim. Each victim represents a separate capital crime. If as to any victim you have not found one of the Category 1 aggravating factors proven to your unanimous satisfaction beyond a reasonable doubt, you must now complete Section A of the decision form for defendant Richard Tipton that relates to that victim."

In other words, since you are required to find at least one aggravating factor from Category 1, and one aggravating factor from Category 2, if you find none from Category 1, by definition, you could not find that defendant guilty -- find that the death penalty should be imposed as it relates to that defendant. That's simply what that's telling you.

If you do find a Category 1 statutory aggravator, you would then move on to Category 2, and they would be handled in the same way. Category 2 aggravators are laid out, and you are to answer yes or no as it relates to each individual victim.

Again, when you finish that, you will find at the end of that similar advice: "Review your findings. Here again, if you don't find any statutory aggravators out of Category 2, that would be the end of the matter in terms of the death penalty as it relates to a particular victim and a particular defendant. You would not be able to impose the death penalty."

Now, if in fact you find one out of each of the Category 1 and Category 2, then you can go on. Next would be the non-statutory aggravating factors. Here again, they are outlined, what the government has cited as non-statutory aggravating factors as it relates to that defendant. And again, for instance, that defendant Richard Tipton committed multiple murders. You would answer yes or no, decide that.

After you finish the non-statutory aggravating factors, then you would come to the mitigating factors. And here again, you would -- there is a difference here. You have the consideration of the following mitigating factors specifically provided by statute. And then they are outlined. After each one of these, instead of having yes or no, you have a number. It says, "Number of jurors who so find by a preponderance of the evidence." And the difference is obvious, because with the aggravating factors you have to find them unanimously beyond a reasonable

354a

doubt. So the answer would be yes or no. With the mitigating factors, one person who finds a mitigating factor by a preponderance of the evidence, then that's fine, you put that in. If it is one person, six people, how many care to find a particular mitigating factor, you simply plug in the number.

Now, a second category of mitigating factors, non-statutory; it describes them and it would be the same process. You simply look at them again. For example, "That defendant Richard Tipton was subjected to emotional and physical abuse and neglect as a child and he was deprived of the parental guidance and protection that he needed." And then, "Number of jurors who so find by a preponderance of the evidence." Again, you would plug in a number. It could be 12, it could be one, if any member find by a preponderance of the evidence. Then after you have dealt with non-statutory mitigating factors, you come to another page which gives the juror or jurors or jury an opportunity to consider any additional mitigating factors that you might find, perhaps not argued or cited by the defense lawyers. But if there is something that you find to be a mitigating factor in addition to what was cited, then again, any juror who makes such a finding by a preponderance of the evidence can say so. "I think X is a mitigating factor." And you write it down. X, mitigating factor, number of people who agree. All right.

When you have gone through all of that, the Foreperson will sign and date these special findings.

Now, after you have completed the special findings, you have to make a decision regarding each defendant and each capital case. So there will be a decision form relating to each victim, the decision form relating to Douglas Talley, Bobby Long, Anthony Carter, Dorothy Mae Armstrong, Curtis Thorne, Linwood Chiles. Now you will start out, you pick one of these decision forms up and it has to do with Douglas A. Talley. "As to the crime of killing Douglas A. Talley while engaged in or in furtherance of a Continuing Criminal Enterprise," and you have got options. A: "We the jury do not unanimously find proven beyond a reasonable doubt the existence of the statutory aggravating factors required by law as prerequisites to the imposition of capital punishment, and therefore, do not consider the death penalty as to this capital crime for which defendant Richard Tipton has been convicted." If that's what you find, based on your earlier findings, then you would fill that in. B: "We the jury unanimously find beyond a reasonable doubt that the aggravating

factors required by law as prerequisites for the imposition of capital punishment have been proven by the government as to this capital crime. We further find unanimously and beyond a reasonable doubt that the aggravating factors proven in this case as to this crime and this defendant sufficiently outweigh any mitigating factors and are themselves so serious that justice mandates the sentence of death. We vote unanimously that Richard Tipton," or the named defendant, "shall be sentenced to death for this capital crime." That's one option.

C: "We the jury do not unanimously find that the aggravating factors proven in this case as to this capital crime and this defendant so outweigh the mitigating factors that justice mandates the sentence of death. We therefore return a decision that Richard Tipton not be sentenced to death for this capital crime."

The final option: "We the jury, having considered and evaluated the evidence presented in light of the instructions of the Court are not unanimously persuaded that a death sentence should be imposed for this capital crime. We therefore return the decision that Richard Tipton not be sentenced to death." Let me explain this. Option A would mean that you did not find the statutory aggravating factors that are required, and that would result in a finding that the death penalty is not in order. B would be a finding that you have found the statutory aggravating factors as necessary; that you have found mitigating factors; that you have gone through the weighing process, and you find that the aggravating factors outweigh the mitigating factors; and thus, you unanimously find a sentence of death is appropriate.

In C, you will be indicating that you have again found aggravating factors, mitigating factors, gone through the weighing process, and find that the aggravating factors do not outweigh the mitigating factors, which would lead to a sentence that does not impose the sentence of death.

And finally, the last option which also leads to a finding by the jury that the sentence of death is not appropriate, that last option would come about if you had considered other factors and decided that you are not going to impose the death penalty. If one of your number came to that conclusion, you could use Option D to indicate that conclusion.

As I say, there will be a decision form for every victim. The Foreperson will just have to sign and date the appropriate option.

Now the final thing is a certificate indicating

the non-discriminatory consideration of the case, certifying that you haven't considered race, color, sex, religion, or national origin of the victim or the defendants in coming to your decision. Each juror will have to sign that no matter what you decide. That certificate has to be signed by each juror.

All right. We have got a few more instructions that I have to give you.

As was the case in the first phase, in reaching your decisions in this sentencing here, you must consider only the evidence I have admitted in the case. The term "evidence" includes the sworn testimony of the witnesses, the exhibits admitted in the record at both phases of the trial. Remember that any statements, objections, or arguments made by the lawyers are not evidence. The function of the lawyers is to point out those things that are most significant or most helpful to their side of the case, and in so doing, to call your attention to certain facts or inferences that might otherwise escape your notice.

In the final analysis, however, it is your own recollection and interpretation of the evidence that controls in the case. What the lawyers say is not binding upon you. Also, during the course of this hearing I occasionally may have made comments to the lawyers or asked questions of a witness or admonished a witness or a lawyer, for that matter. Do not assume from anything I may have said that I have any opinion concerning any of the issues in this case. Except for my instructions to you on the law, you should disregard anything I may have said during the hearing in arriving at your decisions.

Also, as before, you should not be concerned about whether the evidence is direct or circumstantial. Direct evidence is the testimony of one who asserts actual knowledge of the fact, such as an eyewitness. Circumstantial evidence is proof of a chain of facts and circumstances indicating that a certain fact is true. The law makes no distinction between the weight you may give to either direct or circumstantial evidence.

Now, I have said that you must consider all the evidence. This does not mean, however, that you must accept all of the evidence as true or accurate. You are the sole judges of the credibility or believability of each witness and the weight to be given to his testimony. In weighing the testimony of a witness, you should consider his or her relationship to the government or defendant; his or her interest, if any, in the outcome of the case; his

357a

or her manner of testifying; his or her opportunity to observe or acquire knowledge concerning the facts about which he or she testified; his or her candor, fairness, and intelligence, and the extent to which he or she has been supported or contradicted by other credible evidence.

You may, in short, accept or reject the testimony of any witness in whole or in part. Also, the weight of the evidence is not necessarily determined by the number of witnesses testifying as to the existence or nonexistence of any fact. You may find that the testimony of a smaller number of witnesses as to any fact is more credible than the testimony of a larger number of witnesses to the contrary.

A witness may be discredited or impeached by contradictory evidence by showing that he or she testified falsely concerning a material matter or by evidence that at some other time the witness has said or done something or has failed to do or say something which is inconsistent with the witness' present testimony. If you believe that any witness has been so impeached, then it is your exclusive province to give the testimony of that witness such credibility or weight, if any, as you may think it deserves.

The fact that a witness has previously been convicted of a felony or a crime involving dishonesty or false statement is also a factor you may consider in weighing the credibility of that witness. The fact of such a conviction does not necessarily destroy the witness' credibility, but is one of the circumstances you may take into account in determining the weight to be given to his testimony.

In the guilt phase of this case, the government called as one of its witnesses an alleged accomplice named as a co-defendant in the indictment with whom the government has entered into a plea agreement providing for the dismissal of some charges or providing that the government may in its discretion file a motion informing the Court that the witness has provided substantial assistance to the government in its investigation or prosecution of the defendants in this case or of other persons. If such a motion is filed by the government, the court may elect to impose a lesser sentence than the witness would otherwise have received for the offense to which he pled guilty. Such plea bargaining, as it is called, has been approved as lawful and proper and is expressly provided for in the rules of this Court. An alleged accomplice, including one who has entered into a plea agreement with the government, is not

prohibited from testifying.  On the contrary, the testimony of such a witness alone may be sufficient, be of sufficient weight, to sustain a verdict of guilty.  However, the jury should keep in mind that such testimony is always to be received with caution and weighed with great care.  In sum, you should look at all of the evidence in deciding whether to believe an accomplice witness and what weight, if any, his or her testimony deserves.

The testimony of an alleged accomplice and the testimony of one who provides evidence against the defendant as an informer for pay or for immunity from punishment or for personal advantage or vindication must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses.  You the jury must decide whether the witness' testimony has been affected by any of these circumstances or by the witness' interest in the outcome of the case, or by prejudice against the defendant, or by the benefits that the witness has received, either financially or as a result of being immunized from prosecution.  You should keep in mind that such testimony is always to be received with caution and weighed with great care.

The testimony of a drug or alcohol abuser must be examined and weighed by the jury with greater care than the testimony of a witness who does not abuse drugs or alcohol.  The jury must determine whether the testimony of a drug or alcohol abuser has been affected by the drug or alcohol abuse or the need for drugs or alcohol.

In this case, you have also heard testimony from various expert witnesses.  An expert is a witness allowed to express an opinion on matters about which he or she has a special knowledge and training.

Expert testimony is presented to you on the theory that someone who is experienced in a particular field may assist you in understanding the evidence or in reaching an independent decision on the facts.  In weighing expert testimony, you may consider the expert's qualifications, the opinion given, the witness' reason for testifying, as well as all the other considerations that ordinarily apply when you are deciding whether or not to believe a witness.  You may give expert testimony whatever weight, if any, you find it deserves in light of all the other evidence before you.  You should not, however, accept a witness' testimony merely because he or she is an expert in her field, nor should you substitute for your own judgment, reason, and common sense.  The determination of the facts in this case rests solely with you.

Remember that a defendant has an absolute right not to testify or offer evidence. The fact that the defendant did not testify or offer any evidence should not be considered by you in any way, or even discussed in your deliberation. I remind you that it is up to the government at this stage in the proceedings to prove beyond a reasonable doubt the existence of aggravating factors sufficient to justify the death penalty. It is not up to the defendant to prove that he should not receive the death penalty.

In making your determinations regarding the existence or nonexistence of aggravating and mitigating factors, each defendant should be given separate and individual consideration. Likewise, in determining whether any defendant should be sentenced to death or to life imprisonment without possibility of parole, you must consider each defendant as an individual. The fact that one defendant was sentenced to death by you may not provide any reason to sentence any other defendant to death.

As was the case in the first phase of this trial, your Foreperson will preside over your deliberations and will speak for you here in open Court. The importance of your deliberations should be obvious. I remind you that you can return a decision sentencing a defendant to death, only if you are unanimously persuaded after weighing the aggravating and mitigating factors that such a sentence is justified. Even if one juror is not so persuaded, if any one of you concludes that the death penalty is not justified, you must return a decision against the death penalty.

It is your duty as jurors to consult with one another and to deliberate with one another with a view towards reaching an agreement if you can do so without violence to individual judgment. Each of you must decide the issues for yourself, but do so only after an impartial consideration of the evidence in the case with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous. Do not surrender your honest conviction, however, solely because of the opinion of fellow jurors. Remember at all times that you are not partisans. You are judges, judges of the facts. Your sole interest is to seek the truth from the evidence you have heard and to weigh those facts carefully in reaching your decisions.

As before, if during your deliberations you desire to communicate with me, please reduce your message or question to writing signed by the

Foreperson and summon the Marshal, who would then bring it to my attention. I will then respond as promptly as possible, either in writing or by bringing you back into the courtroom to address you orally. When you have reached your decisions as to the death penalty with respect to all defendants, send me a note signed by your Foreperson that you have completed your deliberations.

As before, the Marshal and Bailiff will be outside, right outside the jury room.

Now, we have a number of exhibits, and some of it is extensive. It will be coming in, all of these books. I believe we have enough for everybody. I think so. In any event, you take your time, go through all of the exhibits, and have your deliberations and discussions. When you have completed those, let us know and the matter will be resolved and your findings will be, or at least the decisions, will be called out in open court.

Now, are there any objections other than those previously made?

(No response.)

Apparently not. All right.

It is now 2:30. I will send you out to begin your deliberations. The lawyers will take a few minutes to look through the exhibits, make sure everything is there, and the exhibits will come in with the verdict form. Madam Forewoman, remember, three packets of verdict forms, one for each defendant, and you have got to kind of keep control of these. They are to be held together so you can get through them completely.

All right, ladies and gentlemen, we are going to release you now to start your deliberations. I am going to excuse the alternates, again, not quite permanently. We won't do that until the base jury has returned with their deliberations. We will still keep you available just in case. What we will do is call you and let you know the result. In the interim, you are still a juror; you cannot discuss this matter with anyone. And again, thank you very, very much. "Thank you" is just hollow under these circumstances. I cannot begin to express the gratitude that we have for your service. Thank you so very, very much. And you three may now be excused.

(The alternate jurors left the courtroom.)

Now, another word. If you have not completed your deliberations somewhere between 5:00 and 5:30, the Marshals will come, we will go out of session, then the Marshals will assist you in getting your cars and getting those secure, and then will take you

in for dinner and lodging.

All right, everyone remain seated while the jury leaves the courtroom.

(The jury left the courtroom.)

MR. COOLEY:  Your Honor, this may or may not be appropriate, but before we get to the conclusion of the case, I think at least from our point of view it would be appropriate for us to commend to the Court the outstanding work that the Clerk's Office and the Marshal's Service has done throughout this trial and in preparation for trial, particularly Ms. McDonald.

THE COURT:  Thank you.

MR. GEARY:  We would say the same except for one exception in the Clerk's Office, which we all know about.

THE COURT:  All right.  Okay, you all check your exhibits and make sure everything gets in there, and we will be in recess to await the jury's call.  Mr. Marshal, remove the defendants.

MR. BAUGH:  While we are still on the record, my co-counsel would like to have these go back.  Is it permissible?

THE COURT:  That's fine with me.

(Counsel referring to blow-up charts displayed to experts.)

(The defendants were removed from the courtroom.)

All right.  We will be in recess and await the jury's call.

(Recess taken from 2:35 p.m. to 5:20 p.m.)

THE COURT:  All right.  I am going to stop the jury's deliberation at this point and bring them back tomorrow morning.  Bill, bring in the jury.

(The jury entered the courtroom.)

All right.  We are going to adjourn for the evening and I'm going to have the Marshals bring you back tomorrow at 9:30.  And we will do it as we did before in the first phase.  When you come in, don't start deliberating until I've brought you into Court and then sent you back out to start your deliberations again.  When you leave now, go back to the jury room.  The Marshals will come by and explain to you how we are going to deal with the cars, get that taken care of, and you will be in their hands for the rest of the evening.

All right.  Everyone remain seated while the jury leaves the courtroom.  Let me say this before you go, just out of an abundance of caution: Continue to adhere to my admonitions.  Do not discuss the case with anyone else; don't let anyone else discuss it with you; and do not deliberate until you

362a

are brought into Court and given the go-ahead on that.  Do not listen to any television or radio that has any coverage of this.  Do not read any newspaper articles that might relate to this trial.

All right.  Everyone remain seated while the jury leaves the courtroom.

(The jury left the courtroom.)

All right, Mr. Marshal, you can remove the defendants.

(The defendants were removed from the courtroom.)

All right, Mr. Marshal, the jury is in your hands.  Make sure that they get the cars, get them secured, and take care of them.  We will be in adjournment until tomorrow morning at 9:30.

(Proceedings adjourned at 5:25 p.m.)



IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division



JUL 2 0 1992

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 3:92CR68 |
| | ) | |
| RICHARD TIPTON aka Whittey | ) | 21 USC § 846 |
| (Counts 1-7, 11-30, 32-33) | ) | Conspiracy |
| | ) | (Count 1) |
| CORY JOHNSON aka "O" aka "CO" | ) | |
| (Counts 1, 2, 8-32) | ) | 21 USC § 848 |
| | ) | Continuing Criminal Enterprise |
| JAMES H. ROANE, JR., aka "J.R." | ) | (Count 2) |
| (Counts 1, 2, 5-16, 32) | ) | |
| | ) | 21 USC § 848(e)(1)(A) & 18 USC § 2 |
| VERNON LANCE THOMAS | ) | Murder in Furtherance of CCE |
| aka Anthony Mack aka "V" | ) | (Counts 3,5,8,11,17,18,19,24,25) |
| (Counts 1, 2, 11-16, 24-30, 32) | ) | |
| | ) | 18 USC § 924(c) |
| JERRY R. GAITERS | ) | Use of Firearm in Relation to Crime of |
| (Counts 1, 17-23, 32) | ) | Violence or Drug Trafficking Crime |
| | ) | (Counts 6,9,12,15,20,26) |
| STERLING HARDY | ) | |
| (Counts 1, 14-16, 32) | ) | 18 USC §§ 1959 & 2 |
| | ) | Violent Crimes in Aid of Racketeering |
| SANDRA REAVIS | ) | (Counts 4,7,10,13,14,16,21-23,27-30) |
| (Count 1) | ) | |
| | ) | 21 USC § 841(a)(1) |
| | ) | Distribution of Crack |
| | ) | (Count 31) |
| | ) | |
| | ) | 21 USC § 841(a)(1) & 18 USC § 2 |
| | ) | Possession w/Intent to Distribute Crack |
| | ) | (Counts 32-33) |

115

00085

SECOND SUPERSEDING INDICTMENT

JULY 1992 TERM - At Richmond

COUNT ONE

THE GRAND JURY CHARGES that from on or about January, 1989, the exact date being unknown to the grand jury, and continuously thereafter up to and including the filing of this indictment, in the Eastern District of Virginia, and elsewhere, the defendants, RICHARD TIPTON, aka Whittey, CORY JOHNSON, aka "O," aka "CO", VERNON LANCE THOMAS, aka Anthony Mack, aka "V", JAMES H. ROANE, JR., aka "J.R.", JERRY GAITERS, STERLING HARDY, and SANDRA REAVIS, did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree with each other and with other persons, both known and unknown to the grand jury to commit the following offenses against the United States of America:

1.    To knowingly, intentionally, and unlawfully possess with the intent to distribute, and to distribute, a Schedule II narcotic controlled substance, that is, at least fifty (50) grams or more of a mixture or substance described in Title 21, United States Code, Section 841(b)(1)(A)(ii), which contains cocaine base, in violation of Title 21, United States Code, Section 841(a)(1).

### WAYS, MANNERS, AND MEANS OF THE CONSPIRACY

The ways, manners, and means by which the conspirators carried out the purpose of the conspiracy includes, but are not limited to, the following:

1.    It was part of the conspiracy that defendants and co-conspirators would cause cocaine to be purchased in New York City, and elsewhere, and transported to Richmond, Virginia, where the cocaine was to be distributed.

2

00086

365a

2.      It was further part of the conspiracy that once the defendants and co-defendants would receive cocaine in Richmond, Virginia, they would cook the cocaine in such a way to make it cocaine base ("crack" or "cook-em-up"), which cocaine was intended to be distributed on the streets of Richmond, Virginia.

3.      It was further part of the conspiracy that the defendants and co-defendants would induce other individuals to work for them selling the crack cocaine on the streets of Richmond, Virginia.

4.      It was further part of the conspiracy to engage in a pattern of violent activity, including murder, assaults, and threats of violence to further the goals of the conspiracy.  To that end, members of the conspiracy bought, possessed, and transferred firearms, which firearms were used in their violent activities.

## OVERT ACTS

In furtherance of this conspiracy, and to bring about the objects and goals of the conspiracy, the defendants, co-conspirators, and unindicted co-conspirators committed overt acts in the Eastern District of Virginia and elsewhere, including, but not limited to, the following:

1.      In or about December, 1991, defendants RICHARD TIPTON, aka Whittey, and CORY JOHNSON, aka "O," aka "CO", assaulted an individual known to the grand jury over a cocaine debt.

2.      On or about January 5, 1992, RICHARD TIPTON, aka Whittey, murdered Douglas A. Talley.

3

00087

3. On or about January 13, 1992, RICHARD TIPTON, aka Whittey, and JAMES H. ROANE, JR., aka "J.R." murdered Douglas Moody.

4. On or about January 13, 1992, an individual known to the grand jury, disposed of the knife used by JAMES ROANE, JR., aka "J.R.", to kill Doug Moody.

5. On or about January 14, 1992, members of the conspiracy caused an individual known to the grand jury to purchase one Glock handgun and two Tech 9mm handguns from Southern Gun World in Richmond, Virginia.

6. On or about January 14, 1992, JAMES ROANE, JR., aka "J.R." and CORY JOHNSON, aka "O;" aka "CO", murdered Peyton Maurice Johnson.

7. On or about January 15, 1992, CORY JOHNSON, aka "O," aka "CO", distributed a certain amount of cocaine base ("crack" or "cook em up") in Richmond, Virginia.

8. On or about January 29, 1992, RICHARD TIPTON aka Whittey, JAMES ROANE, JR., aka "J.R.", and CORY JOHNSON, aka "O," aka "CO", VERNON LANCE THOMAS, aka Anthony Mack, aka "V", murdered Louis J. Johnson, Jr., in Richmond, Virginia.

9. On or about January 31, 1992, CORY JOHNSON, aka "O," aka "CO", assaulted an individual known to the grand jury over a drug debt, and solicited that individual to kill Dorothy Armstrong.

10. On or about February 1, 1992, JAMES ROANE, JR., aka "J.R.", RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", VERNON

4

00088

LANCE THOMAS, aka Anthony Mack, aka "V", and STERLING HARDY murdered Torrick Brown and shot Martha McCoy in Richmond, Virginia.

11. On or about February 1, 1992, RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS murdered Bobby Long, Anthony Carter, and Dorothy Mae Armstrong aka Mousey, in Richmond, Virginia.

12. On or about February 2, 1992, defendants RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", STERLING HARDY, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", JAMES H. ROANE, JR., aka "J.R.", and JERRY GAITERS possessed with the intent to distribute crack cocaine.

13. On or about February 13, 1992, STERLING HARDY solicited the murders of certain individuals.

14. On or about February 19, 1992, RICHARD TIPTON, aka Whittey, CORY JOHNSON, aka "O," aka "CO", and VERNON LANCE THOMAS, aka Anthony Mack, aka "V", murdered Curtis Thorne, Linwood Chiles, and shot, seriously wounding, Gwendolyn Green and Priscilla Green, in Richmond, Virginia.

15. On or about April 10, 1992, RICHARD TIPTON, aka Whittey, possessed with the intent to distribute crack cocaine in Richmond, Virginia.

(In violation of Title 21, United States Code, Section 846).

## COUNT TWO

THE GRAND JURY FURTHER CHARGES that from at least January, 1991, and continuously thereafter up to and including the date of the filing of this indictment, in the Eastern District of Virginia, and elsewhere, the defendants RICHARD TIPTON,

5

00089

aka Whittey, CORY JOHNSON, aka "O", aka "CO," JAMES H. ROANE, JR., aka "JR," and VERNON LANCE THOMAS, aka Anthony Mack, aka "V", unlawfully, intentionally, and knowingly, did engage in a Continuing Criminal Enterprise, that is, they did violate Title 21, United States Code, Section 841 and 846, including, but not limited to, those violations alleged in the instant indictment, which are realleged and incorporated by reference herein, and did commit other violations of said statutes, which violations were part of a continuing series of violations of said statutes undertaken by RICHARD TIPTON, aka Whittey, CORY JOHNSON, aka "O", aka "CO," JAMES H. ROANE, JR., aka "JR," and VERNON LANCE THOMAS, aka Anthony Mack, aka "V", in concert with at least five other persons with respect to whom they occupied positions of organizer, supervisor, and manager, and from which continuing series of violations the defendant, RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O", aka "CO," JAMES H. ROANE, JR., aka "JR," and VERNON LANCE THOMAS, aka Anthony Mack, aka "V", obtained substantial income and resources.

(In violation of Title 21, United States Code, Section 848.)

## COUNT THREE

THE GRAND JURY FURTHER CHARGES that on or about January 5, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendant RICHARD TIPTON aka Whittey, while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Douglas A. Talley, and such killing resulted.

6

00090

369a

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

## COUNT FOUR

THE GRAND JURY FURTHER CHARGES that on or about January 5, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendant, RICHARD TIPTON aka Whittey, did knowingly, intentionally, and unlawfully cause the murder of Douglas Talley, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT FIVE

THE GRAND JURY FURTHER CHARGES that on or about January 13, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON aka Whittey, and JAMES H. ROANE, JR., aka "J.R.", while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Douglas Moody, and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

7

00091

## COUNT SIX

THE GRAND JURY FURTHER CHARGES that on or about January 13, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON, aka Whittey, and JAMES H. ROANE, JR., aka "J.R.", did knowingly, willfully, and unlawfully use a firearm, during and in relation to a crime of violence or a drug trafficking crime, which is a felony prosecutable in a court of the United States, that is, a violation of Title 21, United States Code, Section 846 and 848, and Title 18, United States Code, Section 1959, as set forth in Counts One, Five and Seven of this Indictment. (In violation of Title 18, United States Code, Sections 924(c) and 2.)

## COUNT SEVEN

THE GRAND JURY FURTHER CHARGES that on or about January 13, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON, aka Whittey, and JAMES H. ROANE, JR., aka "J.R.", did knowingly, intentionally, and unlawfully cause the murder of Douglas Moody, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

8

00092

## COUNT EIGHT

THE GRAND JURY FURTHER CHARGES that on or about January 14, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants JAMES H. ROANE, JR., aka "J.R.", CORY JOHNSON, aka "O," aka "CO", and while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Peyton Maurice Johnson, and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

## COUNT NINE

THE GRAND JURY FURTHER CHARGES that on or about January 14, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants JAMES H. ROANE, JR., aka "J.R.", and CORY JOHNSON, aka "O," aka "CO", did knowingly, willfully, and unlawfully use a firearm, during and in relation to a crime of violence or a drug trafficking crime, which is a felony prosecutable in a court of the United States, that is a violation of Title 21, United States Code, Sections 846 and 848, and Title 18, United States Code, Section 1959, as set forth in Counts One, Eight and Ten of this Indictment. (In violation of Title 18, United States Code, Sections 924(c) and 2.)

9

00093

372a

## COUNT TEN

THE GRAND JURY FURTHER CHARGES that on or about January 14, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, JAMES H. ROANE, JR., aka "J.R." and CORY JOHNSON, aka "O," aka "CO", did knowingly, intentionally, and unlawfully cause the murder of Peyton Maurice Johnson, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT ELEVEN

THE GRAND JURY FURTHER CHARGES that on or about January 29, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON aka Whittey, JAMES H. ROANE, JR., aka "J.R.", CORY JOHNSON, aka "O," aka "CO", and VERNON LANCE THOMAS, aka Anthony Mack, aka "V", while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Louis J. Johnson, Jr., and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

10

00094

373a

## COUNT TWELVE

THE GRAND JURY FURTHER CHARGES that on or about January 29, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, JAMES H. ROANE, JR., aka "J.R.", CORY JOHNSON, aka "O," aka "CO", and VERNON LANCE THOMAS, aka Anthony Mack, aka "V", did knowingly, willfully, and unlawfully use a firearm, during and in relation to a crime of violence or a drug trafficking crime, which is a felony prosecutable in a court of the United States, that is a violation of Title 21, United States Code, Sections 846 and 848, and Title 18, United States Code, Section 1959, as set forth in Counts One, Eleven and Thirteen of this Indictment.

(In violation of Title 18, United States Code, Sections 924(c) and 2.)

## COUNT THIRTEEN

THE GRAND JURY FURTHER CHARGES that on or about January 29, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, JAMES H. ROANE, JR., aka "J.R.", CORY JOHNSON, aka "O," aka "CO", and VERNON LANCE THOMAS, aka Anthony Mack, aka "V", did knowingly, intentionally, and unlawfully cause the murder of Louis J. Johnson, Jr., as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in

11

00095

narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT FOURTEEN

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, JAMES H. ROANE, JR., aka "J.R.", CORY JOHNSON, aka "O," aka "CO", VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and STERLING HARDY, did knowingly, intentionally, and unlawfully cause the murder of Torrick Brown, Jr., as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT FIFTEEN

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, JAMES H. ROANE, JR., aka "J.R.", CORY JOHNSON, aka "O," aka "CO", VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and STERLING HARDY, did knowingly, willfully, and unlawfully use a firearm, during and in relation to a crime of violence or a drug trafficking crime, which is a felony prosecutable in a court

12

00096

of the United States, that is a violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 1959, as set forth in Counts One, Fourteen and Sixteen of this Indictment.

(In violation of Title 18, United States Code, Sections 924(c) and 2.)

## COUNT SIXTEEN

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, JAMES H. ROANE, JR., aka "J.R.", CORY JOHNSON, aka "O," aka "CO", VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and STERLING HARDY, did knowingly, intentionally, and unlawfully commit assault resulting in serious bodily injury to Martha McCoy, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT SEVENTEEN

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS, while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21

13

00097

USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Bobby Long, and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

## COUNT EIGHTEEN

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS, while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Anthony Carter, and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

## COUNT NINETEEN

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS, while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded,

14

00098

377a

induced, procured, and caused the intentional killing of Dorothy Mae Armstrong, and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

## COUNT TWENTY

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS, did knowingly, willfully, and unlawfully use a firearm, during and in relation to a crime of violence or a drug trafficking crime, which is a felony prosecutable in a court of the United States, that is a violation of Title 21, United States Code, Sections 846 and 848, and Title 18, United States Code, Section 1959, as set forth in Counts One, Seventeen, Eighteen & Nineteen and Twenty-One through Twenty-Three of this Indictment.

(In violation of Title 18, United States Code, Sections 924(c) and 2.)

## COUNT TWENTY-ONE

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS, did knowingly, intentionally, and unlawfully cause the murder of Bobby Long, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity,

15

00099

and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT TWENTY-TWO

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS, did knowingly, intentionally, and unlawfully cause the murder of Anthony Carter, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT TWENTY-THREE

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS, did knowingly, intentionally, and unlawfully cause the murder of Dorothy Mae Armstrong, as consideration for the receipt of, and as consideration for a promise and

16

00100

379a

agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)


## COUNT TWENTY-FOUR

THE GRAND JURY FURTHER CHARGES that on or about February 19, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON, aka Whittey, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and CORY JOHNSON, aka "O," aka "CO", while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Curtis Thorne, and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).


## COUNT TWENTY-FIVE

THE GRAND JURY FURTHER CHARGES that on or about February 19, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON, aka Whittey, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and CORY JOHNSON, aka "O," aka "CO", while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly,

17

00101

intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Linwood Chiles, and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

## COUNT TWENTY-SIX

THE GRAND JURY FURTHER CHARGES that on or about February 19, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON, aka Whittey, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and CORY JOHNSON, aka "O," aka "CO", did knowingly, willfully, and unlawfully use a firearm, during and in relation to a crime of violence or a drug trafficking crime, which is a felony prosecutable in a court of the United States, that is a violation of Title 21, United States Code, Section 846 and 848, and Title 18, United States Code, Section 1959, as set forth in Counts One, Twenty-Four, Twenty-Five and Twenty-Seven through Thirty of this Indictment.

(In violation of Title 18, United States Code, Sections 924(c) and 2.)

## COUNT TWENTY-SEVEN

THE GRAND JURY FURTHER CHARGES that on or about February 19, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON, aka Whittey, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and CORY JOHNSON, aka "O," aka "CO", did knowingly, intentionally, and unlawfully cause the murder of Curtis Thorne, as consideration for the receipt of, and as

18

00102

consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT TWENTY-EIGHT

THE GRAND JURY FURTHER CHARGES that on or about February 19, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON, aka Whittey, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and CORY JOHNSON, aka "O," aka "CO", did knowingly, intentionally, and unlawfully cause the murder of Linwood Chiles, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT TWENTY-NINE

THE GRAND JURY FURTHER CHARGES that on or about February 19, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON, aka Whittey, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and CORY JOHNSON, aka "O," aka "CO", did knowingly, intentionally, and

19

00103

unlawfully cause the maiming of Priscilla Green, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT THIRTY

THE GRAND JURY FURTHER CHARGES that on or about February 19, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON, aka Whittey, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and CORY JOHNSON, aka "O," aka "CO", did knowingly, intentionally, and unlawfully cause the maiming of Gwendolyn Green, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT THIRTY-ONE

THE GRAND JURY FURTHER CHARGES that on or about January 15, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendant, CORY

20

00104

383a

JOHNSON, aka "O," aka "CO", did knowingly and intentionally distribute a Schedule II narcotic controlled substance, that is, a mixture and substance described in Title 21, United States Code, Section 841(b)(1)(A)(ii), which contains cocaine base, commonly known as "crack," or "cook em up."

(In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.)

## COUNT THIRTY-TWO

THE GRAND JURY FURTHER CHARGES that on or about February 2, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", STERLING HARDY, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", JAMES ROANE, JR., aka "J.R.", and JERRY GAITERS, did knowingly and intentionally possess with the intent to distribute a Schedule II narcotic controlled substance, that is, more than fifty (50) grams of a mixture and substance described in Title 21, United States Code, Section 841(b)(1)(A)(ii), which contains cocaine base, commonly known as "crack," or "cook em up."

(In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.)

## COUNT THIRTY-THREE

THE GRAND JURY FURTHER CHARGES that on or about April 10, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD

21

00105

TIPTON aka Whittey, did knowingly and intentionally possess with the intent to distribute a Schedule II narcotic controlled substance, that is, more than fifty (50) grams of a mixture and substance described in Title 21, United States Code, Section 841(b)(1)(A)(ii), which contains cocaine base, commonly known as "crack," or "cook em up."

(In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.)

A TRUE BILL:

ISI Christopher F. Snead
FOREPERSON

RICHARD CULLEN
UNITED STATES ATTORNEY

By:

Howard C. Vick, Jr.
Assistant United States Attorney

William Parcell
Special Assistant U.S. Attorney

22

00106

385a

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**



FEB 1 6 1993

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

```
                              )
UNITED STATES OF AMERICA      )
                              )
   v.                         )      Criminal Case No. 3:92CR68-02
                              )
CORY JOHNSON                  )
   a.k.a. "O," a.k.a. "CO"    )
                              )
```

## SPECIAL FINDINGS

### I.  Statutory Aggravating Factors:

**Category One:**  (21 U.S.C. § 848(n)(1))

WE, THE JURY, FIND as follows:

1A.   That defendant CORY JOHNSON intentionally killed the victim of the capital crime.

Proven to the jury's unanimous satisfaction,
   beyond a reasonable doubt:

As to Peyton Maurice Johnson .........  ___Yes___
                                          (Yes or No)

As to Louis J. Johnson, Jr. ..........  ___Yes___
                                          (Yes or No)

As to Bobby Long .....................  ___Yes___
                                          (Yes or No)

As to Anthony Carter .................  ___Yes___
                                          (Yes or No)

As to Dorothy Mae Armstrong ..........  ___Yes___
                                          (Yes or No)

As to Curtis Thorne ..................  ___Yes___
                                          (Yes or No)

As to Linwood Chiles .................  ___Yes___
                                          (Yes or No)

1B. That defendant CORY JOHNSON intentionally inflicted serious bodily injury which resulted in the death of the victim of the capital crime.

Proven to the jury's unanimous satisfaction, beyond a reasonable doubt:

As to Peyton Maurice Johnson ......... _____Yes_____
(Yes or No)

As to Louis J. Johnson, Jr. .......... _____Yes_____
(Yes or No)

As to Bobby Long ..................... _____Yes_____
(Yes or No)

As to Anthony Carter ................. _____Yes_____
(Yes or No)

As to Dorothy Mae Armstrong .......... _____Yes_____
(Yes or No)

As to Curtis Thorne .................. _____Yes_____
(Yes or No)

As to Linwood Chiles ................. _____Yes_____
(Yes or No)

1C. That defendant CORY JOHNSON intentionally engaged in conduct intending that the victim of the capital crime be killed, or that lethal force be employed against the victim, which resulted in the death of the victim.

Proven to the jury's unanimous satisfaction, beyond a reasonable doubt:

As to Peyton Maurice Johnson ......... _____Yes_____
(Yes or No)

As to Louis J. Johnson, Jr. .......... _____Yes_____
(Yes or No)

As to Bobby Long ..................... _____Yes_____
(Yes or No)

As to Anthony Carter ................. _____Yes_____
(Yes or No)

As to Dorothy Mae Armstrong .......... _____Yes_____
(Yes or No)

As to Curtis Thorne .................. _____Yes_____
(Yes or No)

As to Linwood Chiles ................. _____Yes_____
(Yes or No)

2

387a

1D.   That defendant CORY JOHNSON intentionally engaged in conduct which defendant JOHNSON knew would create a grave risk of death to a person, other than one of the participants in the offense, and that such conduct resulted in the death of the victim of the capital crime.

Proven to the jury's unanimous satisfaction,
     beyond a reasonable doubt:

As to Peyton Maurice Johnson ........   ___Yes___
                                         (Yes or No)

As to Louis J. Johnson, Jr. ..........   ___Yes___
                                         (Yes or No)

As to Bobby Long ....................   ___Yes___
                                         (Yes or No)

As to Anthony Carter ................   ___Yes___
                                         (Yes or No)

As to Dorothy Mae Armstrong ..........   ___Yes___
                                         (Yes or No)

As to Curtis Thorne .................   ___Yes___
                                         (Yes or No)

As to Linwood Chiles ................   ___Yes___
                                         (Yes or No)


Jurors:   At this point, review your findings on the Category One aggravating factors as to each individual victim. Each victim represents a separate capital crime. If, as to any victim, you have not found one of the Category One aggravating factors proven to your unanimous satisfaction, beyond a reasonable doubt, you must now complete Section A of the Decision Form for defendant CORY JOHNSON that relates to that victim.

If, as to one or more victims, you have found a Category One aggravating factor proven to your unanimous satisfaction, continue to the Category Two factors on the following page.


3

388a

**Category Two:**    (21 U.S.C. §§ 848(n)(2)-(12))

WE, THE JURY, find as follows:

2A.   That defendant CORY JOHNSON committed the killing of the victim of the capital crime after substantial planning and premeditation.

Proven to the jury's unanimous satisfaction,
      beyond a reasonable doubt:

As to Peyton Maurice Johnson .........   __Yes__
                                          (Yes or No)

As to Louis J. Johnson, Jr. ..........   __Yes__
                                          (Yes or No)

As to Bobby Long .....................   __Yes__
                                          (Yes or No)

As to Anthony Carter .................   __Yes__
                                          (Yes or No)

As to Dorothy Mae Armstrong ..........   __Yes__
                                          (Yes or No)

As to Curtis Thorne ..................   __Yes__
                                          (Yes or No)

As to Linwood Chiles .................   __Yes__
                                          (Yes or No)

2B.   That, in the commission of the capital crime, defendant CORY JOHNSON knowingly created a grave risk of death to one or more persons in addition to the victim of the capital crime.

Proven to the jury's unanimous satisfaction,
      beyond a reasonable doubt:

As to Curtis Thorne ..................   __Yes__
                                          (Yes or No)

As to Linwood Chiles .................   __Yes__
                                          (Yes or No)

4

389a

Jurors:    At this point, again review your findings as to each
individual victim.  If, as to any victim, you now have
not found proven, to your unanimous satisfaction, both
one of the Category One factors <u>and</u> one of the Category
Two factors, you must complete Section A of the Decision
Form for defendant CORY JOHNSON that relates to that
victim, if you have not already done so.

If, however, you have found both a Category One factor
and a Category Two factor proven to your unanimous
satisfaction as to one or more victims (i.e., one or more
capital crimes), continue your deliberations with regard
to those particular capital crimes by proceeding to the
section on the next page dealing with nonstatutory
aggravating factors.

5

390a

## II. Nonstatutory Aggravating Factors:

WE, THE JURY, FIND as follows:


1.   That defendant CORY JOHNSON committed multiple murders.

Proven to the jury's unanimous satisfaction,
     beyond a reasonable doubt:

          ___Yes___
          (Yes or No)


2.   That defendant CORY JOHNSON has a substantial criminal history.

Proven to the jury's unanimous satisfaction,
     beyond a reasonable doubt:

          ___Yes___
          (Yes or No)


3.   That defendant CORY JOHNSON seriously wounded two individuals in the course of committing the CCE murders for which he has been convicted.

Proven to the jury's unanimous satisfaction,
     beyond a reasonable doubt:

          ___Yes___
          (Yes or No)


4.   That defendant CORY JOHNSON was knowingly and willfully a member of a conspiracy which had as one of its goals the murder of individuals other than those for which the defendant was charged.

Proven to the jury's unanimous satisfaction,
     beyond a reasonable doubt:

          ___Yes___
          (Yes or No)


Jurors:   Regardless of your findings as to these nonstatutory aggravating factors, proceed to the next section concerning mitigating factors.


6

391a

### III.  Mitigating Factors:

WE, THE JURY, FIND as follows:

Jurors:   Consideration of the following mitigating factors is specifically provided for by statute.

1.   That defendant CORY JOHNSON's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge(s).

Number of jurors who so find,
by a preponderance of the evidence:    ___Ø___
                                      (Number)

2.   That defendant CORY JOHNSON is punishable as a principal (as defined in section 2 of Title 18 of the United States Code) in the offense(s), which was (were) committed by another, but defendant CORY JOHNSON's participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge(s).

Number of jurors who so find,
by a preponderance of the evidence:    ___Ø___
                                      (Number)

3.   That defendant CORY JOHNSON could not reasonably have foreseen that his conduct in the course of the commission of the murder(s) would cause, or would create a grave risk of causing, death to any person.

Number of jurors who so find,
by a preponderance of the evidence:    ___Ø___
                                      (Number)

4.   That defendant CORY JOHNSON was youthful, although not under the age of 18.

Number of jurors who so find,
by a preponderance of the evidence:    ___9___
                                      (Number)

7

392a

5.  That defendant CORY JOHNSON did not have a significant prior criminal record.

    Number of jurors who so find,
    by a preponderance of the evidence:    __9__
    (Number)

6.  That defendant CORY JOHNSON committed the offense(s) under severe mental or emotional disturbance.

    Number of jurors who so find,
    by a preponderance of the evidence:    __0__
    (Number)

7.  That another defendant or defendants, equally culpable in the crime(s), will not be punished by death.

    Number of jurors who so find,
    by a preponderance of the evidence:    __12__
    (Number)

8.  That the victim(s) consented to the criminal conduct that resulted in his (her) (their) deaths.

    Number of jurors who so find,
    by a preponderance of the evidence:    __12__
    (Number)

9.  That the following other factors in the defendant's background or character mitigate against imposition of a death sentence:

    Jurors:    The following are nonstatutory mitigating factors.

a)  That defendant CORY JOHNSON was subjected to emotional and physical abuse, abandonment and neglect as a child, and was deprived of the parental guidance and protection that he needed.

    Number of jurors who so find,
    by a preponderance of the evidence:    __12__
    (Number)

b)  That defendant CORY JOHNSON suffers from neurological impairments which were identified and which were not adequately treated or addressed when he was a child or adolescent.

    Number of jurors who so find,
    by a preponderance of the evidence:    __12__
    (Number)

8

393a

c)   That defendant CORY JOHNSON suffers from brain dysfunction which has gravely impaired his ability to function in the absence of strong support or guidance.

Number of jurors who so find,
by a preponderance of the evidence:          _____8_____
                                              (Number)

d)   That defendant CORY JOHNSON was introduced to addictive drugs and alcohol while still a child.

Number of jurors who so find,
by a preponderance of the evidence:          _____12_____
                                              (Number)

e)   That defendant CORY JOHNSON has responded well to structured environments, and would likely make a reasonable adaptation to prison if he were sentenced to life imprisonment.

Number of jurors who so find,
by a preponderance of the evidence:          _____7_____
                                              (Number)

f)   That defendant CORY JOHNSON's full scale I.Q. is 77.

Number of jurors who so find,
by a preponderance of the evidence:          _____8_____
                                              (Number)

g)   That defendant CORY JOHNSON grew up in an impoverished and violent environment, and was exposed to extreme violence as a child and throughout his life.

Number of jurors who so find,
by a preponderance of the evidence:          _____12_____
                                              (Number)

h)   That defendant CORY JOHNSON suffers from an extremely severe learning disability which impairs his ability to use good judgment to control his behavior, and to understand and foresee the consequences of his actions.

Number of jurors who so find,
by a preponderance of the evidence:          _____0_____
                                              (Number)

9

USCA4 Appeal: 20-8     Doc: 2-3     Filed: 05/22/2020     Pg: 359 of 375

i) That defendant CORY JOHNSON suffers from a neurological impairment (brain damage) that impairs his ability to exercise good judgment, to control his behavior and to understand and foresee the consequences of his actions.

Number of jurors who so find, by a preponderance of the evidence: _____2_____
(Number)

j) That defendant CORY JOHNSON was brought up in an extremely unstable, abusive and neglectful family.

Number of jurors who so find, by a preponderance of the evidence: _____12_____
(Number)

k) That defendant CORY JOHNSON's severe learning disability affected his intelligence, his speech, and his ability to read, write and learn. Those limitations impaired his ability to exercise good judgment and to control his behavior.

Number of jurors who so find, by a preponderance of the evidence: _____5_____
(Number)

l) That defendant CORY JOHNSON had no parental involvement or support from or by his father.

Number of jurors who so find, by a preponderance of the evidence: _____12_____
(Number)

m) That defendant CORY JOHNSON, if not sentenced to death, will be sentenced to life in prison without any possibility of parole.

Number of jurors who so find, by a preponderance of the evidence: _____12_____
(Number)

Jurors: If any juror or jurors find(s) that a mitigating factor not listed above has been proven to exist by a preponderance of the evidence, please identify that mitigating factor on the following page, together with the number of jurors who so find. Remember, however, that you need not be able to articulate a mitigating factor with specificity to consider it in your deliberations.

10

395a

If additional space is needed, use the back of this page.

Factor: ~~XXXX~~ ~~B~~ The defendant's eagerness
to be accepted by ~~his~~ others ~~XX~~ he was
easily manipulated.
Number of jurors who so find,
by a preponderance of the evidence:    11
                                  (Number)

Factor: That the defendant's severe Learning
Disability, based on neurological impairment (brain damage)
could impair his ability to exercise good judgem.
Number of jurors who so find,
by a preponderance of the evidence:    12
                                  (Number)

Factor: _____

_____

Number of jurors who so find,
by a preponderance of the evidence:    _____
                                  (Number)

Factor: _____

_____

Number of jurors who so find,
by a preponderance of the evidence:    _____
                                  (Number)

Jurors:    You have completed the Special Findings as to defendant
CORY JOHNSON, and must now begin the process of weighing
the aggravating and mitigating factors to determine if
the death penalty is justified as to each capital crime
for which this defendant has been convicted. Remember,
you are now considering only those capital crimes for
which you have not already completed Section A of the
Decision Form. Upon completing your deliberations as to
the remaining capital crimes charged to this defendant,
complete Section B, C or D of the Decision Form for each
crime as appropriate.

11

396a

The date and your foreperson's signature should appear
below, certifying that these are your Special Findings as
to defendant CORY JOHNSON.

_____     _____
        FOREPERSON'S SIGNATURE                2/15/93
                                                 DATE

12

397a

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION



FILE
FEB 1 6 1993
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

UNITED STATES OF AMERICA )
)
v. )    Criminal Case No. 3:92CR68-02
)
CORY JOHNSON )
  a.k.a. "O," a.k.a. "CO" )
)

### DECISION FORM

As to the crime of killing <u>Linwood Chiles</u> while engaged in, or in furtherance of, a continuing criminal enterprise:

A.    WE, THE JURY, <u>do</u> <u>not</u> unanimously find proven, beyond a reasonable doubt, the existence of the statutory aggravating factors required by law as prerequisites for the imposition of capital punishment, and therefore do not consider the death penalty as to this capital crime for which defendant Cory Johnson has been convicted.

_____     _____
FOREPERSON'S SIGNATURE          DATE

OR

B.    WE, THE JURY, unanimously find beyond a reasonable doubt that the aggravating factors required by law as prerequisites for the imposition of capital punishment have been proven by the government as to this capital crime. We further find, unanimously and beyond a reasonable doubt, that the aggravating factors proven in this case, as to this crime and this defendant, sufficiently outweigh any mitigating factors, and are themselves so serious, that justice mandates a sentence of death. We vote unanimously that Cory Johnson shall be sentenced to death for this capital crime.

_____     2/15/93_____
FOREPERSON'S SIGNATURE          DATE

OR

398a

15

C.  WE, THE JURY, <u>do</u> <u>not</u> unanimously find that the aggravating factors proven in this case, as to this capital crime and this defendant, so outweigh the mitigating factors that justice mandates a sentence of death.  We, therefore, return a decision that Cory Johnson <u>not</u> be sentenced to death for this capital crime.

_____          _____
FOREPERSON'S SIGNATURE                          DATE

<u>OR</u>

D.  WE, THE JURY, having considered and evaluated the evidence presented in light of the instructions of the Court, are not unanimously persuaded that a death sentence should be imposed for this capital crime.  We, therefore, return a decision that Cory Johnson not be sentenced to death for this capital crime.

_____          _____
FOREPERSON'S SIGNATURE                          DATE

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION



**FILED**
FEB 16 1993

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

```
UNITED STATES OF AMERICA      )
                              )
   v.                         )      Criminal Case No. 3:92CR68-02
                              )
CORY JOHNSON                  )
   a.k.a. "O," a.k.a. "CO"    )
                              )
```

## DECISION FORM

As to the crime of killing <u>Curtis Thorne</u> while engaged in, or in furtherance of, a continuing criminal enterprise:

A.  WE, THE JURY, <u>do</u> <u>not</u> unanimously find proven, beyond a reasonable doubt, the existence of the statutory aggravating factors required by law as prerequisites for the imposition of capital punishment, and therefore do not consider the death penalty as to this capital crime for which defendant Cory Johnson has been convicted.

_____          _____
FOREPERSON'S SIGNATURE                              DATE

OR

B.  WE, THE JURY, unanimously find beyond a reasonable doubt that the aggravating factors required by law as prerequisites for the imposition of capital punishment have been proven by the government as to this capital crime. We further find, unanimously and beyond a reasonable doubt, that the aggravating factors proven in this case, as to this crime and this defendant, sufficiently outweigh any mitigating factors, and are themselves so serious, that justice mandates a sentence of death. We vote unanimously that Cory Johnson shall be sentenced to death for this capital crime.

_____          _____
FOREPERSON'S SIGNATURE                          2/15/93     DATE

OR

400a

C.    WE, THE JURY, <u>do</u> <u>not</u> unanimously find that the aggravating factors proven in this case, as to this capital crime and this defendant, so outweigh the mitigating factors that justice mandates a sentence of death. We, therefore, return a decision that Cory Johnson <u>not</u> be sentenced to death for this capital crime.

_____          _____
    FOREPERSON'S SIGNATURE                              DATE

<u>OR</u>

D.    WE, THE JURY, having considered and evaluated the evidence presented in light of the instructions of the Court, are not unanimously persuaded that a death sentence should be imposed for this capital crime. We, therefore, return a decision that Cory Johnson not be sentenced to death for this capital crime.

_____          _____
    FOREPERSON'S SIGNATURE                              DATE

401a

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**



FILED

FEB 1 6 1993

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CORY JOHNSON<br>   a.k.a. "O," a.k.a. "CO" | Criminal Case No. 3:92CR68-02 |

## DECISION FORM

As to the crime of killing <u>Dorothy Mae Armstrong</u> while engaged in, or in furtherance of, a continuing criminal enterprise:

A.   WE, THE JURY, <u>do</u> <u>not</u> unanimously find proven, beyond a reasonable doubt, the existence of the statutory aggravating factors required by law as prerequisites for the imposition of capital punishment, and therefore do not consider the death penalty as to this capital crime for which defendant Cory Johnson has been convicted.

_____     _____
FOREPERSON'S SIGNATURE             DATE

OR

B.   WE, THE JURY, unanimously find beyond a reasonable doubt that the aggravating factors required by law as prerequisites for the imposition of capital punishment have been proven by the government as to this capital crime. We further find, unanimously and beyond a reasonable doubt, that the aggravating factors proven in this case, as to this crime and this defendant, sufficiently outweigh any mitigating factors, and are themselves so serious, that justice mandates a sentence of death. We vote unanimously that Cory Johnson shall be sentenced to death for this capital crime.

_____     __2/15/93__
FOREPERSON'S SIGNATURE             DATE

OR

513

C.    WE, THE JURY, <u>do</u> <u>not</u> unanimously find that the aggravating factors proven in this case, as to this capital crime and this defendant, so outweigh the mitigating factors that justice mandates a sentence of death.  We, therefore, return a decision that Cory Johnson <u>not</u> be sentenced to death for this capital crime.


_____          _____
     FOREPERSON'S SIGNATURE                          DATE


<u>OR</u>

D.    WE, THE JURY, having considered and evaluated the evidence presented in light of the instructions of the Court, are not unanimously persuaded that a death sentence should be imposed for this capital crime.  We, therefore, return a decision that Cory Johnson not be sentenced to death for this capital crime.


_____          _____
     FOREPERSON'S SIGNATURE                          DATE

403a

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

F I L E
FEB 1 6 1993
CLERK, U.S. DISTRICT COURT
RICHMOND VA

UNITED STATES OF AMERICA )
)
v. )    Criminal Case No. 3:92CR68-02
)
CORY JOHNSON )
a.k.a. "O," a.k.a. "CO" )
)

## DECISION FORM

As to the crime of killing <u>Anthony Carter</u> while engaged in, or in furtherance of, a continuing criminal enterprise:

A.    WE, THE JURY, <u>do</u> <u>not</u> unanimously find proven, beyond a reasonable doubt, the existence of the statutory aggravating factors required by law as prerequisites for the imposition of capital punishment, and therefore do not consider the death penalty as to this capital crime for which defendant Cory Johnson has been convicted.

_____          _____
FOREPERSON'S SIGNATURE                        DATE

OR

B.    WE, THE JURY, unanimously find beyond a reasonable doubt that the aggravating factors required by law as prerequisites for the imposition of capital punishment have been proven by the government as to this capital crime. We further find, unanimously and beyond a reasonable doubt, that the aggravating factors proven in this case, as to this crime and this defendant, sufficiently outweigh any mitigating factors, and are themselves so serious, that justice mandates a sentence of death. We vote unanimously that Cory Johnson shall be sentenced to death for this capital crime.

_____          ___2/15/93___
FOREPERSON'S SIGNATURE                        DATE

OR

404a

C.    WE, THE JURY, <u>do</u> <u>not</u> unanimously find that the aggravating factors proven in this case, as to this capital crime and this defendant, so outweigh the mitigating factors that justice mandates a sentence of death. We, therefore, return a decision that Cory Johnson <u>not</u> be sentenced to death for this capital crime.


_____          _____
      FOREPERSON'S SIGNATURE                       DATE


<u>OR</u>


D.    WE, THE JURY, having considered and evaluated the evidence presented in light of the instructions of the Court, are not unanimously persuaded that a death sentence should be imposed for this capital crime. We, therefore, return a decision that Cory Johnson not be sentenced to death for this capital crime.


_____          _____
      FOREPERSON'S SIGNATURE                       DATE


405a

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**



F I L E
FEB 16 1993
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

|  |  |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal Case No. 3:92CR68-02 |
| ) | |
| CORY JOHNSON ) | |
| a.k.a. "O," a.k.a. "CO" ) | |

## DECISION FORM

As to the crime of killing <u>Bobby Long</u> while engaged in, or in furtherance of, a continuing criminal enterprise:

A.  WE, THE JURY, <u>do</u> <u>not</u> unanimously find proven, beyond a reasonable doubt, the existence of the statutory aggravating factors required by law as prerequisites for the imposition of capital punishment, and therefore do not consider the death penalty as to this capital crime for which defendant Cory Johnson has been convicted.

_____          _____
FOREPERSON'S SIGNATURE                          DATE

OR

B.  WE, THE JURY, unanimously find beyond a reasonable doubt that the aggravating factors required by law as prerequisites for the imposition of capital punishment have been proven by the government as to this capital crime. We further find, unanimously and beyond a reasonable doubt, that the aggravating factors proven in this case, as to this crime and this defendant, sufficiently outweigh any mitigating factors, and are themselves so serious, that justice mandates a sentence of death. We vote unanimously that Cory Johnson shall be sentenced to death for this capital crime.

_____          2/15/93
FOREPERSON'S SIGNATURE                          DATE

OR

406a

C.    WE, THE JURY, <u>do</u> <u>not</u> unanimously find that the aggravating factors proven in this case, as to this capital crime and this defendant, so outweigh the mitigating factors that justice mandates a sentence of death.   We, therefore, return a decision that Cory Johnson <u>not</u> be sentenced to death for this capital crime.


_____          _____
FOREPERSON'S SIGNATURE                         DATE


OR


D.    WE, THE JURY, having considered and evaluated the evidence presented in light of the instructions of the Court, are not unanimously persuaded that a death sentence should be imposed for this capital crime.  We, therefore, return a decision that Cory Johnson not be sentenced to death for this capital crime.


_____          _____
FOREPERSON'S SIGNATURE                         DATE

407a

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**



FEB 1 6 1993

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

UNITED STATES OF AMERICA )
 )
v. ) Criminal Case No. 3:92CR68-02
 )
CORY JOHNSON )
 a.k.a. "O," a.k.a. "CO" )
 )

## DECISION FORM

  As to the crime of killing <u>Louis J. Johnson, Jr.</u> while engaged in, or in furtherance of, a continuing criminal enterprise:

A. WE, THE JURY, <u>do</u> <u>not</u> unanimously find proven, beyond a reasonable doubt, the existence of the statutory aggravating factors required by law as prerequisites for the imposition of capital punishment, and therefore do not consider the death penalty as to this capital crime for which defendant Cory Johnson has been convicted.

_____  _____
FOREPERSON'S SIGNATURE    DATE

**OR**

B. WE, THE JURY, unanimously find beyond a reasonable doubt that the aggravating factors required by law as prerequisites for the imposition of capital punishment have been proven by the government as to this capital crime. We further find, unanimously and beyond a reasonable doubt, that the aggravating factors proven in this case, as to this crime and this defendant, sufficiently outweigh any mitigating factors, and are themselves so serious, that justice mandates a sentence of death. We vote unanimously that Cory Johnson shall be sentenced to death for this capital crime.

_____  2/15/93_____
FOREPERSON'S SIGNATURE    DATE

**OR**

C.    WE, THE JURY, <u>do</u> <u>not</u> unanimously find that the aggravating factors proven in this case, as to this capital crime and this defendant, so outweigh the mitigating factors that justice mandates a sentence of death.  We, therefore, return a decision that Cory Johnson <u>not</u> be sentenced to death for this capital crime.

_____          _____
FOREPERSON'S SIGNATURE                      DATE

<u>OR</u>

D.    WE, THE JURY, having considered and evaluated the evidence presented in light of the instructions of the Court, are not unanimously persuaded that a death sentence should be imposed for this capital crime.  We, therefore, return a decision that Cory Johnson not be sentenced to death for this capital crime.

_____          _____
FOREPERSON'S SIGNATURE                      DATE

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION



F I L E D

FEB 1 6 1993

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

```
UNITED STATES OF AMERICA        )
                                )
   v.                           )       Criminal Case No. 3:92CR68-02
                                )
CORY JOHNSON                    )
   a.k.a. "O," a.k.a. "CO"      )
                                )
```

### DECISION FORM

As to the crime of killing <u>Peyton Maurice Johnson</u> while engaged in, or in furtherance of, a continuing criminal enterprise:

A.   WE, THE JURY, <u>do</u> <u>not</u> unanimously find proven, beyond a reasonable doubt, the existence of the statutory aggravating factors required by law as prerequisites for the imposition of capital punishment, and therefore do not consider the death penalty as to this capital crime for which defendant Cory Johnson has been convicted.

_____          _____
   FOREPERSON'S SIGNATURE                        DATE

OR

B.   WE, THE JURY, unanimously find beyond a reasonable doubt that the aggravating factors required by law as prerequisites for the imposition of capital punishment have been proven by the government as to this capital crime.   We further find, unanimously and beyond a reasonable doubt, that the aggravating factors proven in this case, as to this crime and this defendant, sufficiently outweigh any mitigating factors, and are themselves so serious, that justice mandates a sentence of death.   We vote unanimously that Cory Johnson shall be sentenced to death for this capital crime.

_____          ___2/15/93_____
   FOREPERSON'S SIGNATURE                        DATE

OR

C.    WE, THE JURY, <u>do</u> <u>not</u> unanimously find that the aggravating factors proven in this case, as to this capital crime and this defendant, so outweigh the mitigating factors that justice mandates a sentence of death.    We, therefore, return a decision that Cory Johnson <u>not</u> be sentenced to death for this capital crime.


_____          _____
FOREPERSON'S SIGNATURE                            DATE


<u>OR</u>


D.    WE, THE JURY, having considered and evaluated the evidence presented in light of the instructions of the Court, are not unanimously persuaded that a death sentence should be imposed for this capital crime.    We, therefore, return a decision that Cory Johnson not be sentenced to death for this capital crime.


_____          _____
FOREPERSON'S SIGNATURE                            DATE


411a