# Appendix 3D

AO 243 (Rev. 5/85)

**MOTION UNDER 28 USC § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY**

| **United States District Court** | District<br>Eastern District of Virginia |
|---|---|

| Name of Movant<br>Cory Johnson | Prisoner No. | Case No. 3:92CR68-2<br>3:97CV895 |
|---|---|---|

Place of Confinement
Mecklenburg Correctional Center, Boydton, VA

| UNITED STATES OF AMERICA        V.        Cory Johnson<br>(name under which convicted) | FILE<br>JUN - 1 1998<br>CLERK, U.S. DISTRICT COURT<br>RICHMOND, VA |
|---|---|

## MOTION

1. Name and location of court which entered the judgment of conviction under attack United States District Court, Eastern District of Virginia, Richmond, VA

2. Date of judgment of conviction June 1, 1993

3. Length of sentence Death with concurrent sentences of Life plus 85 years

4. Nature of offense involved (all counts) CCE Murder, 21 USC 848(e)(7 counts); engaging in CCE, 21 USC 848(a)(1 count); conspiracy to possess cocaine base with intent to distribute, 21 USC 846 (one count); violence in aid of racketeering, 18 USC 1959 (11 counts); use of firearm, 18 USC 924(c) (5 counts); possession of cocaine base w/intent to distribute, 21 USC SEC. 841(a)(1)(2 counts)

5. What was your plea? (Check one)
   (a) Not guilty   ☒X
   (b) Guilty   ☐
   (c) Nolo contendere   ☐

   If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:

   _____

   _____

   _____

6. If you pleaded not guilty, what kind of trial did you have? (Check one)
   (a) Jury   ☒
   (b) Judge only   ☐

7. Did you testify at the trial?
   Yes ☐ No ☒xx

8. Did you appeal from the judgment of conviction?
   Yes ☒ No ☐

(2)

670a

AO 243 (Rev. 5/85)

9.  If you did appeal, answer the following:

    (a) Name of court___U.S. COURT OF APPEALS FOR THE FOURTH CIRCUIT___

    (b) Result ___Affirmed___

    (c) Date of result ___July 8, 1996 (reh. den. 10/28/96; cert. denied 6/2/97)___

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications or motions with respect to this judgment in any federal court?
    Yes ☐ No ☒

11. If your answer to 10 was "yes," give the following information:

    (a)(1) Name of court _____

       (2) Nature of proceeding _____

       _____

       (3) Grounds raised_____

       _____

       _____

       _____

       _____

       (4) Did you receive an evidentiary hearing on your petition, application or motion?
       Yes ☐ No ☐

       (5) Result_____

       (6) Date of result _____

    (b) As to any second petition, application or motion give the same information:

       (1) Name of court _____

       (2) Nature of proceeding _____

       _____

       (3) Grounds raised_____

       _____

       _____

       _____

(3)

AO 243 (Rev. 5/85)

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐ No ☐

(5) Result_____

(6) Date of result _____

(c) Did you appeal, to an appellate federal court having jurisdiction, the result of action taken on any petition, application or motion?
(1) First petition, etc.      Yes ☐ No ☐
(2) Second petition, etc.    Yes ☐ No ☐

(d) If you did not appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

12. State *concisely* every ground on which you claim that you are being held in violation of the constitution, laws or treaties of the United States. Summarize briefly the facts supporting each ground. If necessary, you may attach pages stating additional grounds and facts supporting same.

CAUTION: If you fail to set forth all ground in this motion, you may be barred from presenting additional grounds at a later date.

For your information, the following is a list of the most frequently raised grounds for relief in these proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you have other than those listed. However, you should raise in this motion all available grounds (relating to this conviction) on which you based your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The motion will be returned to you if you merely check (a) through (j) or any one of the grounds.

(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily or with understanding of the nature of the charge and the consequences of the plea.
(b) Conviction obtained by use of coerced confession.

(4)

AO 243 (Rev. 5/85)

(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(e) Conviction obtained by a violation of the privilege against self-incrimination.

(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(g) Conviction obtained by a violation of the protection against double jeopardy.

(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impanelled.

(i) Denial of effective assistance of counsel.

(j) Denial of right of appeal.

A. Ground one: ___SEE ATTACHED___

Supporting FACTS (state *briefly* without citing cases or law) ___

B. Ground two: ___

Supporting FACTS (state *briefly* without citing cases or law): ___

C. Ground three: ___

Supporting FACTS (state *briefly* without citing cases or law): ___

(5)

673a

AO 243 (Rev. 5/85)

D. Ground four: _____

_____

Supporting FACTS (state *briefly* without citing cases or law): _____

_____

_____

_____

_____

_____

13. If any of the grounds listed in 12A, B, C, and D were not previously presented, state briefly what grounds were not so presented, and give your reasons for not presenting them: _____

    SEE ATTACHMENT

_____

_____

_____

14. Do you have any petition or appeal now pending in any court as to the judgment under attack?
Yes ☐ No ☒X

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(a) At preliminary hearing  John J. Byrnes, Federal Defenders
   52 Duane Street (10th), New York, NY 10007

(b) At arraignment and plea  Craig Cooley, 3000 Idlewood Avenue, Richmond, Va.
23221; John F. McGarvey, 320 W. Broad St., Richmond, VA 23220

(c) At trial  Craig Cooley, 3000 Idlewood Ave., Richmond, VA 23221;
   John F. McGarvey, 320 W. Broad St., Richmond, VA 23220

(d) At sentencing  Craig Cooley, 3000 Idlewood Avenue, Richmond, VA 23221;
   John F. McGarvey, 320 W. Broad Street, Richmond, VA 23220

(6)

674a

AO 243 (Rev. 5/85)

(e) On appeal Craig Cooley, 3000 Idlewood Avenue, Richmond,VA 23221

    John McGarvey, 320 W. Broad Street, Richmond, VA 23220

(f) In any post-conviction proceeding _____

_____

(g) On appeal from any adverse ruling in a post-conviction proceeding _____

_____

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at approximately the same time?
Yex ẌẌ No☐

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
Yes ☐ No ẍ̱

    (a) If so, give name and location of court which imposed sentence to be served in the future: _____

_____

_____

    (b) Give date and length of the above sentence: _____

_____

    (c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
Yes ☐ No ☐

Wherefore, movant prays that the Court grant him all relief to which he may be entitled in this proceeding.

_____
Signature of Attorney (if any)

BARBARA L. HARTUNG

I declare under penalty of perjury that the foregoing is true and correct. Executed on

5/29/88
(date)

City/County of Meck. Commonwealth/State of VA.
Sworn to and subscribed before me this 29th day
of May , 1988 Witness my hand and official seal.

_____
Signature of Movant
COREY JOHNSON

_____ , Notary Public

Embossed Hereon Is My
Commonwealth of Virginia Notary Public Seal
My Commission Expires February 28, 19—
JUDY V. BIGGER

(7)

ATTACHMENT TO MOTION UNDER 28 USC SEC. 2255

JOHNSON V. PRUETT
No. 3:97CV895
Crim. No. 3:92CR68

## 12. GROUNDS FOR RELIEF

1. The Government Knowingly Or Negligently Used False Evidence To Portray Johnson As The Leader Of A Continuing Criminal Enterprise Based in New York And/Or New Jersey.

Government witnesses gave false testimony concerning Johnson's participation in a group called the New York Boyz and concerning the organization and leadership of that group. A government witness testified falsely about the existence and organization of this alleged CCE. Another witness described drug purchases by the defendant and others from an individual who was incarcerated at the time of the alleged purchases. The prosecutors knew or should have known the testimony was false. Presentation of this testimony violated the Fifth Amendment rights to due process and a fair trial.

The petitioner's investigation has revealed that key witness Sterling Hardy testified, in large part, from information he received from the government concerning facts of the case and not from his own personal knowledge.

2. The Evidence Was Legally Insufficient To Convict Johnson As A Supervisor of A Continuing Criminal Enterprise Under 21 U.S.C. section 848.

The government's evidence failed to establish an element of the offense, i.e., that Johnson supervised the required five individuals. The government presented inadmissible testimony that was not based on personal knowledge of the witnesses and was misleading, ambiguous, and prejudicial. The government alleged that Johnson supervised many individuals who did not legally qualify as supervisees. The court gave erroneous instructions on the supervision element. Johnson was convicted in violation of his due process rights under the Fifth Amendment.

3. Prosecutorial Misconduct Deprived Johnson Of His Rights To Due Process And A Fair Trial.

The prosecutors engaged in a course of misconduct

8

676a

including but not limited to the following: improper, misleading, and inflammatory argument; vouched for the prosecution witnesses and for their belief in Johnson's guilt; gave unsworn testimony throughout the trial; referred in argument to inadmissible, misleading, and prejudicial evidence and introduced misleading, inadmissible, and prejudicial evidence; improperly argued to the jury that certain persons were CCE supervisees when, as a matter of law, they could not be supervisees; caused government witnesses to testify in an inadmissible, misleading and prejudicial manner; misled the jury with evidence and arguments; and presented testimony without proper legal foundation throughout the trial.

4.     Trial And Appellate Counsel Provided Ineffective Assistance In Violation Of The Sixth Amendment.

Trial counsel, who was also appellate counsel, provided ineffective assistance at all stages of Johnson's trial and appeal, including but not limited to the following. Counsel unreasonably: failed to move for a change of venue despite inflammatory media coverage; failed to request the reverse-Witherspoon question during voir dire; failed to object to the government's peremptory strikes against women; failed to object to Johnson's absence from voir dire; failed to conduct a factual investigation and failed to request the appointment of an investigator to challenge the CCE evidence; failed to object to improper and highly prejudicial conduct and arguments by the prosecutors; failed to object to improper evidence; failed to challenge or rebut the evidence of supervision; failed to present evidence and argument that Johnson was incapable of supervising and/or not likely to be a supervisor; failed to argue and present evidence that Johnson may be mentally retarded; failed to present evidence on prison conditions and lack of future dangerousness; failed to object to improper jury instructions and request proper instructions; failed to make appropriate motions before, during and after trial; and failed to raise meritorious issues on appeal.

5.     Discrimination Against Women

At trial, the prosecution disproportionately exercised peremptory strikes against women in violation of the Equal Protection Clause. Johnson anticipates that discovery will demonstrate that there was no neutral rationale for the exercise of peremptory strikes and that the strikes represented intentional exclusion of female jurors.

9

677a

6.   Juror Misconduct Violated Johnson's Rights To An Impartial Jury and To Due Process of Law.

The jurors and their verdicts were tainted by exposure to and consideration of extraneous testimony and evidence during the trial and during deliberations in violation of the Fifth and Sixth Amendments.

7.   Denial Of Statutory Right To Justice Without Discrimination

African-Americans, including Johnson, have been disproportionately and discriminatorily selected for prosecution under federal death penalty legislation in violation of the right to justice without discrimination.

8.   Johnson Is Actually Innocent of the CCE Convictions

9.   Section 848's Delegation Of Authority to Prosecutors To Create Non-Statutory Aggravators Is An Unconstitutional Delegation Of Authority That Violates The Separation Of Powers.

This issue was raised on appeal by counsel but without benefit of the U.S. Supreme Court's decision in <u>Loving v. United States</u>, 116 S.Ct. 1737 (1996). The Fourth Circuit decided this issue without reference to <u>Loving</u>. The <u>Loving</u> decision demonstrates that this delegation of authority, as opposed to the delegation of authority at issue in <u>Loving</u> is an unconstitutional violation of the separation of powers principle.

10.  Johnson Adopts By Reference Those Claims Presented By His Co-Petitioners, Tipton and Roane, To The Extent That They Are Applicable To Him.

13.  <u>Grounds not previously presented:</u>

a.   Ineffective assistance of counsel: not presented on appeal because 4th Circuit law precludes raising issue on direct appeal and reserves it for sec. 2255.

b.   Prosecutorial misconduct: not presented on appeal because information supporting it was not available in the trial record and further discovery remains necessary; to the extent that misconduct appears in the record, not presented on appeal due to ineffective assistance of counsel.

10

678a

   c. Juror Misconduct: not presented on appeal because information supporting it was not available in the trial record and further discovery remains necessary.

   d. Insufficient Evidence: not presented on appeal due to ineffective assistance of counsel at trial and on appeal.

   e. Actual Innocence: relies on information not available at trial, could not be presented on appeal, and relies on further investigation.

   f. Delegation of authority to create non-statutory aggravating circumstances: Presented and decided on appeal but argued prior to the U.S. Supreme Court decision in Loving v. United States, 116 S. Ct. 1737 (1996), and decided by the Fourth Circuit without reference to that case, which was decided just prior to the Fourth Circuit's decision.


   By Order dated May 26, 1998, the Hon. James R. Spencer granted petitioner an extension of time to June 15, 1998, to file his habeas petition. A copy of the Order is attached. In accordance with that Order, petitioner will file a Memorandum of Law in support of this Motion on or before June 15, 1998.

11

CERTIFICATE OF SERVICE

I hereby certify that one copy of the attached Motion Under 28 USC Section 2255 of Petitioner with Attachment (4 pages) Cory Johnson was served by mail on June 1, 1998, on counsel for the Respondent, Robert J. Erickson, Department of Justice, 10th and Constitution Avenues, N.W., Washington, D.C. 20530.

BARBARA L. HARTUNG

12



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| CORY JOHNSON<br><br>　　　　　　　　Petitioner,<br><br>v.<br><br>SAMUEL PRUETT, WARDEN<br>　　　　　　　　Respondent. | Civil Action Number 3:97CV895<br>Criminal Action Number 3:92CR68 |
| RICHARD TIPTON<br><br>　　　　　　　　Petitioner,<br><br>v.<br><br>RONALD ANGELONE<br>　　　　　　　　Respondent. | Criminal Action Number 3:92CR68-01 |
| JAMES H. ROANE, JR.<br><br>　　　　　　　　Petitioner,<br><br>v.<br><br>UNITED STATES OF AMERICA<br>　　　　　　　　Respondent. | Criminal Action Number 3:92CR68 |

## ORDER

As the Court has granted the Government's motion for an extension to respond to the petitioners' motion to interview jurors, the petitioners are hereby notified that the Court is extending the due date of their petitions for writ of habeas corpus under 28 U.S.C. § 2255. The petitioners must file their petitions on or before June 15, 1998.

The Clerk is DIRECTED to send a copy of this Order to all counsel of record.

It is SO ORDERED.

UNITED STATES DISTRICT JUDGE

MAY 26 1998

DATE

682a

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

FILED

JUN 15 1998

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

CORY JOHNSON,                          )
                                       )
            Petitioner,                )       Crim. No. 3:92CR68
v.                                     )
                                       )       Civil No. 3:97CV895
SAMUEL PRUETT, WARDEN,                 )
                                       )
     Mecklenburg Correctional          )
     Center, Boydton, Virginia,        )
            Respondent.                )

---

**MEMORANDUM IN SUPPORT OF**

**INITIAL PETITION FOR WRIT OF HABEAS CORPUS**

**PURSUANT TO 28 U.S.C. SECTION 2255**

---

BARBARA L. HARTUNG
VSB 38062
1001 East Main Street
Suite 504
Richmond, VA  23219
(804) 649-1088

EDWARD E. SCHER
VSB 23064
Thorsen Marchant &
  Scher, LLP
316 West Broad Street
Richmond, VA  23220-4219
(804) 644-0711

Counsel for Cory Johnson

June 15, 1998

683a

TABLE OF CONTENTS

Page

A.  JURISDICTIONAL STATEMENT . . . . . . . . . . . .    1

B.  PARTIES  . . . . . . . . . . . . . . . . . . . .    1

C.  PROCEDURAL HISTORY . . . . . . . . . . . . . . .    2

D.  OVERVIEW OF GROUNDS COMPELLING
    THE ISSUANCE OF THE WRIT  . . . . . . . . . . .    4

    1.  No Pretrial Investigation  . . . . . . . .    4

    2.  Ineffective Voir Dire and Prejudicial Publicity    5

    3.  Insufficient Proof of CCE Supervision  . .    6

    4.  Prosecutorial Misconduct . . . . . . . . .    7

    5.  Counsels' Errors At Penalty Phase  . . . .    9

E.  GROUNDS FOR RELIEF . . . . . . . . . . . . . . .   12

  I.  THE PROSECUTION KNOWINGLY OR NEGLIGENTLY USED
      FALSE EVIDENCE TO CREATE THE ILLUSION THAT
      JOHNSON AND HIS CO-DEFENDANTS WERE LEADERS OF
      A HIGHLY ORGANIZED CONTINUING CRIMINAL
      ENTERPRISE HAVING ITS ROOTS IN NEW YORK
      AND/OR NEW JERSEY  . . . . . . . . . . . . . .   12

      A.  The Government's Strategy . . . . . . . .   14

      B.  Greg Scott's Trial Testimony Linking Johnson
          And His Co-defendants To The New York Boyz Was
          False, And The Government Knew Or Should Have
          Known It Was False . . . . . . . . . . . .   17

      C.  Maurice Saunders' Trial Testimony Linking
          Tipton To "Light" And To Large Sums Of Money Was
          False, And The Government Knew Or Should Have
          Known It Was False . . . . . . . . . . . .   26

  II. THE EVIDENCE WAS LEGALLY INSUFFICIENT TO CONVICT
      JOHNSON AS A SUPERVISOR OF A CONTINUING CRIMINAL
      ENTERPRISE UNDER 21 U.S.C. SECTION 848 . . . . .   31

      A.  The CCE Supervision Element: Governing
          Principles  . . . . . . . . . . . . . . . .   33

1.    The Fourth Circuit Does Not Require Proof
Of Management By The CCE  Defendant In All
Cases, While Other Circuits Always Require
Proof Of A Management Relationship . . .    34

2.    Proof Of A Buyer-Seller Relationship In
A Drug Distribution System Does Not
Establish The Supervision Element . . .    36

3.    The Government Was Required To Prove
That Johnson Himself Satisfied the
Supervision Element . . . . . . . . . .    38

4.    A CCE Conviction Must Be Vacated Where
(As Happened Here) The Court Does Not
Properly Instruct The Jury After The
Government Introduces Evidence Of
Individuals Who, As A Matter Of Law, Are
Incapable Of Counting As "Supervisees." .    39

B.    The Government's Effort To Prove
The Supervision Element . . . . . . . . . .    42

1.    Many Of Alleged "Supervisees" Were
Individuals Who, As A Matter Of Law,
Were Not Capable Of Being Supervisees,
And Proper Jury Instructions Were Not
Given; Under *Barona* and *Jerome*, The CCE
Convictions Must Be Vacated . . . . . .    43

2.    There Is No Admissible Evidence
Demonstrating That Johnson Supervised
Five Individuals Within The Meaning
Of The CCE Statute  . . . . . . . . . .    49

   a.    The Government Relied Principally
On The Conclusory Terms "Worker" and
"Employee" To Prove Supervision; Such
Terms Misled The Jury And Prejudiced
Johnson And The Other Defendants . . .    49

   b.    The So-Called Evidence Of
"Supervision" Was Largely Without A
Foundation Of Personal Knowledge And
Was Inadmissible Under FRE 602 . . . .    56

   c.    Even The Evidence Cited By The
Government On Appeal Does Not
Establish That Johnson Supervised
Five Individuals . . . . . . . . . . .    56

ii

685a

C.   Habeas Claims Related To the CCE
     Supervision Element . . . . . . . . . . . . . . . .   61

     1.   The Jury Was Not Properly Instructed As
          To The Supervision Element . . . . . . . .   61

          a.   Buyer-seller relationship . . . . . .   61

          b.   Individuals not capable of
               being CCE supervisees   . . . . . . .   61

          c.   Management requirement  . . . . . . .   62

     2.   There Was Insufficient Evidence To
          Support The Supervision Element  . . . . .   62

     3.   Prosecutorial Misconduct Relating To
          The Supervision Element . . . . . . . . .   62

          a.   Improper use of unsupported,
               ambiguous testimony . . . . . . . . .   63

          b.   Improper argument concerning the
               supervision element . . . . . . . . .   63

     4.   Ineffective Assistance Of Counsel At Trial
          And Appeal . . . . . . . . . . . . . . . .   64

          a.   Counsel Could Have And Should Have
               Shown That Johnson Was Incapable Of
               Being A Supervisor Or At Least Not
               Likely To Be A Supervisor . . . . . .   65

          b.   Counsel Failed To Object To Repeated,
               Improper Evidence . . . . . . . . . .   66

          c.   Counsel Failed To Demonstrate That
               The Proof Against Johnson Did Not
               Establish Five Supervisees . . . . .   71

          d.   Counsel Failed To Object To The
               Prosecutor's Closing Argument On The
               Supervision Element . . . . . . . . .   71

          e.   Counsel Failed To Request Proper Jury
               Instructions On The Supervision Element
               Of The CCE Statute . . . . . . . . .   71

          f.   Trial Counsel Failed To Stop The
               Onslaught Of Prosecutorial Misconduct . 72

iii

g.    Counsel Failed To Seek Relief Available
      Under *Barona* and *Jerome* . . . . . . . . 72

h.    Counsel Should Have Pursued Each Of
      The CCE Supervision Issues Above  . . . 72

III. JOHNSON IS ACTUALLY INNOCENT OF THE CCE CONVICTIONS . 73

IV.   TRIAL AND APPELLATE COUNSEL PROVIDED
      INEFFECTIVE ASSISTANCE IN VIOLATION
      OF THE SIXTH AMENDMENT . . . . . . . . . . . . . . . . 75

A.    GUILT PHASE INEFFECTIVENESS . . . . . . . . . . . 77

      1.    Defense Counsel Failed To Request The
            Appointment Of An Investigator Pursuant
            To 21 U.S.C. Section 848(q) And Failed
            To Conduct An Adequate Factual
            Investigation . . . . . . . . . . . . . . . . . 77

      2.    Defense Counsel Failed To Move For A
            Change Of Venue Despite Inflammatory
            Media Coverage About The Charges
            And The Defendants . . . . . . . . . . . . . . 81

      3.    Defense Counsel Failed to Request <u>Voir Dire</u>
            Pursuant to *Morgan v. Illinois*,
            504 U.S. 719 (1992) . . . . . . . . . . . . 88

      4.    Defense Counsel Failed To Object
            To The Prosecution's Strikes
            Against Women Jurors . . . . . . . . . . . . 95

      5.    Defense Counsel Failed To Object To
            Johnson's Absence From <u>Voir Dire</u>
            And Johnson Lost His Right To
            Participate In Jury Selection . . . . . . . . 96

      6.    Defense Counsel Failed To Challenge The
            Government's Evidence That Johnson Was
            A Supervisor Of A CCE  . . . . . . . . . . . 105

      7.    Defense Counsel Failed To Object To Or
            Ask For Proper Jury Instructions On The
            Substantive Counts Charged . . . . . . . . . 106

            a.    Defense Counsel Failed To Request A
                  Unanimity Instruction On The CCE
                  Elements . . . . . . . . . . . . . . . . 106

iv

          b.     The Jury Was Not Properly Instructed As To The Supervision Element Of The CCE Charges . . . . . . . . . . . . 106

      8.     Defense Counsel Failed To Object To Improper And Highly Prejudicial Conduct And Arguments By The Prosecutors Throughout Johnson's Capital Trial . . . . . . . . . . . . . . . 107

  B.    COUNSEL PROVIDED INEFFECTIVE ASSISTANCE AT THE SENTENCE PHASE . . . . . . . . . . . . . . . 108

      1.     Defense Counsel Failed To Argue That Johnson's Mental Ability Was Not Accurately Reflected By His I.Q. Test And, In Fact, Was Below 77 . . . . 108

      2.     Defense Counsel Failed To Present Evidence Of Johnson's Prison Conditions If Sentenced To Life . . . . . . 111

  C.    INEFFECTIVE ASSISTANCE ON APPEAL . . . . . . . . . 114

  D.    THE CUMULATIVE EFFECT OF COUNSELS' ERRORS PREJUDICED JOHNSON UNDER STRICKLAND . . . . . . . 116

V.  PROSECUTORIAL MISCONDUCT DEPRIVED JOHNSON OF HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL . . . . . . . . 120

  A.    The prosecutors misled the jury by vouching, in inflammatory terms, to their personal belief in Johnson's guilt and the veracity of witnesses . . . . . . . . . . . . . . . . . 121

  B.    The prosecutors introduced inadmissible evidence suggesting that Johnson and the other defendants threatened the lives of witnesses . . . . . . . . . . . . 125

  C.    The prosecutors misled the jury into believing it had a *duty* to convict and to impose a death sentence . . . . . . . . . . . . 126

  D.    The prosecutors misled the jury by making misleading and inflammatory arguments to the jury, unsupported by the evidence, regarding the conditions Johnson would face if given a life sentence . . . . . . . . . 128

v

E. The prosecutors improperly emphasized that Johnson and the other defendants did not testify . . . . . . . . . . . . . . . . . . . . . . . 129

F. Prosecutors suggested that a Government witness had passed a polygraph test . . . . . . . 132

G. The Government prosecutors improperly treated Johnson and the other defendants as a group, rather than as individuals . . . . . . 132

H. The Prosecutors Improperly Argued That Sentencing Should Be Based On Deterrence . . . . . 135

I. Misconduct relating to testimony without foundation . . . . . . . . . . . . . . . . . . . 135

J. The prosecutors misled the jury by suggesting that they had not influenced witnesses to use the terms "partner," "worker," and "employee." . . . 141

K. The Government Excluded Women From The Jury In Violation of *J.E.B. v. Alabama*, 114 S. Ct. 1419 (1994) . . . . . . . . . . . . . . . . 141

L. Misconduct relating to the CCE supervision element . . . . . . . . . . . . . . . . . . 141

VI. THE PROSECUTION IMPROPERLY DISCRIMINATED AGAINST WOMEN IN SELECTING THE JURY . . . . . . . . . . . . 142

VII. JUROR MISCONDUCT VIOLATED JOHNSONS' RIGHTS TO AN IMPARTIAL JURY AND TO DUE PROCESS OF LAW . . . . 144

VIII. JOHNSON WAS DENIED HIS STATUTORY AND CONSTITUTIONAL RIGHT TO JUSTICE WITHOUT DISCRIMINATION . . . . . . . . 145

IX. SECTION 848'S DELEGATION OF AUTHORITY TO PROSECUTORS TO CREATE NON-STATUTORY AGGRAVATORS IS AN UNCONSTITUTIONAL DELEGATION OF AUTHORITY THAT VIOLATES THE SEPARATION OF POWERS . . . . . . . . 147

X. JOHNSON ADOPTS BY REFERENCE THOSE CLAIMS PRESENTED BY HIS CO-PETITIONERS, TIPTON AND ROANE, TO THE EXTENT THAT THEY ARE APPLICABLE TO HIM . . . . 161

RELIEF REQUESTED . . . . . . . . . . . . . . . . . . . . . . . 162

vi

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

CORY JOHNSON,                          )
                                       )
          Petitioner,                  )
                                       )
     v.                                )    Crim. No. 3:92CR68
                                       )    Civil No. 3:97CV895
SAMUEL PRUETT, Warden,                 )
   Mecklenburg Correctional            )
   Center, Boydton, Virginia           )
             Respondent.               )

MEMORANDUM IN SUPPORT OF
INITIAL PETITION FOR WRIT OF HABEAS CORPUS
PURSUANT TO 28 U.S.C. SECTION 2255

Petitioner, Cory Johnson, a federal prisoner now in the custody of the United States, held at Mecklenburg Correctional Center, Boydton, Virginia, and under sentence of death, hereby petitions this Court pursuant to 28 U.S.C. Section 2255 for a writ of habeas corpus. Johnson states that he is in custody in violation of the Constitution or laws or treaties of the United States, as more fully set forth herein. In support of his initial petition filed June 1, 1998, Johnson submits this Memorandum and states as follows:

A.   JURISDICTIONAL STATEMENT

This petition is filed pursuant to 28 U.S.C. §§ 2241 and 2255. Section 2255 directs that the petition be filed with this Court.

B.   PARTIES

Johnson is an individual who is in the custody of the United States, the Respondent, in violation of the Constitution or laws or treaties of the United States. The Warden of the Mecklenburg

690a

Correctional Center, Boydton, Virginia, has current custody of Johnson.

C.    PROCEDURAL HISTORY

In 1992, Richard Tipton, Cory Johnson and James Roane were charged with participating in a crack cocaine distribution ring in Richmond, and committing a number of violent crimes in furtherance of this activity.  The indictment charged the defendants altogether with a total of nine murders committed in furtherance of their drug activities.[1]

Johnson was indicted in the United States District Court for the Eastern District of Virginia on charges of capital murder in furtherance of a continuing criminal enterprise and various related racketeering, firearms and drug offenses.  He was convicted of seven capital murders charged under 21 U.S.C. section 848(e), conspiracy to possess cocaine base with intent to distribute (21 U.S.C. sec. 846), engaging in a continuing criminal enterprise (21 U.S.C. sec. 848(a)), eleven counts of committing acts of violence in aid of racketeering activity (18 U.S.C. sec. 1959), five counts of using a firearm in relation to a crime of violence or drug trafficking offense (18 U.S.C. sec. 924(c)), and two counts of possession of cocaine base with the intent to distribute (21 U.S.C. sec. 841(a)(1)).  JA[2] 569-72.

---

[1]    The killing of Torrick Brown was not charged as a murder "while engaged in and working in furtherance of" a criminal enterprise.  21 U.S.C. section 848(e)(1)(A).

[2]    "JA" refers to the pages of the joint appendix filed on direct appeal.  "Tr" refers to pages of the trial transcript on file in the district court clerk's office.

2

691a

The jury recommended that Johnson be sentenced to death on all of the seven section 848(e) murders. The district court sentenced Johnson to death in accordance with the jury's recommendations pursuant to 21 U.S.C. sec. 848(1), and imposed various sentences of imprisonment for the several noncapital counts totalling life plus 85 years. JA 569-72.

Johnson's convictions[3] and death sentences were affirmed by the United States Court of Appeals for the Fourth Circuit on July 8, 1996. <u>United States v. Tipton, Johnson, et al.</u>, 90 F.3d 861 (4th Cir. 1996). Johnson's petition to the United States Supreme Court for a writ of certiorari was denied on June 2, 1997.

Pursuant to Johnson's motion, in November, 1997, this Court appointed undersigned counsel to assist Johnson in the preparation of his initial habeas corpus petition. The Court ordered that the petition be filed by June 1, 1998, and then, in view of pending motions, extended that date to June 15, 1998. On June 1, 1998, Johnson filed an initial petition on the court's 2255 petition form and stated that this Memorandum in support would be filed on June 15, 1998.

---

[3] On appeal, the Fourth Circuit vacated the convictions and sentences under section 846 (the conspiracy counts) on the grounds that these offenses were lesser included offenses within the section 848 (CCE) convictions. 90 F.3d at 891.

3

D.    OVERVIEW OF GROUNDS COMPELLING ISSUANCE OF THE WRIT

Johnson's conviction under the "drug kingpin" law and his subsequent death sentences were the result of an extraordinarily unfair trial in violation of the U.S. Constitution.

1.    No Pretrial Investigation

Johnson's defense counsel were utterly unprepared for trial. They conducted no independent investigation into the charges and made no apparent effort to investigate the alleged conspiracy's activities in New York, New Jersey, or Virginia. That evidence would turn out to be both critical to the government's case and false.

The governments's evidence that Tipton, Johnson and Roane organized, supervised or managed a highly organized drug conspiracy, and that the murders were carried out to further that conspiracy, consisted entirely of the statements of other participants in the conspiracy. The government blocked the defendants from any pre-testimony contact with the witnesses, by concealing witnesses allegedly placed "in protection" and defying the command of 18 U.S.C. § 3432 that they disclose the witnesses' names and addresses prior to trial. Later, when courtroom interviews were arranged, prosecutors intimidated the witnesses to prevent them from speaking with defense counsel.

Johnson's defense counsel made no effort to develop defense witnesses or evidence. They simply relied upon the Government to provide information through various disclosure requirements. This was particularly hurtful to Johnson because at least a

4

693a

portion of the Government's trial evidence, as shown herein, was demonstrably fabricated. Counsel's failure was particularly egregious in view of the fact that Johnson was constitutionally and statutorily entitled to a court-appointed investigator. Defense counsel never requested this assistance.

2.    Ineffective Voir Dire And Prejudicial Publicity

Johnson's counsel continued their neglectful representation at jury selection. Voir dire lasted three days. Although the Fourth Circuit has held that a defendant's right to be present at jury selection is so fundamental it may not be waived, Johnson's court-appointed counsel purported to waive that right, even though Johnson and his co-defendants were never advised of their right to be present or asked if they waived it. Thus, Johnson was not present to hear any potential jurors answer any of the questions put to them in voir dire, or to observe them. Johnson was excluded entirely from that portion of the voir dire concerning the jurors' attitudes toward the death penalty and any racial prejudices.

Trial counsel failed to request the most fundamental voir dire question -- the Supreme Court-sanctioned "reverse-*Witherspoon*" question -- that would have identified jurors with a predisposition to imposing capital punishment given the facts of this case. Counsel inexplicably allowed individuals to serve on the jury who obviously were inclined towards law enforcement.

Despite pervasive prejudicial media coverage about the case and the defendants, defense counsel failed to make a change of

5

694a

venue motion.  As detailed below, press coverage tainted the jury pool.  However, defense counsel failed to take appropriate steps to protect Johnson from a jury influenced by extensive inflammatory publicity concerning Johnson and the trial. Finally, they failed to object when the Government embarked on an obvious strategy to remove women from the jury.  The Government used eight of its ten strikes to remove women from the jury.

3.    <u>Insufficient Proof Of CCE Supervision</u>

Johnson's counsel failed to demonstrate at trial and on appeal that the Government's evidence, as a matter of law, did not prove the CCE supervision element as to Johnson.  No rational trier of fact could have found proof of CCE supervision beyond a reasonable doubt.  Defense counsel failed to show that Johnson was incapable of or not likely to be a CCE supervisor.  Ample evidence existed that Johnson was not capable of supervision and management.  Counsel failed to object to repeated, improper testimony, evidence and argument allegedly demonstrating that Johnson supervised five people.  Had counsel dealt with this issue properly, Johnson would not have been convicted of a CCE, and he could not be eligible for or sentenced to death.

Johnson's counsel failed to take appropriate steps that would have prevented the jury from considering as alleged CCE "supervisees" a large number of persons who, as a matter of law, could not be counted as supervises.  A number of individuals testified that they received drugs from the defendants and then resold those drugs for a price determined by the seller.  The

6

government's evidence <u>failed</u> to demonstrate that Johnson supervised five individuals as required under 21 U.S.C. section 848(c). Proof of a mere buyer-seller relationship is insufficient to convict under section 848 ("CCE").

Johnson's counsel also overlooked fundamental jury instructions that would have focused the jury on the proper issues and prevented his CCE convictions. Johnson's convictions and the subsequent death sentences cannot stand where the government failed to prove Johnson's role in the CCE. But for counsels' ineffectiveness, the CCE convictions would have been vacated on direct appeal. *See, e.g., United States v. Barona,* 56 F.3d 1087 (9th Cir. 1995); *United States v. Jerome,* 942 F.2d 1328 (9th Cir. 1991).

4.    <u>Prosecutorial Misconduct</u>

Defense counsel took no action to protect Johnson from an onslaught of prosecutorial misconduct throughout the trial. The Government engaged in a persistent course of prosecutorial misconduct that made it impossible for Johnson to receive a fair trial. Among other things, they misled the jury with improper and inflammatory argument, expressly telling the jury -- in a total fabrication of evidence -- that Johnson would enjoy comfortable prison conditions if not executed. They repeatedly vouched to the jury, in the most inflammatory terms imaginable, as to their personal belief in Johnson's guilt and the veracity of the Government's witnesses.

7

696a

Defense counsels' ineffectiveness was compounded by additional prosecutorial misconduct. The government adopted a strategy of trying the defendants not as individuals, but as an undifferentiated group, and of imputing all of the evidence against each of the defendants. The government successfully opposed the defendants' motions to sever, at both the guilt and penalty phases, as well as co-defendant Roane's motion for an instruction advising the jury that the New Jersey evidence - in which he concededly played no part - could not be used against him. From opening statement through closing argument, the government consistently referred to the defendants *en masse* as "these people," in a transparent effort to encourage the jury not to distinguish between the defendants. The result of this strategy was that each piece of evidence adduced by the government weighed against all of the defendants.

The prosecutors also repeatedly told the jurors that the jury had a duty to convict, improperly emphasized Johnson's failure to testify, suggested to the jury through improper evidence that Johnson was a threat to the lives of witnesses, and blurred Johnson's conduct together with that of his co-defendants. The prosecutors introduced a mountain of evidence against Johnson that was both extremely prejudicial and *inadmissible*. They made inflammatory, improper arguments to the jury that were not supported by evidence and that conflicted with the law.

8

697a

To make matters worse, the prosecution sought throughout the penalty phase to lump the defendants together in the jury's mind, so that evidence that might bear on the intent of one would be transferred to the acts of another. The government constantly invited the jury to confuse the defendants by repeatedly referring to them as a group; dozens of times during his opening and closing arguments at the penalty phase, the prosecutor made references to "they" and "these people" in instances in which individual references were required by the facts and should have been compelled by the law. See Tr. at 3317-35, 3881-3907. Moreover, although capital sentencing focuses on the individual's acts and intent, and principles of aider-and-abettor and conspiracy liability have no place in such proceedings, the trial court permitted the prosecutor, over objection, to argue both. Tr. 3320, 3330.

Because of the prosecution's brazen attempts to convince the jury to treat the defendants as "members of a faceless, undifferentiated mass to be subjected to the blind infliction of the death penalty," Woodson, 428 U.S. at 304, the defendants sought a mistrial of the sentencing phase, or, alternatively, an instruction requiring the jury to focus on the individual intent of each defendant rather than any "collective" intent. However, the trial court denied a mistrial and refused to give the requested instruction.

9

5.    Counsels' Errors At Penalty Phase

Furthermore, Johnson's counsel provided ineffective assistance at the penalty phase.  Trial counsel failed to present what would likely have been extremely powerful evidence.  Counsel failed to argue that Johnson's mental abilities may have been lower than the test results demonstrated, placing him within the range of mental retardation.  In addition, counsel failed to present evidence to counter the claim that life imprisonment would be a soft and lenient sentence by, for example, explaining to the jury the conditions Johnson would face if imprisoned for life.

There can be no doubt that trial counsel's neglect and the prosecutor's misconduct prejudiced Johnson.  As a result, he was improperly sentenced to death.  As the jury found, he was youthful at the time of his offenses.  He had no significant prior criminal record.  The jury knew that equally culpable defendants would not be punished by death, and the victims consented to the criminal conduct that resulted in their deaths.  Moreover, Johnson was subject to emotional and physical abuse as a child.  He suffers from neurological impairments and brain dysfunction.  His I.Q. is near, and very probably below, the level of retardation.  The jury found that he was easily manipulated by others and that he suffers from brain damage that could impair his ability to exercise good judgment.  See Ex. 1, (special verdict form).

10

Despite a total of 18 mitigating factors found by the jury, Johnson still received seven death sentences from the jury. A review of the record makes clear the reason for this incongruity: *The jury's verdict was the end product of a series of unjust, unfair, and unlawful events that essentially rendered Johnson's death sentences a foregone conclusion.* As this Memorandum explains in detail, Johnson's CCE convictions and death sentences must be vacated, as a matter of law and fundamental fairness, as they were obtained in violation of his rights under the United States Constitution.

11

700a

E.    GROUNDS FOR RELIEF

I.    THE PROSECUTION KNOWINGLY OR NEGLIGENTLY USED FALSE
      EVIDENCE TO CREATE THE ILLUSION THAT JOHNSON AND HIS CO-
      DEFENDANTS WERE LEADERS OF A HIGHLY ORGANIZED CONTINUING
      CRIMINAL ENTERPRISE HAVING ITS ROOTS IN NEW YORK AND/OR
      NEW JERSEY.

The central theme of the government's case was that Johnson
and co-defendant Tipton were part of a violent, highly-organized
gang known as the "New York Boyz", who fled trouble in the North
to continue their reign of criminal terror in Richmond, Virginia.
Co-defendant Roane was alleged to have joined this continuing
criminal enterprise after release from the Virginia prison
system.

The government relied almost exclusively upon the dramatic
account of cooperating witness Gregory Scott, who gave vivid
testimony concerning the New York Boyz organization and its
violent ways.  Without Scott's testimony, the government would
have had great difficulty proving that Johnson and his co-
defendants were a part of a continuing criminal enterprise, and
were not simply three independent crack dealers who ran in the
same circles.  It likely is for this reason that the Government
prosecutors presented Scott's testimony despite the fact that it
was totally <u>false</u>.  Indeed, the government used Scott to
corroborate testimony from Maurice Saunders and other "Virginia
witnesses" that otherwise would not have been believable.
Scott's false testimony was the linchpin to the government's CCE
case.

12

701a

A conviction obtained through the use of evidence the prosecutor knows is false violates due process. Napue v. Illinois, 360 U.S. 264, 269 (1959); Kyles v. Whitley, 115 S. Ct. 1555 (1995). Under such circumstances, the conviction must be set aside if there is any reasonable likelihood that the false evidence could have affected the judgment of the jury. United States v. Bagley, 473 U.S. 667, 678-80 & n.9 (1985). Giglio v. United States, 405 U.S. 150, 154 (1972)(citing Brady v. Maryland, 373 U.S. 83, 87 (1963); Mooney v. Holohan, 294 U.S. 103 (1935). Where it is established that the Government knowingly permitted the introduction of false testimony, reversal is "virtually automatic." United States v. Stofsky, 527 F.2d 237, 243 (2d Cir. 1975), cert. denied, 429 U.S. 819 (1976)(citing Napue, 360 U.S. at 269); see also Miller v. Pate, 386 U.S. 1, 7 (1967).

The same is true where the Government allows false evidence to go uncorrected. Giglio, 405 U.S. at 153; Napue, generally. A prosecutor may not "turn a blind eye to doubts about the veracity of testimony presented by its witnesses." United States v. English, 998 F.2d 609, 611 (8th Cir. 1993), cert. denied, 510 U.S. 1001 (1993).

Even if false testimony relates only to the credibility of a Government witness and other evidence has called that witness' credibility into question, a conviction must be reversed when "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Kelly, 35 F.3d 929, 933 (4th Cir. 1994)(quoting United States v.

13

702a

Agurs, 427 U.S. 97, 103 (1976); see also, United States v. Wallach, 935 F.2d 445, 456-57 (2d Cir. 1991), aff'd. 979 F.2d 912 (2d Cir. 1991).

The knowing use of perjured testimony offends the due process clause of the Constitution.  Any "conviction acquired through the knowing use of [such] perjured testimony . . . violates due process."  Kelly, 35 F.3d at 933 (citing Napue, 360 U.S. at 269).  The Government, whether it "knew, should have known . . ., or simply allowed such testimony to pass uncorrected," cannot benefit from the use of perjury and the concomitant violation of due process.  Id. (emphasis added).

The importance of Scott's testimony and the resulting harm to Johnson must be assessed in the light of the Government's presentation of its case to the jury and its reliance on Scott's, as well as Saunders', testimony.

A.   The Government's Strategy

At trial, the government presented evidence of three separate and distinct drug conspiracies.  It began its presentation with evidence of the 1989-91 activities of the "New York Boyz" a group in Trenton, New Jersey.  This evidence included graphic testimony about acts of violence committed in Trenton, including the razor blade slashing of a rival drug dealer (who came down from the witness stand to give jurors a closer look at his facial scars), and the use of aluminum baseball bats (which did not break as easily as wood bats) to beat competitors.  This evidence also included critical testimony

14

concerning the level of organization of the New York Boyz - *i.e.*, that the group met to plan violent acts, and insisted that all members participate in them.

Evidence of activities occurring in New York and New Jersey was critical to the government's case. The government relied on that evidence to "establish[] the origins and *modus operandi* of the New York Boyz." Brief of the United States at 73. As the government has noted, evidence of the events in New York and New Jersey was used to:

> [E]xplain[] the exclusive relationship among the "partners," who were considered "family" because of their common origins in New York City; the "partners[']" access to a stable source of cocaine; the "partners[']" use of a network of street-level "workers" to distribute crack cocaine' the "partners'" method of pooling their money when additional supplies of cocaine were needed; the use of planned, violent retaliation in a concerted fashion to protect and expand the "partners'" drug turf; and the obligation of "partners" to participate in such retaliatory activities as an incident of membership in the New York Boyz.

Id. at 73-74. In other words, this evidence was the linchpin of the government's single conspiracy theory, as it relied on testimony about the New York/New Jersey events to graft a structure onto the Newtown activities, which structure was necessary to the convictions in this case, but which was otherwise absent from the Newtown activities.[4]

The prosecution made this link explicit in arguing that "workers" in New Jersey could be counted toward the five or more

---

[4] Even if there was structure in Newtown, the jury could have convicted on the basis of structure in New York.

15

"supervisees" required to prove a CCE, Tr. 2983, that the defendants could be found guilty of murders in furtherance of a CCE run by "Light," Tr. 2989, and that evidence that gang members in New Jersey were required to participate in acts of violence elevated the murder of Torrick Brown to a murder in furtherance of a CCE.  Tr. 3004.

After its evidence of activities in New Jersey, the government moved to evidence suggesting that while Tipton was involved with the New York Boyz in Trenton, he independently began to supply drugs in the Central Gardens neighborhood of Henrico County, outside of Richmond.  This group confined its activities to Central Gardens, and engaged in no drug-related violence.

The third conspiracy involved the "Newtown Gang," which was the focus of the indictment in this case.  The government alleged that Johnson was involved in all three conspiracies.

The government sought the death penalty against each of the defendants.  This required the prosecution to prove the murders were committed in furtherance of a "continuing criminal enterprise," which in turn required a showing that the alleged conspiracy was highly organized.  21 U.S.C. § 848(c),(e).  The government argued that Tipton, Johnson and Roane were "partners" who organized, supervised and managed five or more "workers" in the conduct of their drug distribution activities, that the murders were carried out to further their drug-related business.

However, the evidence showed that the Newtown crack

16

705a

cocaine market was not highly organized, but consisted of numerous independent "retailers" who obtained their supplies from common sources - including the defendants -- but who were free to distribute cocaine when, where, and at whatever price they wished.

Therefore, in order to foster the illusion of a high degree of "organization, supervision and management," the government grafted the alleged Newtown conspiracy to the New Jersey and Central Gardens conspiracies, and argued that the jury should impute acts of management, organization or supervision carried out by those other conspiracies to the participants in the Newtown conspiracy.

> B.  Greg Scott's Trial Testimony Linking Johnson and His Co-defendants to the New York Boyz Was False, And the Government Knew or Should Have Known It Was False.

The government used the testimony of Gregory Scott to set the stage for its case in chief.  During opening statements, prosecutor Vick told the jury:

> We are going to put before you first that group of witnesses that will establish that conspiracy and that Continuing Criminal Enterprise.  The first witness, for example, is an individual by the name of Gregory Scott. Gregory Scott is a very articulate man, frighteningly articulate, to think he got involved in this criminal activity.  He is from 155th and Amsterdam Avenue in New York.  He will tell you, ladies and gentlemen, that he knows Mr. Richard Tipton and he knows Mr. Cory Johnson and he knows Mr. Lance Thomas, "V", because he grew up with Mr. Lance Thomas at 155th and Amsterdam Avenue in New York City.  And that in 1989 when he lost his job with a market in New York City, he went with Mr. Lance Thomas, a lifelong friend of his, to Trenton, New Jersey, where Mr. Lance Thomas had set up business with

17

706a

Mr. Richard Tipton, Mr. Cory Johnson, and 15 or 20 or 25 other individuals from New York City, most of them from 155th and Amsterdam Avenue.

He will tell you that they had a name for themselves, they have been given it by the police, but which they like: the New York Boyz. They were down there selling crack cocaine in Trenton, New Jersey. And they were a group organized to protect each other and to help each other distribute cocaine. And they liked the name the New York Boyz because it kept competitors away and it instilled a certain amount of fear in people who might want to cross their path.

He will testify that Mr. Richard Tipton, Mr. Lance Thomas, and Mr. Cory Johnson were members of the New York Boyz; that they actually sat around in New Jersey, in Trenton, and had meetings and discussed what physical acts of retaliation they should take against people who had wronged them and decided whether it would hurt business to hit this person or whether it would not hurt business.

He will tell you that they used to beat people regularly with baseball bats, aluminum bats that the New York Boyz used because they wouldn't break. He will tell you that Mr. Cory Johnson and Mr. Richard Tipton particularly liked razor blades and knives to carry with them. In fact, you will hear from a number of witnesses that Mr. Richard Tipton will carry a razor blade almost every day, every waking hour, inside his mouth so he can spit it out and grab it and cut you in a heartbeat with it. You will hear testimony from people who have been at the other end of that razor blade.

He will tell you that from 1989 through 1991, the New York Boyz stayed in Trenton and distributed crack cocaine on the streets of Trenton. Richard Tipton, a New York Boy, went back and forth from Richmond, Virginia, to Trenton and would talk about how much money he would make in Richmond, Virginia, how much more you could sell the cocaine for in Richmond, Virginia. There were a series of events that led them to leave Trenton, a series of busts by the police that led them—Greg Scott was busted at 491 Martin Luther King Boulevard in Trenton, and a number of the New York Boyz were arrested up there. And unfortunately, for the inhabitants of the City of Richmond, several of the New York Boyz decided to make their way south because Mr. Richard Tipton, "Whitey," said there was so much money to be made down here.

18

707a

Richard Tipton, you will hear from a number of witnesses, had been born in Richmond and spent some time in Richmond, grew up in New York, and had people here in Richmond that he knew. And he came back and forth with his cocaine.

In 1991, Cory Johnson came down with Richard Tipton and set up shop in Richmond selling cocaine. In December of 1991 or early 1992, Lance Thomas and Edgar Black, "E.B.," came down and set up shop with "Whitey" and "C.O." selling cocaine. The New York Boyz arrived.

Gregory Scott will tell you that they didn't kill anybody in New Jersey, not that he knows of. But for some reason, when they came to Richmond the violence escalated and these people were all killed or wounded because of the presence of the New York Boyz and their cocaine distribution operation here in the City of Richmond.

. . .

When they came to Richmond, "Whitey" had known a number of people in the Central Gardens area out near Highland Springs. And he came and that's where he first set up shop. And he recruited a number of people from Central Gardens to sell crack cocaine with him. You will hear the testimony of those witnesses. You will hear from Antwoine Brooks, who was recruited by him in 1989 to sell crack cocaine. You will hear from Charles Townes. You will hear from Maurice Saunders. You will hear from "Studie" Green. You will hear from a number of people in the Central Gardens area who were recruited by these people to sell crack cocaine, and they will tell you the same story, particularly Mr. Maurice Saunders. He will tell you "Whitey" was awful proud of the fact he was a New York Boy and had wreaked havoc in Trenton and would take care of those same sorts of people that crossed him down here and would kill anybody who got in his way and would hurt anybody who crossed his path in a way that offended him.

. . .

You will hear from Greg Scott, also, that "Light" was a member of the New York Boyz and that "Light" was the main source of cocaine for "Whitey," Richard Tipton. Charles Townes is one of the Central Gardens people who was recruited by "Whitey" to sell for him. And it is with Charles Townes and the next witness, Mr. Hussone Jones, that we begin to hear the frightening story of the murder rampage that was foisted upon the City of Richmond from January 5th

19

of last year until February 19th of last year, a period of 45 days, ladies and gentlemen, when there were 11 people killed by this conspiracy, by these individuals.

JA 1618-1624.

Scott testified to all of this, and more. For example, he did testify that he grew up with "V" at 155th and Amsterdam Avenue, and that he joined the "V" in New Jersey after losing his job in 1989. JA 1732. He testified that Tipton and Johnson were involved in selling drugs in New Jersey while he was there. JA 1735. According to Scott, the New York Boyz had 15-30 members. *Id.*

The government elicited testimony from Scott in support of its inflammatory theme that Tipton and Johnson were New Yorkers who brought their unique brand of violence to the sleepy South. After testifying that the name, "New York Boyz", was given to this gang by the police, he explains that they liked the name because it "let people know we were from out of town and we were taking over." JA 1736. According to Scott, the New York Boyz would meet whenever it or one of its members had a problem, to discuss it, and to decide whether to retaliate with violence. As one example, he described a meeting where the group decided to retaliate against another group of guys because one of them had stabbed New York Boy "Smooth." JA 1736-37. Tipton and Johnson participated in the discussions. *Id.*

Scott described for the jury how the New York Boyz would use bats, razor blades, or their fists to take over territory in

20

Trenton.  He claimed that co-defendant Thomas[5] taught him how to use a baseball bat for enforcement purposes, and that he was advised to use an aluminum bat instead of a wooden one because aluminum wouldn't break.  JA 1738-39.

According to Scott, the New York Boyz used Trenton locals as what would be referred to throughout the trial as "workers". They had about 20 workers in Trenton, who were expected simply to sell crack on the street.  These workers were "outsiders", and "weren't family".  According to Scott, the members of the New York Boyz referred to each other as family, and specifically as cousins and brothers.  JA 1743-44.

Concerning the New York Boyz' meetings to discuss retaliation, Scott testified that, if one of the New York Boyz refused to engage in violence "[t]hey would stop messing with him, leave him alone, because he was a traitor . . . [H]e wasn't down with the program, wasn't with the program of hurting anybody or taking over a property."  JA 1756.  Such a member would no longer be considered a member of the New York Boyz, and instead, "would be just like anybody who lived in Trenton."  JA 1757. Workers, on the other hand, were not required to engage in acts of violence.

Scott claimed that he was working during this time for Rufus Alvarez, also known as "Light."  Scott testified that he received guns from "Light", and that "Light" was Tipton and Johnson's

---

[5]    Lance Thomas was tried separately from Tipton and his co-defendants.

21

supplier.  Scott testified that he saw Johnson get drugs from "Light."  JA 1749.

Toward the end of his testimony, the prosecutor elicited from Scott testimony that the New York Boyz did not engage in acts of violence simply for retaliation.  Their other goal was to take over more territory.  The group conspired to engage in these violent acts to let the people in Trenton know that the New York Boyz were in town, and were going to take over the crack trade. JA 1805-06.  On cross-examination, Scott was asked to describe some of the incidents that led to meetings and violent retaliation.

Scott's testimony was a complete fabrication, and given the thorough investigation of this case, the government either knew, or was deliberately ignorant that Scott's testimony was perjured. To begin with, even his statement that he grew up at 155th and Amsterdam was a lie.  According to several individuals identified by Scott as members of the New York Boyz, Scott did not grow up at 155th and Amsterdam Avenue.  He did have relatives there, and knew some of these individuals.  Nevertheless, Scott and "V" did not grow up together at 155th and Amsterdam in New York.  See JA 1732.

All of the reputed New York Boyz interviewed by the petitioner's investigator admit that they know each other and grew up together, and do not deny that they were involved in selling drugs.  Nevertheless, they all deny that they ever were a

22

gang or were otherwise "organized," and insist that they never had meetings to discuss retaliation and acts of violence.

Scott's testimony concerning his boss, "Light," also is false. John Matthews, also known as "Light," has reviewed Scott's testimony in this case. According to him, it is "full of lies."

Matthews admits that, near the end of 1989, Greg Scott approached him concerning the selling of drugs, and that the two of them sold drugs together until Matthews' son was born in June, 1990. Moreover, he admits that he was friends with all of the individuals described by Scott as members of the New York Boyz. Nevertheless, he also maintains that this group of friends never participated in group discussions concerning retaliation, and never engaged in planned acts of violence over drugs. According to Matthews, Scott's testimony that he received guns from Matthews is false. Matthews was incarcerated during the entire term of the investigation in this case, under the name of Rufus Alvarez. Ex. 2. Nevertheless, he was never interviewed by anyone in connection with the Newtown Gang case.

During closing argument, the prosecutor relied heavily upon Scott's testimony to establish that Johnson and his co-defendants indeed were members of a CCE:

> Remind yourself in rendering your decision on Count 1 of the testimony of Greg Scott. He told you from the witness stand about the existence of the New York Boyz, a group of people who grew up at 155th and Amsterdam Avenue--and others who joined them--but a group of people who grew up at 155th and Amsterdam Avenue in New York decided in 1989 to go to New Jersey and sell drugs. Included in that group was "Whitey" and "C.O."

23

> That because of a string of events that occurred in Trenton, New Jersey, a number of the New York Boyz got arrested. And unfortunately for the people of Richmond, and particularly unfortunately for the 11 people who died as a result of their actions, Richard Tipton chose to bring some of the New York Boyz south. He brought with him Cory Johnson, "C.O.," Lance Thomas, "V," (and) "Hess" came south with him. Paul, the Jamaican from Blackwell, came south with him. And the New York Boyz continued their actions here in the City of Richmond.

JA 3787. (Tr. 2963).

To prove the essential element that the CCE in this case involved the requisite number of people, the prosecutor asked jurors to:

> Remind yourself of the testimony of Greg Scott about the New York Boyz. There were 30 or so New York Boyz operating in Trenton, each of whom recruited to themselves workers. In Richmond, when the New York Boyz came south with "Whitey," you had the following people, at least, who were working with them in the sale or distribution of cocaine. . . .

JA 3808. (Tr. 2983).

The government indicted Tipton, Roane, and Johnson for the killing of Torrick Brown. The government knew that this murder was committed because Roane was upset with Brown for spending time with his girlfriend, and not in furtherance of the CCE. Because of Scott's perjured testimony, however, the government was able to argue at closing that the murder was committed in furtherance of the CCE:

> Why? It is clear why. Remind yourself again of the testimony of Greg Scott. Remember what he told you about the New York Boyz? They got together for protection and for going back to New York and re-upping cocaine. And when they got together for protection, each and every member of the New York Boyz had to go in on a crime of violence or they were no longer a member of the

24

713a

New York Boyz. 1959 says that you must find that
the murder was either paid for or done to maintain
one's position within an organization. And I
suggest to you that's the critical language in
that statute as to each one of these murders.
Those murders were done to maintain the individual
defendant's stature within the conspiracy. They
were done so that "C.O." and "V" could help James
Roane kill Torrick Brown and prove what a macho
drug dealer, what a macho, murdering drug dealer
they were. Remember, they would have been
ostracized had they not.

Another little telling piece of evidence here:
Greg Scott told you that the workers didn't have
to go in with the crimes of violence. Remember
that? Only the New York Boyz themselves, the
bosses, the partners, had to agree and follow up
on the agreements to commit violence.

That's what they did with Torrick Brown.

                .  .  .

Remember, you mess with one of the New York Boyz, you
mess with them all. That's what Greg Scott told you.
That's what Torrick Brown's murder proves to you.

JA 3829-34. (Tr. 3004-09).

During closing arguments, prosecutor Vick also used

Scott's testimony as a means of demonstrating to the jury

that, contrary to the defense theory, the entire case had

not been carefully orchestrated, and that witnesses had not

been encouraged to lie. As is discussed below, the irony is

that, when it is considered in light of the petitioner's

post-conviction investigation, Scott's testimony

demonstrates that the government did very deliberately

orchestrate its case in chief.

25

714a

C.  Maurice Saunders' Trial Testimony Linking
Tipton to "Light" and to Large Sums of Money Was
False, and the Government Knew or Should Have
Known It Was False.

During the course of the trial, the prosecutor elicited from several witnesses that Tipton introduced Cory Johnson to him as his "brother," introduced Roane to them as his "cousin," and discussed his supplier, "Light", who he bought from when he went "Uptown" to buy drugs.  The government elicited this testimony to enhance the credibility of otherwise unreliable testimony, by arguing to the jury that, since none of the "Virginia witnesses" had ever met Scott, they and Scott must have been telling the truth throughout their testimony.  The petitioner's investigation has revealed that certain of Scott's perjured statements were used to create a seemingly unassailable link between Tipton, Johnson, and the New York Boyz.

During opening statements, prosecutor Vick told the jury that:

> you will hear from Greg Scott, for example, about
> "Light."  Then you will hear from Maurice
> Saunders, who doesn't know Greg Scott, about going
> to New York from Richmond and meeting "Light," who
> was one of the New York Boyz and their source of
> cocaine.  Your common sense will tell you that
> testimony meshes and shows that they are telling
> the truth.  How could two people who don't know
> each other tell the same story unless they had
> seen it?

JA 1648 (Tr. 818).

Maurice Saunders, who was 18 at the time of the trial, did corroborate Scott's testimony that "Light" was Tipton's

26

715a

supplier.  According to Saunders, after Christmas of 1991, he and Tipton's friend, "Hess," traveled to New York "[t]o bring back crack cocaine and some vials."[6]  JA 2160.  He testified that he and Hess went to 155th and Amsterdam, where he was introduced to "Light".  Saunders claimed that he had heard the name "Light" from Tipton before.  JA 2161-62.  He and Hess traveled to New York with $18,000, which Hess used to buy a kilo of cocaine.  Saunders gave dramatic testimony that he was advised by Tipton that on this trip he should "act like you don't know and forget what you see."  Tr. 2162-64.

According to Saunders, he made a second trip to New York, this time with Tipton.  Again, they went to 155th and Amsterdam, where he again saw "Light" and other reputed members of the New York Boyz.  Tipton again told him to "act like you don't know and forget what you see."  On this trip, they brought $40,000 and purchased 2 ½ or 3 kilos of cocaine.

The problem with Saunders' testimony is that John Matthews, a.k.a. Rufus Alvarez, a.k.a. "Light" was arrested for selling drugs on December 3, 1990, and remained incarcerated until he was released on April 2, 1996.  Ex. 2.  Saunders could not have been introduced to "Light," much less have purchased drugs for him.  Moreover, petitioner's

---

6/  Hess was identified by Saunders and other government witnesses as Tipton's enforcer," who traveled to Virginia because things had gotten too hot for the New York Boyz in the North.

27

investigator has spoken with Jorge Delao, a.k.a. "Hess", who admits that he did travel to New York with Saunders in December, 1991. They did not make this trip, however, to purchase cocaine from "Light". Rather, they traveled to New York to buy clothing, jewelry, and vials in which to package crack. Delao admits that he knows John Matthews, and that he used to sell drugs, but he did not purchase a kilo of cocaine during his trip to New York with Saunders.

Saunders' testimony was not limited to his recount of his trips to New York. Rather, it was broad-ranging and severely damaging to all defendants, generally, and to Tipton in particular. For example, he testified that, more than once, Tipton told him that "you only deal with me if you value your life," and that "if it was to come down to that, he would do anything as far as to kill for." JA 2152-53.

As it did with other witnesses, the government elicited from Saunders testimony that Tipton introduced Cory Johnson to him as his "little brother" and introduced Roane to him as his "cousin James." JA 2171-72. The obvious reason for this was to bolster the testimony of Greg Scott.

The government relied heavily upon Maurice Saunders' testimony during closing argument. For example, concerning the requirement that the CCE generated substantial income prosecutor Vick reminded the jury of:

> Maurice Saunders' testimony . . . of ounce after ounce of cocaine being cooked up and sold on a

28

717a

weekly basis here in the City of Richmond. There is absolutely no issue concerning whether there was more than 50 grams of crack cocaine sold by these people.

JA 3801.  (Tr. 2976).

To convince the jury that he had not orchestrated the government's case and suborned perjury, prosecutor Vick stated:

> I will remind you of the testimony about the New York Boyz, 155th and Amsterdam Avenue, who went to Trenton, and came then south through "Whitey," and set up shop in Richmond. And I'll show you how the testimony meshes in that regard and is an example of how you should weigh the testimony that you received from the witness stand and see how it meshes. Remember what Greg Scott told you about that, 155th and Amsterdam Avenue, the New York Boyz, "Whitey", and "O" got cocaine, and this is very important, "Whitey" and "O" got cocaine. Their primary source of cocaine was from a fellow named "Light." Remember that testimony? Maurice Saunders later testified he doesn't know Greg Scott from Adam. Has never met Greg Scott. But Maurice Saunders testified to you that indeed, he went to 155th and Amsterdam Avenue in New York with "Hess" and "Whitey" to get cocaine. And who did they get cocaine from? "Light."
>
> Again, that clearly rings true, that testimony. It shows you that those people are telling you the truth, and that the only way they wouldn't be telling you the truth is if you indeed believed that we got together and orchestrated their testimony in some way, told them how to testify. If you don't believe that, then indeed that proves their testimony to be true. How could two people testify about the same thing when they have not had an opportunity to talk to each other, don't know each other? The only way they could is if that is indeed a fact.

JA 3802-03 (Tr. 2977-78).

Concerning the element that the CCE generated substantial income, prosecutor Vick urged the jurors to:

29

718a

> remind yourself of the testimony of Maurice Saunders; that on one occasion he took $18,000 to New York to purchase cocaine, and on the other occasion he took $40,000 to purchase cocaine. The money came from "Whitey." Forty thousand dollars is a lot of money, ladies and gentlemen. And from unimpeachable sources we know that they generate substantial money.

JA 3812.   (Tr. 2987).

Without the testimony of Scott and Saunders, the government could not have proven that Johnson, Tipton and their co-defendants were leaders of a long-standing, highly-organized, violent gang having its genesis in the dreaded "North". Indeed, the murders that prompted the investigation in this case were committed during a period of weeks, and not years. The obvious falsity of the testimony given by Greg Scott and Maurice Saunders calls into question the credibility of every single witness who testified in this case.

Defense counsel for Johnson and his co-defendants were correct--the prosecution orchestrated the testimony presented to convince the jury that Tipton, Johnson, and Roane managed and supervised a CCE and that they committed the charged murders to further this enterprise. The government's use of this false testimony to implicate Johnson and his co-defendants in a non-existent CCE was fundamentally unfair and denied Johnson's rights to due process, effective assistance of counsel, trial by an impartial jury, and to be free of cruel and unusual punishment, under the Fifth, Sixth, and Eighth Amendments to

30

719a

the United States Constitution.  There can be no doubt that Johnson was prejudiced for there is a reasonable probability that the false testimony could have affected the judgment of the jury.  See Brady v. Maryland, 373 U.S. 83 (1963); United States v. Bagley, 473 U.S. 667 (1985); Kyles v. Whitley, 115 S. Ct. 1555 (1995).  Accordingly, Johnson's convictions and sentences on all counts should be vacated and a new trial ordered.

II.  THE EVIDENCE WAS LEGALLY INSUFFICIENT TO CONVICT JOHNSON AS A SUPERVISOR OF A CONTINUING CRIMINAL ENTERPRISE UNDER 21 U.S.C. SECTION 848.

Johnson's CCE conviction is based on legally insufficient evidence, improper jury instructions, prosecutorial misconduct, and ineffective assistance of counsel, all regarding the supervision element of 21 U.S.C. §848, in violation of the Fifth, Sixth, And Eighth Amendments.

Johnson's death sentence is dependent upon his conviction of engaging in a continuing criminal enterprise ("CCE") under 21 U.S.C. §848.  A careful examination of just one element of the CCE offense -- the supervision element -- reveals a series of problems that render the CCE conviction invalid.  These problems fall into three basic areas:

(1)   The jury was allowed to consider as alleged "supervisees" a large number of persons who, as a

31

720a

matter of law, could not be counted as supervisees. As a result, the CCE convictions must be vacated. *See, e.g., United States v. Barona,* 56 F.3d 1087 (9th Cir. 1995); *United States v. Jerome,* 942 F.2d 1328 (9th Cir. 1991) (discussed in detail below).

(2) In comparison to other circuits, the Fourth Circuit holds the Government to a lower burden of proof on the supervision element. The Fourth Circuit does not require that the Government prove the element of "management" in all CCE cases, while other circuits always require proof of "management." The Fourth Circuit standard is not the correct one, and Johnson's conduct was not evaluated under the proper standard.

(3) A close examination of the evidence reveals that Johnson did not supervise the required five individuals, *under any standard*. The Government misled the jury into concluding that there was supervision by presenting a huge volume of misleading evidence with no apparent foundation of personal knowledge. Johnson is entitled to habeas corpus relief because upon the evidence adduced at trial "no rational trier of fact could have found proof of guilt beyond a reasonable doubt."

32

*Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 2791-2 (1979) (applying section 2254).

These three categories of problems translate into several distinct matters supporting the Petition: (1) the jury was not correctly instructed on the law; (2) there was insufficient evidence to establish a CCE; (3) prosecutorial misconduct; and (4) ineffective assistance of trial and appellate counsel.

The following subsections of the Petition analyze the relevant legal standards, and then apply those standards to the facts of this case.

A.    The CCE Supervision Element: Governing Principles

To support Johnson's CCE conviction, the Government must prove that he committed certain offenses as part of a continuing series of offenses which were undertaken by him "in concert with five or more other persons with respect to whom [he] *occupies a position of organizer, a supervisory position, or any other position of management.*" 21 U.S.C. §848(c) (emphasis added).    In order for a person to qualify as a CCE supervisee, there must be an agreement between the controlling party and the controlled person. *United States v. Ward*, 37 F.3d 243, 249 (6th Cir. 1994), citing *United States v. Jeffers*, 432 U.S. 137, 148050, 97 S.Ct. 2207, 2214-16, 53 L.Ed.2d 168 (1977) ("[Section] 848 does require proof of an agreement among the persons involved in the continuing criminal enterprise.").

33

722a

In the context of this case, several aspects of the supervision element must be considered.

1.   The Fourth Circuit Does Not Require Proof Of Management By The CCE Defendant In All Cases, While Other Circuits *Always Require Proof Of A Management Relationship.*

The Fourth Circuit has held that the supervision element is satisfied by alternative means.  The first method is proof of a supervisory or managerial relationship, which requires a showing of some degree of control by the defendant over the other persons. *United States v. Butler*, 885 F.2d 195,  200-1 (4th Cir. 1989).  The second method is to show that the defendant acted as an organizer, which is defined as "a person who puts together a number of people engaged in separate activities and arranges them . . . in one essentially orderly operation or enterprise." *Id.* According to the Fourth Circuit, proof of a managerial relationship is not required of an "organizer." *Id.*

The Fourth Circuit's view on this point has been rejected by other circuits, which hold that even an "organizer" must exercise managerial responsibility. *See, e.g., United States v. Lindsey*, 123 F.3d 978, 987 (7th Cir. 1997) ("organizing for CCE purposes requires more than simply coordinating various players; it requires some exercise of managerial authority"); *United States v. Possick,* 849  F.2d 332, 335-6 (8th Cir. 1988) ("A defendant . . . need only occupy some managerial position....  In essence, the management element is established by

34

723a

demonstrating that the defendant exerted some type of influence over another individual as exemplified by that individual's compliance with the defendant's directions, instructions, or terms."); *United States v. Barona,* 56 F.3d 1087, 1097 (9th Cir. 1995) ("The syntax of the statute [implies] that "organizers are counted only if they exercise some sort of managerial responsibility."); *United States v. Delgado*, 4 F.3d 780, 786 (9th Cir. 1993) ("it is not enough to be just a non-managerial organizer."); *United States v. Apodaca*, 843 F.2d 421, 426 (10th Cir. 1988) ("'organizer' and 'supervisor' are but two examples of managerial roles"); *United States v. Williams-Davis*, 90 F.3d 490, 508-9 (D.C. Cir. 1996), *cert. denied*, ___ U.S. ___, 117 S.Ct. 986 (1997).

Thus, it is clear that the Fourth Circuit approach of not requiring proof of management *frees the Government of proving what other circuits recognize to be an essential element of the CCE offense: "management."*

(Although, as discussed below, the supervision element of a CCE was not proven as to Johnson under either standard, there is no doubt that Johnson's position at trial and on appeal would have been much stronger had the Government been required to prove the management element. As discussed below, the discrepancy between the Fourth Circuit's standard and the majority rule was not raised by Johnson's trial or

35

724a

appeal counsel, which results in ineffective assistance claims both at the trial level and on appeal.)

    2.    Proof Of A Buyer-Seller Relationship In A Drug Distribution System Does Not Establish The Supervision Element.

It is beyond dispute that a relationship of buyer and seller of drugs, even wholesaler and retailer, is insufficient to establish the "organization, supervision or management" under Section 1848. *See United States v. Butler*, 885 F.2d at 200; *United States v. Delgado*, 4 F.3d 780, 785-86 (9th Cir. 1993); *United States v. Patrick*, 965 F.2d 1390, 1396 (6th Cir. 1992); *United States v. Jenkins*, 904 F.2d 549, 553 (10th Cir. 1990). As the Fourth Circuit recently explained, "[b]uyer-seller relationships are not characterized by 'the exercise of power or authority.'" *United States v. Hall*, 93 F.3d 126, 130-1 (4th Cir. 1996), *cert. denied* ___ U.S. ___, 117 S.Ct. 1087 (1997). Thus, "[s]elling [drugs] to people does not make one an organizer of customers, even wholesale customers. *Barona* at 1096 (citing *U.S. v. Delgado*, 4 F.3d 780, 785 (9th Cir. 1993).

This fundamental rule has a number of corollaries: Mere extensions of credit from seller to buyer or "fronting," absent other indicia of authority or control, does not establish the supervision element. *United States v. Shifflett,* 93-5693, 1995 WL 125506 (4th Cir. March 23, 1995) *(per curiam); United States v. Ward,* 37 F.3d 243, 248 (6th Cir. 1994); *United States v. Possick*, 849 F.2d 332, 336 (8th

36

Cir. 1988); *United States v. Delgado*, 4 F.3d 780, 787 (9th Cir. 1993); *United States v. Witek*, 61 F.3d 819, 822 (11th Cir. 1995), *cert. denied*, 116 S.Ct. 738 (1996). The element of supervision is not satisfied when a supplier gives a buyer directions and instructions concerning where to meet for a drug purchase. *United States v. Ward*, 37 F.3d at 249. The element of supervision is not satisfied when the drug supplier changes arrangements for delivery or controls the quality of the cocaine. *United States v. Silvers*, 888 F. Supp. 1289, 1304 (D. Md. 1995). The element of supervision is not satisfied by a defendant who "simply sets up a system of supply." *Jerome* at 1331, citing *United States v. Apodava*, 843 F.2d 421, 426 (10th Cir. 1988). The seller's imposition of specifications regarding beepers and surreptitiousness for meetings and deliveries does not establish the supervision element. *Id*. The need of buyers and sellers to accommodate one another when meeting and arranging for delivery is incidental to the buyer-seller relationship and thus not proof of supervision. *United States v. Witek,* 61 F.3d at 823; cited with approval in *United States v. Lindsey*, 123 F.3d 978, 987 (7th Cir. 1997).

(As discussed in detail below, many of the alleged supervisees had nothing more than a buyer-seller relationship with one or more of the defendants. Defense counsel at trial and appeal failed to demonstrate this or address its significance, or to get a proper jury

instruction, which again results in ineffective assistance claims both at the trial level and on appeal.)

3.    The Government Was Required To Prove That Johnson *Himself* Satisfied the Supervision Element.

The plain language of the CCE statute provides that the Government must prove that each defendant supervised at least five persons.    *See also, e.g., See, United States v. Butler*, 885 F.2d 195, 201 (4th Cir. 1989) (focusing on control or organizational activities by the defendant);[7] *United States v. Alvarez*, 860 F.2d 801, 816-17 & n.14 (7th Cir. 1988), modified in another respect, 868 F.2d 291 (7th Cir. 1989), vacated on other grounds, 956 F.2d 1165 (7th Cir. 1992) ("other persons" supervised or controlled not by defendant, but by another member of the alleged enterprise "on the same hierarchical plane" as the defendant, could not be considered to have been organized, supervised or managed by the defendant).

(As discussed below, the Government did not prove that Johnson *himself* had a supervisory relationship to at least five people.  Defense counsel at trial and appeal failed to demonstrate this or address its significance, which again results in ineffective assistance claims both at the trial level and on appeal.)

---

[7]    The Fourth Circuit, relying on cases from other Circuits, recognized in dicta that organizational authority and responsibility can be delegated. *Id*. Delegation is not an issue in this case.

38

4.    A CCE Conviction Must Be Vacated Where (As Happened Here) The Court Does Not Properly Instruct The Jury After The Government Introduces Evidence Of Individuals Who, As A Matter Of Law, Are Incapable Of Counting As "Supervisees."

When (as happened here) (1) the Government introduces evidence of a large number of individuals involved in various drug activities and argues to the jury that those individuals were supervisees, and (2) some of those persons were, as a matter of law, incapable of counting as supervisees, the law requires that special instructions be given to the jury.  The failure to give those special instructions -- even if not requested by trial counsel -- requires that the CCE conviction be vacated.  *See United States v. Barona*, 56 F.3d 1087, 1097 (9th Cir. 1995); *United States v. Jerome*, 942 F.2d 1328 (9th Cir. 1991).

In *United States v. Barona,* 56 F.3d 1087, 1097 (9th Cir. 1995), the government had produced at trial "an extensive list of individuals, allowing the jury to pick those it felt met the definition of supervisee." *Id.* at 1096.  Some of those individuals could not legally qualify as supervisees because (it appears from the decision) the evidence showed only that they were re-sellers of drugs obtained from the defendants. *Id.* at 1096-7.  The jury convicted the defendant of CCE.

On appeal, the Government argued that the conviction should stand because the evidence supported a finding that at least five of the people were supervisees of the

39

defendants, and it should be presumed that the jury chose the correct five because it was properly instructed on the law. *Id*. at 1097. The Ninth Circuit rejected the Government's contention *and vacated the convictions*. The court's analysis of the case is clear and compelling:

> *If certain individuals were, as a matter of law, incapable of counting as supervisees, the jury needed to be instructed of this.*
>
> The problem in this case is not that the jury was presented with more than five individuals, or even that the jury may have chosen different people from the list of potential supervisees to fulfill the role. The problem is that, among the list of people who the jury was told that it could choose, there existed individuals that the jury was not allowed to choose as a matter of law.
>
> The government's contention that we should presume that the jury picked the proper five supervisees has some initial appeal.... But upon closer inspection, [this presumption] cannot save the legal error that occurred here.
>
> * * * *
>
> [Defendants] are not just contending that the evidence with respect to the list of supervisees is insufficient to support a finding by the jurors that five of them could not have played the requisite role. Rather, they are making the argument that certain persons on the list, given their role, could not have been supervisees of [defendants] as a matter of law. Based on *Delagado*, certain individuals could not be counted as supervisees, even if the jury made the precise factual findings that the government asked the jurors to make.... Where the jury is presented with a legally inadequate theory, [*Yates v. United States*, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957)] *requires that the conviction be vacated and the case retried as to that charge.*
>
> Here, we cannot tell whether the jury selected one of the purported supervisees who was actually ineligible under *Delgado*. There were no instructions directing the jury to exclude one who is only a customer. Lacking some assurance that proper

40

729a

> differentiation could be made, the verdicts . . . must
> be reversed.

*Barona*, 56 F.3d at 1097-8. [8] As discussed further below, the

facts of this case are even more compelling than those of *Barona*.

In *United States v. Jerome*, 942 F.2d 1328 (9th Cir. 1991),

the Ninth Circuit was presented with another case just like this

one:  one where the jury was presented with potential supervisees

who were incapable of qualifying as supervisees.  There, as here,

there was no apparent objection by trial counsel.  There, as

here, the jury was not instructed that it must unanimously agree

to the identity of each of the five supervisees, and trial

counsel did not request such an instruction.  *Id*. at 1331.

The Ninth Circuit, on direct appeal, found plain error in

those circumstances, notwithstanding its general rule that "only

rarely will an improper jury instruction justify a finding of

plain error." *Id*. at 1331.  The court went on to vacate the CCE

conviction, offering the following analysis:

> [A] genuine possibility of juror confusion exists when it is
> possible that some jurors will convict on the basis of one
> set of facts while others will convict on the basis of
> another set of facts. *The jury in this case was presented
> with a variety of persons that the prosecution told them
> could count* in making up the five persons necessary to
> trigger the statute.  However, some of the people named by
> the prosecution could not have been organized by Jerome. *In
> such a case the court must give the jurors a unanimity*

---

[8]    In the very recent decision in *United States v. Lindsey,* 123
F.3d 978 (7th Cir. 1997), the  Seventh Circuit followed the Ninth
Circuit's *Barona* analysis in a direct appeal where counsel had
failed to object at trial.  The court did not vacate the CCE
conviction on direct appeal, but openly suggested ineffectiveness
of trial counsel, observing that had the defendant "objected to the
argument, and been overruled, we would have a much more difficult
problem." *Id*. at 985.

41

*instruction -- that is the jury had to be instructed that they must unanimously agree as to the identity of each of the five people Jerome organized, managed or supervised. The failure of the court so to instruct was highly prejudicial, with a high probability of substantially affecting the jury verdict. Plain error, the failure calls for reversal of Jerome's [CCE] conviction.*

*Id.* at 1331 (citations omitted; emphasis added).

Thus, although in the ordinary CCE case there is no requirement in the Fourth Circuit that the jury be instructed that it must unanimously agree as to the identity of the supervisees, *see, e.g., United States v. Tipton*, 90 F.3d 861, 885-6 (4th Cir. 1996); *United States v. Hall*, 93 F.3d 126, 130 (4th Cir. 1996), it is not an ordinary case when the Government identifies for the jury individuals who were not capable of being supervisees. In such a case, as in *Jerome* and *Barona*, the failure to so instruct the jury requires that the CCE conviction be vacated.

B.    The Government's Effort To Prove The Supervision Element.

Over several weeks of trial, the Government presented a multitude of witnesses testifying about many potential supervisees. Then, during closing argument the Government argued to the jury that *each of the individuals the jury had heard about were supervisees.* Although the Government's evidence was voluminous as measured by time and number of witnesses, the evidence failed in at least two critical respects regarding the supervision element of the CCE.

42

731a

First, many of the alleged supervisees were incapable of qualifying as supervisees, and the jury was not instructed as required in *Barona* and *Jerome*. As discussed above, this fact is fatal to the CCE conviction and requires that the writ be granted and the conviction be vacated.

Second, when the record is examined closely, it is apparent that there is simply no evidence demonstrating that Johnson supervised five individuals.

1. Many Of Alleged "Supervisees" Were Individuals Who, As A Matter Of Law, Were Not Capable Of Being Supervisees, And Proper Jury Instructions Were Not Given; Under *Barona* and *Jerome*, The CCE Convictions Must Be Vacated.

In closing argument, the prosecutor argued to the jury that it could consider a huge list of specified individuals -- *as well as everyone else they heard testimony about* -- to be potential supervisees. Specifically, the prosecutor identified the following persons as potential supervisees:

> "30 or so New York Boyz"
> Denise Berkley
> Priscilla Greene
> Curt Thorne
> Linwood Chiles
> Jerry Gaiters
> Sterling Hardy
> Papoose Davis
> Hussone Jones
> Charles Townes
> "Man, Man", Maurice Saunders,
> Antwoine Brooks
> "the people from Charles City that were testified about"
> Pam Williams
> Charlotte Moore
> Greg Noble
> Sam Taylor
> "and a number of others you have heard testimony about."

43

Tr. 2983-4.    The prosecutor also told the jury (incorrectly as discussed below):

> [Y[ou need not find that each and every one of these people supervised five or more people themselves.  You need find only that as a group, there were five or more people involved. And I suggest to you it is clear from the evidence that *there were five or more people involved in the distribution of cocaine,* just here in the City of Richmond.
>
> * * * *
>
> [The evidence showed that defendants] were the people who organized the workers, who went out and recruited the workers, who supplied the workers with the cocaine, and that those workers went forth and sold their cocaine on the streets of the City of Richmond.  That's all that is required by the law.

Tr.  2984-5 (emphasis added).    Here, the Government expressly argued, contrary to law, that individuals could be CCE supervisees if they were involved in the distribution of drugs.

Apart from the improper reference to drug re-sellers generally, it is beyond dispute that the Government's list of names is overly broad, and that many of these individuals simply could not qualify as supervisees as a matter of law -- even assuming a proper foundation for the testimony about them.   (As discussed below, in many cases there is no foundation establishing personal knowledge by the witnesses.)   In the case of some of the individuals, they could not be CCE supervisees because the Government's unchallenged evidence showed only that they resold drugs obtained from the defendants.  In other cases, the Government's unchallenged evidence showed that the individuals were "partners" of the defendants, and by definition

44

not "supervisees." *See, e.g, United States v. Ward*, 37 F.3d 243, 248 (6th Cir. 1994) ("[I]f anything, her testimony indicates that Ward and Hicks were acting as partners in this transaction. Thus, we find no evidence from which the jury could reasonably infer that Ward was 'supervising' or 'organizing' . . . Hicks"). And in virtually all of the foregoing and many others, there was no evidence whatsoever of any acts of supervision or management (or even "organization" without management, under the Fourth Circuit's standard) by Johnson or any other defendant.

The following table is a *partial* list of alleged supervisees who, as a matter of law, could not have been counted as Johnson's supervisees for the foregoing reasons (note that the table assumes that each piece of evidence is based on personal knowledge and a proper foundation; in fact, as discussed below at page 56, the vast majority is not):

45

734a

Table 1

| So-called "supervisee" argued by prosecutor: | Evidence about the individuals demonstrating that such person is not capable of being a "supervisee": |
|---|---|
| "30 or so New York Boyz" | There is no evidence that Johnson supervised "30 or so" members of this organization. To the contrary, the only evidence about the "workers" of the New York Boyz was that there were about 20, and they would buy drugs from the New York Boyz and sell drugs to someone else. Tr. 913. |
| "the people from Charles City that were testified about | There is no evidence that Johnson supervised anyone in Charles City County. The only evidence about Charles City County was that a government witness testified that Tipton "was selling drugs in Charles City." Tr.1313- 4 |
| Dorothy "Mousey" Armstrong | This individual was a "partner," according to a Government witness, Tr. 1888 (testimony of Robert "Papoose" Davis)[9]; drug reseller, Tr. 1684 (testimony of Denise Berkley). |
| Swain Ball | The only evidence about this person is that he was an "employee," Tr. 2324. According to his grand jury testimony, this individual's only relationship with Johnson was that he obtained drugs from Johnson, sold them, and split the proceeds with him. Ex. 3. |
| Johnny Lee Byrd | This individual distributed drugs with Doug Talley; purchased his drugs from Robert "Papoose" Davis. Tr. 1432, 1438. |
| Antwoine Brooks | This individual was a "partner," according to two Government witness. Tr. 1545 (testimony of Hussone Jones); Tr. 1146 (Tr. 1146). *The Government concedes that Brooks was a partner.* Ex. 4 (excerpt of Government's brief to the Fourth Circuit, page 10.) |

---

[9]    Denise Berkley testified, without any factual basis, that Armstrong was a "worker." Tr. 1684.

46

735a

| | |
|---|---|
| "Damien" | This individual was involved with Tipton, in an unspecified manner, selling drugs. Tr. 1317. |
| Jerry Gaiters | This individual testified that he sold drugs obtained from Roane, and *had no relationship with Johnson.* Tr. 2324. |
| Priscilla "Pepsi" Green | According to one witness, this individual was a drug reseller. Tr. 1690. However, *Green herself denied that she had ever sold cocaine.* Tr. 2546. |
| Sterling Hardy | On a single occasion, this individual received $5 from Roane to deliver a vial of cocaine to a person named Denise. Tr. 2324. |
| Rhonda Hollman | Roane or Tipton offered this individual a drug deal but she declined. She testified that she was a partner of Peyton Johnson. Tr. 1964, 1974. |
| Peyton Maurice Johnson | This individual sold drugs to Robert Davis, Tr. 1909, and was a partner of Rhonda Hollman, Tr. 1961. |
| Charlotte Moore | This individual bought guns for "Studie"; Tipton paid her $100. Tr. 2492-5 (testimony of Charlotte Moore). |
| Greg Noble | Tipton gave this individual drugs, and he could do whatever he wanted with them. Tr. 2620. |
| Nat Rozier | This individual brought people who bought cocaine from defendants. Tr. 1892-3 (testimony of Robert "Papoose" Davis). |
| Hussone Sanders | This individual was a reseller of drugs obtained from Tipton. Tr. 1321. |
| Leroy Slater | This individual was a drug reseller, who allowed Tipton to stay at his house, where Tipton cooked cocaine twice. Tr. 2630-2. |
| Sandra Reavis | This individual was a "partner," according to a Government witness. Tr. 1888, Tr. 1950 (testimony of Robert "Papoose" Davis); "was in on it [with the defendants] with the cocaine," according to another Government witness, Tr. 1675 (testimony of Denise Berkley). |

47

| J.T. Taylor | This individual sold drugs he obtained from Tipton. Tr. 1545. |
|---|---|
| Lance Thomas | This individual was Tipton's "partner." Tr. 1559. *The Government concedes that Thomas was a partner.* Ex. 4 (excerpt of Government's brief to the Fourth Circuit, pp. 9-14.) |
| Curt Thorne | This individual was a drug reseller. Tr. 2547. |
| Charles Towns | This individual was a drug reseller who obtained drugs from Tipton. He testified that he was free to do anything he wanted with his drugs. *See* Tr. 1239-40. |

With respect to each of these individuals, there is no evidence demonstrating any act of management by Johnson; nor, even assuming that the Fourth Circuit standard were valid, is there any evidence demonstrating any act of "organization" without "management" by Johnson. Indeed, in many instances, there was not even any evidence of any relationship at all between these individuals and Johnson. As a matter of law, each one was incapable of being Johnson's supervisee.

In view of the foregoing, trial counsel should have sought instructions (1) identifying for the jury, as required in *Barona*, which individuals could not be supervisees, and (2) requiring the jury, as in *Jerome*, to unanimously agree as to the identity of each of the five supervisees. Although trial counsel failed to do so, under *Barona* and *Jerome* the CCE convictions must be vacated.

48

2.    There Is No Admissible Evidence Demonstrating That Johnson Supervised Five Individuals Within The Meaning Of The CCE Statute.

In a wide variety of respects, the supervision element as to Johnson was given no meaningful attention by anyone involved in the trial or appeal of the case -- lawyers, prosecutors, courts, and ultimately jury members. As a threshold matter, at trial the government avoided direct proof of supervision, opting instead to introduce (1) repetitive testimony characterizing various persons with the ambiguous and misleading labels "worker" and "employee"; and (2) supplemental evidence of purported fact that was unsupported by apparent personal knowledge.

Trial counsel failed to object consistently to this improper testimony or to seek cautionary instructions to the jury when it repeatedly occurred. On those few occasions when defense counsel did object, this Court overruled the objections, permitting the Government to steamroller Johnson with unfounded evidence. Then appellate counsel failed to raise this issue on appeal.

The net result is simple: the supervision element was not proven by any plausible standard, and the jury could not have properly found Johnson to be guilty of the CCE charge.

a.    The Government Relied Principally On The Conclusory Terms "Worker" And "Employee" To Prove Supervision; Such Terms Misled The Jury And Prejudiced Johnson And The Other Defendants.

As shown on the following table of transcript references, the Government repeatedly offered testimony by numerous witnesses using the terms "worker" and "employee" to establish that at least 16 individuals were CCE supervisees:

49

738a

Table 2
Alleged Supervisees
Labeled as a "worker" or "employee"
(or words of similar import):[10]

| Individual | Transcript Reference |
|---|---|
| Dorothy "Mousey" Armstrong | Tr. 1684 (testimony of D. Berkley), Tr. 1883 (testimony of R. Davis) |
| Swain Ball | Tr. 2324 (testimony of J. Gaiters). Note, however, that this individual testified to the grand jury that his only relationship with Johnson was that he obtained drugs from Johnson, sold them, and split the proceeds with him. Ex. 3. |
| Denise Berkley | Tr. 1891 (testimony of R. Davis) |
| Linwood Chiles | Tr. 1683-4 (testimony of D. Berkley); Tr. 2708-9 (testimony of V. Butler |
| "Damien" | Tr. 1319 (testimony of M. Sanders) |
| Robert "Papoose" Davis | Tr. 1684 (testimony of D. Berkley), Tr. 2324-5 (testimony of J. Gaiters); Tr. 1883, 1888 (testimony of R. Davis) |
| Jerry Gaiters, Tr. | Tr. 2324 (testimony of J. Gaiters); Tr. 1684 (testimony of D. Berkley); Tr. 1889 (testimony of R. Davis) |
| Priscilla "Pepsi" Green | Tr. 1690 (testimony of V. Butler). Significantly, however, *Green herself denied that she had ever sold cocaine.* Tr. 2546. |
| Hussone Jones | Tr. 2708 (testimony of V. Butler) |
| Keith Ross | Tr. 2324-5 (testimony of J. Gaiters) |
| Maurice Sanders | Tr. 1545 (testimony of H. Sanders) |
| Doug Talley | Tr. 2330 |
| J. T. Taylor | Tr. 1546 (testimony of H. Sanders) |
| Curt Thorne | Tr. 1890-1 (testimony of R. Davis); Tr. 2708 (testimony of V. Butler); Tr. 2324 (testimony of J. Gaiters) |

---

[10]    This list is intended to be illustrative, not exhaustive. The undersigned believes that there are additional examples of this in the record.

50

| Charles Towns | Tr. 1147 (testimony of C. Towns) |
| J.T. Williams | Tr. 1546 (testimony of H. Sanders) |

At first glance, this constant use of the labels "worker" and "employee" has meaning. After all, to a jury familiar with normal employment situations, the terms "worker" and "employee" would naturally suggest an element of supervision. But as a closer examination shows, the terms as used by the Government's witnesses are utterly ambiguous and *not* probative of any aspect of supervision. Indeed, *the Government's own evidence reveals that the witnesses who used these terms gave them definitions having no connection whatsoever to the supervision element, whether under the Fourth Circuit test or the test followed in other Circuits.* For example,

- A Government witness identified several persons as "workers." He then defined that term to mean the people in the drug distribution chain who "get a little percentage of the money." Tr. 1545 (testimony of Hussone Sanders). The same witness identified several persons as "workers," only to describe them as people who sold drugs that they obtained from Tipton. *Id.*

- A Government witness used the term "partner" and "worker" interchangeably to describe her own status in the drug distribution chain, and she also suggested that the distinction between "partner" and "worker" was that the "partner" received more money. Tr. 1961, Tr. 1973 (testimony of Rhonda Hollman).

- A Government witness, during his direct examination by the Government, first testified that a particular individual was a "worker" and then testified that she was a "partner." Tr. 1883, 1888 (testimony of Robert "Papoose" Davis).

- A Government witness testified that he was a "worker" during a transaction when he merely took $300 worth of drugs from

51

Tipton for resale, and agreed to split the proceeds with him.  Tr. 1154, Tr. 1168 (testimony of Charles Towns).

- A Government witness testified that he was not a "partner" because he "had to bring money back" after he sold drugs obtained from the defendants.  Tr.  1159.

- A Government witness described another individual as a "worker," only to disclose that the person's role with the defendants was to be the "maid of the house."  Tr. 1891.

- A Government witness described Robert Davis as an "employee" of the defendants.  Tr. 2324-5.  Davis himself testified to no facts suggesting a relationship of employment or supervisee with any defendant.

- A Government witness testified Priscilla Green "worked for" the defendants.  Tr. 1690.  Green herself testified to no facts suggesting a relationship of worker or supervisee with any defendant.

- A Government witness who called himself a "worker" also testified that he received drugs from Tipton; that he was free to do anything he wanted with those drugs;  that no one was telling him what to do, where to go, or how to do it; that he was responsible for making his own money; and as long as he paid Tipton for the drugs, Tipton did not care what he did with them.  Tr. 1239-40.

- On at least one occasion, the Government engaged its witness in a series of questions that reveals the real meaning of "worker":

> Q:   As to the relationship of "Mousey" Armstrong with [Johnson], do you know what that relationship was?
>
> A:   She used to work for him.
>
> Q:   Where did you get that term, "worker?"
>
> A:   It is *a street term when somebody is selling somebody else's product.*
>
> Q:   *When you say worked for her, what do you mean?*
>
> A:   Well, *you would give somebody a percentage of what you sell.*
>
> Q:   Was there a difference between [Johnson] and "Mousey?"

52

A:     Yes.  Well, *[Johnson] is the supplier and "Mousey" was the worker.*

Q:     As to Jerry Gaiters, in his relationship with [Tipton], do you know what that relationship was?

A:     Yes.

MR. WHITE:     Objection.  Same objection.  He can say what he saw. [(This is an example of a proper objection to lack of foundation that was incorrectly overruled.)]

THE COURT:  Overruled.

BY MR. VICK:
Q:     Go ahead.

A:     He would supply  -- *[Tipton] would supply and Jerry was the worker.*

Tr. 2107-8 (emphasis added)

It is clear from the foregoing that the "worker" has been used to mean almost everything -- from a person providing maid service, to a person who gets only a small percentage of drug proceeds, to a person who obtains drugs for resale from a supplier -- *almost anything, that is, except a person who is a CCE supervisee.*

Thus, although the terms "worker" and "employee" seem to suggest supervision, in reality -- and as used by the Government's witnesses -- the terms have nothing to do with CCE supervision.

Conclusory terms that amount to opinions and personal characterizations, but do not state facts, are insufficient to establish supervision. *See, e.g., United States v.* Silvers, 888 F.Supp. 1289, 1303-4 (D. Md. 1995) (in a CCE case, rejecting witnesses' "conclusory assertions" purporting to show

53

742a

supervision); *United States v. Becker*, 892 F.2d 265, 267 (3rd Cir. 1989) (in a CCE case, holding that a witness's characterization is not determinative of the supervision element; looking instead to the facts established by the evidence).

Moreover, in any context, conclusory opinions and characterizations by lay witnesses are inadmissible under FRE 701 unless, among other things, such testimony is "helpful to a . . . determination of a fact in issue." Given the ambiguity of the terms "worker" and "employee" in this case, such opinions and characterizations cannot possibly be helpful. Indeed, the characterization of an individual as a "worker" or "employee" is essentially a legal conclusion which should not have been presented to the jury by testimony. *See, e.g., Christiansen v. National Savings And Trust Co.*, 683 F.2d 520, 529 (D.C. Cir. 1982) (inadmissibility of conclusion that defendants held a "fiduciary" relationship).

The characterizations "employee" and "worker" were clearly intended by the Government to establish that various individuals were "supervised" as normal "employees" and "workers" are. As such, the characterizations were not admissible because they did nothing but "tell the factfinder what result to reach," *Hogan v AT&T*, 812 F.2d 409, 411 (8th Cir. 1987), and, as discussed above, in this case did so in a very misleading manner. As one court stated in circumstances similar to those presented here, but without the element of misleading terminology:

> It is not clear whether the statements [that there was a pattern of age discrimination] were intended to be the

54

743a

> opinions of an expert or lay witness. In either event, they amounted to legal conclusions.... Neither can it be said that the opinions helped with the determination of a fact in issue. To begin with, the question of whether age discrimination existed or not was the ultimate issue, not just a fact in issue. Although testimony which embraces an ultimate issue is not objectionable (Fed. R. Evid. 704), seldom will be the case when a lay opinion on an ultimate issue will meet the test of being helpful to the trier of fact since the jury's opinion is as good as the witness' and the witness turns into little more than an "oath helper."

*Mitroff v. Xomox Corp.*, 797 F.2d 217, 276 (6th Cir. 1986).

It is obvious that the Government's repetitive use of improper and inadmissible testimony describing various individuals as "workers" and "employees" played a significant part in the jury's verdict and therefore prejudiced Johnson. For example, the prosecutor's own closing argument focused on these terms:

> Each and every witness who took that stand testified remarkably consistently concerning their relationship with one another; that "J.R.," "O," "Whitey," "V" were *partners* or bosses; that they were the people who organized the *workers*, who went out and recruited the *workers*, who supplied the workers with the cocaine, and that those workers went forth and sold their cocaine on the streets of the City of Richmond. That's all that is required by the law.

Tr. 2985 (emphasis added). This emphasis by the prosecutors demonstrates the significance and likely impact of these terms upon the jury.

This testimony was also prejudicial on appeal. When examining sufficiency of the evidence, the Fourth Circuit held:

> [The] record reveals -- certainly supports findings beyond a reasonable doubt -- that these "retailers," in more than sufficient numbers as to each of the appellants, acted as *"workers"* who were either or both organized, supervised, and managed by appellants while acting as principal *"partners...."*

55

744a

*United States v. Tipton,* 90 F.3d 861, 891 (4th Cir. 1996). Thus, it is apparent that the Fourth Circuit relied heavily on this improper, misleading testimony.

> b.  The So-Called Evidence Of "Supervision" Was Largely Without A Foundation Of Personal Knowledge And Was Inadmissible Under FRE 602

FRE 602 states:

> A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.

This rule was repeatedly ignored by the Government, defense counsel, and the Court while the Government offered voluminous testimony concerning the roles and activities of various individuals (including the characterizations of such individuals as "workers" or "employees"[11]). This occurred with such frequency that it is impossible to identify every example. A lengthy list of examples of violations of FRE 602 -- in the context of the CCE supervision element and otherwise -- is set forth below starting at page 67.

> c.  Even the evidence cited by the Government on appeal does not establish that Johnson supervised five individuals.

Presumably, the Government's strongest case for showing that Johnson supervised five individuals was made in the Government's Brief to the Fourth Circuit. There, after making a series of

---

[11]  Thus, these characterizations violated FRE 701 not only in that it was not helpful testimony, but also in that there was no basis to know whether the opinion was rationally based on the perception of the witness.

56

conclusory assertions unsupported by any citation to the record, the Government identified eight particular individuals who it claimed were shown by the evidence to be supervisees: Linwood Chiles, Mousey Armstrong, "Pea Sue," "Bracey and Williams," Jerry Gaiters, Valerie Butler, and Denise Berkley. Government's Brief at 161-3.[12] The Government's arguments as to each alleged supervisee are addressed here in turn.

Linwood Chiles. The record cited by the Government concerning Chiles reveals only the conclusory testimony of a witness, with no demonstrated basis of personal knowledge, that Chiles traveled out of town with defendants, and the defendants came back with cocaine. Tr. 1690-1. Even if this testimony had been based on personal knowledge and therefore potentially admissible, however, it would not be probative of supervision. The testimony does not show that Chiles was in any manner "supervised" by Johnson under any standard. Indeed Chiles' true role might fall in any number of labels, assuming he had knowledge of the drug purchase: drug supplier, supervisor, partner, conspirator. Even if it were assumed that Johnson supervised Chiles in a general sense, absent evidence that Chiles knowingly participated in illegal activities in connection with driving Johnson to New York this supervision would not qualify as CCE supervision. "[I]nnocent participants in a criminal activity may not be counted as part of a continuing criminal

---

[12] *See* Ex. 4 (excerpts of Government's brief to the Fourth Circuit).

57

enterprise." *United States v. Smith*, 24 F.3d 1230, 1234 (10th Cir. 1994), citing *Jeffers v. United States*, 432 U.S. 137, 148-50, 97 S.Ct. 2207, 2214-15 (1977). In short, given the record Chiles is incapable as a matter of law of being Johnson's CCE supervisee.

<u>Moussey Armstrong.</u>    The record cited by the Government concerning Moussey Armstrong reveals only the conclusory testimony of a witness, with no demonstrated basis of personal knowledge, that Johnson was selling drugs "out of a white house" belonging to Armstrong. Tr. 1583. Even if this testimony had been based on personal knowledge, it would not be probative of CCE supervision. The testimony does not show that Armstrong was in any manner "supervised" by Johnson or any other defendant under any standard; indeed, it fails even to show the threshold requirement of an agreement between Johnson and Armstrong. In short, given the record Armstrong is incapable as a matter of law of being Johnson's CCE supervisee.

<u>"Pea Sue."</u>    The portion of the record cited by the Government reveals only that a witness asked "Pea Sue" if the defendants "could use her house for to cook cocaine," and she said yes. Tr. 1689. The answer was rank hearsay and inadmissible. Even treating it as admissible, it did not establish that Johnson or any defendant in fact cooked cocaine at her house. The witness testified that he does not know whether that happened "because I had left." Tr. 1689. Moreover, even if there had been testimony that Johnson had actually cooked cocaine

58

at Pea Sue's house, that would not demonstrate in any manner that Pea Sue was "supervised" by Johnson or any other defendant under any standard;  nor would it demonstrate the threshold requirement of agreement.  Given the record, Pea Sue is incapable as a matter of law of being Johnson's CCE supervisee.

Bracey and Williams.  The record cited by the Government is the testimony of Williams.  She testified that Bracey introduced her to Johnson, "V" [Thomas], and Roane; that *Johnson sat in the living room* while Thomas and Roane took her upstairs to ask her to get guns in exchange for "a sixteenth"; that she, Thomas, Roane, Bracey, and another person *(not Johnson)* went to the gunshop; at the gunshop, Roane told her Bracey what kind of guns to get; she ordered the guns;  *that Johnson had "stayed at the house the whole time,"* that, when they returned, *Johnson gave her "4 or 5 pieces";* that, the next day, she changed her mind and did not want to pick up the guns; that, upon her changing her mind, Roane and Thomas became violent with her, causing her to go with them to pick up the guns; that Roane gave her the $1,400 to pay for the guns; that Thomas had given Roane the money in the car; *while Johnson again remained at the house.*  Tr. 1836-48. **Thus, the only evidence against Johnson is that he gave Williams some cocaine on a single occasion.**  There is no evidence that he was involved in any manner in the managing, organizing, or supervising of the these individuals or the transaction at issue. Nor is there any evidence that Johnson had an agreement of any kind with these individuals.  Given the record, these individuals

59

748a

are incapable as a matter of law of being Johnson's CCE supervisees.

Jerry Gaiters. The record cited by the Government is merely Gaiters' testimony that Johnson said "I want you to get Mousey to bring out the house. When I shoot the bitch in the as [sic] I want you to run back to the car." Tr. 2343-4. This testimony may demonstrate a conspiracy, but it does not demonstrate supervision by Johnson over Gaiters. Moreover, any suggestion that Johnson "supervised" Gaiters is belied by Gaiters' himself, who twice testified that his so-called supervision relationship was with other defendants, but *not* with Johnson. *See* Tr. 2324 (Gaiters testifying that Tipton and Roane "was like the boss. They ran things."); Tr. 2325 (Gaiters testifying that Johnson refused to give him drugs because Gaiters "worked for" one of the other defendants). In addition, Gaiters' trial testimony conflicts with his grand jury testimony concerning Johnson's and his activities in the Mousey Armstrong murder. He testified to the grand jury that Johnson held a gun to his back and forced him to go to Armstrong's house and knock on the door and identify himself as the visitor. Ex. 5. Gaiters' actions do not qualify as the actions of a supervisee if he was under acting duress, as he testified to the grand jury.

Berkley and Butler. Johnson contends that the evidence does not show that these two individuals were supervisees. However, because these are the only two individuals left and the

60

749a

Government must prove five, there is no need to set forth Johnson's analysis here.

C.    Habeas Claims Related To The CCE Supervision Element

Based on the foregoing analysis, Johnson's CCE conviction must be vacated and the writ granted for the following reasons:

1.    The Jury Was Not Properly Instructed As To The Supervision Element

The following list of instances of incorrect jury instructions relate only to the supervision element.

a.    Buyer-seller relationship.    As discussed above, it is beyond dispute that a relationship of buyer and seller of drugs, even wholesaler and retailer, is insufficient to establish the "organization, supervision or management" under Section 1848. See United States v. Butler, 885 F.2d at 200.  The jury was not instructed of this critical rule.  Where so much of the government's evidence of alleged CCE supervision was in reality evidence of a buy-seller relationship, the failure to give this instruction is plain error and denied Johnson a fair trial.

b.    Individuals not capable of being CCE supervisees.    As discussed above, when (as happened here) (1) the Government introduces evidence of a large number of individuals involved in various drug activities and argues to the jury that those individuals were supervisees, and (2) some of those persons were, as a matter of law, incapable of counting as supervisees, the jury needed to be instructed that it could not find those persons to be supervisees.  See United States v. Barona, 56 F.3d 1087,

61

750a

1097 (9th Cir. 1995). Likewise, the jury needed to be instructed that it must unanimously agree to the identity of each of the five supervisees. *United States v. Jerome*, 942 F.2d 1328 (9th Cir. 1991). The jury was not given either of the required instructions. As a result, the CCE convictions must be vacated. *Id.*

c. <u>Management requirement.</u> As discussed above, the Fourth Circuit -- unlike many other Circuits -- does not require the Government to prove the element of "management" for a so-called CCE "organizer." The Fourth Circuit rule is incorrect, and the jury should have been instructed -- as it would have been in most other circuits -- that the Government must prove the element of "management."

2. <u>There Was Insufficient Evidence To Support The Supervision Element</u>

As discussed at length above, there is no evidence that Johnson was a CCE supervisor of five persons. Upon the evidence adduced at trial, "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 2791-2 (1979) (applying section 2254).

3. <u>Prosecutorial Misconduct Relating To The Supervision Element.</u>

The following list of instances of prosecutorial misconduct relate only to the supervision element. Other allegations of

62

751a

such misconduct, which this Court must consider are set forth in Claim V of this Petition.

a. <u>Improper use of unsupported, ambiguous testimony.</u> As discussed above starting at page 42, the prosecutors built their case on CCE supervision through a combination of misleading terminology (*i.e.*, "worker" and "employee") plus evidence for which there was no apparent foundation of personal knowledge, all of which misled the jury. Then, the prosecutors emphasized it repeatedly in argument to the jury and to the Fourth Circuit. All of this was improper, and denied Johnson due process and a fair trial.

b. <u>Improper argument concerning the supervision element.</u> In its closing argument, the Government *misled the jury about the supervision element in several critical respects*.

First, as discussed above, the prosecutor identified numerous individuals as supervisees who simply, as a matter of law, could not count as supervisees.

Second, the prosecutor told the jury:

> [Y[ou need not find that each and every one of these people supervised five or more people themselves. *You need find only that as a group, there were five or more people involved.* And I suggest to you it is clear from the evidence that *there were five or more people involved in the distribution of cocaine,* just here in the City of Richmond.

\* \* \* \*

> [The evidence showed that defendants] were the people who organized the workers, *who went out and recruited the workers, who supplied the workers with the cocaine, and that those workers went forth and sold their cocaine on the streets of the City of Richmond. That's all that is required by the law.*

63

Tr. 2984-5(emphasis added). This argument is flat wrong. It begins by stating that the Government need only prove that, *as a* "group, there were five or more people involved." Then, the argument urges to jury to find supervision on the ground that the "workers" were under Johnson in the chain of drug distribution. Both of these points are contrary to governing law, as discussed above.

At the conclusion of the Government's closing argument, the prosecutor made the following misleading and improper argument:

> My colleagues have told you and told you and told you how there is no organization here. There is no management. There is no supervision. *They say all those things have to be done. It is not true.* ...Mr. Cooley's little cute Wonder Bread-Safeway joke was interesting yesterday, but it didn't have anything to do with what we are about. *Because we are talking about illegal crack cocaine. We are talking about killings. And we are talking about the furtherance of that killing that was done for the furtherance of the conspiracy. The conspiracy is to distribute crack cocaine and to make money.* It is not about the legal bread business or Safeway. It is a good analogy, but *it doesn't make any difference. We are talking about apples and oranges. We are talking about a criminal enterprise and a criminal nature. He is talking about a legitimate business.*

Tr. 3187-8 (emphasis added). With this argument, the prosecutor improperly sought to evade the entire issue of supervision by focusing on inflammatory issues, suggesting that because this case involved drug distribution the ordinary concepts of supervision did not apply.

These misleading, inflammatory arguments were improper and denied Johnson due process and a fair trial.

> 4.  <u>Ineffective Assistance Of Counsel At Trial And Appeal Concerning The Supervision Element</u>

64

753a

The following list of instances of ineffective assistance of counsel relate only to the supervision element of the CCE charge.

a.    Counsel Could Have And Should Have Shown That Johnson Was Incapable of Being A Supervisor Or At Least Not Likely To Be A Supervisor

Trial counsel presented ample evidence during the sentencing phase of Johnson's severe intellectual deficiencies.  Much of this evidence should have been presented at the guilt phase of Johnson's trial to demonstrate that he was incapable of carrying out, or at least unlikely to carry out, the supervisory and management function required under section 848.

Dr. Dewey Cornell, a clinical psychologist, testified that he had found Johnson only "minimally competent to stand trial" and that his I.Q. was 77, just barely above the recognized range for mental retardation.   JA 4392, 4510. Johnson's prior IQ score at the age of 16 years was 69-74, demonstrating a history of low intellectual functioning.  JA 4425.  Cornell stated that Johnson suffered from very severe learning disabilities.  Tests conducted before trial demonstrated brain damage.  Cornell found that Johnson had impaired adaptive behavior in several areas.  JA 4515-16.  The mentally retarded and those who are borderline mentally retarded share the following characteristics: they are very susceptible to peer pressure, are suggestible, have poor judgment and rely on others.  JA. 4519-24, 4519-20.  Johnson's characteristics were consistent with mild retardation and inconsistent with Johnson's directing, organizing and supervising others as required under section 848.  In response to the

65

754a

prosecutor's question, Cornell stated: "I don't think Cory was pulling strings and giving orders and directing people around." JA 4526.

Defense counsel failed to use this testimony and evidence to raise a reasonable doubt in the minds of the jurors about an essential element of the offense--supervision and management. During the sentencing phase, eleven jurors found that due to Johnson's eagerness to be accepted by others, he was easily manipulated. Twelve jurors found that he suffered from neurological impairments and that his severe learning disability impaired his judgment. Eight jurors found that his I.Q. was 77. Had this same evidence been presented at the guilt phase, the jurors certainly would have reached a different result on the CCE charges. Defense counsel provided ineffective assistance, and Johnson was prejudiced.

b.    Counsel Failed To Object To Repeated, Improper Evidence.

Defense counsel failed to object to improper testimony and evidence as set forth in Claims IV(A) and V and incorporated by reference here. Trial counsel permitted the government witnesses to repeatedly testify to the misleading terms of "worker" and "employee," and to give testimony that was not based on personal knowledge. Having failed to object, defense counsel should have cross-examined witnesses to establish their lack of foundation and then moved to strike that testimony.

As discussed above starting at 56, the Government's principle evidence on the CCE supervision element and other

66

755a

elements was based largely on evidence that was introduced without any apparent basis of personal knowledge by the witness, in violation of Fed.R.Evidence 602.

Trial counsel's response to this inadmissible testimony was wholly inadequate. As a threshold matter, trial counsel objected only a few times to the testimony. Counsel should have taken the initiative and made a wholesale objection to this tactic, in the form of a motion in limine or other method that would draw the Court's attention to the problem in a clear way. Counsel failed to do this, and instead merely objected on a haphazard basis. When counsel did object, the Court's responses were inconsistent. The following is a summary of the few objections that habeas counsel has been able to locate, and the Court's responses:

| Question | Objection | Ruling |
|---|---|---|
| "Do you know . . . whether there was a business relationship of sorts between" Johnson and Tipton? Tr. 1154 | "Objection. If the Court please, that's a conclusion. He can state what he saw them do. It is up to the jury to draw their own inferences." Tr. 1154. | Sustained. |
| "Did you come . . . to understand the business relationship" between Johnson and Tipton? Tr. 1158. | "Objection. If the Court please, one objection to the business relationship has already been sustained. He can testify to what he saw." Tr. 1159. | "I'm going to sustain the objection. Just ask him what went on, if he knows, between them." Tr. 1159 |

67

| | | |
|---|---|---|
| "Do you know what went on between" the defendants? Tr. 1159. | "Your honor, objection. He can ask what he observed." Tr. 1159. | "'What went on is fine. He can answer the question." Tr. 1159. |
| "Were any of the other people that you have identified as your knowing sold cocaine with 'Whitey,' 'C.O.,' thought of as a partner? Tr. 1172. | "Objection. Thought of? That is conclusory." Tr. 1172. | "Sustained." |
| "Do you know if [Johnson] was considered to be working for [Tipton]. . . based on your knowledge and involvement?" Tr. 1565. | "Objection. How would he know that?" Tr. 1565. | "I'll sustain the objection." Tr. 1565. |
| Q: "What do you know about 'J.R.'s' involvement with those people." A: "To me he seemed a partner." Tr. 1888 | "Objection. 'Seemed?' There is a problem." Tr. 1888. | "That's his wording." Tr. 1888. |
| "Do you know, based upon your observation, the relationship between [the defendants] in the distribution of cocaine?" Tr. 2107. | "Objection. Calls for a conclusion. He can say what he saw." Tr. 2107. | "Sustained." Tr. 2107. |

68

| | | |
|---|---|---|
| "As to Keith Ross, Curt Thorne, 'Moussey' and Jerry Gaiters, do you know what relationship they had, based upon your own knowledge and observation, with [defendants]." Tr. 2107. | "Same objection. He can say what he saw." Tr. 2107. | "Sustained." Tr. 2107. |
| "As to Jerry Gaiters, in his relationship with [Tipton], do you know what that relationship was?" Tr. 2108. | "Objection. Same objection. He can say what he saw." Tr. 2108. | "Overruled." Tr. 2108 |
| "Based upon your involvement, do you know what the relationship was between [defendants] in the sale of cocaine?" Tr. 2546. | "She can properly testify to what she saw and heard." Tr. 2546-7. | "Overruled." Tr. 2547. |
| Q: "Do you know what happened to Mousey Armstrong"? Tr. 2555. A: "[Johnson and another person] killed her." Tr. 2555 | "I object, unless she is testifying from her personal knowledge." Tr. 2555. | "Overruled." Tr. 2555. (Witness went on to testify that the basis for this testimony was hearsay. Then the objection was sustained, with no cautionary instruction asked for or given. Tr. 2555.) |

69

| | | |
|---|---|---|
| "What did they tell you their relationship was; what did you find out that their relationship with 'J.R.' and 'V' was? .... Based upon those conversations, what did you come to know?" Tr. 2707 | "Objection. The first question was what did he tell them. [The last question is] conclusory." Tr. 2707. | "State what they told." Tr. 2707. |

In the vast majority of the times when Rule 602 was violated, counsel did not object. When counsel did object, as shown above, they did so irregularly. For example, immediately after having their objection sustained as to the relationship between Ross, Thorne, Moussey, and Gaiters, Tr. 2107, counsel did not object when essentially the identical question was asked as to Moussey alone. Tr. 2107.

Trial counsel might have been confused by the Court's inconsistent treatment of the objections. As shown above, on some occasions the Court did require first hand knowledge on the part of the witnesses, but on other occasions the Court did not.

Long after the testimony, trial counsel raised the point in post-trial motions. *See* Tr. 2769, 3035. By then, it was too late to control the evidence heard by the jury. Johnson was prejudiced by counsels' performance as the jury was permitted to consider as "evidence" testimony that was not based on personal knowledge and may have had no basis in fact.

70

759a

c.    Counsel Failed To Demonstrate That The Proof
      <u>Against Johnson Did Not Establish Five Supervisees</u>

Defense counsel, who were also appellate counsel, failed to focus on the supervision element in the Rule 29 motion, post-trial motions, and direct appeal. As counsel failed to marshal the facts and analyze the testimony, as discussed above and incorporated by reference here, counsel never demonstrated that the government had failed to prove that Johnson supervised five people. Counsel were ineffective and Johnson was prejudiced.

d.    Counsel Failed To Object To The Prosecutor's
      <u>Closing Argument On The Supervision Element</u>

As set forth above and incorporated by reference here, the prosecutor made several improper arguments to the jury concerning the supervision element of the CCE statute. Defense counsel made no objection at trial and did not raise the issue on appeal. Counsel were ineffective and Johnson was prejudiced.

e.    Counsel Failed To Request Proper Jury Instructions
      <u>On The Supervision Element Of The CCE Statute</u>

As set forth above and incorporated by reference here, defense counsel failed to object to improper jury instructions on the supervision element and failed to request that proper instructions be given. Counsel failed to pursue this issue on appeal. Counsel were ineffective and Johnson was prejudiced.

71

f.    Trial counsel failed to stop the onslaught of prosecutorial misconduct.

Trial counsel should have taken steps to resist the prosecutorial misconduct relating to the CCE supervision element, discussed above.

g.    Counsel failed to seek relief available under *Barona* and *Jerome*.

As discussed above, under *Barona* and *Jerome* the CCE convictions would have been vacated on direct appeal. Counsel failed to pursue this relief before this Court or on appeal.

h.    Counsel should have pursued each of the CCE supervision issues set forth above.

As demonstrated by this section of the Petition, defense counsel had multiple opportunities to help Johnson avoid a CCE conviction. Counsel failed to do so.

*        *        *

As a result of these errors, viewed individually and collectively, Johnson was convicted as a CCE supervisor under section 848 on the basis of legally insufficient evidence in violation of his Fifth and Sixth Amendment rights to due process and a fair trial. His counsel rendered ineffective assistance at trial and on appeal when defending against the CCE charges, Johnson was prejudiced as there was a reasonable probability of a different result but for counsel's errors, and Johnson's conviction was obtained in violation of his Sixth Amendment rights. The writ must be granted on this basis.

72

III. JOHNSON IS ACTUALLY INNOCENT OF THE CCE CONVICTIONS

For the reasons set forth elsewhere in this Memorandum and incorporated here by reference, Johnson is actually innocent of his convictions under sections 848 and of the death sentences imposed thereon. He did not supervise five individuals within the meaning of the CCE statute. His convictions and sentences violate the Fifth, Sixth and Eighth Amendments and must be vacated.

Concern about the injustice that results from the conviction of an innocent person has long been at the core of our criminal justice system. That concern is reflected, for example, in the "fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free." In re Winship, 397 U.S. 358, 372 (1970) (Harlan, J., concurring); Schlup v. Delo, 513 U.S. 298, 115 S. Ct. 851 (1995).

Johnson sets forth his substantive claim first, that his conviction, sentence, and incarceration are in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution. See Herrera v. Collins, 506 U.S. 390 (1993). For this claim, Johnson must show that his conviction, sentence and incarceration were "constitutionally intolerable" because of evidence of his innocence. See id. at 419 (O'Connor, J., concurring). See also, Schlup, 115 S. Ct. at 861 (discussing the Court's holding in Herrara). Pursuant to this substantive, actual innocence claim, the Court must grant the writ even if the Court finds that the proceedings that resulted in the Petitioner's conviction and

73

762a

incarceration were entirely fair and free of error.  See id. at 419 (O'Connor, J., concurring).

To the extent that the Court finds that this claim or certain aspects of it, including but not limited to the newly discovered evidence (Claim I), should have been, but were not, presented or preserved by trial counsel or appellate counsel, then Johnson did not receive the effective assistance of counsel due him under Strickland v. Washington, 466 U.S. 668 (1984).  In addition to the following claims, this section also incorporates all prior claims that indicate that Johnson was convicted and sentenced although he was actually innocent.

For Johnson's procedural actual innocence claim, his constitutional claims set forth prior to and after this claim are incorporated herein.  In this case, Johnson "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial" creating a gateway through which the court must consider Johnson's constitutional claims state within this petition.  Schlup, 115 S. Ct. at 861 (citing Herrara, 506 U.S. at 404).  Johnson satisfies the standard applicable to procedural actual innocence claim because his was the "extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent."  Schlup, 115 S. Ct. at 864 (quoting Murray v. Carrier, 477 U.S. 478, 477 (1986)).  See also, Smith v. Murray, 477 U.S. 527, 537 (1986)(quoting same).  "Petitioner must show that it is more likely than not

74

that no reasonable juror would have found Petitioner guilty beyond a reasonable doubt." Schlup, 115 S.Ct. at 867.

To the extent that the Court finds that other claims made by Johnson within his petition and this memorandum, including but not limited to his substantive actual innocence claim, or finds that certain aspects of any claim, should have been but were not, presented or preserved by trial counsel or appellate counsel, then Johnson relies on the "actual innocence" gateway to argue the merits of his underlying claims.

## IV.  TRIAL AND APPELLATE COUNSEL PROVIDED INEFFECTIVE ASSISTANCE IN VIOLATION OF THE SIXTH AMENDMENT.

Johnson's court appointed counsel rendered ineffective assistance at both the guilt and sentencing phases of the trial, as well as on appeal, in violation of the Sixth and Eighth Amendments to the United States Constitution. Counsels' performance was deficient, fell outside the range of professional competent assistance, and was unreasonable under the circumstances of the case. Strickland v. Washington, 466 U. S. 668 (1984); Turner v. Williams, 35 F.3d 872 (4th Cir. 1994); Hooper v. Garraghrty, 845 F.2d 471 (4th Cir. 1988), cert. denied, 488 U. S. 833 (1988).

As a result of trial counsel's deficient performance, Johnson was prejudiced for "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the

75

outcome." Strickland v. Washington, 466 U.S. 668, 694 (1984). A trial can be rendered unfair and the result unreliable even where petitioner cannot demonstrate by a preponderance of the evidence that counsel's errors affected the outcome. Id. at 694. Where the defendant challenges a death sentence:

> [P]rejudice is established when "there is a reasonable probability that, absent [counsel's errors, the sentencer -- including an appellate court, to the extent it independently reweighs the evidence -- would have concluded that the balance of aggravating and mitigating factors did not warrant death."

Turner, 35 F.3d at 894.

Johnson easily meets the Strickland standard where the errors included counsels' failure to challenge the government's proof on elements of the CCE charge, failure to investigate the case, failure to object to highly prejudicial misconduct by the government, and failure to present compelling evidence at the sentencing phase. Counsel also waived Johnson's presence during voir dire, a critical phase of this capital trial, failed to conduct essential voir dire, and failed to object to the government's removal of women jurors.

Some errors and omissions standing alone satisfy the Strickland standard. However, the cumulative prejudice from all the errors and omissions of trial counsel created a reasonable probability that the jury would have reached a different result as to guilt and sentence. "[C]ounsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 695-96. Johnson can

76

765a

establish both deficient performance and prejudice.

A.    GUILT PHASE INEFFECTIVENESS

1.    Defense Counsel Failed To Request The
Appointment Of An Investigator Pursuant
To 21 U.S.C. Section 848(q) And Failed To
Conduct An Adequate Factual Investigation.

Defense counsel conducted no independent investigation of the facts or the witnesses in this capital case. Counsel relied exclusively in the government's required Brady and Jencks act disclosures and on "interviews" with government witnesses held in the presence of the prosecutors. In addition, resources were available to assist counsel but counsel never requested them.

Although Johnson was charged in a narcotics conspiracy with activities located in New York City, Trenton, New Jersey, and Richmond, Virginia, defense counsel failed to move for the appointment of an investigator pursuant to 21 U.S.C. section 848(q). That section provided (prior to the 1996 amendments):

> Upon a finding in ex parte proceedings that investigative, expert or other services are reasonably necessary for the representation of the defendant, whether in connection with issues relating to guilt or sentence, the court shall authorize the defendant's attorneys to obtain such services on behalf of the defendant and shall order the payment of fees and expenses therefore, under paragraph 10. Upon a finding that timely procurement of such services could not practicably await prior authorization, the court may authorize the provision of and payment for such services nunc pro tunc.

The right to a fair trial guaranteed by the due process clause of the Fifth Amendment requires that an indigent defendant be provided access to "the basic tools of an adequate defense.' Ake

77

766a

v. Oklahoma, 470 U.S. 68 (1985). Under the Sixth Amendment, a criminal defendant has the right to the assistance of those experts required to prepare and present the defendant's case at every stage of the trial, including sentencing. Ake, supra; Williams v. Martin, 618 F.2d 1021 (4th Cir. 1980). Thus, defense counsel could have requested the appointment of an investigator under section 848. Given the nature of the case, the motion would have been granted.

Even if this case involved only the Richmond area, an investigator would have been essential to Johnson's defense. An investigator is surely required where there are so many witnesses. Private investigators are far better suited than lawyers at locating and interviewing recalcitrant witnesses. Indeed, few lawyers have the time to conduct a real investigation. Moreover, a fact investigation by trial counsel is often pointless, because the lawyer cannot testify at trial as a witness to what a person told him.

A variety of factors made it obvious that Johnson's defense counsel required the services of a trained criminal investigator. Johnson was charged with membership in a narcotics conspiracy headquartered in New York City. As an alleged "partner" in the conspiracy's operation, he was charged with obtaining wholesale quantities of powdered cocaine from suppliers in New York City, transporting it to Richmond, and then converting it into crack cocaine for retail distribution. The government alleged that the conspiracy's activities were conducted in Trenton, New Jersey, for

78

767a

a period of time before moving into Richmond. Given the difficulty of investigating criminal activities in cities such as New York or Trenton when counsel is located in Virginia, an investigator was essential.

Prejudice arising out of counsel's failure to investigate this case is obvious. As a general matter, the failure foreclosed the possibility that Johnson would be able to call any fact witnesses. More specifically, the failure prevented Johnson's trial counsel from learning that an essential part of the Government's case was fabricated. At trial, the government presented testimony about the New York and Trenton operations in which Johnson was allegedly involved. The government's principle witness on the New York and New Jersey activities was Greg Scott. Investigation of Scott in preparation for this petition demonstrates that much of his testimony was false. For example, Scott testified that he saw Johnson obtain drugs from an individual known as "Light." Petitioner's investigation has revealed that John Matthews was known as "Light," and that Matthews knew Greg Scott. Matthews was incarcerated during the time period at issue under the name of Rufus Alvarez. Ex. 2. Hence, Scott never saw Johnson purchase drugs from "Light" as he claimed at trial. Petitioner's investigation has revealed that Matthews and others contradict Scott's testimony and refute allegations of a New York gang centered around 155th and Amsterdam Avenue in New York. Defense counsels' failure to undertake a similar investigation before trial was objectively unreasonable.

79

Johnson was severely prejudiced by this failure. Post-trial investigation has revealed that the testimony concerning the New York events on which the government relied at trial was a tissue of lies. The government's star witness on the New York/New Jersey activities was Greg Scott. Scott identified a number of members of the New York Boyz in New Jersey, several of whom have disclosed that Scott's testimony is false in numerous respects. For example, the government relied on Scott's testimony to show that the New York Boyz met to plan acts of retaliation in furtherance of their drug activities, and that members of the gang were required to participate in such retaliatory acts. However, at least three of the New York Boyz identified by Scott have stated that this was untrue.[13]

Investigation in connection with this petition has also disclosed other false testimony. For example, in critical testimony, Maurice Saunders testified that on two occasions after Christmas of 1990, he went to New York to obtain cocaine from "Light," or John Matthews. Tr. 1330, 2977. However, as noted above, Matthews was incarcerated at the time. Ex. 2.

Even without the interstate element, defense counsel required investigative assistance on the Richmond drug conspiracy charges. The government's pretrial witness list included about 120 names. Many of these individuals were drug buyers or sellers who lived in

---

[13] Notably, . of the four such meetings to which Scott testified, two resulted in *no* retaliation, Tr. 913, 925, and two involved retaliation for purely personal - not drug-related - matters. Tr. 966-68.

80

the Richmond area but had no fixed address.  Some were witnesses held in protective custody and unavailable for direct questioning. Thus, counsel would have to approach their friends or associates for information.  Defense counsel could not possibly locate and interview all relevant witnesses themselves or those associated with them while simultaneously preparing other aspects of Johnson's capital case.  An investigator would have been more efficient and would have had a greater chance of success of obtaining information from those in the drug community.  An investigator would have been available to testify at trial.

Counsel's failure to request this assistance was objectively unreasonable.  Johnson was prejudiced as revealed by the information since uncovered about the prosecution's witnesses.

2.    Defense Counsel Failed To Move For A Change Of Venue Despite Inflammatory Media Coverage About The Charges And The Defendants.

Johnson's case was the first capital trial in the Richmond district court under the drug "kingpin" statute and the first multiple defendant capital trial in the country.  As a result, it attracted extensive news media interest.  Much of the news coverage contained inflammatory and prejudicial information about the case which would have been inadmissible at trial.  The jurors were improperly exposed to this extrinsic information.

The Due Process Clause guarantees each defendant a trial by a fair and impartial jury "free from outside influences." Sheppard v. Maxwell, 384 U.S. 333, 362 (1966).  Due process is violated when pretrial publicity results in either "identifiable prejudice" or

81

"presumed prejudice." Estes v. Texas, 381 U.S. 532, 542-543 (1965); see also Coleman v. Zant, 708 F.2d 541, 544 (11th Cir. 1983). Prejudice is presumed from pretrial publicity when the publicity is sufficiently inflammatory and has saturated the community where the trial was held. Rideau v. Louisiana, 373 U.S. 723, 726-27 (1963); Murphy v. Florida, 421 U.S. at 798-99; Sheppard, 384 U.S. at 352-53; Estes, 381 U.S. at 542-43.

The recent distribution of prejudicial publicity is a critical factor when determining whether such publicity is likely to affect an accused's right to a fair trial. See Irwin v. Dowd, 366 U.S. at 725 (vacating and remanding denial of habeas petition where "a barrage of newspaper headlines, articles, cartoons and pictures was unleashed against [the petitioner] during the six or seven months preceding his trial"); Sheppard, 384 U.S. at 333; Wansley v. Slayton, 487 F.2d 90, 93 (4th Cir. 1973), cert. denied, 416 U.S. 994 (1974).

Under the presumed prejudice test, "where a petitioner adduces evidence of inflammatory, prejudicial pretrial publicity that so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from the community, 'prejudice is presumed and there is no further duty to establish bias." Mayola v. Alabama, 623 F.2d 992, 997 (5th Cir. 1980)(quoting in part from United States v. Capo, 595 F.2d 1086, 1090 (5th Cir. 1979), cert. denied, 444 U.S. 1012 (1980).

Johnson's case received heavy news coverage in the Richmond area and the surrounding counties. Two papers, The Richmond News

82

771a

Leader and The Richmond Times Dispatch ("TD"), announced the indictments with front page coverage. The TD's April 29, 1992, story took up most of the front page with the headline "U.S. to seek death penalty for 3 here." See Ex. 6, pp. 1-3. The story featured photographs of the 7 defendants, a summary of the circumstances surrounding 11 homicides[14], and a city map indicating the site of each homicide. The story included the following remarks from city police:

> The gang, police say, carried out its business with almost unheard of brutality, even for a city where homicides happen on average every third day.
>
> Lt. Oscar T. Clarke of the Richmond Police Bureau said the Newtown gang easily overshadowed the notorious Johnson-Brown gang, which dominated the South Richmond drug trade in the late 1980s.
>
> "This one makes Johnson-Brown look like small potatoes," Clarke said. If police hadn't "nipped it in the bud," the gang easily could have wiped out another 10 people, he said.

U.S. Attorney Richard Cullen stated that if the defendants were convicted, "it's my opinion, without doubt" that they should be executed.

In a companion story run the same day, the police compared the defendants to the Johnson-Brown gang and the infamous Briley brothers [who were both executed by Virginia for capital murder] and stated they were "slicker and more vicious than any group of criminals ever to operate here." Ex. 6, p. 4. The news account

---

[14] The Rozier homicide was not part of the government's proof at trial but was included in all the pretrial news accounts.

83

772a

emphasized the law enforcement view that the defendants were connected to a "Jamaican 'posse' in New York City" whose "game plan" was to takeover the Richmond drug trade. The invasion of the Richmond area by New York drug dealers was an ongoing theme in both the news accounts and in the prosecution's presentation of the case at trial.

Johnson was not arrested upon indictment. A follow-up story in the TD on May 9, 1992, reported that he had been placed on the "most-wanted" list. Ex. 6, p. 5. The story reported that Johnson had eight murder charges and that the "Newtown" gang had been responsible for "about a dozen murders early this year" in Richmond [i.e., more than charged in the indictment]. A May 30, 1992, story concerning the trial date, reported that Johnson, from New York City, "remains a fugitive." Ex. 6, p. 5-A.

On June 4, 1992, the TD's account on the upcoming trial described the defendants as "members of Richmond's ultra-violent 'Newtowne gang.'" Ex. 6, p. 6. The story reported that Johnson was still a fugitive. The news account contained the following remarks concerning the joint trial from the trial judge, the Hon. James Spencer:

> Certain government witnesses "fear for their safety," Spencer said. Many of these witnesses have been relocated for their protection, he added.
>
> "Accordingly, forcing these witnesses to testify at multiple trials could result in substantial additional costs and ultimately in their refusing to cooperate due to the fear for their safety," Spencer said.

84

773a

Thus, prospective jurors learned from remarks of the trial judge that trial witnesses required protection from the defendants and had been relocated for their safety.

A June 13, 1992, news story on the plea agreement of co-defendant, Jerry Gaiters, reported that he pled guilty to three murders and that he would testify against the remaining defendants. The murders were those of Bobby Long, Dorothy Armstrong, and Tony Carter. Gaiters, Tipton and Johnson were all charged with the three murders. Ex. 6, p. 7.

A lengthy profile of the federal prosecutor, Toby Vick, appeared on June 16, 1992. The story highlighted threats on Vick's life while prosecuting defendants in prior Richmond drug cases described as similar to those of the Newtowne case. Ex. 6, pp. 9-11.

Johnson's arrest in New York City on June 23, 1992, was reported the following day in the TD. The story reiterated an account of the charges, including the 11 homicides. Ex. 6, p. 12.

A lengthy editorial on July 5, 1992, in the TD was written by the U.S. Attorney Richard Cullen. Cullen applauded the federal government's prosecution of the defendants under the federal "kingpin" statute and highlighted the advantages of federal prosecution. Ex. 6, pp. 13-15.

On July 10, 1992, the TD reported that the trial had been postponed to January, 1993, due in part to Johnson's continued detention in New York City. Extradition proceedings were under way. Ex. 6, pp. 16-17.

85

Defendant Sterling Hardy entered guilty pleas in the case, and the news account appeared on July 29, 1992. Hardy admitted participation in the shooting of Torrick Brown by driving some of his co-defendants to Brown's house in southside. Hardy would testify against the defendants at the upcoming trial. Ex. 6, pp. 18-19.

The day before jury selection began, the TD ran a front page story in the metro section on the charges and the trial. Ex. 6, pp. 20-21. The story, dated January 10, 1993, recounted details of some of the 11 homicides charged and included pretrial hearing testimony from Det. Woody:

> Woody testified that two of the accused members, Tipton and Johnson decided "they were going to take care of all the weaklings that were close to them because the police were getting close."

The news account stated:

> Security precautions are expected to be elaborate around the courthouse at 10th and Main streets, as well as the courtroom itself. U.S. marshals from other cities will be on hand to bolster the force that usually provides security.

Ex. 6, p. 20.

Widespread, continuous, prejudicial and inflammatory news coverage about Johnson and the Newtowne case was published from the date of indictment up to the time of jury selection. As a result, it was impossible for Johnson to obtain a fair trial in the Richmond area. Prospective jurors were repeatedly exposed to the opinions of the police investigators (who would later be trial

86

witnesses) and the trial prosecutors about the merits of the case and the guilt of the defendants.

Prospective jurors were told by the trial judge himself via the newspaper account that the defendants were a threat to the trial witnesses. As a result, those witnesses had been placed in protective custody.

The atmosphere of violence and fear was enhanced by news stories detailing attempts on the prosecutor's life in very similar drug cases. The perception of danger was then heightened by a news report that federal marshals had been brought in from other cities to tighten the security at the courthouse.

From these facts, prejudice must be presumed. The pretrial publicity was inflammatory and saturated the community where the trial was held. Rideau v. Louisiana, 373 U.S. 723, 726-27 (1963); Murphy v. Florida, 421 U.S. at 798-99; Sheppard, 384 U.S. at 352-53; Estes, 381 U.S. at 542-43. Of the 130 prospective jurors who completed the pretrial jury questionnaire, 43 admitted reading or hearing about the case in the media.[15] Of these, **FIVE** were selected as jurors or alternate jurors. Yet defense counsel failed

---

[15] The jurors by name and number were: F. Allen (3), M. Allen (4), D. Anderson (5), K. Anderson (6), S. Armes (8), E. Attkisson (11), C. Blackwell (21), U. Brooks (33), T. Brown (35) H. Carroll (39), S. Cassady (41), M. Chappelle (44), B. Clemons (47), T. Conner (52), S. Conway (53), D. Currier (57), D. Dabney (58), P. Deane (64), E. Denton (65), E. Dobson (68), P. Douglas (71), S. Dyke (73), C. Edkert (75), L. Estep (78), B. Faircloth (79), L. Farrar (80), P. Fox (85), R. Gainsburg (86), T. Gay (87), S. Gibbs (88), F. Goodman (89), B. Grappone (91), A. Gunton (95), J. Harrison (103), C. Harvey (104), D. Hawke (105), M. Hawkins (106), D. Hayes (107), E. Hill (111), R. Hollingsworth (114), B. Holmes (116), A. Horne (118), C. Houston (119)

87

to move for a change of venue to a location outside the Richmond area. This omission was below the level of performance of a reasonably effective counsel. No strategic reason can support this decision. Only jurors who had not been exposed--repeatedly--to the prejudicial news accounts and who were not associated with the Richmond area could have satisfied the constitutional requirement of an impartial jury. Johnson was clearly prejudiced by counsel's omission.

3.  Defense Counsel Failed to Request <u>Voir Dire</u> Pursuant to <u>Morgan v. Illinois, 504 U.S. 719 (1992)</u>

If ever there was jury with a predisposition to the death penalty, it was Johnson's jury. As discussed below, this jury found 18 mitigating factors. Some of these factors directly contradict a finding that Johnson was so accountable for his conduct that the ultimate penalty is required. Johnson's counsel could have ferreted out those with strong predispositions to impose death by conducting appropriate voir dire.

Defense counsel rendered ineffective assistance by failing to request <u>voir dire</u> on the reverse-<u>Witherspoon</u> question--whether the juror would always impose the death penalty if Johnson was found guilty of the specific charges here. Under the Sixth Amendment, a capital defendant must be given an opportunity to identify a juror who may be biased and to demonstrate through questioning that the juror cannot be impartial. In <u>Witherspoon v. Illinois</u>, 391 U.S. 510, 522 (1968), the Supreme Court ruled that jurors could not be excluded for cause because they expressed general objections,

88

777a

reservations, or even religious scruples against imposition of the death penalty. However, where a juror's views on capital punishment would "prevent or substantially impair the performance of his duties as a juror," he may be excluded for cause. Wainwright v. Witt, 469 U.S. 412, 423 (1985).

In Witt the Supreme Court emphasized that it was the responsibility of the attorney seeking to exclude a juror to "demonstrate, through questioning, that the potential juror lacks impartiality. [Citation omitted.] It is then the trial judge's duty to determine whether the challenge is proper." Id. at 423. Thus, defense counsel in a capital case has an obligation and a duty to make a thorough inquiry into a juror's views and beliefs in order to uncover bias and partiality.

After Witt, the Supreme Court held that the state may challenge for cause those jurors whose opposition to the death penalty would compromise their impartiality. The court recognized that such jurors must be discovered through voir dire:

> [T]he State may challenge for cause prospective jurors whose opposition to the death penalty is so strong that it would prevent them from impartially determining a capital defendant's guilt or innocence. Ipso facto, the State must be given the opportunity to identify such prospective jurors by questioning them at voir dire about their views on the death penalty.

Lockhard v. McCree, 476 U.S. 162, 170 n.7 (1986).

Building on Lockhard in Morgan v. Illinois, 504 U.S. 719 (1992), the Supreme Court concluded that the trial court had improperly restricted the defendant's voir dire and reversed the death sentence. As in Johnson's trial, the trial judge had

89

778a

conducted the questioning and posed general questions concerning fairness, impartiality, and an ability to "follow the law." In response to the prosecutor's request, the trial court asked whether any juror would in all cases refuse to impose the death penalty, whether any juror had moral or religious principles so strong that he could not impose the death penalty regardless of the facts, and whether any juror would automatically vote against the death penalty regardless of the facts. Each juror was asked if he could be fair and impartial.

However, the court refused to ask the specific question requested by petitioner: "If you found [the defendant] guilty, would you automatically vote to impose the death penalty no matter what the facts are?" The Supreme Court reversed the death sentence stating that a juror may well believe that he can be impartial and follow the law, yet at the same time believe that death must be imposed upon conviction in the case at trial. A capital defendant must have an opportunity to probe for a juror's inconsistent beliefs. Id. at 735-36 and n. 9. The Court explained:

> Surely if . . . the judge, who imposes sentence should the defendant waive his right to jury sentencing under the statute . . . was to announce that, to him or her, mitigating evidence is beside the point and that he or she intends to impose the death penalty without regard to the nature or extent of mitigating evidence if the defendant is found guilty of a capital offense, that judge is refusing in advance to follow the statutory direction to consider that evidence and should disqualify himself or herself. Any juror to whom mitigating factors are likewise irrelevant should be disqualified for cause, for that juror has formed an opinion concerning the merits of the case without

90

779a

> basis in the evidence developed at trial.
> Accordingly, the defendant in this case was
> entitled to have the inquiry made that he
> proposed to the trial judge.

Id. at 738-39.

Johnson's defense counsel never requested, and the trial judge

never asked, the specific reverse-Witherspoon question required in

Johnson's case:

> If you found Johnson guilty of the intentional,
> premeditated murder of seven individuals in the course of
> an ongoing drug enterprise, would you automatically vote
> to impose the death penalty no matter what the facts are?

The right to this question depends on defense counsel's request.

Morgan at 879.  And the court must permit the question if defense

counsel asks for it.  Defense counsel never did.

The voir dire conducted by the trial court did not include the

reverse- Witherspoon question.  The court asked only the following

general questions:

> -- Do you have any strong feelings in favor of the
>    death penalty?
>
> -- Do you have any strong feelings against the death
>    penalty?
>
> -- Do you feel that you can be fair at this first stage
>    [guilt phase] of the proceedings that I talked
>    about.  Can you be fair to both sides at the first
>    stage of this trial?

JA. 1172 (emphasis added).

Where a juror indicated support for the death penalty, the court

posed follow-up questions.  For example:

> -- Understanding that you are in favor of the death
>    penalty, are your feelings such that you would
>    always vote to impose the death penalty against
>    anyone convicted of a capital offense?

91

780a

This general question was not the equivalent of the reverse-Witherspoon question as the Fourth Circuit properly recognized in deciding a related issue on direct appeal. Tipton, 90 F.3d 861 at 879 ("An inquiry which more explicitly embodies the 'reverse-Witherspoon' question might give greater assurance--might in some cases be more prudent--but that is not the question for us."(emphasis added)). Defense counsel and the court had to determine that the juror would not always vote for death in a case with facts like Johnson's. The harm to Johnson from counsel's omission was clearly demonstrated by the jury verdict at the sentencing phase. The jurors collectively found eighteen mitigating factors yet sentenced Johnson to death for each of the seven murders. Analysis of the jury's sentencing verdicts as to all three defendants demonstrates that the jury employed a "triggerman" rule[16] and gave no effect to any mitigating evidence presented by any defendant.

As to Johnson, the jury found the following statutory aggravating factors: Johnson had intentionally killed seven people, after substantial planning and premeditation, and created a grave risk of death to others in addition to the victims. The jury found the following nonstatutory aggravating factors: Johnson had committed multiple murders, had a substantial criminal history, had seriously wounded two individuals in the course of the CCE murders, and was a knowing and willing member of the conspiracy

---

[16] Several states limit eligibility for the death penalty to the individual who actually commits the murder, i.e., the triggerman rule.

92

whose goals included the murder of individuals other than those charged against Johnson.   JA 425-435.

The jurors collectively found a total of eighteen mitigating factors.   Ex. 1.   The jurors found the following statutory mitigating factors:

> -- Johnson was youthful (9 jurors);
>
> -- Johnson did not have a significant prior criminal record (9 jurors);
>
> -- Another defendant or defendants, equally culpable in the crimes will not be punished by death (12 jurors);
>
> -- The victims consented to the criminal conduct that resulted in their deaths (12 jurors).

The jurors found the following nonstatutory mitigating factors:

> -- Johnson was subjected to emotional and physical abuse, abandonment and neglect as a child, and was deprived of the parental guidance and protection that he needed (12 jurors);
>
> -- Johnson suffers from neurological impairments which were identified and which were not adequately treated or addressed when he was a child or adolescent (12 jurors);
>
> -- Johnson suffers from brain dysfunction which has gravely impaired his ability to function in the absence of strong support or guidance (8 jurors);
>
> -- Johnson was introduced to addictive drugs and alcohol while still a child (12 jurors);
>
> -- Johnson has responded well to structured environments, and would likely make a reasonable adaptation to prison if he were sentenced to life imprisonment (7 jurors);
>
> -- Johnson's full scale I.Q. is 77 (8 jurors);
>
> -- Johnson grew up in an impoverished and violent environment, and was exposed to extreme violence as a child and throughout his life (12 jurors);

93

-- Johnson suffers from a neurological impairment (brain damage) that impairs his ability to exercise good judgment, to control his behavior and to understand and foresee the consequences of his actions (2 jurors);

-- Johnson was brought up in an extremely unstable, abusive and neglectful family (12 jurors);

-- Johnson's severe learning disability affected his intelligence, his speech, and his ability to read, write and learn. Those limitations impaired his ability to exercise good judgment and to control his behavior (5 jurors);

-- Johnson had no parental involvement or support from or by his father (12 jurors);

-- Johnson, if not sentenced to death, will be sentenced to life in prison without any possibility of parole (12 jurors);

-- The defendant's eagerness to be accepted by others; he was easily manipulated (11 jurors);

-- That the defendant's severe learning disability based on neurological impairment (brain damage) could impair his ability to exercise good judgment (12 jurors).

Given the jury's findings that substantial mitigating factors had been proven and the jury's imposition of the death sentence on each count despite this overwhelming mitigation evidence, it is highly probable that the reverse-Witherspoon question would have revealed one or more jurors who would automatically impose death given the facts of Johnson's case. As the Supreme Court held in Morgan, the presence of even one such juror requires that the death sentence be vacated.

Defense counsels' failure to ask the reverse-Witherspoon question was compounded by the trial court's refusal to permit voir dire on the jurors' attitudes about potential mitigating factors,

94

783a

such as emotional and physical abuse, limited intelligence, and brain dysfunction. The voir dire conducted and requested by defense counsel was inadequate to reveal juror bias. Johnson was demonstrably prejudiced by counsels' performance. The death sentences must be vacated.

4.    Defense Counsel Failed To Object To The Prosecution's Strikes Against Women Jurors

The government discriminated in its peremptory strikes against women as set forth in Point VI, infra. The government used eight of its ten peremptory strikes to remove women although equal numbers of men and women were in the final panel. This was an open attempt to remove jurors based on the common assumption that women would be less likely to impose a death sentence. Defense counsel raised no objection to this readily apparent violation of the equal protection clause.

Although J.E.B. v. Alabama ex rel. T.B., 114 S. Ct. 1419 (1994), prohibiting the discriminatory use of gender-based peremptory strikes was decided within a year of Johnson's trial, the issue was being raised in the courts prior to Johnson's trial. In fact, Supreme Court review of J.E.B. was granted in May, 1993, before this Court imposed Johnson's sentence. The constitutional principles supporting the decision in J.E.B. are set forth in Batson v. Kentucky, 476 U.S. 79 (1986), decided well below Johnson's trial. In failing to challenge the blatant removal of women jurors by the government and in failing to require the government to state its reasons for each strike, defense counsel rendered ineffective assistance.

95

While counsels' objections at the trial level might have been overruled, counsel would have preserved an important constitutional issue for appellate review.  One function of trial counsel is to preserve legal errors for appellate review.  Accord Claudio v. Scully, 982 F.2d 798, 803-05 (2d Cir. 1992), cert. denied, 113 S. Ct. 2347 (1993)(ineffective assistance on appeal where omitted claim involved right not yet explicitly recognized by state's highest court).  Counsels' failure to make timely objections here deprived Johnson of his right to equal protection as well as his right to challenge the government's actions on appeal.  Counsel's omission was clearly prejudicial.

> 5.    Defense Counsel Failed To Object To Johnson's Absence From Voir Dire And Johnson Lost His Right To Participate In Jury Selection

Based on ignorance of the relevant law, defense counsel failed to object to Johnson's absence from the voir dire proceedings in his capital case and, in fact, invited the error.  As a result, Johnson lost his constitutional right to be present during jury selection at his capital trial.

In the Fourth Circuit, a capital defendant cannot waive his right to be present at his trial.  Near v. Cunningham, 313 F.2d 929, 931 (4th Cir. 1963)(right to presence in capital trial so fundamental it cannot be waived); see also, Diaz v. United States, 223 U.S. 442, 445 (1912)("one who is charged with a capital offense [is] incapable to waiving the right" to presence)(dictum); United States v. Gregorio, 497 F.2d 1253, 1257 n.2 (4th Cir. 1974)(same). On appeal of Johnson's case, the Fourth Circuit acknowledged that

96

785a

Near has never been expressly overruled by the Fourth Circuit or the Supreme Court and reserved decision on the issue. Tipton, 90 F.3d 861, 873 n.3. Reviewing the facts, the Court concluded that no formal waiver by Johnson was reflected by the trial record and that defense counsel had in fact invited the district court to conduct voir dire outside Johnson's presence.[17] Given the importance of the entire jury selection process in a federal capital case where the jury determines both guilt and sentence, defense counsel provided ineffective assistance at this critical stage of the proceedings.

The Court conducted voir dire in two stages. In the first, roughly one-half of the venire was asked a series of questions concerning "generally non-sensitive" sources of possible disqualifying bias such as knowledge of the case, the parties, witness or counsel. Jurors who responded affirmatively to any question were called to the bench individually, where they were questioned by the Court in the presence of counsel. See, e.g., Tr. at 37-41; 90 F.3d at 871. This stage was conducted in open court,

---

[17] The Fourth Circuit found Johnson's exclusion from voir dire to be harmless error. 90 F.3d at 875. It ruled that under United States v. Olano, 507 U.S. 725 (1993), there may be a "category of plain errors as to which prejudice should be presumed," but that this "could only involve absences throughout the entire [voir dire] process," 90 F.3d at 875 n.6, and that Johnson's absence was "of the intermittent sort, not approaching the voir dire that might warrant a presumption of prejudice." 90 F.3d at 875. However, as in Camacho, where the defendant's conviction was reversed because of his exclusion from voir dire, Johnson heard not a single response to the court's questions "to the jurors, and was denied the opportunity to participate meaningfully in peremptory challenges." 955 F.2d at 956. Johnson was absent from all substantive aspects of the voir dire as was the defendant in Camacho. Thus, Johnson was prejudiced.

97

with the defendants at counsel table, but the defendants were not present at the questioning of individual jurors at the bench.

After twelve members of the venire had been questioned in this fashion, counsel for co-defendant Roane stated that a waiver of defendants' right to presence was required. Tr. 53 (JA 885); see Rogers v. United States, 853 F.2d 249 (4th Cir. 1988). After summarily conferring with Johnson, defense counsel stated that their client waived the right of presence. Id.

The second stage of voir dire was conducted over the course of three days in chambers. In that stage, each potential juror was questioned as to his or her feelings toward the death penalty and racial prejudices. See, e.g., Tr. at 175-77. Counsel for the prosecution and defense were present, but the defendants were taken to the courthouse lock-up, where they were unable to hear the jurors' responses or to communicate with their attorneys. Tr. 174-75. Thus, Johnson was entirely precluded from observing potential jurors as they responded to voir dire questioning, or to hear them answer any of the questions posed during voir dire.

"An accused 'has a [constitutional] right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings.'"[18] United States v. Camacho, 955 F.2d at 952-53 (quoting Faretta v. California, 422 U.S. 806, 819 n. 15

---

[18] The right to presence is largely rooted in the Confrontation Clause, Illinois v. Allen, 397 U.S. 337 (1970), but is also "protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him." United States v. Gagnon, 470 U.S. 522, 526 (1985) (per curiam).

98

(1975)). Federal Rule of Criminal Procedure 43(a) confers an even broader right to presence. Camacho, 955 F.2d at 953; United States v. Alessandrello, 637 F.2d 131, 138 (3d Cir. 1980). The impaneling of the jury is a stage of the trial in which the defendant's absence frustrates the fairness of the proceedings, because the defendant is unable to give suggestions to his attorney concerning potential jurors or effectively exercise his peremptory challenges, "a process that is essential to an impartial trial." United States v. Hanno, 21 F.3d 42, 28 (4th Cir. 1994) (*quoting* Camacho, supra, 955 F.2d at 953); see also Camacho, supra, 955 F.2d at 953 ("[a] defendant's absence during the impaneling of the jury certainly frustrates the fairness of the trial"). The Constitution and Rule 43(a) therefore guarantee criminal defendants the right to presence during voir dire. United States v. Tipton, 90 F.3d 861, 872 (4th Cir. 1996); United States v. Ford, 88 F.3d 1350, 1369 (4th Cir. 1996); Camacho, supra, 955 F.2d at 953; United States v. Gordon, 829 F.2d 119, 123-24 (D.C. Cir. 1987); see also Diaz v. United States, 223 U.S. 442, 455 (1912).

The right to presence is particularly critical in a capital case. In fact, a capital defendant cannot waive his right to presence. Near v. Cunningham, 313 F.2d 929, 931 (4th Cir. 1963) (right to presence in capital trial so fundamental it cannot be waived); see also Diaz v. United States, 223 U.S. 442, 455 (1912) ("one who is charged with a capital offense [is] incapable of waiving the right" to presence) (dictum); United States v. Gregorio, 497 F.2d 1253, 1257 n.2 (4th Cir. 1974) (same).

99

"[T]he defendant's presence [at voir dire] is fundamental to the basic legitimacy of the criminal process." United States v. Washington, 705 F.2d 489, 497 (D.C. Cir. 1983). "Convening a criminal tribunal without the presence of the defendant treads precariously close to the concept of trial in absentia, which our system has long disdained." Hanno, supra, 21 F.3d at 47.

The right to be present at voir dire is rooted in the notion that an accused is entitled to meaningful input into the selection of the "jury of his peers" that will judge him. Camacho, supra, 955 F.2d at 953. In Camacho, the Fourth Circuit wrote that:

> It is of the utmost importance that the defendant be present when the jury is being selected. . . . [T]he defendant has unique knowledge which is important at all stages of the trial, including voir dire. At the voir dire he may identify prospective jurors that he knows. He may also have knowledge of facts about himself or the alleged crime which may not have seemed relevant to him in the tranquility of his lawyer's office, but which may become important as the individual prejudices or inclinations of the jurors are revealed. He may also be a member of the community in which he will be tried and might be sensitive to particular local prejudices his lawyer does not know about.

955 F.2d at 956. In addition, jurors may draw a negative inference about a defendant absent from voir dire. Camacho, supra, 955 F.2d at 957; United States v. Alikpo, 944 F.2d 206, 210-11 (5th Cir. 1991). For example, in this case, the jurors may have concluded that the defendants were excluded because they were dangerous or likely to retaliate against jurors.[19]

---

[19] In fact, the government argued at trial that while incarcerated, the defendants ordered that witnesses against them, and detectives investigating the case, be killed. Tr. 3385-86 One juror, who read a newspaper article speculating about such orders, was excused from service when she told the Court that she was too frightened of the defendants to serve. Tr. 2094-05.

100

A defendant's right to a say in the selection of the jury is particularly urgent where the jury will decide whether he lives or dies. Nevertheless, despite the importance of Johnson's presence, and despite the clear law requiring that presence and precluding any waiver of the right, Johnson's counsel failed to object to his exclusion, and even purported to waive that right. This fell outside the range of professionally competent assistance, and there is a reasonable probability that, absent this error, the result of Johnson's trial would have been different.

Johnson did not know, and was never told by his counsel or the trial court, that he had a right to be present during voir dire and that he could not waive attendance at voir dire during a capital trial. He was never asked whether he wished to hear the questioning at the bench during the first stage of voir dire and was told by counsel simply that he was not required at voir dire. Johnson did not know, and was never advised, what would occur during the in-chambers portion of the voir dire and was never asked whether he consented to be excluded from it. Finally, Johnson's counsel never solicited or received his input regarding the exercise of challenges, never advised him of his right to object to a potential juror, and never asked if he was satisfied with the composition of the jury panel. Because Johnson did not know who the jurors were or their backgrounds, he could not assist his attorneys in formulating defense strategy during trial. Had Johnson known of his right to be present, of the role he could play

101

790a

in jury selection, and of his right to object to jurors, he would not have consented to be excluded.

Counsel did not explain to Johnson the implications of the waiver or the fact that counsel might select as jurors individuals whom Johnson might find objectionable. If Johnson had been present, trial counsel would have been forced to explain the reasons for keeping or striking individual jurors. Thus, Johnson's very presence might have prevented the selection of unsuitable jurors. Counsels' retention of three jurors, for example, cannot be justified and is evidence of ineffectiveness.

Bonita Faircloth disclosed that she "believe[d] in" the death penalty." Tr. 541. She stated that her best friend's mother was recently raped and murdered and that the death penalty was not imposed in that case. Tr. 541-42. These statements suggested that Faircloth would have a personal reaction to alleged crimes of violence and would be strongly predisposed towards the death penalty.

A second juror, Jerome Harrison, had a brother who was a patrolman on the Richmond police force. Tr. 635. This created a real risk that Harrison would be exposed to extrinsic information about the case if he had not been already. He was also likely to be sympathetic to law enforcement. This became important during the trial when evidence was presented of planned retaliation against police officers.

A third juror, Frances Hodson, stated that her ex-husband had killed her son and himself. Tr. 666. She became emotional

102


791a

during voir dire, and the prosecutor questioned whether she would be able to sit through the trial. Tr. 667. At one point it appeared that the Court intended to dismiss here. Tr. 667. Like Faircloth, an abnormal personal reaction to crimes of violence should have been foreseen by defense counsel.

Because trial counsel failed to object to the defendants' exclusion from voir dire, the Fourth Circuit on direct appeal reviewed the exclusion for plain error, and held that it could be corrected on appeal only upon a "specific showing" of prejudice by Johnson. 90 F.3d at 871, 874. This, the Fourth Circuit found, required a showing that his presence at voir dire would have resulted in a different outcome, for example, by showing that one of the jurors he would have insisted on striking was "demonstrably biased." Id. at 876. At the same time, the Fourth Circuit acknowledged the practical impossibility of such a showing.[20] Id.

Had Johnson's counsel objected to his exclusion, either (1) Johnson would have been allowed to be present for voir dire, the jurors discussed above would have been excused, and there would be no possibility of prejudice; or (2) the standard of review on appeal would have been de novo, and the impossible "specific showing" of prejudice would not have been required. In

---

[20] The task is made even more difficult by this Court's Rule 83.5, which prohibits a defendant or his counsel from interviewing jurors after the completion of trial. Johnson, along with his co-petitioners, has moved the Court for permission to interview the jurors.

103

those circumstances, the clear error of excluding Johnson from voir dire would have required reversal.

Even if waiver were possible, no valid waiver occurred here as Johnson was never questioned by the Court on the record about his decision to absent himself from critical portions of the trial. See Johnson v. Zerbst, 304 U.S. 458, 464 (1938)(proceeding required to insure "intentional relinquishment or abandonment of a known right"). Defense counsel's purported waiver was invalid and a nullity. Moreover, defense counsels' recommendation that Johnson waive his presence at this critical juncture constitutes ineffective assistance given the critical role jurors' play in a capital trial.

Thus, defense counsel committed serious and prejudicial legal error when he consented to the district court's voir dire of prospective jurors in a capital case without Johnson. His performance fell below that of a reasonably competent attorney.

Johnson was prejudiced by counsel's error as he was deprived of an opportunity to consult with counsel about the prospective jurors as they were questioned, to suggest further inquiry, and to form his own opinions about the prospective jurors based on their demeanor and responses. As a result, Johnson was unable to make knowing and informed decisions during the jury selection process.

Counsels' failure to object to Johnson's absence and to the absence of an on-the-record waiver prejudiced Johnson on appeal as well. Since defense counsel made no objection, the

104

793a

issue was reviewed on appeal under the plain error standard.
Under this more onerous standard, Johnson would have to
demonstrate that the voir dire procedure followed by the trial
court resulted in actual prejudice. Tipton, 90 F.3d at 875. As
the Fourth Circuit observed, that is a stringent standard "near
if not beyond the limits of practical possibility given the
variables in the process and evidentiary restrictions." Id. at
876. As counsel on appeal had argued presumed prejudice and not
actual prejudice, the Court concluded that plain error had not
been demonstrated.

Given the clear legal error presented here, defense
counsel assistance fell below that of a reasonably competent
attorney. Johnson was prejudiced where his ability to
participate in the jury selection process was irreparably
impaired as was his right to review of the issue on appeal.

6. Defense Counsel Failed To Challenge The Government's
Evidence That Johnson Was A Supervisor Of A CCE.

Defense counsel provided ineffective assistance at
trial and on appeal when they failed in multiple respects to
challenge the Government's evidence and argument that Johnson was
a supervisor of five or more individuals as required under the
CCE statute. (As discussed elsewhere, this includes failing to
object or act upon the Government's inclusion of individuals who,
as a matter of law, could not qualify as CCE supervisees; failing
to object to the prosecution's improper and inadmissible
evidence, testimony, and arguments concerning supervision;

105

794a

failing to demonstrate that the Government's appeal arguments were insufficient; failing to introduce evidence tending to show that Johnson was incapable of being a supervisor, or not likely to be a supervisor.) The substantive discussion in Claim II is realleged and incorporated here by reference. As a result, Johnson was prejudiced for there was a reasonable probability of a different result both at the guilt phase and on appeal but for counsels' unreasonable performance.

7. Defense Counsel Failed To Object To Or
   Ask For Proper Jury Instructions
   On The Substantive Counts Charged.

a. Defense Counsel Failed To Request A
   Unanimity Instruction On The CCE Elements

As discussed in Claim II, defense counsel failed to request a unanimity charge, which under the unique circumstances of this case (as in *United States v. Jerome)* was required. Defense counsel failed on appeal to even attempt to explain to the Fourth Circuit why *Jerome* dictates a unanimity instruction and the vacating of a CCE conviction when such an instruction is not given in circumstances like those present here.

b. The Jury Was Not Properly Instructed As To
   The Supervision Element Of The CCE Charges.

Trial counsel failed to request proper instructions on the CCE supervision elements. The argument set forth in Claim II is reasserted and incorporated by reference here. Johnson was

106

prejudiced as there was a reasonable probability of a different result at the guilt phase.

      8.    Defense Counsel Failed To Object To Improper And Highly Prejudicial Conduct And Arguments By The <u>Prosecutors Throughout Johnson's Capital Trial</u>

During the course of Johnson's trial, the prosecutors engaged in a variety of improper and highly prejudicial conduct. The prosecutors misled the jury by vouching, in inflammatory terms, as to their personal belief in Johnson's guilt and the veracity of witnesses. They introduced inadmissible evidence suggesting that Johnson and the other defends had threatened the lives of witnesses. The prosecutors misled the jury into believing it had a duty to convict and to impose death sentences. The prosecutors misled the jury by making misleading and inflammatory arguments, unsupported by the evidence, regarding the conditions Johnson would face if given a life sentence. The prosecutors improperly emphasized that Johnson and the other defendants did not testify. They suggested that a Government witness passed a polygraph test. The prosecutors improperly treated Johnson and the other defendants as a group, rather than as individuals. They improperly argued that sentencing should be based on deterrence. The prosecutors presented testimony lacking proper foundation. They presented improper testimony about the CCE supervision element and the use of key terms. The prosecutors excluded women from the jury. This misconduct is set forth in detail at Claim V, <u>infra</u>, and is incorporated by

107

796a

reference herein.  With few exceptions, defense counsel failed to object to the prosecutors' repeated, improper behavior.  Defense counsel's performance in this regard was well below that of a reasonably competent counsel, and Johnson was prejudiced, for the reasons set forth in Claim V, as there was a reasonable probability of a different result at the guilt and sentence phases.

B.  COUNSEL PROVIDED INEFFECTIVE ASSISTANCE AT THE SENTENCE PHASE

1.  DEFENSE COUNSEL FAILED TO ARGUE THAT JOHNSON'S MENTAL ABILITY WAS NOT ACCURATELY REFLECTED BY HIS I.Q. TEST AND, IN FACT, WAS BELOW 77.

Johnson's scores during his teen years placed him within the mentally retarded range, and he scored only slightly higher in tests prior to his capital trial.  Under federal law, a mentally retarded defendant cannot be executed.  21 U.S.C. sec. 848(l); 18 U.S.C. sec. 3596(c)[Added 9/13/94].  In his opening statement at the sentencing phase, defense counsel harmed Johnson's mitigation case by conceding that Johnson was not mentally retarded.  Counsel stated:

> The law states that mentally retarded persons cannot be executed.  And the reasons that they are excluded is because the law recognizes that mentally retarded persons are not totally and completely blameworthy. They are not fully responsible for their actions.
>
> Now, I'm not intending to suggest at this juncture or any other juncture that Cory Johnson is mentally retarded.

JA. at 4372.

> In this case, Cory Johnson, as I said is not mentally retarded.  But he has substantial mental, intellectual deficits that he has been plagued with his entire life.

108

797a

> His IQ is within two points of being classified by the law [as] mentally retarded, and therefore, legally not executable. . . . He has an IQ of 77.

JA. at 4374.

Contrary to counsel's concessions to the jury, Johnson's intelligence was probably lower than his test scores indicated. Studies demonstrate that IQ determination has significant variables. Defense counsel and his expert could have and should have used widely accepted studies to argue that Johnson in fact had a lower IQ than the pretrial testing revealed. Such evidence and argument would have created a reasonable doubt in the minds of the jurors. This argument would likely have persuaded one or more jurors that a life sentence, not death, was the appropriate punishment where the execution of the mentally retarded is prohibited under federal law. Instead, counsel wrongly conceded a critical fact issue.

The Wechler Adult Intelligence Scale Revised (WAIS-R) is one of the most widely used IQ tests. This was the test given to Johnson. Studies reveal that IQ measurement on this test increases over time. The phenomenon of "IQ inflation" is explained as follows:

> Work by James Flynn (1984, 1988) has indicated that there is a real phenomenon of IQ gains over time. Individuals appear to gain approximately 3-5 IQ points over a 10 year period. Since the WAIS-R was published in 1981 and the data was collected a year prior to the publication, this inflation factor could mean that the average IQ could be as high as 105-107 points rather than the accepted value of 100.

See Ex. 7 at 2.

109

798a

Dr. Dewey Cornell, an expert assigned by the court, administered the WAIS-R to Johnson on October 1992. Johnson's overall IQ score was 77 which placed him in the 6th percentile and in the borderline mentally retarded range. The test Johnson took was published in 1981 and was based on data collected one year before. Thus, the normative data was twelve years old when Johnson took the test in 1992. Johnson's score of 77 was therefore inflated by at least 3-5 points and possibly more. Allowing for the inflation effect, Johnson's score was actually in the 72-74 range or lower, placing him within the recognized range of mental retardation. JA at 4515, 4517 (Dr. Cornell: 70-75 I.Q. can be considered in the range of mental retardation). This adjusted score would be consistent with his prior, lower test results during his teens.

Low intelligence was a mitigating factor found by the jurors. Eight jurors found that Johnson's IQ was 77. JA. 433. This was one of eighteen mitigating factors found by the jurors. Given the wealth of mitigating evidence found by the jurors, defense counsel missed a critical chance to create reasonable doubt in the minds of the jurors concerning Johnson's mental capabilities. If only one juror concluded that Johnson was in fact mentally retarded, then that juror may well have concluded that a sentence of life rather than death was appropriate. Counsel was ineffective for failing to present this evidence. See Emerson v. Gramley, 91 F.3d 898 (7th Cir. 1996)(counsel ineffective for failing to present mitigation evidence, including

110

fact that defendant had diminished IQ); Henricks v. Calderon, 70 F.3d 1032 (9th Cir. 1995), cert. denied, 116 S. Ct. 1335 (1996)(counsel ineffective for failure to adequately prepare and present statutory mitigation evidence even where defense expert was presented); Jones v. Thigpen, 788 F.2d 1101 (5th Cir. 1986), cert. denied, 479 U.S. 1087 (1987)(counsel ineffective during sentencing phase where he failed to present evidence that defendant was mentally retarded).

Johnson was certainly prejudiced given the wealth of mitigation evidence found by the jurors. There was a reasonable probability of a different result at sentencing if the jurors had heard this additional evidence. See Blanco v. Singletary, 943 F.2d 1477, 1505 (11th Cir. 1991)(where some jurors inclined to mercy absent any mitigating evidence and such evidence was available but not presented, there was a reasonable probability of a life sentence); Jackson v. Herring, 42 F.3d 1350 (11th Cir. 1995)(counsel failed to present persuasive mitigation evidence). The writ should be granted on the sentence.

2.    DEFENSE COUNSEL FAILED TO PRESENT EVIDENCE OF
      JOHNSON'S PRISON CONDITIONS IF SENTENCED TO LIFE

The public, and jurors, assume that prison conditions are unduly comfortable for inmates. Effective capital counsel must provide jurors with accurate information. The jurors were presented with two alternative punishments -- death or life without parole. While the jurors clearly understood the first alternative, they received no evidence concerning the second.

111

Defense counsel failed to portray the bleak existence facing Johnson if the jurors sentenced him to life imprisonment. Counsels' omission was particularly harmful in light of the prosecutor's summation at the sentencing phase. Accurate information is essential in any capital case. It was especially so here as the prosecutor argued without any basis in fact:

> Ask yourself, should they be punished beyond incarceration? I'm not telling you incarceration is nice and a lifetime of incarceration is not punishment. But think about each and every day of their existence in jail. They will wake up, bathe, be fed. They will be able to watch TV, read books. They will be able to use the telephone to talk to their loved ones.

JA. 4729 (Tr. 3904). Johnson's counsel objected on the grounds that these facts were not in the record, and the Court sustained the objection. Id. However, the jury was never told about the realities of a life sentence.

Trial counsel should have demonstrated this point in at least two different ways. First, they should have called an inmate who was serving a life sentence in a maximum security prison to testify about the day to day living conditions. See Ex. 8. That inmate could have described the small cell used to house two inmates, and the minimal furnishings. Jurors would have learned that inmates spend much of their time locked in their cell, that "lockdowns" can last for days, that searches (including strip searches) occur at random, and that inmates have no privacy in any aspect of prison life. Ordinary events such as bathing are strictly limited and regulated, and many prisons have no air conditioning. Access to television is restricted. Some

112

reading materials are prohibited.  The jurors would have heard about prison violence, gangs, and the constant threats to personal safety.

Second, counsel should have called a corrections expert, such as a former or current warden or prison administrator.  Ex. 9.  A corrections expert could describe the conditions in a maximum security prison including the limitations on recreation, personal visits, medical care, and personal correspondence.  In some "super" maximum prisons, inmates spend 23 hours a day in their cells and never see the outside.

Testimony on life in a maximum security prison would have refuted the prosecution's argument that Johnson would be facing a relatively easy life if given a life sentence.  The jurors should have heard about the realities of prison life.  Where only one vote could defeat a death sentence, counsels' failure to present testimony about actual prison conditions constituted ineffective assistance of counsel and Johnson was prejudiced.  In any event, after the prosecutor made his improper statements to the jury, trial counsel should have sought leave to introduce evidence that would correct the false impression created by the prosecutor.

Johnson was prejudiced by these omissions as there was a reasonable probability of a different result on sentencing if this testimony had been presented.

113

C.   INEFFECTIVE ASSISTANCE ON APPEAL

Johnson's counsel failed to properly appeal a series of meritorious issues.   As discussed in Claim II above,  Johnson's counsel could easily have demonstrated a series of defects in Johnson's CCE convictions, ranging from the abject failure to prove supervision to the need for vacating the convictions on direct appeal because of the Government's evidence and arguments concerning individuals who, as a matter of law, could not be CCE supervisees.

Defense counsel simply failed to focus on key aspects of the CCE evidence, failed to marshal the facts,  and failed to analyze the testimony.   Counsel never demonstrated that the government had failed to prove that Johnson supervised five people, or that the Government had attempted to include persons who, as a matter of law, could not be supervisees.   Instead, counsel merely argued in a general sense, *utterly without regard to specifics*, that the government had demonstrated no more than a buyer-seller relationship.   Had counsel dealt with this issue properly, and presented a detailed analysis of the facts and the law, Johnson's conviction on the CCE counts, and his resulting death sentence, would not have been affirmed.   At minimum, the CCE convictions would have been vacated.   *See United States v. Jerome; United States v. Barona* (discussed in Claim II).

A defendant has a constitutional right to the effective assistance of counsel on his first appeal as to right.   Evitts v. Lucey, 469 U.S. 387 (1985).   To satisfy this right, the appellate

114

attorney must embrace the role of an active advocate in presenting the appellant's claims. Anders v. California, 386 U.S. 738 (1967). Where counsel has failed to raise an arguably meritorious claim on direct appeal in favor of other issues, petitioner must demonstrate that appellate counsel's performance was deficient under the standards set forth in Strickland. See Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir.), cert. denied, 115 S. Ct. 81 (1994), United States v. Cook, 45 F.3d 388, 395 (10th Cir. 1995). A petitioner must demonstrate that his appellate attorney's performance "fell below an objective standard of reasonableness [Strickland at 688] and that, but for counsel's error, there is a "reasonable probability" that the outcome would have been different [Strickland at 694].

There is no dispute that the omission of an obviously winning issue from an appellate brief constitutes ineffective assistance on appeal. See, Banks v. Reynolds, 54 F.3d 1508, 1515 (10th Cir. 1995)(failure to raise Brady claim); United States v. Cook, 45 F.3d 388, 395 (10th Cir. 1995)(failure to raise conflict of interest issue); Mayo v. Henderson, 13 F. 3d 538, 533-34 (2d Cir.)(failure to raise state law violation requiring automatic reversal), cert. denied, 115 S. Ct. 81 (1994); Matire v. Wainwright, 811 F.2d 1430, 1438 (11th Cir. 1987)(failure to raise Fifth Amendment claim while raising "single, weak issue").

However, Johnson is not required to demonstrate that the omitted claim would have resulted in reversal on appeal. He must only demonstrate that a reasonably competent attorney would have

115

804a

presented the claim on appeal.  In <u>Claudio v. Scully</u>, 982 F.2d
798, 803-05 (2d Cir. 1992), <u>cert.</u> <u>denied</u>, 113 S. Ct. 2347 (1993),
the Second Circuit Court of Appeals held that ineffective
assistance had been provided on appeal where the omitted claim
involved a right that had not yet been explicitly recognized by
the state's highest court.  <u>Strickland</u> requires only a
"reasonable probability" of success.  <u>Ibid.</u>  Given the weakness
of the government's evidence of the CCE supervision element,
Johnson has demonstrated a reasonable probability of success if
only appellate counsel had properly briefed and argued the issue.

D.  <u>The Cumulative Effect Of Counsels' Errors</u>
<u>Prejudiced Johnson Under Strickland.</u>

As set forth above, defense counsel made a variety of
individual errors or omissions which, standing alone, satisfy the
<u>Strickland</u> standard, and the writ must be granted for those
reasons.  In addition, there can be no doubt that the cumulative
effect of counsel's errors and omissions satisfies the <u>Strickland</u>
standard.  None of these errors can be attributed to strategic
decisions on the part of counsel.[21]  Viewing counsel's
performance as a whole, "counsel's <u>errors</u> were so serious as to
deprive the defendant of a fair trial."  <u>Strickland v.</u>
<u>Washington</u>, 466 U.S. 668, 687 (1984)(emphasis added).

_____

[21]  <u>See</u> Ex. 10, Declaration of Craig S. Cooley, lead trial and
appellate counsel for Mr. Johnson.

116

Strickland requires that counsel's performance be considered as a whole and that the effect of his deficient performance be considered as a whole in evaluating prejudice. With respect to the performance prong, the Strickland court said, "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687. The use of the plural indicates that while an individual error may sometimes be sufficiently egregious to satisfy the performance prong on its own, it is also appropriate for courts to consider whether counsel's errors collectively caused his performance to fall below the threshold of professional competence. See also id. at 688 ("In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances."); id. at 690 ("A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts of omissions were outside the range of professionally competent assistance.")

With respect to prejudice, the Supreme Court again used the plural: "Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that

117

806a

counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687. In short:

> [A] court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury . . . Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated trivial effect.

Id. at 695-96.

At least eight other circuits have held that courts must look at the cumulative effect of counsel's errors in assessing performance and/or prejudice. See, e.g., Wise v. Smith, 735 F.2d 735, 739 (2d Cir. 1984); McNeil v. Cuyler, 782 F.2d 443, 451 (3d Cir.), cert. denied, 479 U.S. 1010 (1986); Derden v. McNeel, 978 F.2d 1453, 1456-59 (5th Cir. 1992), cert. denied, 113 S. Ct. 2928 (1993); King v. Beto, 429 221, 225 (5th Cir. 1970), cert. denied, 401 U.S. 936 (1971); United States v. Swidan, 888 F.2d 1076, 1080-81 (6th Cir. 1989); Williams v. Washington, 59 F.3d 673, 682 (7th Cir. 1995); Galowski v. Murphy, 891 F.2d 629 (7th Cir. 1989), cert. denied, 495 U.S. 921 (1990); Drake v. Clark, 14 F.3d 351, 356 (7th Cir. 1994); Kellogg v. Scurr, 741 F.2d 1099, 1105 (8th Cir. 1984); Ramseyer v. Wood, 64 F.3d 1432 (9th Cir. 1995); Cooper v. Fitzharris, 586 F.2d 1325, 1333 (9th Cir. 1978); United States v. Hammonds, 425 F.2d 597, 604 (D.C. Cir. 1970).

Moreover, the Fourth Circuit has held, in effect, that the cumulative effect of defense counsel's errors must be considered in determining if counsel was ineffective. In Washington v. Murray, 4 F.3d 1285 (4th Cir. 1993), the court stated "[w]e turn

118

first to the district court's findings on trial counsel's performance, and then will take up the court's holdings as to prejudice and <u>overall ineffectiveness</u>." <u>Id.</u> at 1288 (emphasis added). Recently the Fourth Circuit endorsed the appropriateness of an inquiry into the cumulative effect of counsel's errors in <u>Middleton v. Evatt</u>, 77 F.3d 469, 1996 WL 63038 (4th Cir. 1996)(unpublished). The court recognized the need, especially in light of <u>Kyles v. Whitley</u>, 115 S. Ct. 1555 (1995), to review errors cumulatively when determining whether counsel rendered ineffective assistance. In affirming the district court's denial of habeas relief, the court held, "[O]ur review of the entire record on appeal compels us to conclude that [trial counsel's] alleged errors, whether viewed singularly or cumulatively, did not fall outside the purview of the objective standard of reasonableness." <u>Id.</u> <u>See also</u>, <u>Whitley v. Blair</u>, 802 F.2d 1487, 1493 (4th Cir. 1986); <u>Roach v. Martin</u>, 757 F.2d 1463, 1480 (4th Cir. 1985); <u>Lankford v. Foster</u>, 546 F. Supp. 241, 253 (W.D. Va. 1982)(in assessing whether counsel rendered ineffective assistance, the record as a whole and the cumulative effect of the acts and omissions should be considered), <u>aff'd</u>, 716 F.2d 896 (4th Cir. 1983), <u>cert. denied</u>, 467 U.S. 1214 (1984).

This Court must conclude, after viewing the record as a whole, that counsel's performance was objectively unreasonable, was prejudicial to Johnson as there was a probability of a different result both as to guilt and sentence, and deprived Johnson of his Fifth and Sixth Amendment guarantees to effective

assistance of counsel and a fair trial.  The writ must be granted on this basis.

V.   PROSECUTORIAL MISCONDUCT DEPRIVED JOHNSON OF HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL.

A prosecutor has a special duty to refrain from using improper methods and improper argument at trial to secure a conviction.  Berger v. United States, 295 U.S. 78, 88 (1935); United States v. Hall, 989 F.2d 711, 717-18 (4th Cir. 1993); see also United States v. Carroll, 678 F.2d 1208, 1210 (4th Cir. 1982). As shown in the following sections, the Government prosecutors repeatedly engaged in improper behavior that prejudiced Johnson and resulted in a fundamentally unfair trial and a verdict unsupported by the evidence in violation of his Fifth and Sixth Amendment rights.

Notwithstanding counsel's failure to object to the prosecutor's improper actions, or to request cautionary instructions in response thereto, the trial court erred by allowing the Government to engage in this pattern of improper conduct.  "The Judge . . . is not a passive by-stander in the arena of justice, a spectator at a 'sporting event;' rather he or she has the most pressing affirmative responsibility to see that justice is done in every case." United States v. McCord, 509 F.2d 334 (D.C. Cir. 1974), cert. denied, 95 S. Ct. 1656 (1975). "[T]he function of a federal trial judge is not that of an umpire or a moderator at a town meeting.  He sits to see that justice is done in the cases heard before him; and it is his duty to see

120

that a case on trial is presented in such a way as to be understood by the jury, as well as himself." Simon v. United States, 123 F.2d 80 (4th Cir.), cert. denied, 314 U.S. 694 (1941).

As discussed herein, the prosecutors engaged in a persistent course of misconduct, covering the gamut of improper tactics. These acts, whether considered individually or in the aggregate, tainted the proceedings and denied Johnson his constitutional rights to a fair trial and due process. It is well established that false, misleading, and inflammatory statements by prosecutors are improper, and that the need for reliable sentencing in capital cases requires new sentencing proceedings where such misconduct "created an unacceptable risk that the death penalty may have been meted out arbitrarily or capriciously." *Sawyer v. Smith*, 497 U.S. 231, 235, 110 S.Ct. 2822, 2827 (1990) (internal quotation marks and brackets deleted). In Johnson's case, prosecutorial misconduct created such a risk.

A. The prosecutors misled the jury by vouching, in inflammatory terms, to their personal belief in Johnson's guilt and the veracity of witnesses.

A prosecutor may not vouch for or bolster the testimony of his witnesses. He may not express his personal opinion concerning the testimony and evidence. United States v. Young, 105 S.Ct. 1038 (1985); United States v. Lewis, 10 F.3d 1086 (4th Cir. 1993); United States v. Taylor, 900 F.2d 779 (4th Cir. 1990); Newlon v. Armontrout, 885 F.2d 1328 (8th Cir. 1989). The

121

Government prosecutors violated this fundamental rule repeatedly.

In closing argument on the guilt phase, for example, the prosecutor began by vouching, as a general matter, for his personal belief as to ultimate issues in the case:

> Closing statement is . . . to give us an opportunity to argue to you what *we believe, what inferences we believe* you should draw from the evidence."

Tr. 2956-7 (emphasis added).    He then vouched for the Government's evidence as a whole, telling the jury: "[a]ll the Government wants is to present truthful testimony."    Tr. 3020.

Later, the prosecutor *openly stated his belief that Johnson and the other defendants were murderers* and that the Government's witnesses were innocent:

> [A]gain I remind you, you cannot penetrate a conspiracy without some of the participants in the conspiracy cooperating with you.    Use-immunity agreements had to be given.    *We feel like we gave use-immunity to only those people who were not murderers in this case.*

Tr. 2968 (emphasis added).

The prosecutor went on to tell the jury of his knowledge of what happened in certain murders in the case:

> There is no 848 murder charged here, no murder in furtherance of the Continuing Criminal Enterprise charged here, because *we know* it was a murder over a woman.    *We know* that Robin Cooper was the cause of that murder of Torrick Brown....*[W]e also know* that despite the fact that that murder occurred . . . other members of the conspiracy joined him to help that murder.

Tr. 3004 (emphasis added).

Finally, the prosecutor told the jury, in no uncertain terms, of his belief that Johnson and the other defendants were guilty of murder:

122

811a

> The only thing they haven't done yet is bring Ray Charles
> and his chorus line and say, "You've Got The Wrong One,
> Baby." That's the only thing they haven't done. That's
> not going to happen, because *the government does have the
> right ones*.

Tr. 3173.

Other instances of this are more subtle, but still prejudicial and improper. At various points, the prosecutor argued that Government witnesses should be believed because witnesses have to be truthful to get a 5K motion. *See, e.g,* Tr. 3192. He also told the jury that "We have told these witnesses that if you come in and if you tell us the truth, each and every one of them predicated their testimony upon telling the truth." Tr. 2968. In a particularly subtle tactic, the prosecutor twice asked questions, over objections, trying to establish that a detective had determined the truth of a government witness's testimony. 2442-3. Similarly, the prosecutor had another detective testify that certain charges were dismissed against the Government's key witness Jerry Gaiters because "the evidence showed it was not him." Tr. 2855. Implicitly, in asking these questions and eliciting this testimony, the prosecutor was suggesting to the jury that he believes the witness is knowledgeable and truthful -- and that the Government is the arbiter of whether its witnesses are telling the truth.

Government prosecutors also repeatedly vouched for the facts -- indeed, the prosecutors actually gave unsworn testimony under the guise of making objections. For example, when defense counsel cross-examined a witness about making a deal with the

123

812a

prosecutors, the prosecutor interrupted and testified to the jury: "That's factually incorrect. We could not get one if we wanted to." Tr. 1983. When another defense counsel cross-examined a witness about what the prosecutors offered the witness that day, the prosecutor interrupted and testified for the jury: "Asked and answered. The Witness Protection Program. Asked and answered." Tr. 2054.

The unfairness inherent in prosecutors vouching for their case and witnesses was exacerbated in this case because of the inflammatory language the prosecutors used at various times. For example, during the prosecutor's opening statement at sentencing, he repeatedly called Johnson and the other defendants "mass murderers." Tr. 3330, Tr. 3333. The prosecutor repeated this during closing argument on sentencing. Tr. 3882. Similarly, during the cross-examination of an expert, the Government prosecutor called a defendant a "virtual killing machine." Tr. 3770. These terms were used only to inflame the jury; obviously, under any appropriate definition of the terms, the defendants were not "mass murderers" or "virtual killing machines." Such inflammatory language in itself violated Johnson's right to a fair trial. *Martin v. Parker*, 11 F.3d 613, 615-7 (6th Cir. 1993) (*per curiam*) (due process right to fair trial violated by prosecutor comparing defendant to Hitler in closing argument); *Miller v. Lockhart*, 65 F.3d 676, 682-4 (8th Cir. 1995) (due process right to fair trial violated by prosecutor calling defendant a "mad dog"). The government's

124

argument prejudiced Johnson and violated his due process and fair trial rights.

B.    The prosecutors introduced inadmissible evidence suggesting that Johnson and the other defendants threatened the lives of witnesses.

It is beyond dispute that evidence of the Government's decision to place a witness in the Witness Protection Program, or that the witness or the Government otherwise fears that a defendant will harm a witness, is not admissible.  Such evidence is not relevant under FRE 401.  Even if it were theoretically relevant, it would be excluded under FRE 403, especially in a capital case where such evidence is particularly prejudicial. Such evidence serves only to inflame the jury.  It would not be relevant in any proper manner.

Nevertheless, the Government repeatedly elicited evidence that its witnesses were in danger of physical harm from Johnson and the other defendants.   Many witnesses, for example, testified that they were in the Witness Protection Program. *See, e.g.,* Tr. 1428 (testimony of Johnny Byrd; Tr. 1777 (testimony of Denise Berkley); Tr. 2030 (testimony of Moody); Tr. 2686 (testimony of Valerie Butler).  At least one witness testified directly that he feared that the defendants would kill him. *See, e.g.,* Tr. 1903-7 (testimony of Robert Davis).  On yet another occasion, the Government questioned a witness as follows:

    Q:    Why has the United States Government paid your
          rent? [(Of course, this question should have
          been objected to because it called upon the

125

814a

> witness to testify as to the Government's
> motivations.)]

A:    My well-being and safety.

* * * *

Q:    And how did that come to pass; why is it for
your safety?

A:    Because I'm in so much danger.

Tr. 1650.

There was no legitimate purpose to this type of evidence. It served only to further inflame the jury against Johnson and the other defendants.

C.    The prosecutors misled the jury into believing it had a duty to convict and to impose death sentence.

The prosecutors compounded the problem of their personal vouching by telling the jurors that they had a legal duty to convict and impose a death sentence. For example, during closing statement on the guilt phase, the prosecutor told the jury:

> *You have taken an oath and you can't shirk from that oath.* That oath says you will truly render the facts to a verdict. *When you do that, you have no choice but to find these defendants guilty* of each and every count in that indictment.

Tr. 3021 (emphasis added).

During closing argument at sentencing, the prosecutor told the jury:

> Now it is the time for you to go back and do your *duty.* .
> . . *Your duty,* . . ., given the evidence you have heard,
> *requires no less verdict than death.*
> * * * *
>
> I began this by saying that this is an awesome *duty* that
> you have undertaken, and indeed it is an awesome *duty* that
> you have undertaken. *But the law is clear that in certain*

126

> *cases, the death penalty should be imposed. It is the*
> *will of Congress. It is the law that you must follow.*
>
> \* \* \* \*
>
> Ladies and gentlemen, *it is a strong duty you have. But*
> *it is just that. It is a duty.* This case warrants the
> imposition of the maximum punishment possible, the
> imposition of the death penalty as to each defendant.

Tr. 3881-2, 3905-6 (emphasis added).

Some of these statements -- *e.g.,* that *the law is clear*
*that in certain cases, the death penalty should be imposed* -- are
flat wrong. Neither Congress nor any other legal authority makes
it clear that the death penalty ever "should" be imposed. The
prosecutors plainly followed an improper strategy of trying to
convince the jury that the law *required* a death penalty -- nay,
that the death penalty is *the will of Congress.* It is well
established that arguments such as this "wrapped in the cloak of
state authority have a heightened impact on the jury." *Drake v.*
*Kemp,* 762 F.2d 1449, 1459 (11th Cir. 1985) *(en banc)*, *cert.*
*denied*, 476 U.S. 1020 (1986). Arguments such as these are
improper because they suggest that the law does not countenance
mercy toward the defendant. "To state that mercy towards a
defendant in a capital case contravenes the law . . . strikes at
the core of the jury's role in sentencing." *Id*. at 1460. *See*
*also Potts v. Kemp*, 814 F.2d 1512, 1516 (11th Cir. 1987)
(reinstating in pertinent part, *Potts v. Zant*, 734 F.2d 526, 535-
6 (11th Cir. 1984) (prosecutor violated due process by "plainly
attempting to suggest to the jury that prior decisions of the

127

state supreme court mandated the imposition of the death penalty in this case").

Along that same line, in closing argument the prosecutors made the inflammatory statement that "no longer should the innocent suffer a punishment greater than the person who caused the injury." Tr. 3951. As an argument of personal belief, this was improper. Newlon v. Armontrout, 885 F.2d 1328 (8th Cir. 1989), cert. denied, 497 U.S. 1038 (1990).

D.     The prosecutors misled the jury by making misleading and inflammatory arguments to the jury, unsupported by the evidence, regarding the conditions Johnson would face if given a life sentence.

It is axiomatic that a prosecutor may not argue facts not in evidence. United States v. Samad, 754 F.2d 1091 (4th Cir. 1984). The prosecutor violated this principle in the most inflammatory, prejudicial way possible, regarding the most critical issue in this case: sentencing. He did this by concocting for the jury, during closing argument, an absolute fabrication of what Johnson's life would be like in prison:

> But think about each and every day of their existence in jail. They will wake up, bathe, be fed. They will be able to watch TV, read books. They will be able to use the telephone to talk to their loved ones.

Tr. 3904. Defense counsel objected to this, and the objection was sustained -- *but no cautionary instruction was given to the jury.* The prosecutor's false statement to the jury feeds on every juror's worst assumptions: that if a killer is not executed, he will enjoy a life of relative comfort in prison. At

128

817a

minimum, the prosecutor's statement reinforced this false assumption. More likely, in view of the fact that no cautionary instruction was given, the jury perceived this as a true statement from someone -- a government attorney, after all -- in a position to know.

In a less dramatic way, but nevertheless very prejudicial to Johnson, the prosecutor suggested to Johnson's mitigation witness -- *over a sustained objection* -- that Johnson will face peer pressure toward violence if he spends his life in prison. Tr. 3710. These tactics rendered the sentencing phase fundamentally unfair.

E.      The prosecutors improperly emphasized that Johnson
        and the other defendants did not testify.

The Fifth Amendment "forbids comment by the prosecution on the accused's silence" at trial. *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 1233 (1965) (reversing conviction because prosecutor commented on defendant's silence). The prosecutors flouted this fundamental principle, repeatedly emphasizing to the jury that Johnson and the other defendants had not testified, both during the guilt phase and at sentencing.

For example, during closing argument at sentencing, the prosecutor asked the jury rhetorically: "Have you seen once from the witness stand an iota of remorsefulness from that man?" Tr. 3897. This statement to the jury was very prejudicial because it suggested that, by not testifying, the defendants were not

129

remorseful -- a factor the jury would very likely consider with regard to punishment.

The outrageousness of this statement is apparent from the record.  The Court, upon trial counsel's objection, stated:  "Mr. Vick, don't get stupid in the end of this, please."  Tr. 3897. After hearing the prosecutor's explanation of why he made the statement, the Court said, "Let me make it crystal clear, Mr. Vick, that I do not buy your argument at all.  It was astonishing to me that you would even come close to making this kind of fundamental error."  Tr. 3957.  Even more outrageously, it is apparent that this statement was a deliberate, planned argument by the prosecutor, as opposed to a mere slip of the tongue in the heat of battle.  *See* Tr. 3956-7 (prosecutor prepared with case authority for the Court in support of his improper statement).

The prosecutor also drew the jury's attention to Johnson in particular for not testifying.  Immediately after being instructed by the Court to not "get stupid," Tr. 3897, the next thing out of his mouth to the jury was:

> As to *Cory Johnson, he, too, says* "I've had a bad youth. I've got a learning disability.  I should therefore be excused from blameworthiness for what I have done."

Tr. 3897 (emphasis added).  By sarcastically asserting that Johnson "said" anything, the Government merely emphasized Johnson's failure to testify.  Then, to reinforce the point to the jury after the Court gave the jury a cautionary instruction concerning the defendant's right not to testify, during the closing argument of a non-capital defendant, the prosecutor

130

interrupted to remind the jury:  "*I don't remember Johnson testifying.*"  Tr. 3163 (emphasis added).

Significantly, the prosecutors did more than just emphasize the defendant's failure to testify.  *They converted that failure into substantive concessions as to elements of the CCE offense.*  For example, during closing on the guilt phase, the prosecutor told the jury:

> *[The defendants] have implicitly conceded* that indeed they have sold drugs, that indeed they sold drugs together. Count One in this case *has been implicitly conceded* by defendants.

Tr. 2960 (emphasis added).  He then went on to tell the jury:

> *Each of them has admitted tacitly, if not implicitly,* that they sold drugs.  *Each of them has admitted tacitly, if not implicitly,* that they sold those drugs together in concert one with each other.

Tr. 2960-1.   The only basis for such tacit admissions or implicit concessions was Johnson's silence.

The case law is clear that this prosecutorial misconduct violated Johnson's due process rights.  *See, e.g, Miller v. Lockhart*, 65 F.3d 676, 682-5 (8th Cir. 1995) (prosecutor's closing argument commented on petitioner's decision not to testify, violated due process); *Lesko v. Lehman*, 925 F.2d 1527, 1546-7 (3rd Cir.), *cert. denied*, 112 S.Ct. 273 (1991) (prosecutor's closing argument violated rule of *Griffin v. California*, 380 U.S. 609 (1965), by referring to petitioner's failure to express remorse in penalty phase testimony).

131

F.      Prosecutors suggested that a Government witness
        passed a polygraph test.

Evidence that a witness has taken a polygraph test is inadmissible. *United States v. Brevardi,* 739 F.2d 180, 182 (4th Cir. 1984). Notwithstanding this clear rule, the prosecutor bolstered the credibility of a witness by leading her to testify to the fact that she had taken a polygraph test:

> Q:  As to the murder of Katrina Rozier, did you fully
>     cooperate with the police officials concerning that?
>
> A:  Yes, I did.
>
> Q:  Did everything that was requested of you?
>
> A:  Yes sir.
>
> Q:  Including taking a test, is that correct?

Tr. 2428. There could be no purpose to this question other than to lead the witness to testify to prejudicial, inadmissible evidence -- that she had taken a polygraph examination. Although the Court sustained defense counsel's objection, Tr. 2428, no cautionary instruction was given to the jury, and the jury was left with the definite impression that the witness had taken and passed the test.

G.      The Government prosecutors improperly treated Johnson
        and the other defendants as a group, rather than as
        individuals.

The Government was required to prove the charged offenses against each defendant individually beyond a reasonable doubt. The Government routinely ignored this principle while introducing evidence and when conducting argument. In some instances,

132

defense counsel objected.  In some instances, the Court sustained the objections.  But as a general matter, the Government was permitted to treat the defendants collectively, with the result that differences among defendants were glossed over in a very prejudicial way.

Counsel is without the resources to provide an exhaustive list of the occasions when this happened, but here are some of the more extreme examples:

i)  During closing argument on guilt concerning the CCE elements, the prosecutor failed to address the defendants individually, choosing instead to treat them as a group.  Indeed, the prosecutor ignored governing CCE law (discussed above starting at page 33) and asserted to the jury that "you need not find that each and every one of these people supervised five or more people themselves.  You need find only that as a group, there were five or more people involved."  Tr. 2984.  Also, when overstating the potential supervisees, as discussed above, the prosecutor argued: "[y]ou had the following people, at least, who were working with *them* in the sale or distribution of cocaine." He went on to assert "Well in excess of five people just here in the City of Richmond who *these people* recruited to sell crack cocaine with *them*."  Tr. 2984-5 (emphasis added).

ii)  During opening statement on the sentencing phase, the prosecutor told the jury that "under law of conspiracy they are guilty of each act they did together."  3330-2.  This is misleading and wrong at sentencing.  This is flat wrong and

133

822a

terribly misleading and prejudicial. *See, e.g., Francis v. Franklin*, 471 U.S. 307 (1985) (instruction that a person "is presumed to intend the natural and probable consequences of his acts" unconstitutionally gave defendant burden of proof on element of intent to kill).

iii)  During closing argument, the prosecutor told the jury that "James Roane, Cory Johnson, and Richard Tipton and 'V' Mack get Pam Williams to go buy [handguns]." Tr. 3176. This lumping together of the defendants is demonstrably improper. As discussed at page 59, there is no evidence whatsoever that Johnson was involved in Williams' purchase of guns. Nevertheless, the prosecutor repeated this misstatement of evidence and improper grouping of the defendants: "[T]hey . . . bought firearms with the aid of Pam Williams. Why? So *they* could kill people." Tr. 3324 (emphasis added).

iv)  During closing argument at sentencing, the prosecutor repeatedly lumped the defendants together in a prejudicial manner. His statements include: "*They* deserve the maximum punishment . . . because . . . *they* chose to kill ten people," Tr. 3903; "We have been together in this trial for five weeks, the same length of time within a week that *these three people killed ten*," Tr. 3945; "*They* made seven decisions [(*i.e.,* to kill)] in [Louis Johnson's] life," Tr. 3946;  "*They* knew how to do these crimes," Tr. 3948.

134

823a

As a result of the government's efforts to treat Johnson not as an individual but as part of a group, his fair trial and due process rights were violated.

H.    The Prosecutors Improperly Argued That Sentencing Should Be Based On Deterrence

A death sentence requires individual consideration. The prosecutor violated this principle by improperly appealing to deterrence as a justification for the death penalty. Specifically, he said to the jury: "[t]he death penalty is an appropriate sanction for three reasons. The first reason is that our laws act as a deterrence." Tr. 3902. He also told the jury: "A sentence of life in the penitentiary by you will in essence tell [other drug dealers] that you can sell drugs and kill people and you will get punished no more severely . . . than if you sell drugs only." Tr. 3903.

I.    Misconduct relating to testimony without foundation.

As discussed above, most of the Government's testimony concerning the CCE supervision element was without a foundation of personal knowledge. Significantly, however, the Government's misuse of unsupported testimony was not limited to the supervision element. It extended to all areas of the trial, including areas extremely prejudicial to Johnson.

The use of testimony unsupported by personal knowledge violates FRE 602, which states:

> A witness may not testify to a matter unless evidence is introduced sufficient to support a

135

finding that the witness has personal knowledge of
the matter.

This rule of evidence was repeatedly ignored by the Government,
defense counsel, and the Court while the Government offered
voluminous testimony concerning a variety of issues (including
the roles of various individuals in the alleged CCE) which was
not supported by personal knowledge.

This fundamental problem of testimony without foundation
runs through every aspect of the case. It was constant and
denied Johnson a fair trial. Here are 38 examples, which surely
represent only a partial list of the times it actually occurred:

> 1.    Priscilla Green, one of the Government's
> most sympathetic and essential witness, testified
> that Johnson and "V" killed Mousy Armstrong.
> Defense counsel objected, and the objection was
> overruled. Then, the witness volunteered that the
> basis for her testimony was that someone else
> (Chiles) had told her this information. Then the
> objection was sustained -- but no cautionary
> instruction regarding Green's improper testimony
> was given or asked for. Tr. 2555.

> 2.    Stanley Smithers testified that Gaiters
> "got the cocaine that he was selling" from Tipton.
> Trial counsel objected; the Court overruled the
> objection. The witness went on to testify that
> the reason he knows this is that "I've loaned him
> money to get it." Tr. 2104. No further
> objection was made, but Smithers' testimony
> reveals that he simply had no basis in personal
> knowledge for his testimony.

> 3.    Smithers also testified that Curt Thorne
> was selling cocaine that he obtained from Tipton.
> Tr. 2105-6. Trial counsel did not object; but
> when the Government asked Smithers how he knew
> this, Smithers revealed that it was based on
> hearsay. Then, trial counsel made an objection,
> the objection was sustained, but no cautionary
> instruction to the jury was requested or given.

136

4.    Denise Berkley testified, without any basis of personal knowledge, that Green "was selling" crack for the defendants. Tr. 1690. Later, however, *Green herself denied that she had ever sold cocaine.* Tr. 2546.

Examples 1 through 4 are very important because they demonstrate an essential point: *when there was no apparent personal knowledge supporting Government testimony, a challenge to the basis of the testimony would have revealed that the witness in reality had no personal knowledge.* And this problem occurred constantly during the trial: typically, no objection was stated; usually, when one was stated, the objection was overruled; and when the objections were granted, clarifying instructions to the jury were neither asked for nor given. Other examples include:

5.    Priscilla Green, one of the Government's most sympathetic and essential witnesses, testified, without any basis of personal knowledge, that Johnson "was the head man." Tr. 2552. Given that a supervisory role in the alleged CCE is a critical element of the case, this testimony was some of the most damaging, prejudicial evidence against Johnson.

6.    Ms. Green also testified, without any basis of personal knowledge, that Moody was killed because Johnson and Whitey didn't want Maurice and him to work in that area, Tr. 2553 (no objection by trial counsel). This testimony was extremely damaging to Johnson because it connected Moody's murder to the alleged CCE.

7.    Ms. Green also testified, without any basis of personal knowledge, that Johnson, Tipton, and Roane were "partners." (Here, trial counsel objected to lack of foundation; the Court overruled the objection.) Tr. 2546-7.

8.    Regarding Ms. Green, whose physical injuries were obvious and whose mental faculties and memory were in question, Detective Fleming testified that her memory had improved over time. Tr. 2585 (Trial counsel objected to this testimony, but the Court overruled

137

826a

it.)  Detective Fleming could not possibly know whether her memory was improving unless he tested her memory in an appropriate manner.  All he really could know is his observation:  that her recollections changed with the passage of time.  By giving the testimony he did, he was able to improperly bolster and validate the accuracy of Green's recollection in an improper manner.

9.    Valerie Butler testified, without any basis of personal knowledge,  that Johnson wanted to kill Charles and Hussone because "he had messed up their money."   Tr. 2710 (No objection by trial counsel.) This improper testimony was  particularly damaging to Johnson because it connected the murders to the alleged CCE.

10.    Stanley Smithers testified, without any basis of personal knowledge, that Keith Ross was selling cocaine, and that Ross was getting his cocaine from Johnson.   2105.   (No objection to lack of foundation.)

11.    Smithers testified, without any basis of personal knowledge,  that Mousey Armstrong sold cocaine that she received from Johnson.   2106-7.

12.    Smithers testified, without any basis of personal knowledge, that Gaiters worked for Tipton. (Trial counsel's objection as to lack of foundation was overruled.)  Tr. 2108.

13.    Smithers testified, without any basis of personal knowledge, that Tipton, Roane, and Johnson used to leave, go pick up the drugs, and come back. Tr.  2109.  There is no basis demonstrated for how he could know what the three men did when they were out of his presence.

14.    Denise Berkley testified, without any basis of personal knowledge, that each defendant "supported himself by cocaine."  Tr. 1674.   There is no foundation for personal knowledge of this critical fact.   This was especially prejudicial to Johnson because of the CCE element of substantial income.

15.    Berkley testified, without any basis of personal knowledge, that Papoose sold for "them."  Tr.  1680. Even after Court admonished the Government with "let's get specific," no foundation was given for this testimony.

138

827a

16. Berkley testified, without any basis of personal knowledge, to what defendants would do with cocaine after they came back from New York, and how they allocated it. Tr. 1681-3.

17. Valerie Butler testified, without any basis of personal knowledge, that Tipton had forced "Nita" to have oral sex with him over a drug debt. 2731. This testimony was not only without foundation, but it was also irrelevant and inflammatory.

18. Multiple witnesses testified, without any basis of personal knowledge, that the defendants were "partners." *See, e.g.,* Tr. 1158 (testimony of Charles Towns); Tr. 1888 (testimony of R. Davis) (objection overruled); Tr. 2546 (testimony of Priscilla Green) (objection overruled); Tr. 1172 (testimony of Charles Towns). (Counsel believes that this is an incomplete list of examples.)

19. Detective Woody was allowed to testify that certain charges were dismissed against the Government's key witness Jerry Gaiters because "the evidence showed it was not him." Tr. 2855.

20. Berkeley testified, without any basis of personal knowledge, that Armstrong was a "worker," and that Armstrong was "selling [cocaine] for them." Tr. 1684.

21. Davis testified, without any basis of personal knowledge, that Armstrong "worked for O." Tr. 1883.

22. Gaiters testified, without any basis of personal knowledge, that he thought Armstrong was an "employee" of the defendants. Tr. 2324.

23. Gaiters testified, without any basis of personal knowledge, that he thought Ball was an "employee." Tr. 2324.

24. Sanders testified, without any basis of personal knowledge, Damien "was dealing with" Tipton in the Central Gardens area. Tr. 1317.

25. Sanders testified, without any basis of personal knowledge, that Damien was a "worker." Tr. 1319.

26. Berkley testified, without any basis of personal knowledge, that "the people like me, Moussey, and the rest of them, the workers." Tr. 1684.

139

27.    Butler testified, without any basis of personal knowledge, that Jones "work[ed] for them." Tr. 2708.

28.    Gaiters testified, without any basis of personal knowledge, that Ross "was involved in the sale or distribution of cocaine" and that he got his cocaine from the defendants. Tr. 2317.

29.    Gaiters testified, without any basis of personal knowledge, that he thought Ross was an "employee." Tr. 2324-5.

30.    Davis testified, without any basis of personal knowledge, that Rozier "used to bring people to come and get some rock cocaine. She knew the people who wanted to buy it." Tr. 1892-3.

31.    Green testified, without any basis of personal knowledge, that Talley "used to take them to New York before Linwood did . . [t]o pick up drugs." Tr. 2548.

32.    Towns testified that, without any basis of personal knowledge, Talley "used to take them back and forth to New York . . . to get coke." Tr. 1165.

33.    Sanders testified, without any basis of personal knowledge, that Taylor was "selling drugs for" Tipton. Tr. 1545.

34.    Green testified, without any basis of personal knowledge, that Thorne "wasn't really a partner. He was just selling drugs." Tr. 2547.

35.    Green testified, without any basis of personal knowledge, that "they would tell him a certain time they would need their money, and when he was to come pick up the drugs." Tr. 2548

36.    Townes testified, without any basis of personal knowledge, that Thorne "sold drugs." Tr. 1161.

37.    Berkley testified, without any basis of personal knowledge, that Thorne was "selling" drugs "every day." Tr. 1683, Tr. 1689.

38.    Gaiters testified, without any basis of personal knowledge, that he thought Thorne was an "employee." Tr. 2324-5.

Thus, much of the government's "proof" concerning the charged offenses was not based on any actual knowledge of the witnesses.

140

829a

As a result, Johnson was prejudiced.  The trial was fundamentally unfair.

J.    The prosecutors misled the jury by suggesting that they had not influenced witnesses to use the terms "partner," "worker," and "employee."

During the trial, the prosecutors repeatedly had witnesses establish that the terms "partner," "worker," and "employee" had not been suggested by the prosecutors.  In fact, documents produced by the Government under *Jencks* reveal that in many cases it was the Government, not the witnesses, who first used the terms "partner," "worker," and "employee,"  For example, during grand jury testimony, the Government led Hussone Jones to testify that Johnson and Tipton were, in the prosecutor's words, "partners."  Ex. 11.  Similarly, the Government led Charles Towns to testify that the defendants were, in the prosecutor's words, "partners."  Ex. 12.

K.    The Government Excluded Women From The Jury In Violation Of *J.E.B. v. Alabama, 114 S. Ct. 1419 (1994)*

As discussed in Claim VI, infra, the Government excluded women from the jury in violation of *J.E.B. v. Alabama*, 114 S.Ct. 1419 (1994), and the Equal Protection Clause.

L.    Misconduct relating to the CCE supervision element.

As discussed above in Claim II, supra, the Government prosecutors engaged in repeated misconduct with regard to their presentation of evidence and argument as to the CCE supervision element.

141

\*       \*       \*

In sum, the Government prosecutors engaged in a wide variety of improper and prejudicial behavior throughout the guilt and sentence phases of Johnson's trial. The Government's improper conduct had a substantial and very prejudicial effect on the jury's verdict. Brecht v. Abramson, 509 U.S. 619 (1993). There is a reasonable probability that but for this misconduct, Johnson would not have been convicted of the CCE offenses and would not have been sentenced to death. As a result, Johnson's rights under the Fifth, Sixth and Eighth Amendments were violated.

VI.    THE PROSECUTION IMPROPERLY DISCRIMINATED
       AGAINST WOMEN IN SELECTING THE JURY

The discriminatory use of gender-based peremptory strikes is forbidden. J.E.B. v. Alabama ex rel. T.B., 114 S. Ct. 1419, 1430 (1994).[22] The government's discriminatory use of peremptory challenges against women in this case requires that Johnson's convictions and sentences be set aside.

After voir dire, the jury was selected by a process in which twelve venirepersons were called to the box, after which the government and the defense exercised their peremptory

---

[22] Although J.E.B., involved application of the Fourteenth Amendment, as did Batson v. Kentucky, 476 U.S. 79 (1986), its holding is applicable to this federal prosecution by operation of the Fifth Amendment. E.g., United States v. Lane, 866 F.2d 103, 104 n.1 (4th Cir. 1989). In addition, although J.E.B. was decided after Johnson was convicted and sentenced, the rule applies in this case. Griffith v. Kentucky, 479 U.S. 314, 328 (1987).

142

challenges.  Those venirepersons struck were then replaced with additional venirepersons, after which the parties again exercised peremptory challenges.  This process was repeated until twelve jurors were seated.  See Tr. 749-57.

The government struck eight of twenty women who were ultimately seated in the box, as compared to only two of the twenty-one men seated in the box.  All told, the government used eight of its ten peremptory challenges to strike women.  The government's disproportionate use of peremptory strikes against women raises an inference that the strikes were used for the discriminatory purpose of excluding women from the jury in violation of the Equal Protection Clause.

However, the Fourth Circuit held on appeal that the "bare showing of gender discrimination" Johnson was able to make on appeal was insufficient to allow the Fourth Circuit to consider the issue or to remand the case for consideration of it.  90 F.3d at 881.  To further support his claim, Johnson and his co-petitioners will be filing a motion for discovery predicated, *inter alia*, on their need for information regarding the prosecution's motivations in striking a disproportionate number of women.  Thus, Johnson requires discovery and an evidentiary hearing to prove this claim for relief.

143

VII.   JUROR MISCONDUCT VIOLATED JOHNSON'S RIGHTS TO AN
       IMPARTIAL JURY AND TO DUE PROCESS OF LAW.

Johnson has strong reason to believe the jury in this case was tainted by outside influences.   This case was widely and sensationally publicized, both before and during the trial.   On at least one occasion, this publicity reached the jury.   On January 23, 1993, the Richmond Times-Dispatch published a front-page article suggesting that the defendants - who were then incarcerated - had caused a car carrying Richmond police detectives to be shot at.   Ex. 6, p. 22.   At least two jurors read the article, and one was so frightened by the article that she asked to be, and was, excused.   Tr. 2094-05.   The other indicated that the article would not affect his consideration of the case, and was allowed to remain on the jury.   Tr. 2092-94. The Court, however, did not instruct him not to consider the article in deliberations or to discuss it with other jurors. Later, the Court refused defense counsel's request for additional voir dire when a witness testified in the penalty phase that he overheard Tipton ordering the shooting referred to in the article.   Tr. 3385-86.

Then, on February 9, 1993, as the penalty phase was about to begin, the Richmond *Style Weekly* magazine featured on its cover distorted photographs of Messrs. Tipton, Johnson and Roane. Ex. 13.   Inside was an extended article describing the trial and the underlying facts, and including information not in evidence, such as a detective's statement that:

144

833a

> The 11 [murders] they did in 45 days are the ones we can prove. . . . We know they did others, but we can't prove it.

No statement could have been more prejudicial at this juncture in the trial, but the Court did not even inquire of the jurors whether they had seen the article.

Johnson has been unable to develop this claim fully because the Rules of this Court prohibit him from interviewing the trial jurors. E.D. Va. Rule 83.5. Prior to the filing of this petition, Roane, Tipton and Johnson moved the Court for permission to interview the jurors, to determine whether the jury was in fact tainted by extraneous factors, including but not limited to media coverage of the case. After receiving the government response and before petitioners could file their reply, this Court denied the motion by Order dated June 10, 1998. Petitioners will be filing a motion for reconsidered shortly. It is essential that Johnson be granted an opportunity to discover facts supporting this claim at this time.

## VIII. JOHNSON WAS DENIED HIS STATUTORY AND CONSTITUTIONAL RIGHT TO JUSTICE WITHOUT DISCRIMINATION

The Supreme Court has recognized that systematic discrepancies in the implementation of the death sentence "appear[] to correlate with race," but has held that those discrepancies are "best presented to the legislative bodies." McCleskey v. Kemp, 481 U.S. 279, 312, 319 (1987). In the Continuing Criminal Enterprise statute under which Johnson was convicted and sentenced to death, Congress expressly granted defendants the "right . . . to justice without discrimination."

145

A study required by the statute, 21 U.S.C. § 848(o)(2), unequivocally found "a pattern of evidence indicating racial disparities in the charging, sentencing, and imposition of the death penalty." GAO REPORT TO THE SENATE AND HOUSE COMMITTEES ON THE JUDICIARY, DEATH PENALTY SENTENCING: RESEARCH INDICATES PATTERN OF RACIAL DISPARITIES at 5 (Feb. 1990). Relying on this and other studies showing racial discrimination in the criminal justice system, see J. A. 152 (Attachments), defendants moved to dismiss the § 848(e) counts of the indictment. J. A. 148, 167, 225. However, the district court denied these motions, and the Fourth Circuit affirmed that denial without comment. United States v. Tipton, 90 F.3d 861, 891 n.16 (4th Cir. 1996).

Since Johnson's conviction, and its affirmance on appeal, it has only become clearer that the federal death penalty is infected with racism. According to the Federal Death Penalty Resource Counsel Project, the Attorney General has authorized prosecutors to seek the death penalty in 119 cases since 1988. *More than three-quarters* of these - 94 cases - involved minority defendants. Nine of the twelve individuals to receive federal death sentences since 1994 have been African-American.

The statute and the death penalty have been applied in an arbitrary, disproportionate, and discriminatory manner in violation of the Fifth and Eighth Amendments of the United States Constitution. The death penalty has been imposed disporportionately on individuals like Johnson who are male,

146

835a

African-American, and indigent.  As a result, his death sentence
was unconstitutional.


IX.    THE UNBRIDLED DISCRETION TO FASHION NON-STATUTORY
       AGGRAVATING FACTORS GIVEN TO PROSECUTORS BY
       § 848 IS AN UNCONSTITUTIONAL DELEGATION OF
       LEGISLATIVE AUTHORITY.

When seeking the death penalty under § 848, the Government
must file notice of its intention "setting forth the aggravating
factors enumerated in [the statute] and any other aggravating
factors which the Government will seek to prove as the basis for
the death penalty".  21 U.S.C. § 848(h)(1)(B) (emphasis added).
On direct appeal, counsel challenged § 848(h) as an
unconstitutional delegation of legislative authority to the
executive branch, because it gives individual prosecutors
unbridled discretion to create non-statutory aggravators to be
weighed at sentencing.

The Fourth Circuit's entire analysis of this issue consisted
of the following:

> Assuming, without deciding, that by specifically
> authorizing consideration of non-statutory aggravating
> factors noticed by prosecutors, Congress actually
> delegated a legislative function to the executive
> branch, as opposed to merely recognizing a
> traditionally shared function with that branch.  See
> United States v. Pretlow, 779 F.Supp. 758, 765-
> 67(D)(N)(J) (1991).  Any delegation involved was
> sufficiently circumscribed by "intelligible principles"
> to avoid violating separation of power principles.  See
> Mistretta v. United States, 448 U.S. 361 (1989); accord
> United States v. McCullah, 76 F.3d 1087, 1106-07 (10th
> Cir. 1996).

United States v. Tipton, 90 F.3d 861, 895 (4th Cir. 1996).


147


836a

Appellate counsel briefed this issue without benefit of the United States Supreme Court's decision in <u>Loving v. United States</u>, 116 S.Ct. 1737 (1996). Similarly, the Fourth Circuit failed to consider the impact of the <u>Loving</u> decision on the analysis of this claim, because <u>Loving</u> was decided just weeks before the Court handed down its decision. The analysis of this issue, in light of the <u>Loving</u> decision, reveals that this delegation of authority is unconstitutional, and that Johnson's death sentences must be vacated.

Non-statutory aggravating factors play a specialized role in the jury's decision-making process at the penalty trial. The first decision a jury must make as it progresses toward a death verdict is whether any of the four statutory aggravating factors set forth in § 848(n)(1) are present. These (n)(1) aggravating factors essentially are state-of-mind determinations that require the sentencer to find again that the killing at issue was intentional. If the Government succeeds in establishing an (n)(1) factor, the jury proceeds to its second decision-making point--whether one or more of the specified aggravating factors set forth in § 848(n)(2) through (n)(12) have been established.

If the Government establishes, in sequence, both the existence of an (n)(1) factor and one or more of the (n)(2) through (n)(12) factors, the jury may then make special findings identifying non-statutory aggravating factors.[23] The jury must

---

[23] If the Government fails to establish a factor from either category of statutory aggravating factors, the jury cannot recommend, and the judge cannot impose, a death sentence, and the

148

then weigh the aggravating factors (statutory and non-statutory) against the mitigating factors and determine if the aggravating factors outweigh the mitigating factors.

Article I, § I, of the United States Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States".  Section 848(h)(1)(B) constitutes an unconstitutional delegation of legislative power to the executive branch because it gives prosecutors unbridled discretion to create and rely upon non-statutory aggravators, without setting forth any intelligible principle to guide that discretion.

The Supreme Court has held that Congress may not constitutionally delegate its legislative power to another branch of Government.  In Mistretta v. United States, 488 U.S. 361 (1989), the Court observed that "the non-delegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government".  Id. at 371.  Although Congress may obtain assistance from its coordinate branches through delegations of enforcement and policy-making authority, it also must "'lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform . . .'".  Mistretta, 488 U.S. at 372 (quoting J. W. Hampton, Jr. & Co. v. United States, 276 U.S. 394, 406 (1928)); Panama Refining Co. v. Ryan,

_____

jury need not reach the issue of non-statutory aggravating factors.

149

838a

293 U.S. 388, 432 (1935) (Congress, in order "to prevent its being a pure delegation of legislative power, must enjoin upon [the delegate entity] a certain course of procedure and certain rules of decision in the performance of its function").

The federal courts have split on whether Congress has delegated legislative power by conferring upon prosecutors the limitless discretion to designate any evidence or circumstance as a non-statutory aggravating factor.  For example, in United States v. Pretlow, 779 F.Supp. 758, 767 (D.N.J. 1991), the Court held that § 848(h)(1)(D) does constitute a delegation of legislative authority. Nevertheless, the Court also held that the delegation was proper and not unconstitutional, because the prosecutor's broad discretion to allege non-statutory aggravating factors necessarily is guided and constrained by Supreme Court precedent limiting the scope of aggravating factors and the fact that these alleged circumstances must be relevant.  Id. at 767.

In contrast, the Court in United States v. Pitera, 795 F.Supp. 546 (E.D.N.Y. 1992), aff'd., 986 F.2d 499 (2nd Cir. 1992),  held that § 848(h)(1)(B) did not constitute a delegation of legislative authority to the prosecutor:

> In identifying non-statutory aggravating factors pursuant to § 848 (j), the prosecution plays virtually the same role in a capital sentencing procedure as it does in a non-capital one.  See Fed.R.Crim.P. 32 (a) (prosecution is entitled to be heard at sentence).  It brings relevant facts to the sentencer's attention and urges it to reach a particular result.  In a capital case this advocacy will, in no small part, reflect the prosecution's considered judgment as to why the case was a "proper occasion" for serving a death penalty notice in the first place:  an enforcement, not a legislative decision . . . such advocacy does not,

150

839a

> however, involve the prosecution in the fixing of sentence. That remains exclusively the jury's function. Indeed, the jury remains free to reject imposition of the death penalty, even if fully persuaded about the prosecution's position. The Court thus finds no delegation of legislative authority to the prosecutor in § 848(j).

Id. at 562. (citations omitted). The Pitera Court also held that the prosecutor's discretion under § 848 is not unlimited but rather is constrained by the fact that non-statutory factors must be "more probative than prejudicial to exploration of a defendant's character and the charged crime". Id.

The Pretlow and Pitera decisions were handed down prior to the Supreme Court's decision in Loving v. United States, 116 S.Ct. 1737 (1996). In that case, the Supreme Court addressed the separation of powers argument raised by a death-sentenced Army private, holding that it was not unconstitutional for Congress to delegate to the President its constitutional authority to define aggravating factors that permit imposition of the statutory penalty of death in military capital cases. Although this holding, standing alone, might appear to validate the delegation made by § 848, application of the Loving Court's separation of powers analysis reveals that this delegation of extraordinary power to individual prosecutors is unconstitutional.

Loving was convicted of capital murder under Article 118 of the Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 918(1), (4). In the sentencing phase of the trial, the court-martial found three aggravating factors to exist, from the 11 categories

151

840a

of aggravating factors enumerated in Rule 1004(c) of the Rules for Courts-Martial (RCM).

Loving based his separation of powers argument upon the fact that the President of the United States, and not Congress, had promulgated the aggravating factors set forth in RCM 1004(c). Article 118 of the UCMJ was enacted in 1950, and it describes four types of murder subject to court-martial jurisdiction, two of which are punishable by death:

> Any person subject to this chapter who, without justification or excuse, unlawfully kills a human being, when he--
>
> (1)    has a premeditated design to kill;
> (2)    intends to kill or inflict great bodily harm;
> (3)    is engaged in an act which is inherently dangerous to another and evinces a wanton disregard of human life; or
> (4)    is engaged in the perpetration or attempted perpetration of burglary, sodomy, rape, robbery or aggravated arson;
>
> is guilty of murder and shall suffer such punishment as a court-martial may direct, except that if found guilty under Clause (1) or (4), he shall suffer death or imprisonment for life as a court-martial may direct.

10 U.S.C. § 918.

Prior to Loving, in 1983 the United States Court of Military Appeals confronted a challenge to the constitutionality of the military capital punishment scheme in light of Furman v. Georgia, 408 U.S. 238 (1972), and the Supreme Court's ensuing death penalty jurisprudence. The Court held valid most of the death penalty procedures followed in courts-martial, but it found one fundamental defect: the failure of either the UCMJ or the RCM to require that court-martial members "specifically identify the

152

aggravating factors upon which they have ruled in choosing to impose the death penalty". <u>United States v. Matthews</u>, 16 M.J. 354, 379 (CMA 1983). The Court reversed the death sentence before it, but ruled that either Congress or the President could remedy the defect and that the new procedures could be applied retroactively. 16 M.J. at 380-82.

The President, and not Congress, responded to <u>Matthews</u>, issuing in 1984 an Executive Order promulgating RCM 1004. This Rule, as amended, requires a unanimous finding that the accused was guilty of a capital offense before a death sentence may be imposed. RCM 1004(a)(2). The Rule also requires unanimous findings that at least one aggravating factor exists, and that any extenuating or mitigating circumstances are substantially outweighed by any proven aggravating factors. RCM 1004(b). RCM 1004(c) enumerates 11 categories of aggravating factors. Loving attacked this scheme as unconstitutional, contending that the Eighth Amendment and the doctrine of separation of powers require that Congress, and not the President, make fundamental policy determinations respecting the factors that warrant the death penalty. 116 S.Ct. at 1742.

The Court first rejected Loving's argument that Congress cannot delegate to the President the authority to prescribe aggravating factors in capital murder cases. Loving argued that, even though Congress may delegate certain authority under certain circumstances, the delegation at issue was inconsistent with the Framers' decision to vest in Congress the power "to make Rules

153

842a

for the Government and Regulation of the land and naval forces".
United States Constitution, Article I, § 8, cl. 14. After a
lengthy analysis of the history of this constitutional clause,
the Supreme Court held that, under Clause 14, Congress exercises
a power of precedence over, not exclusion of, Executive
authority. The Supreme Court:

> discern[ed] no reasons why Congress should have less
> capacity to make measured and appropriate delegations
> of this power than of any other . . . . Indeed, it
> would be contrary to precedent and tradition for us to
> impose a special limitation on this particular Article
> I power, for we give Congress the highest deference in
> ordering military affairs . . . . And it would be
> contrary to the respect owed the President as
> Commander-in-Chief to hold that he may not be given
> wide discretion and authority. We decline to import
> into Clause 14 a restrictive non-delegation principle
> that the Framers left out.

116 S.Ct. at 1748. (citations omitted).

Next, the Court rejected Loving's argument that even if
Congress can delegate this authority, it did not do so by
implicit or explicit action. The Court found a proper
delegation of this authority in Articles 18 and 56 of the
UCMJ. Article 56 specifies that "[t]he punishment which a
court-martial may direct for an offense may not exceed such
limits as the President may prescribe for that offense". 10
U.S.C. § 856. Article 18 states that a court-martial "may,
under such limitations as the President may prescribe,
adjudge any punishment not forbidden by [the UCMJ],
including the penalty of death when specifically authorized
by" 10 U.S.C.

154

843a

§ 818.  116 S.Ct. at 1749.  When read together with Articles 18 and 56, the Court also found a delegation of sufficient authority in Article 36 of the UCMJ, which gives the President the power to make procedural rules for courts-martial, applying "the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts . . . .".  Id.; (quoting 10 U.S.C. § 836(a)).

Finally, the Court rejected Loving's argument that, even if these statutory provisions are delegations, they lack an intelligible principle to guide the President's discretion.  In United States v. Curtis, 32 M.J. 252, cert denied, 502 U.S. 952 (1991), the Court of Military Appeals expressed its belief that the President's discretion to define aggravating factors for capital crimes was limited by Article 36's directive that regulations the President prescribes must "apply the principles of law . . . generally recognized in the trial of criminal cases in the United States district courts, but which may not be contrary to or inconsistent with this chapter".  10 U.S.C. § 836(a).  The Supreme Court, however, analyzed this issue differently.

The Court chose to focus not on whether there are any explicit principles given to guide the President, but rather:

> whether any such guidance was needed, given the
> nature of the delegation and the officer who is to
> exercise the delegated authority.  First, the
> delegation is set within boundaries the President

155

844a

may not exceed. Second, the delegation here was to the President in his role as Commander in Chief. Perhaps more explicit guidance as to how to select aggravating factors would be necessary if delegation were made to a newly-created entity without independent authority in the area. Cf. Mistretta, 488 U.S. at 374, 379 (upholding delegation to the United States Sentencing Commission because of detailed congressional directives channeling agency discretion). The President's duties as Commander in Chief, however, require him to take responsibility and continuing action to superintend the military, including the courts-martial. The delegated duty, then, is interlinked with duties already assigned to the President by express terms of the Constitution, and the same limitations on delegations do not apply "where the entity exercising the delegated authority itself possesses independent authority over the subject matter", United States v. Mazurie, 419 U.S. 544, 556-57 ( 1975). . . . [W]e need not decide whether the President would have inherent power as Commander in Chief to prescribe aggravating factors in capital cases. Once delegated that power by Congress, the President, acting in his constitutional office of Commander in Chief, had undoubted competency to prescribe these factors without further guidance. "The military constitutes a specialized community governed by a separate discipline from that of the civilian", Orloff v. Willoughby, 345 U.S. 83, 94 (1953), and the President can be entrusted to determine what limitations and conditions on punishments are best suited to preserve that special discipline.

116 S.Ct. at 1750-51. (emphasis added and citations omitted).

In his concurring opinion, Justice Scalia sought to define further the Court's holding. He noted first that there is no such thing as a "lawful delegation of legislative authority", because legislative power is non-delegable. Id. at 1752. Although Congress may not delegate some of its Article I power to the Executive, it may assign

156

845a

responsibilities to the Executive. Id. at 1753. When the Executive carries out those assigned responsibilities, it serves, not as the "delegate" of Congress, but as an agent of the people. Id.

Justice Scalia concluded by noting that:

[a]t some point the responsibilities assigned can become so extensive and so unconstrained that Congress has, in fact, delegated its legislative powers; but until that point of excess is reached there exists, not a "lawful" delegation, but no delegation at all.

Id. at 1753 (Scalia and O'Connor, J. J., concurring in part and concurring in the judgment).

Section 848 reaches the point of excess, because it gives extensive and unconstrained power to individual Government prosecutors to determine what the law will be in a particular capital case by declaring on an ad hoc basis what factors will increase the likelihood that a capital defendant is sentenced to death.

Article I, § I, of the United States Constitution provides: "All legislative Powers herein granted shall be vested in a Congress of the United States". Legislative functions include defining criminal conduct and setting appropriate punishments for such conduct. The Supreme Court has long recognized that the responsibility for establishing criminal punishment belongs to the legislature. Bell v. United States, 349 U.S. 81, 82 (1954); Ex parte United States, 242 U.S. 27 (1916). More specifically, the Court has held that it is the responsibility of Congress to define

157

846a

federal crimes and their appropriate punishments. <u>Whalen v. United States</u>, 445 U.S. 684, 689 (1980) ("[T]he power to define criminal offenses and to prescribe the punishments to be imposed upon those found guilty of them, resides wholly with the Congress".)

There is, however, no absolute rule against Congress' delegation of authority to define criminal punishments. As is noted in <u>Loving</u>, the Court has upheld delegations allowing the executive or an independent agency to define by regulation what conduct will be criminal, so long as Congress makes the violation of regulations a criminal offense and fixes the punishment, and the regulations "confin[e] themselves within the field covered by the statute". <u>Loving</u>, 116 S.Ct. at 1748 (quoting <u>United States v. Grimaud</u>, 220 U.S. 506 (1911)). The Court also noted that the exercise of a delegated authority to define crimes may be sufficient in certain circumstances to supply the notice to defendants the Constitution requires. Id.

When Congress enacted § 848, however, it did not delegate to the Executive or an independent agency the authority to define by regulation what specific conduct will be criminal. By requiring a jury to weigh the aggravating and mitigating factors in a case before a defendant is death-eligible, but then giving prosecutors unbridled discretion to create on a case-by-case basis non-statutory aggravating factors that will be weighed in this process,

158

Congress improperly delegated to individual Government prosecutors the power to determine who is eligible for the death penalty by defining non-statutory aggravating factors that may be weighed against the mitigating factors. Thus, while a particular defendant's statutory aggravating factors may be outweighed by mitigating factors, the Government could expand the class of death-eligible defendants to include a particular defendant by adding non-statutory factors that tip the balance in favor of the aggravating factors.

Stated another way, in Loving the Court upheld the delegation of authority to define aggravating circumstances for the military death penalty because it was within the scope of authority traditionally given to the President, because the President, as Commander in Chief, is uniquely suited to perform this duty, and because the aggravating circumstances promulgated by him would apply across-the-board to all military capital cases. Section 848, however, constitutes an abdication of Congress' duty to define the crimes that will make a defendant eligible for the death penalty, and not a mere delegation of limited authority to define by regulation what conduct will be criminal. Congress, and not individual prosecutors, has the duty to declare what behavior will make one eligible for the federal death penalty.

159

848a

Even if Congress does have the power to delegate to the President or some other agency of the executive branch, such as the Department of Justice, the authority to determine the aggravating factors for federal capital crimes, the § 848 delegation to individual prosecutors is constitutionally infirm because it fails to place limiting principles or give any guidance concerning the scope of non-statutory aggravating factors. The Loving Court dealt with a delegation of authority to the President, questioning whether, under those unusual circumstances, explicit guidance was needed, and concluding that it was unnecessary. The delegation made in § 848, however, is made to individual prosecutors, and the Loving Court noted that "[p]erhaps more explicit guidance as to how to select aggravating factors would be necessary if delegation were made to a newly created entity without independent authority in the area." 116 S.Ct. at 1750. See, e.g., Mistretta, 488 U.S. at 377 (delegation to United States Sentencing Commission is constitutional where "[t]he statute outlines the policies which prompted establishment of the Commission, explains what the Commission should do and how it should do it, and sets out specific directives to govern particular situations.") (citing U.S. v. Chambless, 680 F.Supp. 793, 796 (E.D.La. 1988)). Certainly, if explicit guidance is needed when delegation is made to an entity to promulgate across-the-board regulations, even more guidance is needed

160

849a

when a delegation is made to a multitude of individuals. Section 848 provides no guidance at all to the individual prosecutors trying capital cases.

In this case, the government gave notice that it would seek to prove at sentencing four non-statutory aggravators, including commission of multiple murders, substantial criminal history, the serious wounding of others in the course of the CCE murders, and the knowing and willful membership in a conspiracy which sought to murder persons not charged at trial. Of these, the jury found all four against Johnson. It was unconstitutional for the Court to permit the jury to consider these non-statutory aggravators, because Congress' delegation of this authority to individual prosecutors is unconstitutional. Consequently, Johnson's death sentences must be vacated.

X.    JOHNSON ADOPTS BY REFERENCE THOSE CLAIMS PRESENTED BY HIS CO-PETITIONERS, TIPTON AND ROANE, TO THE EXTENT THAT THEY ARE APPLICABLE TO HIM.

To the extent applicable to him and not inconsistent with anything herein, Johnson adopts the claims and arguments of his co-petitioners, Roane and Tipton.

161

**WHEREFORE**, for the reasons set forth above Johnson prays that this Court grant the following relief:

a.    Issue a writ of habeas corpus commanding Respondent to bring Johnson before the Court to the end that he may be discharged from his unconstitutional confinement and/or be relieved of his unconstitutional sentence of death;

b.    Conduct a hearing on this Petition and accord Johnson the right to present witnesses, exhibits, and argument of counsel;

c.    Grant Johnson the authority to obtain subpoenas <u>in forma pauperis</u> for witnesses and documents necessary to prove the facts as alleged in this Petition, and to permit any other discovery allowed by law;

d.    Grant Johnson leave to amend this Petition in light of any facts uncovered through further investigation, discovery, or testimony; and

e.    Grant Johnson such other relief to which he may be entitled or which the Court deems just and proper.

                        Respectfully submitted,

                        CORY JOHNSON

June 15, 1998          BY:_____
                        Counsel

Edward E. Scher         Barbara L. Hartung, VSB 38062
VSB 23064               1001 E. Main Street, #504
Thorsen Marchant        Richmond, VA  23219
 & Scher, LLP           (804) 649-1088
316 West Broad Street
Richmond, VA  23220-4219
(804) 644-0711

                        162


                        851a

E X H I B I T   1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION



FEB 16 1993

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

)
UNITED STATES OF AMERICA )
)
v. )    Criminal Case No. 3:92CR68-02
)
CORY JOHNSON )
   a.k.a. "O," a.k.a. "CO" )
)

## SPECIAL FINDINGS

### I.  Statutory Aggravating Factors:

**Category One:**  (21 U.S.C. § 848(n)(1))

WE, THE JURY, FIND as follows:

1A.  That defendant CORY JOHNSON intentionally killed the victim of
the capital crime.

   Proven to the jury's unanimous satisfaction,
      beyond a reasonable doubt:

| | |
|---|---|
| As to Peyton Maurice Johnson ......... | Yes <br> (Yes or No) |
| As to Louis J. Johnson, Jr. .......... | Yes <br> (Yes or No) |
| As to Bobby Long .................... | Yes <br> (Yes or No) |
| As to Anthony Carter ................ | Yes <br> (Yes or No) |
| As to Dorothy Mae Armstrong ......... | Yes <br> (Yes or No) |
| As to Curtis Thorne ................. | Yes <br> (Yes or No) |
| As to Linwood Chiles ................ | Yes <br> (Yes or No) |

853a

425

1B.  That defendant CORY JOHNSON intentionally inflicted serious bodily injury which resulted in the death of the victim of the capital crime.

Proven to the jury's unanimous satisfaction, beyond a reasonable doubt:

As to Peyton Maurice Johnson ......... _Yes_
(Yes or No)

As to Louis J. Johnson, Jr. .......... _Yes_
(Yes or No)

As to Bobby Long ..................... _Yes_
(Yes or No)

As to Anthony Carter ................. _Yes_
(Yes or No)

As to Dorothy Mae Armstrong .......... _Yes_
(Yes or No)

As to Curtis Thorne .................. _Yes_
(Yes or No)

As to Linwood Chiles ................. _Yes_
(Yes or No)

1C.  That defendant CORY JOHNSON intentionally engaged in conduct intending that the victim of the capital crime be killed, or that lethal force be employed against the victim, which resulted in the death of the victim.

Proven to the jury's unanimous satisfaction, beyond a reasonable doubt:

As to Peyton Maurice Johnson ......... _Yes_
(Yes or No)

As to Louis J. Johnson, Jr. .......... _Yes_
(Yes or No)

As to Bobby Long ..................... _Yes_
(Yes or No)

As to Anthony Carter ................. _Yes_
(Yes or No)

As to Dorothy Mae Armstrong .......... _Yes_
(Yes or No)

As to Curtis Thorne .................. _Yes_
(Yes or No)

As to Linwood Chiles ................. _Yes_
(Yes or No)

426                     854a

1D.    That defendant CORY JOHNSON intentionally engaged in conduct which defendant JOHNSON knew would create a grave risk of death to a person, other than one of the participants in the offense, and that such conduct resulted in the death of the victim of the capital crime.

Proven to the jury's unanimous satisfaction,
    beyond a reasonable doubt:

As to Peyton Maurice Johnson ......... ___Yes___
                                        (Yes or No)

As to Louis J. Johnson, Jr. .......... ___Yes___
                                        (Yes or No)

As to Bobby Long ..................... ___Yes___
                                        (Yes or No)

As to Anthony Carter ................. ___Yes___
                                        (Yes or No)

As to Dorothy Mae Armstrong .......... ___Yes___
                                        (Yes or No)

As to Curtis Thorne .................. ___Yes___
                                        (Yes or No)

As to Linwood Chiles ................. ___Yes___
                                        (Yes or No)

Jurors:    At this point, review your findings on the Category One aggravating factors as to each individual victim. Each victim represents a separate capital crime. If, as to any victim, you have **not** found one of the Category One aggravating factors proven to your unanimous satisfaction, beyond a reasonable doubt, you must now complete Section A of the Decision Form for defendant CORY JOHNSON that relates to that victim.

If, as to one or more victims, you **have** found a Category One aggravating factor proven to your unanimous satisfaction, continue to the Category Two factors on the following page.

3

855a

427

**Category Two:**  (21 U.S.C. §§ 848(n)(2)-(12))


WE, THE JURY, find as follows:


2A.  That defendant CORY JOHNSON committed the killing of the victim of the capital crime after substantial planning and premeditation.

Proven to the jury's unanimous satisfaction,
       beyond a reasonable doubt:

As to Peyton Maurice Johnson .........   <u>Yes</u>
                                         (Yes or No)

As to Louis J. Johnson, Jr. ..........   <u>Yes</u>
                                         (Yes or No)

As to Bobby Long ....................   <u>Yes</u>
                                         (Yes or No)

As to Anthony Carter ................   <u>Yes</u>
                                         (Yes or No)

As to Dorothy Mae Armstrong ..........   <u>Yes</u>
                                         (Yes or No)

As to Curtis Thorne .................   <u>Yes</u>
                                         (Yes or No)

As to Linwood Chiles ................   <u>Yes</u>
                                         (Yes or No)


2B.  That, in the commission of the capital crime, defendant CORY JOHNSON knowingly created a grave risk of death to one or more persons in addition to the victim of the capital crime.

Proven to the jury's unanimous satisfaction,
       beyond a reasonable doubt:

As to Curtis Thorne .................   <u>Yes</u>
                                         (Yes or No)

As to Linwood Chiles ................   <u>Yes</u>
                                         (Yes or No)


4

428                          856a

Jurors:     At this point, again review your findings as to each
individual victim.  If, as to any victim, you now have
not found proven, to your unanimous satisfaction, both
one of the Category One factors <u>and</u> one of the Category
Two factors, you must complete Section A of the Decision
Form for defendant CORY JOHNSON that relates to that
victim, if you have not already done so.

If, however, you have found both a Category One factor
and a Category Two factor proven to your unanimous
satisfaction as to one or more victims (i.e., one or more
capital crimes), continue your deliberations with regard
to those particular capital crimes by proceeding to the
section on the next page dealing with nonstatutory
aggravating factors.

5

857a

429

## II.  Nonstatutory Aggravating Factors:

WE, THE JURY, FIND as follows:

1.    That defendant CORY JOHNSON committed multiple murders.

   Proven to the jury's unanimous satisfaction,
         beyond a reasonable doubt:

   _____Yes_____
   (Yes or No)

2.    That defendant CORY JOHNSON has a substantial criminal history.

   Proven to the jury's unanimous satisfaction,
         beyond a reasonable doubt:

   _____Yes_____
   (Yes or No)

3.    That defendant CORY JOHNSON seriously wounded two individuals in the course of committing the CCE murders for which he has been convicted.

   Proven to the jury's unanimous satisfaction,
         beyond a reasonable doubt:

   _____Yes_____
   (Yes or No)

4.    That defendant CORY JOHNSON was knowingly and willfully a member of a conspiracy which had as one of its goals the murder of individuals other than those for which the defendant was charged.

   Proven to the jury's unanimous satisfaction,
         beyond a reasonable doubt:

   _____Yes_____
   (Yes or No)

Jurors:    Regardless of your findings as to these nonstatutory aggravating factors, proceed to the next section concerning mitigating factors.

6

858a

430

### III. Mitigating Factors:

WE, THE JURY, FIND as follows:

Jurors:    Consideration of the following mitigating factors is specifically provided for by statute.

1.    That defendant CORY JOHNSON's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge(s).

Number of jurors who so find,
by a preponderance of the evidence:    ___Ø___
                                          (Number)

2.    That defendant CORY JOHNSON is punishable as a principal (as defined in section 2 of Title 18 of the United States Code) in the offense(s), which was (were) committed by another, but defendant CORY JOHNSON's participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge(s).

Number of jurors who so find,
by a preponderance of the evidence:    ___Ø___
                                          (Number)

3.    That defendant CORY JOHNSON could not reasonably have foreseen that his conduct in the course of the commission of the murder(s) would cause, or would create a grave risk of causing, death to any person.

Number of jurors who so find,
by a preponderance of the evidence:    ___Ø___
                                          (Number)

4.    That defendant CORY JOHNSON was youthful, although not under the age of 18.

Number of jurors who so find,
by a preponderance of the evidence:    ___9___
                                          (Number)

7

431

5.  That defendant CORY JOHNSON did not have a significant prior criminal record.

Number of jurors who so find,
by a preponderance of the evidence:          9
                                        (Number)

6.  That defendant CORY JOHNSON committed the offense(s) under severe mental or emotional disturbance.

Number of jurors who so find,
by a preponderance of the evidence:          Ø
                                        (Number)

7.  That another defendant or defendants, equally culpable in the crime(s), will not be punished by death.

Number of jurors who so find,
by a preponderance of the evidence:          12
                                        (Number)

8.  That the victim(s) consented to the criminal conduct that resulted in his (her) (their) deaths.

Number of jurors who so find,
by a preponderance of the evidence:          12
                                        (Number)

9.  That the following other factors in the defendant's background or character mitigate against imposition of a death sentence:

    Jurors:   The following are nonstatutory mitigating factors.

a)  That defendant CORY JOHNSON was subjected to emotional and physical abuse, abandonment and neglect as a child, and was deprived of the parental guidance and protection that he needed.

Number of jurors who so find,
by a preponderance of the evidence:          12
                                        (Number)

b)  That defendant CORY JOHNSON suffers from neurological impairments which were identified and which were not adequately treated or addressed when he was a child or adolescent.

Number of jurors who so find,
by a preponderance of the evidence:          12
                                        (Number)

8

432

860a

c)  That defendant CORY JOHNSON suffers from brain dysfunction which has gravely impaired his ability to function in the absence of strong support or guidance.

Number of jurors who so find,
by a preponderance of the evidence:     _____8_____
                                          (Number)

d)  That defendant CORY JOHNSON was introduced to addictive drugs and alcohol while still a child.

Number of jurors who so find,
by a preponderance of the evidence:     _____12_____
                                          (Number)

e)  That defendant CORY JOHNSON has responded well to structured environments, and would likely make a reasonable adaptation to prison if he were sentenced to life imprisonment.

Number of jurors who so find,
by a preponderance of the evidence:     _____7_____
                                          (Number)

f)  That defendant CORY JOHNSON's full scale I.Q. is 77.

Number of jurors who so find,
by a preponderance of the evidence:     _____8_____
                                          (Number)

g)  That defendant CORY JOHNSON grew up in an impoverished and violent environment, and was exposed to extreme violence as a child and throughout his life.

Number of jurors who so find,
by a preponderance of the evidence:     _____12_____
                                          (Number)

h)  That defendant CORY JOHNSON suffers from an extremely severe learning disability which impairs his ability to use good judgment to control his behavior, and to understand and foresee the consequences of his actions.

Number of jurors who so find,
by a preponderance of the evidence:     _____0_____
                                          (Number)

9

433

i)   That defendant CORY JOHNSON suffers from a neurological impairment (brain damage) that impairs his ability to exercise good judgment, to control his behavior and to understand and foresee the consequences of his actions.

Number of jurors who so find,
by a preponderance of the evidence:     _____2_____
                                             (Number)

j)   That defendant CORY JOHNSON was brought up in an extremely unstable, abusive and neglectful family.

Number of jurors who so find,
by a preponderance of the evidence:     _____12_____
                                             (Number)

k)   That defendant CORY JOHNSON's severe learning disability affected his intelligence, his speech, and his ability to read, write and learn.  Those limitations impaired his ability to exercise good judgment and to control his behavior.

Number of jurors who so find,
by a preponderance of the evidence:     _____5_____
                                             (Number)

l)   That defendant CORY JOHNSON had no parental involvement or support from or by his father.

Number of jurors who so find,
by a preponderance of the evidence:     _____12_____
                                             (Number)

m)   That defendant CORY JOHNSON, if not sentenced to death, will be sentenced to life in prison without any possibility of parole.

Number of jurors who so find,
by a preponderance of the evidence:     _____12_____
                                             (Number)

Jurors:   If any juror or jurors find(s) that a mitigating factor not listed above has been proven to exist by a preponderance of the evidence, please identify that mitigating factor on the following page, together with the number of jurors who so find.  Remember, however, that you need not be able to articulate a mitigating factor with specificity to consider it in your deliberations.

10

862a

If additional space is needed, use the back of this page.

Factor: ~~XXXX~~ The defendants eagerness
to be accepted by ~~others~~ others ~~XX~~ he was
easily manipulated.
Number of jurors who so find,
by a preponderance of the evidence: _____11_____
(Number)

Factor: That the defendant's severe Learning
Disability, based on neurological impairment (brain damage)
could impair his ability to exercise good judgement
Number of jurors who so find,
by a preponderance of the evidence: _____12_____
(Number)

Factor: _____

_____

Number of jurors who so find,
by a preponderance of the evidence: _____
(Number)

Factor: _____

_____

Number of jurors who so find,
by a preponderance of the evidence: _____
(Number)

Jurors:    You have completed the Special Findings as to defendant
CORY JOHNSON, and must now begin the process of weighing
the aggravating and mitigating factors to determine if
the death penalty is justified as to each capital crime
for which this defendant has been convicted. Remember,
you are now considering only those capital crimes for
which you have not already completed Section A of the
Decision Form. Upon completing your deliberations as to
the remaining capital crimes charged to this defendant,
complete Section B, C or D of the Decision Form for each
crime as appropriate.

11

435

The date and your foreperson's signature should appear below, certifying that these are your Special Findings as to defendant CORY JOHNSON.

_____     ___2/15/93_____
FOREPERSON'S SIGNATURE                   DATE

12

436                                    864a

E X H I B I T   2



# State of New Jersey

## County of Mercer





I, Albert E. Driver, Jr. Clerk of the County of Mercer, and also Clerk of the Mercer County Court—Law Division and also Deputy Clerk of Superior Court—Law Chancery Division in and for said County, the same being courts of record, holden therein, **do hereby Certify** that the foregoing is a true and correct copy of a certain

Judgement in re: State of New Jersey vs. Rufus Alvarez. Indictment

Number 91-05-0540 as the same remains of record and on file in

my said office.

**In Testimony Whereof,** I have hereunto set my hand and affixed my Official Seal at Trenton, this _____13th._____ day of ____July____ A. D. 19_94_



ALBERT E. DRIVER, JR.

Deputy Clerk of Superior Court    CC-2

866a

State of New Jersey

v.

Rufus Alvarez
...........................................................
Defendant (Specify Complete Name)

New Jersey Superior Court
MERCER                County
Law Division – Criminal

☐ Judgment of Conviction
☐ Change of Judgment
☒ Order for Commitment
☐ Indictment/Accusation Dismissed
☐ Judgment of Acquittal

......8/21/68.......................... DATE OF BIRTH
......4537.66B........................ S.B.I.
......12/3/90........................ DATE OF ARREST
......5/1/91.......................... DATE IND / ACC FILED
......5/30/91........................ DATE OF ORIGINAL PLEA
☒ NOT GUILTY  ☐ GUILTY    ORIGINAL PLEA

| ADJUDICATION BY: | DATE |
| --- | --- |
| ☒ GUILTY PLEA | 12/8/93 |
| ☐ JURY TRIAL | |
| ☐ NON-JURY TRIAL | |
| ☐ Dismissed/Acquitted | |

ORIGINAL CHARGES _____

| IND / ACC No. | Count | Description | Degree | Statute |
| --- | --- | --- | --- | --- |

Ind. 91-05-0540  Ct 1 Conspicary 2C:35-10a(1)
90-2430-01 Cts 2&7 Poss of CDS 2C:35-10a(1) Cocaine
Ct 3 Poss of CDS W/I Dist. 2C:35-5a(1)
Ct 4 Poss of CDS W/I Dist. O/O Nr. Sch. Prop. 2C:35-7

**FINAL CHARGES** ___Ct 5 Maint. or Operation A CDS Production Facility 2C:35-4___
Cts 6 & 8 Maint. a Narcotics Nuisance 2C:35-1- 24:21-21(a)(6)

| Count | Description | Degree | Statute |
| --- | --- | --- | --- |

Ct 1 Conspiracy 2C:35-10a(1)
Ct 3 Poss of CDS W/I Dist. 2C:35-5a(1)
Ct 5 Maintaining or Operating a CDS Production Facility 2C:35-4

It is, therefore, on ____1/21/94____    ORDERED and ADJUDGED that the defendant is sentenced as follows:

Court merged Count 1 into count 3 for sentence.

Under Ct 3 -2C:35-5b(1) 1st. Deg. offense - Custody of the Commissioner Department of Corrections for the term of fifteen (15) years.  Minimimum parole five (5) years DEDR $3,000  Lab fee $50.00  VCCB: $30.00  License revoked for 6 mos.

Under Ct 5 - 1st. deg. 2C:35-4  Custody of the Commissioner Department of Corrections for the term of fifteen (15) years.  Minimum parole ineligibility of five (5) years. Sentence is to run concurrent with each other.

DDR $3,000 Lab fee $50.00 VCCB: $30.00  License revoked 6 mos.

Counts 2,4,6,7,8 dismissed.

☒ It is further ORDERED that the sheriff deliver the defendant to the appropriate correctional authority.

12/3/90 to present

☒ Defendant is to receive credit for time spent in custody (R. 3:21-8).

| TOTAL NO DAYS | DATES (From / To) |
| --- | --- |
| | DATES (From / To) |

☐ Defendant is to receive gap time credit for time spent in custody (N.J.S.A. 2C:44-5b(2)].

| TOTAL NO DAYS | DATES (From / To) |
| --- | --- |

Total Custodial Term _15 yrs_    Institution ___867a CCDC___    Total Probation Term _____
Mpe 5 yrs.

State of New Jersey v. _____    S.B.I. # _____    IND / ACC # _____

| | |
|---|---|
| Total FINE  $ _____ | If any of the offenses occurred _on or after_ July 9, 1987, and is for a violation of Chapter 35 or 36 of Title 2C. |
| Total RESTITUTION  $ _____ | 1) A mandatory Drug Enforcement and Demand Reduction (D.E.D.R.) penalty is imposed for _each_ count. (Write in # times for each.) |

1) A mandatory Drug Enforcement and Demand Reduction (D.E.D.R.) penalty is imposed for _each_ count. (Write in # times for each.)

____ 1st Degree @ $3000      ____ 4th Degree @ $750
____ 2nd Degree @ $2000      ____ Disorderly Persons or Petty
____ 3rd Degree @ $1000      ____ Disorderly Persons @ $500
      Total D.E.D.R. Penalty $ ___6,000___

☐ Court further ORDERS that collection of the D.E.D.R. penalty be suspended upon defendant's entry into a residential drug program for the term of the program.

2) A forensic laboratory fee of $50 per offense is ORDERED. _____ Offenses @ $50.
      Total LAB FEE    $ ___100.00___

3) Name of Drugs Involved ~~Cocaine~~ _____

If the offense occurred on or after December 23, 1991, an assessment of $50 is imposed on each count on which the defendant was convicted unless the box below indicates a higher assessment pursuant to N.J.S.A 2C:43-3.1. (Assessment is $30 if offense is on or after January 9, 1986 but before December 23, 1991, unless a higher penalty is noted. Assessment is $25 if offense is before January 9, 1986.)

4) A mandatory driver's license suspension of ___12 mos___ months is ORDERED.

The suspension shall begin today, _____ and end _____.

Driver's License Number _____unk_____

(IF THE COURT IS UNABLE TO COLLECT THE LICENSE, PLEASE ALSO COMPLETE THE FOLLOWING.)

Defendant's Address ___206 Farnsorth Ave. Bordentown NJ 08505___

Eye Color _____ Sex _____ Date of Birth _____

☐ Assessment Imposed on

count(s) _____

Is $ ___30.00___ each.

Total VCCB Assessment $ 60.00

☐ The defendant is the holder of an out-of-state driver's license from the following jurisdiction _____. Driver's license # _____.

☐ Installment payments are due at the rate

of $ _____ per _____.

beginning _____.
          (DATE)

☐ Your non-resident driving privileges are hereby revoked for _____ Months.

If the offense occurred on or after February 1, 1993 and the sentence is to probation or to a State Correctional facility, a transaction fee of up to $1.00 is ordered for each occasion when a payment or installment payment is made. (P.L. 1992, c. 169)

| NAME (Court Clerk or Person who prepares this form) | TELEPHONE NUMBER | NAME (Attorney for Defendant at Sentencing) |
|---|---|---|
| Blanca M. Diaz, Court Clerk | | Lisa Granger, Esq. |

STATEMENT OF REASONS

The defendant, Rufus Alvarez, is sentenced within parameters of plea agreement.

Aggravating Factors:    Defendant's prior conviction for drug activity; need to deter.

Mitigating Factor:    Hardship to defendant's family.

The aggravating factors outweigh the mitigating factors and warrant the imposition of an enhanced term.  He is sentenced under Count 5 - Maintaining or Operating a CDS Production Facility,  first degree,  to a term of 15 years with a 5 year minimum parole ineligibility (discretionary) term.
The sentences are to run concurrently so that the aggregate sentence is to a term of 15 years with 5 years minimum parole ineligibility.

| JUDGE (Name) | JUDGE (Signature) | DATE |
|---|---|---|
| Charles A. Delehey JSC | | 1/21/94 |

E X H I B I T   3

Page 1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA       MAY 0 4 1992

RICHMOND DIVISION

                                                  19 PAGES

UNITED STATES OF AMERICA

V.

RICHARD TIPTON AKA WHITEY

NEWTOWN GANG                           GRAND JURY 92-1


        TESTIMONY OF SWANE HENDERSON BALL

        before a full quorum of the grand jury

        on April 20, 1992, at 4:35 p.m.


        Foreman:   CHRISTOPHER F. SNEAD

        Assistant Foreman:   MARY A. McNULTY


        Assistant U. S. Attorney:

        Toby Vick, AUSA

        Buddy Parcell, Assistant Commonwealth's Attorney

                    City of Richmond


        Reporter:   Barbara D. Watts, RPR


        ACCU-BETA Depositions, Videos & Images, Inc.
                        870a

Page 2

April 20, 1992                    4:35 p.m.

SWANE HENDERSON BALL, called by the government, first being duly sworn, testifies and says, viz:

EXAMINATION BY MR. PARCELL:

Q    Please talk loud.  Your name, please?

A    Swane Henderson Ball.

Q    How old a fellow are you, sir?

A    23.

Q    Where are you presently residing?

A    Where I'm at, Richmond city jail.

Q    Why?

A    A violation.

Q    Probation violation?

A    Yes.

Q    What have you been convicted of?

A    Burglary.

Q    B&E.  What else?

A    That is it.

Q    What violated your probation?

A    I stopped going to see my PO.

Q    When were you locked up on the probation violation?  When were you locked up for the violation?  How long have you been in jail?

ACCU-BETA Depositions, Videos & Images, Inc.

871a

Page 3

A    Four months.

Q    Prior to going to jail where did you live?

A    1619 Glenfield.

Q    Did you know someone by the name of Whitey?

A    Yes, I did.

Q    Who is this person?

A    Yes, that is Whitey.

Q    Let the record show he has identified Mr. Tipton, Richard Tipton.  How did you know him?

A    I used to associate with him.

Q    Who is this person?

A    √Carter Brown.

Q    How did you have associated with those two men?

A    Drug related.

Q    I mean Cory Johnson.  Sorry.

     What do you mean drug association?

A    I used to sell drugs for him.

Q    Sell drugs for them?

A    Yes, sir.

Q    For both of them?

A    INDICATING YES.

ACCU-BETA Depositions, Videos & Images, Inc.

872a

Page 4

Q    How did the arrangement first begin?

A    It came around in the west end.

Q    They asked you to do what?

A    They asked me what time of day it was.

Q    What did that mean to you?

A    What was going on in the neighborhood?

Q    What did you tell him?

A    I said, won't too much going around.

Q    Did they ultimately ask you to help sell their cocaine?

A    Yes, it came to that point.

Q    What exactly did they ask you?

A    They said what could I move around the neighborhood, stuff like that.

Q    Who asked you that?

A    At the time both of them was present.

Q    Anybody else present?

A    No.

Q    Was that the first time they had a drug conversation with you?

A    Yes.

Q    What did you tell them?

ACCU-BETA Depositions, Videos & Images, Inc.

Page 5

A       I said I would move anything they gave me around to move.

Q       What agreement did you end up with that day?

A       Gave me like 30 sack.

Q       Sorry.

A       A 30 sack, $300 worth.

Q       A little bag, a 30 sack?

A       Yes.

Q       When they gave you that 30 sack, what form was that?  Cook'em up or powder?

A       Cook'em up.

Q       Do you know who cooked it up?

A       No, I don't.

Q       Who actually gave you the cocaine?

A       O.

Q       What was your agreement as far as the selling of drugs and what happened to the money?

A       60-40.

Q       Who got 60?

A       They did.

Q       Who got 40?

A       I did.

Q       Did you sell the 30 bag?

A       Yes, sir.

Page 6

Q    You gave them the $60. You kept the $40?

A    I gave them $200. I kept $100.

Q    After that, who did you sell your cook'em up to?

A    People around the neighborhood.

Q    What neighborhood? Newtown?

A    Yes, Newtown.

Q    That is--

A    Central.

Q    In Jackson Ward section of the city?

A    Clay Street, Clay Street, Hancock, all up in there.

Q    Did there come a point in time you had occasion to get some more cocaine from them?

A    Yes, I did.

Q    Approximately what month of what year did you get the first 30 bag from them?

A    September I guess.

Q    What year?

A    Around October, 1991.

Q    How long did it take you to sell that 30 bag?

A    No time.

Q    Day, two days?

E X H I B I T   4

Anthony Carter, Curtis Thorne, and Linwood Chiles.[6] With the exception of the Brown murder, all of the murders were committed in furtherance of appellants' continuing criminal enterprise. The victims were killed because they were suspected of cooperating with the police (JA 2021-2022, 2396-2397, 3021), because they "messed up" money owed to appellants (JA 2545-2546, 2735-2736, 2751), because they were potential witnesses, or because they were viewed as rivals in the drug trade (JA 3166-3167, 3382).

B. Appellants' Drug Trafficking Activities. Richard "Whitey" Tipton, Cory "C.O." or "O" Johnson, and Vernon Lance "V" Thomas were members of the "New York Boyz," a group of 15-30 persons who continuously distributed "large amounts" of crack cocaine in Trenton, New Jersey, from 1989 to June 4, 1991. JA 1730-1732, 1734-1736, 1748-1751, 1802-1803, 1808.[7] As part of their mode of operation, members of the New York Boyz -- including Tipton and Johnson -- used intimidation and violence to further their drug

---

[6] Evidence pertaining to an eleventh murder -- that of Katrina Rozier -- was introduced, but the murder was not charged as a substantive offense. In sum, the evidence showed that Rozier was fatally shot (JA 3426-3428, 3435-3437) by use of a pistol that was later seized from Tipton's possession and with structurally distinctive ammunition that was similar to ammunition later seized at a house from which appellants ran their drug operation. JA 3508-3510; GX 80, 124. Rozier owed a drug debt to Johnson (JA 2544), and Roane stated his belief that Rozier "was police" and, therefore, "we had to get rid of her" (JA 3161-3162).

[7] Members of the New York Boyz all came from New York City and considered fellow members to be "brothers" and "cousins." JA 1744. Although the name "New York Boyz" originated with the Trenton police, the group adopted it because it "let people know we were from out of town and were taking over." JA 1736.

9

trade (JA 1736-1739, 1746, 1826-1833, 1858-1861)[8] and employed a network of local residents as workers in their drug trafficking business. When the members of the New York Boyz had sold their available stock of crack cocaine (their total sales averaged 200-300 grams per day and one and one half kilos per week -- JA 1748, 1750, 1802-03), the members would pool their resources, and Johnson and Thomas would travel to New York City to purchase a new supply of cocaine. JA 1737, 1771, 1809. The Trenton-based operation continued in existence until June 4, 1991, when Trenton police raided a house where Johnson, Thomas, and other members lived and seized crack cocaine and guns. JA 1752-53, 1813-20; GX 131.

While the Trenton-based operation was still under way, Tipton stated that there was "big money" to be made selling crack cocaine in Richmond, Virginia, since the market was larger and the mark-up on crack cocaine greater than in Trenton. JA 1751-1752. In August 1990, Tipton formed a partnership with Antwoine Brooks to distribute crack cocaine in the Central Gardens area of Richmond. JA 1886-1887. Starting with four ounces of crack cocaine that Tipton obtained from his supplier in New York City, Tipton and Brooks recruited several workers (including Hussone Jones and Maurice Saunders) and sold their initial stock of crack cocaine for approximately $11,000. JA 1887-1891, 1975-1978, 2147-2149, 2157,

---

[8] According to Greg Scott, members of the New York Boyz "got together whenever we had a problem. We would discuss it, to retaliate or not to retaliate"; thereafter, members "would get together and retaliate." JA 1736-1737. Scott participated in several such discussions with Tipton, Johnson, and Thomas. JA 1737. A member who did not engage in acts of retaliation was regarded as "a traitor" and dropped from membership. JA 1756-1757.

10

2374-2376. From then until Brooks' arrest in February 1991, Tipton and Brooks continuously distributed crack cocaine -- they averaged between 2-3 ounces per week and a kilogram per month -- from which they each realized weekly profits of $3,000 to $5,000. JA 1893-1895, 1922, 1979-1980, 2139-2141, 2149, 2156. When they needed to "re-up" their supplies, Tipton took $5,000 to $6,000 in cash and obtained more crack cocaine from suppliers in Richmond or Norfolk. JA 1892, 1896, 1921.

Tipton told Brooks that "Hess" and his other friends in New York would take care of anything that they needed done. JA 1901-1902.[9] In late 1990, "Hess" arrived in Richmond, where Tipton introduced him as an "enforcer" and a member of the "New York Boyz." JA 2157-2159. Thereafter, in December 1990, Saunders accompanied "Hess" to New York, where they obtained a kilogram of crack cocaine from "Light" and "E.B." with $18,000 that had been provided by Tipton. JA 2160-2165, 2380-2281.[10] A month later, Saunders accompanied Tipton to the same locale in New York City, where Tipton bought nearly three kilograms of cocaine for $40,000. JA 2165-2168. Tipton identified "Light" and "E.B." as part of the New York crew. JA 2161-2162.

In the summer of 1991, Johnson -- whom Tipton introduced as his "brother" (JA 1899-1900, 1983-1984) -- arrived in Richmond "to

---

[9] As Saunders testified, Tipton "always talked about his New York Boyz * * *, the crew he had," and stated that if anything ever happened to him, the crew members "would come down and just kill everything." JA 2153.

[10] "Light" had been Tipton's principal source of cocaine during the Trenton operation. JA 1748-1749.

11

make sure that we don't take no losses this time." JA 2170-71, 2382-83. Johnson began selling crack cocaine with Tipton in the Central Gardens area. JA 2382-83. In late 1991, James "J.R." Roane and Thomas -- who were both introduced as Tipton's "cousins" (JA 2000, 2172-73, 2385, 2387) -- joined Tipton and Johnson in Richmond as partners in their crack cocaine distribution enterprise. As Tipton stated, he had selected an area in Newtowne that he "was going to lock down" and "sew * * * up" in terms of controlling its drug trade once his "cousin" Roane was released from jail in November 1991. JA 1986-87, 2005-07, 2172-73. See also, JA 3159-60. Thus, by November 1991, appellants had moved their drug operation to a house located on West Moore Street in Newtowne (JA 2496-99, 2502-03), although they continued to supply crack cocaine to Central Gardens, Southside Richmond, and other parts of the city (JA 2724).

From November 1991 until the time of their arrests in the spring of 1992, appellants supported themselves by selling crack cocaine "[e]very day." JA 2504-05, 2933-34. During this time, appellants, Thomas, and "E.B." were "like * * * one family" and "the boss[es]" who "ran things." JA 2514, 3154. Tipton, Johnson, and Thomas -- often accompanied by Douglas Talley, "Studie" Green, or Linwood Chiles -- travelled to New York City every other day to purchase "half a key" of powdered cocaine from their suppliers. JA 1994-98, 2083, 2145, 2149, 2390, 2394, 2506-07, 2520-22, 3377. Once the cocaine was transported to Richmond, either Tipton (JA

12

1979, 2146-47, 2508-09, 2517-19, 2715-17, 2749)[11] or Roane (JA 2229-2231, 2248-2249) cooked it into crack cocaine.

Appellants, Thomas, and "E.B." then divided the processed cocaine among themselves (JA 2510-2511, 2773-2777, 2939-2940) and distributed it through a network of "workers" (JA 2002-2003, 2513-2514) that included codefendant Sandra Reavis (JA 1991-1992, 1999, 2513, 2721, 3147-3148, 3535), Curtis Thorne (JA 1990-1991, 1999, 2065-2066, 2068, 2513, 2519-2520, 2936-2937, 3153-3155, 3535 Jerry Gaiters (JA 1992-1993, 1199, 2512-2513, 2720, 2934-2935, 2939, 3143-3145), Hussone Jones (JA 1999, 3535-3536), Dorothy "Mousey" Armstrong (JA 2512, 2722-2723, 2937-2939, 3145-3146, 3154), Douglas Talley (JA 2267-2270, 3160), Nina Bracey (JA 3535), Charles "Man-Man" Townes (JA 1982-1985, 1988, 1990, 1998-1999, 3535), Robert "Papoose" Davis (JA 2509-2510, 2519, 2712-2713, 3146-3147, 3155), Linwood Chiles (JA 2513, 3536), Priscilla "Pepsi" Greene (JA 2520, 3373-3374, 3535), Douglas Moody (JA 2530-2531), Katrina "Nat" Rozier (JA 2542-2543), Keith Ross (JA 2936, 3155), and Swain Ball (JA 3155).[12]

For example, Townes continuously sold crack cocaine during a four-month period, receiving a "300 sack" (i.e., $300 worth of crack cocaine) from Tipton every other day. JA 1984-1990, 1998. During that period, Townes realized $10,000 in proceeds, of which $6,000 was given to Tipton. JA 1998-1999. So too, "Mousey"

---

[11] Johnson described Tipton as "a master cook, master chef." JA 2712.

[12] "Studie" Green (JA 2376-2377) and Denise Berkley (JA 2496-2500, 2721-2722) ran errands for appellants.

13

Armstrong "[e]very day" sold crack cocaine that she received from Johnson to between 50-100 customers, realizing at least $400 per day in proceeds from her drug sales. JA 2514-2515, 3151-3152.

Appellants realized a "tremendous" amount of money from selling crack cocaine. JA 2573. Tipton stated, in December 1991, that he was making more money selling drugs in Newtowne than he had previously made selling drugs in Central Gardens. JA 2384-2385. Tipton further predicted that "eventually he was going to have the city sewed up because they were making big bucks" selling crack cocaine. JA 2941-2942. Appellants, Thomas, and "E.B." pooled the money they made from distributing drugs (JA 2776-2777) and used the proceeds to purchase more cocaine (JA 2610).

C. The Murders and Related Conduct.

1. The Talley Murder (Counts 3-4). On January 3, 1992, Johnny Lee Byrd helped Talley distribute approximately $1,000 worth of crack cocaine that Talley had received from "Papoose" Davis in installments (JA 2262-2263, 2268); however, Byrd had "messed up the drugs and the money" by smoking some of the crack cocaine himself and by spending the proceeds realized from his sales. JA 2269-2271. The next morning, Byrd saw Talley in a car parked outside Byrd's house, along with Tipton, Johnson, and Roane. While Tipton remained in the car with Talley, Johnson and Roane went to Byrd's house and knocked on the door. Learning that Byrd was not at home, Johnson and Roane returned to the car, where Roane struck Talley in the face with his fist. JA 2271-2272, 2283. The four men then drove off together.

Late on the night of January 4, 1992, Roane arrived at the

14

distributed through a network of street-level distributors working on commission. Johnson (see JA 3155-3157) and his "partners" exercised the right to determine whether a street-level distributor would receive cocaine to sell; controlled the quantity of cocaine provided to each distributor (usually a "300 sack" containing 30 rocks of crack cocaine that could be sold for $10 per rock); and dictated the commission (the "partners" would usually receive a profit of $200 from the sale of a "300 sack," and the distributors were allowed to retain $100). In light of their regularity and their nature, these consignment transactions went "far beyond a simple buyer-seller arrangement." United States v. Apodaca, 843 F.2d at 426-427.[96]

Even apart from the supervisory relationship that can be inferred from Johnson's role in supplying cocaine to "workers" in the drug distribution network, the record is replete with examples of Johnson's exercise of control over five or more persons. Thus, Butler stored weapons for Johnson (JA 3528); rented automobiles that Johnson and Tipton used on drug runs (Tr. 3528-3529, 3543-3544) (see United States v. Possick, 849 F.2d at 337); delivered crack cocaine for Johnson (JA 3536); facilitated the three-way telephone calls; and, along with Reavis (JA 3545-3549), collected

---

[96] See also, United States v. Becker, 892 F.2d 265, 267 (3d Cir. 1989); United States v. Butler, 885 F.2d at 201 (relationship analogous "to an exclusive franchise dealership"); United States v. Moya-Gomez, 860 F.2d 706, 748-749 (7th Cir.), cert. denied, 492 U.S. 908 (1988); United States v. Possick, 849 F.2d at 336; United States v. Cruz, 785 F.2d 399, 407 (2d Cir. 1986) ("franchise distributors earning commissions on consignments of [drugs] prepared and distributed by the Cruz organization").

161

and wired the bail money after Johnson was arrested (cf., United States v. Losada, 674 F.2d 167, 174 (2d Cir.), cert. denied, 457 U.S. 1125 (1982). Chiles drove Johnson to New York City to replenish the "partners'" cocaine supply (JA 2520-2523) *1690-1693* (see United States v. Chalkias, 971 F.2d 1206, 1214 (6th Cir.), cert. denied, 113 S.Ct. 351 (1992); United States v. Butler, 885 F.2d at 201; United States v. Moya-Gomez, 860 F.2d at 748). Armstrong regularly allowed Johnson to distribute cocaine out of her house (Tr. 1583) (see United States v. Chalkias, 971 F.2d at 1214; United States v. Possick, 849 F.2d at 337). Berkley ran a variety of drug-related errands, including delivering crack to Johnson's street-level distributors (JA 2519-2520) *1689-90*, acting as a "look-out" while Johnson and his "partners" cooked and packaged crack cocaine for distribution (JA 2512) *1682*, and hiding firearms that had been used in *1711* drug-related murders (JA 2541). In addition, Johnson offered Berkley the option of either killing Armstrong or being killed herself (JA 2549-2550) *1719-20* (see United States v. Moya-Gomez, 860 F.2d at 748; United States v. Possick, 849 F.2d at 336; United States v. Jones, 801 F.2d 304, 308-309 (8th Cir. 1986)). Pea Sue allowed *1688-9* Johnson to use her house to cook crack cocaine (JA 2518-2519). Davis allowed Johnson to stay at his apartment and deal drugs from *1879*  *1836-90*  *1844-5* it (JA 2710). Bracey (JA 2666-2670) and Williams (JA 2674-2675) facilitated the purchase of firearms for Johnson for use in drug-related violence. Finally, Gaiters agreed to aid Johnson in the drug-related murder of Armstrong. Given this substantial evidence of five or more persons working under Johnson's control, he was

162

properly convicted of engaging in a continuing criminal enterprise. See <u>United States</u> v. <u>Butler</u>, 885 F.2d at 201.

2. Appellant Tipton similarly argues (Tipton Br. 22-29) that the evidence was insufficient to prove that he was an organizer, manager, or supervisor in the drug trafficking enterprise.[97] His claim fails for exactly the same reasons that Johnson's claim failed. The evidence was overwhelming that Tipton was the prime organizer of the enterprise. The evidence further showed that Tipton's relationship with the various "workers" was far more than a mere buyer-seller relationship.

Thus, there was evidence that Townes, Jones, Saunders, and Thorne all sold cocaine "for" Tipton; indeed, Townes and Jones specifically stated that they solicited positions with Tipton as distributors. JA 1973-1974, 1979-1980, 1984-1985, 1990-1991, 1999, 2025-2027, 2372, 2384, 2395. And, Tipton told Saunders that "[y]ou only deal with me if you value your life." JA 2152. Saunders further accompanied Tipton on drug runs to New York City (JA 2160-2168), packaged drugs, and delivered them to the street-level distributors (JA 2155). Talley likewise drove for Tipton on his resupply trips (JA 1995-1998). Jones drove the getaway car for Tipton during the Talley murder (JA 2398-2400, 2435-2436),

---

[97] Tipton argues at length (Tipton Br. 24-26) that there was no evidence indicating that he occupied a managerial or supervisory role during the time that he distributed drugs in New Jersey. That fact -- which we do not dispute -- is immaterial: Count 2 alleged that the charged continuing criminal enterprise existed "from at least January 1991," until the return of the second superseding indictment. JA 77. Thus, the alleged continuing criminal enterprise entirely post-dated Tipton's activities in New Jersey.

163

E X H I B I T   5

IN THE UNITED STATES DISTRICT COURT FOR

THE EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

-------------------------)

UNITED STATES OF AMERICA )       11 PAGES

v.                    )

RICHARD TIPTON,         )

aka Whittey, et al.     )       GRAND JURY 92-1

-------------------------)

The testimony of JERRY GAITERS, taken on the 21st day of April, 1992, commencing at approximately 9:30 a.m.

FOREMAN:  CHRISTOPHER F. SNEAD

DEPUTY FOREPERSON: MARY A. McNULTY

ASSISTANT UNITED STATES ATTORNEY:

HOWARD C. VICK, AUSA

Reported By:  Debra L. Johnson

ACCU-BETA DEPOSITIONS, VIDEOS, & IMAGES, INC.
(804) 746-0746

Page 7

Q    You knew at some point they were going to kill her?

A    Yes

Q    You knew they were upset with her over a drug debt?

A    I went there and picked money up.  I didn't know she was even hiding from him.

Q    You knew according to Whittey and "O" she owed them money for drugs?

A    Well, Whittey didn't say anything about it.  "O" said he was going to pick them up some money.

Q    They brought you along because they wanted you to get them in the house.  Right?

A    Yes

Q    They knew they'd open the door for you?

A    Right.

Q    They had guns with them?

A    "O" had a gun.

Q    You did, indeed, go up to that house and knock on the door and they said who is it.  Bobby Long said that?

A    Bobby asked who was it.

Q    You said Jerry?

ACCU-BETA DEPOSITIONS, VIDEOS, & IMAGES, INC.
(804) 746-0746

888a

Page 8

A    I went forcefully.

Q    They threatened you?

A    He had a gun in my back.

Q    Who did?

A    "O".

Q    You thought if you didn't go along with them they were going to-- --

A    Yes.

Q    And Whittey and "O" were there present with you?

A    Well, Whittey wasn't.

Q    Where was Whittey?

A    Whittey let us off at the corner.

Q    He was there--went over to Church Hill with you?

A    Yes.

Q    With "O"?

A    Yes.

Q    You knocked on the door.  Bobby Long said who is it?

A    Yes.

Q    You said it's Jerry?--

A    Yes

Q    Or you said it's Gaiters?

A    I said "G".

ACCU-BETA DEPOSITIONS, VIDEOS, & IMAGES, INC.
(804) 746-0746

889a

E X H I B I T   6

# U.S. to seek death penalty fo

## Eleven killed in 45 days

### The accused

      

**Jerry R. Gaiters**
Murder

**Sterling Hardy**
Murder

**Sandra B. Reavis**
Conspiracy

**James Roane Jr.**
Murder
(faces death)

**Lance Thomas**
Murder

**Richard R. Tipton**
Murder
(faces death)

**Cory Johnso**
(still at large
Murder
(faces death)

### The victims

**1** Douglas A. Talley, 37, of the 2600 block of Third Avenue, was f
stabbed more than 80 times inside a parked car in the 200 block c
13th Street Jan. 5. Authorities say his assailant may have thought
was a police officer. Murder indictment: Richard R. Tipton.

**2** Douglas Moody, 36, of the 1300 block of West Catherine Street,
shot and stabbed in a driveway outside a house in the 800 block c
North Harrison Street just after midnight Jan. 13. Murder indictmen
Richard R. Tipton and James Roane Jr.

**3** Peyton Maurice Johnson, 27, of the 1100 block of St. John Stree
shot in the head in an apartment in the 1200 block of West Clay S
Jan. 14. Murder indictment: James Roane Jr. and Cory Johnson.

**4** Katrina A. Rozier, 26, of the 400 block of North Hancock Street,
found lying in a pool of blood near an Interstate 95 overpass at N
Lombardy Street Jan. 21. She had been shot in the head. Charged
murder (in state court): Jerry R. Gaiters.

**5** Louis Julius Johnson Jr., 29, of the 1400 block of West Clay Stre
was shot several times in the head at point-blank range in the 900
block of Kinney Street around 11:10 p.m. Jan. 29. Murder indictm
Richard R. Tipton, James Roane Jr., Cory Johnson and Lance Thor

**6** Torrick Brown, 26, of the 2600 block of Lynhaven Avenue, was
at his apartment at 7 p.m. Feb. 1. His sister, Martha McCoy, was
wounded, as her three children watched the shootings. Murder
indictment: Richard R. Tipton, James Roane Jr., Cory Johnson, Lan
Thomas and Sterling Hardy.

**7** Bobby Long, 34, of the 2800 block of East Clay Street, was shot
head during a triple homicide at his residence Feb. 1. Murder
indictment: Richard R. Tipton, Cory Johnson and Jerry R. Gaiters.

**8** Tony Carter, 42, of the 600 block of North 31st Street, was shot ir
head and neck during the triple homicide at Long's house Feb. 1.
Murder indictment: Richard R. Tipton, Cory Johnson and Jerry R. Ga

**9** Dorothy Mae Armstrong, 23, of an unknown address, was shot
least eight times in the back during the triple homicide at Long's ho
Feb. 1. She died at the hospital the next day. Murder indictment:
Richard R. Tipton, Cory Johnson and Jerry R. Gaiters.

**10** Linwood Chiles, 34, of the 1000 block of West Clay Street, was f
shot at the wheel of a car in the 1200 block of Stoney Run Drive arc
10:30 p.m. Feb. 19 in a double homicide. Murder indictment: Rich
Tipton and Cory Johnson.

**11** Curtis Lee Thorne, 38, of the 1000 block of West Catherine Stree
shot Feb. 19 in Chiles' car. Two sisters in the car were critically inju
Murder indictment: Richard R. Tipton and Cory Johnson.

Staff graphic by Luther L.N. T

**1**

# Clinton, Bush roll along in Penn

rginia 23293      **142nd Year, No. 120**      **35 cents**

# k death penalty for 3 here

## 45 days

    

**ra B. Reavis**
iracy

**James Roane Jr.**
Murder
(faces death)

**Lance Thomas**
Murder

**Richard R. Tipton**
Murder
(faces death)

**Cory Johnson**
(*still at large*)
Murder
(faces death)

## The victims

**1** **Douglas A. Talley**, 37, of the 2600 block of Third Avenue, was found stabbed more than 80 times inside a parked car in the 200 block of East 13th Street Jan. 5. Authorities say his assailant may have thought he was a police officer. Murder indictment: Richard R. Tipton.

**2** **Douglas Moody**, 36, of the 1300 block of West Catherine Street, was shot and stabbed in a driveway outside a house in the 800 block of North Harrison Street just after midnight Jan. 13. Murder indictment: Richard R. Tipton and James Roane Jr.

**3** **Peyton Maurice Johnson**, 27, of the 1100 block of St. John Street, was shot in the head in an apartment in the 1200 block of West Clay Street Jan. 14. Murder indictment: James Roane Jr. and Cory Johnson.

**4** **Katrina A. Rozier**, 26, of the 400 block of North Hancock Street, was found lying in a pool of blood near an Interstate 95 overpass at North Lombardy Street Jan. 21. She had been shot in the head. Charged with murder (in state court): Jerry R. Gaiters.

**5** **Louis Julius Johnson Jr.**, 29, of the 1400 block of West Clay Street, was shot several times in the head at point-blank range in the 900 block of Kinney Street around 11:10 p.m. Jan. 29. Murder indictment: Richard R. Tipton, James Roane Jr., Cory Johnson and Lance Thomas.

**6** **Torrick Brown**, 26, of the 2600 block of Lynhaven Avenue, was shot at his apartment at 7 p.m. Feb. 1. His sister, Martha McCoy, was wounded, as her three children watched the shootings. Murder indictment: Richard R. Tipton, James Roane Jr., Cory Johnson, Lance Thomas and Sterling Hardy.

**7** **Bobby Long**, 34, of the 2800 block of East Clay Street, was shot in the head during a triple homicide at his residence Feb. 1. Murder indictment: Richard R. Tipton, Cory Johnson and Jerry R. Gaiters.

**8** **Tony Carter**, 42, of the 600 block of North 31st Street, was shot in the head and neck during the triple homicide at Long's house Feb. 1. Murder indictment: Richard R. Tipton, Cory Johnson and Jerry R. Gaiters.

**9** **Dorothy Mae Armstrong**, 23, of an unknown address, was shot at least eight times in the back during the triple homicide at Long's house Feb. 1. She died at the hospital the next day. Murder indictment: Richard R. Tipton, Cory Johnson and Jerry R. Gaiters.

**10** **Linwood Chiles**, 34, of the 1000 block of West Clay Street, was found shot at the wheel of a car in the 1200 block of Stoney Run Drive around 10:30 p.m. Feb. 19 in a double homicide. Murder indictment: Richard R. Tipton and Cory Johnson.

**11** **Curtis Lee Thorne**, 38, of the 1000 block of West Catherine Street, was shot Feb. 19 in Chiles' car. Two sisters in the car were critically injured. Murder indictment: Richard R. Tipton and Cory Johnson.

Staff graphic by Luther L.N. Trower Jr.

**By Frank Green
and Arthur Hodges**
Staff writers

Prosecutors will seek the death penalty for three alleged members of a Richmond cocaine gang that bloodied the early days of the year with a furious killing campaign that left 11 dead — nearly a quarter of the city's pace-setting 1992 murder toll.

One murder charge pending in state court against an accused gang member was not included in the extraordinary federal indictment unsealed yesterday that takes aim at a gang that police said could act with "reptilian coldness."

But it was not so much the number of homicides police believe were committed by the "Newtown gang" in January and February that authorities said prompted the largest federal death penalty case of its kind ever attempted in the country.

Instead, the ultimate sanction is being sought because of: the swiftness with which the gang acted — 11 murders in 45 days; its vicious overkill, one victim was stabbed 87 times, another shot 16 times; and the mindlessness of the violence — some of the killings were over small amounts of cash or cocaine.

The gang, police say, carried out its business with almost unheard of brutality. even for a city where homicides happen on average every third day.

Lt. Oscar T. Clarke of the Richmond Police Bureau said the Newtown gang easily overshadowed the notorious Johnson-Brown gang, which dominated the South Richmond drug trade in the late 1980s.

"This one makes Johnson-Brown look like small potatoes," Clarke said. If police hadn't "nipped it in the bud," the gang easily could have wiped out another 10 people, he said.

U.S. Attorney Richard C. Cullen said the acts charged against Richard R. Tipton, Cory Johnson, and James Roane Jr., if proven, "are so violent and so aggravated to warrant the death penalty."

Cullen said that the death penalty is "something that nobody takes any joy in." But, he said, "it's my opinion, without doubt, that it's the

Continued on page 6, col. 1

**2**

A-6 Richmond Times-Dispatch, Wednesday, April 29, 1992

# U.S. to seek death penalty for 3 here

## Alleged gang seen as killers of 11

Continued from first page

appropriate sanction for the three individuals."

"Somebody said this is the first time in the country that this will be done and we believe this is the right case for that," he added.

Cullen said he met yesterday morning with U.S. Attorney General William P. Barr in Washington, who authorized him "to seek the death penalty should these individuals be convicted of the counts as charged."

The death penalty will be sought for the three if they are convicted of committing a murder that was carried out to further the operation of a continuing criminal enterprise — the so-called kingpin statute.

"We go out and do business with dollars and cents," said Cullen. "We're alleging in this indictment that they go out and do business with guns and bullets" and murder.

"This is a good example, I think, of swift justice. It's highly unusual that investigators are able to put together a case of this nature in so swift a a time," Cullen said.

"Some of the charges occurred in April, just a few days ago. And the violent acts, the murders, took place over a 45-day period from January the 5th of this year until February 19th," he said.

Richmond Police Chief Marty Tapscott said, "If you can get people off the street swiftly, I'm sure you're saving some lives."

Assistant U.S. Attorney Howard C. Vick said he could not comment on why the 11th murder was not included in the federal indictment. Cullen and Richmond Commonwealth's Attorney Joseph D. Morrissey said they expected the pending state murder charges against gang members would be dropped in light of the federal indictment.

Clarke, head of the police bureau's violent crime unit, said the city mounted an "intense investiga-



Staff pho

**CRIME SPREE** — U.S. Attorney Richard Cullen, flanked by Police Chief Marty M. Tapscott and City Manager Robert C. Bobb, po outlining the crimes of the Newtown

# Gang avoided flashy ways but was unutterably ruth

By Battinto Batts Jr.
Staff writer

Richmond has had some ruthless bad guys, but nothing like the Newtown gang, slicker and more vicious than any group of criminals ever to operate here, authorities say.

"The Johnson-Brown gang was bad, looking back, the Briley brothers were pretty bad, but these guys were crazy," said William H. Parcell III, a Richmond prosecutor. "They're nuts."

Parcell said the Newtown gang was so violent that one homicide victim, an alleged gang member who was thought to be an undercover police officer, was stabbed 87 times in the face and head.

Others were slain because they were rival drug dealers, or because of money owed on cocaine debts or

range on Jan. 29 on a street in the Carver neighborhood.

A drug debt and a domestic situation resulted in one of Richmond's bloodiest nights in recent history. Four people were killed in a span of three hours on Feb. 1.

Torrick Brown, 26, of the 2600 block of N. Lynhaven Avenue was shot to death at his apartment at 7 p.m. Brown's sister Martha McCoy was wounded in the hail of gunfire while her children were in the next room eating.

"If those kids had been in the same room, they probably would have shot them, too," said Howard Vick, a federal prosecutor.

According to police, Brown was killed because he had been involved with the girlfriend of James H. Roane Jr., who has been indicted in

damage, according

Chiles' car, an old wagon, was the gar Parcell said. Chile: have driven the Brown's murder, pe

"They would get them to homicides forth to New York

After the Fulton the gang leaders lef a few weeks later. base of operations.

"They wanted to ganization," said Vi residence on East Blackwell. "They w 'we are going to se Parcell said.

Police received i the leaders a be arrested key ayc

# Gang avoided flashy ways but was unutterably ruthless

## By Battinto Batts Jr.
### Staff writer

Richmond has had some ruthless bad guys, but nothing like the Newtown gang, slicker and more vicious than any group of criminals ever to operate here, authorities say.

"The Johnson-Brown gang was bad, looking back, the Briley brothers were pretty bad, but these guys were crazy," said William H. Parcell III, a Richmond prosecutor. "They're nuts."

Parcell said the Newtown gang was so violent that one homicide victim, an alleged gang member who was thought to be an undercover police officer, was stabbed 87 times in the face and head.

Others were slain because they were rival drug dealers, or because of money owed on cocaine debts or as a result of domestic situations, authorities say.

Although they commanded attention with brutal violence, the gang members kept a low profile, Parcell said.

Gang members avoided flashy items such as thick gold chains and customized cars often associated with the drug trade.

Instead, they poured most of their earnings back into their business, hoping to increase their standing with a Jamaican "posse" in New York City, Parcell said.

The Newtown gang took root in the Richmond area roughly three years ago, according to sources interviewed by authorities.

The group's activities reached a peak late last year and the bloodshed began Jan. 5 with the murder of Douglas Talley, the alleged gang member who was stabbed to death.

As the group fought to secure a portion of the city's crack cocaine trade, rival dealers were also killed, police said.

Such victims include: Peyton Johnson, 27, shot in the head inside a house in Jackson Ward on Jan. 14 and Louis Johnson, 29, found shot several times in the head at close range on Jan. 29 on a street in the Carver neighborhood.

A drug debt and a domestic situation resulted in one of Richmond's bloodiest nights in recent history. Four people were killed in a span of three hours on Feb. 1.

Torrick Brown, 26, of the 2600 block of N. Lynhaven Avenue was shot to death at his apartment at 7 p.m. Brown's sister Martha McCoy was wounded in the hail of gunfire while her children were in the next room eating.

"If those kids had been in the same room, they probably would have shot them, too," said Howard Vick, a federal prosecutor.

According to police, Brown was killed because he had been involved with the girlfriend of James H. Roane Jr., who has been indicted in four of the slayings.

A few hours later, Dorothy Armstrong, Tony Carter and Bobby Long, were slain in a house in the 2800 block of East Clay Street.

Ms. Armstrong was killed over an $800 drug debt, according to Vick. Police believe Carter and Long were killed just because they were there.

The next day, a Richmond police SWAT team executed a search warrant at a residence in the 1200 block of West Moore Street in the Newtown neighborhood, seizing 120 bags of cocaine, three automatic weapons and arresting a number of alleged gang members.

The gang leaders, sensing that their business had begun to unravel, sought to kill any members with vital knowledge, said Vick.

So a hit list was compiled. One name that might have been on the list was that of Linwood Chiles. Chiles, 34, was arrested during the raid on West Moore Street and charged with possession of cocaine and illegal use of a firearm.

On Feb. 19, Chiles, who was free on a $2,000 bond, and Curtis Lee Thorne were shot to death inside Chiles' car on Stoney Run Drive in Fulton Bottom in the East End.

Two sisters, Gwendolyn and Priscilla Green, were wounded. One is paralyzed and the other has brain damage, according to police.

Chiles' car, an older model station wagon, was the gang's "coke [car]," Parcell said. Chiles is believed to have driven the getaway car in Brown's murder, police said.

"They would get Chiles to take them to homicides and back and forth to New York," Parcell said.

After the Fulton Bottom slayings the gang leaders left town, returning a few weeks later, seeking a new base of operations, Parcell said.

"They wanted to start a new organization," said Vick. They chose a residence on East 15th Street in Blackwell. "They went in and said 'we are going to sell drugs here,'" Parcell said.

Police received information that the leaders were back in town and arrested a key player, Richard Rosenfield Tipton, also known as "Whitey" on April 8.

Tipton, 21, was arrested on charges stemming from the Moore Street search.

Tipton, described on warrants as "armed and dangerous," was one of the alleged members authorities had been seeking to establish their new organization.

City officials praised the Bureau of Police yesterday for quickly breaking up the gang that caused such an uproar.

But authorities say the arrests have little effect on the major cartel back in New York.

"These people are insignificant in the game plan back in New York," Parcell said. "All this hasn't [fazed] the people ... in New York. That's how insignificant they were to them."

---

### Left column (continued from previous page)

...e alleging in this indictment [is tha]t they go out and do business [with] guns and bullets" and murder. "This is a good example, I think, [of] swift justice. It's highly unusual [that] investigators are able to put [tog]ether a case of this nature in so [swi]ft a time," Cullen said.

"Some of the charges occurred in [Ap]ril, just a few days ago. And the [vio]lent acts, the murders, took place [ove]r a 45-day period from January [the] 5th of this year until February [9t]h," he said.

Richmond Police Chief Marty [Ta]pscott said, "If you can get people [off] the street swiftly, I'm sure you're [sav]ing some lives."

Assistant U.S. Attorney Howard Vick said he could not comment [on] why the 11th murder was not [inc]luded in the federal indictment.

[Cul]len and Richmond Commonwealth's Attorney Joseph D. Morrissey said they expected the pending [sta]te murder charges against gang [me]mbers would be dropped in light [of] the federal indictment.

[Clarke, head of the police bureau's violent crime unit, said they mounted an "intense investigation" that culminated in the arrest of [ma]ny alleged gang members in February.

"The biggest challenge was there [we]re no witnesses to [most of] these [cri]mes," he said. "Everybody they [ca]me into contact with — they'd kill [th]em."

Several investigators singled out [Ti]pton — indicted for nine of the 11 [ki]llings — as the most murderous of [th]e group. All but Johnson are in [cu]stody.

Those charged yesterday are:

● Tipton, also known as "Whity," pronounced whitey, 21; conspiracy to distribute crack cocaine; operating a continuing criminal enterprise; murder in the furtherance [of] the criminal enterprise; use of a [fi]rearm; violent crime in the aid of [ra]cketeering; distribution of crack [co]caine; and possession with the intent to distribute crack cocaine.

● Johnson, also known as "O," 23; [co]nspiracy; operating a continuing [cri]minal enterprise; murder in the [fu]rtherance of the criminal enterprise; use of a firearm; violent crime [i]n the aid of racketeering; distribution of crack cocaine; and possession [of] crack cocaine with the intent to [d]istribute.

● Roane, also known as "J.R.," [2]6, conspiracy; operating a continuing criminal enterprise; murder in [t]he furtherance of the criminal enterprise; use of a firearm; violent crime in the aid of racketeering; and possession of crack cocaine with the intent to distribute.

● Lance Thomas, also known as "V," 21; conspiracy; operating a

---

## Alleged chiefs of drug cartel are arrested

894a

MIAMI (AP) — Agents have arrested U.S. managers of Colombia's

---

## Taipei policeman killed in explosion

TAIPEI, Taiwan (AP) — A [bomb] exploded at a McDonald's restaurant yesterday, killing a policeman who was trying to defuse it, news reports said.

There was no immediate claim of responsibility for the bomb.

---

**CORRECTION**

There are a number of errors appearing in our ad which publishes in April 29/30 edition of the Tri-Cities PLUS. The errors and correction as follows:

The ad's headline reads:
SALE STARTS NOON WEDNESDAY APRIL 29
*It should have read:*
LAST 3 DAYS TO SAVE!

4

USCA4 Appeal: 20-8    Doc: 2-7    Filed: 05/22/2020    Pg: 227 of 472

===========================  ==========================  ===========================
THE RICHMOND NEWS LEADER
Copyright (c) 1992, Richmond Times-Dispatch

DATE: Saturday, May 9, 1992          TAG: 9201210290
PAGE: 24                             EDITION: Metro
SECTION: Area/State                  LENGTH:   29 lines
ILLUSTRATION: PHOTO
MEMO: (lcf)

## TWO SUSPECTS ARE ADDED TO WANTED LIST

The only member of the so-called "Newtowne" gang who is not in custody has been added to the Richmond police most-wanted list.

Police have said the drug-dealing gang was responsible for about a dozen murders early this year.

The suspect, Cory Johnson, 23, whose last known address was 1212 W. Moore St., also has homes in Trenton, N.J., and on Amsterdam Avenue in New York City.

Johnson also is known as O, C.O., Cary James Johnson, John Wood and James Johnson. He recently was indicted in U.S. District Court here on eight murder charges. He faces the death penalty if convicted.

Johnson is described as 6 feet tall and weighing 160 pounds. He is considered armed and extremely dangerous, police said.

Also added to the most-wanted list today was Shawn Christian Thackston, 19, whose last known address was in the 300 block W. Grace St.

Thackston is charged with grand larceny and robbery, though details about those cases were not available.

He is described as white, 6 feet 2 inches tall, weighing 150 pounds with blond hair and blue eyes.

KEYWORDS: RICHMOND    POLICE    CRIME    LIST
ENHANCER: 00130084

===============================================================================
79 of 82. 2 Terms

USCA4 Appeal: 20-8    Doc: 2-7    Filed: 05/22/2020    Pg: 228 of 472

td                JUDGE HESITANT TO CONTINUE TRIAL                    05/30/92
========================== ========================== ==========================
                              RICHMOND TIMES-DISPATCH
                   Copyright (c) 1992, Richmond Times-Dispatch

DATE: Saturday, May 30, 1992          TAG: 9201240217
PAGE: B-4                             EDITION: City
SECTION: Area/State                  LENGTH:   57 lines
SOURCE: By Randolph Goode
        Staff writer
MEMO: (lcs)

### JUDGE HESITANT TO CONTINUE TRIAL

A federal judge here indicated strongly yesterday that he is not in favor of granting a continuance in the Sept. 16 trial of two Richmond men facing the death penalty for suspected drug-related slayings.

Defense lawyers for the two men, Richard R. Tipton III, 21, and James H. Roane Jr., 26, requested the delay during a hearing on technical matters before U.S. District Judge James R. Spencer.

The men are alleged members of a cocaine-dealing organization known to police as the "Newtowne gang." Police say the gang is responsible for at least 10 city slayings during a 45-day period in January and February. Tipton was named in nine of the slayings and Roane in two shootings; both also were indicted on drug and firearms counts.

"You all have plenty of time" to prepare for the trial, Spencer said to the defense lawyers.

Originally the trial was set for Sept. 14, but recently it was moved back two days by Spencer.

Two of the lawyers, Eric D. White and David P. Baugh, said they planned to file a motion seeking the continuance of the trial.

A third man indicted in April with Tipton and Roane also is facing the death penalty if convicted, but he remains a fugitive. He is Cory Johnson, 23, of New York City.

The case here would be the first in the nation in which the federal death penalty has been sought against three defendants in a single trial.

Four other people also were indicted for their alleged roles in the gang.

"I know you all have your job to do and I know this is a new statute. But there is nothing unusual about a continuing criminal enterprise and homicides," Spencer said in  response to the attorneys' suggestion for an extension.

"As far as I'm concerned, you all have enough time," the judge added.

Federal law, as amended in 1989 by Congress, allows prosecutors to seek the death penalty against people who are convicted of operating a continuing criminal enterprise and who kill or order a killing.

The law often is called the "drug kingpin" statute.

While the amended statute has been used a few times since 1989, the Richmond case is the first time it has implemented against multiple defendants.

Yesterday's hearing before Spencer was scheduled for two reasons.

First, Tipton and Roane were arraigned again because the original indictment contained some technical errors in the language of the charges. The individual charges, though, against the defendants remained the same.

Tipton and Roane both pleaded not guilty and asked for a jury trial.

The other four individuals being held pending trial also will have to be rearraigned. They are Lance Thomas, also known as Anthony Mack, 21; Jerry R. Gaiters, 38; Sterling Hardy, 27; and Sandra Reavis, 34.

Also yesterday, Spencer discussed with lawyers technical aspects of the pending trial.

KEYWORDS: DRUG    CRIME    MURDER
ENHANCER: 00151068

========================================================================
 77 of 82, 2 Terms                    896a

USCA4 Appeal: 20-8     Doc: 2-7     Filed: 05/22/2020     Pg: 229 of 472

================================  ================================  ================================

RICHMOND TIMES-DISPATCH
Copyright (c) 1992, Richmond Times-Dispatch

DATE: Thursday, June 4, 1992            TAG: 9201240809
PAGE: B-7                               EDITION: City
SECTION: Area/State                     LENGTH:   45 lines
SOURCE: BY RANDOLPH GOODE
        Times-Dispatch Staff Writer
MEMO: (ljc)

## JUDGE: GANG TO BE TRIED TOGETHER

U.S. District Judge James R. Spencer ruled yesterday that six people authorities say are members of Richmond's ultra-violent "Newtowne gang" must stand trial together on September 16.

Originally, two of the defendants -- Sandra Reavis, 34, and Lance Thomas, 26 -- refused to waive the federal Speedy Trial Act provisions and a July 6 trial date was set for them.

But Spencer warned them that he might be persuaded by Assistant U.S. Attorney Howard C. Vick Jr. to consolidate the defendants into one proceeding.

Under the Speedy Trial Act, a defendant must be tried within 70 days from the time of indictment unless the statute is waived.

Richard R. Tipton, 21; James H. Roane Jr., 26; Jerry R. Gaiters, 38; and Sterling Hardy, 27, told Spencer when they were arraigned May 5 that they intended to waive that right.

Tipton and Roane face the death penalty if convicted on a charge of murder while operating a continuing criminal enterprise. The other four could receive a maximum term of life without parole.

A seventh defendant, Cory Johnson, 23, of New York City, remains a fugitive. He also faces the death penalty if convicted.

Richmond police say the crack-dealing organization was responsible for at least 10 murders in the city during a 45-day period in January and February.

In yesterday's ruling, Spencer said the Newtowne case "is unique and complex (and) is fraught with complexities and logistical problems."

Certain government witnesses "fear for their safety," Spencer said. Many of these witnesses have been relocated for their protection, he added.

"Accordingly, forcing these witnesses to testify at multiple trials could result in substantial additional costs and ultimately in their refusing to cooperate due to the fear for their safety," Spencer said.

"In conclusion, the court has carefully weighed and balanced the interests of society and the defendants in a speedy trial, and based upon the facts of this case, the court finds that society's interest in meeting the ends of justice outweighs the interest of defendants and of society in achieving a speedy trial."

The trial is scheduled to last three weeks in federal court here.

KEYWORDS: DRUG    CRIME    MURDER    RICHMOND
ENHANCER: 00156024



=========================  =========================  =========================
RICHMOND TIMES-DISPATCH
Copyright (c) 1992, Richmond Times-Dispatch

DATE: Saturday, June 13, 1992          TAG: 9201250798
PAGE: B-3                              EDITION: City
SECTION: Area/State                   LENGTH:   68 lines
SOURCE: BY RANDOLPH GOODE
        Times-Dispatch Staff Writer
MEMO: (lgw)

## MAN HOPES PLEA AGREEMENT WILL HELP AVOID LIFE IN PRISON

A man police say was a member of Richmond's death-and-drug-dealing "Newtowne gang" pleaded guilty in U.S. District Court yesterday to charges -- including three murders -- that could put him in prison for life without parole.

Jerry R. Gaiters Jr., 38, of the 1000 block of Kinney St., is betting on a much lighter sentence, though.

As part of an agreement with Assistant U.S. Attorney Howard C. Vick Jr., Gaiters will testify against other alleged members of the cocaine organization when their trial begins in federal court Sept. 16.

In return for Gaiters' cooperation, Vick may seek a much lighter prison term.

Judge James R. Spencer accepted Gaiters' guilty pleas but did not set a sentencing date.

Gaiters' decision to plead guilty and cooperate with the government leaves five defendants facing trial in September. All were indicted in late April.

They are James H. Roane Jr., 26, of the 2600 block Lynhaven Ave.; Richard R. Tipton, 21, no address available; Lance Thomas, also known as Anthony Mack, 21, of the 800 block Nelson St.; Sterling Hardy, 27, of the 800 block N. 21st St., and Sandra Reavis, 34, whose address was not available.

Roane and Tipton are facing the death penalty under a federal statute aimed at individuals who kill or order a killing while operating a continuing criminal enterprise.

A seventh person, Cory Johnson, 23, of New York City, was indicted but has not been arrested. He also is facing the death penalty.

Gaiters appeared in court yesterday wearing a burgundy-colored double-breasted suit over a gray shirt open at the collar.  Horn-rimmed glasses gave Gaiters a studious look as he chatted with his lawyer, Christopher J. Collins, before court convened.

He responded with polite, "yes, sir" answers to all questions asked by Spencer.

Vick then summarized the government's case against Gaiters. The prosecutor began by saying Gaiters began distributing cocaine for the "Newtowne gang" in January.

During a 45-day period in January and February, Richmond police assert at least 10 slayings were attributed directly to the gang's violence.

Vick described three of them, ones in which Gaiters was involved.

On Feb. 1, Gaiters and two co-defendants went to the home of Bobby Long in the 2800 block of East Clay St. on the city's East End. Vick said the object of the visit was Dorothy Mae Armstrong, 23, whom gang members felt knew too much about their cocaine operation.

Gaiters was admitted into the residence because he was Long's cousin, Vick said.  As Gaiters entered, one of the other men with him burst into the house and fired at least eight shots into Ms. Armstrong.  She died the following day.

Long was shot by the man as he tried to escape. A third person in the house, Tony Carter, also was killed by the assailant.

Gaiters, Tipton and Johnson were indicted in connection with the slayings.

Long and Carter apparently were killed because they were in the wrong place at the wrong time, authorities say.

After Vick's summary, Judge James R. Spencer asked Gaiters, "Is that what
=========================  =========================  =========================

=========================  ==========================  ============================
you did?"

"Yes, sir," Gaiters responded.

Besides the three murders, Gaiters pleaded guilty to conspiring to possess crack cocaine with the intent to distribute it, use of a firearm during a drug trafficking crime, violent crime in aid of racketeering and possessing crack with the intent to distribute it.

KEYWORDS: RICHMOND    DRUG    CRIME    MURDER    COURT    VERDICT
ENHANCER: 00165046

===========================  ===========================  ===========================

RICHMOND TIMES-DISPATCH
Copyright (c) 1992, Richmond Times-Dispatch

DATE: Tuesday, June 16, 1992                    TAG: 9201260107
PAGE: B-1                                       EDITION: City
SECTION: Area/State                             LENGTH:  163 lines
ILLUSTRATION: PHOTO
SOURCE: BY RANDOLPH GOODE
        Times-Dispatch Staff Writer
MEMO: (ljc) PROFILE

### PROSECUTOR SHRUGS OFF PERILS TO GET DEALERS OFF THE STREET

His office resembles a large eagle's nest, nestled in a high-rise cliff 18 floors above downtown Richmond. The space, though, is comfortable with legal documents, books and the usual clutter -- the domain of a busy man.

A large framed print of an unyielding Winston Churchill dominates one wall of the office at 600 E. Main St. Stuck in the frame of the Churchill print is a still-glossy black-and-white photograph of a World War II fighter pilot. The handsome young pilot is smiling. He looks supremely confident.

Seated below the photo at an overflowing desk is the pilot's son -- Howard C. Vick Jr., high-profile federal prosecutor.

He's not looking quite as comfortable as the man in the photograph.

First, he fidgets with his green-striped tie that hangs neatly against a crisp white shirt. Then he smoothes down his dark hair at the sides and crosses his legs. He stares out the window, looking east across the busy Richmond skyline toward the Capitol. He turns back to his visitor.

"I find all this embarrassing," he admits.

Vick does not particularly like interviews or talking about himself.

He would much rather be working on one of the many drug cases that have brought him cheers and jeers.

Since February 1990, Vick has been an assistant U.S. attorney here. He has prosecuted Richmond's biggest drug figures -- the fast-talking but cold Eugene Johnson, the hard-eyed Carlton Brown, the weird James Butler, the smooth Daryl Carpenter and others.

Johnson and Brown are doing life terms without parole.  Butler, too, is serving a life term, also without parole. Carpenter was sentenced to 32 years, and he likely will serve virtually all but a year or two.

Prosecuting drug dealers is not a job recommended for the faint-hearted or the thin-skinned, especially with the strict federal sentencing guidelines that mandate minimum sentences.

Vick's life has been threatened.

He's been called the feds' legal thug.

And, he's been called a racist by families of black defendants he has prosecuted.

During the Johnson trial it was  disclosed that a "contract" was on Vick's head.

"I've had prices on my head before," Vick said slowly, recalling the sanguinolent facts of the Johnson case.  Johnson's feud with a rival drug gang left at least 30 people dead.

Once several years ago, while prosecuting a case in the Virgin Islands, someone fired a bullet that went through a chair in Vick's office.

"Obviously, they didn't like me. But you can't let dogs like Eugene Johnson run you out of the business," Vick said, looking as defiant as Churchill in the framed print.

Vick is preparing for another big trial that begins here in September. Two of the five defendants are facing the death sentence for slayings reportedly committed during drug deals. A sixth defendant, who also faces the death penalty, remains a fugitive.

The defendants are members of what Richmond police call the "Newtowne gang," named after the tiny Carver neighborhood in which some of the defendants and the victims lived.

===========================================================================

================================================================

"Eugene Johnson was a pretty significant case. But that gang had pretty much shot its wad by the time we got to them.

"Newtowne is different because of the turnaround -- we took them off the streets in a hurry," Vick said.

During a 45-day period in January and February this year, Richmond police say members of the crack-dealing gang killed at least 10 people.

"We indicted them in April," Vick said, recalling the joint investigation by city police and federal drug agents. "That's moving fast."

Preparing for the prosecution of the case takes up most of Vick's time these days. Until the trial begins, Vick will make few appearances in U.S. District Court here.

"I've never handled a death case and I find I am working on it constantly. I would find it hard to devote time to another case during this period."


*  *  *

Vick was raised in the Richmond area, but left to attend Georgetown University, where he received his undergraduate degree in business administration.

Before joining a Washington law firm in 1983, he was an assistant attorney general here and later an assistant commonwealth's attorney in Arlington.

Then he moved to New Orleans in 1985, where he was a member of the Justice Department's Organized Crime Strike Force. Later, he opened a strike force office in Houston.

Vick will be 40 on July 15.  Big drug cases, though, are now routine to him.

A 1979 graduate of the University of Richmond's T.C. Williams School of Law, Vick worked in the federal prosecutor's office in Miami from 1987 to 1990. There he was in charge of the Organized Crime Drug Enforcement Task Force for the Florida-Caribbean region.

He supervised 18 attorneys who worked on large narcotics conspiracy cases. Vick tried several multidefendant, multiweek trials, including the case of one of the leaders of Colombia's Cali cartel.

"To the Colombians, drugs are a business, but surprisingly the trials are that way, too. I mean by that, to them, I am just doing my job. Nothing personal.

"During a trial in Miami, you'd end up talking to the defendants. It is all business to them.

"Here in Richmond, the problem is the violence. In Miami, it is the suppliers. Here it is the real users of the drugs and the problem, therefore, is really out in the community."

After those three years in Miami, Vick was ready to return home.

"I love being back in Richmond. I really do. This is home," he states quietly.


*  *  *

Vick's job is taking the street dealers off the pavement and taking the problem out of the community.

"The Johnson case cleared up the Blackwell area, at least for a period of time," the prosecutor believes.

But Vick refuses to get philosophical about the continuing problem with drugs, even with an all-out federal war being waged against the dealers.

"All I can do is continue to do what I do.  There are a lot of factors involved in the drug problem and many of them will take more than prosecution," he said.

"Toby" -- the nickname Vick was given at birth by his mother -- is an outgoing, friendly man who likes a good laugh and an occasional  cold beer outside the courtroom.

Inside the courtroom, Vick puts on his game face and becomes a thorough, well-prepared and penetrating prosecutor. There is a tightness around his

================================================================

=============================================================================

mouth that is not there when he is chatting in the corridors of the federal courthouse here.

So, how does he relax?

"I try to run 5 miles every other day. I exercise. Play golf. Hang around with my family. But I have no hobby to speak of. I do like reading about World War II.

"Basically, I love my family and my friends." He has a wife and two children.

Vick has no plans other than to continue what he does now -- put drug dealers behind bars.

"Sure, it is tough sometimes. But I love my job. I'm drained at the end of a trial, usually. But a new case comes along like Newtowne and you get the adrenalin flowing again.

"In fact, a couple days after a trial, I'm fine. I will say this, you lose a case and it kills you."

Vick has lost two cases in his career, both of them in Richmond. Typically, he continues to second-guess himself about the losses.

Vick describes himself as "happy-go-lucky" and makes references to not being considered "a serious student" in law school.

But Vick finished in the upper half of his class at T.C. Williams.  He has a quick mind in legal matters, associates say.

Says U.S. Attorney Richard Cullen: "Toby is all you want in a prosecutor. He's quite bright, he's hard-working and he's fearless," Cullen said.

David P. Baugh, a well-known defense lawyer, is not as appreciative, and called Vick a creature of "the Ronald Reagan school of prosecution."  Baugh has clashed with Vick in the courtroom.

"His plea bargain procedure is very suspect along racial lines," said Baugh.


                                    ***

The visitor to the eagle's nest is leaving, but Vick is relaxed now, joking and recalling old cases.

He calls attention to several photographs and objects in his office. Clearly, he is having a good time at the end of a long day.

Why did he decide to make the law his career?

It is a softball question and Vick swings at it.

"Ahhh, painting houses was hard," he responds.

KEYWORDS: GOVERNMENT      LAW      OFFICIAL      CAREER      BIOGRAPHY
           INTERVIEW
ENHANCER: 00168002

=============================================================================

USCA4 Appeal: 20-8    Doc: 2-7    Filed: 05/22/2020    Pg: 235 of 472

==========================  ==========================  ==========================

RICHMOND TIMES-DISPATCH
Copyright (c) 1992, Richmond Times-Dispatch

DATE: Wednesday, June 24, 1992            TAG: 9201270065
PAGE: B-3                                 EDITION: City
SECTION: Area/State                       LENGTH:   39 lines
SOURCE: BY BATTINTO BATTS JR.
        Times-Dispatch Staff Writer
MEMO: (lka)

## RICHMOND SUSPECT ARRESTED IN NEW YORK

A tip enabled authorities to capture a suspect last night who had been sought by Richmond police for two months.

Cory Johnson, an alleged member of the Newtowne Gang that police broke up in April, was arrested in New York City, Richmond prosecutor William H. Parcell III said.

The tip, which came from a confidential source in New York, led authorities to Manhattan, where Johnson was arrested at 8:45 p.m. without major incident, according to Parcell.

Johnson, 23, was indicted on April 28, along with six other people police say composed the violent drug gang. Authorities have blamed the gang for 11 of Richmond's homicides early this year.

Johnson was the only suspect not in police custody when the 33-count indictment was handed up. He was being held without bond last night in Manhattan pending an extradition hearing in a few days, said Parcell.

A joint investigation by the U.S. Attorney's office, the Drug Enforcement Administration, the Richmond Bureau of Police and the city commonwealth attorney's office swiftly secured the federal indictments against the gang.

Johnson, also known as "O", has been charged with conspiracy, operating a continuing criminal enterprise, murder in the furtherance of the criminal enterprise; use of a firearm, violent crime in the aid of racketeering, distribution of crack cocaine, and possession of crack cocaine with the intent to distribute.

Prosecutors will seek the death penalty against Johnson and two other alleged gang members when the federal trial, scheduled for Sept. 16, gets under way.

James Roane Jr., 26, and Richard R. Tipton, 21, also could face the death penalties for their alleged involvement in the gang.

KEYWORDS: DRUG    CRIME    MURDER    RICHMOND    NEW YORK
ENHANCER: 00176093

12

RICHMOND TIMES-DISPATCH
Copyright (c) 1992, Richmond Times-Dispatch

DATE: Sunday, July 5, 1992                 TAG: 9201280293
PAGE: F-7                                  EDITION: City
SECTION: Editorial                         LENGTH:  139 lines
ILLUSTRATION: DRAWING
SOURCE: By Richard Cullen
        * Mr. Cullen is the United States Attorney for the Eastern District
        of Virginia.
MEMO: (ljc)

## FEDERAL CRIME-FIGHTING ARSENAL HAS WEAPONS VIRGINIA NEEDS

The indictment of the Newtowne Gang in federal court in Rich mond a couple of weeks ago raised some eyebrows.

"Isn't murder a local problem better suited for state court?" a Washington Times editorial pointedly asked. "There is no reason why Richmond or Virginia or any other state or local jurisdiction shouldn't be able to enforce its own laws and protect its citizens," the editorial asserted.

The editorial really missed its mark. The federal government has a vital role in combatting drug-related violence. It is no coincidence that cities like Richmond, Alexandria, Norfolk, and Roanoke are seeing record murder rates year after year. The common denominator in this carnage is the violent gangs. The drug gangs are violent and they are organized. Many have the sophistication of successful small businesses. Most are mean as snakes.

The violent drug trade and the skyrocketing murder rates are a national problem crying out for a federal solution. Attorney General William Barr has targeted violent drug dealers as the Department of Justice's No. 1 priority, and we reject out-of-hand the Washington Times' hypothesis that the federal government should take a back seat.

FEDERAL LAW enforcement has several new weapons in our arsenal to combat interstate and international drug dealers, especially those whose calling card is violence and intimidation.

The federal drug kingpin statute is my favorite. It enables prosecutors to target entire drug organizations -- indict and prosecute them en masse and mete out tough sentences without parole. Under the statute, we are able to convict the top-level management of the drug organization -- the bosses who never get their victims' blood on their hands, but who nevertheless orchestrate and order the murders performed by their low- and mid-level subordinates. Every member of the drug organization who is convicted faces at a minimum 10 years without parole. The kingpins themselves face a minimum sentence of 20 years without parole. Often the penalties are even more severe.

The sentences are enhanced tremendously when a drug-related homicide occurs, or when large quantities of illegal drugs are involved.

THREE MEMBERS of the Newtowne Gang, for example, have been indicted under the kingpin statute and, if they are convicted, could face the death penalty. The grand jury has charged the three with being responsible for several murders in Richmond in furtherance of their alleged drug-running organization. If their jury believes the allegations and convicts, each of the three defendants faces the death penalty or life in federal prison without parole. These federal statutes have teeth and are geared to target gang-related drug dealers who act in violence.

Many state legislatures, including Virginia's, lag behind Congress in passing up-to-date criminal statutes to assist in the war on drugs.

We are blessed in Virginia with the spirit of co-operation in law enforcement. Governor Wilder's newly appointed Secretary of Public Safety, Randolph Rollins; William Corvello, superintendent of the Virginia State Police; and most Commonwealth's Attorneys, local chiefs of police, and sheriffs work every day in joint law enforcement operations with the Federal Bureau of Investigation, Drug Enforcement Administration, Internal Revenue

==============================================================================

Service, Alcohol Tobacco, and Firearms investigators, Customs, and other federal agencies involved against violent drug dealers.

Governor Wilder's new commission to study violent crime in Virginia is being chaired by Secretary Rollins, and as a member of that commission, I will ask that it examine existing state law to see if it should be amended to give Virginia's judges and prosecutors four of the tools that the federal government has given its prosecutors and courts.

* First, federal statutes permit entire gangs to be indicted and tried together. There are enormous benefits to law enforcement in being able to try an entire gang at one trial, where the facts are presented one time and both verdicts and sentences for all defendants can take all related circumstances into account. Virginia law requires a separate (and expensive) trial for each member of the alleged drug gang. This benefits the defendants.

* Second, the Federal Sentencing Guidelines are a tremendously effective law-enforcement tool. They enable judges to mete out sentences uniformly and fairly throughout the country. Race, education, and economic standing play no role. Rather, the sentences are determined by the crime. For example, in a drug case the amount of the illegal drugs involved in the crime determines the sentencing level. The sentence is enhanced if the defendant has a prior record.

In many instances, mandatory minimum sentences are built into the Guidelines. In these cases the defendant cannot be given probation. He must do prison time. There are no exceptions. In crimes of violence and drug-related felonies there are mandatory minimum sentences ranging from five, 10, to 20 years. In drug-conspiracy cases, every member of an indicted gang faces the potential mandatory life sentences under the Guidelines when the gang is found guilty of dealing more than 50 grams of crack cocaine.

In Alexandria, our office has been involved in dismantling an entire drug gang called Bush-Davis. We have alleged that the Bush-Davis gang is responsible for at least 36 homicides in the Washington, Northern Virginia, and New York metropolitan areas. Under the Guidelines and the mandatory minimum sentence requirements, each defendant in the Bush-Davis organization was facing a possible life sentence without parole because of the amount of crack cocaine involved in the drug dealings.

THE ONLY HOPE for a defendant under the Federal Sentencing Guidelines is to co-operate with the government, become a prosecution witness, and help the government dismantle the drug organization by providing testimony in federal court. When the defendant recognizes that he faces a life sentence without parole if he does not co-operate, his choice becomes easy.

Bush-Davis is an example of how lower-level drug dealers were able to provide compelling testimony against their higher-ups who in turn were effectively forced to plead guilty and also cooperate. This is not to say that the cooperating witnesses ultimately receive lenient sentences. To date, 25 defendants in Bush-Davis have pled guilty, five defendants have received life without parole, and the average sentence has been about 14 years without parole.

* Third, there is no parole under federal law. In Virginia and other states mandatory and discretionary parole can result in significantly reduced sentences. The problem is compounded in Virginia where a defendant is sentenced not by the judge but by a jury that has no information about the defendant's criminal background. And he will serve only a fraction of the time the jury imposes.

* Fourth, federal law has strict pretrial detention provisions. When a defendant in a federal indictment is charged with a serious drug-related crime or a crime of violence, he is taken off the street and placed in jail where he stays until his trial. This pretrial detention provision has reduced the fear in many communities that those charged will be released on bail and return to harass or harm law-abiding citizens who are otherwise willing to testify against them in court. In addition, the federal witness protection service is available to protect co-operating witnesses at no cost to them.

* Finally, under federal law, the use of a firearm during or in relation to a crime of violence or a drug-trafficking crime will expose the

**14**

==============================================================================

==========================================================================

offender to a mandatory five-year prison sentence. That sentence is increased
to a 10-year mandatory sentence if a sawed-off rifle or shotgun is used, and
to a 30-year mandatory sentence if a machine gun is used or if the firearm is
equipped with a silencer.

As with other federal penalties, no part of these sentences may be
suspended and there is no parole.

I AM HOPEFUL that we on the Commission will be able to address these
federal programs to determine whether something similar can be recommended to
the General Assembly for adoption in Virginia. But I am a realist. I recognize
that the Assembly, for one reason or another, will be slow to move unless the
public demands swift changes in the criminal justice system. The public must
demonstrate its willingness to support the need for more prison space and more
funds for state and local police and prosecutors. It is time for the public to
make its views known.

KEYWORDS: OPINION    DRUG      CRIME     MURDER    LAW      OFFICIAL
          POLICE    COURT     SENTENCE
ENHANCER: 00187153

15

======================================================= ========================
RICHMOND TIMES-DISPATCH
Copyright (c) 1992, Richmond Times-Dispatch

DATE: Friday, July 10, 1992                TAG: 9201280717
PAGE: B-8                                  EDITION: City
SECTION: Area/State                        LENGTH:   81 lines
SOURCE: By Randolph Goode
        Times-Dispatch Staff Writer
MEMO: (ljb)

JUDGE POSTPONES GANG TRIAL
PROSECUTORS MAY SEEK DEATH PENALTY FOR 4

A federal judge's "suggestion" yesterday in a ground-breaking capital punishment case brought smiles to the faces of defense lawyers, but the chief prosecutor said he is not worried.

U.S. District Judge James R. Spencer's suggestion ended up continuing until Jan. 11 the trial of six alleged members of Richmond's often-violent, crack-dealing "Newtowne gang." The trial had been set for Sept. 16.

"All defense counsel are very relieved we don't have to go forward until January with what is a very complicated case," said lawyer Robert P. Geary, who is representing one of perhaps four defendants facing death if convicted.

Assistant U.S. Attorney Howard C. Vick Jr. said the later  date makes no difference to him.

"We were ready to go to trial on Sept. 16. We will be ready for trial on Jan. 11," Vick said.

Until yesterday, prosecutors were seeking the seldom-used federal death penalty statute against three defendants -- Richard R. Tipton, 21, James H. Roane Jr., 26, and Cory Johnson, 23.

However, defense lawyer Reginald M. Barley said yesterday that he understands Vick will seek the death penalty against his client, Lance Thomas, 26, who also is known as Anthony Mack.

Vick would only say such a move "is under consideration."

Already the case has been billed as the largest capital punishment proceeding to go to trial in the United States. The addition of  a fourth defendant facing  the death penalty is likely to set precedent in trial law, according to an informed legal source.

Vick must receive permission from the U.S. Department of Justice before adding the capital punishment charge against Thomas.

Other defendants set for trial in January are Sterling Hardy, 27, and Sandra Reavis, 34. All of the accused live in Richmond except for Johnson, a resident of New York City.

Another person charged in the case, Jerry R. Gaiters, 38, pleaded guilty last month to seven counts, including three of murder. Gaiters will cooperate with the government in the prosecution of the others.

Johnson had been a fugitive until last week, when he was arrested in New York. Johnson and the others were indicted in late April by a federal grand jury here.

When Johnson will arrive in Richmond is not known. His "removal hearing" from New York has been continued until at least July 22, according to Vick.

Thus, the indefinite status of Johnson and the possibility of death penalty charges being filed against Thomas left the judge with little alternative but continue the case.

Spencer made his decision after a brief hearing yesterday to hear defense counsel's motions for a continuance.

"It seems clear the case will have to be continued," the judge said. "The question is, when?"

Saying he was "trying to be fair to all parties," the judge said he had a suggestion for a new trial date:  Jan. 11.

Defense lawyers quickly agreed. Vick did not oppose the new date. The trial is expected to last a month.

When Johnson arrives in Richmond, he will be represented by Richmond

=============================================================907a===============================================

*16*

========================= ========================= =========================

lawyers Craig Cooley and John McGarvey.

Geary and Eric White are representing Tipton; David Baugh and Arnold Henderson are Roane's defense lawyers. If Thomas is charged with a capital crime, it is likely that a second lawyer will be named to assist Barley.

Before Spencer's decision to continue the trial, Vick told the court that he would not object to a short delay in the proceedings.

"I'd rather have a short continuance and . . . try all the defendants together," the prosecutor said.

"The case is severe in sanctions, your honor, but it is not a complicated matter," Vick added.

Although murder usually is a state crime, a federal law that took effect in 1989 permits prosecutors to seek the death penalty against people who are convicted of operating a continuing criminal enterprise and who kill or order a killing.

Richmond police say members of the Newtowne gang are responsible for at least 10 slayings during a 45-day period this year.

All of the defendants in the case are charged with conspiring to distribute crack. But the main charge for Tipton, Roane, Johnson and possibly Thomas is murder in furtherance of a continuing criminal enterprise.

KEYWORDS: DRUG    CRIME    MURDER    COURT    CAPITAL PUNISHMENT
ENHANCER: 00192011

**17**

USCA4 Appeal: 20-8    Doc: 2-7      Filed: 05/22/2020    Pg: 241 of 472

===========================================================  ==========================

RICHMOND TIMES-DISPATCH
Copyright (c) 1992, Richmond Times-Dispatch

DATE: Wednesday, July 29, 1992          TAG: 9201300827
PAGE: B-6                                EDITION: City
SECTION: Area/State                      LENGTH:   68 lines
SOURCE: BY RANDOLPH GOODE
        Times-Dispatch Staff Writer
MEMO: (lcs)

## GUILTY PLEA COULD LEAD TO LIFE SENTENCE

A second man accused of being a member of an often-violent drug gang pleaded guilty in U.S. District Court yesterday to charges that could put him into a federal prison for the rest of his life.

But a plea bargain with federal prosecutors could reduce the possibility of Sterling Hardy receiving life in prison without parole.

Hardy, 27, entered pleas of guilty to one count of conspiracy, two counts of violent crime in aid of a racketeering activity and one count of use of a firearm in a violent or drug trafficking crime.

A charge of possession of crack with the intent to distribute it was dismissed yesterday.

In return for Hardy's admission of guilt and his cooperation during an upcoming trial, Assistant U.S. Attorney Howard C. Vick Jr. may seek to have any sentence Hardy receives reduced.

Judge James R.  Spencer accepted Hardy's guilty pleas and said a sentencing date will be set later.

Last month, another defendant -- Jerry R. Gaiters, 38 -- accused of being a member of the so-called Newtowne gang pleaded guilty to nine counts, including conspiracy, murder in furtherance of a continuing criminal enterprise, violent crime in aid of racketeering and possession with intent to distribute crack.

Gaiters also is facing life in prison without parole.

But the government may seek to have any sentence Gaiters receives reduced if he cooperates with the prosecution against five other alleged gang members.

The others are Richard Tipton, 21, Cory Johnson, 23, James H. Roane Jr., 26, Vernon Lance Thomas, 26, and Sandra Reavis, 34.

Tipton, Johnson and Roane are facing charges that, if they are convicted, could bring them the death penalty.  The government also may seek the death penalty against Thomas.

Ms. Reavis is charged with one count of possessing crack cocaine with the intent to distribute it.

A Jan. 11 jury trial is set for the five. The trial is expected to continue at least a month.

Richmond police say  the alleged gang members distributed large amounts of cocaine and killed at least 10 people during a 45-day period in January and February.

One of the counts against Hardy charged him with taking part in the Feb. 1 slaying of Torrick Brown at his sister's apartment on Lynhaven Avenue in South Richmond. The sister was wounded in the attack.

Vick said Hardy picked up three men with guns and drove them to the scene of the shootings. Hardy waited outside in case he was needed to drive a car after the shooting.

Spencer questioned Hardy closely about his role.

At one point, Hardy responded to a question from the judge by saying, "I didn't know nothing about the killing."

Hardy related how one of the co-defendants phoned him and said he was having trouble. Hardy said he was told to pick up the others.

As he waited outside the Lynhaven Avenue house, Hardy said he "heard them put clips into the guns."

"What did you think was going to happen when you went to South Side?" Spencer asked.

=====================================================================================

=========================    ==========================    ==========================
"I didn't know," Hardy answered.

"Did you know someone was going to be harmed?" the judge asked. "What was in your mind?"

Hardy responded by saying "I'm thinking something was going to happen. That James was going to do something. That he was going to kill somebody or hurt somebody."

KEYWORDS: DRUG     CRIME     VERDICT
ENHANCER: 00211017

RICHMOND TIMES-DISPATCH
Copyright (c) 1993, Richmond Times-Dispatch

DATE: Sunday, January 10, 1993          TAG: 9301010894
PAGE: B-1                                EDITION: City
SECTION: Area/State                      LENGTH:  106 lines
SOURCE: BY RANDOLPH GOODE
        Times-Dispatch Staff Writer
MEMO: (ljc)


## DRUG TRIAL HERE TO SET PRECEDENT
## DEATH PENALTY SOUGHT AGAINST 3 DEFENDANTS

Jury selection begins tomorrow in U.S. District Court to pick a panel that will decide whether three young men -- alleged members of a murderous drug gang -- should live or die.

Scheduled to last six weeks, the precedent-setting trial will mark the first time the death penalty has been sought against more than one defendant.

Jury selection is expected to last at least two days and possibly three, according to court officials.

Richard Tipton, 22; Cory Johnson, 23; and James H. Roane Jr., 26, are accused of being members of a cocaine-dealing organization known to police as the "Newtowne gang."

Police contend the gang was responsible for 11 murders during a 45-day period early last year -- slayings that helped set a homicide record in 1992.

Prosecutors also are seeking the death penalty against a fourth alleged gang member, Vernon Lance Thomas, 26. Thomas' trial, though, will be later this year.

Federal law that became effective in 1989 permits prosecutors to seek the death penalty against people who are convicted of murder while operating a continuing criminal enterprise.

Should the jury find a defendant guilty of the capital punishment charge, then a second phase of the trial will be held to determine punishment -- death or life in prison without parole.

Normally in federal courts, a jury determines only guilt or innocence. Sentencing is left solely to the judge.

In this case, if the jury fails to reach a decision as to the sentence, the judge will impose it. But the judge cannot impose the death sentence under such circumstances.

During the past four years, the federal death penalty has been sought against about 24 defendants. Only one person has been sentenced to death and his case is now on appeal.

About 250 potential jurors have been ordered to appear for the selection process. Half will appear tomorrow and the rest on Tuesday.

By the time opening arguments begin later this week, 12 jurors and at least four alternates will be in the jury box located in the third-floor courtroom at the U.S. Courthouse here.

Security precautions are expected to be elaborate around the courthouse at 10th and Main streets, as well as in the courtroom itself. U.S. marshals from other cities will be on hand to bolster the force that usually provides security..

In addition to Tipton, Johnson and Roane, a fourth defendant -- Sandra Reavis, 35 -- also will be at the defense table tomorrow. Unlike her co-defendants, however, Ms. Reavis is charged with one count: Conspiracy to distribute crack cocaine.

In addition to the murder charge, Tipton, Johnson and Roane face a number of other counts, including conspiracy, use of a firearm in a violent or drug-trafficking crime and possession of crack cocaine with the intent to distribute it.

Each of the three men facing the death penalty will be defended by two lawyers. Robert P. Geary and Eric D. White are representing Tipton; Craig S. Cooley and John McGarvey are Johnson's counsel; David P. Baugh and Arnold

USCA4 Appeal: 20-8     Doc: 2-7     Filed: 05/22/2020     Pg: 244 of 472
===============================================================================

Henderson are Roane's lawyers.

The case is being prosecuted by Assistant U.S. Attorney Howard C. Vick Jr. and William H. Parcell, Richmond's deputy commonwealth's attorney.

Vick and Parcell are expected to call more than 100 witnesses, many of them people once involved in drug trafficking. About 130 prosecution exhibits are expected to be introduced into evidence.

Included among the government's witnesses are two men -- Jerry R. Gaiters and Sterling Hardy -- who were indicted with the defendants last April.

As part of an agreement with the government, Gaiters and Hardy pleaded guilty to various charges in hopes that prosecutors will file a motion for a reduction in any sentence they receive later.

At a hearing last May, city homicide Detective C.T. Woody testified that several of the 11 victims were gang members who were slain because it was feared they had -- or would -- talk to police.

Woody testified that two of the accused members, Tipton and Johnson, decided "they were going to take care of all the weaklings that were close to them because the police were getting close."

The veteran detective also testified that one victim, Dorothy Mae Armstrong, was killed because of her knowledge of gang operations.

She was shot at least eight times in the back last Feb. 1 during a triple homicide in a Church Hill home. The other two victims, Bobby Long and Tony Carter, happened to be in the wrong place at the wrong time, Woody testified.

A Richmond police officer said last spring that the gang would kill "everybody they came in contact with."

In another shooting, Torrick Brown, 26, was shot in his sister's apartment on Lynhaven Avenue. The sister, Martha McCoy, also was shot but survived. Her three children witnessed the shootings.

U.S. Attorney Richard Cullen contends that the alleged gang members brought a large amount of cocaine into the city from New York.

"They went out and did business with guns and bullets," Cullen said.

But the defense lawyers are expected to mount a vigorous counterattack against the evidence presented by the government.

For example, the defense lawyers are expected to attack the testimony made by many witnesses, especially those who are testifying in return for either immunity from prosecution or in hopes of getting a reduction in sentence.

Some of the pretrial motions have alleged that the federal death penalty statute is unconstitutional.

"The range of offenders potentially subject to capital punishment is so broad and irrationally defined that it fails to satisfy the statute's purpose and undermines it justification," Geary argued in one motion.

Pretrial sparring, however, has not dimmed the magnitude of the case, in the lawyers' view.

"This is the biggest criminal prosecution ever to hit this courthouse," White said recently.

KEYWORDS: DRUG     CRIME     MURDER
ENHANCER: 00010116

===============================================================================

1-2343

F RONT
PAGE

# Gunshot hits auto carrying detectives

**BY BATTINTO BATTS AND RANDOLPH GOODE**

TIMES-DISPATCH STAFF WRITERS

Two detectives involved in the Newtowne gang drug trial were shot at Thursday night on East Main Street, sources confirmed yesterday.

C.T. Woody and T.P. Leonard, of the Richmond police narcocide unit, were riding on East Main Street about 6:30 p.m. when a shot was fired into a rear window of their car, according to sources.

■ The trial continues, page B6.

Woody and Leonard had gone to pick up the children of a protected witness in the trial, the sources said.

No one was injured. Police still are investigating the incident.

Immediately after the shooting, police protection was provided at the houses of Assistant U.S. Attorney Howard C. Vick Jr. and William H. Parcell III, the deputy commonwealth's attorney who is assisting in the prosecution.

Tight security continued yesterday for the prosecutors and witnesses as the trial of several alleged members of one of Richmond's most deadly gangs continued.

The sources also said that Woody had been a target of a "hit" contract from members of the gang several weeks before the trial began.

Several witnesses also had been targeted for death by the gang, which authorities say has been known to kill with "reptilian coldness."

Gang members from New York had been sent here in search of the witnesses, but federal authorities had scattered them throughout the country.

913a

22

E X H I B I T   7

USCA4 Appeal: 20-8      Doc: 2-7      Filed: 05/22/2020      Pg: 247 of 472

An Introduction to the Wechsler Adult Intelligence Scale, Third Edition (WAIS-III)

David S. Tulsky, Ph.D.

Jianjun Zhu, Ph.D.

Aurelio Prifitera, Ph.D.

The Psychological Corporation
San Antonio, TX

Paper presented during the Symposium: **Modernizing the WAIS-R - Implications for Clinical Practice** at the 104th Annual Convention of the American Psychological Association, Toronto, 1996.

Requests for reprints and other correspondence about this paper should be directed to: David S. Tulsky, The Psychological Corporation, 555 Academic Court, San Antonio, TX 78204.

Copyright © 1996 by The Psychological Corporation. All Rights Reserved. No part of this presentation may be reproduced or transmitted in any form or by any other means, electronic or mechanical including photocopy, recording, or any information storage and retrieval system, without permission in writing from the publisher, *The Psychological Corporation.*

915a

## Abstract

In 1992, the revision of the WAIS-R to the WAIS-III began. The standardization edition contained all the 11 traditional subtests and 3 optional, experimental subtests. This paper will present a brief description of the three new experimental subtests that have been added to the WAIS-III. Also, this paper will outline the goals of the revision and highlight the major additions that will be made to this instrument. A description of the preliminary work (including item reviews, pilot studies, and a nationwide tryout study) as well as the research design for the standardization study will be reported.

2

The Wechsler Adult Intelligence Scale-Revised (WAIS-R) is one of the most popular IQ tests in the world, used by the vast majority of clinical and school psychologists. The WAIS-R is an individually-administered battery of 11 subtests which measure the intellectual ability of people who are between the ages of 16-74. It can be administered in 60-75 minutes, and it has sets of Verbal (6) and Performance (5) subtests. The subtests vary in content from tasks such as defining vocabulary words, stating abstract relations between two objects or concepts, repeating a string of digits, putting puzzles together, putting blocks together to match a pattern, and sequencing a set of pictures to tell a story. The following are subtests from the WAIS-R:

| Verbal Scale | Performance Scale |
|---|---|
| Information | Picture Completion |
| Vocabulary | Block Design |
| Similarities | Object Assembly |
| Comprehension | Picture Arrangement |
| Digit Span | Digit Symbol |
| Arithmetic | |

Several factors have contributed to the decision to update the WAIS-R. The most obvious factor is the outdated normative information. Work by James Flynn (1984, 1988) has indicated that there is a real phenomenon of IQ gains over time. Individuals appear to gain approximately 3-5 IQ points over a 10 year period. Since the WAIS-R was published in 1981 and the data was collected a year prior to the publication, this inflation factor could mean that the average IQ could be as high as 105 - 107 points rather than the accepted value of 100. While this

3

reason alone would be sufficient for a revision, there are several other goals for improving the WAIS-R.

First, the normative information could be improved upon. Individuals in the United States are living longer. Current estimates place the average life expectancy at birth to be 78 years for women and 71 years for men (La Rue, 1992). However, the WAIS-R only has normative information up to 74 years of age, and hence, it is becoming less sufficient for estimating intelligence in an older adult population. To make up for this deficit, two independent research teams have conducted studies to extend the norms upward into an older adult population. The first project was conducted by Ryan, Paolo, & Brungardt (1990) who received a grant from the American Association of Retired Persons/Andrus Foundation. The grantors were concerned that psychologists could use better information to assess the cognitive functions of older adults. These investigators selected a sample of 130 people (60 individuals who were between the ages of 75-79 and 70 who were 80 years old and up). Attempts were made to match the sampling stratification criteria of the WAIS-R as much as possible. The second research team was operating out of the Mayo Clinic, and collected normative data on 512 individuals between 56 and 97 years of age (Ivnik, Malec, Smith, Tangalos, Peterson, Kokmen, & Kurland, 1992). Ivnik et al. (1992) deviated from the WAIS-R scoring technique by developing "age-specific" raw score to scale score conversions rather than basing the conversion on the optimal functioning "reference" group. Using the 56-74 year-old sample as a reference point, the research group also spent a considerable amount of time investigating the similarities between the Mayo Older Adult

4

Normative Studies (MOANS) norms and the WAIS-R standardization sample norms so that they could make their norms as similar as possible to the WAIS-R.

In addition, Malec, Ivnik, Smith, Tangalos, Petersen, Kokmen, & Kurland (1992) present the MOANS data corrected for both age and education level (MOANS-E) scores. Another research group, lead by Heaton and his colleagues, have published demographic normative information on the WAIS[1] (Heaton, Grant, and Mathews, 1991) and WAIS-R (Heaton, 1992). This work illustrates the practical need in the field for education adjusted normative information. Hence, two perceived shortcomings of the WAIS-R are 1) that the WAIS-R sample does not include a large enough age range and 2) that the WAIS-R norms do not adjust for key demographic variables. The WAIS-III will eliminate these shortcomings. The normative sample of the WAIS-III will now include older adults (e.g., 74-89), and in addition to the basic norms, supplements will be provided allowing the clinician to adjust for education by age in cases where the examiner needs to predict premorbid IQ functioning.

A third goal is to improve the item content of each of the subtests. A number of items are outdated and should be replaced. The artwork on the WAIS-R is old and out of date. The new revision would improve the artwork and the materials. The size of the visual stimuli have been enlarged significantly, making them more appropriate for an older adult population. Additionally, some examiners have criticized the WAIS-R for containing some items that appear to be biased against certain groups. Extensive bias analyses and reviews have been conducted so that biased items could be replaced in the revision.

---

[1] The WAIS was included as part of an extended Halstead-Reitan Battery.

5

Another criticism of the WAIS-R is that some of the subtests are too dependent upon quick performance. For instance, on the Object Assembly subtest of the WAIS-R where subjects put puzzle pieces together, an examinee may earn up to 12 raw score points (e.g., 29% additional raw score points) as time bonus points for speedy performance. This could result in a difference of between 7 and 10 subtest scaled score points. Hence, another one of our objectives is to reduce the contribution of speed and bonus points to the Performance IQ wherever it is possible. To help achieve this goal, a new untimed performance subtest, Matrix Reasoning was developed. It was hoped that Matrix Reasoning would help extend the WAIS-III's ability to measure more fluid, abstract reasoning on the performance scales.

A fifth modification focuses on the composite scores. Some researchers have written about the limitations of the IQ score (Lezak, 1988, 1995). Others have suggested that the scale should measure a wider spectrum of domains of cognitive functioning (Malec et al., 1992). To incorporate some of the advances in the field, when the childrens' version, the WISC-III, was published in 1991, new factor based composite scores (e.g., Verbal, Perceptual Organizational, Attention, and Speed of Information Processing) were added in addition to the traditional IQ composite scores. The WAIS-III revision will include an alternate composite scoring system, in addition to the traditional IQ scoring system, New optional subtests were developed to assess abilities on a hypothesized 3rd factor (Attention/Working Memory) and a 4th factor (Speed of Information Processing). Specifically, two subtests, "Cancellation" and "Letter-Number Sequencing," were designed to measure "Attention and/or Working Memory", and a third subtest, "Symbol Search" was designed to measure "Processing Speed."

920a

6

Additionally, the WAIS-R subtests do not accurately measure abilities more than 3 standard deviations below average, limiting measurement of individuals with very low or impaired intellectual functioning. Effort was made to increase the precision of measuring clinically relevant groups (e.g., people with mental retardation, people with neuropsychological impairment). This could be achieved in two ways, by extending the range of scores downward so that more reliable measurement could be made at the lower end of functioning and by including new diagnostic features to make the scale useful in the field of neuropsychology. To achieve the former, several "low end" items were created and added to the majority of subtests. To achieve the latter, several optional procedures (like testing incidental learning following the Digit Symbol administration - see Kaplan, Fein, Morris, & Delis, 1991) were added to the WAIS-III Standardization edition.

Another goal of the revision is to link the WAIS-III with other tests to help facilitate the clinical decision making process. Significantly, the standardization sample was co-normed with the WMS-III (the revision of the Wechsler Memory Scale - Revised). This linkage will allow clinicians to examine IQ/Memory discrepancy scores and will allow better interpretation of the domains of cognitive functioning that include both intelligence and memory assessment.

Finally, extensive work has been performed to validate the new instrument and to demonstrate comparability between the WAIS-III and WAIS-R. Correlations between the WAIS-III and the WAIS-R, WISC-III, WIAT, WMS-III, Progressive Matrices, and the Stanford-Binet, 4th Edition will be calculated to show the concurrent validity of the instrument. Furthermore, the WAIS-III and WMS-III will be tested in a series of clinical validity studies with more than 600 individuals with neuropsychological impairment (e.g., Alzheimer's Dementia,

Traumatic Brain Injury), psychiatric diagnosis (e.g., Schizophrenia, Depression), learning disabilities, mental retardation, or those who are deaf. From these studies, the construct validity and clinical utility of the WAIS-III will be demonstrated.

History and timelines of the WAIS-III:

Development of the WAIS-III officially began in September of 1992. The project can be divided into 5 main phases: 1) a review of the existing WAIS-R items and the development of new items and subtests; 2) pilot testing of the initial WAIS-III subtests to determine initial item difficulties and functioning; 3) a national tryout study to test item difficulty, item bias, and the WAIS-III factor structure; 4) a large national standardization study to collect normative information, test item difficulty and bias, and to make final item decisions; and 5) several studies to determine the reliability, concurrent validity, construct validity, and clinical utility of the test.

At the initial phases of the project, the existing WAIS-R items were reviewed for potential bias and datedness and new item pools were written for each subtest. To help evaluate the existing WAIS-R items, reviews related to content and potential bias were obtained from 12 experts in the field. Also, the item statistics from the WAIS-R Standardization study were reviewed, and an Item Response Theory (IRT) analysis and an IRT bias analysis on the existing WAIS-R items were performed. Simultaneous to the item review, new item pools were generated for the Comprehension, Similarities, Information, Picture Completion, Vocabulary, Picture Arrangement, and Block Design subtests. These new item pools were rated for content relevance and expected difficulty level and then, were narrowed considerably. For some subtests like Comprehension, the "ratings" were more formal; a mini-pilot study was conducted with

undergraduate students at a local university. Other subtests like Vocabulary did not warrant any pre-pilot testing. For Vocabulary, the preliminary items were rated based upon grade equivalents and familiarity as rated by Word Frequency Book (Carroll, Davies, & Richman, 1971) and A Revised Core Vocabulary (Taylor, Frackenpohl, & White, 1989). Still, for other subtests like Picture Completion, item ratings were performed by having members of the project team review and rank each item on a 5 point likert scale for relevance and on a 3 point scale for difficulty. Through these methods, the initial items for pilot testing were selected for each of the subtests. However, before the final decisions were made, the subtests were then carefully re-reviewed for their content representativeness to ensure that the items selected were roughly parallel in nature to those making up the WAIS-R. If parallelism was not found, then some items were dropped or added at this stage. In addition to modifying the existing subtests, work began on developing the new subtests. Early versions of Symbol Search, Matrix Reasoning, Cancellation, and Working Memory were developed (Zhu, Tulsky, Hilmer, Thomas, O'Donnell, & Nyugen, 1996).

The second phase of development consisted of formally testing each of the new items in 3 pilot studies. The subtests were administered with very liberal discontinue rules and several "additional" items were added to the majority of subtests. Some subtests had alternate forms (e.g., Cancellation). The sample sizes for each of these pilot study ranged from 113 to 168 examinees. The analysis centered around examining the item difficulties and the item correlation with the total score in order to select items to be tested in the nationwide Tryout study that would follow. In addition to the classical item analysis technique, in analyzing the speeded, attentional, and working memory subtests, the correlations with other subtests were analyzed to determine if

9

it was likely that a subtest would add to the measurement of the attentional, working memory, and/or speed of information processing domains of cognitive ability. Most of the new subtests appeared to be achieving their purpose (Zhu, Tulsky, Hilmer, Bow-Thomas, O'Donnell, & Nyugen, 1996). However, the Picture Ordering subtest, which was designed to test working memory, seemed to be too difficult to administer in a user friendly manner on the WAIS-III. Hence, this subtest was dropped and not included in the Tryout.

The third phase of the development consisted of a large national Tryout with 446 subjects, as well as additional smaller studies testing the psychometric properties of the scale (e.g., construct validity and test-retest reliability). The sample was stratified on several key variables: age, sex, education level, ethnicity, and region of the country. The sampling plan also included a large oversampling of African-American and Hispanic examinees to help us detect and remove items that were potentially biased against either of these minority groups. Traditional Mental-Hanszel Bias analysis and Item Response Theory bias analyses were conducted to help us detect potentially problematic items. Following these analysis, a sub-sample of our subjects was selected (N = 284) that roughly represented the census statistics for the general population. Using this sample, classical item analyses (such as computing item difficulties and item-total correlations) and IRT Rasch analysis were performed for each subtest so that the items sets for standardization could be selected. Detailed scoring studies of the four verbal subtests (e.g., Vocabulary, Similarities, Comprehension, and Information) were conducted on the 446 subjects with two trained scorers coding and comparing each response so that more refined rules could be developed. Exploratory factor analyses were also performed. The results of these latter analyses

924a

10

suggested that a 4-factor solution was supported. Some subtests, such as Cancellation and Symbol Search, were modified based upon the Tryout results.

The fourth phase of development focused on the collection of the standardization data and began in July, 1995. The standardization sample is comprised of 2450 subjects spanning the ages 16-89. The sample was also stratified on sex, education level, ethnicity, and region of the country. For sex, an equal number of males and females were collected with subjects for age groups 16-64. For the older subjects, where the percentage of females is higher than the percentage of males, this variable was stratified on census proportions. Also, samples based on education level, ethnicity, and region of the country were collected stratified by demographic information provided in the 1993 census update. Included in the sampling design was a plan to jointly collect Standardization data on the Wechsler Memory Scale, Third Edition (WMS-III). Over 1500 individuals took both the WAIS-III and the WMS-III (in a counterbalanced order) allowing direct comparison of intelligence and memory and the provision of normative information of a combined set of expanded domains of cognitive abilities that include verbal and performance abilities, verbal and visual memory, working memory, speed of information processing, and learning acquisition.

In addition to the basic Standardization sample, 200 African-American and Hispanic individuals were tested without discontinue rules so that the item bias analysis could be repeated with sufficient observed item scores for both of these ethnic groups. Also, an additional 432 examinees were tested to ensure that there were at least 30 individuals in each education level within each age group so that age by education level normative data could be provided. These

925a

USCA4 Appeal: 20-8    Doc: 2-7    Filed: 05/22/2020    Pg: 258 of 472

11

latter cases were treated as "oversampled" data and were not included in the basic standardization sample.

The fifth phase of development began concurrently with the standardization data collection. It focused on the psychometric properties of the WAIS-III. To assess the stability of the instrument, a test-retest correlation coefficient was computed on 390 examinees who completed the WAIS-III within a range of a 3 to 12 week interval. Concurrent validity studies were performed to investigate the correlation between the WAIS-III and the WAIS-R (N=210), the WAIS-III and the WISC-III (N=200), the WAIS-III and the WIAT (N=100), the WAIS-III and the Stanford Binet - IV (N=30), and the WAIS-III and the Ravens Progressive Matrices (N=30). Test administrations are being counterbalanced for administration order. Finally, as an index of the construct validity and the clinical utility of the scale, the WAIS-III is being administered in several small studies to a wide variety of individuals with neuropsychological deficits (e.g., Alzheimer's Dementia, Traumatic Brain Injury), individuals with mental retardation, individuals with psychiatric disorders, individuals with learning disabilities, and individuals who are deaf. We plan to collect approximately 30 examinees in each of these clinical groups.

In summary, it should be reiterated that the WAIS-III will resemble its predecessors. All of the familiar subtests will be included in the kit and the verbal, performance, and full scale IQ scores may be obtained. The revised scale will also have several features that will assist diagnosticians in making complex clinical judgements about their examinees. Some of the improvements include:

12

1.  Replacement of outdated norms and an extension of the normative sample to include older adults (e.g., 74-89). Additionally, when premorbid prediction of IQ is needed, supplemental normative data will allow clinicians to adjust scores for both age and education level.

2.  Replacement of outdated and biased items. Also, improved quality of the artwork and the material. Enhancement of materials to make test administration easier.

3.  Development of new factor based composite scores (in addition to the traditional ones). These new composite indices take advantage of some of the advancements in the measurement of cognitive abilities. New optional subtests will be developed to assess abilities on some of these factors.

4.  Reduced emphasis on the speed and bonus points in the instrument. To help achieve this goal, a new subtest, Matrix Reasoning, was developed. Additionally, the reliance of bonus points on some subtests (e.g., Arithmetic) has been reduced in the revised version.

5.  Extension of the floor of the subtests so that the test will provide more clinical utility when testing people with Mental Retardation. To achieve this goal, several "low end" items were created and added to the majority of subtests.

6.  The WAIS-III was co-normed with the revision of the Wechsler Memory Scale - III (WMS-III) to allow clinicians to examine IQ/Memory discrepancy scores, as well as to allow for better assessment of multiple domains of cognitive functioning.

927a

13

7. Extensive validation studies that demonstrate the clinical utility and construct validity of the new scale.

8. Similarity with the WAIS-R. People who are conversant with the administration and interpretation of the current instrument (WAIS-R) should be able to use the WAIS-III with minimal training.

14

## References

Carroll, J.B., Davies, P., & Richman, B. (1971). The American Heritage: Word Frequency Book. Boston: Houghton Mifflin Company.

Flynn, J.R. (1984). The Mean IQ of Americans: Massive gains 1932 to 1978. Psychological Bulletin, 95, 29-51.

Flynn, J.R. (1988). Massive IQ gains in 14 nations: What IQ tests really measure. Psychological Bulletin, 101, 171-191.

Heaton, R.K., Grant, I., & Matthews, C.G. (1991). Comprehensive Norms for an Expanded Halstead-Reitan Battery: Demographic Corrections, Research Findings, and Clinical Applications. Odessa, FL: PAR, Psychological Assessment Resources, Inc.

Heaton, R.K. (1992). Comprehensive Norms for an Expanded Halstead-Reitan Battery: Supplement for the Wechsler Adult - Revised. Odessa, FL: PAR, Psychological Assessment Resources, Inc.

Ivnik, R. J., Malec, J.F., Smith, G.E., Tangalos, E.G., Petersen, R.C., Kokmen, E., & Kurland, L.T. (1992). Mayo's older adult normative studies: WAIS-R norms for ages 56-97. The Clinical Neuropsychologist, 6 (Supplement), 1-30.

Kaplan, E., Fein, D., Morris, R., & Delis, D.C. (1991). WAIS-R as a Neuropsychological Instrument Manual. San Antonio: The Psychological Corporation.

La Rue, A. (1992). Aging and Neuropsychological Assessment. New York: Plenum Press.

Lezak, M.D. (1988). IQ: R.I.P. Journal of Clinical And Experimental Neuropsychology, 10, 351-361.

15

Lezak, M.D. (1995). <u>Neuropsychological Assessment. Third Edition</u>. New York: Oxford
University Press.

Malec, J.F., Ivnik, R.J., Smith, G.E., Tangalos, E.G., Petersen, R.C., Kokmen, E., & Kurland,
L.T. (1992). Mayo's older adult normative studies: Utility of corrections for age and
education for the WAIS-R. <u>The Clinical Neuropsychologist. 6 (Supplement)</u>. 31-47.

Ryan, J.J., Paolo, A.M., & Brungardt, T.M. (1990). Standardization of the Wechsler Adult
Intelligence Scale - Revised for persons 75 Years and Older. <u>Psychological Assessment.</u>
2, 404-411.

Taylor, S.E., Frackenpohl, H., & White, C.E. (1989) <u>A Revised Core Vocabulary</u>. Columbia, SC:
EDL.

Zhu, J., Tulsky, D.S., Hilmer, C., Bow-Thomas, C.C., O'Donnell, L., & Nyugen, C. (1996). New
Experimental Subtests of WAIS-III. Paper presented during the 104th Annual Convention
of the American Psychological Association, Toronto, 1996.

E X H I B I T   8

VI. Sentencing Closing Arguments COPY

VIRGINIA:

    IN THE CIRCUIT COURT OF FAUQUIER COUNTY

_____

COMMONWEALTH OF VIRGINIA,    :

    Plaintiff,    :

v.    : CRIMINAL NO. CR96-160
    CR96-161, CR96-162

DAVID D. MATTHEWS, JR.,    :

    Defendant.    :

_____

    September 8, 1997

    Day 15

    The Jury Trial held in the above-captioned matter, which convened, pursuant to notice, at 9:00 a.m. at the Fauquier County Courthouse, Warrenton, Virginia.

BEFORE:

    THE HONORABLE WILLIAM SHORE ROBERTSON

APPEARANCES:

    For the Commonwealth:
    JONATHAN S. LYNN, COMMONWEALTH ATTORNEY
    J. GREGORY ASHWELL, DEPUTY COMMONWEALTH ATTORNEY

    For the Defendant:
    JUD A. FISCHEL, ESQUIRE

    ALEXANDER N. LEVAY, ESQUIRE
    MOYES & LEVAY

    Robin Creswell, Court Reporter

they have to bring the next witness over from the jail. He was apparently here and brought back.

THE COURT: I would suppose that would take approximately 15 minutes, so we will have to take a short recess for that.

Ladies and gentlemen, we'll take another recess of about 15 minutes.

(A brief recess was had.)

THE COURT: Counsel ready?

MR. LEVAY: Yes, sir.

THE COURT: Who will be your next witness?

MR. LEVAY: Melvin Shifflett.

THE COURT: All right. Let's seat the jury and the witness can be brought in.

(Jury in at 11:15 a.m.)

- - -

Thereupon,

MELVIN SHIFFLETT

was called as a witness, and after being first duly sworn, was examined and testified as follows:

THE COURT: Mr. Shifflett, please have a seat, sir, and please answer to Mr. Levay.

DIRECT EXAMINATION

BY MR. LEVAY:

Q    Good morning.

A    Good morning.

Q    Please state your name for the jury and the Court.

A    Melvin Shifflett.

Q    Mr. Shifflett, where do you currently reside?

A    Right now I'm at Loudoun County Adult Detention Center, but I was in Augustus Correction Center in Greenville, Virginia.

Q    And, Mr. Shifflett, can you tell the jury, please, how many maximum security prisons you have resided in?

A    Just about all of them.

Q    And could you give the names?

A    You have Buckingham Corrections Center, Ottawa, Brunswick, Greensville, King Mountain, Augustus, all of the road camps from No. 1 to 31. They're numbered.

Q    Now, in your maximum security prison cell, can you tell -- you have been transferred to Loudoun County temporarily; is that right?

72

A    Yes, sir.

Q    And where will you return to?

A    More than likely, back to King Mountain.

Q    And in King Mountain --

A    Yes.

Q    In King Mountain, can you tell the jury how big your cell is?

A    It's about 8 feet by 15 -- 8 by 15.

Q    And what is in that cell?

A    You got -- some cells have double bunks. Most of them have double bunks. You got a table that's bolted to the wall, your sink, commode, and a mirror.

Q    And what is the sink and commode made out of, sir?

A    Stainless steel.

Q    Any covers on that toilet?

A    No, sir.

Q    What is the mirror, is that stainless steel?

A    Stainless steel.

Q    How many hours do you spend in your cell in a day?

73

A      If you arrive at a major institution and they have a building called "dead heads." When you first get there, that's where you go. You are in your cell from nine o'clock at night to seven in the morning.

Q      How long do you spend each day in your cell, sir?

A      Nine o'clock at night to seven o'clock the next morning.

Q      And, Mr. Shifflett, can you tell the jury whether or not you have any control as to your movement in prison?

A      Maximum security prison you don't. It's all controlled movement. When you leave your building, say to go to the rec yard or something, you have to ask the officer to go, he gets on the radio and the officer outside sits there at the door and you can come outside. He escorts you to the rec yard or whatever. You are under control at all times.

Q      Is there generally two to a cell, sir?

A      Yes, sir.

Q      Do you have any choice in who that other inmate is?

74

A     Not necessarily.

Q     Do you have any privacy in prison, Mr. Shifflett?

A     No, sir.

Q     Are your showers taken in your cell, Mr. Shifflett?

A     No, sir. They send -- you are assigned to a pod. You have four showers to a pod. And when you walk in, you got a door that's like an old saloon door that swings open. It's half partition. All it does is cover you from your knees to here, and people can still see you; the guards can see you; inmates can see you.

Q     Is that controlled movement as well, sir?

A     Yes, sir.

Q     What is lockdown, Mr. Shifflett?

A     Lockdown consists of the whole institution on lock down. No movement whatsoever.

Q     And what are the reasons for lockdown?

A     Riots, disturbances, stabbings --

Q     Can -- I'm sorry, go ahead.

A     Fights.

Q     Can an individual be put in lockdown?

MAUREEN MCMAHON REPORTING, INC.
(540) 347-1016   (703) 771-3993

75

A    Yes, sir.

Q    Have you been put in lockdown?

A    Yes, sir.

Q    What are the reasons for you being put in lockdown?

A    When I got transferred from King Mountain to Augustus Correctional Center to go back to court in Loudoun, when I arrived at Augustus Correctional Center, two inmates there recognized me and claimed me as an enemy, so they went to administration and told them they were scared of me, so they locked me up, put me in lockdown.

Q    And how many hours did you spend in your cell in lockdown?

A    I'm there 23 hours a day.

Q    Mr. Shifflett, are inmates subject to searches in their cell?

A    Yes, sir.

Q    What kind of searches are conducted in their cells?

A    It all depends on what they are looking for.  If they are looking for, you know, wine or drugs or something like that, you know, you could be

76

stripsearched.

Q    What is a strip search?

A    Strip search consists of you being in your cell, strip you down naked, squat, cough, and get redressed and search the rest of your cell.

Q    Do these searches happen randomly or in order?

A    It could be any time.  If the officer suspects you have something in your cell or on your person, they can search you down.

Q    Mr. Shifflett, how are convicted child molesters treated in prison?

A    They're the lowest thing on earth.

Q    Have you, personally, observed violence upon convicted child molesters?

A    I have seen people get stabbed; I have seen people get killed; I have seen people get acid thrown on them, burnt up.  I have seen it all.

Q    Mr. Shifflett, did they take cereal away from the inmate's diet in prison?

A    The presweetened cereal, yes.

Q    Why is that?

A    So you couldn't make mash, homemade wine.

77

Q    And, sir, in maximum security prison or super maximum security prison, is it next to impossible to obtain alcohol?

A    Pretty much.  If the administration knows that you're an alcoholic or you like drinking, they keep a well good eye on you.  Like I said, they can search you any time, day or night.  Same way with drugs.  If you're a known drug addict, they do the same thing.

MR. LEVAY:  Thank you, Mr. Shifflett. That's all I have.

MR. LYNN:  I have no questions.

THE COURT:  Thank you, Mr. Shifflett.

MR. LEVAY:  My last witness will be James Aiken.

- - -

Thereupon,

JAMES E. AIKEN

was called as a witness, and after being first duly sworn, was examined and testified as follows:

THE COURT:  Have a seat and kindly speak into the microphone and answer Mr. Levay's questions.

DIRECT EXAMINATION

E X H I B I T   9

VII Sentencing Closing Arguments COPY

VIRGINIA:

IN THE CIRCUIT COURT OF FAUQUIER COUNTY

COMMONWEALTH OF VIRGINIA,          :

        Plaintiff,                 :

v.                                 : CRIMINAL NO. CR96-160
                                       CR96-161, CR96-162
DAVID D. MATTHEWS, JR.,            :

        Defendant.                 :

                                        September 8, 1997

                                        Day 15

        The Jury Trial held in the above-captioned matter, which convened, pursuant to notice, at 9:00 a.m. at the Fauquier County Courthouse, Warrenton, Virginia.

BEFORE:

        THE HONORABLE WILLIAM SHORE ROBERTSON

APPEARANCES:

        For the Commonwealth:
        JONATHAN S. LYNN, COMMONWEALTH ATTORNEY
        J. GREGORY ASHWELL, DEPUTY COMMONWEALTH ATTORNEY

        For the Defendant:
        JUD A. FISCHEL, ESQUIRE

        ALEXANDER N. LEVAY, ESQUIRE
        MOYES & LEVAY

                        Robin Creswell, Court Reporter

                MAUREEN MCMAHON REPORTING, INC.
                     (540) 347-1016

77

Q    And, sir, in maximum security prison or super maximum security prison, is it next to impossible to obtain alcohol?

A    Pretty much.  If the administration knows that you're an alcoholic or you like drinking, they keep a well good eye on you.  Like I said, they can search you any time, day or night.  Same way with drugs.  If you're a known drug addict, they do the same thing.

MR. LEVAY:  Thank you, Mr. Shifflett.  That's all I have.

MR. LYNN:  I have no questions.

THE COURT:  Thank you, Mr. Shifflett.

MR. LEVAY:  My last witness will be James Aiken.

- - -

Thereupon,

JAMES E. AIKEN

was called as a witness, and after being first duly sworn, was examined and testified as follows:

THE COURT:  Have a seat and kindly speak into the microphone and answer Mr. Levay's questions.

DIRECT EXAMINATION

78

MR. LEVAY:

Q    Good morning, Mr. Aiken.

A    Good morning.

Q    Mr. Aiken, please tell the jury your full name.

A    My name is James Evans Aiken, A-I-K-E-N.

Q    And Mr. Aiken, what is your occupation, sir?

A    I am a correctional expert in the field of criminal justice and have been practicing since September 1971.

Q    And could you give the jury a brief background of your educational background, sir?

A    I have an undergraduate degree and a bachelor of arts degree from Benedict College, Columbia, South Carolina.  I have a master's degree in criminal justice from the University of South Carolina in Columbia, South Carolina.

Q    Give the jury an outline of your positions that you have held in Department of Corrections settings?

A    I began my Department of Corrections career in 1971 as I just stated.  I was hired in the

79

capacity of a social worker working with substance abusers that had been convicted of crimes, and that was in a maximum as well as a medium security environment.

I also served as administrative assistant to the warden of a medium security prison in South Carolina.

I also served as a deputy warden of a maximum security state penitentiary in South Carolina.

I also served as warden of a women's prison which encompassed maximum security inmates, medium security inmates and minimum security inmates.

I also served as a warden of a maximum security state prison which enclosed about 1,800 inmates, between 1,200 and 1,800 inmates, to include death row population as well as mentally incapacitated population.

I also served as a deputy regional administrator in which I provided administrative function over 16 various institutions, to include maximum security, super maximum security, as well as medium security and minimum security inmate

80

population and facilities.

I served as commissioner of corrections for the state of Indiana which included male, female, adults; male, female juvenile; parole; as well as community corrections populations of those people that I indicated; maximum security, medium security, minimum security facilities, as well as having the overall function of that aspect of the criminal justice process in the state of Indiana.

I also served as director of corrections for the United States Virgin Islands. This included pretrial inmate population, posttrial inmate population, maximum security inmate population, medium security inmate population, minimum security inmate population, as well as those individuals that were being held under juvenile statutes.

I also served as deputy corrections coordinator for the Commonwealth of Puerto Rico. This I served in the capacity as a correctional expert to provide technical assistance to the government of Puerto Rico, as well as representing the United States District Court in civil litigation against the Commonwealth of Puerto Rico regarding the

81

proper management of inmate populations.

I have also served in the capacity of a private consultant assisting the United States Department of Justice National Institution of Corrections, as well as to the National Academy of Corrections in providing technical assistance to various correctional agencies throughout the United States, as well as other countries, to provide correctional leadership, development, stress management, as well as managing gangs, as well as insuring proper security of facilities, to include maximum security, single maximum security, minimum security, as well as other aspects of correctional inmate management.

Also, I served as an adjunct professor at the Midlands Technical College in Columbia, South Carolina. I also served as adjunct professor at Indiana University, Purdue University in Indianapolis. I also served as a member of the board of visitors for Indiana University, Bloomington, Indiana.

Q     Mr. Aiken, in your role as warden and director of corrections for the state of Indiana and

82

some of the other long and lengthy history and career that you had, what are the duties and tasks that you have performed related to prison corrections duties, responsibilities of that nature?

A    Well, just to answer that quickly, I have probably managed or dealt with every conceivable aspect of correctional operations.  That's inclusive of managing maximum, medium, minimum security inmate populations, as well as implementation of classification systems, evaluating inmates, thousands of inmates, on where they should be placed within the corrections environment.

Additionally, I had to deal with a number of issues as it relates to managing a correctional institution, as well as an agency, to include shakedown, inmates investigation of murders, investigation of rapes, to actually executing two inmates, managing death row population.  A number of hostage situations in which some inmates have ended up in death, to include staff assaults, to include contraband trafficking, to include weapons introduction to an institution and getting those out, riots, disturbances.  Every aspect, I have just about

83

involved myself.

Q     How many inmates have you supervised classification over?

A     I would literally say thousands.  In the state of Indiana I had at least 10,000 inmates, and I had indirect as well as direct supervision over every aspect of inmates in that system.

In the South Carolina Correctional System, I literally signed my name to classification documents on thousands of occasions, stating that I agreed, and I have reviewed and I state my professional judgment on the placement of this inmate in the correctional environment.

Q     Now, you have also been an author, have you not, on classification of inmates?

A     That's correct.  I authored or coauthored a document on classification management, a tool for managing today's offender, and that document is intended for other correctional agencies so that they can make sure that their purpose, on the classification purpose, is one of providing the maximum protection to the public, the staff, as well as other inmate populations, that's within the

949a

84

context of constitutional requirements set by the Court.

Q    And these articles on classification have been published in Virginia in the American Correctional Association; is that right?

A    That's correct, sir.

Q    And with regards to your consultant work, have you not given consultant advice to the Virginia Department of Corrections?

A    Yes, I have.  I have assisted them in their development of managing of female inmate populations, as well as leadership development for their executors and administrators through the U.S. Department of Justice National Academy of Corrections.

Q    You have been to Virginia maximum security prisons, have you not?

A    Yes.  I've had an occasion to physically be at a maximum facility prison within the Virginia Department of Corrections.  The purpose of that particular visit is to evaluate and ascertain their death row as well as death penalty procedures on carrying out executions in the state of Virginia.

Q    Now, you professionally know the director of corrections for the state of Virginia, Mr. Angellone, do you not?

A    That is correct, sir.  We were coinvolved as commissioners of corrections.  I have attended many meetings with him; I've interacted with him; I have provided training, as well as received training together with him, and he's very knowledgeable of his correctional practice, yes.

Q    And you're also very knowledgeable of the classification criteria and process for the state of Virginia, sir?

A    Yes.  The classification processes of the state of Virginia, in my expert opinion, is outstanding.  And based on Mr. Angellone, as well as other individuals of the state of Virginia to insure that the maximum care for and protection to the public.

MR. LEVAY:  Your Honor, at this time, I would move Mr. Aiken in as an expert in prison operations and classifications.

MR. LYNN:  I have no objection.

THE COURT:  All right.. He may render

opinion within his area of expertise, preserving for the Commonwealth any objections to particular questions.

MR. LEVAY:  Thank you, Your Honor.

BY MR. LEVAY:

Q     Mr. Aiken, can you tell us, please, whether or not you reviewed Mr. Matthews' Department of Correction file?

A     Yes, I did.

Q     Can you tell us, please, whether or not you are aware that Mr. Matthews has been convicted of capital murder?

A     Yes.

Q     And based upon your review of his file and his conviction here today and your knowledge of the Virginia classification system, could you please tell the jury where Mr. Matthews will be classified or how Mr. Matthews will be classified?

A     Mr. Matthews will be placed in a maximum security environment.  A maximum security environment is one in which the inmate is in least control of his self and in maximum control by the staff and the structures of that facility.

That individual will be told when to get up and when to go to bed. That individual is in constant, constant evaluation and supervision by staff. The inmate will be placed with other predatorily, aggressive, dangerous, violent inmate population.

Q    Go ahead.

A    You will also note that in a maximum security environment, that when you mean -- when I say the comment like "in total control of staff", I mean strip searches at any time staff deems appropriate. You cannot get medical attention until staff deems that appropriate. You will not get visitors until staff deems that appropriate. You are in constant evaluation of searches, of people going through your cell and going through all your personal items on a continual basis.

Also, you will understand that if you violate certain rules, it may result in your death. If you violate that perimeter, lethal force will be used against you, even if you get a chance to even get near that perimeter. You are under constant evaluation. You cannot go outside to get a breath of

88

fresh air until an officer allows you to do that, and you are in constant evaluation.

Q    Mr. Aiken, with regards to super maximum prisons, are you aware of the building and construction of those prisons in Virginia, sir?

A    Yes, I am aware that super maximum security facilities are being constructed, and I am very familiar with those type of designs as well as the operations of a maximum security, super max facility.

Q    Please tell the jury the difference with regards to the super maximum facilities being built in Virginia?

A    In a super maximum security facility, not only is there maximum evaluation of that inmate population by staff, there are also mechanical restraints when there's movement from point A to point B within that prison setting; that staff are there to escort you; you are handcuffed behind your back; you are -- everything that comes in contact with you is evaluated and searched, physically searched.

Also, that staff is especially trained and

89

equipped to use whatever force that is allowable by law to ensure that you are in constant compliance with rules, regulations, policies, and procedures, and that's everything from a written reprimand to being killed.

Q     What are the hours in cell for super maximum prisons?

A     A normal super maximum security environment requires that an inmate is locked up 23 hours a day.  And that one hour out of those 23 hours that individual is allowed out of the cell, and many of them, super maximum security environments, don't let you see sunshine.  The sunshine is indirect light.  The windows are often covered, and if they are not covered, they are so small that you cannot get a view of what the outside world is all about.  And many of the facilities, when you do get a chance to look outside, all you see are gun towers or fences or patrols and people with weapons that would be used against you if you attempted to -- if you had an opportunity to attempt to violate anything.

Q     Once the super maximum prisons are completed in Virginia, do you have an opinion,

Mr. Aiken, with regard to the likelihood of Mr. Matthews taking residence at one of those facilities?

A    Based on his criminal activity, based on the thousands and thousands of records I have reviewed over my history, this individual will be incarcerated in a super maximum security environment and he will remain there for the remainder of his life.

Q    Now, based upon your review of Mr. Matthews' record and your knowledge of the system and prisons in general, can you assess whether or not Mr. Matthews will pose a risk in the future to the society in prison?

A    Mr. Matthews, in my candid opinion, number one, I have two opinions on that.

The first opinion is this: I have been in prison work all of my adult career. I have not collected a paycheck that I can remember outside of working in corrections. I have dealt with, ate with, worked with, supervised, interacted with the criminal population like this for many, many years. I can state without any reservations that I can house,

91

supervise, manage, interact on a daily basis for the rest of my career with an individual like this while not providing him -- while not providing an unusual risk of harm to myself, my staff, the community or other inmates. And I state that opinion based on the thousands of inmate population members that I have evaluated and supervised. I can put that person in my prison and supervise that person until his last breath without any hesitation that he will present an unusual risk or risk of harm to myself, my person, me.

Second opinion is this: He may be considered a predator in the community, but in prison, it's a different story. A person with his type of criminal history is not a kingpin in prison. In fact, he is the lowest of the lowest on the totem pole, so to speak. This individual has no sphere of influence over staff, no sphere of influence over inmates. In fact, inmates resent -- inmates -- in my career, I've had a difficult time making sure that this person lives out his natural life, and a constant evaluation and a constant security evaluation has to be conducted to ensure that this

92

individual is protected from real predators within a correctional environment.  He is the lowest of the lowest on the totem pole.

Q    Now, what is your confidence and opinion of the Virginia Department of Corrections ability to monitor, supervise and guard Mr. Matthews?

A    Based on my interaction with the individual who is the administrator of the system, based on my knowledge of being, personally, inside a correctional environment, a maximum security environment within the state of Virginia, based on my 25, 26 years of in and out of prison systems throughout the whole United States, as well as managing them, I have no reservation whatsoever that the state of Virginia Department of Corrections is a step above most.  It's a very, very efficient, well-trained, well-equipped agency to deal with this type of criminal behavior for an individual for the rest of his life without endangering the public.  And the public is inclusive of the community, the staff, as well as other inmates.  They have done it many times before, and I have no reservations in stating that they can do it in the future.

MAUREEN MCMAHON REPORTING, INC.

Additionally, I have no reservations at all in stating to you, based on the professionalism as well as the systems that are in place within the correctional agency, that this individual will never, never have an opportunity, never have an opportunity to inflict any harm against the public.

MR. LEVAY:  Thank you very much, Mr. Aiken.

THE COURT:  Cross-examination?

MR. LYNN:  Commonwealth has no questions.

THE COURT:  May Mr. Aiken be excused?

MR. LEVAY:  He may be, with my thanks.

THE COURT:  Thank you very much, sir.  You are free to go.

Will counsel approach on scheduling, please.

Did you contemplate any additional evidence?

MR. LYNN:  Just briefly, Your Honor.

THE COURT:  Do you want to start back at 1:00?

MR. LYNN:  We can probably get our evidence on very shortly if you just want to keep

E X H I B I T   10

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

CORY JOHNSON,                        )
                                     )
            Petitioner,              )
                                     )
    v.                               )        Crim. No. 3:92CR68
                                     )        Civil No. 3:97CV895
SAMUEL PRUETT, Warden,               )
    Mecklenburg Correctional         )
    Center, Boydton, Virginia        )
            Respondent.              )

## DECLARATION OF CRAIG S. COOLEY

Craig S. Cooley, pursuant to 28 U.S.C. §1746, hereby declares that the following is true to the best of his knowledge, recollection, and belief:

1.    I served as one of Cory Johnson's two attorneys in his capital murder trial before this Court and his appeals after the trial.

2.    This declaration is submitted to address particular issues raised by Mr. Johnson's habeas counsel. It is not designed to be a complete statement of every fact that I may know that is germane to Mr. Johnson's habeas petition, and it is not designed to be a complete analysis of every aspect (including effectiveness of counsel, prosecutorial misconduct, and prejudice to Mr. Johnson) of the trial and appeals of Mr. Johnson's case.

3.    My recollection is that my co-counsel and I conducted no independent investigation of the facts or witnesses for the guilt phase of Mr. Johnson's case. Instead, my recollection is that we relied exclusively on disclosures received from the Government and on attempted (and generally uninformative) interviews with government witnesses held in the presence of the

prosecutors. We did not move for appointment of an investigator pursuant to 21 U.S.C. §848(q). Our failure to have a private investigator conduct an independent investigation was not the result of strategic or tactical decisions. I believe that this failure might have prejudiced Mr. Johnson.

4.    Mr. Johnson's case received media coverage prior to and during the trial. I recall that the media coverage was extensive and contained information that was inflammatory, prejudicial to Mr. Johnson, and inadmissible at trial. Voir dire demonstrated that many prospective jurors had prior knowledge about the case. I did not move for a change of venue of the trial. As best I can recall, this failure was not the result of strategic or tactical decisions. I believe that this failure might have prejudiced Mr. Johnson.

5.    I recall that I did not advise Mr. Johnson of his right to be present during jury voir dire. I *did* advise him to accept the conducting of voir dire in his absence. As a result of his exclusion, he was not present to hear any potential juror answer the questions put to them, or to observe them, during critical portions of voir dire. My failure to object to his exclusion during voir dire, my failure to advise him of his right to be present, and my advice to him that he accept the conducting of voir dire in his absence were all error. These failures were not the result of strategic or tactical decisions. I believe that these failures might have prejudiced Mr. Johnson.

6.    As I recall, I did not notice during jury selection that the Government used eight of its ten strikes to remove women. Because I did not notice this, I did not make a *Batson/J.E.B.* objection. If in fact the Government used eight of its ten strikes to remove women, my failure to make such an objection was an error; this failure was not the result of strategic or tactical decisions. I believe that this failure might have prejudiced Mr. Johnson.

2

7. In preparation for trial, the defense gathered a substantial amount of information concerning Mr. Johnson's severe intellectual deficits and susceptibility to the influence of others. I do not recall ever considering that this evidence should be used for Mr. Johnson's benefit during the guilt phase, even though one of the elements of a CCE is that the defendant affirmatively supervised at least five people. Such evidence could and perhaps should have been offered during the guilt phase for the purpose of demonstrating to the jury that Mr. Johnson was either not capable of such supervision or not likely to supervise. This failure was not the result of strategic or tactical decisions. I believe that this failure might have prejudiced Mr. Johnson.

8. A major theme of Mr. Johnson's defense was that he was not a supervisor, but that he merely sold drugs to other people, who then resold the drugs. I believe that I failed to support this defense with a requested jury instruction that would have informed the jury that the relationship of buyer and seller of drugs is insufficient to establish CCE supervision. The failure to so offer this evidence was error; this failure was not the result of strategic or tactical decisions. I believe that this failure prejudiced Mr. Johnson.

9. Based on my recollection, I believe that during the trial and on appeal I failed at various stages to raise the point that (1) the Government introduced evidence of a large number of individuals involved in various drug activities and argued to the jury that those individuals were CCE supervisees, when (2) many of those persons were, as a matter of law, incapable of counting as CCE supervisees. The failure to raise this point was error; this failure was not the result of strategic or tactical decisions. I believe that this failure prejudiced Mr. Johnson.

10. My recollection is that, during the trial and on appeal, I failed to challenge the Fourth Circuit's standard for CCE supervision, which differs from the standard applied in many

3

other circuits. The failure to challenge this standard was error; this failure was not the result of strategic or tactical decisions. I believe that this failure prejudiced Mr. Johnson.

11.    My recollection is that, during the trial, I and my co-counsel frequently failed to ask for cautionary instructions when defense objections were sustained. I believe that this failure might have prejudiced Mr. Johnson.

12.    My recollection is that I did not file a reply brief on appeal that responded to the Government's argument that specific aspects of the record demonstrated that Mr. Johnson supervised five individuals. The failure to do so was error; this failure was not the result of strategic or tactical decisions. I believe that this failure prejudiced Mr. Johnson.

13.    Upon my review of materials shown to me by habeas counsel, it appears that I failed on a number of occasions during the trial to object to (1) a number of improper arguments and tactics used by the prosecutor, (2) the Government's misleading, ambiguous testimony, (3) the Government's testimony that was unsupported by personal knowledge of the witnesses. The failure to do so was error; this failure was not the result of strategic or tactical decisions. I believe that this failure prejudiced Mr. Johnson.

14.    During the trial, I did not make any effort to introduce evidence of the harsh living conditions that Mr. Johnson would face if he were not given the death penalty. This failure was not the result of strategic or tactical decisions. I believe that this failure might have prejudiced Mr. Johnson.

15.    I was not aware, and was not advised by my expert, of the following: (1) that there is a phenomenon of IQ test score inflation caused by the delay between when the test was first constructed and when the test is actually administered, (2) that the age of the IQ tests taken by Mr.

4

964a

Johnson probably caused Mr. Johnson's IQ test scores to be improperly inflated; and (3) that Mr. Johnson's IQ test score would probably have been lower, and within the level of mental retardation, if he had taken the IQ test when test was first created. Assuming that there was a basis to demonstrate and argue that Mr. Johnson's IQ test score was improperly inflated and that in reality his true performance was within the level of mental retardation, I would have brought this to the Court's and jury's attention, and I believe this might have caused Mr. Johnson to receive a life sentence, rather than the death penalty.

16. I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge, recollection, and belief. Executed on June _11_, 1998.

_____
Craig S. Cooley

5

965a

E X H I B I T   11

06/15/98  11:20  ☎804 643 3702        T M & S                                    ☑002

Page 1

IN THE UNITED STATES DISTRICT COURT FOR

THE EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

--------------------------)

UNITED STATES OF AMERICA )                    15 PAGES

v.                       )

RICHARD TIPTON,          )

aka Whittey, et al.      )          GRAND JURY 92-1

--------------------------)


The testimony of HAUSSON C. JONES, taken on the 21st day of April, 1992, commencing at approximately 1:15 p.m.


FOREMAN:  CHRISTOPHER F. SNEAD

DEPUTY FOREPERSON: MARY A. McNULTY


ASSISTANT UNITED STATES ATTORNEY:

W. H. PARCELL, III, AUSA


Reported By:  Debra L. Johnson


ACCU-BETA DEPOSITIONS, VIDEOS, & IMAGES, INC.
(804) 746-0746

Page 7

ounces?

A       Yes.

Q       You sold it and he kept 60 percent and you got 40?

A       Yes.

Q       Where would you usually see him when you would obtain the cocaine?

A       I would either go see him where he was at, or he would come around and see me.

Q       Where would he usually be at?

A       He was staying in the West End during this time.

Q       Did you ever see him cook the cocaine or was it always in cook-em-up form when you got it?

A       Always in cook-em-up form.

Q       Do you know anyone else in this organization who he was partners with?

A       "CO".

Q       They were equal business partners?

A       Yes.

Q       What was J.R.'s relationship to them?

A       I think he was his cousin.

Q       Was he also in the cocaine business?

E X H I B I T  12

Page 1

IN THE UNITED STATES DISTRICT COURT FOR

THE EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

--------------------------)

UNITED STATES OF AMERICA )                19 PAGES

v.                        )

RICHARD TIPTON,           )

aka Whittey, et al.       )                GRAND JURY 92-1

--------------------------)


     The testimony of CHARLES TOWNES, taken on the

21st day of April, 1992, commencing at approximately

12:45 p.m.


FOREMAN:  CHRISTOPHER F. SNEAD

DEPUTY FOREPERSON: MARY A. McNULTY


ASSISTANT UNITED STATES ATTORNEY:

HOWARD C. VICK, AUSA


Reported By:  Debra L. Johnson


ACCU-BETA DEPOSITIONS, VIDEOS, & IMAGES, INC.
(804) 746-0746


970a

Page 4

to your coming in here and testifying today?

A     Yes.

Q     And we've told you we're not going
to use anything you say against you.  We just want
your cooperation?

A     Right.

Q     You sold drugs with a guy by the
name of Hausson Jones.  Is that right?

A     Yes.

Q     In Central Gardens?

A     Yes.

Q     Both of you work for Whittey.  Is
that right?

A     Yes.

Q     You've had occasion to talk to
Whittey a number of times, haven't you?

A     Yes.

Q     Did Whittey tell you whether he had
partners in the drug business, people who worked on
the same level as him?

A     Yes, sir.

Q     Who were they?

A     J.R.

Q     Is that James Roane?

A     Yes.  "V".

ACCU-BETA DEPOSITIONS, VIDEOS, & IMAGES, INC.
(804) 746-0746

E X H I B I T   13

USCA4 Appeal: 20-8    Doc: 2-7    Filed: 05/22/2020    Pg: 305 of 472



Don Dale sees 'Queen'

Republican shift
on gun control
may signal strategy

New book dissects the
CONFEDERATE VALUES of
Monument Avenue

# TRUE DETECTIVE

*How the Richmond police nabbed the Newtowne gang*

DEFENDANT'S
EXHIBIT

973a

# BIG CITY BUST



Narcocide detectives J. Rod Rodriguez, R.T. Fleming (hidden), M.D. Scott, Cliff Jackson, Tom Leonard and C.T. Woody

The word has reached New York. Richmond isn't Mayberry anymore. Fool with the law, and the law will fool with you. Here's how the local cops brought in the Newtowne Gang.

**BY LISA ANTONELLI BACON**

A New York drug dealer recently confided to Richmond Narcocide Detective J. Rodney Rodriguez that easy gun purchases aren't the only things that draw big city dealers to Richmond.

When you lay your dope down, it's usually there when you come back for it, he said. And you get twice the weight for half the money. On top of all that, the dealer went on, "the cops is slow. At least, that's what we was told."

There's a new message on the drug- and gun-running circuit. And Newtowne Gang members are the poster boys for the campaign to get the word out. For the last four weeks, Richard "Whitey" Tipton, Cory "O" Johnson, James "J.R." Roane and Sandra Reavis have been making public appearances, attesting to the speed and dexterity of Richmond cops. Even though the appearances have all been in federal court, the print and TV coverage they've generated would cost in the hundreds of thousands of dollars, if anyone had to pay for the exposure.

The case might not have made the New York Times, but you can bet the news has reached those New Yorkers who Richmond cops want to reach. Tipton, Johnson and Roane went on trial and were found guilty on murder charges last week and prosecutors have asked for death penalties.

974a

04/24/98   FRI 17:10   FAX 202 293 1827   MILLER CASSIDY   ☑015

It's a landmark case: the largest number of defendants in a federal trial to be targeted for the death penalty since it was reinstated in 1989. So the word is out. In drugland parlance, Richmond *ain't* Mayberry R.F.D. If you fool with the law, the law will fool with you.

The Newtowne Gang had the cops stymied at first. In fact, the bodies were three deep and two weeks into 45 days of violent retribution and murderous paranoia before police came to believe that one bunch of guys was responsible.

It all became clear to the cops when a handful of homicide detectives teamed up with the narcocide squad, a hybrid team of street-savvy drug and murder investigators, to create a task force that would eventually knock the legs out from under the gang.

Before it was over, detectives, with the help of forensics and ballistics experts, traced nine murders to five guns, and the five guns to the handful of people that police and press now refer to as The Newtowne Gang. "The 11 they did in 45 days are the ones we can prove," says Narcocide Detective C.T. Woody. "We know they did others, but we can't prove it."

## THE NEW YORK BOYZ MOVE SOUTH

The seeds of the Newtowne gang sprouted in 1989, in Trenton, N.J., as a drug gang that deterred competition with razor blades and aluminum baseball bats—aluminum because they don't break on impact like wooden bats do. In Trenton, they called themselves The New York Boyz, according to gang member Greg Scott, "to let people know we were from out of town and were taking over." Scott testified in U.S. District Court here on Jan. 15 that Tipton and Johnson were feared members of the New York Boyz, known for carrying razors in their mouths.

Tipton and Johnson came to Richmond in the last days of 1991 to muscle in on the drug trade here. Police say they were a new breed. Unlike the notorious Johnson-Brown gang that ruled Blackwell drug trade until they were locked up two years ago, Tipton and Johnson were not flashy. No gold chains, no fancy cars. "They didn't own anything, used cabs and never used their real names," says Woody. That's how they managed to stay on

the streets as long as they did, police say. "For a long time, all we had were nicknames," says Richmond Deputy Commonwealth's Attorney William H. Parcell III who, along with Assistant U.S. Attorney Howard C. Vick Jr., put the Johnsons and the Browns behind bars. "Nobody, not even the people working for them, knew their real names."

According to Woody, Tipton and Johnson rounded up between 15 and 20 people to sell drugs for them. "They hired local boys to take all the chances. If the boys messed up, they let people see 'em kill. That puts fear in people."

The Boyz had barely been in town a month when they made their first kill. In dramatic testimony on Jan. 19, 1993, Hussone Jones, who admits he sold crack for the gang, described the murder of Doug Talley, who Roane, a local gang recruit/leader, believed was "5-O," street talk for "police."

Jones testified that he was sitting in a car within 30 feet of Talley near the intersection of 13th and Stockton streets in South Side when Talley was killed in the early morning hours of Jan. 5, 1992. According to Jones, Roane, seated behind Talley, grabbed Talley around the neck. Then Tipton, who was in the front passenger seat, stabbed Talley repeatedly. Jones estimated the stabbing lasted between three and five minutes. An autopsy would reveal 84 stab wounds, two of which penetrated the skull and pierced the brain.

In one of the trial's most dramatic moments, Jones described how Tipton "had to push his foot off the door to get the knife out" of Talley's head. Then, he testified, Tipton kicked the car door against Talley's body, which had begun to slide out of the car. Jones said that when they got in his car to leave the scene, Tipton and Roane were laughing.

## NOBODY KNEW THEIR NAMES

When Detective J.J. Cox was assigned to the case, his best material evidence would turn out to be bogus. The killer had left an army fatigue jacket in Talley's car. In the pockets were a set of juggling rings, reading glasses and some medication for Johnny Lee Buie Jr. It seemed a good clue to be true, and it was. Because it was Talley's possessions. And he was wearing the coat because some someone gave it to him. He didn't know the owner, he

said, "but he goes by 'Whitey.'"

About a week later, just after midnight on Jan. 13, "Little Doug" Moody was in a house at Harrison and Clay streets, discussing drug money with Tipton. According to Priscilla "Pepsi" Green, who did small jobs for gang members, 'O' and Whitey didn't want Little Doug and Peyton Maurice Johnson working that area.

Witnesses testified that Moody dove through a window and Roane followed Moody outside with a large, black-handled military knife. In the alley behind the house, Roane stabbed Moody 18 times in the back, face and chest. Then, as emergency teams raced to the scene, Pepsi testified, Roane gave the knife to her to dispose of.

When Homicide Detective Steve Dalton took the case, some street names surfaced, but no one knew any real names. The murders of Talley and Moody went unconnected.

It would seem that even the least experienced criminal would keep some distance between himself and the fresh scene of his crime. And even if the old adage about the criminal returning to the scene is true, the Newtowne Gang breathed new life into its meaning. On Jan. 14, the very day after Moody was killed outside the house at Harrison and Clay, police found



# THE GOOD GUYS

**Narcocide Detective J. Rodney Rodriguez** *Baby-faced narc who spent a year undercover as a Hispanic drug dealer.*

**Narcocide Detective C.T. Woody:** *"The 11 [murders the Newtowne Gang] did in 45 days are the ones we can prove. We know they did others, but we can't prove it."*

**Narcocide Detective Cliff Jackson:** *Stunning good looks for disarming female witnesses.*

**Narcocide Detective R.T. Fleming:** *Can break down killers using manners befitting the Prince of Wales.*

**Narcocide Detective M.D. Scott:** *Has worked so closely with Fleming for so long that they can communicate in blinks and shrugs.*

**Narcocide Detective Tom Leonard:** *Sharp shooter who gave the signal to raid the house at 1212 Moore St. that resulted in indictments of Thomas, Hardy, Roane and Reavis.*

**Homicide Detective J.J. Cox** *Soft-talking, slow-walking Southern boy.*

**Homicide detectives J.J. Cox, Ray Williams and Billy Blaylock**

**Homicide Detective Billy Blaylock:** *Veteran cop with a good pipeline to the streets.*

**Street Crimes Detective Ray Williams:** *A former homicide detective who's been rerouted to street crimes. He helped bring in the South Side strangler.*

**Homicide Detective Steve Dalton:** *When he took the case, some street names surfaced, but no one knew any real names.*

**Homicide Detective Ray House:** *Brought valuable street information into the investigation.*

**Detective A.J. Reid:** *Came on board after the murders of Talley, Moody and Johnson were thought to be related.*

**Forensic detectives Paul Tuttle, Gary Brunelli, Wayne Hines, Dave Tweedie and Tom Searles:** *"The work those guys did made the case," said Richmond Deputy Commonwealth's Attorney William H. Parcell III.*

> **The shooter was so close to the children that shell casings rained down on them at the kitchen table.**



# BE MINE

## Gift ideas that outlast candy and flowers

- ♡ unique gold earrings
- ♡ hand engraved rings
- ♡ custom pins
- ♡ vintage watches
- ♡ diamond engagement rings
- ♡ unusual rings
- ♡ colorful gemstones
- ♡ one-of-a-kind designs
- ✓ a ♡ and come 👁

*Dransfield* **Jewelers**

1310 East Cary St. / In Shockoe Slip
Richmond, VA 23219 / (804) 643-0171



# LSAT MCAT GMAT GRE SAT

*Prep classes forming*
*now for:*

March - GMAT & SAT
April - MCAT, DAT & GRE
June - LSAT

# KAPLAN
## 285-3414

*The answer to the test question*

# BIG CITY BUST



For the cops, the wait outside 1212 W. Moore St. seemed like an eternity.

the body of Peyton Maurice Johnson on a couch inside the same house. dead from several gunshots to the head and body. Roane and Johnson were later charged and convicted.

According to police sources, Maurice Johnson was a big-time dealer in the Newtowne area before the New York Boyz came to town. The Boyz had gotten word that Johnson and Moody wanted to move them out. "They got those guys before those guys could kill them," one source says.

With the Johnson killing, Detective A.J. Reid joined the list of detectives who kept hearing the names "Whitey," "C.O." or "O," and "J.R." Other names, like "Sandra Reavis" and "Pepsi" came up too. By Jan. 20, the light was coming on: The murders of Talley, Moody and Johnson were likely related.

That day, a Monday, detectives Billy Blaylock, Reid and Dalton met with Deputy C.A. Parcell. Parcell advised the team to plow through Newtowne and bring in for questioning anyone who was wanted for anything. from felonies to misdemeanors to failure to show up in court. For the next three days, police brought in three to four witnesses a day. Again, the same names surfaced. No one knew last names for Whitey or "O." But police gained a little ground when they put a last name to J.R. James Roane Jr. had been in trouble with police before. In fact, he'd just been released from prison in mid-November, 1991 for unlawful wounding.

Around 7 the next morning. Jan. 21, a man walking to work stumbled upon body No. 4 near an Interstate 95 overpass near Maggie Walker High School. Katrina Rozier, a known lesbian hooker, had been shot once between the eyes. When she fell forward, her assailant shot her again in the back of the head. Exactly one week later, on Jan. 28, an informant told police that Rozier owed the Boyz money, and that she was killed over the debt.

"We knew we had a problem," says Parcell, "and we'd heard there was a list of people they were going to kill."

Police barely had time to process that information before the body of the next victim turned up. The very next night after receiving the information, Jerry R. Gaiters testified, he and Sterling Hardy were smoking crack with Louis "Johnson in a house off Kinney Street when Roane appeared. According to police sources, Hardy stepped outside to speak with Roane. When Roane left, Hardy, Gaiters and Johnson went to a neighborhood store to buy beer. As they walked toward the store, Roane drove up in a burgundy Buick Regal. Roane yelled for

Johnson to stop, then he shot Johnson once in the back of the head. He went down, face up. "O" followed and pumped several more shots into Johnson's head and body.

When information came in after Louis Johnson's death, police had a couple of new names to track, Gaiters and Hardy. And they'd been told that Roane and "O" were the shooters.

Two days later, on Jan. 31, police sources say, the homicide detectives assigned to the murders—Blaylock, Reid and Dalton and Ray House—met to share information. Narcocide, a six-man unit designed to track drug activity and drug-related murders, had begun hearing from their informants that the gang was getting scared and that they'd developed a hit list of people who knew too much about them. The newest information held that the guys were going "uptown," as they referred to New York, to pick up some dope. They'd be back Sunday and selling by Monday.

But the gang had a surprise for police. They came back early.

## FROM THE MOUTHS OF BABES

At 7:15 p.m. on Saturday, Feb. 1. Detective Ray Williams, a former homicide detective who's been rerouted to street crimes, was in his patrol car near Laurel and Broad when a transmission came over the radio. There had been a double shooting on Lynhaven Avenue in South Side.

When he got there, he found one victim, Torrick Brown, dead from more than a dozen bullet wounds. After being shot six times, Brown's sister, Martha McCoy, had

fished car keys out of Brown's pocket, gathered her three children and attempted to drive for help before collapsing behind the wheel of the car. She was on her way to MCV when Williams arrived.

The children, 7-year-old Montez, 2-year-old Janea and 4-year-old Janequetta were still at the scene. Montez was calm enough to talk to Williams. He told the detective that he and his sisters were sitting at the kitchen table when his mother answered the door. "She started backing up." he told Williams. "Then the guy came in shooting. He shot my uncle, then Mumma. Uncle went down. Mumma dove over the sofa. He came around the sofa and shot Mumma."

The shooter was so close to the children that shell casings, ejected from the murder weapon, rained down on them as they sat at the kitchen table.

Montez told Williams that the shooter had run to an apartment across the courtyard. When the woman at that apartment told Williams that Roane had just left, he knew the gang had struck again. Police would later tag this a domestic killing. Brown allegedly had kept company with Roane's girlfriend while Roane was in prison.

Prosecutor Parcell was at his Fan District home, preparing to have dinner with his wife, when Williams knocked on the door and told him to get in the car. While Blaylock and Williams were briefing Parcell on the Lynhaven Avenue shootings, another radio transmission stopped them in their tracks: Three people had been shot at the corner of 28th and Clay streets.

Williams says that when he arrived, the owner of the house, Bobby Lee Long, was lying between garbage cans and his garage. Inside, Anthony Carter sat at the

There's a sign that stands in the window of a house in Newtowne.

"Trespassers will be shot," it reads. "Survivors will be shot again."

976a

04/24/98  FRI 17:12  FAX 202 293 1927  MILLER CASSIDY  @017

# BIG CITY BUST

## THE VICTIMS

**1**

Jan. 5: Doug Talley was stabbed more than 80 times inside a parked car. Gang members thought he was a police officer.

**2**

Jan. 13: "Little Doug" Moody, a rival drug dealer who was in a dispute about drug money, was shot and stabbed just after midnight.

**3**

Jan. 14: Peyton Maurice Johnson, a rival drug dealer killed the day after Moody in the same house, was found on a couch, dead from several gunshots to the head and body.

**4**

Jan. 21: Katrina Rozier, a known lesbian hooker, was shot between the eyes. Exactly one week later, on Jan. 28, an informant told police that Rozier owed the gang money and that she was killed over the debt.

**5**

Jan. 29: Louis J. Johnson, a gang member, was shot in the head and face.

**6 & 7**

Feb. 1: Torrick Brown, dead from more than a dozen bullet wounds, allegedly kept company with gang member James "J.R." Roane's girlfriend while Roane was in prison. Brown's sister, Martha McCoy, who was with Brown when he was shot, was wounded from six gunshots. She gathered her three children and attempted to drive for help before collapsing behind the wheel of the car.

**8-10**

Feb. 1: Three people shot at 28th and Clay streets: the owner of the house, Bobby Lee Long, was shot in the head. Anthony Carter had a bullet wound behind his ear. Long's sister, Dorothy "Mousie" Armstrong died from eight gunshot wounds. Armstrong was allegedly hiding out there because she owed drug money and knew the gang was looking for her.

**11-14**

Feb. 19: Linwood Chiles, the gang's driver, and associate Curtis Thorne were found shot in a car in Fulton Bottom. Critically injured were sisters Gwendolyn Green, Thorne's girlfriend, and Priscilla "Pepsi" Green. A bullet wound in Pepsi's left ear has left her deaf and paralyzed on that side. She walks with a cane and speaks with difficulty. Gwen will spend the rest of her life in a wheelchair.

kitchen table, head lolling to one side, blood draining from a bullet wound behind his ear. Dorothy "Mousie" Armstrong was on her way to MCV where she would die from eight gunshot wounds.

In court one year later, on Jan. 26, 1993, gang member Jerry Gaiters would recount the events that led to the first major crack in the case, an early dawn raid on a Moore Street dwelling the gang used as a safe house.

Early on the evening of Feb. 1, 1992, Gaiters testified, he met with "O," alleged gang member Lance Thomas, admitted conspirator Sterling Hardy (now a federal witness), and the gang's driver, Linwood Chiles, in a gang dwelling at 1212 W. Moore St. in Newtowne.

After Gaiters left, "O" told us J.R. was having trouble over in South Side," Hardy testified. The men loaded into two cars to drive to Lynhaven Avenue where Torrick Brown would be killed and Martha McCoy would be wounded.

Shortly after the Lynhaven Avenue carnage, "O" and Tipton asked Gaiters where Mousie's brother, Bobby Long, lived. Mousie, they believed, was hiding out there because she had "messed up a package," owed drug money, and knew the gang was looking for her.

On the ride to Long's cinderblock home on Clay Street, Gaiters said, Whitey (Tipton) drove, Gaiters sat in the front passenger seat with "O" behind him.

"I was worried 'bout the way 'O' kept playing with a Glock [semiautomatic weapon]," said Gaiters, indicating that he feared he was in danger. "Whitey said don't worry."

Gaiters said that Tipton drove up the alley behind Long's house, and "O" told him to "bring Mousie out here." Gaiters further testified when he knocked on the

## THE BOYZ

**Richard "Whitey" Tipton**
*Convicted of six murders*

**Cory "O" Johnson**
*Convicted of eight murders*

**James "J.R." Roane**
*Convicted of four murders*

**Sandra Reavis**
*Convicted of conspiracy to distribute crack cocaine*

**Jerry R. Gaiters**
*Plea bargained murder charges in exchange for testimony*

**Sterling Hardy**
*Plea bargained murder charges in exchange for testimony*

**Lance Thomas AKA "V" Mack**
*Will be tried for the murder of Louis Johnson later this year*

## Sweet Treats for Your Valentine

# The Ultimate Brownie

by Diana James

## Try Something New this Year!

| Delectable Cookie Bouquets | Fancy Gift Baskets | Delicious Brownie Tins |

Local Delivery          (804) 266-3288          Shipping Nationwide

---

*The Best in Seafood & Steaks*

**Byram's Lobster House**

*Mrs. Spano's Policy of 45 Years of Fresh Seafood, and fine service continues.*

*Now Open*
*Sunday to Thursday*
*11:30 a.m. to 10:00 p.m.*
*Fridays 11:30 a.m. to 11:00 p.m.*
*Saturdays 3:00 p.m. until.*

Lunch Specials & Early Bird Specials
Mon. through Fri. 5:00 pm to 6:30 pm
Starting at $1.95 including roll and two side dishes. More specials after 6:30 pm!

Banquet facilities available

*Make your reservations for Valentine's Day!*

3215 W. Broad St.
Richmond 355-9193

---

# Final Winter Clearance
# SALE

February 11-15
(Thursday-Monday)

*Receive additional 50% off all current sales prices of fall & winter clothing.*

*40% OFF Selected Belts*
*10% OFF All Jewelry*



## Specialty Boutique for Women

The Shops at Innsbrook
## 747-9996

Mon.-Tues. 10-6,  Wed.-Thur. 10-7,  Fri. 10-6,  Sat. 10-5

977a

04/24/98  FRI 17:12 FAX 202 293 1827    MILLER.CASSIDY    ☑018



## STRAWDERMAN CAMP

In the Shenandoah Valley of Virginia. Girls 6-17. Real mountain camping in the foothills of the Allegheny Mts. Riding, swimming, tennis, hiking, crafts, dramatics, nature study, Indian lore, dancing, music, archery.

We invite you to a video presentation depicting camplife on Sat., Feb. 20, at 2:00, at Edgewood Farm, Crozier, VA. Staff members will be present to answer questions.

Call Libby Smith, Richmond Representative

**784-3257**

---

## Out of Space?

**MAXIMIZE PRESENT OFFICE SPACE AND AVOID A COSTLY MOVE**

Offering 13 Years of Successful Experience in Business Optimization

COMPLETE ANALYSIS OF:
- Building Space Utilization ▲
- Workstation to Function Design ▲
- Paperwork/Task Methodology ▲
- Cost/Benefit Comparisons ▲
- Office Overflow ▲

## SPACE CONCEPTS  745-3534

· Free Consultation ·



# Charles Schwarzschild, Inc.
### Jeweler
## 282-3724

## Intrepid Leopards Cuff Bracelet
18 Karat Gold with Burnished and Glossy Finish

282-3724
By Appointment Only
6000 River Road



Monday-Friday
10 AM - 4 PM
Mastercard/Visa



*We've got it!*
for
# Valentine's Day

Get Your Q-94 Zoo Animal with $25 Purchase
(while supplies last)

## THE · SHOPS · AT WILLOW LAWN

GIFT CERTIFICATES AVAILABLE AT THE INFORMATION DESK.
OVER 100 WONDERFUL SHOPS AND RESTAURANTS ON BROAD STREET AT WILLOW LAWN DRIVE.
OPEN DAILY 10:00 A.M. TO 9:00 P.M., SUNDAY 12:30 TO 5:30 P.M., 804-282-5198.

door, Long asked "Who's there?" When Gaiters identified himself, he said, "'O' pushed by him, entered the house and began shooting.

"Bobby tried to run out, but he fell, and 'O' shot him," Gaiters testified. After the shooting stopped, he and "O" ran to the alley where Tipton had the car running. When they got in the car, Gaiters said, "'O' and Whitey was laughin'."

Tipton drove "O" and Gaiters back to 1212 W. Moore St. where "O" turned on the TV. "'O' said he wanted to see if [the killings] were on the TV news." When the news was over and no mention had been made of the events on Lynhaven or on Clay, "O" told Gaiters, "We got to find out if Mousie's dead." So, according to Gaiters, "O," Thomas, gang driver Chiles, and Curtis Thorne, who also worked with the group, went back to scout the scene in Church Hill. Gaiters said he went home.

## THE SWAT TEAM STRIKES

While gang members were surveying the scene of their most recent shootout, Parcell and several detectives were using the darkest hours of the night to track the suspects. According to several officers involved, it was a night to remember. The six-man Narcocide squad had been called from their homes to join the investigation. Homicide cops had identified four houses in the Newtowne area used by the gang, and the detectives set up tight surveillance on all four locations. "We figured they all had to put their heads down somewhere," said Narcocide Detective Rod Rodriguez. The cops decided to squeeze the location where the most suspects had gathered.

Rodriguez and Narcocide Detective Tom Leonard were secretly posted in a building close to 1212 W. Moore St. While little was stirring at the other three locations, Rodriguez and Leonard saw people coming and going between the hours of 4 and 6 a.m. Meanwhile, the SWAT team was at the Mosque, site of the police academy, being briefed.

As the sun was coming up, the surveillance teams knew it was time to strike. They'd already gotten a search warrant which would lawfully allow them to gain entry and search the house and grounds.

To Parcell and Williams, stationed at another target house within blocks of 1212, the wait seemed like an eternity. Neither, in fact almost none of the detectives, had slept for 24 hours.

"How are we going to know which house?" a bleary-eyed Williams asked Parcell.

"We'll know," answered Parcell.

Minutes later, Parcell turned to Williams.

"How are we going to know when they enter?"

24  FEBRUARY 9, 1993/STYLE WEEKLY

# BIG CITY BUST

"We'll know," said Williams.

By 7 a.m., everyone was in place. waiting for the right moment to storm the house. Then Leonard, who was providing sniper cover from his hiding place, saw someone look out a front window of the house. For Leonard, that was the trigger. He whispered over his radio that it was time to go.

Almost before the man inside had stepped away from the window, SWAT threw a light-sound device (they don't like to use the term "flash bomb") through a front window. Windows blew out into the yard, doors came off their hinges. SWAT members kicked in the front door and rushed in.

Police have a videotape of what happened when the smoke cleared. And it's safe to say the occupants of 1212 were surprised. Lance Thomas, Sterling Hardy and an unidentified juvenile were standing stunned in the front room of the house. Police found Roane and Sandra Reavis in bed in a back room.

"When she heard that explosion and saw that flash, she musta thought J.R. was one helluva lover," Williams said later.

A search of the house turned up nada. But in the backyard, Rodriguez found a tote bag full of guns and 120 vials of cocaine. Because of the testimony of little Montez McCoy, Roane was immediately charged with murder. Hardy, who would later turn federal witness, and Lance Thomas, who goes to trial later this year, were charged with drug and gun charges. By noon on Feb. 2. Thomas, Hardy and Roane were locked up. Reavis would later face federal conspiracy charges.

But killers were still on the loose. "We still didn't know who they were," says Parcell. "We only had street names and descriptions."

Over the next two weeks. police were able to determine a few of the names on the so-called hit list. So when Linwood Chiles and Curt Thorne turned up dead in a car in Fulton Bottom on Feb. 19, police believed the Newtowne group had struck again.

Walter Tuck was driving his pickup to work at Philip Morris when the radio announcer said it was 10:17 p.m. As he came around the bend on Stoney Run Drive, he saw "something fly up in the air."

"I thought someone had been hit by a car," he later told police. As he approached the car, he would later testify in court, he slowed down and saw a woman on the ground, bleeding. At that moment, he noticed a man walking down an embankment. "I saw that, I turned my headlights off and took off."

The "thing" he'd seen fly up in the air was Gwendolyn Green. Gwendolyn and her sister Pepsi thought they were on their way home when Linwood Chiles parked on a dark street in Fulton Bottom. Chiles routinely drove gang leaders to pick up dope around Richmond or to New York, even drove them to some murder scenes. Pepsi was in the front seat with Chiles, Gwendolyn was in the back seat, with "O" on her left and boyfriend Curt Thorne on her right.

Pepsi testified that "O" told Chiles to rest his head on the steering wheel, then pumped a bullet into his head.

"Then 'O' shot me," she said.

Thorne died of gunshot wounds to both sides of the face. The Green women, the only witnesses police had, were hanging on at MCV. For the next several weeks, Parcell and Narcocide detectives R.T. Fleming and M.D. Scott visited them frequently. For the first several days, they gathered information by reading Gwen's lips, because a tracheotomy tube made it impossible for her to speak. According to Parcell, she remembered a lot of what happened that night. And Pepsi began to recall events, too, as she improved. Their testimonies would provide detectives the basis for murder warrants for Tipton and "O."

The bullet Pepsi says "O" put in her left ear has left her deaf and paralyzed on that side. She walks with a cane and speaks with difficulty. She doesn't know what happened after she was shot. But Gwen, who will spend the rest of her life in a wheelchair, remembers Tipton approaching the car. "He called my name, and I turned toward him. That's all I remember."

## ONE LAST BREAK

With the two ringleaders on the loose, Parcell and his men had to hustle. They started by matching guns found at the raid on 1212 W. Moore St. to casings found at the scenes. Eventually, ballistics expert Ann Jones determined that all nine shootings had been committed with the same five guns. Then detectives traced the paper trail that led to a Pam Williams as purchaser of the guns.

When they brought Williams in for questioning, she admitted that she had bought all the guns for some of the gang members in exchange for cocaine on Jan. 14.

By April, the cops had heard that Tipton had set up house in Blackwell. On April 8, an informant claimed to have spotted him, standing in front of a house on 15th Street.

Parcell says it was as if the whole cavalry responded to the tip, driving in droves into the Blackwell area to arrest Tipton.

"Now we had everybody locked up but "O," remembers Parcell. "We knew he'd gone back uptown."

Nearly three months later, the break came. Police had located a girlfriend of "O's." The girlfriend, who is in the Federal Witness Protection Program, was reluctant to talk at first but, she said in testimony, her aunt worked on her. "She told me it was the right thing to do."

The girlfriend gave police the number she called when she wanted to reach "O" in New York. The number belonged to a woman who provided the gang a place to stay. The woman would arrange a time for the girlfriend to call a nearby phone booth, then tell "O" what time to wait there.

The day the girlfriend made the call for police, the woman told her to call the phone booth at 8 p.m. Then Detective Fleming got on a plane for New York. He arrived in plenty of time to plant himself across from the phone booth. But, when 8 p.m., then 8:15 came and went. Fleming thought they'd missed him again.

At 8:23, when "O" sauntered up, Fleming asked him his name. "Cory Johnson," he said. at which time, Fleming, Drug Enforcement Agency agents and N.Y.P.D. cops swarmed him.

• • • • • • • • • • •

Case closed, testimony rendered. The jury took 11 hours to return guilty verdicts. Tipton was convicted of six murders, Cory Johnson with eight. Roane was found guilty of four counts. All three face the death penalty or life in prison. The jury also found Sandra Reavis guilty of conspiracy to distribute crack cocaine. Hardy and Gaiters plea bargained their murder charges in exchange for their testimony. Lance Thomas, otherwise known as "V" or "Anthony Mack," will be tried for the murder of Louis Johnson later this year.

One would hope that the men of Narcocide could call it quits for a while. Just like they hoped they'd do after the Johnson-Brown gang was locked up. But the rest will be short. No matter that these guys are off the streets and their trial over, rumblings of new turf struggles are already being heard on the streets. There's a hand-lettered sign that stands in the window of a house in Newtowne. "Trespassers will be shot," it reads. "Survivors will be shot again."

It'll be a mighty short rest for the men of Narcocide.

Mighty short. ■



## You always have time to read it.

Find out how your business can reach over 108,000 affluent readers, call us at 358-0825.



## SHONEY'S BREAKFAST BAR 10TH ANNIVERSARY

## To Help You Celebrate The 10TH Anniversary Of Our Breakfast Bar, Here's A Party Favor.

# $2.99

All You Care To Eat Breakfast and Fruit Bar.
Monday - Friday 6:00 a.m. to 11:00 a.m.



Cary St., Fairfield Commons, 177 E. Bell Boulevard, Dumbarton Square, Skipwith & Broad, Glenside & Broad, Ashland/Hanover Shopping Center

CERTIFICATION

I hereby certify that one copy of the attached Memorandum In Support Of Initial Petition For Writ Of Habeas Corpus Pursuant To 28 U.S.C. Section 2255 was mailed on June 15, 1998, to counsel for the Respondent:

> Robert J. Erickson
> United States Department of Justice
> Room 6102, Patrick Henry Building
> 601  D. Street, N.W.
> Washington, DC  20530
> (202) 514-2841

Barbara L. Hartung

980a



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

FILED
SEP 24 1998
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

| | |
|---|---|
| CORY JOHNSON,            ) | |
|            Petitioner,    ) | Crim. No. 3:92CR68 |
| v.                       ) | |
|                 ) | Civil No. 3:97CV895 |
| SAMUEL PRUETT, WARDEN,   ) | |
|            Respondent.    ) | |

## FIRST AMENDMENT TO INITIAL PETITION FOR WRIT OF

## HABEAS CORPUS PURSUANT TO 28 U.S.C. SECTION

## 2255 AND TO MEMORANDUM IN SUPPORT OF PETITION

Petitioner, Cory Johnson, a federal prisoner now in the custody of the United States, currently held at Sussex State Prison, Waverly, Virginia, and under sentence of death, hereby amends his previously filed petition for a writ of habeas corpus pursuant to 28 U.S.C. Section 2255 and memorandum in support thereof. Respondent has not yet filed a responsive pleading[1].

Petitioner asserts the various grounds for granting a writ of habeas corpus both individually and cumulatively. Because of the cumulative nature of the alleged errors and the prejudice resulting therefrom, Petitioner hereby incorporates by reference in every paragraph or subparagraph of his initial petition, memorandum in support, and this first amendment every other paragraph or

---

[1] Counsel for Respondent was granted until September 29, 1998, to file his response. Petitioner has no objection to an extension of time to file Respondent's answer in view of this Amendment.

1

subparagraph of his initial petition, memorandum in support, and this amendment, and any subsequent amendment thereto.

I.    The Subsequent Trial Of *Johnson's Co-defendant, Vernon Lance Thomas*, Revealed Additional Facts Supporting The Claims Set Forth In Johnson's Initial Petition.

Vernon Lance Thomas was indicted with Johnson. JA 73. His case was severed, and he was tried in this Court after Johnson's trial. The trial transcript for that related case, *United States v. Vernon Lance Thomas*, provides additional evidence supporting Johnson's Petition on a number of claims.

The Government's two star witnesses against Johnson, Priscilla Green and Jerry Gaiters, both testified in *Thomas,* and their testimony is the focal point of the analysis that follows.

A.    Ms. Green's Testimony In *Thomas* Reveals That She Lied In Johnson's Trial, And That Johnson Was Not A CCE Supervisor.

The facts set forth below amend and supplement Johnson's Claim II, the legal insufficiency of the evidence on the supervision element, Claim III, actual innocence of the CCE convictions and subsequent death sentence, and Claim V, prosecutorial misconduct throughout Johnson's trial.

Background. Priscilla Green provided dramatic, damning evidence against Johnson in connection with his CCE murder convictions. She had been crippled by gun shots. In essence, Green claimed in her testimony that those shots were fired by Johnson and that she saw Johnson in the act of executing other people. Tr. 2546, 2557-59. She was surely the Government's most

2

sympathetic and damaging trial witness against Johnson.

   <u>Ms. Green lied at Johnson's trial</u>.  As a threshold matter, Ms. Green's testimony in *Thomas* proves that she lied in Johnson's trial.   After giving her damning testimony against Johnson, defense counsel attempted a cross-examination.   During cross-examination at Johnson's trial, Ms. Green expressly denied that she had ever sold cocaine.  Tr. 2546.  This testimony was false, as demonstrated by her testimony in *Thomas*, in which she admitted that she had sold cocaine. *United States v. Vernon Lance Thomas*, Trial Tr. 421-2.

   Because Green lied during Johnson's trial, Johnson was denied the opportunity to effectively challenge her credibility on a critical issue--her involvement in drug dealing.  Ms. Green's false testimony on this point ultimately may have affected the sentence Johnson received.  Had the jurors known that Green voluntarily engaged in the same criminal activities that Johnson was charged with, they may have been less inclined to impose death.  This information amends and supplements Johnson's Claims II and III, alleging insufficient proof, innocence of the CCE convictions and of the death sentence.

   <u>Thomas, not Johnson, was the principal supervisor of drug activities.</u>  Beyond revealing her false testimony against Johnson, Ms. Green's testimony in *Thomas* demonstrated that Lance Thomas, not Johnson, was the principal supervisor of the drug activities involved.  Specifically, Green testified that Thomas was "mostly" the head man, because "he mostly controlled the drugs.... [Thomas]

3

983a

controlled the drugs because he had it bagged up and gave it out to the people to sell." *Thomas*, Trial Tr. 424-5.

Ms. Green's testimony during *Thomas* (like Gaiters' testimony in the Johnson trial that persons other than Johnson "was like the boss. . . . [t]hey ran things") supports Johnson's claim of actual innocence -- *i.e.*, that the CCE supervisors were persons other than Johnson. Had she given truthful testimony concerning Thomas's leadership during Johnson's case, when combined with Gaiters' testimony concerning the leadership by others, her testimony would have substantially strengthened Johnson's defense (and weakened the government's case) and enabled a jury to conclude either that Johnson was not a CCE supervisor or, even if he was, that he was not sufficiently responsible to support a death sentence. Green's later testimony amends and supplements Johnson's Claims II and III.

Prosecutorial misconduct. Ms. Green's testimony supports a claim of prosecutorial misconduct in two respects. It is difficult to imagine that the Government did not know (i) that Ms. Green sold drugs and that she testified falsely in Johnson's trial when she denied selling drugs; or (ii) that she would ultimately put most of the responsibility for supervision of drug activities on Thomas. Nevertheless, this information was not revealed to Johnson's defense counsel or to the jury during Johnson's trial.

A conviction obtained through the use of evidence the prosecutor knows is false violates due process and must fail under the Fifth and Fourteenth Amendments. Napue v. Illinois, 360 U.S. 264, 269 (1959); Kyles v. Whitley, 115 S. Ct. 1555 (1995). Under

4

984a

such circumstances, the conviction must be set aside if there is any reasonable likelihood that the false evidence could have affected the judgment of the jury. United States v. Bagley, 473 U.S. 667, 678-80 & n. 9 (1985); Giglio v. United States, 405 U.S. 150, 154 (1972)(citing Brady v. Maryland, 373 U.S. 83, 87 (1963)); Mooney v. Holohan, 294 U.S. 103 (1935). Where it is established that the government knowingly permitted the introduction of false testimony, reversal is virtually automatic." United States v. Stofsky, 527 F.2d 237, 243 (2d Cir. 1975), cert. denied, 429 U.S. 819 (1976)(citing Napue, 360 U.S. at 269); see also Miller v. Pate, 386 U.S. 1, 7 (1967). Thus, Green's subsequent testimony and information provides grounds to amend and supplement Johnson's Claim V, alleging prosecutorial misconduct in the presentation of her testimony.

Furthermore, the government presented and argued two different accounts of the CCE supervision activities, the first at Johnson's trial and the second at Thomas' trial. The government's shifting position in its presentation of testimony and argument made Johnson's trial and conviction fundamentally unfair and produced a result that cannot be relied on. The principles governing the prosecution's responsibility in such instances were stated by the Second Circuit Court of Appeals in United States v. GAF Corp., 928 F.2d 1253, 1260 (2d Cir. 1991):

> Although the government is not bound by what it previously has claimed its proof will show any more than a party which amends its complaint is bound by its prior claims, the jury is at least entitled to know that the government at one time believed, and stated, that its proof established something different from what it

5

985a

<u>currently claims.</u>  Confidence in the justice system cannot be affirmed if any party is free, wholly without explanation, to make a fundamental change in its version of the facts between trials, and then conceal this change from the final trier of the facts.  See [United States v.] McKeon, 738 F.2d [26] at 31 [2d Cir. 1984].

\* \* \*

. . . [I]f the government chooses to change its strategy at successive trials, and contradict its previous theories of the case and version of the historical facts, the jury is entitled to be aware of what the government has previously claimed, and accord whatever weight it deems appropriate to such information.  There is merit still in that "rough and ready" view of the adversary process which leaves parties to bear the consequences of their own acts.  [928 F.2d at 1262].

The prosecutor's improper manipulation of material evidence at two separate murder trials was the basis for granting the writ in <u>Troedel v. Wainwright</u>, 667 F. Supp.1456 (S.D. Fla. 1986), <u>aff'd</u>. 828 F.2d 670 (11th Cir. 1987).  In the trial of defendant Hawkins, the prosecutor presented expert testimony that either Hawkins or Troedel had fired the murder weapon or had been close when a weapon was fired.  The prosecutor also presented testimony of a witness, Tillman, who stated that on the night of the murder Hawkins had asked for a gun and said he wanted to shoot two men who owed him money.  On redirect, the prosecutor bolstered Tillman's testimony.  At Troedel's trial, the same prosecutors called Tillman, who repeated his prior testimony.  On summation the prosecutors distanced themselves from his account, whereas in the prior trial they had embraced it.  Furthermore, at Troedel's trial the expert witness now testified that Troedel had fired the murder weapon and that Hawkins could have been contaminated by proximity to the weapon.  At a federal evidentiary hearing, the expert witness testified that there was no scientific basis for concluding that

6

Troedel had fired the murder weapon. The district court concluded that the prosecutor presented misleading testimony, knew that it was misleading, and that the testimony was material since it could have affected the judgment of the jury. As a result, Troedel's trial was "rendered fundamentally unfair by the State's use of misleading testimony." Id. at 1460. The Court of Appeals affirmed the granting of the writ. Accord United States v. Udechukwu, 11 F.3d 1101, 1105-06 (1st Cir. 1993)(improper conduct for prosecutor to imply or suggest to jury the opposite of what he knows to be true).

The prosecutors in Johnson's trial engaged in the same improper behavior. The prosecution witness Green denied any drug dealing in Johnson's trial but admitted to that illegal activity at Thomas's trial. The same witness named Thomas, not Johnson, as the principal supervisor of the drug activities charged in the indictment. Johnson's jurors never heard this testimony from Green. The testimony was material, certainly would have affected the judgment of Johnson's jury, and Johnson's trial was rendered fundamentally unfair and the results unreliable by the government's manipulation of the evidence. See Miller v. Pate, 386 U.S. 1 (1967). This evidence provides an additional claim for relief based on prosecutorial misconduct, Johnson's Claim V.

The alleged supervisees were mere resellers of drugs.

Johnson's opening brief at Part II argues extensively that the Government's evidence and argument concerning CCE supervisees consists principally of mere drug resellers, who are not capable of

7

987a

being CCE supervisees. Ms. Green's testimony in *Thomas* bolsters this argument. There, she testified that the activities of four so-called CCE supervisees -- herself, Curt Thorne, "Papoose" (Robert Davis), and Mousey Armstrong -- were limited to selling drugs. *Thomas* Tr. 424. This information amends and supplements Johnson's Claims II and III set forth in his Initial Petition.

B.    Gaiters' Testimony In *Thomas* Reveals That He Lied In The Trial
      <u>Against Johnson And That Johnson Was Not A CCE Supervisor</u>

<u>Background</u>. Jerry Gaiters was a less sympathetic witness than Ms. Green, but his testimony was similarly essential to Johnson's CCE murder convictions. Gaiters testified in both cases pursuant to a plea agreement. Pursuant to that agreement, he pled guilty to conspiracy and multiple counts of murder in furtherance of a CCE. Tr. 2309-10. Gaiters testified that he saw Johnson shoot Mousey Armstrong and Bobby Long (both of which were CCE murders for which Johnson received the death sentence). Tr. 2343-47. He also gave testimony concerning specific facts relating to the murder of Mousey Armstrong, which the Government relied upon to demonstrate that he was one of Johnson's CCE supervisees.

<u>Gaiters lied at Johnson's trial.</u> Johnson was a key witness for the Government, claiming to be an eyewitness against Johnson for the capital murder of Mousey Armstrong and Bobby Long. However, it is apparent from the *Thomas* trial that Gaiters did not testify truthfully against Johnson. As discussed in Johnson's opening brief at page 60, Gaiters testified against Johnson that he was directed by Johnson to get Mousey Armstrong out of her house so

8

988a

Johnson could shoot her; and that Gaiter's trial testimony conflicted with his grand jury testimony. During the *Thomas* trial, however, Gaiters testified to an entirely different story: *that he did not know that Johnson was going to hurt or kill Ms. Armstrong.* *Thomas*, Trial Tr. 569.

Thus, Gaiters has now testified under oath three times concerning his role in the Mousey Armstrong murder, and he has told three different stories. His inability to tell the same story twice demonstrates that his testimony against Johnson is likely a fabrication. At minimum, it casts substantial doubt on his veracity and these contradictions were not presented to Johnson's jury. This information amends and supplements Johnson's Claims II and III, alleging insufficient proof, innocence of the CCE convictions and of the death sentence.

For the reasons set forth above when discussing Green's inconsistent testimony, Gaiters' testimony strongly suggests that the Government knew that his testimony at Johnson's trial was false. Thus, Gaiters' testimony at Thomas's trial supports an additional claim of prosecutorial misconduct, Claim V in the Initial Petition.

Johnson was not Gaiters' CCE supervisor. Gaiters' testimony against Johnson concerning the murder of Mousey Armstrong was critical from another standpoint: as discussed in Johnson's opening brief at page 60, the Government had relied upon his testimony as the sole basis to claim that he was a CCE supervisee of Johnson. Gaiters' most recent story that he did not know that Johnson was

9

989a

going to hurt or kill Armstrong, as he testified during the *Thomas* trial, could not possibly support the Government's argument that he was a CCE supervisee due to his actions in concert with Johnson relating to the Armstrong murder. This information amends and supplements Johnson's Claims II and III in his Initial Petition.

## II. Prosecutorial Misconduct In Connection With The Terms "Worker" and "Partner"

Johnson's opening brief at page 141 explains the Government's practice during the trial of having its witnesses use the misleading and ambiguous terms "worker" and "partner" to establish the element of CCE supervision. During Johnson's trial, the Government repeatedly attempted to demonstrate to the jury that prosecutors had not suggested these terms to its witnesses. For example, Government witness Hussone Jones testified as follows:

> Q:    Now, in anticipation of your testimony has anyone told you to use the term worker or partner?
>
> A:    No.

Tr. 1546. The Government attempted on at least one other occasion during the trial to reinforce the notion that it did not suggest these terms to its witness. Tr. 2108.[2]

Various excerpts of grand jury testimony, however, show that the terms were suggested by the Government through leading questions during grand jury proceedings. For example, Hussone

_____

[2]    This was during the testimony of Stanley Smithers. As discussed in Johnson's opening brief at 52-53, Smithers testified that he used that term to mean a drug reseller.

10

Jones -- the very witness referred to in the preceding paragraph -- did *not* use these terms during his grand jury testimony.  These terms were used by the Government in leading questions, and were accepted by Jones in his answers.  *See* Exhibit 11, attached to Johnson's opening brief.  If the Government then showed Jones his grand jury testimony prior to his trial testimony, then it would appear that the Government knowingly planted these terms in his mind for use at trial.  Likewise, during grand jury testimony, the Government suggested these terms to other Government witnesses.  *See*, e.g., Exhibit 12, attached to Johnson's opening brief.  This information amends and supplements Johnson's Claim V, alleging prosecutorial misconduct.

III. The Prosecutors Violated 18 U.S.C. Section 201(c)(2) When Obtaining and Presenting The Testimony Of Several Cooperating Witnesses At Johnson's Trial.  Defense Counsel Failed To <u>Object And Were Ineffective Under Strickland v. Washington.</u>

The prosecutors gave and/or promised favorable treatment to several key prosecution witnesses in exchange for their testimony at Johnson's trial.  In doing so, the prosecutors violated 18 U.S.C. Section 201(c)(2) which states:

> <u>Section 201.</u>   <u>Bribery of public officials and</u> <u>witnesses</u>
>                 *        *        *
> (c)   Whoever --
>
>     (2)  directly or indirectly, gives, offers or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing, or other proceeding, before any court, any committee of either house or both Houses of Congress, or any agency, commission, or officer authorized by the laws of the United States to hear evidence or take testimony, or for

11

> or because of such person's absence therefrom;
>
> *     *     *
>
> shall be fined under this title or imprisoned for not more than two years, or both.

The statute explicitly prohibits attaching any promise, offer, or gift to a witness's testimony in any legal proceeding. There can be no quid pro quo for testimony, including the testimony of government witnesses. Nor can a promise be motivated by a witness's testimony.

The prosecutors violated this statute when presenting the testimony of several witnesses who were central to the case against Johnson. Greg Scott testified pursuant to an agreement with the government. He stated that in exchange for his testimony the government "will speak up for me in behalf of somehow I'll get a deal," i.e., "to reduce my sentence." JA 1727-28. Scott was promised government assistance at his upcoming sentencing. Robert Davis testified that he had been placed in the Witness Protection Program, received lodging, and no prosecutions had been brought against him as conditions of his testimony. JA 2765, 2784. Dennis Moody testified that the government had promised to place him in the Witness Protection Program only after he had given testimony at Johnson's trial. JA 2860-62. The connection between testimony and promised benefit could not be clearer. Stanley Smithers testified that as a condition of his testimony he too had been placed in the Witness Protection Program. JA 2930. Valerie Butler testified that she was placed in the Witness Protection Program (JA 3514) and had never been charged for criminal offenses she committed (JA

12

992a

3566).    Under these conditions, Butler testified for the government.

Sterling Hardy, who had been charged in the indictment with Johnson, entered into a plea agreement with the government. His agreement provided that all state charges would be dropped (JA 3045) and that the government would make a motion for a sentence reduction after he had testified at Johnson's trial. JA 3056-60. Jerry Gaiters, charged as a co-defendant, also entered a plea in this case and like Hardy was awaiting sentence. In exchange for his testimony, the government had agreed to recommend a sentence reduction. "When it is time to come do sentencing, they will talk to see if I can get a lesser sentence." JA 3140. "You are cooperating because you don't want to get the maximum penalty; is that correct? [Gaiters]: Right." JA 3202.

The prosecutors' actions were a clear violation of 18 U.S.C. section 201(c)(2). The testimony of these witnesses should have been prohibited. See United States v. Singleton, 144 F.3d 1343 (10th Cir. 1998), vacated and reh. en banc granted, 144 F.3d 1361 (10th Cir. July 10, 1998). For the reasons set forth in Singleton, adopted in full and incorporated here, Johnson was denied a fair trial and due process in violation of his rights under the Fifth and Sixth Amendments. Therefore, Johnson amends and supplements his Initial Petition and Memorandum to add this violation by the prosecution as Claim V (M), alleging prosecutorial misconduct. The writ must be granted on this basis, and the convictions and sentences vacated.

13

993a

In addition, Johnson amends and supplements his Initial Petition to add a claim of ineffective assistance of counsel, Claim IV (A. 9). Based on the foregoing, Johnson alleges that defense counsel rendered ineffective assistance when they failed to object to the prosecutors' actions and the testimony of the witnesses named above on grounds that the testimony was obtained in violation of section 201(c)(2). Johnson was prejudiced by counsels' failure to object as the testimony of the named witnesses was central to his conviction on all counts and to his resulting death sentences. The writ must be granted on this ground.

IV.  Typographical Errors In Johnson's Opening Brief

Page 56, first full paragraph, last sentence, should read: "A lengthy list of examples of violations of FRE 602 -- in the context of the CCE supervision element and otherwise -- is set forth below starting at page 135."

Respectfully submitted,

CORY JOHNSON

By: _____

Barbara L. Hartung
VSB 38062
1001 East Main Street
Suite 504
Richmond, VA  23219
(804) 649-1088

Edward E. Scher
VSB 23064
Thorsen Marchant & Scher, LLP
316 West Broad Street
Richmond, VA  23220-4219

Counsel for Cory Johnson

September 23, 1998

14

994a

## CERTIFICATION

I hereby certify that one copy of the First Amendment To Initial Petition For Writ Of Habeas Corpus Pursuant to 28 U.S.C. 2255 And To Memorandum In Support Of Petition was sent by facsimile and was mailed on September 24th, 1998, to counsel for the Respondent:

Robert J. Erickson
Deputy Chief, Criminal Division
Appellate Section
U.S. Department of Justice
Room 6102, Patrick Henry Building
601 D Street, N.W.
Washington, D.C.  20530
(202) 514-2841

Barbara L. Hartung

15

995a

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

CORY JOHNSON,                )
                             )
            Petitioner,      )        Crim. No. 3:92CR68
v.                           )
                             )        Civil No. 3:97CV895
SAMUEL PRUETT, WARDEN,       )
                             )
            Respondent.      )

STATE OF VIRGINIA        )
                         )
COUNTY OF SUSSEX         )


### AFFIDAVIT OF COREY JOHNSON

I, Corey Johnson, petitioner in this action, being duly sworn, state:

1.    I have read the foregoing First Amendment To Initial Petition For Writ of Habeas Corpus;

2.    I hereby state, under penalty of perjury, that the facts contained in the Petition are true to the best of my knowledge; and

3.    I hereby state that I am entitled to relief for the reasons set forth in this First Amendment and in my Initial Petition And Memorandum In Support.

Petitioner Corey Johnson
Sussex I Correctional Center
Waverly, Virginia

996a

-2-

Sworn to and subscribed to before me on this 23RD day of September, 1998.

_Darwin N. Cooper_
Notary Public

My commission expires on: MARCH 31, 2002

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

MAR 15 1999

CLERK U.S. DIST. COURT

CORY JOHNSON,                          )
                                       )
            Petitioner,                )          Crim. No. 3:92CR68
                                       )
v.                                     )
                                       )          Civil No. 3:97CV895
SAMUEL PRUETT, WARDEN,                 )
                                       )
            Respondent.                )

MOTION FOR LEAVE TO AMEND AND
SECOND AMENDMENT TO INITIAL PETITION FOR WRIT OF
HABEAS CORPUS PURSUANT TO 28 U.S.C. SECTION
2255 AND TO MEMORANDUM IN SUPPORT OF PETITION

Petitioner, Cory Johnson, a federal prisoner now in the custody of the United States, currently held at Sussex I State Prison, Waverly, Virginia, and under sentence of death, hereby moves the Court pursuant to Fed.R.Civ.P. Rule 15(a) for leave to amend his previously filed petition for a writ of habeas corpus pursuant to 28 U.S.C. Section 2255 and memorandum in support thereof. Petitioner is filing his Reply to the Government's Response to his habeas corpus petitioner on March 15, 1999. This second amendment presents issues raised in Mr. Johnson's initial Petition and Memorandum and in his Reply. Hence, there will be no undue prejudice to the Government by this Second Amendment.

Petitioner asserts the various grounds for granting a writ of habeas corpus both individually and cumulatively. Because of the cumulative nature of the alleged errors and the prejudice resulting therefrom, Petitioner hereby incorporates by reference his initial petition, memorandum in support, first amendment, and reply in this second amendment, and any subsequent amendment thereto.

998a

I.    Johnson Is Exempt From Execution Under 18 U.S.C.
      Sec. 3596(c) and 21 U.S.C. Sec. 848(1) Based On
      Long Standing, Well Documented Mental Impairments.

Under federal law, a mentally retarded defendant cannot be executed.    21 U.S.C. sec. 848(1); 18 U.S.C. sec. 3596(c) [added 9/13/94].    The Government recognized this prohibition in its Response.    Govt. Response at 229.    However, there is no case law defining the meaning of "mental retardation" under the applicable statutes and the outer boundaries under the law have not been defined.    As set forth in the Initial Memorandum (at 108-111) and in his Reply, Mr. Johnson has exhibited the distinguishing characteristics associated with mental retardation for most of his life.

Johnson's defense expert explained at his trial that mental retardation is determined by several factors.    One is intelligence:

> Individuals that fall in the range of 70-75 can be considered in the range of mental retardation.    And then of course, anything lower than that indicates mental retardation.

J.A. at 4515 (testimony of Dr. Dewey Cornell); DSM-IV (4th ed. 1994) at 39-40 (mental retardation may include those with IQ of 70-75 when coupled with significant deficits in adaptive behavior).

Johnson's I.Q. testing history demonstrated the following.    In February 1982 when he was 13 years old, Johnson was given the WISC-R, a test designed to measure a child's I.Q., and achieved a full scale I.Q. score of 88.    The test evaluator described this score as within the low average range of intellectual functioning. (Reply, Ex. 14).    A second WISC-R was given in March 1985, only three years later, when Johnson was 16 years old.    This time Johnson achieved a full scale I.Q. of only 69-74, placing him in the mentally

999a

retarded range (JA 4433), and was described by the evaluator as "Deficient-Borderline range." (Reply, Ex. 14). Shortly prior to Johnson's capital trial, he took the WAIS-R intelligence test, which is the adult version of the WISC-R. JA. 4505. He was then 23 years old and in October 1992 achieved a full scale I.Q. score of 77. (Reply, Ex. 14). The evaluator, Dr. Dewey Cornell, concluded that Johnson was in the "borderline mentally retarded range." (JA 4515, 4517: 70-75 I.Q. can be considered in the range of mental retardation). No explanation was offered for Mr. Johnson's widely differing I.Q. scores.

Where an individual has significant adaptive impairments, the criteria of mental retardation may be met even if the individual has a higher IQ range. DSM-IV at 45. The American Association On Mental Deficiency ("AAMD") reports that the upper limit [of 70 as a standard for retardation] is intended as a guideline; it could be extended upward through IQ 75 or more, depending on the intelligence test used." Ellis & Luckasson, Mentally Retarded Criminal Defendants, 53 Geo. Wash. L. Rev. 414, 422 n. 44 (1985)

The second factor associated with mental retardation is impaired adaptive functioning:

> [Y]ou need to show that the person has impaired adaptive behavior in any two of about ten areas that are listed there. Certainly functional academics, the ability to do academic work is one in which he has impairment. Also, communication deficits with his speech impairment and communication problems, he has some deficits there. Self care, social skills, work, the ability to maintain a job, to have good work habits, to use the kind of common sense you need to hold a job, all of those are possible areas in which his functioning is not at a normal level.

J.A. at 4515-16. Johnson satisfied this second factor. For example, a school report from 1986 when Johnson was 17 years old

set forth as one of his goals learning to "handle money so he can shop for himself" and "learn enough simple arithmetic that he will be able to figure out correct change." See Johnson Reply, Ex. 15. Using this second characteristic, Johnson fell within the mentally retarded group.

While not stated by Cornell, the third factor in determining mental retardation is an intelligence test score in the mental retardation range before the age of 18. (DSM-IV at 39). Johnson also satisfied this factor. He had tested in the I.Q. range of 69-74 in 1985 when he was 16 years old. Thus, the only factor that precluded a finding of mental retardation at the time of Johnson's capital trial was the 1992 I.Q. score. Cornell testified:

> The IQ score I got was 77. If he had gotten a 75, he would be within the range that counts as mental retardation. 70 to 75 is kind of the gray area. If you are in that area, you can be mildly retarded. He was two points above that, which is a matter of one or two questions on an intelligence test that would make the difference there.

J.A. 4517. One or two questions could have accounted for the two point difference in I.Q. when Cornell administered the test.

A finding that the third characteristic of mental retardation has been met obviously depends upon the validity of the testing instrument and/or the test administrator. The American Association On Mental Deficiency (now Retardation), the principal professional organization in the field, has placed the upper limit on mental retardation at an IQ of 75 or more, depending on the reliability of the intelligence test. Classification In Mental Retardation 1, (H. Grossman ed. 1983).

As Johnson argued in his Memorandum, research by James Flynn

1001a

in 1984 and 1988 documented a phenomenon of IQ gains over time that are tied to the age of the testing instrument. Johnson Memo, Ex. 7 at 2. In view of Prof. Flynn's research, Johnson's 1992 I.Q. test cannot be accepted as the final determination of Johnson's status. And there may be additional deficiencies in the testing process as yet unidentified.

Johnson's trial counsel never questioned the validity of the tests conducted on Johnson and, therefore, never argued that Johnson was ineligible for execution under the applicable federal statutes. Given the importance of this issue, an evidentiary hearing is required to examine the issues raised here and to determine whether Johnson is in fact ineligible for execution under federal law.

This additional claim presents an issue raised in Johnson's initial Petition in his related ineffective assistance argument. Respondent is on notice of the substance of the claim here and will not be unfairly prejudiced by this amendment. Therefore, this Court should grant the motion to amend for good cause shown and in the interests of justice.

II.  The Government Violated Brady v. Maryland, 373 U.S. 83 (1963), And Its Progeny When It Failed To Disclose Exculpatory And Impeachment Materials To Johnson's Counsel.

In addition to the specific Brady violations set forth in the pleadings of Johnson and his co-petitioners, Tipton, and Roane, Johnson alleges additional Brady/Bagley/Kyles violations by the government. Johnson requires discovery and an evidentiary hearing in order to demonstrate the factual basis for these additional

claims and to set forth the prejudice to his case. Johnson moves to amend at this time in light of the recent argument before the U.S. Supreme Court in Strickler v. Greene, No. 98-5864 (March 3, 1999), where at least one Justice suggested that a petitioner must raise a Brady claim in post-conviction proceedings even though the factual basis of the claim may not be immediately available to the petitioner and awaits further discovery. To avoid a potential default of this claim, Johnson raises it now.

Respondent is on notice of the general substance of this claim and will not be unfairly prejudiced by this amendment. Therefore, this Court should grant the motion to amend for good cause shown and in the interests of justice.

Respectfully submitted,

CORY JOHNSON

By: _____

Barbara L. Hartung
VSB 38062
1001 East Main Street
Suite 504
Richmond, VA   23219
(804) 649-1088

Edward E. Scher
VSB 23064
Thorsen Marchant & Scher, LLP
316 West Broad Street
Richmond, VA   23220-4219
(804) 644-0711

Counsel for Cory Johnson

March 15, 1999

## CERTIFICATION

I hereby certify that one copy of the Motion To Amend And Second Amendment To Initial Petition For Writ Of Habeas Corpus Pursuant to 28 U.S.C. 2255 And To Memorandum In Support Of Petition was mailed on March 15, 1999, to:

    Robert J. Erickson
    Deputy Chief, Criminal Division
    Appellate Section
    U.S. Department of Justice
    Room 6102, Patrick Henry Building
    601 D Street, N.W.
    Washington, D.C.  20530
    (202) 514-2841

    Counsel for Respondent

    Scott L. Nelson
    Paul F. Enzinna
    Michael J. Barta
    Miller, Cassidy, Larroca & Lewin, L.L.P.
    2555 M Street, N.W.
    Washington, DC  20037
    (202) 293-6400

    Counsel for James H. Roane, Jr.

    Donald R. Lee, Jr.
    Frederick R. Gershon
    Macaulay, Lee & Powell
    1015 East Main Street - 4th
    Richmond, VA  23219
    (804) 649-2128

    Counsel for Richard Tipton

_____
Barbara L. Hartung

1004a

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

FILED
OCT - 1 1999
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

CORY JOHNSON,                          )
                                       )
              Petitioner,              )        Crim. No. 3:92CR68
v.                                     )
                                       )        Civil No. 3:97CV895
UNITED STATES[1],                      )
                                       )
              Respondent.              )
                                       )

PETITIONER JOHNSON'S
THIRD AMENDMENT TO INITIAL PETITION FOR WRIT OF
HABEAS CORPUS PURSUANT TO 28 U.S.C. SECTION
2255 AND MEMORANDUM IN SUPPORT OF PETITION

Petitioner, Cory Johnson, a federal prisoner now in the custody of the United States, currently held at the Federal Correctional Institution, Terre Haute, Indiana, under sentence of death, submits this Third Amendment to his previously filed petition for a writ of habeas corpus pursuant to 28 U.S.C. Section 2255 and memorandum in support thereof. On August 3, 1999, this Court granted Johnson leave to amend his petition and ordered the amendment filed no later than Friday, October 1, 1999.

Petitioner asserts the various grounds for granting a writ of habeas corpus both individually and cumulatively. Because of the cumulative nature of the alleged errors and the prejudice resulting therefrom, Petitioner hereby incorporates by reference his initial petition, memorandum in support, and all subsequent amendments and pleadings in support of his motion for habeas relief. He also

---

[1] As noted in the text, Johnson is no longer in custody in a Virginia prison. With this pleading, the caption has been corrected to reflect the United States as Respondent.

1005a

incorporates each of the grounds for relief stated by his codefendants Richard Tipton and James Roane, Jr., to the extent that they apply to him.

Johnson was convicted under 21 U.S.C. sec. 848(c), which prohibits participation in a continuing series of narcotics violations that meet specified criteria. Upon conviction, he was sentenced to death.

CLAIM XII:        THE DISTRICT COURT FAILED PROPERLY
                  TO INSTRUCT THE JURY ON THE ESSENTIAL
                  ELEMENTS OF THE CCE STATUTE IN VIOLATION
                  OF PETITIONER'S SIXTH AMENDMENT
                  RIGHT TO TRIAL BY JURY.

In Richardson v. United States, ___ S. Ct. ___ (1999), 1999 WL 342214 (U.S.), the Supreme Court held that a jury in a federal Continuing Criminal Enterprise ("CCE") case [21 U.S.C. sec. 848] must unanimously agree not only that the defendant committed some 'continuing series of violations,' but must unanimously agree on which specific 'violations' make up that 'continuing series.' In reaching that decision, the Court interpreted the CCE statute and held that each violation in the series constitutes a separate element of the offense. The jury must specify which of the violations charged make up the continuing series. The Court explained:

> Our decision will make a difference where . . . the Government introduces evidence that the defendant has committed more underlying drug crimes than legally necessary to make up a 'series.' (We assume, but do not decide, that the necessary number is three, the number used in this case.)

Id. at 4.                        *  *  *

2

1006a

> To hold that each 'violation' here amounts to a separate element is consistent with a tradition of requiring juror unanimity where the issue is whether a defendant has engaged in conduct that violates the law. To hold the contrary is not.

Id. at 5. With this decision, the Court resolved a split in the circuits. Compare, e.g., United States v. Edmonds, 80 F.3d 810, 822 (3rd Cir. 1996) (en banc) (jury must unanimously agree on which 'violations' constitute the series), with United States v. Hall, 93 F.3d 126, 129 (4th Cir. 1996) (unanimity with respect to particular 'violations' is not required). The Richardson Court specifically reserved the question of whether such an error may be "harmless."

A.    The Proceedings Below

On direct appeal, Johnson had raised this very issue. He argued that the district court committed plain error in failing to instruct that a CCE conviction required jury unanimity as to which narcotics violations constituted the series[2]. The district court had given only a general unanimity instruction. JA 4057. ("Any verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. In other words, your verdict must be unanimous.")

The district court's charge on Count 2, the CCE count, failed to treat the defendants separately and was particularly likely to

---

[2] Where an issue has been decided on direct appeal and there is a subsequent change of law, the petitioner may raise the issue again under sec. 2255. See Davis v. United States, 417 U.S. 333, 342; Sales v. United States, 139 F.3d 322, 324-25 (2d Cir.), cert. denied, 118 S. Ct. 2377 (1998); Underwood v. United States, 15 F.3d 16, 18 (2d Cir. 1993); English v. United States, 998 F.2d 609, 612-13 (8th Cir. 1993).

3

confuse the jury. Thus, the jury could convict without making the necessary finding that each defendant committed a "continuing series of violations." The charge contained the following relevant provisions:

> Now, in order to sustain its burden of proof for the crime of engaging in a Continuing Criminal Enterprise as charged in Count Two of the indictment, the government must prove the following five essential elements with respect to each individual defendant charged beyond a reasonable doubt: One, the defendant committed a felony violation of the federal narcotics laws; <u>two, such violation was part of a continuing series of related violations of federal narcotics laws; three, the continuing series of violations was undertaken by the defendants</u> in association or in concert with five or more other persons; four, the defendant was an organizer of these five or more other persons, or occupied a management or supervisory position with respect to these five or more other persons; five, the defendant obtained substantial income or resources from the continuing series of narcotic violations.
>
> \*     \*     \*
>
> The first phrase: "Felony violation." The phrase "felony violation of the federal narcotics laws" as used in these instructions means the commission of any act specifically prohibited by certain sections of the United States Code for which a defendant could be imprisoned for more than one year. The distribution or possession with intent to distribute cocaine or crack cocaine in violation of 21 U.S. Code Section 848(a)(1) is a felony violation of the narcotics laws.
>
> What is a continuing series of violations? A continuing series of violations means at least three violations of the federal drug laws as charged in Counts One, Three, Five, Eight, Eleven, Seventeen, Eighteen, Nineteen, Twenty-four, Twenty-five, Thirty-one, Thirty-two, and Thirty-three of the indictment before you. It also requires a finding that those violations were connected together as a series of related or ongoing activities as distinguished from isolated and disconnected acts.

JA 4035-36 (emphasis added).

The district court's jury charge posited 13 violations that

4

were alleged to satisfy the "continuing series" requirement[3]. Of the 13 violations listed, only Counts 1, 31, and 32, charged Johnson with violations of sec. 841(a)(1) or sec. 846 (prohibiting distribution, possession with intent to distribute, or conspiracy to do so) as charged in the indictment. The charge included counts not charged against Johnson (Counts 3, 5, and 33). The remaining counts charged intentional murder by one "engaged in a CCE" or "working in furtherance" of the CCE under sec. 848(e), although not alleged in Count Two of the indictment. Further confusing the issue, the district court erred when charging on the third element when the court stated that the prohibited continuing series of violations "was undertaken by the defendants," rather than by each individual defendant. JA 4035.

The jury delivered a general verdict finding Johnson "guilty" of the CCE (Count 2). The jury never specified which three or more predicate acts the jury found had satisfied the continuing series requirement. As the Supreme Court observed in Richardson, there is a real risk that juror disagreement about a defendant's role in specific violations will be hidden absent a unanimity requirement. In addition, where multiple criminal acts are involved, the risk is increased that "jurors, unless required to focus upon specific factual detail, will fail to do so, simply concluding from testimony, say, of bad reputation, that where there is smoke there

---

[3] The charge impermissibly amended the indictment that had alleged only violations of sec. 841 and 846 in Count Two. Count Two failed to identify what three (or more) violations by Johnson were alleged to comprise the requisite continuing series under the CCE statute.

5

must be fire." <u>Richardson</u> at 5. In Johnson's case, there was the additional risk that the jurors considered violations not charged against Johnson when finding three violations that satisfied the CCE statute. <u>See</u> <u>United States v. Edmonds</u>, 80 F.3d 810, 823 (3rd Cir. 1996) (reasonable likelihood that jury interpreted the district court's general unanimity instruction to require agreement only that <u>some</u> three predicate violations occurred and not that the <u>same</u> three violations occurred).

Furthermore, the CCE statute requires not just three violations but three <u>related</u> and continuing violations. Without knowing which three (or more) violations by Johnson the jurors found to have satisfied the continuing series requirement, it is <u>impossible</u> to review the jury's determination that the three were <u>related</u> as required for a CCE conviction.

The Fourth Circuit reviewed the issue under the plain error rule since no objection had been raised at trial[4]. <u>United States v. Tipton</u>, 90 F.3d 861, 885 (4th Cir. 1996), <u>cert. denied</u>, 117 S. Ct. 2414 (1997). Noting that the circuits were split on the issue, the Fourth Circuit did not rule on the unanimity question but, instead, addressed only the issue of prejudice. The Court held

_____

[4] Although the law of the Circuit at the time of Johnson's trial did not support the motion, the Circuits were in conflict on the issue. Counsel rendered ineffective assistance when he failed to raise the claim at trial. Petitioner has raised a claim of ineffective assistance concerning the jury instructions in his initial Memorandum in support Claim IV(7). He now amends that claim to allege ineffective assistance in failing to request a jury instruction requiring unanimity on the predicate acts that constitute the "continuing series" under the CCE statute (Claim IV(7)(c). Johnson was prejudiced for the reasons stated herein.

<u>6</u>

that actual prejudice could not be demonstrated since:

> [T]he jury unanimously found each [defendant] guilty of at least five predicate violations: the conspiracy charged in Count 1, the drug possession charged in Count 32, and at least three of the sec. 848(e) murders as variously charged to them.

Ibid.    In light of Richardson, the Fourth Circuit erred in its analysis.    The district court's error in refusing the instruction was "structural," and therefore subject to automatic reversal, without any inquiry into prejudice[5].

B.    The Erroneous CCE Charge Was A Structural Defect

"Although most constitutional errors have been held amenable to harmless error analysis, some will always invalidate the conviction."    Sullivan v. Louisiana, 508 U.S. 275, 279 (1993). Errors that "necessarily render a trial fundamentally unfair," and which "deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair," require reversal in all cases, independent of any showing of actual prejudice.    Rose v. Clark, 478 U.S. 570, 577-78 (1986).

The error at issue here -- the Court's failure to instruct the jury that to convict Cory Johnson of involvement in a CCE, it was required to agree unanimously on which specific "violations" made up the "continuing series of violations" required by the CCE statute -- was clearly not in the class of "trial errors which

---

[5]  Moreover, even if harmless error analysis were appropriate here (which it is not), the error was far from harmless.

7

occur 'during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented.'" Sullivan, supra, 508 U.S. at 307-08. Rather, it belongs to the class of "structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless error standards." Id. at 307 (quoting Arizona v. Fulminante, 499 U.S. 279, 307-09 (1991)).

A criminal defendant is, of course, entitled to have a jury consider the evidence, and decide whether the defendant's acts constitute a crime. But errors occurring in the course of trial, such as the improper admission of particular evidence, may be assessed under the harmless error standard, because an appellate court reviewing the case "simply reviews the remainder of the evidence against the defendant to determine whether the admission of the [improper evidence] was harmless beyond a reasonable doubt. Arizona v. Fulminante, 499 U.S. 279, 310 (1991).

In addition, however, a criminal defendant is entitled to acquittal unless the jury determines guilt unanimously. By contrast to situations in which an appellate court may determine for itself whether, in light of properly admitted evidence, the improper admission of particular evidence was harmless beyond a reasonable doubt, a jury that does not act unanimously produces 'consequences that are necessarily unquantifiable and indeterminate," and therefore not amenable to harmless error analysis. Sullivan, supra, 508 U.S. at 282. For example, a general verdict of guilty rendered by a jury that had been

8

1012a

instructed that a simple majority was sufficient for conviction could not be upheld under harmless error analysis, no matter how strong the evidence against the defendant. This is so because the question facing the appellate court is "not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered . . . was surely unattributable to the error." Sullivan, supra, 508 U.S. at 279.

The right to a unanimous verdict is so critical that it is one of the few rights that may not be waived, in any circumstances. United States v. Ullah, 976 F.2d 509, 513 (9th Cir. 1992); United States v. Gipson, 553 F.2d 453, 456 n.4 (5th Cir. 1977). As then-Judge Kennedy stated, the requirement of a unanimous verdict underlies the very framework of our criminal system:

> The dynamics of the jury process are such that often only one or two members express doubt as to the view held by a majority at the outset of deliberations. A rule which insists on unanimity furthers the deliberative process by requiring the minority view to be examined and, if possible, accepted or rejected by the entire jury. The requirement of jury unanimity thus has a precise effect on the fact-finding process, one which gives particular significance and conclusiveness to the jury's verdict. Both the defendant and society can place special confidence in a unanimous verdict. . .

United States v. Lopez, 581 F.2d 1338, 1341-42 (9th Cir. 1978). In our system, it is insufficient for conviction that a jury merely agree that the defendant is an evildoer. See, e.g., Lanzetta v. New Jersey, 306 U.S. 451 (1939). Since the criminal law punishes acts, rather than persons, the jury must first agree, unanimously, on "just what a defendant did as a step preliminary to determining

9

whether the defendant is guilty of the crime charged." <u>United States v. Gipson</u>, 553 F.2d 453, 457-58 (5th Cir. 1977).

By failing to instruct the jury that it could convict on the continuing criminal enterprise counts only if it agreed unanimously on the three specific, related, underlying violations alleged to make up the "continuing series of violations" necessary to prove a CCE, 21 U.S.C. sec. 848(c)(2), the trial court deprived Johnson of his right to trial by jury in violation of the Sixth Amendment.

The conviction should be vacated and the relief requested granted.

Respectfully submitted,

CORY JOHNSON

By: Barbara L. Hartung

Barbara L. Hartung
VSB 38062
1001 East Main Street
Suite 504
Richmond, VA  23219
(804) 649-1088

Edward E. Scher
VSB 23064
Thorsen Marchant & Scher, LLP
316 West Broad Street
Richmond, VA  23220-4219
(804) 644-0711

Counsel for Cory Johnson

October 1, 1999

10

1014a

## CERTIFICATION

I hereby certify that one copy of Petitioner Johnson's Third Amendment To Initial Petition For Writ Of Habeas Corpus Pursuant to 28 U.S.C. 2255 And To Memorandum In Support Of Petition was mailed on October 1, 1999, to:

Robert J. Erickson
Deputy Chief, Criminal Division
Appellate Section
U.S. Department of Justice
Room 6102, Patrick Henry Building
601 D Street, N.W.
Washington, D.C.   20530
(202) 514-2841

Wingate Grant
Assistant U.S. Attorney
U.S. Attorney's Office
600 E. Main Street
Suite 1800
Richmond, VA   23219
(804) 819-5400

Counsel for Respondent

Scott L. Nelson
Paul F. Enzinna
Michael J. Barta
Miller, Cassidy, Larroca & Lewin, L.L.P.
2555 M Street, N.W.
Washington, DC   20037
(202) 293-6400

Counsel for James H. Roane, Jr.

Donald R. Lee, Jr.
Frederick R. Gershon
1015 East Main Street - 4th
Richmond, VA   23219
(804) 649-2128

Counsel for Richard Tipton

Barbara L. Hartung

11

FILE COPY

FILED
MAY – 1 2003
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

UNITED STATES OF AMERICA )

v. )

RICHARD TIPTON a/k/a "WHITEY" )
CORY JOHNSON a/k/a "O" )
JAMES ROANE. a/k/a "J.R." )

CASE NO. 3:92CR68

## ORDER

In accordance with the accompanying Memorandum Opinion, it is ordered that:

1. The United States' motion for summary judgment is granted in part and denied in part.

2. Johnson and Tipton's grounds for § 2255 relief are dismissed and their motions pursuant to 28 U.S.C. § 2255 are denied.

3. All of Roane grounds for § 2255 relief will be dismissed except for his claim that he was denied effective assistance of counsel in conjunction with the charges pertaining to the murder of Douglas Moody (Claim IV.B.2) and his claim that he is actually innocent of the murder of Moody (Claim VIII).

4. Tipton's request to conduct additional discovery is denied.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to counsel of record and counsel for the United States.

It is so ORDERED.

United States District Judge

Richmond, Virginia
Date: 5-1-03

1016a

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

FILED

MAY – 1 2003

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

UNITED STATES OF AMERICA )
                          )
v.                        )          CASE NO. 3:92CR68
                          )
RICHARD TIPTON a/k/a "WHITEY"  )
CORY JOHNSON a/k/a "O"         )
JAMES ROANE. a/k/a "J.R."      )

## MEMORANDUM OPINION

The matter is before the Court on the 28 U.S.C. § 2255 motions filed by Tipton, Johnson, and Roane (collectively "the Defendants") and the United States' motions for summary judgment.[1] Tipton, Johnson and Roane's grounds for relief are set forth in appendices A, B, and C respectively. For the reasons set forth below, the Court finds that the United States is entitled to summary judgment on all claims except for a portion of Roane's claim that he was denied effective assistance of counsel in conjunction with the charges pertaining to the murder of Douglas Moody (Claim IV.B.2) and Roane's claim that he is actually innocent of the murder of Moody (Claim VIII).

## I.    STANDARD FOR SUMMARY JUDGEMENT

It is the responsibility of the party seeking summary judgment to inform the Court of the basis for its motion, and to identify the parts of the record which it believes demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[O]nce the moving party has met its burden under Rule 56(c), the adverse party 'may not rest upon the mere

---

[1] The general facts that led to the Defendants' convictions and sentences of death are set forth in United States v. Tipton, 90 F.3d 861 (4th Cir. 1996) and will not be repeated here. References to the "record" in this opinion do not include the evidence introduced at the evidentiary hearing conducted on June 21, 2002.

1

1017a

allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.'" Catawaba Indian Tribe v. South Carolina, 978 F.2d 1334, 1339 (4th Cir. 1992)(quoting Fed. R. Civ. P. 56(e)).   In determining whether a particular claim is subject to summary judgment the Court "must view the evidence presented through the prism of the substantive evidentiary burden." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986).

The Defendants contend that summary judgment is premature because they need to conduct further discovery.   The Defendants' unsworn arguments regarding discovery (which already have been rejected by this Court in denying their motions for discovery) do not provide an adequate basis for forestalling a decision on the motion for summary judgment.   See Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996).   A demand for additional "discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for a Rule 56(f) affidavit . . . and the failure to file an affidavit under Rule 56(f) is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." Id. (quoting Paddington Partners v. Bouchard, 34 F.3d 1132, 1137 (2d Cir. 1994)).   Because the Defendants have not met the burden of demonstrating that they are entitled to discovery, see Rule 6(a) Governing § 2255 Proceedings, and have not complied with the requirements of Fed. R. Civ. P. 56(f), the Defendants' request to forestall summary judgment until they can conduct additional discovery will be denied.

## II.    PROCEDURAL STANCE OF THE DEFENDANTS' CLAIMS

Review of many of the Defendants' claims is precluded because the claim was rejected on direct appeal, see Boeckenhaupt v. United States, 537 F.2d 1182 (4th Cir. 1976)(intervening change

2

in the law is required to relitigate issues in § 2255 motion that were rejected on direct appeal), or the claim could have been raised at trial and direct appeal, but was not. United States v. Frady, 456 U.S. 152, 168-69 (1982). Specifically, the following claims will be dismissed because they were rejected on direct appeal and the Defendants failed to direct the Court to a change in the law that requires the Court to revisit the claim: Tipton Claims V.B.3.b, V.G, V.H; Johnson Claims II.C.2, VIII, IX; and Roane Claim V, and those aspects of the juror misconduct claims relating to mid-trial publicity and juror Cooke, Tipton Claim V.A, Johnson Claim VII, and Roane Claim III.[2]  See United States v. Wiley, 245 F.2d 750, 752-53 (8th Cir. 2001)(concluding new facts do not require review of claims rejected on direct appeal), cert. denied, 122 S. Ct. 818 (2002).

The Government correctly notes that the Defendants have defaulted the following claims by failing to raise the claim either at trial or on direct appeal:  Tipton Claims V.B.3.a.i, V.B.3.a.ii-iv, V.B.3.c, V.E. 1-15, V.J, V.K, V.L; Johnson Claims II.C.1.a-c, II.C.3.a, II.C.3.b, V.A-V.M, VI, XII, XIII; Roane Claims I.a, I.d, II, VII. Frady, 456 U.S. at 168-69.  The Court may grant relief on the foregoing claims only if the Defendant demonstrates that either cause and actual prejudice, or actual innocence excuse his default. See Bousley v. United States, 523 U.S. 614, 622 (1998).  Hence, with respect to these defaulted claims, if the Defendant fails to demonstrate that either novelty, or ineffective assistance of counsel, or actual innocence, or some other cause, excuses his default, the claim will be dismissed without further discussion.  As discussed below, except for part of Roane's Claim VIII, the Defendants' proffered excuses are unconvincing and are rejected.

---

[2] The Government also is correct that the new facet of the Defendants' juror misconduct claim, is defaulted because it could have been raised at trial and on direct appeal but was not. Frady, 456 U.S. at 168-69.  The Defendants fail to demonstrate any cause to excuse the new aspect of the juror misconduct claim.   See Order entered June 10, 1998 and infra Sec. XII and XIII.

3

III.   **RELIEF BASED ON <u>APPRENDI</u> v. NEW JERSEY**
Johnson Defaulted Claim XIII
Tipton Defaulted Claim V.L
Roane Defaulted Claim VII

Title 21 U.S.C. § 848(e) provides that any person who, while engaged in or working in furtherance of a continuing criminal enterprise ("CCE"), "intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual" may be sentenced to death or a term of imprisonment from twenty years to life. However, before the death penalty may be imposed, the jury is required to find the presence of certain aggravating factors enumerated in 21 U.S.C. § 848(n). In Apprendi v. New Jersey, 530 U.S. 466 (2000), the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." Id. at 490. The Court also explained that "the indictment must contain an allegation of every fact which is legally essential to the punishment to be inflicted." Id. at 489 n. 15 (quoting United States v. Reese, 92 U.S. 214, 232-33 (1875)). Relying on the foregoing statement from Apprendi, the Defendants contend that their convictions and sentences of death are unconstitutional because the indictment failed to charge the aggravating factors that were essential to the imposition of a death sentence.

The United States responds that such a claim is defaulted, barred by the new rule doctrine of Teague v. Lane, 489 U.S. 288 (1989), and lacks merit. See United States v. Sanders, 247 F.3d 139, 144-46 (4th Cir.), cert. denied, 122 S. Ct. 573 (2001). Because the United States' procedural arguments carry the day, it is unnecessary to address the merits of the Defendants' substantive claim.

A.   **Novelty As Cause**

4

The Defendants assert that their failure to raise the claim on direct appeal should be excused because the legal basis for their claim was not available at the time of direct appeal. In Reed v. Ross, 468 U.S. 1 (1984), the Supreme Court held that a claim that "is so novel that its legal basis is not reasonably available to counsel" may constitute cause to excuse a procedural default. Id. at 16. While novelty continues to be a valid cause for excusing a procedural default, the Supreme Court has narrowed the reach of Reed by expanding the interpretation of when a claim may be reasonably available. See United States v. Bousley, 523 U.S. 614, 622 (1998). In Bousley the Court rejected the petitioner's assertion that a Bailey-type challenge to his § 924(c) conviction prior to the decision in Bailey v. United States, 516 U.S. 137 (1995) was not reasonably available, because the "Federal Reporters were replete with cases involving challenges to the notion that 'use' is not synonymous with mere 'possession'." Id. at 622. The Court then explained that, even if it appears "futile" to attempt a particular legal argument, that perceived futility "cannot constitute cause if it means simply that a claim was 'unacceptable to that particular court at that particular time.'" Id. at 623 (quoting Engle v. Isaac, 456 U.S. 107, 130 n. 35 (1982)).

Following this refined view of novelty, the Fourth Circuit rejected a defendant's assertion that his Apprendi claim was not reasonably available at the time of his sentencing in 1998. See United States v. Sanders, 247 F.3d 139, 145 (4th Cir.), cert. denied, 122 S. Ct. 573 (2001). The court explained that the Apprendi claim was available in 1998, because

> the germ of Sander's Apprendi claim had sprouted at the time of his conviction and there is no reason why he could not have raised it then. Although the court may not have been likely to accept Sanders' argument, Sanders plainly had at his disposal the essential legal tools with which to construct his claim.

Id. at 146(citing United States v. Smith, 241 F.3d 546, 548 (7th Cir.), cert. denied, 122 S. Ct. 267

5

(2001)).

The Supreme Court's decision in McMillan v. Pennsylvania, 477 U.S. 79 (1986), provided Tipton, Johnson and Roane with the necessary tools to construct their Apprendi claim. "No one can read McMillan without learning that the Court was open to the argument that the Constitution requires a fact which does increase the available sentence to be treated as an element of the crime." Almendarez-Torres v. United States, 523 U.S. 224, 256 (1998)(Scallia, J.)(dissenting). Thus, because "the foundation for Apprendi was laid long before 1992," the Defendants cannot assert the claim was not reasonably available at the time of their trial and appeal. Sanders, 247 F.3d at 145(quoting Smith, 241 F.3d at 548). The Defendants' assertion of novelty as cause is rejected.

The Defendants assert that they are actually innocent of all their convictions under 21 U.S.C. § 848 and thus this Court is permitted to review their defaulted claims. As discussed below at Section VI, such an assertion, with the exception of Roane's claims pertaining to the murder of Douglas Moody, is utterly without merit. Nevertheless, even though Roane's assertion of innocence regarding that murder is meritorious, this Court is still foreclosed from granting Roane, Tipton, or Johnson relief on their Apprendi related claim because of the new rule doctrine.

**B.    Apprendi Created A New Rule Of Constitutional Procedure That Is Not Retroactive To Cases On Collateral Review**

New rules of constitutional criminal procedure are generally not applied retroactively on collateral review. See Teague v. Lane, 489 U.S. 288, 312 (1989). Apprendi's requirement that any fact, (other than a prior conviction) that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt, constitutes a new rule of criminal procedure that is not retroactive to cases on collateral review. United States

6

1022a

v. Sanders, 247 F.3d 139, 146-48 (4th Cir.), cert. denied, 122 S. Ct. 573 (2001).  The Defendants

counter that the extension of Apprendi they seek - that all facts necessary to the imposition of a

capital sentence must be found by the grand jury and charged in the indictment–is a new rule of

substantive, rather than procedural, criminal law.  See United States v. Bousely, 523 U.S. 614, 620

(1998)(concluding Teague analysis is not applicable where the Court simply decides the meaning

of a criminal statute).  The Defendants are wrong.  Sanders, 247 F.3d at 147(holding that Apprendi

"constitutes a procedural rule because it dictates what fact-finding procedure must be employed to

ensure a fair trial" and that it "is certainly a new rule of criminal procedure"); United States v.

Sanchez, 269 F.3d 1250, 1268 (11th Cir. 2001), cert. denied, 122 S. Ct. 1327 (2002).

Next, the Defendants assert that the new rule they seek is retroactive because it falls within

Teague's second exception to non-retroactivity.  In order to qualify under that exception, the new

rule must be such that, without it, "'the likelihood of an accurate conviction is seriously diminished'"

and the rule must "'alter our understanding of the bedrock procedural elements essential to the

fairness of a proceeding.'"  Sanders, 247 F.3d at 148 (quoting Teague, 489 U.S. at 313 and Sawyer

v. Smith, 497 U.S. 227, 242 (1990) respectively)).  In Sanders, the Fourth Circuit assumed that a

"rule that certain sentencing factors must be proven beyond a reasonable doubt will promote

marginally more accurate results." 247 F.3d at 149-50.  However, the court then concluded that such

a rule lacked the trappings of a truly "watershed" rule because it would not impact all criminal

defendants, it would not taint a defendant's entire conviction, and it did not contribute significantly

to the core fundamental rights such as the right to counsel, trial by jury, and a finding of guilt beyond

a reasonable doubt, but merely answered a subsidiary question about one of those core rights.  Id.

at 150-51; see O'Dell v. Netherland,  521 U.S. 151, 167 (1997)(noting that qualifying rule should

7

be a "sweeping" change that applies to a large swath of cases rather than a "narrow right" that applies only to a "limited class" of cases); United States v. Mandanici, 205 F.3d 519, 529 (2d Cir.)(discussing eleven new rules or proposed new rules which the Supreme Court has declined to apply retroactively), cert. denied, 531 U.S. 879 (2000).

It logically follows that, if the necessity of a petit jury finding beyond a reasonable doubt on all factors that increase a defendant's maximum sentencing exposure are not of sufficient primacy and centrality to satisfy Teague's second exception, then the narrower rule that the Defendants demand, which merely requires a grand jury finding by a preponderance of the evidence on the aggravating factors necessary for the imposition of capital sentence factors, is not. See United States v. Cotton, 122 S. Ct. 1781, 1784-86 (2002)(concluding omission from the indictment of certain facts necessary to imposition of a particular sentence did not deprive court of jurisdiction to impose that sentence); Basden v. Lee, 290 F.3d 602, 619 (4th Cir. 2002)(concluding Apprendi based challenges to an indictment are not retroactive to cases on collateral review), cert. denied, 123 S. Ct. 446 (2002). Unlike the straightforward application of Apprendi rejected in Sanders, the extension the Defendants seek would contribute little or nothing toward ensuring an accurate conviction or sentence; the aggravating factors ultimately are found by a jury, beyond a reasonable doubt, before the imposition of a capital sentence. See Jones v. Smith, 231 F.3d 1227, 1238 (9th Cir. 2000)(holding that "the Apprendi rule, at least as applied to the omission of certain necessary elements from the state court information, is neither implicit in the concept of ordered liberty nor an absolute prerequisite to a fair trial"); United States v. Moss, 252 F.3d 993, 998 (11th Cir. 2001)(stating that "we do not believe Apprendi's rule recharacterizing certain facts as offense elements that were previously thought to be sentencing factors resides anywhere near that central core of fundamental rules that are absolutely

8

1024a

necessary to insure a fair trial"), cert. denied 122 S. Ct. 848 (2002). Accordingly, the Defendants' Apprendi based claims are barred by the new rule doctrine and will be dismissed.

## IV.    ISSUES RELATED TO THE SELECTION OF THE JURY

### A.    Counsel Failed To Move For A Change of Venue
Johnson Claim IV.A.2
Tipton Claim V.F.1.a
Roane Claim IV.A

The Defendants assert that counsel were deficient for failing to move for a change of venue in light of the pretrial publicity. In order to demonstrate he was denied his right to the effective assistance of counsel, a defendant must show that counsel's representation was deficient and that the deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). The deficient performance facet of the Strickland test "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. To satisfy this facet of Strickland, the defendant must demonstrate that "counsel's representation fell below an objective standard of reasonableness." Id. at 687-88. Furthermore, in order to avoid the distorting effects of hindsight, the Court is required to evaluate "the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. at 690.

In order to carry a motion for a change of venue prior to trial, counsel is required to demonstrate that the publicity is so inherently prejudicial that trial proceedings must be presumed to be tainted. See United States v. Baker, 925 F.2d 728, 732 (4th Cir. 1991). However, "[o]nly in extreme circumstances may prejudice be presumed from the existence of pretrial publicity itself." Id. (qouting Wells v. Murray, 831 F.2d 468, 472 (4th Cir. 1987)). Instead, "a trial court customarily

9

should take the second step of conducting a voir dire of prospective jurors to determine if actual prejudice exists." Baker, 925 F.2d at 732. A defendant would then be entitled to a change of venue if "voir dire reveals that an impartial jury cannot be impaneled." Id.

In assessing whether a change of venue is warranted, not only the volume, but the character and timing of media coverage are critical factors. See Murphy v. Florida, 421 U.S. 794, 801 n. 4 (1975) (important to distinguish between factual and inflammatory publicity); Baker, 925 F.2d 732-33. "The recency of alleged prejudicial publicity is important because '[o]bviously where considerable time has elapsed since publication, the probability or likelihood of impact is appreciably lessened.'" Baker, 925 F.2d 732-33(quoting Wansley v. Slayton, 487 F.2d 90, 93 (4th Cir. 1973)). The Defendants rely on fourteen newspaper articles to support their claim that a motion for change of venue was warranted. Of those articles, eleven were printed at least five months prior to the start of the trial in January of 1993. The twelfth article appeared on January 10, 1993, the day that jury selection began, and was largely factual. The thirteenth article concerned a shot fired at detectives carrying witnesses and was printed on January 23, 1993. The final article was the article that appeared on February 9, 1993. With only a single, largely factual article appearing in the five months preceding their trial, counsel reasonably eschewed pursuing a motion for a change of venue based on pretrial publicity. See Mu'Min v. Pruett, 125 F.3d 192, 199 (4th Cir. 1997)(concluding the 47 articles published over three months prior to defendant's trial did not create a presumption that the court could not select an impartial jury).

Nor did the actual voir dire suggest that it would be necessary to change venue in order to obtain a fair and impartial jury. Of the four jurors, and one alternate juror, who had been exposed to pretrial publicity, each unequivocally stated that nothing in the media coverage would prevent him

10

or her from being a fair and impartial juror. Additionally, the Court's opening instructions further reassured counsel that a change of venue was not necessary to avoid any inflammatory media coverage. At the beginning of the trial, the Court instructed the jury "not to read or listen to anything touching on this case in any way." Tr. at 762. "Now as I said –and this is very important, so I am going to repeat it . . . .You should be insulated from outside forces. And what happens in this courtroom should be what makes up the body of knowledge that will bring you to your conclusions and determinations." Tr. 766. In light of the foregoing, the Defendants have failed to demonstrate that counsel was constitutionally deficient for not moving for a change of venue or that they were prejudiced by counsel's failure to do so. The above listed claims will be dismissed.

**B.      The Prosecution's Purported Use of Peremptory Strikes Against Women in Violation of J.E.B. v. Alabama ex. rel. T.B., 511 U.S. 127 (1994).[2]**
Johnson defaulted Claim V.K, VI
Tipton defaulted Claim V.E.1&12
Roane defaulted Claim II

The prosecution used two peremptory challenges to remove men and eight peremptory challenges to remove women. The Defendants did not raise any objection at trial to the prosecution's purportedly improper use of peremptory challenges. Subsequent to the Defendant's trial, the Supreme Court held that intentional discrimination on the basis of gender by the use of peremptory strikes in jury selection violates the Equal Protection Clause. J.E.B. v. Alabama ex. rel. T.B., 511 U.S. 127 (1994). When the Defendants sought to raise the issue on appeal based on the disproportionate number of challenges the prosecution exercised against women, the Fourth Circuit concluded that, "the bare showing of gender discrimination first attempted on this direct appeal does not suffice either to allow first instance consideration by this court (as appellants concede), nor to warrant a remand for first instance consideration by the district court." United States v. Tipton, 90

11

F.3d 861, 881 (4th Cir. 1996).

Each of the Defendants asserts that the prosecutor engaged in misconduct by using his peremptory strikes to remove women from the jury. These claims are defaulted because counsel failed to make a contemporaneous objection. The Defendants rely on the constitutionally deficient performance of trial counsel, see Tipton Claim V.F.1.c and Johnson Claim IV.A.4, and novelty to establish cause to excuse their default.

1. **Purported Deficient Performance of Counsel for Failing to Raise J.E.B. Or Prosecutorial Misconduct Claim**
   Tipton Claim V.F.1.c
   Johnson Claim IV.A.4

At the time of the Defendants' trial, the Supreme Court had yet to grant certiorari in J.E.B., and the Ninth Circuit was the only Federal Circuit court to extend Batson to strikes based on gender. See United States v. De Gross, 913 F.2d 1417 (9th Cir. 1990), and 960 F.2d 1433, 1437-1443 (1992) (en banc) (extending Batson v. Kentucky, 476 U.S. 79 (1986), to prohibit gender-based peremptory challenges in both criminal and civil trials). The Fourth Circuit had explicitly rejected attempts to extend Batson to peremptory challenges based on gender and the language of that decision hardly encouraged counsel to continue to raise the issue. See United States v. Hamilton, 850 F.2d 1038, 1042 (4th Cir. 1988). "[W]e find no authority to support an extension of Batson to instances other than racial discrimination." Id. (emphasis in original); see also id. at 1042-43; United States v. Mitchell, 886 F.2d 667 (4th Cir. 1989)(rejecting defendants attempt to extend Batson to peremptory challenges based on age).[3] In light of the Fourth Circuit's explicit rejection of attempts to extend

---

[3] At the time of the Defendants' trial, the Seventh Circuit agreed with the Fourth Circuit. United States v. Nichols, 937 F.2d 1257, 1262-1264 (7th Cir. 1991) (declining to extend Batson to gender), cert. denied, 502 U.S. 1080 (1992); see also United States v. Broussard, 987 F.2d 215, 218-220 (5th Cir. 1993) (same).

12

Batson to gender, the Defendants cannot demonstrate that the failure of counsel to object to the prosecution's strikes of female jurors fell below the wide range of professionally competent performance. See United States v. McNamara, 74 F.3d 514, 517 (4th Cir. 1996)(concluding counsel is not deficient for following the controlling circuit law at the time of trial); Kornahrens v. Evatt, 66 F.3d 1350, 1360 (4th Cir. 1995); Honeycutt v. Mahoney, 698 F.2d 213, 216-17 (4th Cir. 1983). Accordingly, the Defendants' claims that they were denied effective assistance by counsel's failure to object at trial to the prosecution's use of peremptory strikes against female jurors will be dismissed.

### 2. Novelty As Cause For Failure to Raise the J.E.B claims

The Defendants next suggest that, if counsel was not deficient for failing to raise the J.E.B. claim, then surely its novelty must constitute cause excusing their default. This is not so. See Kornahrens v. Evatt, 66 F.3d 1350, 1360 (4th Cir. 1995)(rejecting a similar argument and concluding that "a necessarily stringent procedural hurdle, coupled with a similarly important deference to attorney performance" precluded petitioner from raising challenge for the first time on habeas).

The Defendants contend that the absence of a contemporaneous objection is excused because the claim was not reasonably available in light of the Fourth Circuit's position in United States v. Hamilton, 850 F.2d 1038, 1042 (4th Cir. 1988). As discussed in conjunction with the Defendants' Apprendi claim, "a claim that 'is so novel that its legal basis is not reasonably available to counsel' may constitute cause for a procedural default." Bousley v. United States, 523 U.S. 614, 622 (1998)(quoting Reed v. Ross, 468 U.S. 1, 16 (1984)). However, novelty or "futility cannot constitute cause if it means simply that a claim was unacceptable to that particular court at that particular time." Bousely, 523 U.S. at 623(internal citations and quotations omitted)(rejecting petitioner's assertion

13

that his Bailey claim was not reasonably available at the time of his trial). Here, the Defendants had at their disposal not only the Batson decision, but also a federal circuit court decision and several state court decisions that had concluded that Batson extended to strikes based on gender.[4] Such authorities provided the Defendants with sufficient tools to challenge any improper gender based exercise of peremptory challenges. See United States v. Sanders, 247 F.3d 139, 145 (4th Cir.), cert. denied, 122 S. Ct. 573 (2001). Hence, the Defendants' assertion that the legal basis for their J.E.B. claim was not reasonably available must fail. The Defendants' assertions of cause are rejected. The substantive prosecutorial misconduct claims are defaulted and will be dismissed.

**C.    Trial Counsels' Errors Resulted In The Defendants' Exclusion From Voir Dire And The Loss Of The Right To Participate In Jury Selection**
Tipton Claim V.F.1.d
Johnson Claim IV.A.5
Roane IV.C.

On direct appeal the Defendants asserted that their absence from portions of voir dire violated their rights under the Confrontation Clause of the Sixth Amendment, the Due Process Clause of the Fifth Amendment, and their right to be present under Fed. R. Crim. P. 43(a). Because the Defendants did not raise a contemporaneous objection at trial, the Fourth Circuit reviewed for plain error. The Fourth Circuit concluded that in order to obtain relief on such a claim, the Defendants would be required to demonstrate "'actual prejudice, i.e., that their absences ' affected the outcome of the [trial],' or 'probably influenced the verdict[s]' against them either on the guilt or sentencing phases." United States v. Tipton, 90 F.3d 861, 875 (4th Cir. 1996)(qouting United States v. Olano, 507 U.S. 725, 734-35 (1993)). The court then concluded that the Defendants could not meet this

---

[4] Di Donato v. Santini, 283 Cal.Rptr. 751 (1991), review denied (Cal., Oct. 2, 1991); People v. Mitchell, 593 N.E.2d 882 (Ill App. 1992), aff'd in part and vacated in relevant part, 614 N.E.2d 1213 (Ill. 1993); People v. Irizarry, 165 App.Div.2d 715, 560 N.Y.S.2d 279 (1990) .

14

burden simply by suggesting that if they had been present, the panel would have been composed of different jurors.

> If no more is shown, for example, than that jurors 1, 3, and 5 would have been excluded, this could not suffice to show that their presence caused the finally unfavorable "outcome." Something more, for example, that jurors 1, 3, and 5 in the above hypothetical were demonstrably biased, surely must be shown, and even that might not, under all the circumstances, suffice.

Tipton, 90 F.3d at 876.

Johnson and Tipton assert that had they been present for the entire voir dire, they would have insisted that three of the seated jurors be excused or struck: (1) Frances Hodson, because her husband had killed their son then committed suicide; (2) Bonita Faircloth because her best friend's mother had recently been raped and murdered; and (3) Jerome Harrison, because his brother was a patrolman on the Richmond police force. On direct appeal, Roane suggested that he would have struck these same jurors, to which the Fourth Circuit responded that "even if this were accepted as fact, it would not suffice as a showing of actual prejudice. Nor would the stated bases for his challenges--relationships to law enforcement officers and to the victim of a rape-murder--suffice without more to tip the balance." Id. at 876 n. 7. The Defendants have not supplemented their § 2255 motions with any additional evidence that jurors Harrison, Hodson or Faircloth, or any of the other jurors that sat, had any demonstrable bias. Nor have the Defendants presented any compelling argument as to why the Court should doubt the jurors' sworn assurance that they could render a fair and impartial judgment. Cf. Williams v. Netherland, 181 F. Supp.2d 604, 613-15 (E.D. Va. ) (finding juror had implied bias based on her repeated failure to answers questions in an objectively truthful manner), aff'd, 39 Fed.Appx 830 (4th Cir. 2002). Hence, the suggestion that the Defendants

15

were prejudiced by the presence of above listed jurors is rejected.

Next, the Defendants suggest that the jurors might have drawn negative inferences regarding their absence from particular portions of the voir dire. See United States v. Camacho, 955 F.2d 950, 955-56 (4th Cir. 1992). Here, unlike Camacho, the Defendants were not absent for the entirety of voir dire. Each of the Defendants was personally and immediately present during some portions of the overall voir dire from whom all of the regular and alternate jurors were ultimately selected. Furthermore, since the Defendants were present during some portions of the voir dire, there is no reason the jurors would believe the Defendants absence from certain portions of voir dire was any different from a bench conference. Finally, unlike Camacho the burden is on the Defendants to demonstrate prejudice, which they have not done;[5] the Defendants failed to explain how the result of their trial might have been different if they had been present for all of voir dire. The above described claims will be dismissed.

4.    **Defense Counsel Failed To Request Voir Dire Pursuant To Morgan v. Illinois, 504 U.S. 719 (1992).**
Johnson Claim IV.A.3
Tipton Claim V.F.1.b

Capital defendants have a "right to an inquiry sufficient to ensure--within the limits of reason and practicality--a jury none of whose members would 'unwaveringly impose death after a finding of guilt' and hence would uniformly reject any and all evidence of mitigating factors, no matter how instructed on the law." United States v. Tipton, 90 F.3d 861, 878 (4th Cir. 1996)(quoting Morgan

---

[5] Nor can the Defendants satisfy the prejudice component simply by alleging the lack of an objection forced their direct appeal of the issue to be subjected to a more stringent standard of review. See Smith v. Yago, 888 F.2d 399, 405 (6th Cir. 1989)(holding that "the district court applied an improper standard of prejudice by looking only to the outcome of Smith's direct appeal and not to the outcome of the entire criminal proceeding").

16

v. Illinois, 504 U.S. 719, 733-34 (1992)). Tipton and Johnson contend that counsel were deficient and they were prejudiced because counsel failed to ensure that every juror was specifically asked whether he or she would always impose a sentence of death if they found the defendant guilty of capital murder. As recounted by the Fourth Circuit on direct appeal, the record forecloses Tipton and Johnson's unsupported speculation that omissions by counsel resulted in a jury that might have contained individuals who would have been subject to removal under Morgan. Tipton, 90 F.3d at 878-79. "[T]he district court's inquiry into death penalty attitudes was sufficient to cull out any prospective juror who would always vote for the death penalty." Tipton, 90 F.3d at 879.

Undeterred, Tipton and Johnson argue that prejudice is self-evident because the jury sentenced them to death despite the fact that it found twelve mitigating factors as to Tipton and eighteen mitigating factors as to Johnson. To the contrary, the jury's verdicts demonstrate that its members were not automatically predisposed to impose the death penalty after finding a defendant guilty of a capital crime: the jury failed to recommend the death penalty for three of the six capital counts on which Tipton was convicted and for two of the three capital counts on which Roane was convicted. See Stamper v. Muncie, 944 F.2d 170, 177 (4th Cir. 1991)(concluding jury's verdict refuted suggestion that jury would automatically impose the death penalty). The Defendants cannot demonstrate any prejudice flowing from the purported omissions of counsel, hence their claims will be dismissed.

## V.    CLAIMS OF ERROR RELATED TO THE CCE CONVICTION

In order to convict a defendant of engaging in a continuing criminal enterprise the government must prove:

> (1)[the] defendant committed a felony violation of the federal drug
> laws; (2) such violation was part of a continuing series of violations

17

of the drug laws;  (3) the series of violations were undertaken by defendant in concert with five or more persons;  (4) defendant served as an organizer or supervisor, or in another management capacity with respect to these other persons; and (5) defendant derived substantial income or resources from the continuing series of violations.

United States v. Ricks, 882 F.2d 885, 890-91 (4th Cir. 1989).  As on appeal, the Defendants'

challenges are focused on the second, third, and fourth elements.

A.    **Counsel Failed To Demand A Unanimity Instruction On The Predicate Acts That Constitute CCE Continuing Series Element**
      Johnson Claim IV.A.7.a          Defaulted Claim XII
      Tipton Claim V.F.1.g.4          Defaulted Claim V.K
      Roane                          Defaulted Claim VI

After the Defendants were convicted and sentenced, the Supreme Court held in Richardson

v. United States, 526 U.S. 813 (1999), that in a prosecution for engaging in a CCE under 21 U.S.C.

§ 848, the jury "must agree unanimously about which three crimes the defendant committed," to

satisfy the statutory requirement that the defendant's behavior is "part of a continuing series of

violations" described in 21 U.S.C. § 848(c)(2). Id. at 818-24.  Although they had not requested such

an instruction at trial, on appeal the Defendants asserted that the failure to give a special unanimity

instruction constituted plain error.  United States v. Tipton, 90 F.3d 861, 884 (4th Cir. 1996).  The

claim was rejected:

> the record plainly indicates that appellants could have suffered no actual prejudice from the lack of a special unanimity instruction on the predicate violation element . . . . By its verdict, it is clear that the jury unanimously found each guilty of at least five predicate violations:  the conspiracy charged in Count 1, the drug possession charged in Count 32, and at least three of the § 848(e) murders as variously charged to them.   Assuming, without deciding, that unanimity on at least three predicate violations is required to convict, it is clear that unanimity occurred here as to each appellant so that no actual prejudice from the failure so to instruct could be shown.  See United States v. Olano, 507 U.S. 725, 734 (1993) (burden is on defendant to show actual prejudice from forfeited error).

18

Id. at 885.

In their present motions, the Defendants assert that they were deprived of the effective assistance of counsel by counsel's failure to demand a unanimity instruction on the predicate violation element. However, in order to prevail on such a claim, the Defendants must demonstrate that they were prejudiced by that omission. United States v. Stitt, 250 F.3d 878, 883 (4th Cir. 2001)(rejecting assertion that Richardson error is a structural defect), cert. denied,122 S. Ct. 153 (2002). And, as discussed above, the verdict forecloses the Defendants' assertion that they were prejudiced by counsels' omission. Accordingly, because the Defendants have not demonstrated any prejudice their claims will be dismissed.

## B.    Instructions On The Supervision Element

The Defendants' direct challenges to the jury instructions are defaulted. Therefore, the following discussion is primarily confined to assessing whether the failure to raise a particular challenge constitutes ineffective assistance of counsel sufficient to excuse the default.

> **1.    Counsel Was Deficient For Failing To Demand That The Court Instruct The Jury That The Government Must Prove The Element Of Management As Part Of The Element of Supervision For A CCE Organizer**
> 
> | | |
> |---|---|
> | Johnson Claim II.C.4.e | Defaulted Claim II.C.1.c |
> | Tipton Claim V.B.3.d.iv, V.F.1.g.3 | Defaulted Claim V.B.3.a.iv |

The Court instructed the jury that in order to convict the Defendants on the CCE Count, the Government must prove beyond a reasonable doubt that "the defendant was an organizer of these five or more other persons, or occupied a position of management or a supervisory position with respect to these five or more other persons." Tr. at 3209. The Court then explained that:

> The term "organizer" and the term "supervisory position" and "position of management" are to be given their usual and ordinary meanings. These words imply the exercise of power or authority by

19

a person who occupies some position of management or supervision.

An organizer can be defined as a person who puts together a number of people engaged in separated activities and arranges them in their activities and in one essentially orderly operation or enterprise.

A supervisory position can be defined as one who manages or directs or oversees the activities of others.

Tr. at 3212.

The Defendants contend that the given instructions were insufficient because under the syntax of the statute, the jury must be instructed that even an organizer must exercise managerial authority over those whom he organizes. See United States v. Lindsey, 123 F.3d 978, 986 (7th Cir. 1997); United States v. Jerome, 942 F.3d 1328, 1332 (9th Cir. 1991)("We read the statutory language 'or any other position of management' to indicate that an 'organizer' must exercise some sort of managerial responsibility."). However, at the time of the Defendants' trial, the Fourth Circuit had concluded that "while proof of a supervisory or managerial relationship requires a showing of some degree of control by the defendant over the other persons, such proof is not required to show that a defendant acted as an organizer." United States v. Butler, 885 F.2d 195, 201 (4th Cir. 1989). Despite this authority, the Defendants were able to obtain the above described instruction which stated that the term organizer "impl[ied] the exercise of power or authority by a person who occupies some position of management or supervision." Tr. at 3212. Counsel was not deficient for obtaining an instruction more favorable than the law in the Fourth Circuit demanded. Accordingly, the above described claims will be dismissed.

### 2.    Counsel Failed To Demand a Buyer-Seller Instruction
Johnson Claim II.C.4.e.                    Defaulted II.C.1.a
Tipton Claim V.B.3.d.iv; V.F.1.g.3         Defaulted Claim V.B.3.a.(i)

The "mere showing of a buyer-seller relationship, without more, is not sufficient under 21

20

U.S.C. § 848" to demonstrate that a Defendant acted as a supervisor, manager, or organizer. United States v. Butler, 885 F.2d 195, 201 (4th Cir. 1988). Thus, Johnson and Tipton fault counsel for not demanding an instruction which stated that individuals who had only buyer-seller relationships with them were not supervised or organized by them.

In United States v. Hall, 93 F.3d 126 (4th Cir. 1996), the court had instructed the jury that "the term organizer and the term supervisory position and position of management are to be given their usual and ordinary meanings. These words imply the exercise of power or authority by a person who occupies some position of management or supervision." Id. at 130. Hall asserted that the jury should have further been told that "individuals who had only buyer-seller relationships with Hall were not supervised or organized by him." Id. In rejecting that assertion the Fourth Circuit concluded,

> [t]he instructions plainly allowed the jury to understand the supervisory requirement. The 'usual and ordinary' meaning of manager or supervisor does not include a mere buyer-seller relationship. Buyer-seller relationships are not characterized by 'the exercise of power or authority.' Jurors are competent to understand and apply ordinary concepts like organizer, supervisor and management.

Id. at 130-31. This Court gave instructions identical to the instructions approved by the Fourth Circuit in Hall. Tr. at 3212. Accordingly, Tipton and Johnson have failed to demonstrate that counsel were deficient or they were prejudiced by the lack of a buyer-seller instruction and their claims suggesting the same will be dismissed.

### 3. Counsel Was Deficient For Failing To Demand Additional Instructions On the Identity of the Five Supervisees

| | |
|---|---|
| Johnson Claim II.C.4.g, IV.A.7.b | Defaulted Claim II.C.1.b.(i&ii) |
| Tipton V.B.3.d.vi; V.F.1.g.1, | Defaulted V.B.3.a.ii,V.B.3.a.iii |

Tipton and Johnson assert that the prosecution presented the jury with numerous individuals

21

who as a matter of law could not count as supervisees. Therefore, Tipton and Johnson contend that counsel were deficient for failing to demand that the Court (1) instruct the jurors that certain of the named individuals could not count as supervisees, see United States v. Barona, 56 F.3d 1087, 1096-7 (9th Cir. 1995), and (2) instruct the jurors that they must unanimously agree on the identities of the five individuals supervised by each defendant, see United States v. Jerome, 942 F.2d 1331 (9th Cir. 1991)[6] . Tipton and Johnson's claims in this regard are meritless because (1) they erroneously assume that the given instructions permitted the jury to select people who could not qualify as supervisees; (2) contrary to Jerome's and Barona's fixation, the supervision element of the CCE statue is concerned with the number of supervisees rather than the identities of those individuals; and (3) they cannot demonstrate a reasonable probability that they each supervised less than five individuals.

First, Tipton and Johnson's demand for additional instructions, particularly the Barona instruction, rests on the flawed assumption that the given instructions would permit the jurors to choose as supervisees individuals who could not be supervisees. The given instructions did not permit the jurors to select as supervisees individuals who could not legally qualify as supervisees. If the evidence was insufficient to prove that any of the alleged individuals was in fact a supervisee, then reasonable counsel would assume that a jury following the Court's instructions would discard

---

[6] In Jerome, the government had referred in closing argument to individuals for whom defendant's organization/supervision would have been logically impossible--they were only "the suppliers of his suppliers" in the drug distribution chain. 942 F.2d at 1330. The Ninth Circuit concluded that because the government had presented the jury with a confusing array of individuals, some of whom could be counted as persons managed by a CCE defendant and some of whom, as a matter of law, could not be counted toward the supervision element, "the jurors had to be instructed that they must unanimously agree as to the identity of each of the five people Jerome organized, managed or supervised." Id. at 1331.

22

that individual from its count. See United States v. Griffin, 502 U.S. 46, 59 (1991)(concluding that lay juries can be presumed to have rejected factually unsupported grounds, but not legally inadequate ones such as, e.g., one that "fails to come within the statutory definition of the crime").[7] Nor can counsel be faulted for not demanding additional instructions on the possibility that the jury would disregard those instructions in favor of the prosecution's argument because the Court repeatedly instructed the jury that "your source as to the law is the Court", not the lawyers. Tr. at 887. See Tr. 3193-95; United States v. Tapia, 738 F.2d 18, 21 (1st Cir. 1984) (prosecutor's rendition of his version of controlling legal principles not prejudicial when "the judge made clear to the jury that it was the judge's description of the law--not that of either counsel--that was to control").

Second, Tipton and Johnson's assertion that counsel were not acting competently because they failed to demand relief pursuant to Barona and Jerome ignores the legal landscape at the time of Defendants' trial in February of 1993. See United States v. McNamara, 74 F.3d 514, 517 (4th Cir. 1996). Although Jerome had been decided by the date of the Defendants' trial, every other Court of Appeals that had addressed the issue had concluded that, "the requirement of action in concert with five or more other persons . . . aims the statute at enterprises of a certain size, so the identity of the individual supervisees is irrelevant."[8]  Richardson v. United States, 526 U.S. 813, 829

---

[7] Tipton and Johnson contend that the Government presented the jury with individuals, who "could not as a matter of law be supervisees." However, their arguments as to the vast majority of these individuals rest on the premise that the evidence was insufficient to prove that the individual was a supervisee rather than that it was logically/legally impossible for the individual to be a supervisee.

[8] Indeed, the Fourth Circuit affirmed that view in this very case. On direct appeal the Defendants argued that, because the prosecution presented the jury with some individuals who could not be counted as supervisees, it was plain error not to instruct the jurors that they must unanimously agree as to the identity of each of the five people each Defendant organized, managed or supervised. See Roane's Reply Brief at 27(citing United States v. Jerome); see also

23

(1999)(Kennedy, J., dissenting)(citing cases). See United States v. Cole, 857 F.2d 971, 973 n.1 (4th Cir. 1988)(rejecting defendant's assertion that the jury was required to return a special interrogatory on the CCE count that listed the individuals which he supervised); cf. United States v. Chaklias, 971 F.2d 1206, 1215 (6th Cir. 1992)(concluding it was not plain error for court to fail to instruct jury as to identity of persons whom defendant could not have been considered to have been managing when court gave instructions very similar to those given here). Accordingly, counsel were not deficient for failing to demand the instructions demanded here by Tipton and Johnson.

Tipton and Johnson also assert that the propriety of a unanimity instruction regarding the supervisees must be reevaluated in light of the decision in Richardson v. United States, 526 U.S. 813 (1999), which held that unanimity is required for the three predicate crimes element. They are wrong. United States v. Stitt, 250 F.3d 878, 886 (4th Cir. 2001), cert. denied,122 S. Ct. 153 (2002). Even after Richardson, the "identity of individual supervisees is irrelevant." Id. Stitt teaches that Tipton and Johnson cannot demonstrate prejudice in conjunction with their challenges to the supervision element simply by suggesting that the jurors were confused about who could be counted as a supervisee.

> Precise details, like the identities of the underlings supervised by the defendant, are not essential elements of the CCE but rather "merely historical facts as to which the jurors could have disagreed without undermining their substantial agreement as to the ultimate and essential fact of whether the requisite size and level of control existed."

Stitt, 250 F.3d at 887(quoting United States v. Jackson, 879 F.2d 85, 89 (3d Cir. 1989)). Rather,

---

Roane's Opening Brief at 87(citing Jerome). The Fourth Circuit rejected that claim and concluded that the focus of "this element is on the size of the enterprise . . . rather than the identities of those who make up the requisite number." United States v. Tipton, 90 F.3d 861, 886 (4th Cir. 1996).

24

it is incumbent upon the Defendants to demonstrate that absent the purportedly improper conduct of counsel or the Government, there is a reasonable probability that the jury would not have concluded that each Defendant supervised or organized the requisite floor of five individuals. This they cannot do. See infra Section V.C. Hence, the above listed claims will be dismissed because the Defendants have demonstrated neither deficiency nor prejudice.

## C.    Claims Pertaining To Proof Of The Supervision Element

As a prelude to their challenges pertaining to the sufficiency of evidence on the CCE count, the Defendants assert that the prosecution engaged in misconduct in the manner in which it proved the CCE count. The Defendants assert that these defaulted claims of misconduct are excused by the ineffective assistance of counsel. Specifically, the Defendants fault counsel (1) for not objecting to the witnesses' use of the terms "partner" and "worker" as violating Fed. R. Evid. 701 and (2) for not objecting to the testimony by numerous witnesses that was not based on a foundation of personal knowledge.

### 1.    Counsel Failed To Object To Testimony That Purportedly Violated Fed. R. Evid. 602.

| | | |
|---|---|---|
| Johnson II.C.4.b. | Defaulted | II.C.3.a, V.I |
| Tipton V.B.3.d.(i) | Defaulted | V.B.3.c.(i), V.E.11 |

The Federal Rules of Evidence provide that "[a] witness may not testify about a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. However, the "threshold of Rule 602 is low", United States v. Hickey, 917 F.2d 901, 904 (6th Cir. 1990), thus, a Court may accept a witness's unelaborated assertion of personal knowledge "when other evidence indicates that the witness had a personal connection to the subject matter, there is nothing to suggest that the witness likely did not have or could not have had such knowledge, and its probable absence could be easily shown."

25

United States v. Davis, 792 F.2d 1299, 1304-05 (5th Cir. 1986).  Furthermore, "[b]ecause most knowledge is inferential, personal knowledge includes opinions and inferences grounded in observations or other first-hand experiences." United States v. Joy, 192 F.3d 761, 767 (7th Cir. 1999), cert. denied, 530 U.S. 1250 (2000).

Johnson and Tipton list numerous instances where they allege the prosecutor elicited or sought to elicit testimony from a witness that violated Fed. R. Evid. 602.  The vast majority of these instances simply did not warrant an objection by counsel because there was a foundation for the testimony or the witness could likely provide one.  For example, Johnson and Tipton assert that Denise Berkley testified without any basis of personal knowledge that each Defendant supported himself by selling cocaine.  Tr. at 1674-75.  However, Berkley previously had testified that she saw Johnson and Tipton selling drugs, Tr. at 1667-68, and "every day" for a couple of months the Defendants would give her crack 4 or 5 times for performing chores, Tr. at 1669-70.  Additionally, in faulting counsel for failing to object to the admission of testimony, Tipton and Johnson fail to acknowledge that "the personal knowledge requirement of Rule 602 does not apply to statements of a co-conspirator admissible as non-hearsay under Rule 801(d)(2)(E)." United States v. Goins, 11 F.3d 441, 444 (4th Cir. 1993).  Thus, Tipton and Johnson unreasonably chide counsel for not objecting each time one of their lackeys testified regarding the position or function of the Defendants and other individuals in their drug enterprise.  The witnesses could readily supply the necessary foundation for testimony that the Defendants were "partners," or that certain individuals were "workers" because these witnesses were themselves members of the drug conspiracy and the record reflects that the conspirators regularly referred to each other in such terms.  See Goins, 11 F.3d at 444; Davis, 792 F.2d at 1304; see also United States v. Cantu, 167 F.3d 198, 204 (5th Cir.

26

1999)(permitting witness to testify that individual "worked" for the defendant).

Only in the following few instances does the transcript suggest the propriety of an objection

pursuant to Fed. R. Evid. 602 would be well-grounded in law:

> Stanley Smithers' testimony that the Defendants purchased drugs
> when they were not in his presence and his testimony that Keith Ross
> and Mousey Armstrong were selling cocaine which they obtained
> from Johnson; Papoose Davis' testimony that Nat Rozier used to
> bring people by to purchase crack; Priscilla a/k/a "Pepsi" Greene's
> testimony that Talley and Chiles used to drive the Defendants to New
> York to pick up drugs; and Pepsi Greene's testimony regarding the
> motivation for the Moody murder.

However, with the exception of Pepsi Greene's testimony regarding the Moody murder, the

aforedescribed testimony was cumulative of other testimony and was not crucial to the case against

the Defendants.

Tipton and Johnson correctly note that Pepsi Greene did not provide a full foundation for her

testimony that Little Doug Moody and Peyton Maurice Johnson were killed because Tipton and

Johnson "didn't want Maurice and Little Doug to work in that area." Tr. at 2553. However, it is one

thing to demonstrate an objection would have been feasible, and quite another to demonstrate the

objection would preclude the admission of the testimony which in turn would alter their convictions

and sentences. The record reflects that Greene had intimate knowledge of the workings of the CCE

and of the events preceding the Moody murder and thus could likely have provided a foundation for

her statement. Additionally, as discussed infra at Section VII, there was ample evidence which

linked the Moody murder to the plan of Tipton, Johnson and Roane to take over the drug traffic in

the Newtowne area. Hence, Tipton and Johnson have not demonstrated that Pepsi Greene could not

have supplied a foundation for the testimony described above, much less that if that single remark

was excluded there is a reasonable probability their convictions and sentences would have been any

27

different. In summary, the majority of this ineffective assistance claim will be dismissed because counsel was not deficient and as to remaining instances where counsel failed to object for a lack of demonstrable prejudice.

### 2. Counsel Failed To Object To Testimony That Purportedly Violated Fed. R. Evid. 701

Johnson II.C.4.b          Defaulted II.C.3.a, V.I

Tipton V.B.3.d.i,         Defaulted V.B.3.c(i), V.E.13

Federal Rule of Evidence 701 limits lay testimony to those opinions or inferences which are "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." Fed. R. Evid. 701. A witness' testimony that he considered himself or others to work for the Defendants does not run afoul of either of the requirements of Fed. R. Evid. 701. See United States v. Freerman, 619 F.2d 1112, 1120 (6th Cir. 1980)(permitting witnesses to testify as to their perception of the defendants' relationship). The Advisory Committee's Notes explain that natural characteristics of the adversary system, such as cross-examination and closing argument will point up the weakness of empty assertions and exclusion should be reserved for those instances where the opinions constitute "meaningless assertions which amount to little more than choosing up sides." Fed. R. Evid. 701 advisory committee's notes. Here, counsel followed the foregoing admonition and used cross-examination and closing argument to suggest that the terms worker or employee did not imply the exercise of control by the Defendants. See e.g., Tr. at 2378-80, 2405-08; Tipton Closing Tr. at 3035 ("This worker-partner stuff is baloney. He wasn't their boss. He was their supplier."); Tr. at 3053-55; Johnson Closing Tr. at 3063-68. Moreover, counsel reasonably eschewed objecting to the use of the terms "partner" or "worker" because the witnesses were not offering a legal conclusion but were simply using the terms coined/employed by members of the conspiracy to describe the relationships

28

of different members of the drug conspiracy.[9]   Accordingly, counsel were not deficient for failing to object to the use of the term worker or partner by the witnesses.  The above described claims will be dismissed.

> **2(a).    The Prosecutors misled the jury by suggesting that they had not influenced witnesses to use terms "partner," "worker," and "employee."**
> Johnson Defaulted Claim V.J

Charles Townes, Hussone Jones, and Denise Berkley reiterated Antwoine Brooks' testimony that the terms worker and partner originated from the members of the enterprise, not from the prosecution, and swore that they had not been persuaded to use such terms by the prosecution. Despite this explicit testimony, Johnson asserts that counsel should have known that the prosecution encouraged the witnesses to use those terms by inserting the terms into their questioning of Jones and Townes before the grand jury.  In light of the trial testimony directly refuting such a claim of misconduct, counsel can hardly be deemed deficient for failing to raise such a claim based on the nebulous evidence offered by Johnson.  Accordingly, Johnson's assertions of cause to excuse his default are rejected.  Claim V.J is defaulted and will be dismissed.

### 3.    Counsel Were Deficient For Failing To Demonstrate That Each Defendant Supervised Less Than Five Individuals
Johnson II.C.4.c, IV.A.6
Tipton V.B.3.d.(ii), V.F.3.a, V.F.1.f
Roane IV.D

The Defendants contend that the Government's proof of the supervision was based entirely

---

[9]   Antwoine Brooks, was the first witness to explain what the terms meant in conjunction with the CCE in Richmond.  Tipton asked Brooks to be his "partner" in selling crack in Central Gardens.  Brooks explained that he and Tipton recruited Maurice Saunders and Hussone Jones as workers.  The workers were fronted $300 crack.  The workers were responsible for selling the crack and returning $200 to the partners.  When asked on cross-examination if someone had suggested that he use the term "worker," Brooks responded, "[w]e just came up with it. It is true. They worked for us at the time." Tr. at 1085.

29

on misleading testimony. Specifically, the Defendants assert that the term worker simply meant the purchasing of drugs on credit and does not demonstrate a supervisory relationship. The Defendants' argument in this regard ignores the abundance of testimony that indicated that the partners exercised control or supervision over the workers in addition to just providing them drugs on credit. The Defendants' arrangement with their dealers went beyond simple fronting and constituted a consignment or franchise type of operation, with the Defendants retaining ultimate control over the drugs.[10] Brooks explained that people who were simply fronted drugs were not considered workers. Tr. at 1105. And, the workers consistently testified, not that they purchased drugs from the partners, but rather sold drugs "for" the partners. See, e.g., Tr. at 1542, 1682-83, 2324. Furthermore, Brooks indicated the consignment relationship between partners and workers was an exclusive relationship. Tr. at 1103-4; see United States v. Butler, 885 F.2d 195, 201 (4th Cir. 1989)(concluding the defendant exercised control over purchaser whose relationship was "analogous to an exclusive franchise dealership"). Maurice Saunders, a "worker", explained that he was not permitted to obtain crack from sources other than a partner. Tipton told Saunders, on more than one occasion, "You deal only with me if you value your life." Tr. at 1322. In any event the provision of drugs on consignment to workers was not the only evidence the government adduced to show that each Defendant supervised, organized or managed in excess of five individuals.

> The record reveals--certainly supports findings beyond a reasonable doubt--that these 'retailers,' in more than sufficient numbers as to each of the appellants, acted as 'workers' who were either or both organized, supervised, and managed by appellants while acting as principal 'partners' in a concerted drug trafficking enterprise, and that

---

[10] While such a consignment relationship is not sufficient in and of itself to establish supervision, it is probative of that issue. See United States v. Butler, 885 F.2d 195, 201 (4th Cir. 1989)(citing United States v. Possick, 849 F.2d 332 (8th Cir. 1988)).

30

> some of these people served variously not only as street dealers for the enterprise but as sometime chauffeurs, hideout providers, weapons-keepers, and general underlings for each of the appellants.

United States v. Tipton, 90 F.3d 861, 890 (4th Cir. 1996).   No argument by counsel could have overcome the fact that each Defendant personally organized, managed or supervised in excess of five individuals.[11]   Accordingly, the Defendants have failed to demonstrate that they were prejudiced by any purportedly deficient effort by counsel to challenge the supervision element.   The above described claims will be dismissed.

4.    **Johnson Contends That Counsel Was Deficient For Failing To Introduce Evidence That Demonstrated That He Was Mentally Incapable Of Acting As An Organizer.**
Johnson Claim-II.C.4.a

Johnson asserts that counsel should have adduced evidence of Johnson's low intelligence and learning disabilities to persuade the jury that he was mentally incapable of acting as a CCE organizer. Assuming such evidence would have been admissible in the guilt phase, it would have opened the door to a host of prejudicial evidence and its value to the defense was minimal.  Regardless of what any social worker or psychologist may have opined, the record amply demonstrates Johnson was a partner in the CCE and independently directed the activities of his many underlings.  Counsel was not deficient for reserving the evidence of Johnson's mental deficiencies, one of the few bolts of

---

[11] The transcript is simply littered with testimony supporting the supervision element. See e.g.: Tipton,Tr. at 1061, 1147, 1161, 1165-66, 1173, 1193, 1196-97, 1199, 1200, 1325, 1330, 1542, 1544, 1545-46, 1556, 1565, 1574-78, 1582, 1683-84, 1689-91, 1888, 2330, 2494, 2546-48, 2550, 2703, 2706-8 ; Johnson Tr. at 1162, 1582-83, 1683-84, 1690-92, 1705-8, 1711, 1720, 1888, 1891, 1895,1897, 1899, 1901, 1921, 2321-22, 2340, 2343, 2374, 2546-48, 2550, 2698, 2703, 2706, 2709, 2720; Roane Tr. at 1574, 1682, 1684, 1689, 1705-8, 1888-89, 1895, 1897, 2163, 2172, 2318, 2324, 2337, 2417, 2546, 2550, 2551, 2708.  The foregoing evidence also demonstrates that lack of merit of the assertion that the evidence was insufficient to support the supervision element.  See Johnson Claim II.C.2, Tipton Claim V.B.3.b.

31

mitigation, for use to maximum effect at the inevitable sentencing proceeding. Claim II.C.4.a will be dismissed.

D.      **Purported Use Of False Testimony To Prove The Existence Of The CCE**

The Defendants assert that the government knowingly elicited false testimony from Gregg Scott, Maurice Saunders, and Priscilla "Pepsi" Greene. If the Defendant shows that: (1) the testimony was false, see Boyd v. French, 147 F.3d 319, 329-30 (4th Cir. 1998); and (2) the prosecutor or other government official knew, or should have known, the testimony was false; see Stockton v. Virginia, 852 F.2d 740, 749 (4th Cir. 1988); Thompson v. Garrison, 516 F.2d 986, 988 (4th Cir. 1975)(noting that "a recantation, particularly by an accomplice should be received skeptically"), then the conviction must be set aside if (3) there "is any reasonable likelihood that false testimony could have affected the judgment of the jury." See United States v. Bagley, 473 U.S. 667, 679 (1985). However, a prosecutor's mere suspicion about testimony is not enough. See, e.g., Hoke v. Netherland, 92 F.3d 1350, 1360 (4th Cir. 1996)(citing Bank of Nova Scotia v. United States, 487 U.S. 250, 261 (1988) ("Although the Government may have doubts about the accuracy of certain aspects of [evidence], this is quite different from having knowledge of falsity.")). And, "[m]ere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony." United States v. Grilley, 814 F.2d 967, 971 (4th Cir. 1987). The Defendants have garnered affidavits and other documents which they assert demonstrate that Maurice Saunders, Gregg Scott and Pepsi Greene testified falsely.

1.      **Gregg Scott's Testimony Linking Tipton And His Codefendants To The New York Boyz Was False, And The Government Knew Or Should Have Known That It Was False**
Johnson Claim I.B
Tipton Claim V.C.1.b
Roane Claim I.C.1

32

The Defendants assert that Scott lied when he: (1) stated that he grew up at 155th and Amsterdam in New York; (2) described the New York Boyz as a gang; (3) swore that the New York Boyz met to discuss retaliating against individuals who threatened other members of the gang; and (4) testified falsely when he said he received guns from "Light". The first two statements the Defendants describe as false amount to a difference of opinion, rather than a perjurious statement of a fact. See United States v. Ellis, 121 F.3d 908, 927-8 (4th Cir. 1997). Additionally, the fact that Tipton and Johnson were associated with a gang in New York/New Jersey area that supplied the Defendants with drugs is beyond dispute.[12] See United States v. Smith, 223 F.3d 554, 574 (7th Cir. 2000), cert. denied, 122 S. Ct. 2658 (2002). In short, the Defendants have failed to demonstrate Scott's first two statements were false, much less that the prosecution knew they were false.

The Defendants have submitted evidence that creates a question of fact as to whether Scott testified accurately about the retaliation meetings and receiving guns from "Light"[13]. However, the

---

[12] Anthony Howlen testified that both Tipton and Johnson were members of the gang known as the New York Boyz; Anthony Howlen and Richard Brice, a security guard, testified to a retaliatory gang attack over drug matters that involved both Johnson and Tipton; Officer Malone testified that a search of a residence Johnson shared with Scott, Lance Thomas and other purported New York Boyz, turned up guns and a substantial amount of crack; and multiple witnesses testified as to Tipton's comments regarding the New York Boyz, and his ability to call upon them for drugs and assistance. See also Tr. at 1072-73, 1684.

[13] At trial Scott was cross-examined regarding his statement that the New York Boyz would meet to discuss retaliating against any individual who threatened one of the members. Counsel asked Scott to describe those incidents where retaliation had taken place. Scott testified that "Smooth" was cut in a fight, after which Scott, Smooth, "Light," "Law," "L.A.", Lance Thomas, Cory Johnson, "Heavy D" and "Gary William" discussed retaliating against the guys who stabbed "Smooth" (Darryl Williams) and, thereafter, attacked the guys who had stabbed "Smooth." Tr. at 968-69. The Defendants have submitted affidavits, wherein "Light", "Hess", "L.A.", and "Smooth" swear that they were never involved in group discussions of retaliation. Tipton Reply Mem. App. at 1, 4, 5 and 6. "Smooth" further avers that he was never stabbed in his life. Id. at 6. Additionally, in his affidavit, "Light", a/k/a, Rufus Alvarez, a/k/a John Matthews, avers that he did not give any guns to Scott. Id. at 1 ¶ 10.

33

Defendants have offered no proof which suggests the prosecution knew, or should have known that these aspects of Scott's testimony were false. Cf. United States v. Biberfeld, 957 F.2d 98, 102 (3d Cir. 1992)(concluding petitioner was entitled to hearing where he alleged that prosecution had reviewed files which indicated witness was testifying falsely). Instead, the Defendants speculate that the prosecution knew the testimony was false because it was beneficial to the prosecution. The Defendants then direct the Court to the affidavit of Government witness Sterling Hardy which they suggest demonstrates that the prosecutors pressured witnesses to testify falsely and fed the witnesses the testimony they wanted. The affidavit does not demonstrate that the prosecution knowingly elicited false testimony from Hardy, much less support the claim currently before the Court, that the prosecution knew Gregg Scott testified falsely.[14] Hardy's hopelessly muddy remark that the

---

[14] Indeed, Hardy's affidavit, when compared to his trial testimony, belies the suggestion that the prosecutors permitted or encouraged Hardy to testify falsely to any fact. In his affidavit, Hardy swears that,

> The prosecutors wanted me to say that Richard Tipton was present at the Southside shooting when Torrick Brown was killed. I told them Richard was not there, and I did not want to lye[sic]on him. The prosecutors also wanted me to say that Richard Tipton was present when Louis Johnson was killed. I again told them that Richard was not there.
>
> I was not clear on many of the particulars, [h]owever after Mr. Vick and Mr. Parcell clarified them I was able to testify the way they wanted me to. They told me to tell the truth and be honest, but if I did, I would not have testified the way they wanted me to.
>
> It was my understanding that Mr. Toby Vick instructed my attorney Mr. Everhart to have me say nine words. I did not know what nine words I needed to say until Mr. Everhart told me. He told me to say "James had problems in the Southside, go get Cory and Lance Thomas."

Johnson Reply Memo Ex. A, Aff. 8.

At trial Hardy did not provide any testimony placing Tipton at the scenes of the Torrick Brown and Johnson murders. Nor did Hardy testify that anyone had instructed him to get Johnson and Lance Thomas to help Roane kill Torrick Brown. Furthermore, at trial, Hardy

34

prosecutors "told me to tell the truth and be honest, but if I did, I would not have testified the way they wanted me to," does not warrant a different conclusion. Such "[a]iry generalities, conclusory assertions and hearsay statements [do] not suffice" to stave off summary judgment or entitle a habeas petitioner to an evidentiary hearing, because none of these would be admissible evidence at an evidentiary hearing. See United States v. Aiello, 814 F.2d 109, 113-14 (2d Cir. 1987). Simply put, the Defendants have failed to provide any factual anchor for the theory that prosecutors orchestrated false testimony from Scott. See Blackledge v. Allison, 431 U.S. 63, 80 (1976). The above listed claims will be dismissed.

2.    **Maurice Saunders' Testimony Linking Tipton to "Light" and Large Sums of Money Was False**
Johnson Claim I.C
Tipton ClaimV.C.1.a
Roane  Claim I.C.2

The Defendants assert that Saunders testified falsely concerning his two trips to New York where he assisted in the purchase of cocaine and purported to see New York Boy, "Light." This claim flows from an apparent misstatement by the prosecutor in questioning Saunders about the date of the first of these two trips:

> Q.    I direct your attention to after Christmas of 1991; did you have an occasion to make a trip to New York with "Hess"?
> A.    Yes, I did.
> Q.    What was the purpose of that trip?
> A.    To bring back crack cocaine and some vials.
> Q.    Who were you getting the crack cocaine for?
> A.    For Rich[Tipton].

---

specifically and repeatedly disavowed that anyone had told him how he should testify. Tr. at 2193, 2202, 2243.

35

Tr. at 1330.[15] Saunders explained that he and Hess went to an apartment building at 155th and Amsterdam to purchase the crack.

> Q.    Who did you see there?
> A.    I saw a few other people. Pointed out to me was a guy named "E.B." and pointed out to me was a dude named – he said "Light," I think it was "Light". I'm not sure.

Tr. at 1331. Hess then went into the apartment with $18,000 and emerged with roughly a kilo of crack. Tr. at 1333.

About a month after the first trip, Saunders accompanied Tipton, with $40,000, to New York, back to the same apartment building to buy two and half kilograms of cocaine. Tr. at 1336-37.

> Q.    Who did you see up there?
> A.    I saw the same faces.
> Q.    Did you see "Light" again?
> A.    Yes. I did.

Tr. at 1336-37.

The Defendants insist that Saunders testified falsely when he said he observed "Light" on each of these trips. In support of this claim, the Defendants direct the Court to (1) an affidavit from "Light" and criminal records which demonstrate that "Light" was incarcerated from December 3, 1990 to April 2, 1996, the period wherein the drug buying trips purportedly occurred and (2) an affidavit from Hess wherein he swears that he never pointed out "Light" to Saunders and that they

---

[15] By his question, the prosecutor suggested to Saunders that the first buying trip took place after Christmas in 1991. However, the whole of Saunders' testimony indicates the trip actually took place in late November or early December of 1990 and the second trip took place in January or February of 1991. Specifically, Saunders stated that he went to New York at about the same time Tipton promoted him and after he moved in with Tipton. Tr. at 1321, 1325. The move and promotion occurred in late November, Tr. at 1324, or early December of 1990. Tr. at 1320-21. Indeed, Hussone Jones, Saunders' brother, swore the first trip took place in the fall of 1990, around Christmas. Tr. at 1550.

36

merely purchased clothes, rather than crack on their trip.    The Defendants have not adduced any evidence that the prosecution was, or should have been aware of "Light's" incarceration[16] at the time of the buying trips. See Horton v. United States, 983 F. Supp. 650, 654-55 (E.D. Va. 1997)(rejecting petitioner's assertion that, for Brady purposes, federal prosecutor is charged with knowledge of state prison records) or had obtained information from "Hess" regarding his version of the first trip to New York. Instead, the Defendants assert that the prosecution knew that Saunders' testimony in this regard was false because it had "orchestrated" Saunders' testimony to corroborate Scott's testimony, i.e., that the prosecution told Saunders to tell the jury that he had seen "Light" on his trips to New York. Neither this palpably incredible allegation nor the inconclusive affidavit from Sterling Hardy substantiate the charge that the prosecutors were aware of any inaccuracies with regard to Saunders' testimony. See McBride v. United States, 446 F.2d 229, 232 (10th Cir. 1971)(summarily dismissing § 2255 motion for failure to specifically advise the district court as to how he intended to factually prove his allegation of a knowing use of perjured testimony). The lack of proof on this score dooms the knowing use of false testimony claims. Accordingly, the above listed claims will be dismissed.

3.    **Counsel Were Deficient For Failing To Request An Investigator And For Failing To Conduct An Adequate Investigation**
Johnson Claim IV.A.1
Tipton Claim V.F.1.e
Roane IV.B.1

Tipton sought and was granted the appointment of an investigator to assist in the Richmond aspects of the case.  However, Tipton now contends, along with Johnson and Roane, that counsel

---

[16] From December 3, 1990 until April 2, 1996, John Matthews a/k/a "Light" was detained, under the name of Rufus Alvarez, in Mercer County, New Jersey on a variety of drug related charges including conspiracy to distribute cocaine and maintaining a controlled dangerous substance production facility.

37

should have requested investigative assistance with respect to the New York and New Jersey aspects of the case. The Defendants suggest that had counsel investigated this aspect of the conspiracy they would have discovered evidence to impeach the Government's witnesses. For example, the Defendants note that several of the reputed New York Boyz dispute their membership in an "organized" gang that distributed drugs or engaged in planned retaliatory violence.

The Defendants' assertion that they were prejudiced by the failure to introduce the evidence discovered by habeas counsel disregards the negative repercussions of introducing such evidence and overstates their impeachment value to the case as a whole. First, the suggestion that the Defendants were prejudiced by counsel's failure to locate and call as witnesses, New York Boyz, Lamont Sabb ("L.A."), Larry Williams ("Law"), Darryl Williams ("Smooth"), Jorge Delao ("Hess or James Wilkerson") and John H. Matthews ("Light") ignores the fact that the Strickland prejudice inquiry also accounts for the damaging evidence that could be elicited from each such individual upon cross-examination. See Whitley v. Bair, 802 F.2d 1487, 1494-97 (4th Cir. 1986)(emphasizing court must evaluate the negative aspects of any purportedly omitted mitigating evidence in evaluating prejudice). For example, although some of the above individuals denied being a member of a formal group called the New York Boyz or being involved in group discussions of retaliation, they do not dispute the fact that they hung out with Tipton and Johnson, were involved in the sale of drugs, and pooled their money with Tipton and Johnson to purchase additional drugs. See Tr. 907. Nor does John Matthews a/k/a "Light" deny that, for a time, he was Tipton's regular source of crack. Tr. at 918.

Additional investigation might have yielded the record of "Light's" incarceration, a fact which might have been introduced without additional damage to the defense. However, Saunders

38

admitted that his identification of "Light" was questionable and impeachment on that matter hardly undermines confidence in their convictions.[17] For example the proffered testimony does not negate: Anthony Howlen's testimony that Johnson and Tipton were part of the New York Boyz and sliced him with razors when he interfered with their attempts to sell drugs in New Jersey; the repeated references to the New York Boyz during the course of the Richmond based activities; Tipton's threats to invoke the assistance of his New York associates if retaliatory actions were required; the appearance of New York Boyz Lance Thomas and Hess in Richmond; and the repeated trips by Tipton and Johnson from Richmond to New York to obtain drugs. Moreover, none of the proffered testimony undermines the voluminous evidence that during 1991 and 1992, the Defendants operated a continuing criminal enterprise in Richmond which distributed drugs through a series of workers and murdered numerous individuals in order to ensure the success of that enterprise. Therefore, the Defendants have failed to demonstrate they were prejudiced by counsel's purported omissions and their claims will be dismissed.[18]

---

[17] On direct examination, Saunders acknowledged that his identification was based on the fact that someone "pointed out to me . . . a dude named – he said 'Light,' I think it was 'Light'. I'm not sure." Tr. 1331. On cross-examination, Saunders acknowledged that, on his trips to New York, he heard a lot of names he did not connect with faces. Further, Saunders admitted that it is entirely possible, on the second trip, that Tipton obtained cocaine from someone other than "Light". Tr. 1366-69.

[18] The Defendants assertions of deficiency on the part of trial counsel are equally unconvincing. None of the Defendants couple the deficient investigation claim with evidence that suggested to counsel that an independent investigation into New York/New Jersey aspects would be helpful to the defense. See Smith v. Collins, 977 F.2d 951, 960 (5th Cir. 1992)(noting a reasonable defense does not "contemplate the employment of wholly unlimited time and resources"). While Johnson's trial counsel disparages the quality of his own pretrial preparation, see Johnson Memo Ex. 10, the tenor of the cross-examination reflects that counsel for Tipton and Johnson, whether from information provided by the government or their clients, had detailed knowledge of the activities and events in New York and New Jersey. See e.g. Tr. at 935-40, 967, 975-76. Additionally, Roane's counsel had little reason for allocating resources into

39

4.    **Purported False Testimony By Priscilla "Pepsi" Greene**[19]

    a.    **The Government allowed Greene to testify falsely regarding her drug dealing activities**

Johnson Claim V.N
Tipton V.C.3
Roane Claim I.C.3.a

The Defendants contend that the purported difference between Greene's testimony regarding her drug dealing activities at their trial and the subsequent trial of their codefendant, Lance Thomas, demonstrate that Greene lied at their trial.  At the Defendants' trial, Greene testified as follows:

Q.    How long were you involved with "O," "Whitey" and "J.R.," were you involved in the sale of cocaine with them?
A.    I never sold cocaine.
Q.    Did you help Curt Thorne when he sold cocaine?
A.    Yes.

Tr. at 2546.  At Lance Thomas' trial, Pepsi Greene, consistent with her prior testimony, explained that she merely helped Curt Thorne to sell drugs.

Q.    Do you know how Curt Thorne supported himself?
A.    Yes.  Curt sold drugs for "Whitey" and "O."
Q.    What kind of drugs did he sell for "Whitey" and "O"?
A.    Crack, cook'-em-up.
Q.    Did you help Curt in any way sell the drugs?
A.    Yes.
Q.    What did you do for him?
A.    Well, people would come to the door, maybe sometimes I would pass the

investigating the events in New York and New Jersey, because it was undisputed that Roane was not involved with Johnson and Tipton when they were selling drugs in New York/New Jersey. See Strickland v. Washington, 466 U.S. 668, 691 (1984).  In short, the Defendants fail to demonstrate that prior to trial facts known to counsel suggested that independent investigation into the New York/New Jersey activities would be beneficial.  Hence, the foregoing claim of ineffective assistance cannot succeed because the Defendants have not demonstrated that counsel were deficient.

[19] Roane's contention that Pepsi Greene provided false testimony regarding his role in the murder of Doug Moody is addressed infra at Section VII.B.

40

cocaine to them and get the money.

Thomas Tr. at 421-22. The Defendants' claim of perjury is based on Greene's initial denial at their trial that she sold cocaine. In Greene's perception she did not sell cocaine, she merely helped her boyfriend, Curt Thorne, sell cocaine. See United States v. Derrick, 163 F.3d 779, 828-29(4th Cir. 1998)(emphasizing that an allegation of perjury as to a matter of perception fails absent conclusive proof that the witness testified falsely as to her belief, rather than that she was merely mistaken in her subjective assessment of the facts). Whatever the distinction in these activities, the claim lacks merit because the prosecution made sure the jury was not misled as to Greene's drug dealing activities. See United States v. Vaziri, 164 F.3d 556, 564 (10th Cir. 1999). Because the prosecution corrected Greene's misleading statements that she was not involved in selling drugs, and Greene did not otherwise testify falsely, the Defendants' claim of prosecutorial misconduct pertaining to this portion of Greene's testimony lacks merit and will be dismissed.

**b.    The prosecution permitted Greene to testify falsely regarding the primacy of Thomas' role in the enterprise/ the Government engaged in misconduct by presenting two different version's of Tipton's role in the conspiracy at Lance Thomas' trial**
Johnson Claim V.O
Tipton Claim V.C.3,V.D.3, V.D.4, V.E.16
Roane Claim I.c.3.b

At their trial, Greene testified that Tipton, Johnson, and Roane were "partners." Tr. at 2547. Additionally, in response to the question if she knew from whom Sandra Reavis received drugs, Greene stated, "'O.' Because 'O' was the head man." Tr. at 2552. Greene was not questioned regarding Thomas' role in the drug enterprise.

At Thomas' trial, Priscilla Greene testified that, around November of 1991, through Curt Thorne's drug selling activities, she met Tipton, Johnson and Roane. Thomas Tr. at 423. About a

41

1057a

month or two after that, Greene met Lance Thomas. Thomas Tr. at 424. Greene then explained that Thorne, "Papoose" Davis and others were merely sellers, while "[t]hey was like the head people." Thomas Tr. at 424. The prosecutor then asked Greene to explain who she meant by they.

> Q. Who were the head people?
> A. "Whitey," "O," – Whitey," "O," "J.R.," "V" because "V" mostly, after he came down he mostly controlled the drugs."

Thomas Tr. at 424-25. She then explained that Thomas "controlled the drugs because he had it bagged up and gave it out to people to sell." Thomas Tr. at 425. Contrary to the Defendants' current suggestion, Greene did not contradict her prior testimony that the Defendants were "partners" nor did she contend that Thomas took over leadership of the organization and managed Tipton, Johnson and Roane. Rather, Greene's later testimony, merely reflects that in January and February of 1992, within the partnership, Thomas was primarily tasked with the duty of distributing the drugs to the workers. Assumption of this task by Thomas, left the other Defendants more time to pursue the other increasing needs of the enterprise such as obtaining cocaine, collecting drug debts, eliminating the competition, and killing suspected snitches.[20] Accordingly, the above listed claims will be dismissed because the Defendants have not demonstrated that the prosecution presented misleading, much less false testimony from Greene.

In his index of claims, Tipton alleged that Greene's purportedly false statements discussed above demonstrated that the Government had violated Brady v. Maryland, 373 U.S. 83 (1963). See Tipton Claims V.D.3, V.D.4. The three components to a Brady claim are (1) the evidence at issue must be favorable to the defendant, whether directly exculpatory or of impeachment value; (2) it

---

[20] Nor is there any plausible suggestion that Greene's testimony at Thomas' trial is somehow exculpatory.

42

must have been suppressed by the government, whether willfully or inadvertently; and (3) it must be material.  See Spicer v. Roxbury Correctional Institute, 194 F.3d 547, 555 (4th Cir. 1999).  "Suppressed evidence is 'information which had been known to the prosecution but unknown to the defense.'" Id. at 556(quoting United States v. Agurs, 427 U.S. 97, 103 (1976)).  Tipton fails to demonstrate that this evidence meets any of the above elements.  The respective roles of Greene and Thomas in distributing drugs was common knowledge to the members of the drug conspiracy.  Tr. at 1690, 2708;  Fullwood v. Lee, 290 F.3d 663, 686 (4th Cir. 2002), cert. denied, No. 02-7101, 2003 WL 99455 (U.S. Jan 13, 2003).  Moreover, Greene's statements from the Thomas' trial do not diminish Greene's credibility or Tipton's guilt and do not create any possibility of a different result at either the guilt or sentencing phases.  Accordingly, Claims V.D.3 and V.D.4 will be dismissed.

## VI.    ACTUAL INNOCENCE
Tipton Claim V.I
Johnson Claim III
Roane VIII

"Claims of actual innocence, whether presented as freestanding ones, see Herrera v. Collins, 506 U.S. 390, 417, (1993), or merely as gateways to excuse a procedural default, see Schlup v. Delo, 513 U.S. 298, 317 (1995), should not be granted casually." Wilson v. Greene, 155 F.3d 396, 404 (4th Cir. 1998).   In Schlup, the Supreme Court held that the proper test for whether a habeas petitioner has established that his case is "extraordinary" enough to fall into that "narrow class of cases," which "implicat[e] a fundamental miscarriage of justice," is whether that petitioner has shown that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Schulp, 513 U.S. at 327.  Thus, in order to have his procedurally defaulted claims reviewed in these proceedings, the Defendants must show that "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." Id.; see also O'Dell v.

43

Netherland, 95 F.3d 1214, 1249-50 (4th Cir. 1996).

This exacting standard requires the petitioner to bring to the federal habeas court probative, reliable, new evidence which establishes the claim of innocence. See Weeks v. Bowersox, 119 F.3d 1342, 1352 (8th Cir. 1997)(en banc). And, as explained by the Supreme Court:

> To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful.

Schlup, 513 U.S. at 324. And, of course, the new evidence "not presented at trial" must also have been evidence that was excluded or not available at the time of trial. Id. at 327-28. The habeas court then must evaluate "petitioner's innocence 'in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial.'" Schlup, 513 U.S. at 328 (quoting Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi. L. Rev. 142, 160 (1970)).

The Defendants assert that they are actually innocent of being an organizer of a continuing criminal enterprise violation. Their new reliable evidence of innocence consists of the same frail evidence they offer to prove their claims that Government witnesses perjured themselves. The Defendants' new evidence and the host of arguments presented in the papers does nothing to dispel the overwhelming evidence documentary and testimonial evidence that they are guilty of running a CCE and of the CCE related murders for which they stand convicted. Accordingly, with the exception of Roane's claim that he is actually innocent of the murder of Doug Moody, the

44

Defendants' claims of actual innocence will be dismissed.

## VII.    THE MOODY MURDER

### A.    Evidence Of The Moody Murder At Trial

In early 1992, Ronita Hollman and Doug Moody were selling drugs in the Newtowne area for Peyton Maurice Johnson. Tr. at 1992-93. Tipton, Johnson, and Roane decided to take over the drug trade in Newtowne. Tr. at 1156-58, 2330. As part of this plan, Roane and Tipton approached Hollman to lure her away from her association with Peyton Johnson and to sell drugs for them. Tr. at 1962-63. Tipton told Hollman about his plans for the Newtowne area and informed her that they were willing to kill people to accomplish those plans. Tr. at 1963. Shortly, thereafter Tipton, Johnson, and Roane began to eliminate their competition in the Newtowne area.

On or about January 6, 1992, Cory Johnson and Roane left two handguns with their underling, Robert Papoose Davis. Tr. at 1894. On January 11 or January 12, 1992, Roane retrieved one of the guns from Davis. Tr. at 1895. Douglas Moody was murdered shortly after midnight on January 13, 1992. See Gov't Trial Exhibit 119. Moody had been shot once and stabbed repeatedly.

Shortly after midnight on January 13, 1992, Denise Berkley testified that she was smoking crack at a building on the corner of Clay and Harrison Streets. Tr. at 1694. Berkley heard a shot followed by the breaking of a window from the back of the building. Tr. at 1696. After disposing of her drugs, Berkley went outside and saw Roane repeatedly stabbing Doug Moody while Moody pleaded for Roane to stop. Tr. at 1697-98. Roane then approached Pepsi Greene, gave her the knife and told her to get rid of it. Tr. at 1699. Later that evening, Berkley went to a house on Moore Street, where Tipton was talking excitedly about how he had tried to shoot Moody at the house on Harrison Street.

45

Pepsi Greene testified that she was on the corner of Clay and Harrison Street when she heard two or three shots. Tr. at 2549. Pepsi then saw Roane and Tipton exit the house from where the shots were fired. Tr. at 2549. After five or ten minutes, Pepsi, accompanied by Roane, went to Curt Thorne's house, where Roane directed Pepsi to get him the big knife he stored there. Tr. at 2550-51, 2572-3. Later that night, Roane returned the knife, now covered with blood, to Pepsi and told her to dispose of it. Tr. at 2551-52.

Papoose Davis also testified that, on January 13, 1992, following the Moody murder, he heard Tipton and Roane conversing as follows, "Yeah, I got him, I got him . . . we can't stay out here this is hot anyway." Tr. at 1896. Davis lived within a block or two of the Moody murder. Tr. at 2560.

The next day, January 14, 1992, Berkley was present while Tipton, Johnson and Roane loaded firearms in a house on Norton Street. Tr. at 1705-6. Later that evening, Roane and Johnson retrieved the guns. Tr. at 1707-08. Roane asked Berkley if she had seen Peyton Maurice Johnson. Tr. at 1708-09. Berkley told him she had just seen him go around the corner. Tr. at 1709. Roane then located Peyton Maurice Johnson in a tavern. Within minutes of Roane departing the tavern, Cory Johnson entered the tavern and fatally shot Peyton Maurice Johnson with an automatic weapon.

### B. Purported Perjury By Pepsi Greene
Roane Claim I.c.3.c

Roane contends that Greene's testimony from Lance Thomas' trial demonstrates that she lied at his trial regarding the events of the Moody murder. However, Roane does not direct the Court to any testimony from the Thomas trial that contradicts her earlier testimony. Rather, Roane directs the Court to testimony from Thomas' trial where Greene admits, 15 minutes prior to the shooting of Doug Moody, she was in Curt Thorne's apartment, with Curt. Roane and Doug Moody arrived

46

and "they excused me out of the house." Thomas Tr. at 426. After the shots were fired, Curt ran

out of the house followed by Roane. Thomas Tr. at 426. Roane fails to demonstrate how Greene's

subsequent testimony contradicted her testimony at his trial; why Greene was on the corner at the

time of the shooting was not explored at Roane's trial.[21] Accordingly, Roane's Claim I.c.3.c will

be dismissed because he has failed to demonstrate that Greene testified falsely.

### C. Actual Innocence And Ineffective Assistance Of Counsel In Conjunction With The Moody Murder
Roane Claim IV.B.2

Roane contends that his counsel failed to conduct an adequate investigation and defense into

the murder of Doug Moody. For ease of analysis, this claim is best divided into three subparts: (a)

counsel's failure to adduce available testimonial and documentary evidence to support an alibi; (b)

counsel's failure to discover the testimony of an eyewitness who swears that Tipton and Johnson,

not Roane, murdered Moody; and (c) general critiques of the quality of counsel's cross-examination

and argument. While the trial record largely belies Roane's general critiques of counsel's

performance, Roane has tendered evidence which offers substantial support to the first two aspects

of this claim and his assertion that he is actually innocent of the murder of Doug Moody.

### 1. Counsel's Performance At Trial

At trial, David Baugh, one of Roane's attorneys, effectively cross-examined both Berkley

and Greene, developing the inconsistencies between their accounts and the accounts of other

witnesses. Furthermore, Baugh called Gina Taylor, a neighbor who had attempted to aid the

---

[21] Roane suggests that Greene concealed this information at his trial because she wished to prevent the exposure of Thorne's possible role in the murder of Moody. That suggestion is belied by the record; Greene acknowledged that Thorne was present at the site of Moody's murder in her statement to the police and implicitly in her testimony at trial. See Tr. at 2570-80; Clerk's Record # 778 Ex. A & B.

47

wounded Moody. Taylor testified that she had seen the individual jabbing the prostrate Moody. Taylor testified that the assailant was only about five feet six inches tall and was definitely not Roane. Baugh followed up this description by presenting evidence that two hours before the murder, a person named Keith had come to Moody's mother's house looking for him, and that a week prior, Keith's friends, armed with machine guns, had kicked in the door of Moody's mother's residence while attempting to find Moody. Baugh then called Detective Dalton who stated the foregoing information initially had led the police to suspect Keith Barley, a small featured black juvenile male, as Moody's murderer. Roane's complaints about the quality of Baugh's courtroom performance, with exception of the lack of an objection to Pepsi Greene's statement regarding the motivations for the Moody murder, fail to point up any significant deficiency on the part of counsel.

Pepsi Greene stated Peyton Maurice Johnson and Doug Moody were killed because "O and Whitey and them didn't want Maurice and 'Little Doug' to work that area." Tr. at 2553. Assuming that counsel was deficient for failing to object to this statement on the ground that there was no foundation, Roane fails to demonstrate that an objection might have resulted in the exclusion of Greene's statement, much less altered the outcome of the proceedings. Although Rule 602 provides that a witness' testimony must be based on personal knowledge, it "does not require that the witness' knowledge be positive or rise to the level of absolute certainty. Evidence is inadmissible . . . only if in the proper exercise of the trial court's discretion it finds that the witness could not have actually perceived or observed that which he testifies to." M.B.A.F.B. Federal Credit Union v. Cumis Insurance Society, Inc., 681 F.2d 930, 932 (4th Cir. 1982). Roane fails to direct the Court to any evidence that suggests Greene's challenged statement was based on speculation rather than the conversations of her coconspirators. Moreover, even if Roane could have excluded Greene's

48

statement he cannot demonstrate prejudice. As recited above, there was ample circumstantial evidence, from numerous witnesses which demonstrated that the Doug Moody murder and the Peyton Johnson murder (that occurred the following day) were part of the Defendants' plan to eliminate competition in the Newtowne area. Accordingly, Roane was not prejudiced by counsel's failure to object to the foregoing statement.

### 2. Failure To Present Alibi Evidence

Roane contends that his counsel was deficient for failing to present evidence that he was at a hotel on the night of Doug Moody's murder. An attorney's failure to present available exculpatory evidence is ordinarily deficient, "unless some cogent tactical or other consideration justified it." Washington v. Murray, 952 F.2d 1472, 1476 (4th Cir. 1991). In his affidavit, Baugh acknowledges that,

> [p]rior to trial, James Roane told me that at the time Douglas Moody was murdered he was at a Richmond motel. I attempted to obtain records from the motel confirming that fact, but was unsuccessful. Mr. Roane identified a witness to that fact, whom I interviewed. She confirmed Mr. Roane's account but stated that she did not want to testify. I do not recall why I did not subpoena her or call her as a witness.

Roane Opening Memo. Ex. H at ¶ 3. Neither Baugh nor the record suggests any tactical reasons for not calling this unnamed woman who would have provided Roane with an alibi for the Moody murder. Additionally, Roane has produced hotel records from the Howard Johnson hotel at 3207 North Boulevard that support his claim that he was at a hotel at the time of the Moody murder. See Roane Reply Memo Ex. A. The records reflect that on January 2, 1992 and January 12, 1992, a Mr.

49

Chiles[22], rented a room and then checked out the following day. Id. The records are accompanied by a letter from the present management indicating they were readily available in 1992. Id.

Giving Roane the benefit of all favorable inferences, the record before the Court indicates that Roane's counsel performed deficiently when he failed to produce available testimonial and documentary evidence of an alibi. See Bruce v. United States, 256 F.3d 592, 599-600 (7th Cir. 2001); Griffin v. Warden, 970 F.2d 1355, 1358 (4th Cir. 1992). The Government fails to direct the Court to evidence to counter the suggestion that the failure to produce this evidence was attributable to bad judgment and an inadequate investigation. Furthermore, it is difficult to discount the effect of this alibi evidence in light of the disputed direct eyewitness testimony regarding the description of the individual who stabbed Moody to death. A plausible alibi might sufficiently bolster Gina Taylor's testimony that Roane was not the attacker to create a reasonable probability of a different result. See Bruce., 256 F.3d at 599-600 (remanding for evidentiary hearing to determine whether defendant prejudiced by counsel's failure to call alibi witness); Griffin, 970 F.2d at 1358. Accordingly, the Government's motion for summary judgment on Roane's claim that counsel was deficient in his investigation of the Moody murder will be denied.

### 3.    Demetris Rowe

Roane contends that the inadequacy of counsel's pretrial investigation is further evidenced by counsel's failure to locate and call as a witness Demetris Rowe. Roane has tendered an affidavit from Rowe, who swears that she witnessed the Moody murder from across the street on a porch.

---

[22] One of Roane's minions, who acted as a driver, was named Linwood Chiles. The registration card for January 2, 1992 is under the name of Linwood Chiles. The registration card and receipt for January 12, 1992, is under the name Larry Chiles. Both registration cards contain the same address for Mr. Chiles.

50

Specifically, Rowe avers that,

> At the time of the killing, I had been on the porch for several hours. Earlier, I had seen "Whitey" and "O" enter an apartment at the back of [the] house. A couple of hours later, I saw Doug Moody enter the same apartment. A few minutes later, I heard noises of a fight from the apartment, and saw Doug Moody come out of the apartment. Moody was bloody, and staggering. He was followed closely by "Whitey" and "O." Moody went into the yard, and then, the alley, where "Whitey' and "O" attacked him. A woman came out of the house next door and tried to help Moody.
>
> I did not see James Roane, Sandra Reavis, Pepsi Greene or Denise Berkley at the scene of Douglas Moody's murder.

Roane Third Amend. Memo. Ex. A, Clerk Record #849.

The United States has not specifically addressed counsels' failure to discover Rowe's testimony in its motion for summary judgment. Hence, this Court may only summarily dispose of this claim without an evidentiary hearing only if, "the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255 Raines v. United States, 423 F.2d 526, 531 (4th Cir. 1970). In this regard, Roane persuasively argues that Rowe's proffered testimony creates a reasonable probability of a different result. Similarly, the record does not conclusively refute Roane's suggestion that the failure to discover Rowe's testimony is attributable to an unreasonable failure[23] by counsel to canvass the vicinity of the Moody murder to locate eyewitnesses to the crime who could exculpate his client.

Roane further contends that Rowe's testimony demonstrates that he is actually innocent of the Moody murder. In order for Roane to have his defaulted claims excused, based on his assertion

---

[23] The information known to counsel justified such an investigation. Specifically, prior to trial, counsel had the testimony of an apparently disinterested eyewitness, Gina Taylor, who insisted that Roane did not commit the murder. Second, counsel had the detailed account of the alibi from his client. Third, counsel's initial investigation, corroborated the details of the account provided by Roane.

51

of actual innocence, Roane must eventually persuade the Court that "it is more likely than not that no reasonable juror would have convicted him" had Rowe testified in accordance with her affidavit. See O'Dell v. Netherland, 95 F.3d 1214, 1249-50 (4th Cir. 1996). However, to survive summary judgment, Roane is required merely to produce evidence, which if credited, creates a material question of fact as to whether no reasonable juror would have convicted him. Certainly Rowe's belated testimony can be viewed with some scepticism and is not entirely supportive of the evidence of his innocence offered at trial.[24] Schulp, 513 U.S. at 332(noting the court may consider "the timing of the submission and the likely credibility of the affiants" in assessing probable reliability of new evidence). However, Roane's conviction turns primarily on a credibility contest between the testimony of Pepsi Greene and Denise Berkley and Gina Taylor. And, in this setting Pepsi Greene's credibility is bolstered by the statement she gave to the police prior to sustaining brain damage. See Schulp, 513 U.S. at 328 (actual innocence review includes evidence tenably claimed to have been wrongly excluded). Nevertheless, in light of the ample, but limited, evidence marshaled against Roane, Rowe's testimony, if credited, constitutes the sort of concrete eyewitness testimony deserving of a hearing. See Armine v. Bowersox, 128 F.3d 1222, 1227-28 (8th Cir. 1997). Accordingly, the foregoing claims will be dismissed in part. Roane is entitled to an evidentiary hearing on his assertions that he is actually innocent of the Moody murder and that he was denied effective assistance of counsel in defense of that crime.

## VIII. THE TALLEY MURDER

At approximately 8:00 a.m., on January 5, 1992, the police found Doug Talley stabbed to

---

[24] Rowe's proffered testimony is inconsistent with defense witness Gina Taylor's testimony that she saw a single small individual, who she did not recognize, stabbing Moody. Gina Taylor had had a romantic relationship Tipton.

52

death in his car, on the southside of Richmond. On the floor in the rear of the car, the police found an army field jacket belonging to Johnny Lee Byrd. In the jacket, the police found Byrd's glasses, some pills and a dull, rusty, six inch long knife(hereinafter the "Byrd knife"). The police tested the knife and although the presence of blood was detected, tests to determine the species of origin were inconclusive. Clerk's Record #778, Ex C. Additionally, police were unable to recover any "latent prints of value for identification purposes" from the Byrd knife. Id.

At trial, Johnny Lee Byrd testified he had been selling drugs with Talley for a few days, when on January 3, 1992, Tipton asked to borrow his field jacket. Later that day, Byrd and Talley went to Papoose Davis, on four or five occasions, to obtain drugs to sell. Thereafter, Byrd smoked some of the drugs he obtained and spent the money he had earned from selling the drugs so that he was unable to repay Davis or the Defendants.

On January 4, 1992, Talley accompanied by Tipton, Roane and Johnson came looking for Byrd. Byrd was hiding because he was unable to repay the Defendants for the drugs that had been provided to him. When the Defendants could not find Byrd at his residence, Roane punched Talley in the eye.[25] Then, Tipton, Roane, Johnson, and Talley drove off.

Hussone Jones testified that on January 4, 1992, Tipton told Jones to get in his car and follow Tipton and Roane who were going to ride with Doug Talley. Between 3 a.m. and 5 a.m. on January 5, 1992, Talley stopped on a corner on the southside of Richmond . Jones pulled in behind Talley's car, within a "car or two lengths." Tr. at 1571. Roane and Tipton got out of Talley's car and then got back in. Roane sat behind Talley and Tipton sat in the passenger seat. Roane grabbed Talley around the neck and Tipton started stabbing Talley in the body. "After awhile," Roane released

---

[25] A bruise over Talley's eye is clearly visible in the autopsy pictures. Gov't Ex. 4-3.

53

Talley and got in the car with Jones.

At Roane's direction, Jones pulled up beside Talley's car. By this point, Tipton had gotten out of Talley's car and continued to stab Talley, who "was hanging out of the car." Tr. at 1575. Tipton's final stab stuck in Talley's head, and Tipton had to push his foot against the door to get the knife out. Tipton kicked the car door in an attempt to shut Talley's body in the car, but the door would not shut. Tipton, Roane and Jones, left the scene with Talley's body still hanging out of the door.

Tipton told Jones to take them to "Wildman's" house. After dropping off Roane, Tipton and Jones arrived at Wildman Stevens' house. Jones testified that Tipton gave Stevens the knife to wash off while he took a shower.

Tipton and Roane allege that the prosecution knew or should have known that Jones' description of the Talley murder and the events immediately following it were false. Additionally, Titpon contends that his counsel provided ineffective assistance in defending Tipton on the Talley murder.

### A.    Purportedly False Description of the Stabbing
Tipton Claim V.C.2,
Roane Claim I.c.4

Tipton and Roane assert the description of the stabbing was false because "the crime scene video and the location where Talley's car and body were discovered would have revealed that the position of the streetlights did not allow a clear view of the events. The most [Jones] could have seen were shadows and silhouettes." Tipton Opening Memo at 70. The record reflects that Jones was within ten to twenty feet of the stabbing. Although the crime scene video does not reveal any streetlights within fifty feet of where Talley's car and body were found, it offers persuasive evidence

54

that Jones would have been able to clearly witness the stabbing. In the video, filmed about four hours after the murder, the interior car light is on (Talley's head and arm prevented the door from closing). See Gov't'Trial Ex. 119. Thus, Jones would have had an illuminated view of the stabbing, after Roane exited Talley's car and subsequently when Talley or Tipton opened the driver's door.

Next, the Defendants cite Dr. Fierro's testimony for the proposition that Talley was either stabbed from behind by a right-handed assailant or stabbed from the front by a left-handed assailant. Asserting that he is right-handed, Tipton argues that Jones' account of the stabbing must have been false and the prosecutor must have known of its falsity. Contrary to the Defendants' suggestion, Dr. Fierro's testimony does not contradict, Hussone Jones' description of the mode of attack employed by Talley's murderer.

> Q.    You keep pointing to the right side of your neck. Were the majority of his injuries received from the right side of his body?
> A.    Yes.
> Q.    Would that indicate to you that his attacker was to his right, to his left, behind, or in front of him?
> A.    It either means that someone is behind him stabbing this way, or in front of him stabbing this way. (Witness indicating.)

Tr. at 2066. Dr. Fierro's testimony did not suggest that Tipton, who was initially sitting on the right of Talley, could not stab Talley on the right side of his body. Additionally, although Talley had 47 stab wounds to his right scalp and neck, the remainder of the wounds were distributed across his body and head.[26] Such a diffusion of wounds is consistent with Jones' description that, by the end of the stabbing, Talley had struggled partly out of the car and Tipton had left the car and continued to stab Talley from outside the vehicle. And, Jones' description of a stab wound penetrating the skull

---

[26] Talley had 11 stabs wounds on the front of his chest and neck, 14 stab wounds to his his face, 9 to his right upper back, and 3 stabs to his right wrist

was confirmed by the autopsy.

In addition to the autopsy, the minutiae of Jones' account were corroborated by the crime scene and the testimony of Charles Townes. Just as Jones described, Talley's car was parked near a corner, Talley was left hanging out of the door, and the car door bore a dent from where Tipton had attempted to kick the door shut. Furthermore, the police recovered Tipton's blood-smeared finger print from the door of Talley's car. Finally, Jones' account of the stabbing was confirmed by Charles Townes. Tipton told Townes that Jones was present while Tipton stabbed Doug Talley in the head, in Talley's car, on the southside of Richmond. The record conclusively refutes Tipton and Roane's assertions that Jones testified falsely regarding his viewing of the Talley murder or that the prosecution knew Jones testified falsely in that regard.

Next, Roane and Tipton allege that the prosecution knew that Jones testified falsely about Tipton giving the murder weapon to Wildman Stevens' to wash. The only admissible evidence they offer to support this is a vague affidavit wherein Stevens swears that "Richard never gave me a knife to wash. I have never seen Richard with a knife. I recalled Mr. Toby Vick asking a lot of questions." Tipton Reply Memo App. at 8. The United States has responded by submitting the affidavit of Toby Vick and contemporaneous notes of his interview with Stevens. Vick swears that "[t]here was no information other than that contained within my written notes that was given to me by Mr. Stevens which was germane to the issue. There was nothing of an exculpatory nature contained in Mr. Stevens' statement to me." Govt's Resp. Ex. B.[27]  Vick's notes do not indicate

---

[27] It is unclear when Vick interviewed Stevens. Jones initially failed to reveal his role in the Talley murder to the prosecution or the grand jury. Tr. at 1596-97, 1615, 1646. Until Jones revealed his role in the Talley murder, the record does not suggest the prosecution would have a reason to question Stevens about the night of the Talley murder.

56

Stevens was questioned or provided any information about a knife or the Talley murder. The record does not demonstrate any knowing use of false testimony by the United States. Moreover, in light of the overwhelming evidence that corroborated Jones' account of the Talley murder, there is no "reasonable likelihood" any testimony about events at Wildman's house "could have affected the judgment of the jury," with regard to the conviction of Roane and Tipton for the Talley murder. See United States v. Bagley, 473 U.S. 667, 679 (1985). Tipton's Claim V.C.3 and Roane's Claim I.c.4 will be dismissed.

B.    **The Prosecution Suppressed "Wildman" Stevens' Statement Regarding The Events At His Home Following The Talley Murder**
Tipton Claim V.D.1
Roane Claim I.b.

Roane and Tipton assert that the same facts which demonstrate that the prosecution knew Jones lied about the events at Stevens' house constitute a Brady violation. Specifically, Vick was obliged to inform the defense that Stevens had denied receiving a knife from Tipton. However, as described above, there is no evidence that Stevens actually conveyed such information to Vick. Accordingly the above listed claims will be dismissed because the prosecution had no exculpatory information from Stevens.

C.    **Counsel Failed To Adequately Defend Tipton On The Charge That He Murdered Talley**
Tipton Claims V.F.1.h

In support of this claim, Tipton asserts that counsel (1) should have called Victoria Harris as an alibi witness, (2) should have called Wildman Stevens as a witness to refute Jones' testimony, (3) should have pointed out that it was too dark for Jones to have observed the stabbing, (4) should have performed independent testing on the knife found in Johnny Lee Byrd's jacket to determine whether it was the murder weapon, and (5) should have requested the appointment of a fingerprint

57

1073a

expert.

Conspicuously absent from these criticisms is any evidence from Tipton that he told his counsel that the foregoing avenues of investigation would have been fruitful. See Lackey v. Johnson, 116 F.3d 439, 152 (5th Cir. 1997)(counsel is not ineffective for failing to discover evidence about which the defendant knows but withholds from counsel). For example, there is no evidence that Tipton told counsel that Victoria Harris could provide him with an alibi[28] or that Wildman Stevens would contradict Hussone Jones' description of the events following the Talley murder. Nevertheless, Tipton maintains that counsel's duty to conduct a reasonable investigation required him to seek out and interview Stevens. This is not true. Counsel had no reason to believe that it would be fruitful to interview Stevens when the Government's evidence indicated that Stevens was simply another CCE minion. Tipton has not shown counsel was deficient for failing to interview or call Stevens and Harris as witnesses. Additionally, because Talley's car was illuminated by the interior car light, counsel wisely eschewed contending that Jones' description of the stabbing was a fabrication.

Similarly, counsel had little reason to believe the independent forensic analysis urged here by Tipton would aid Tipton's defense to the Talley murder.[29] For example, Tipton contends counsel

---

[28] Tipton has failed to produce an affidavit or any other evidence to support his claim that Victoria Harris could provide an alibi. See Fed. R. Civ. P. 56(e).

[29] At trial, defense counsel suggested through cross-examination and argument that the knife found in the pocket of Byrd's jacket was the murder weapon. Counsel then called Detective Cox who testified that they had questioned Byrd in conjunction with the Talley murder and that Byrd had provided inconsistent statements regarding the identity of the person to whom he had supposedly lent his jacket. And in closing argument, counsel for Roane and Tipton called to the jury's attention the similarity in the width of the knife recovered from Byrd's jacket and the stab wounds described by Dr. Fierro.

58

should have conducted an independent forensic and fingerprint analysis of the Byrd knife and the blood on that knife. Counsel's decision to forego independent forensic testing was entirely reasonable in light of his knowledge that pretrial testing was unable to ascertain the species of the blood on the knife and indicated that "no latent prints of value for identification purposes are present." Clerk's Record #778, Ex C; see Jones v. Murray, 947 F.2d 1106, 1112 (4th Cir. 1991)(concluding counsel reasonably relied on state experts in foregoing an investigation of mental health defenses).[30] Nevertheless, Tipton argues that even if the latent fingerprints were not sufficient to provide a positive match they might have been sufficient to eliminate him as the subject who left the fingerprints. Counsel reasonably eschewed this investigation -- no one suggested that Tipton had used the Byrd knife to murder Talley.[31] Thus, instead of wasting time and resources on an investigation that was unlikely to provide exculpatory information,[32] counsel chose to exploit the Government's failure to conduct the additional testing to undermine its proofs with respect to the

---

[30] Counsel had no reason to suspect the state employees who conducted the tests were incompetent or biased in the performance of their duties. The record indicates the testing was performed at a time when the police were still questioning Byrd as a suspect with regard to the Talley murder.

[31] Nor can Tipton demonstrate any prejudice flowing from the lack of an independent forensic examination of the Byrd knife . On May 3, 2000, the Court granted Tipton's request to have the knife examined by his expert. Thereafter, the Court forwarded the knife and other materials pertaining to the murder of Talley to Tipton's forensic expert, Herbert MacDonnell. MacDonnell's examination of the knife did not produce any new exculpatory information nor did it identify the species of the blood on the knife. See Clerk's Record # 822, Ex. 1. Instead, without explaining what tests he conducted, MacDonnell speculates that, perhaps, DNA testing might reveal the nature of the blood found on the knife blade.

[32] Counsel had good reason to believe that additional expert testimony would constrict the range of available defenses. Specifically, while counsel freely suggested to the jury that Byrd murdered Talley, counsel knew that Byrd had passed a lie detector test with regards to that murder. Tr. at 5. Additionally, the dull rusty knife recovered from Byrd's jacket is not entirely consistent with the "sharp blade" that had been used to kill Talley. Tr. at 2069(Dr. Fierro).

59

Talley murder. See Smith v. Stewart, 140 F.3d 1263, 1273 (9th Cir. 1998)(in rejecting ineffective assistance claim, court notes that counsel "was happier to have [missing witness] as an empty chair to which he could point, without facing the danger of refutation"). Thus, in his closing argument, counsel employed these omissions to great effect noting the prosecution's failure to tell the jury about the Byrd knife even though it was "obvious[]" from Dr. Fierro's testimony that the knife could have been the murder weapon. Tr. at 3041-42. Counsel then suggested that the prosecution had not performed any tests to determine if the Byrd knife was the murder weapon because such tests might be inconsistent with the prosecution's "Get Whitey" theory. Counsel made a similar inference about the failure of the police to determine whether the substance from which Tipton's fingerprint was lifted was in fact blood.

Undeterred, Tipton contends that counsel should have retained an expert to testify that Tipton's fingerprint recovered from the window of Talley's car could have been made prior to the Talley murder. Counsel was able to elicit testimony on this point from the prosecution's expert who admitted that he could not tell if the fingerprint recovered from Talley's car had been made in December or January. Such a brief jab at the prosecution's evidence was a sounder tact than prolonged expert testimony on the theoretical life span of fingerprints on glass or disputing the prosecution's assertion that the print found was superimposed in blood in light of the crime scene photos. Those photos reflect that Tipton's latent print was found superimposed in a reddish brown substance that looks identical to the blood that was smeared all over the crime scene. See Gov't Ex. 1-1 through 1-7. Tipton has not demonstrated that counsel was deficient in his investigation and presentation of a defense to the Talley murder. For these same reasons, Tipton's request to conduct additional discovery and testing regarding Byrd's jacket and/or Byrd's other personal items obtained

60

from the Talley car will be denied. See Clerk's Record 822. Moreover, in light of Tipton's bloody fingerprint at the crime scene, Jones' well-corroborated eyewitness account of the murder, and Tipton's confession of the murder to Charles Townes, Tipton has failed to demonstrate a reasonable probability that any further investigation by counsel would have altered the jury's findings. The above described claims will be dismissed.

### D. Counsel Was Deficient For Failing To Object To Incorrect Instructions Regarding The Enterprise Element Of the RICO Charges
Tipton Claim V.F.1.g.2

Title 18 U.S.C. § 1959 penalizes certain violent crimes, such as the Talley murder, when they are committed for the purposes of gaining entrance to or maintaining or increasing one's position in "an enterprise engaged in racketeering activity." In order to secure a conviction under § 1959, "the Government must prove both the existence of an "enterprise" and the connected "pattern of racketeering activity." United States v. Turkette, 452 U.S. 576, 583 (1981)(explaining the distinction between the two elements). When instructing the jury on the elements of a § 1959 offense, the Court twice misspoke, referring to racketeering activity when it should have said "an enterprise engaged in racketeering activity". Tr. at 3220. However, the instructions as a whole told the jury that it must find both the existence of an enterprise engaged in racketeering activity and the criminal acts that constitute the racketeering activity, see United States v. Tipton, 90 F.3d 861, 888 (4th Cir. 1996). Moreover, in light of the abundance of evidence demonstrating that the racketeering enterprise existed, Tipton has not explained, much less demonstrated, a reasonable probability that more accurate instructions would have resulted in his acquittal on the RICO counts. Accordingly, the above claim will be dismissed.

### IX. THE STONEY RUN MURDERS (Curt Thorne and Linwood Chiles)

61

## A.    Evidence At Trial

On February 19, 1992, at approximately 10:15 p.m., Curt Thorne, Linwood Chiles, Gwen Greene and Pepsi Greene were shot in Chiles' station wagon, on Stoney Run Road.[33]  Pepsi Greene testified that she, Gwen, Thorne, Chiles and Johnson were driving when they pulled in "something like an alley." Tr. at 2558.  A gray car pulled in behind them.  Johnson told Chiles to place his head on the steering wheel, then Johnson put a gun to Chiles' head and shot him.

Gwen Greene testified that, immediately prior to being shot, Tipton called to her from outside the vehicle, she then saw Tipton wearing blue jeans and a brown jacket with a hood.[34]   This description of Johnson's accomplice to the Stoney Run murder was confirmed by Walter Tuck, a passing motorist, who observed a medium complexioned black male, wearing a brown jacket, walking away from the murder scene.

Additionally, the Government's evidence indicated that Tipton's arrival at the murder scene in the gray vehicle was part of a plan he and Johnson had coordinated to provide a getaway car. Specifically, Valerie Butler testified that at 4:00 p.m., on February 19, 1992, Johnson borrowed her gray car and then called Tipton.  Johnson then appeared at Nita Bracey's house around 7:30 p.m. with Curt Thorne.  At 8:00 p.m., Johnson dropped Butler off at her home and told her he needed to

---

[33] Officer Cynthia Riley testified that she received a call to respond to the shooting at 10:36 p.m. Tr. at 2519.  Walter Tuck testified that he saw a lady lying in the road with blood around her head and the radio announced the time as 10:17 p.m. Tr. at 2529-31.

[34] Tipton asserts that only a single gun, that was later recovered from Johnson, was used in the Stoney Run murders.  Although the portions of the record cited by Tipton attribute some of the recovered bullets to a Glock later retrieved from Johnson, the ballistic evidence does not demonstrate whether all the bullet fragments recovered from the crime scene came from the Glock recovered from Johnson.  In contrast, the possibility of a second shooter is suggested by Thorne's autopsy which reflected that he had been hit by bullets fired from two different directions.

62

keep her car because he wasn't finished with it. Johnson then picked up Curt Thorne and drove to an apartment on the Southside of Richmond where they waited for Chiles and the Greene sisters to arrive. When Chiles and the Greene sisters arrived, Johnson paged Tipton, who was driving around with Charles Townes, John Knight, and Thomas "Stoodie" Green.[35] Tr. at 1188. Upon receiving the page, Tipton called Johnson back and then got in the car and said "'C.O. just got all four of them'. Studie [Stoodie] said, 'Who?' He said, 'Linwood, Curt,' and then he had cut it short." Tr. at 1189. Townes and Knight then dropped Tipton and Stoodie Green off at an apartment in the Southside of Richmond and drove home. Townes and Knight arrived home at 9:45 p.m.[36] Meanwhile, Tipton had left the apartment and was driving to aid Johnson in eliminating Thorne, Chiles, and the Greene sisters.

### B.    Alleged Brady Violation
Tipton Claim V.D.2

In Claim V.D.2, Tipton contends that the Government suppressed, in violation of Brady, the exculpatory statements of his alibi witnesses to the Stoney Run murders. Specifically, Tipton contends that, when he was paged by Johnson, the Stoney Run murders already had occurred, hence, he went back to the car and told Knight, Stoodie Green, and Townes that Johnson had killed four people. "Knight and Green [in turn] told government agents that Tipton said that Johnson had killed four people." Tipton Reply Memo at 52. This Brady claim is flawed. Here, Tipton obviously knew the identities of the parties who had heard his comments following the page from Johnson and was

---

[35] Townes testified that Tipton was wearing blue jeans and a gray hooded sweatshirt. Except for the color of the sweatshirt, the clothing is consistent with what Gwen Greene stated Tipton was wearing on the night of the murder.

[36] Townes was very sure about the time, because Knight had to work the next day.

63

free to question them. Such facts foreclose any Brady claim because, "where exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the Brady doctrine." United States v. Wilson, 901 F.2d 378, 381 (4th Cir. 1990). "Certainly, then, information that is not merely available to the defendant but is actually known by the defendant would fall outside of the Brady rule." Fullwood v. Lee, 290 F.3d 663, 686 (4th Cir. 2002), cert. denied, No. 02-7101, 2003 WL 99455 (U.S. Jan 13, 2003). Additionally, Tipton has not tendered evidence that demonstrates that Stoodie Green provided the police with any statement containing exculpatory information regarding the Stoney Run murders. Moreover, as discussed below in connection with the related ineffective assistance claim, Green and Knight's vague proffers utterly fail to counter the direct and circumstantial evidence that Tipton was an active participant in the Stoney Run murders. Tipton's Claim V.D.2 will be dismissed.

### C.    Counsels' Failure To Call Knight And Green As Defense Witnesses
Tipton Claim V.F.1.i

In Claim V.F.1.i, Tipton blames his counsel, rather than the Government, for failing to adduce purportedly exculpatory evidence from Knight and Stoodie Green. Conspicuously absent from the record is any evidence from Tipton that he told counsel that Stoodie Green or Knight could exonerate him from involvement in the Stoney Run murders. "In general, counsel is not ineffective for failing to discover evidence about which the defendant knows but withholds from counsel." Lackey v. Johnson, 116 F.3d 439, 152 (5th Cir. 1997). Counsel reasonably concluded from Tipton's silence that neither Green nor Knight could provide exculpatory information. Moreover, as discussed below, Tipton has failed to demonstrate that Green or Knight could counter the compelling

64

1080a

evidence of his involvement in the Stoney Run murders.

Tipton has submitted an affidavit wherein Stoodie Green avers that,

> I was with Richard Tipton, Charles Townes, and John Knight on February 19, 1992, the night Linwood Chiles and Curt Thorne were killed. I remember Richard received a page from someone and using the telephone. Later that evening we hear it on the news.
> I know Richard Tipton did not commit that crime . . . .
> I never heard Richard Tipton talk about killing people.

Tipton Reply Memo Ex. 10. Strikingly absent from Green's affidavit is an indication that Green could provide Tipton with an alibi for the interval between roughly 9:30 and 10:17 p.m. when the Stoney Run murders occurred. In the absence of that information from Green, Green's general denial of Tipton's guilt has little probative value. See Evans v. Technologies Applications & Service Co., 80 F.3d 954, 960-61 (4th Cir. 1996). Nor does the affidavit of Alfred Brown prove that Green could offer a convincing alibi for Tipton.[37] Tipton Reply Memo Ex. 11. Brown's affidavit consists entirely of inadmissible hearsay. See Greensboro Prof. Firefighters Ass'n v. Greensboro, 64 F.3d 962, 967 (4th Cir. 1995); Maryland Highways Contractors Ass'n v. Maryland, 933 F.2d 1246, 1251-2 (4th Cir. 1991).

Tipton fails to demonstrate that John Knight could have contributed any more to his defense

---

[37] In his affidavit Brown states,

> Greene told me that on the afternoon of February 19, 1992, he was riding with Richard Tipton, John Knight and Charles Townes. They were in south Richmond when Richard Tipton received a page from Cory Johnson. After using the telephone, Richard returned to the vehicle and stated "four people just got killed."
> He also said that he and Richard remained together, and later that night they watched the report of the murders on the news.

Tipton Reply Memo Ex. 11.

65

than Stoodie Green. Knight avers that,

> On February 19, 1992, I was in the company of Thomas Green, Charles Townes, [and] Richard Tipton in South Richmond when Richard received a page. I stopped the car to allow him to use the telephone. He returned to my car and said four people had gotten killed.
> Shortly after that I drove them to Hillside court where Richard and Stoodie got out at a house.
> I returned to Central Gardens with Charles Townes.
> I was questioned by police and I gave the above statement to a detective.

Tipton Reply Memo Ex. 9. Conspicuously absent from Knight's proffered testimony is any reference to time. Regardless of what Tipton may have said upon his return to the vehicle, the evidence convincingly demonstrates that the murders did not occur until after Tipton received the page.

Saunders' testimony placed the page at about 9:30 p.m. Tuck, the passing motorist, indicated the murders had taken place just before 10:17 p.m. John Knight has not proffered any testimony that suggests he could have testified to Tipton's whereabouts during the interval of time between 9:30 p.m and 10:17 p.m. Furthermore, the circumstantial evidence, as recounted above, strongly supports the Government's theory that during the interval roughly from 9:30 p.m. to 10:17 p.m., Tipton had retrieved Valerie Butler's gray car and was following Chiles' station wagon, so as to provide Johnson a means to flee the crime scene. The theory that Tipton had planned the Stoney Run murders was further supported by Tipton's comments to Johnson that he "moved too fast; it was not supposed to be done there." Tr. at 1349 (Saunders' Testimony). Sterling Hardy also presented evidence that indicated the murder of Chiles was to be a joint venture planned by Johnson and Tipton. While incarcerated Sterling Hardy told Lance Thomas that he was concerned that Chiles

66

might testify against them. Tr. 2191. Thomas responded, "not to worry about that, because what he did for Cory and Whitey, that they will take care of that for them." Tr. at 2191. Finally, Gwen Greene's compelling testimony placed Tipton at the scene of the murders. Tipton has demonstrated neither deficiency nor prejudice. Tipton's Claim V.F.1.i will be dismissed.

X.  **THE PROSECUTION KNOWINGLY PERMITTED JERRY GAITERS TO TESTIFY FALSELY REGARDING THE MURDERS OF LONG, ARMSTRONG, AND CARTER**
Johnson Claim V.P
Tipton Claim V.C.4

Jerry Gaiters testified that he aided Johnson in murdering Dorothy Armstrong. Relying on testimony from Lance Thomas' trial, Johnson claims that Gaiters perjured himself regarding when he knew that Johnson intended to kill Armstrong. Thomas Tr. at 569. The facts surrounding this claim are as follows. At Johnson's trial, Gaiters testified that he was talking to Linwood Chiles when Johnson asked him for directions to Armstrong's brother's house, Bobby Long. Gaiters told Johnson that he would take him over there. Tipton then pulled up in a car with a young fellow and Johnson and Gaiters got in the car. They drove to 1212 West Moore Street and retrieved a bag of guns. After dropping off the young fellow, they drove to Bobby Long's house. Johnson sat in the back seat playing with a Glock pistol he had retrieved from 1212 West Moore Street. Gaiters stated that he was kind of nervous because Johnson's manner led him to believe that he might be shot in the head.

When they arrived at Bobby Long's house, Johnson told Gaiters, "I want you to get 'Mousey' to bring out the house[sic]. When I shoot the bitch in the as[s] I want you to run back to the car." Tr. at 2343-44. Gaiters went to the door and induced Bobby Long to open the door. At which point,

67

Johnson burst into the room and killed Armstrong, Carter and Long using a Glock pistol. [38]

At Lance Thomas' trial, Gaiters testified that he initially believed that Johnson simply wanted to talk to Armstrong. Thomas Tr. at 569. Counsel then asked Gaiters whether "[a]t some point on the way over there [you knew] what 'C.O.' was going to do didn't you?" Thomas Tr. at 569. To which Gaiters responded, "no." Thomas Tr. at 569. Johnson and Tipton contend that Gaiters' denial of foreknowledge of the Armstrong murder demonstrates that Gaiters lied at their trial and requires that their convictions be set aside. They are wrong.

First, at the Defendants' trial, Gaiters testified that during the car ride to Long's home there was no conversation regarding hurting or killing Armstrong. Tr. at 2367. And Gaiters stated that he only realized the purpose of the trip, "when we got over there" and "were near the house" but not beforehand. Tr. at 2415. Thus, Gaiters' testimony at Thomas' trial was consistent with his testimony at Johnson's trial, that he did not grasp that Johnson intended to shoot Armstrong until they approached Long's residence.

Second, even if the testimony could be deemed to be inconsistent, it would still fall short of demonstrating that Gaiters testified falsely, much less that the government knew that Gaiters was testifying falsely. See United States v. Grilley, 814 F.2d 967, 971 (4th Cir. 1987)("Mere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony.").

Third, even if Gaiters lied regarding the exact moment he became aware of the plan to murder Armstrong, there is no possibility that exposing such a lie to the jury would have altered

---

[38] Denise Berkley testified that Johnson wanted to kill Armstrong because Armstrong had welched on a drug debt.

68

Tipton's and Johnson's convictions and sentences. Defense counsel fully exposed Gaiters dissembling regarding his culpability for the murder of Dorothy Armstrong. See e.g., Tr. 2363-64, 2373-77, 2380-94. Exposing another misrepresentation of that ilk by Gaiters would not significantly diminish Gaiters' credibility regarding the roles Tipton and Johnson played in the murder of Armstrong, Long, and Carter. Cf. United States v. Hoyte, 51 F.3d 1239, 1243 (4th Cir. 1995)(discussing effect of cumulative impeachment evidence). Gaiters' testimony on that score was thoroughly confirmed by Charles Townes and the ballistics evidence. Charles Townes testified that immediately prior to the murders, Tipton and Johnson told him they were going to Church Hill to murder Armstrong. Subsequent to the murders, Tipton provided Townes with an account of the murders which largely corroborated Gaiters' testimony. And, the ballistics evidence corroborated Gaiters' account of the murder. Gaiters asserted that Johnson used a Glock pistol, retrieved from 1212 West Moore Street, to kill Dorothy Armstrong. The ballistic evidence reflected that the bullets that killed Dorothy Armstrong came from a Glock that was hidden at 1212 West Moore Street. Denise Berkley swore that Johnson was the only person who knew where the Glock was hidden. Claims V.P, and V.C.3 will be dismissed.

## XI.    INEFFECTIVE ASSISTANCE OF COUNSEL AT SENTENCING

Each Defendant received one or more sentences of death.[39] Johnson, Tipton, and Roane argue

---

[39] Ultimately, the jury recommended the death sentence for Johnson on all seven of the § 848(e) capital murders for which he had been convicted, those of Louis Johnson, Long, Carter, Armstrong, Thorne, Chiles, and Peyton Johnson. The jury recommended the death sentence for Tipton on three of the capital murders, those of Talley, Chiles, and Thorne, of the six for which he had been convicted. The jury recommended the death sentence for Roane on one of the capital murders, that of Moody, of the three for which he had been convicted. A full description of the aggravating and mitigating factors found as to each defendant is stated at United States v. Tipton, 90 F.3d 861, 894-95 (4th Cir. 1996).

69

that if counsel had put forth a reasonable effort the result might have been different. The Court disagrees with the Defendants' critiques of counsel's performance and the suggestion that a different result was obtainable but for counsel errors. Counsel for each Defendant did an excellent job at sentencing. The sentences of death are not attributable to counsel's omissions, but to the absence of evidence or argument that could counter the Government's compelling case that death was the appropriate punishment for the each Defendant's brutal, remorseless behavior.

### A.    Purported Deficiencies By Roane's Counsel

The jury only sentenced Roane to death for his murder of Doug Moody. As a necessary predicate for that sentence, the Government was required to prove that Roane had committed the murder after substantial planning and premeditation. See 21 U.S.C. § 848(k)&(n)(8). Roane contends, in light of the centrality of this issue, counsel was deficient for failing to challenge the Government's proof of the issue at sentencing and for conceding in his closing arguments that the Government had proved the required aggravating factors.

### 1.    Counsel's Failure To Challenge Substantial Planning Aggravating Factor
Roane Claim IV.E.4

Counsel's concession of this issue was reasonable in light of the ample evidence that demonstrated substantial planning and his sentencing phase strategy of focusing the jury's attention on the humanity of this client rather than the inhumanity of his actions. In rejecting his challenge to the substantial planning factor on appeal, the Fourth Circuit aptly summarized the evidence on this point as follows:

> the jury had before it information that well before Moody's murder, a motive for it, to which Roane was privy with Tipton and Cory Johnson, had developed. Specifically, trial evidence showed that

70

Moody and his superior, Peyton Johnson, a rival drug dealer, were thought by Tipton, Cory Johnson, and Roane to be standing in the way of their taking over the Newtowne drug market whose development was Roane's special function. Evidence from the guilt phase revealed . . . that. Tipton and Johnson "and them didn't want Maurice [Peyton Johnson] and 'Little Doug' [Moody] to work in that area ... selling cocaine." From this and other information respecting the details of Moody's murder, the jury properly could find that the visit of Roane and Tipton to [the] apartment on the night of his murder was for the pre-planned, premeditated purpose of murdering him. It showed that they went there armed with the pistol used by · Tipton in wounding Moody although members of the enterprise did not as a matter of policy ordinarily carry weapons. It showed that Moody's initial wounding and eventual killing were in the pattern of the comparable enterprise-related, cold-blooded assassinations of Talley some ten days earlier and of Moody's superior, Peyton Johnson, the night after Moody was killed . . . . the issue was whether the murder, not its exact means, was the result of substantial planning and premeditation by Roane. And on that issue the jury had ample information upon which to base its finding beyond a reasonable doubt that Moody's murder was "substantially planned and premeditated" by Roane in concert with Tipton.

United States v. Tipton, 90 F.3d 861, 896 (4th Cir. 1996). Despite this evidence and the jury's prior conclusion that he had murdered Moody as part of their drug dealing enterprise, Roane insists counsel should have argued at sentencing that the evidence did not demonstrate that he murdered Moody as a part of a turf battle. Counsel wisely eschewed such a doomed tact.

The best hope for Roane was to emphasize the evidence in mitigation rather than challenge the prosecution's solid case on the substantial planning aggravating factor. See Carter v. Johnson, 131 F.3d 452, 466 (5th Cir. 1997)(concluding it was reasonable for counsel to concede client's culpability in order to establish credibility with the jury); Bell v. Evatt, 72 F.3d 421, 429 (4th Cir. 1995)(concluding counsel reasonably conceded defendant's guilt on the kidnaping charge to retain credibility during the sentencing phase). Thus, at sentencing when the prosecution emphasized that

71

death was the appropriate sentence based on the numerous violent acts of the Defendants, counsel conceded the acts of the defendants were bad, but emphasized that during the sentencing the jury was "to determine whether or not there is something about their lives and individuality that should justify not killing them. We are not here to look at the acts again. We are here to look at the people." Tr. 3928. In light of the foregoing, counsel's failure to challenge the substantial planning aggravating factor and focus on the mitigating evidence was neither prejudicial or deficient. See Truesdale v. Moore, 142 F.3d 749, 754 (4th Cir. 1998); Pruett v. Thompson, 996 F.2d 1560, 1571 n. 9 (4th Cir. 1993). Claim IV.E.4 will be dismissed.

### 2. Purported Deficiencies In Investigating And Presenting Evidence Of Roane's Mental And Emotional Background
Roane Claim IV.E.1-2

Although counsel adduced evidence regarding Roane's severe poverty, organic brain damage, neglect and abuse, humiliation at the hands of his peers, exposure to community and family violence, learning disabilities, self-medication, and the system's failure to respond to these problems, in Claim IV.E.1, Roane vaguely complains counsel's presentation prevented the information from reaching the jury in a cogent form and omitted other critical evidence. Such charges are heavy with adjectives but light on facts and rely primarily on the affidavit of Dr. Lee Norton, who swears that the mitigation case presented by the defense was incomplete and failed to help the jury understand the mitigation evidence presented. Norton fails to support such criticism with the purported omitted mitigating evidence or with any new insights into the relevance of Roanes' experiences and deficits.

For example, Norton criticizes the quality of the investigation into Roane's background. However, the record demonstrates that counsel and his mitigation experts reviewed thousands of

72

1088a

pages of records and interviewed numerous witnesses in preparation for sentencing. At sentencing, Crystal Noakes, a social worker, described Roane's disturbing family background in great detail, including the fact that he had three uncles who were institutionalized, that his mother had been placed in foster care, and that his father left his mother and was convicted of robbery and murder. Despite these efforts, Roane contends that counsel was deficient for not reviewing the medical records, the school records, and the foster care records of Roane's mother; medical records and prison records of Roane's father; and the records documenting the mental illness of Roane's uncles.

The trial record reflects that counsel had uncovered the essential facts regarding these relatives. Additionally, Roane's mother refused to provide any information regarding her time in foster care and the Government has tendered evidence indicating that counsel actively pursued Roane's mother's medical and school records and his father's prison record. See Govt's Response at Ex. C; see also Tr. at 3723. With much on his plate, and his further inquiry into these areas stymied, counsel apparently concluded further investigation into the background of these relatives was not worth the time and effort. That decision appears to be entirely reasonable. "Just as counsel is not obliged to advance every available nonfrivolous argument, so counsel is not necessarily ineffective for failing to investigate every conceivable matter inquiry into which could be classified as nonfrivolous." Smith v. Collins, 977 F.2d 951, 960 (5th Cir. 1992). Roane fails to overcome the "heavy measure of deference" that is accorded counsel's judgment not to pursue further investigations into these tangential matters. See Strickland v. Washington, 466 U.S. 668, 691 (1984). Additionally, Roane fails to demonstrate that the omitted records would have yielded any significant mitigating evidence, much less that counsel should have been aware of that fact.

Next, Roane charges that his counsel failed to elicit expert testimony that explained to the

73

jury the relevance of his self-medication, his relationship with his codefendants, his sexual abuse and his witnessing violence in his youth. The relevant impact of all these factors was addressed at sentencing. Dr. William Lordi testified that Roane suffered from brain damage and Attention Deficit Disorder which resulted in paranoia and other personality problems.[40] Dr. Lordi explained that people with Attention Deficit Disorder, like Roane, often self-medicate with drugs or alcohol and that Roane's criminal association with Tipton and Johnson was a natural consequence of Roane's mental disorders and his desire to create the family structure he never had.

Additionally, Dr. Lordi and Crystal Noakes documented and explained the high incident of trauma Roane had experienced growing up. Dr. Lordi and Noakes testified that Roane had been sexually abused by a family friend on a continuous basis from age four to six and that Roane's early antisocial behavior of setting fires was the result of such abuse. Noakes testified that Roane was traumatized by the death of 30 friends and relatives. Counsel made the obvious point that persons subjected to such persistent violence become desensitized to it. Roane criticizes counsel for "failing to make reference to the literature regarding the effects of exposure to violence on cognitive and emotional development," Roane Opening Memo. Ex. Aff. of Dr. Norton at ¶ 10, but fails to support that critique with citation to the literature or any specific proffer as to the content of that literature.

Having failed to demonstrate any omissions on the part of counsel's case in mitigation, Roane proceeds to challenge counsel's selection of witnesses. For example, Roane asserts that counsel should have called a more experienced expert than Crystal Noakes. The record does not suggest any reason why counsel's selection of Noakes was deficient. Indeed, counsel used Noakes'

---

[40] Dr. Semone confirmed Dr. Lordi's diagnosis and testified that Roane's spiral towards crime was entirely predictable and was not volitional or attributable to any moral weakness on Roane's part or the part of his family.

74

lack of criminal experience to emphasize Noakes' neutrality, noting that Roane's experts were not simply hired guns who regularly testified for defendants.[41]  Roane fails to demonstrate that the selection of Noakes was detrimental, much less that it was deficient.

Finally, in Claim IV.E.2, Roane contends counsel was deficient for failing to present testimony from members of Roane's family. See Bassette v. Thompson, 915 F.2d 932, 940-41 (4th Cir. 1990)(noting that a claim that counsel was deficient for failing to call a witness must be accompanied by a specific proffer of the omitted witnesses' testimony). Roane's proof on this issue is limited to an affidavit from his mother, wherein she swears that she could have,

> described for the jury [Roane's] mental and emotional problems and our attempts to receive help for them. I could have described the circumstances of James' upbringing, as well as his effort to obtain additional education. I also would have told the jury that James is a human being, and that his family cares for him and begged the jury not to sentence him to death.

Roane Opening Memo Ex. Aff. Jeanette Roane at ¶ 4. Counsel was able to elicit this sympathetic information from its expert witnesses, and those experts laid part of the blame for Roane's condition at the feet of his mother who they suggested was too overwhelmed by her seven children to provide adequate care for Roane. Tr. at 3721, 3725, 3743-45, 3789-92. As the deficiencies of Roane's mother played a prominent role in the defense theory of mitigation, it was reasonable for defense counsel to conclude that Jeanette Roane might undermine that theory by casting her actions in a more favorable light. See Beaver v. Thompson, 93 F.3d 1186, 1196 (4th Cir. 1996)(concluding reliance on the credibility of reports and documents from disinterested parties rather than risk that

---

[41] Counsel selected Noakes after the mitigation expert originally engaged by the defense, Dr. Lee Norton, withdrew because the Court limited his hours. The record reflects that Crystal Noakes, a specialist in assessing dysfunctional families, was recommended to counsel by the Governor's Commission on Mental Health and Retardation.

75

defendant's family members might be discredited or testify adversely to defendant's interests on cross-examination was reasonable trial strategy); Bunch v. Thompson, 949 F.2d 1354, 1364 (4th Cir. 1991)(counsel reasonably eschewed calling father for fear he might downplay traumatic childhood of the defendant). Furthermore, counsel was able to convey to the jury that Roane's family loved and supported him without exposing Roane to the risk of placing family members on the witness stand. During her testimony, Crystal Noakes pointed out Roane's mother and other family members who were in the audience. And, Noakes concluded her testimony by telling the jury that Roane has a "very loving family, very loving attitude. They care about James." Tr. at 3796. In short, the record reflects that counsel reasonably eschewed presenting testimony that stood to do more harm than good. Roane's Claims IV.E.1-2 will be dismissed for failure to demonstrate deficiency or prejudice.

> **B.    Counsels' Failure To Introduce Evidence Of The Conditions The Defendants Would Face In Prison**
> Tipton V.F.2.b
> Johnson IV.B.2,
> Roane IV.E.3

Each of the Defendants fault counsel for not presenting evidence regarding the conditions they would face in prison. Even if such evidence were admissible, counsel reasonably chose to forego such tepid evidence in light its potential to expose them to damning evidence and argument from the prosecution. Defense attempts to suggest that the Defendants' confinement was sufficient punishment would permit the prosecution to introduce how the Defendants behaved while confined. Specifically, the Government indicated that both Roane and Tipton had a history of assaultive behavior while incarcerated. The Court had precluded the Government from introducing this evidence because the prosecution failed to include future dangerousness as an aggravating factor

76

in the death notice. Counsel for Roane had further reason to forego such evidence since he had introduced evidence that Roane preferred jail to his home. Additionally, a defense expert on prison conditions would provide the prosecution with another opportunity to remind the jury that Tipton, Johnson and Roane had a proven inclination to engineer murders from behind prison walls. See United State v. Johnson, 223 F.3d 665, 673-78 (7th Cir. 2000)(noting that it is nigh impossible to prevent inmates from transmitting lethal messages to individuals outside the prison), cert. denied, 122 S. Ct. 71 (2001). Finally, any evidence on the harshness of prison conditions would have permitted the prosecution to compare such conditions to the circumstances of the numerous victims of their crimes, particularly the incapacitated Greene sisters. Accordingly, counsel for the Defendants were not deficient for failing to introduce evidence of the Defendants' prison conditions.[42] Additionally, the Defendants cannot demonstrate prejudice because any mitigating benefit from such evidence was far outweighed by the harmful evidence and arguments that would have accompanied its introduction. See Whitley v. Bair, 802 F.2d 1487, 1494-97 (4th Cir. 1986)(emphasizing court must evaluate the negative aspects of any purportedly omitted mitigating evidence in evaluating prejudice). Accordingly, the above described claims will be dismissed.

## C.    Tipton's Counsel Failed To Present An Adequate Case In Mitigation
Tipton Claim V.F.2.a

Tipton contends that counsel failed to present sufficient evidence of his dysfunctional family life and his tender side. The record refutes such a claim. Mitigation evidence on this score was presented by Tipton's cousin, Tina Wilkinson, Hans Selvog, a clinical psychologist, and Brenda

---

[42] The assertion by Johnson's trial counsel that the failure to introduce this evidence was not the result of strategic or tactical decisions does not alter the Court's conclusion that such an omission was not deficient.

77

Williams, a family friend. Wilkinson testified that Tipton grew up in a home in which his mother was regularly beaten, first by Tipton's father and later by his mother's live-in boyfriend; that Tipton's mother and her boyfriend were addicted to heroin and used the drug on a daily basis; that Tipton was present when his uncle committed suicide with a shotgun; that Tipton's mother used to punch him; and that Tipton learned to take care of himself because of his adverse upbringing.

Wilkinson's testimony of Tipton's disturbing upbringing was reinforced by Selvog, a clinical social worker who had interviewed Tipton and his relatives. Selvog described at length Charlene Tipton's (Tipton's mother) heroin addiction, including instances where she overdosed in front of Tipton and confined Tipton to the closet while she conducted all night drug parties. Selvog also related that Charlene would discipline Tipton by punching him in the face, and that Charlene was not attentive to Tipton's medical needs. Selvog testified that Tipton left his mother, but that his paternal grandmother, Ruby Tipton, refused to take him in. Thereafter, Tipton moved in with his father's girlfriend, Brenda Williams, in Richmond, Virginia. Tipton was happy to live with Williams but, recognizing that his presence was a financial burden to her, he told her he thought it was best if he moved on.

Brenda Williams then testified that while he lived with her, Tipton got a job, helped around the house and played with her children. Williams confirmed that Tipton left her home because he did not want to be a financial burden to her.

Based on the foregoing testimony, defense counsel argued, inter alia, that the following nonstatutory mitigating factors mitigated against a death sentence for Tipton:

> Tipton was subjected to emotional and physical abuse and neglect as
> a child and was deprived of parental guidance that was needed;
> Tipton suffers from frontal lobe brain dysfunction that went untreated

78

1094a

> when he was a child; Tipton was introduced to addictive drugs and alcohol while still a child; Tipton grew up in an impoverished, violent and brutal environment, and was exposed to extreme violence as a child and throughout his life.

Tipton Opening Memo Ex. H. The jury agreed; 10 or 12 jury members found each of the foregoing factors mitigated against a sentence of death and refused to impose such a sentence on Tipton for the murders of Long, Armstrong, and Carter.

In his present claim, Tipton contends counsel was deficient for not calling his mother, grandmother and Victoria Harris. Tipton contends that had counsel called his mother and grandmother as witnesses they would have recounted his terrible childhood and begged for his life, while Harris would testify that Tipton lived with her for a time and she once saw him crying while reading a book about self-image. First, the decision not to call Tipton's mother, or maternal grandmother or Harris is reasonable because their testimony would have been cumulative of the evidence regarding Tipton's dysfunctional family and his sensitive side already heard by the jury. See Bacon v. Lee, 225 F.2d 470, 481-82 (4th Cir. 2000), cert. denied 532 U.S. 950 (2001). Second, Tipton has not supported his assertion that the omitted testimony was qualitatively superior to the presented mitigation evidence. See Neal v. Puckett, 239 F.3d 683, 694 (5th Cir. 2001)(noting court should consider "quality and volume" of omitted mitigating evidence)(citing Williams v. Taylor, 520 U.S. 362, 397-99 (2000)). For example, Tipton has not submitted, affidavits from any of these individuals which demonstrate that they were willing to testify consistent with his allegations. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Thirdly, the record suggests that the decision not to call Tipton's mother or Tipton's grandmother was reasonable because they may have tempered the description of Tipton's childhood and their absence would enforce the idea that Tipton had been

79

abandoned by his family. Selvog indicated that Charlene Tipton and Ruby Tipton(the paternal grandmother) were not cooperative in preparing Tipton's defense. And, Tipton's mother requested Wilkerson to "make me look good" when she testified. Tr. at 3445. Hence, the absence of testimony by Tipton's immediate family emphasized that Tipton had been "abandoned" by his family, Tr. at 3909, 3911, and permitted counsel to bring this point home to the jury by asking "[w]here was his mother . . . . When her son is on trial for capital murder, when he is facing the death penalty, his mother is concerned that she look good. Does that tell you why she was not here." Tr. at 3917. In light of the foregoing, counsel was not deficient nor was Tipton prejudiced by the absence of the witnesses he urges here. Tipton's Claim V.F.2.a. will be dismissed.

### D. Johnson's Mental Ability Was Not Accurately Reflected By His I.Q. Test, And, In Fact, Was Below 77

Johnson Claim IV.B.1, Claim XI

Federal law provides that "[a] sentence of death shall not be carried out upon a person who is mentally retarded." 21 U.S.C. § 848(l); 18 U.S.C. § 3596(c). The Supreme Court has indicated that "[t]o be classified as mentally retarded, a person generally must have an IQ of 70 or below." Penry v. Lynaugh, 492 U.S. 302, 308, n. 1 (1989)(citing American Association on Mental Deficiency (now Retardation) (AAMR), Classification in Mental Retardation at 11 (H. Grossman ed. 1983)). In 1992, the association revised its classification to identify individuals with an IQ of 75 or below as presumptively retarded. See Tr. at 3690; Atkins v. Virginia, 122 S. Ct. 2242, 2245 n. 5 (2002).

In 1982, based on his performance on the WISC-R I.Q. test, Johnson was found to have an IQ of 88. See Exhibit 14, Johnson's Reply Memo. When he was retested in 1985, Johnson was found to have an IQ of 69-74. Id. Counsel recognized the critical import of evidence that would

80

demonstrate that Johnson was retarded. Therefore, in preparation for trial, on October 10, 1992, a defense expert, Dr. Cornell, administered a Wechsler Adult Intelligence Scale test ("WAIS test") to Johnson. Based on his performance on that test, Johnson was found to have an IQ of 77. Tr. at 3685.

Dr. Cornell was aware that if Johnson was found to have an IQ of 75 or lower, Johnson might be deemed mentally retarded and not eligible for the death penalty. Therefore, Dr. Cornell rechecked Johnson's scores, saw Johnson a second time, and consulted with colleagues in order to assure that Johnson's score of 77 was accurate. These efforts failed to reveal any evidence that undermined his conclusion that Johnson had an IQ of 77 and was not mentally retarded.

In Claim XI, Johnson contends his execution is barred because he is mentally retarded. In support of this claim, Johnson directs the Court to a paper published in 1996, subsequent to his trial, that states,

> Individuals appear to gain approximately 3-5 IQ points over a ten year period. Since the WAIS-R was published in 1981, this inflation factor could mean that the average IQ could be as high as 105-107 points rather than the accepted value of 100.

See Johnson Opening Memo Ex. 7, at 2, The Psychological Corporation, An Introduction to the Wechsler Adult Intelligence Scale, 3ed, (WAIS-III), Tulsksy, Phd.(1996)). In support of the foregoing proposition, the 1996 paper cites to two articles published in 1984 and 1987.[43] However, Dr. Cornell's testimony that he checked his finding and consulted colleagues before concluding that Johnson was not mentally retarded belies the suggestion that Dr. Cornell's analysis did not account

---

[43] Flynn, J.R., The Mean IQ of Americans: Massive Gains From 1932-1978, Psychological Bulletin 95, 29-31 (1984); Flynn, J.R., Massive IQ Gain in 14 Nations: What IQ Tests Really Measure, Psychological Bulletin 101, 171-191 (1988).

81

for possible variations in his testing instrument. Nor has Johnson tendered any testimony from Dr. Cornell expressing doubt about his prior conclusion that Johnson is not mentally retarded. Finally, in preparation for his § 2255 motion, Johnson was granted another full opportunity to demonstrate that he is mentally retarded. See Clerk's Record #700 A & B, 701. Thereafter, Johnson rejected the Court's invitation to submit any new evidence of his mental retardation. See Clerk's Record # 870-874. Hence, the record before the Court demonstrates that Johnson is not mentally retarded. Claim XI will be dismissed.

Undeterred by his own evidence that indicates he is not mentally retarded, in Claim IV.B.1, Johnson contends that counsel was deficient for failing to argue at sentencing that Johnson could not or at least should not be executed because Johnson was mentally retarded. Johnson contends that counsel was deficient for not realizing that Johnson's score on his latest WISC-R IQ test overstated his IQ. In support of this assertion, Johnson tenders an affidavit from trial counsel, who swears that he was not aware of any studies that suggested the IQ tests taken by Johnson may have over estimated Johnson's IQ. Johnson asserts that in light of his 1985 IQ test indicating he had an IQ of 69-74, and the 1992 test that showed Johnson was within a few points of being considered mentally retarded, counsel should not have relied on his expert's conclusion that Johnson was not retarded. Johnson asserts that counsel should have checked behind Dr. Cornell and discovered the studies that suggested the WAIS-R test inflated IQ scores and thereafter argued to the jury and the Court that Johnson was mentally retarded.

With regard to the competency of counsel's performance, the critical question here is whether, in light of the information described above, counsel's reliance on Dr. Cornell's evaluation of Johnson's IQ was reasonable. "[C]ounsel has a duty to make reasonable investigations or to make

82

a reasonable decision that makes particular investigations unnecessary." <u>Strickland v. Washington</u>, 466 U.S. 668, 691 (1984). In this regard, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." <u>Id</u>. Hence, where counsel is presented with a mental health report that refutes prior indications that his client had a potential mental health defense, counsel generally is not required to "second guess the contents of [the] report . . . . [and] spend valuable time pursuing what appeared to be an unfruitful line of investigation." <u>See</u> <u>Wilson v. Greene</u>, 155 F.3d 396, 403 (4th Cir. 1998)(rejecting inmate's claim that counsel should have pursued mental health defenses where psychological report indicated inmate was competent to stand trial and not suffering from a significant mental disease or defect at time of the crime). Thus, the courts have consistently upheld as reasonable defense counsel's decision to abandon a particular mental health defense where expert examination determines such a defense is unfeasible. <u>See</u> <u>Pruett v. Thompson</u>, 996 F.2d 1560, 1574 (4th Cir. 1993); <u>Washington v. Murray</u>, 952 F.2d 1472, 1482 (4th Cir. 1992)(concluding counsel was not deficient for failing to suspect that subsequent experts would disagree with the diagnosis provided by the defense expert prior to trial).

Johnson fails to direct the Court to any laxity that should have caused counsel to doubt Dr. Cornell's conclusion that Johnson was not mentally retarded. Indeed, the record demonstrates that Dr. Cornell reached that conclusion after a careful analysis and consultation with colleagues. In light of Dr. Cornell's stated diligence and the standard for competent performance recited above, counsel was not deficient for failing to discover any purported overestimate of Johnson's IQ.

Johnson also suggests that despite Dr. Cornell's conclusion that Johnson was not mentally retarded, counsel should have nevertheless argued to the jury that Johnson was mentally retarded.

83

Such a tactic fails to account for the loss of credibility that would flow from counsel arguing that his client was mentally retarded when his own expert disputed that conclusion. Instead, at sentencing, counsel conceded that Johnson was not mentally retarded but that the same lack of blameworthiness that had led Congress to preclude the execution of the mentally retarded, warranted a life sentence for Johnson. In this vein, counsel emphasized that Johnson missed the technical definition of mental retardation by a mere two points on his latest IQ evaluation and suffered from severe learning disabilities. Such a tactic was entirely reasonable. Johnson's Claim IV.B.1 will be dismissed.

## XII. INEFFECTIVE ASSISTANCE OF COUNSEL AS CAUSE EXCUSING PROCEDURAL DEFAULT OF PROSECUTORIAL MISCONDUCT CLAIMS
Tipton V.B.3.d.v, V.F.1.j
Johnson II.C.4.f, IV.A.8,

In the above listed claims, Tipton and Johnson generally fault counsel for failing to stop the purported onslaught of prosecutorial misconduct. In order to prevail on a claim of prosecutorial misconduct, a defendant must demonstrate that: " (1) the prosecutor's remarks and conduct must in fact have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial." United States v. Golding 168 F.3d 700, 702 (4th Cir. 1999)(internal quotations omitted). Here, Tipton and Johnson contend that both of the above components were satisfied because during the guilt phase the prosecutors vouched for their witnesses, suggested that a government witness had passed a polygraph test, introduced inadmissible evidence that the Defendants were threats to the lives of witnesses, improperly emphasized that Tipton and the other defendants did not testify, treated Tipton and the other Defendants as a group, and duped the trial court into believing witnesses were in the witness

84

protection program in order to deny the Defendants access to the witnesses.[44] Of course, the question here is not whether the prosecution engaged in misconduct, but whether that misconduct, either individually or collectively, was so egregious that counsel's failure to challenge the misconduct at trial or on appeal denied Tipton and Johnson the right to effective assistance of counsel. It is to that question that the Court now turns.

> **A.** **Counsel Failed To Object To The Testimony Of Several Cooperating Witnesses Whose Testimony Violated 18 U.S.C. § 201(c)(2).**
> Tipton V.F.1.k.      Defaulted Tipton V.E.15
> Johnson               Defaulted Johnson V.M
> Roane IV.F           Defaulted Roane I.d.[45]

These claims are grounded in the now vacated panel decision in United States v. Singleton, 144 F.3d 1343 (10th Cir. 1998), vacated on reh.'g en banc, 165 F.3d 1297, 1299 (10th Cir. 1999). Title 18 U.S.C. Section 201(c)(2) does not prohibit the United States from offering leniency in exchange for testimony, see United States v. Richardson, 195 F.3d 192, 196-97 (4th Cir. 1999), or "from acting in accordance with the long-standing practice and statutory authority to pay fees, expenses, and rewards to informants even when the payment is solely for testimony, so long as the payment is not for or because of any corruption of the truth of testimony." United States v. Anty, 203 F.3d 305, 311 (4th Cir. 2000). None of the Defendants have demonstrated that the United States

---

[44] The Defendants' claims that the prosecution engaged in misconduct by introducing testimony without foundation and otherwise engaged in misconduct with regards to the CCE charges were rejected supra at Section V.C and V.D . Tipton and Johnson also assert the prosecution engaged in the following misconduct at sentencing: the prosecution made unsupported argument regarding the conditions Johnson and Tipton would face in prison; the prosecution misled the jury into believing it had a duty to impose the death sentence; the prosecution argued that sentencing should be based on deterrence. The claims that the prosecution engaged in misconduct at sentencing are addressed infra at. XII.C.4.

[45] Roane suggests that novelty rather than ineffective assistance of counsel excused his default.

offered a witness inducements "for or because of any corruption of the truth of [the] testimony."

Id. Accordingly, the Defendants cannot demonstrate that counsel were deficient or that they were

in any way prejudiced by the failure to raise the claim.    The above described claims will be

dismissed.

**B.    Purported Prosecutorial Misconduct With Regards To The Witness List**
Tipton Defaulted V.E.5.
Roane Defaulted I.a

Tipton and Roane assert that "the prosecution improperly duped the trial court into permitting

it to withhold its witnesses' addresses because they ostensibly had been placed in the federal witness

protection program when in fact they had not." Tipton's Index of claims at 15-16.  This claim lacks

a basis in fact.  The record before the Court indicates that the prosecution clearly indicated on the

witness list that some witnesses were actually in the "Witness Protection Program" while others were

merely "in protective custody" or "in protection."  Clerk's Record # 393 at 2; # 416.  The Court's

Order of January 5, 1993 recognized the distinction between witnesses in protective custody or

protection and those formally in the Witness Protection Program.  Clerk's Record # 397 at 1.  The

order did not direct the United States to provide defense counsel with any access to witnesses listed

in the "Witness Protection Program" while the United States was required to make arrangements to

permit defense counsel to meet with the witnesses "in protection" or "protective custody." Id.

Nevertheless, the record indicates that the government provided defense counsel with an opportunity

to speak with all witnesses in any protective status prior to trial.  However, the majority of witnesses

declined to speak with defense counsel.  On appeal counsel claimed that the Court erred by failing

to provide him with addresses of the witnesses in the Witness Protection Program or some other

form of protection.  The Fourth Circuit rejected that claim noting that "[a]ccess was ultimately

86

provided, and though appellants quarrel with its timing and its circumstances, they have offered nothing indicating that they were actually harmed by the delay." United States v. Tipton, 90 F.3d 861, 889 (4th Cir. 1996). Thus, counsel reasonably eschewed pressing the claim urged here by Roane and Tipton because the prosecution did not engage in any misconduct and they cannot demonstrate how they were harmed by the prosecution's conduct. Additionally, Roane and Tipton allege that this claim is not defaulted because the facts supporting this claim were not available at the time of his appeal. They fail to identify any recently discovered facts that support such an allegation of cause. Accordingly, the above described claims are defaulted and will be dismissed.

## C.    Purportedly Improper Comments By The Prosecution

Even when the prosecution makes inappropriate remarks, a defendant is not entitled to relief unless the offending remarks or conduct "prejudicially affected the defendant's substantial rights so as to deprive [him] of a fair trial." United States v. Adam, 70 F.3d 776, 780 (4th Cir. 1995). The following factors are relevant to that inquiry:

> (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters . . . .(5) whether the prosecutor's remarks were invited by improper conduct of defense counsel . . . , and (6) whether curative instructions were given to the jury.

See United States v. Wilson, 135 F.3d 291, 299 (4th Cir. 1998)(internal quotations and citations omitted). "These factors are examined in the context of the entire trial, and no one factor is dispositive." Id.   However, the prosecutorial misconduct claims are defaulted and Tipton and Johnson must demonstrate cause and prejudice to excuse their default. As the discussion below

87

reflects, while some of the prosecution's comments were improper, in no single instance (or collectively), do the aforedescribed factors so favor a finding of prejudice that counsel was deficient for failing to pursue the claim of prosecutorial misconduct.

1. **The Prosecution Introduced Inadmissible Evidence Through Which They Vouched That The Defendants Were Threats To The Lives Of The Witnesses**
Tipton Defaulted    V.E.4.
Johnson Defaulted   V.B

Johnson and Tipton complain that the Government improperly elicited testimony from Johnny Byrd, Hussone Jones, Denise Berkley, Denis Moody, Valerie Butler, Robert Davis, Stanley Smithers and Montez McCoy regarding their protective custody status to suggest to the jury that the Defendants posed an ongoing threat to the lives of these witnesses. "The Government may appropriately introduce evidence of their witnesses' participation in the Witness Protection Program in order to counter any inference of improper motivation or bias and, under some circumstances, may present this evidence on direct examination in anticipation of a defense attack upon the witnesses' credibility." United States v. Melia, 691 F.2d 672, 675 (4th Cir. 1982). The key question on this score is whether the prosecution was not merely using such testimony to rebut, "the appearance of special treatment and improper motivation" but was unfairly exploiting the inference that fear of a particular defendant caused the witness to seek the state's protection. Id. at 675-6.

In the Defendants' opening statements and questions on cross-examination, defense counsel suggested that the Government's principal witnesses were testifying because they were simply "bounty hunters" seeking financial rewards and personal gain in exchange for their testimony. See, e.g., 837, 849-54. Thereafter, the Court refused the Government's request to allow its witnesses to testify as to their protective custody status, unless and until, the defense opened the door on cross-

88

examination. Thus, when the defense counsel elicited that the Government was paying Hussone

Jones' rent, on redirect Jones explained that he was in danger and had been placed in the Witness

Protection Program. Denise Berkley's testimony about which the Defendants currently complain

followed a similar sequence of events.[46] Although Berkley and Jones mentioned concerns for their

safety, the prosecution did not attempt in either case to capitalize on these comments.

However, with respect to Denis Moody, Valerie Butler, Robert Davis[47], Stanley Smithers,

and Montez McCoy, the prosecution jumped the gun and on direct examination elicited testimony

about their participation in the Witness Protection Program or about perceived threats to their safety.

On direct examination, the prosecution asked Davis why he was testifying, to which he responded,

"[m]y brother and sister got killed. And I felt I would be next." Tr. at 1906-7.    On direct

examination, Stanley Smithers explained that a state court had continued a show cause against him

because he was currently in the Witness Protection Program. Tr. at 2099. On direct examination,

eight year old Montez McCoy testified that the Marshals had moved his family to New York. Tr.

at 2276. On direct examination, Valerie Butler explained that her children were not living with her

because she was in the Witness Protection Program. Tr. at 2686. Although the above comments

were technically improper and intentionally introduced, its potential for unfair prejudice was partly

mitigated by the jury's understanding that the prosecution was countering the defense's repeated

---

[46] On cross-examination, the defense elicited from Denise Berkley that the United States
had relocated her and paid the majority of her bills. Defense counsel further suggested by the
tenor of his questioning that the promise of such support was made as an initial inducement to
get Berkley to cooperate. On redirect, Berkley explained that she received support because she
feared for her safety and had asked to be placed in the Witness Protection Program.

[47] On cross-examination, defense counsel did attempt to impeach Davis regarding the
benefits he had received in exchange for his testimony. Tr. at 1933-34, 1952.

89

assertion that the witnesses were simply bounty hunters out for personal gain. See United States v. Young, 470 U.S. 1, 12-13, 17 (1985). Moreover, any impression that the Defendants posed a threat to the lives of the witnesses was not the result of the isolated comments cited above but the abundance of properly admitted evidence reflecting that Johnson and Tipton did not want to leave any untrustworthy witnesses to their crimes. For example, Montez McCoy's comment that he had been moved to New York can hardly been deemed to have unfairly prejudiced the defense in light of Butler's testimony regarding a three way phone call between Tipton, Johnson and Roane during which Tipton had told Roane and Johnson that they were dumb for not killing Montez McCoy and the other witnesses to the Torrick Brown murder. Roane then responded that he wanted to kill Martha McCoy and people were trying to locate her for that purpose. Tr. at 2728-29. Butler's testimony in this regard was corroborated by Hussone Jones who testified that he heard Tipton say that Roane "should go back and get the kids" because there "[c]ouldn't be a witness" if there were "[n]o survivors." Tr. at 1580. Similarly, the record reflected that Chiles and Talley were murdered in part to stop them from testifying. Sterling Hardy testified that, while in jail, he told Lance Thomas that he was worried that Linwood Chiles was going to testify "against everybody." Tr. at 2191. Thomas told Hardy not to worry because Tipton and Johnson would "take care of" Chiles. Tr. at 2191. And, Johnson told Charles Townes he killed Chiles because he thought Chiles was talking to the police. Tr. at 1191-92; see Tr. at 2707. The record also suggests that Talley was murdered because Tipton and Roane thought he was involved with the police. Tr. at 1566-67. In summary, it would be nigh impossible to demonstrate unfair prejudice from the brief references to the safety concerns of witnesses because the Defendants were on trial for murdering several potential witnesses. The record was replete with admissible evidence of their efforts to eliminate anyone who

90

posed a threat to the continued vitality of their drug enterprise and the defense invited many of the prosecution's closing comments by its repeated references to the witnesses as bounty hunters. Tipton and Johnson have not demonstrated that counsel were or that they were prejudiced by the failure to pursue the issue at trial or on appeal. The above listed claims will be dismissed.

### 2. The Prosecutors Suggested That A Government Witness Had Passed A Polygraph Test
Johnson Defaulted V.F.
Tipton Defaulted V.E.8

On redirect examination of Jerry Gaiters, the prosecutor asked Gaiters if he fully cooperated with the police with respect to the murder of Katrina Rozier and did everything that was requested of him, "including taking a test." Tr. at 2428. Gaiters responded yes to each of these questions. Id. Counsel objected and moved for a mistrial. Id. The Court sustained the objection but denied the motion for a mistrial.

The Government concedes, as it must, that the reference to the polygraph was deliberate and improper. However, counsel reasonably eschewed requesting a specific curative instruction since such an instruction could likely draw more attention to Gaiters' ambiguous remark. Nor does this single reference to a "test," pertaining to the uncharged criminal conduct of the murder of Rozier, provide counsel with a strong claim for relief. See United States v. Tedder, 801 F.2d 1437, 1445 (4th Cir. 1986)(rejecting request for mistrial because brevity of polygraph remark without reference to results of test and witness' lengthy examination mitigated potential for prejudice). Hence, appellate counsel's failure to raise the issue on appeal was not deficient. See Plath v. Moore, 130 F.3d 595, 600-01 (4th Cir. 1997)(concluding petitioner could not demonstrate prejudice flowing from counsel's failure to object to brief reference to polygraph exam where results of exam were not mentioned and jury had ample opportunity to assess the witness' credibility); see also Arnold v. Evatt, 113 F.3d

91

1352, 1363 (4th Cir. 1997). Accordingly, the above described claims will be dismissed.

### 3. Purported Improper Remarks By the Prosecution During The Guilt Phase Arguments

#### a. Counsel were deficient for failing to object to prosecutor's improper closing arguments regarding the supervision element

| | |
|---|---|
| Johnson II.C.4.d | Defaulted II.C.3.b |
| Tipton V.B.3.d.(iii) | Defaulted V.B.3.c.(ii) |

After recapping the Government's evidence on the continuing series element, the prosecutor went on to the third and fourth elements[48] where he stated:

> The next thing we must have proven to you in order to find them guilty of a CCE is that it was undertaken with five or more people acting in conjunction. And, in deciding this remind yourself of the testimony of Gregg Scott about the New York Boyz. There were 30 or so New York Boyz operating in Trenton, each of whom recruited to themselves workers. In Richmond, when the New York Boyz came south with "Whitey," you had the following people, at least, who were working with them in the sale or distribution of cocaine. You had Denise Berkley, Priscilla Greene, Curt Thorne, Linwood Chiles, Jerry Gaiters, Sterling Hardy, "Papoose" Davis, Hussone Jones, Charles Townes, "Man Man," Maurice Saunders, Antwoine Brooks. You had the people from Charles City that were testified about. You had Pam Williams, Charlotte Moore, Greg Noble, Sam Taylor, and a number of others you have heard testimony

---

[48] In order to convict a defendant of engaging in a continuing criminal enterprise the Government must prove:

> (1) defendant committed a felony violation of the federal drug laws; (2) such violation was part of a continuing series of violations of the drug laws; (3) the series of violations were undertaken by defendant in concert with five or more persons; (4) defendant served as an organizer or supervisor, or in another management capacity with respect to these other persons; and (5) defendant derived substantial income or resources from the continuing series of violations.

United States v. Ricks, 882 F.2d 885, 890-91 (4th Cir. 1989).

92

about.[49]

So that aspect of the CCE is also very clearly proven in this case. That is not an issue.

What is an issue -- let me back up as to the five or more people. You need not find that everyone of these people charged with the CCE, and charged with the CCE are "Whitey," "C.O." and James Roane, you need not find that each and everyone one of these people supervised five or more persons themselves. You need only find as a group, there were five or more people involved in the distribution of cocaine, [hereinafter the **first comment**] just here in the City of Richmond.

But what will be an issue and what you do need to determine in order to determine that indeed a CCE was operated by these people, Continuing Criminal Enterprise was operated by these people, is whether "Whitey," "C.O.," and "J.R." occupied a position of organizer or supervisor. And I suggest to you in that regard, the testimony is also clear and unequivocal. They came down with their source of supply from New York, their source of cocaine, and they orchestrated, organized the people we have already mentioned to you in a distribution outlet, a distribution network. Each and every witness who took that stand testified remarkably consistently concerning the relationship of one with another; that "J.R.," "O," and "Whitey," "V" were partners or bosses; that they were the people who organized the workers, who went out and recruited the workers, who supplied the workers with the cocaine, and that those workers went forth and sold their cocaine on the streets of Richmond. That's all that is required by the law. [the **second comment**] It is not required by the law, as will be argued, I suggest, that they need to provide explicit directions in and orders to each and every one of the people who sold cocaine for them. Although there has been testimony that indeed they supplied directions and orders to each and everyone of these people, that is not necessary for you to find them guilty of operating a Continuing Criminal Enterprise. The language is clear there. All you need to find is that they organized people. And indeed the evidence is clear and unequivocal that they organized a number of people here in the City of Richmond to sell drugs.

---

[49] Johnson and Tipton claim that as a matter of law none of the listed individuals were capable of being a CCE supervisee. As discussed in Section V, the Defendants cannot demonstrate any prejudice on this issue because the jury was properly instructed on the supervision element and there was an abundance of evidence supporting the conclusion that Berkley, Thorne, Gaiters, Chiles, Davis, Jones, Townes, Saunders and numerous others were supervisees.

93

Tr. at 2983-86. The Tipton and Johnson argue that the prosecutor's statements misstated the law and encouraged the jury to convict the Defendants without proof that each Defendant acted as a supervisor or organizer with respect to five or more persons. Additionally, Tipton and Johnson assert that counsel should have objected to the following argument in rebuttal which they contend was inappropriate because the prosecutor sought to avoid the issue of supervision by focusing on inflammatory issues and suggesting that because the case involved drug distribution the jury should convict the Defendants.

> My colleagues have told you and told you and told you how there is no organization here. There is no management. There is no supervision. They say all those things have to be done. It is not true. [the **third comment**] Judge Spencer will tell you what the law is and I will suggest to you the law is that it only requires a person to organize, to supervise or to supervise five or more people in a criminal activity. Mr. Cooley's little cute WonderBread-Safeway joke was interesting yesterday, but it didn't have anything to do with what we are about. Because we are talking about illegal crack cocaine. We are talking about killings. And we are talking about the furtherance of that killing that was done for the furtherance of the conspiracy. The conspiracy to distribute crack cocaine and to make money. [the **fourth comment**] It is not about the legal bread business or Safeway. It is a good analogy, but it does not make any difference. We are talking about apples and oranges. We are talking about a criminal enterprise and a criminal nature. He is talking about a legitimate business. [the **fifth comment**]

Tr. at 3187-88.

Taken in context, the second and third highlighted comments do not mislead the jury as to the supervision element. Rather, these comments simply remind the jury that the supervision element is disjunctive and the Government satisfies the element by demonstrating that the Defendant organized or managed or supervised five or more persons. The fourth and fifth comments were a fair response by the prosecutor to counsel's analogy that there was no supervision because their

94

relationship to the workers was analogous to the Wonderbread-man who simply delivers his bread

to the grocery store. Moreover, "the question we have to ask is not whether the prosecutor's

comments were proper, but whether they were so improper that counsel's only defensible choice was

to interrupt those comments with an objection." Bussard v. Lockhart, 32 F.3d 322, 324 (8th Cir.

1994 ). see United States v. Young, 470 U.S. 1, 13 (1985). Here, counsel reasonably eschewed

objecting to the second through fifth comments because they were sufficiently within the bounds of

fair argument.

Although the first highlighted comment is not an accurate statement of the law, Tipton and

Johnson were not prejudiced by the absence of an objection. As noted previously, the Court

instructed the jury that the supervision element required the Government to prove that each

defendant individually supervised or organized five individuals. Tr. at 3211-12. The Court

repeatedly instructed the jury that "your source as to the law is the Court,"not the lawyers. Tr. at 887,

see also Tr. 758-59, 972, 3193-95, And, the prosecutor reiterated that instruction.

> The Court will instruct you as to what the law is. What I say is the
> law, what any one of these counsel says is the law, is not necessarily
> what the law is. What the Court instructs you that the law is is what
> the law is. What the Court tells you is the law is the law that you
> must follow.

Tr. at 2961.[50] The Court's instructions, and the prosecutor's admonitions foreclose any suggestion

that the jury applied the prosecution's single inaccurate statement of the law, rather than the

appropriate instruction supplied to them by the Court. Accordingly, neither Tipton nor Johnson have

demonstrated that they were prejudiced by counsel's failure to take action with respect to the first

---

[50] The prosecutor prefaced his CCE argument with a reminder to the jury that "the Court is going to apprize you of what the law is." Tr. at 2982.

95

comment.  The above listed claims will be dismissed.

> b. **The prosecutors misled the jury by vouching (often in inflammatory terms) to their personal belief in the Defendant's guilt and the veracity of the prosecution witnesses**
> Johnson Defaulted Claim V.A
> Tipton Defaulted Claim V.E.3

It is improper for a prosecutor to vouch for, or bolster the testimony of, its own witnesses. United States v. Lewis, 10 F.3d 1086, 1089 (4th Cir. 1993). "Vouching occurs when a prosecutor indicates a personal belief in the credibility or honesty of a witness; bolstering is an implication by the government that the testimony of a witness is corroborated by evidence known to the government but not known to the jury." United States v. Sanchez, 118 F.3d 192, 198 (4th Cir. 1997). In asserting that appellate counsel were deficient for failing to pursue the claim urged here, Tipton and Johnson overstate the occasions the prosecutor engaged in impermissible vouching and ignore the abundance of curative instructions provided by the Court.

During closing argument, the prosecution made the following highlighted comments, which Tipton and Johnson assert were improper vouching.

> Closing statement is . . . to give us an opportunity to argue to you what <u>we believe, what inferences we believe</u> you should draw from the evidence . . .

Tr. at 2956-7.

> There is no 848 murder here, no murder in furtherance of a Continuing Criminal Enterprise charged here, because <u>we know</u>, it was murder over a woman.  <u>We know</u> that Robin Cooper was the cause of that murder of Torrick Brown . . . [w]e <u>also know</u> that despite the fact that that murder occurred . . . and was done by James Roane other members of the conspiracy joined him to help that murder.

Tr. at 3003-4.  The mere use of the words "we believe" or "we know" does not constitute improper

96

vouching or bolstering because it was not done to suggest a personal belief in the credibility of a particular witness or imply to the jury that information known to the government but not placed before the jury corroborates the prosecution's version of events.  See United States v. Adam, 70 F.3d 776, 780 (4th Cir. 1995) (noting that prosecutor's use of the phrase "I think" in an innocuous, conversational sense "d[id] not suggest an attempt to replace the evidence with the prosecutor's personal judgments").  Indeed, in both of the instances complained of above, the prosecutor's argument in the surrounding text directed the jury to consider the evidence as the barometer for judging what it should know or believe.[51]

The highlighted remark set forth below, though perhaps a misstep by the prosecutor, did not provide Johnson or Tipton with a viable basis for challenging their convictions.

> There is no evidence, ladies and gentleman, with the exception of Hardy, Sterling Hardy and Gaiters, that any of the people brought forth by the government and placed in this witness stand to provide evidence to you knowingly and willingly engaged in a murder . . . .
>
> * * * *
>
> . . . the government has told these people that the words that they give to you from that witness stand will not be used to prosecute them, with the exception of Hardy and Gaiters, who were knowingly involved in murders by their own testimony, who are facing sentencing in this Court, by this Judge, for their involvement in those murders.  Ladies and gentlemen, again I remind you, you cannot penetrate a conspiracy without some of the participants in the conspiracy cooperating with you.  It is not an exact science.  Use-immunity agreements had to be given.  We feel like we gave use immunity only to those people who were not the murderers in this case.  There has been no evidence that anyone other than Richard Tipton, Cory Johnson, Lance Thomas, Sterling Hardy and Jerry Gaiters were involved in the murders.

---

[51] Nor was the prosecution's references to the portions of the witnesses' plea agreements that required them to testify truthfully good fodder for an appeal. Tr. at 2968; see United States v. Henderson, 717 F.2d 135, 137-8 (4th Cir. 1983); Jenner v. Class, 79 F.3d 736, 739 (8th Cir. 1996).

97

Tr. at 2966-68. While the comment may be read to suggest factors not presented to the jury played a part in the distribution of use immunity, the unfair prejudicial effect was marginal because (1) it was isolated; (2) it did not deflect any plausible suggestion of guilt from one of the witnesses[52] onto the defendants; (3) the evidence of Johnson and Tipton's guilt of the murders was overwhelming; and, (4) the jury was instructed that comments of the attorneys were not evidence and that "the testimony of one who provides evidence against a defendant . . . for immunity from punishment . . . must always be weighed by the jury with greater care and caution than the testimony of an ordinary witness . . . . such testimony is always to be received with caution and weighed with great care." Tr. at 3199-32000.

Indeed, the protective hedge of instructions issued by the Court provided a strong disincentive to appellate counsel hoping to demonstrate prejudice flowing from any improper comments by the prosecution. See Bennet v. Angelone, 92 F.3d 1336, 1346-7 (4th Cir. 1996); United States v. Francisco, 35 F.3d 116, 120 (4th Cir. 1994). At the outset of the trial, the Court explained that:

> Certain things are not evidence and it is important that you understand what is not evidence . . . . First of all, statements, arguments, questions by lawyers are not evidence. Objections to the questions are not evidence . . . . You should not be influenced by the objection or the Court's ruling on it. If the objection is sustained, ignore the question. If the objection is overruled, treat the answer like any other.

Tr. at 759. After opening statements, the Court admonished the jury that,

> [t]he evidence in this matter is what comes from the witness stand,

---

[52] Although the defense counsel tried to implicate Byrd in the Talley death, as reflected supra, Tipton's guilt on that matter was overwhelming.

98

> the exhibits, and any stipulations. The statements, comments, arguments by lawyers are not evidence and should not be accepted as such. A classic example is that we had a couple of objections.

Tr. at 887-88. Finally, after closing arguments in the penalty phase, the Court instructed the jury:

> it is your duty to determine the facts. And in so doing, you must only consider the evidence that I have admitted in the case. The term 'evidence' includes the sworn testimony of the witnesses and the exhibits admitted into the record, and any stipulations or agreements between the parties.
> Remember that any statements, objections, or arguments made by the lawyers are not evidence in the case. . . . What the lawyers say is not binding upon you.

Tr. at 3194-95. Given the instructions provided to the jury and the evidence arrayed against their client, counsel wisely refrained from pursuing the claims urged here by Tipton and Johnson.

For example, Tipton and Johnson fault counsel for failing to raise on appeal an exchange where the prosecution purportedly vouched for Gaiters by the manner in which it asked questions.[53] In light of the fact the objection was sustained and that Woody's subsequent proper testimony corroborated Gaiters' account, and the Court's instructions, any unfair prejudice to the defense was unmeasurable.[54] Next, Johnson and Tipton contend that the prosecution engaged in misconduct

---

[53] The prosecution asked Detective Woody whether Gaiters "is telling the truth" regarding the Armstrong, Long, and Carter murders. Tr. at 2442-43. Counsel objected and the objection was sustained. Tr. at 2443. Detective Woody then testified that Gaiters had consistently described the motive and the manner in which Johnson had committed the triple murder. Tr. at 2443.

[54] The defense later called Woody as a witness. In response to defense questions, Woody testified that in consideration for information, the police had dropped a number of petty charges against Gaiters. Counsel asked whether a number of more serious charges including a murder charge, a rape charge and a robbery charge against Gaiters also had been dropped. Woody responded affirmatively to this question. On cross-examination, the prosecution asked if the murder, rape and robbery charges were dismissed in consideration for cooperation or because the "investigation revealed that he had not committed" the particular crime. Tr. at 2855. Woody responded that the charges were dismissed based on Gaiters' apparent lack of culpability rather

when it asked Roane's psychiatric expert whether he considered Roane to be "a virtual killing machine." Tr. at 3770. The Court sustained the objection. While the prosecution's question was improper, appellate counsel for Johnson and Tipton were hardly deficient for failing to pursue the issue on appeal; the question was not directed to their client, the objection was sustained, and the Court instructed the jury to ignore a question if any objection is sustained. The Defendants also complain about the manner in which the prosecution twice phrased its objections. Even if such remarks were improper, they were hardly worthy of appellate consideration. See Tr. at 1983, 2053-54.

Finally, Johnson and Tipton complain that the prosecution engaged in misconduct during the sentencing p hase w hen t wice d uring o pening a rgument, a nd o nce d uring c losing a rgument h e referred to them as "mass murderers." Counsel reasonably abstained from appealing the issue because that appears to be a fair description of their clients. In light of the instructions provided, the context of the purportedly improper comments and the abundance of evidence, counsel reasonably decided not to appeal the issues urged by Tipton and Johnson in Claims V.E.3 and V.A and such claims will be dismissed.

**c.    The prosecutors misled the jury by treating the Defendants as a group, rather than as individuals**
Tipton Defaulted Claim V.E.9
Johnson Defaulted Claim V.G.

During guilt phase closing arguments, the prosecution told the jury that,

> What happened on January 14? James Roane, Cory Johnson, and Richard Tipton and 'V' Mack get Pam Williams to go buy this Intratec and the AA Arms handguns. What do they do with these guns next? They take them to 'Papoose' Davis' house . . . [Tipton's

———————————

than for any consideration for his cooperation.

100

counsel's objection to the use of 'they' overruled] . . . They come up there that day on January 14th, get the guns, and go take a life, that of Peyton Maurice Johnson.  They come back and brag about their marksmanship.

Tr. at 3176.  Johnson contends that the prosecutor misled the jury because there was no evidence linking him to Williams' purchase of the handguns and Tipton contends there is no evidence that he shot Peyton Johnson.  Johnson is simply wrong.  Although Roane and Thomas accompanied Williams to the gun shop, Johnson gave Williams crack cocaine in partial payment for her aid in obtaining the guns and told Williams' boyfriend that Williams was required to complete the transaction when she attempted to back out of purchasing the guns.

Although it may be reasonably inferred that Tipton approved of the murder of Peyton Maurice Johnson, it was imprecise and sloppy for the prosecution to suggest, during guilt phase closing argument, that Tipton had actually shot Peyton Johnson.[55]  However, in light of the abundance of evidence of guilt, the precise verdict forms, and Court's instructions[56], appellate counsel would have had an impossible task in demonstrating their clients were prejudiced by the

---

[55] Tipton and Johnson also restate their complaint, rejected above (see supra first comment and fifth comment Section XII.C.3.a) , that the prosecutor misstated the law when he suggested the supervision element was satisfied if the Defendants had collectively supervised five persons.

[56] At the beginning of the trial, the Court instructed the jury that, "Each defendant's case should be considered independently." Tr. at 35.  After opening statements the Court stated, "one final thing before I make the admonishment and let you go: the defendants are charged in a number of Counts, and there are obviously four defendants.  Each defendant is entitled to individual consideration.  They cannot be grouped.  When the time comes for you to decide guilt or innocence, you will consider each defendant individually, as it relates to each count in which that defendant may be charged." Tr. at 888.  And the jury was admonished in closing instructions that "the case of each defendant should be considered separately and individually.  The fact that you may find one or more of the accused guilty or not guilty should not control your verdict as to any other offense or any other defendant." Tr. at 3231.

101

prosecutor's occasional collective references to the Defendants. Tipton and Johnson's challenges to the prosecutor's collective references during the sentencing phase are addressed below.

    **4.**    **Alleged Improper Comments By The Prosecution During The Penalty Phase**

        **a.**    **The prosecutors misled the jury by treating the Defendants as a group, rather than as individuals**
            Tipton Defaulted Claim V.E.9
            Johnson Defaulted Claim V.G.

One of the nonstatutory aggravating factors was that the defendant was a knowing and willing member of a conspiracy which had as one of its goals the murder of individuals other than those for which the defendant was charged.[57] In opening statement at the sentencing phase, the prosecution suggested this factor was satisfied because, "it is clear that each one of them intended to kill other people to hide this conspiracy. They intended to kill Martha McCoy and her children because they survived and were witnesses." Tr. at 2228. "Remember under the law of conspiracy, they are guilty of each and every one of the acts that they did together."Tr. at 3330.[58] Contrary to Tipton and Johnson's suggestion, the underlined comment was permissible because it does not encourage the jury to collectively assign blame based on membership in a conspiracy but based on jointly committed actions.

---

[57] To support that factor, the Government reintroduced the guilt phase evidence. The Government also presented further evidence that Johnson, Tipton, and Roane, while incarcerated, had planned to kill several witnesses: Johnson told another inmate he planned to kill Detective Woody; Roane told Douglas Cunningham, Martha McCoy's boyfriend, there was $10,000 "hit" on McCoy's life if she testified, and that McCoy's uncle "was going to be the next one," Tr. 3361; Tipton told Cunningham, "that something was going to happen to me if I was to testify," Tr. at 3359; and Willie Seward overheard Tipton using the phone to tell someone that "he wanted Detective Woody killed . . ." Tr. at 3385.

[58] Shortly thereafter, the prosecutor stressed that each defendant was "due individual consideration in your rendering of your verdict." Tr. 3332.

102

Next, Johnson and Tipton contend that the prosecutor made a number of collective references in closing argument that were improper. "They deserve the maximum punishment, ladies and gentlemen, because in addition to their drug dealing, they chose to kill ten people." Tr. at 3903; "We have been in trial for five weeks, the same length of time within a week that these three people killed ten –[59]." Tr. at 3945. "They know how to do these crimes." Tr. at 3948. Appellate counsel did not ignore these above comments by the prosecution. Rather, appellate counsel cited these comments to support their primary challenge to the Defendants' sentence; that the failure to conduct separate penalty hearings denied them individualized consideration. See Roane App. Brief at 120. In rejecting that argument the Fourth Circuit concluded that "the court's frequent instructions on the need to give each defendant's case individualized consideration sufficed to reduce the risk to acceptable levels." United States v. Tipton, 90 F.3d 861, 892 (4th Cir. 1996)(noting any risk of unfair prejudice was diminished by the separate packets of penalty verdict forms for each Defendant and the Court remonstrances to the Government to "be specific" and to "do it individually" when objections were made). Appellate counsel's use of the prosecution's improper collective references to support his challenge to the joint penalty hearing, rather than in support of a separate claim of prosecutorial misconduct, reflects effective appellate advocacy. Moreover, the Court's repeated instructions foreclose any suggestion of prejudice.[60] Hence, Johnson and Tipton's assertion that ineffective assistance of counsel excuses their default is rejected because they have not demonstrated

---

[59] At this point, Tipton's counsel objected to the use of "these" and the amount of murders. The Court sustained the objection.

[60] The Court's closing instructions repeatedly emphasized that each defendant was to be judged individually. Tr. 3985-86, 4002. The Court repeated during closing instructions that the arguments of lawyers were not evidence and it is the juror's recollection of the evidence that controls. Tr. at 3996.

103

that counsel was deficient or that they were prejudiced. Tipton's Claim V.E.9 and Johnson's claim

Claim V.G will be dismissed.

> **b.    The prosecutor misled the jury by improperly emphasizing that the defendants did not testify**
> Defaulted Tipton V.E.7
> Defaulted Johnson V.E

Tipton and Johnson assert that the prosecutor engaged in misconduct when he repeatedly

commented upon their silence. The most egregious of these comments occurred during the closing

argument. The prosecutor noted that Tipton had told his experts about the deprivation of his youth

which his experts had then conveyed to the jury, yet, "[h]ave you once seen from that witness stand

this week an iota of remorsefulness from that man?" Tr. at 3897. Counsel objected. The Court

sustained the objection and admonished the prosecutor "don't get stupid in the end of this, please."

Id. Immediately, upon the conclusion of the prosecutor's argument the Court instructed the jury as

follows:

> Mr. Vick, in the zeal of his argument, indicated that Mr. Tipton had spoken many times and openly to the defense expert and they took the stand and discussed that. He then followed that up with "But you haven't seen one iota of remorse from the witness stand."
>
> You cannot, you will not, ever require a defendant to take the stand. The defendant doesn't have to testify. The defendant doesn't have any burden to prove that he should not be put to death. The burden is on the government to prove beyond a reasonable doubt that a defendant should be put to death.
>
> As I will indicate to you in further instructions, as I've said to you earlier in the first part of the trial, the argument on the part of counsel is just that. It is not evidence. And you must consider it in that light. But under no circumstances are you to take that kind of argument as indicating that the defendant has an obligation to take the stand and tell you something, even if to indicate remorse. Do you understand?

Tr. at 3906-7. Later, the Court denied the Defendants' motion for mistrial. Tipton's counsel

104

appealed that decision and the Fourth Circuit summarily rejected the claim. United States v. Tipton, 90 F.3d 861, 901 n.25 (4th Cir. 1996).

Tipton and Johnson contend that appellate counsel should have shorn up this claim by pointing to other instances where the prosecutor purportedly made improper comments about their silence. The following rule is used to assess whether argument by the prosecution constitutes an improper comment on the defendant's failure to testify, "[w]as the language used manifestly intended to be, or was it of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify?" United States v. Francis, 82 F.3d 77, 78 (4th Cir. 1996)(quoting United States v. Anderson, 481 F.2d 685, 701 (4th Cir. 1973)). In answering that question, the Court must look to the context in which the comment was made. See Francais, 82 F.3d at 78. Because, as reflected below, the other remarks, in context, are not indicative of a manifest intent to comment upon the defendants' failure to testify and are more readily understood to comment upon the evidence and defense counsel's arguments, counsel reasonably eschewed pursuing the claims urged here by Johnson and Tipton. See Bates v. Lee, 308 F.3d. 411, 420-22 (4th Cir. 2002).

During the sentencing phase closing arguments, the prosecution summarized Johnson's case in mitigation as follows,

> As to Mr. Cory Johnson, he too says, "I've had a bad youth. I've got a learning disability. I should therefore be excused from blameworthiness for what I have done." You can't do that, ladies and gentleman. The testimony of the doctors who testified for him have made it clear that he knew right from wrong.

Tr. at 3898. The foregoing statement does not seek to impugn Johnson's silence. In fact, its most natural reading is to encourage the jury to give Johnson's statements conveyed though his experts

105

the same weight as if Johnson had made them directly from the witness stand.  Cf. United States

v. Walker, 272 F.3d 407, 415 (7th Cir. 2001)(concluding similar attribution of testimonial evidence

to defendant during closing argument was not outside the bounds of closing argument), cert. denied,

122 S. Ct. 1456 (2002).

Next, Johnson and Tipton complain that the prosecutor commented upon their silence, when

during closing argument at the guilt phase, he argued that

> I suggest to you that the evidence has been clear and unequivocal . . .
> . That 11 people lie dead in the streets of Richmond, Virginia because
> those men with others, including "V," wanted to make themselves rich
> selling drugs, wanted to protect their drug business . . . .I suggest to
> you that . . . as to Count One of the indictment, the conspiracy count,
> that those gentlemen haven't truly argued to you, in either opening or
> in the questions presented to the witnesses during the trial, that they
> are not guilty of Count One.  They have implicitly conceded that
> indeed that they have sold drugs, that indeed they sold drugs together.
> Count One in this case has been implicitly conceded by defendants
> James Roane, Cory Johnson –

Tr. at 2960.  At this point the Court overruled an objection by Roane's counsel.  The prosecution

then continued,

> And I suggest to you through opening and through questioning of the
> witnesses in this case, there can be no great issue as to the guilt of
> James Roane, Richard Tipton, and Cory Johnson as to . . . the
> conspiracy count.  Each of them admitted tacitly, if not implicitly,
> that they sold drugs.  Each of them admitted tacitly, if not implicitly,
> that they were together often.  Each of them has admitted tacitly, if
> not implicitly that they sold drugs together in concert with each other.

Tr. at 2961-62.  Placed in context, the remarks are not of such character that the jury would

naturally and necessarily take them to be a comment on the failure of the accused to testify; the

highlighted remarks direct the jury to consider the evidence adduced and the comments by defense

counsel, not the Defendants' silence, in evaluating whether the Defendants were guilty of

106

conspiracy.[61] Therefore, the comments are not inappropriate.  See United States v. Mietus, 237 F.3d. 866, 871-72 (7th Cir. 2001); Oken v. Corcoran, 220 F.3d 259, 270-71 n. 7 (4th Cir. 2000); Francis, 82 F.3d 77, 78 (4th Cir. 1996); see also Tr. at 2976.  To the extent the prosecution's comments may have otherwise been improper, counsel reasonably forsook appealing the issue in light of the evidence of guilt on the conspiracy charge and their concessions during their own opening statements and closing arguments that their clients were guilty of conspiracy to distribute drugs, but not of running a CCE.

Finally, Tipton and Johnson complain about an exchange that occurred during guilt phase closing argument.  Counsel for Sandra Reavis stated, "But remember, Cory Johnson said that he never gave drugs to Sandra Reavis to sell.  So this contradicts what Valerie Butler had to say."  Tr. at 3163.  The prosecutor objected by stating, "I don't remember Cory Johnson testifying, your Honor."  Id.  The Court sustained the objection.  Defense counsel apologized and corrected his statement by stating, "Cory Johnson told Rodney Tucker, who testified here, that he never gave Sandra Reavis any drugs."  Tr. at 3163-64.  "No manifest intent exists where there is another, equally plausible explanation for the remark."  See United States v. Calderon, 127 F.3d 1314, 1338 (11th Cir. 1997).  The prosecutor's attempt to correct a misstatement by defense counsel does not manifest an improper intent to comment on Johnson's failure to testify.  See United States v. Smith, 30 F.3d 568, 571 (4th Cir. 1994)(noting context of prosecutor's statement indicated an intent to

---

[61] Counsel for each defendant conceded in opening argument that his client sold drugs. During questioning of Government witnesses, defense counsels' questions generally focused on negating the substantial income and supervision element of the CCE count, rather than disputing that the petitioners were engaged in the concerted distribution of cocaine.  Tipton also called Gloria Bridges as a witness.  Bridges testified on direct examination that she came to know Titpon because he sold drugs.

107

object to form of the question rather than comment upon the defendant's silence). To the extent, the objection reminded the jury that Johnson had failed to testify, it did not encourage the jury to draw any negative inference from that omission and the Court repeatedly had admonished the jury that it could not draw such an inference. Accordingly, the above claims will be dismissed because Tipton and Johnson cannot demonstrate appellate counsel were deficient for not pursuing the claims.

> **c.** **The prosecution improperly made unsupported comments during closing argument regarding the conditions the Defendants would face in prison if given a life sentence.**
> Johnson Defaulted V.D
> Tipton Defaulted V.E.2

During closing argument the prosecutor asked the jury to ponder what the Defendants' conditions would be if they were sentenced to life in prison.

> I'm not telling you incarceration is nice and a lifetime of incarceration is not punishment. But think about each and every day of existence in jail. They will wake up, bathe, be fed. They will be able to watch TV, read books. They will be able to use the telephone to talk to their loved ones.

Tr. at 3904. Defense counsel objected and the Court sustained the objection. Tr. at 3904. While the foregoing comments were improper, it did not provide counsel with a substantial claim for relief on appeal. The Court had made clear to the jury that the verdict was to be based on the evidence, the arguments of the lawyers were not evidence and it was not to consider matters to which objections had been sustained. Accordingly, counsel was not deficient for failing to raise the issue on appeal.

> **d.** **The prosecution improperly argued that sentencing should be based on deterrence**
> Johnson Defaulted V.H
> Tipton Defaulted V.E.10

108

Tipton and Johnson contend that they were denied individualized consideration because the prosecutor twice urged the jury to consider deterrence during closing argument at the sentencing phase. The limited law on the subject indicates that a defendant's right to individualized consideration is not violated when the prosecutor urges the jury to consider whether a sentence of death in this instance would further the specific deterrent purpose of the statute. See Brooks v. Kemp, 762 F.2d 1383, 1407 (11th Cir. 1985)(en banc), cert. granted, Kemp v. Brooks, 478 U.S. 1016 (1986)(vacating Brooks and remanding for further consideration in light of Rose v. Clark, 478 U.S. 570 (1986)), reinstated on remand, Brooks v. Kemp, 809 F.2d 700 (11th Cir. 1987)). Here, when the prosecutor began to make comments that could be construed as a general deterrence argument, he was cut short by an objection. Thereafter, the prosecutor focused his comments on why the deterrence goals of the CCE death penalty statute favored the imposition of a sentence of death for the acts committed by Tipton and Johnson. In light of the single comment about general deterrence, the sustained objection to that comment, and the extensive instructions on the Defendants' entitlement to individualized consideration, appellate counsel reasonably forsook the claims urged here by Johnson and Tipton.

e.    **The prosecutors misled the jury into believing that it had a duty to convict the Defendants and impose a death sentence**
Tipton Defaulted Claim V.E.6
Johnson Defaulted Claim V.C

Tipton and Johnson assert that the prosecution affirmatively misrepresented the law to suggest to the jury that it was legally required to convict the Defendants and impose a sentence of death. See Potts v. Zant, 734 F.2d 526, 535-6 (11th Cir. 1984)(prosecutor engaged in misconduct by suggesting prior state supreme court decisions mandated imposition of death penalty in this case), vacated on other grounds, 478 U.S. 1017 (1986). Tipton and Johnson base these arguments on the prosecutor's

109

repeated references to "duty."[62] As reflected below, the challenged comments were proper because

they emphasized that the jurors' duty to convict and impose the death penalty derived from their

sworn obligation to fairly apply the evidence in light of the applicable law. See Davis v. Kemp, 829

F.2d 1522, 1527 (11th Cir. 1988)(concluding defendant not denied individualized consideration by

---

[62] The highlighted comments to which Tipton and Johnson object are set forth below.

> You have taken an oath and you can't shirk from that oath.
> That oath says that you will truly render facts to a verdict. When
> you do that, you have no choice but to find these defendants guilty
> of each and every count of the indictment.

Tr. at 3021(guilt phase sentencing).

> Now it is time for you to go back and do your duty.
> Each of you during the voir dire . . . stated that in the
> appropriate case, given the appropriate circumstances, that you
> could indeed render a verdict of death against a defendant . . . . I
> submit that based upon the evidence that you have seen from this
> witness stand over the last five weeks, that this is the appropriate
> case to render a verdict of death as to each and every defendant.
> You took an oath. It is an awesome responsibility. It is an
> awesome duty. But nonetheless, it is just that a duty. Your duty,
> ladies and gentleman of the jury, given the argument that you have
> heard, requires no less verdict than death.

Tr. at 3881-82.

> . . . it is an awesome duty you have undertaken. But the law is
> clear that in some cases the death penalty should be imposed. It is
> the will of Congress. It is the law you must follow. What you
> must determine, is given the evidence that you have heard, is this
> one those appropriate cases? And I suggest to you, ladies and
> gentleman, it is the appropriate case . . . .
> Ladies and gentleman, it is a strong duty you have. But it is
> just that. It is a duty. This case warrants the imposition of the
> maximum punishment possible, the imposition of the death penalty
> as to each defendant.

Tr. at 3905-6.

110

prosecutor's argument that jurors had an obligation to impose the death penalty if they believed it was warranted by the defendant's crime and the evidence introduced at sentencing); cf. United States v. Locasio, 6 F.3d 924, 947 (2d Cir. 1993)(concluding it was not inappropriate for prosecutor to remind jurors of their oath to render a verdict without fear or favor).

Moreover, the Court's numerous instructions throughout the trial refuted any suggestion that the law required that the Defendants receive a sentence of death. "I want to emphasize that even if a jury makes such findings, it is never required to impose a sentence of death upon a defendant." Tr. at 36; 496-97. Again, at the beginning of the sentencing phase the Court reminded the jury that, "[i]t is the government that bears the burden of persuading you beyond a reasonable doubt that a sentence of death is justified as to each defendant." Tr. at 3307. "[E]ven if you do make the findings required by law as prerequisites to the imposition of the death penalty, no jury is ever required to impose the death penalty." Tr. at 3309. And, "[i]t is the government that must persuade you that the death penalty is justified as to each individual defendant. In short, a defendant is not required to prove that he should be allowed to live." Tr. at 3313. And, "you cannot return a decision imposing the death penalty absent a unanimous finding of the existence of certain aggravating factors, no jury is ever required to impose the death penalty, even if it does make such findings." Tr. at 3315. Hence, Tipton and Johnson's attempt to excuse their default is rejected because they have not demonstrated counsel were deficient or that they were prejudiced by any omission of counsel.

### D. Cumulative Claims of Error With Regards To Prosecutorial Misconduct And CCE Convictions

| | |
|---|---|
| Tipton Claim V.B.3.d.v. V.F.1.j | Tipton Defaulted V.E.14 |
| Johnson Claim II.C.4.f, IV.A.8, IV.C | Johnson Defaulted V.L |

Whether the prosecutor's improper conduct is isolated or extensive is one of the six factors relevant to assessing whether a defendant was prejudiced by improper comments by the prosecution.

111

See United States v. Wilson, 135 F.3d 291, 298 (4th Cir. 1998). Thus, Tipton and Johnson contend appellate counsel should have exploited this factor and challenged all of the purportedly improper conduct on appeal.[63] In this regard, Tipton and Johnson must demonstrate their present claims of error were clearly more promising than the substantial claims counsel raised on direct appeal. See Bell v. Jarvis, 236 F.3d 139, 164 (4th Cir. 2000)(en banc), cert. denied, 122 S. Ct. 124 (2001); Smith v. South Carolina, 882 F.2d 895, 899 (4th Cir. 1989)(counsel's failure to raise a weak constitutional claim may constitute an acceptable strategic decision designed "to avoid diverting the appellate court's attention from what [counsel] felt were stronger claims"). Neither Tipton nor Johnson meets this burden. The fact that habeas counsel has seen fit to regurgitate many of the same issues pressed by appellate counsel certainly belies the suggestion that appellate counsel made poor choices on appeal. Moreover, the appellate record confirms that counsel pursued the most promising claims for relief on direct appeal. See Smith v. Murray, 477 U.S. 527, 536 (1986)("Winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy.") Appellate counsel reasonably chose to pursue promising claims of instructional errors, separation of powers and errors during voir dire that would entitle their clients to relief under a more lenient showing of prejudice than would be required to prevail on a prosecutorial misconduct claim. See, e.g., United States v. Tipton, 90 F.3d 861, 872-882, 895, 897-98 (4th Cir. 1996). Accordingly, the above listed claims will be dismissed because Tipton and Johnson have failed to demonstrate deficiency on the part of counsel.

## XIII. CUMULATIVE CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL
Tipton Claims V.B.3.d.vii, V.F.4

------

[63] That portion of these claims which challenges counsels' conduct at trial is rejected for the reasons previously stated by the Court.

112

Johnson IV.D, IV.C

The Defendants contend that the cumulative effect of all counsel's errors prejudiced them. The cumulative analysis the Defendants seek is not permitted for those claims where the Court rejected their assertion that counsel performed deficiently. Fisher v. Angelone, 163 F.3d 835, 852-3 (4th Cir. 1998). "Attorney acts or omissions 'that are not unconstitutional individually cannot be added together to create a constitutional violation.'" Id. (qouting Wainwright v. Lockhart, 80 F.3d 1226, 1233 (8th Cir. 1996). Having reviewed those relatively few instances where the Court rejected an individual claim solely for a lack of prejudice, the Court finds even when considered collectively there is no reasonable possibility that the result of the Defendants' convictions or sentence would be different.[64]  See Huffington v. Nuth, 140 F.3d 572, 583 (4th Cir. 1998).  The Defendants' guilt and culpability were confirmed by numerous credible witnesses. The testimony of the witnesses was well corroborated by the physical evidence including forensic testing, receipts for firearms, the video tape of the murder scenes, and the testimony of other witnesses. The above claims will be dismissed.

## XIV.  THE DEFENDANTS' ADOPTION BY REFERENCE OF CODEFENDANTS' CLAIMS
Tipton V.J
Johnson X
Roane IX

In their initial § 2255 motion, each Defendant asserts that he adopts by reference any claims by his copetitioners to the extent such claims are applicable to him.[65]   By Order entered December

---

[64] Roane did not list in his index a separate claim of cumulative ineffective assistance. The Court's rejection of Roane's assertion of collective prejudice does not encompass Roane's Claim IV.B.2 pertaining to the murder of Douglas Moody.

[65] United States v. Merlino, 2 F.Supp.2d 647, 669 (E.D. Pa. 1997)(denying as inappropriate defendant's request to join codefendants' § 2255 motions).

113

11, 2000, the Court directed each Defendant to provide an index of his claims. Clerk's Record # 830. That order further required each Defendant to list each of his grounds for relief including the subparts thereto and to cite to the portions of the record where the claim is raised and discussed.[66] This opinion has addressed every separate ground for relief listed by Tipton, Johnson, and Roane in his respective index. In light of the specific pleading requirements for § 2255 motions and this Court's orders, the oblique references to the unspecified claims of codefendants do not warrant further individual consideration. Cf. Gray v. Netherland, 99 F.3d 158, 165-66 (4th Cir. 1996)(concluding habeas petitioner had not properly raised claim in federal court where he failed to articulate how the fact and law combined to violate his rights). Claims V.J , X and IX will be dismissed for the reasons previously stated in conjunction with each claim specifically raised by Johnson, Tipton and Roane.

Tipton and Johnson's motion for relief pursuant to 28 U.S.C. § 2255 will be denied. Roane's motion for 28 U.S.C. § 2255 relief is denied in part.

An appropriate Order shall issue.

_James R. Spencer_
United States District Judge

Richmond, Virginia
Date: 5-1-03

---

[66] The Court warned the parties that review of their claims would be limited to those portions of the record designated in their individual index.

114

## APPENDIX A
## RICHARD TIPTON'S GROUNDS FOR RELIEF[1]

V.A    JUROR MISCONDUCT VIOLATED TIPTON'S RIGHT TO AN IMPARTIAL JURY AND TO DUE PROCESS OF LAW.

V.B.3.a[2]    The Jury Was Not Properly Instructed As To The Supervision Element:

    (i)    The trial court failed to instruct the jury that a mere buyer/seller of drug relationship is insufficient to establish the "organization, supervision, or management" element under section 848;

    (ii)    The trial court failed to instruct the jury that some persons alleged to be CCE supervisees were, as a matter of law, incapable of being CCE supervisees;

    (iii)    The trial court failed to instruct the jury that it must unanimously agree to the identity of each of the five supervisees;

    (iv)    The trial court failed to instruct the jury that the government must prove "management" to satisfy the organizer/supervisor element of a CCE.

V.B.3.b    There Was Insufficient Evidence To Support The Supervision Element Because The Government Failed To Prove Tipton Supervised Five Persons.

V.B.3.c    The Prosecutorial Misconduct Relating To The Supervision Element:

    (i)    The Prosecution used unsupported, ambiguous, and misleading testimony to prove "supervision";

    (ii)    The Prosecution used improper and prejudicial argument, misleading the jury, about the supervision element.

V.B.3.d    Ineffective Assistance of Counsel At Trial and On Appeal:

    (i)    Counsel failed to object to the repeated use of improper and prejudicial evidence;

    (ii)    Counsel failed to determine and demonstrate that there were less than five supervisees;

    (iii)    Counsel failed to object to the prosecutor's closing argument on the supervision element;

    (iv)    Counsel failed to seek proper jury instructions on the supervision element;

    (v)    Counsel failed to stop the onslaught of prosecutorial misconduct;

    (vi)    Counsel failed to seek relief available pursuant to Barona and Jerome;

    (vii)    Counsel's errors, viewed individuallly or collectively, require the Court to grant relief.

V.C.1    Tipton's Right To Due Process Was Violated Because The Government Knew Or Should Have Known that:

_____

[1] Tipton's claims are identified by the letters and numerals used by Tipton in his index of claims.

[2] Section V.B. 1 & 2 discuss legal principals and background and do not set forth claims.

i

a. Maurice Saunder's Testimony Linking Tipton to "Light" and Large Sums of Money Was False; .

b. Greg Scott's Testimony Linking Tipton and his Codefendants to the New York Boyz Was False.

C.2 Hussone Jones' Testimony That Tipton Stabbed Douglas Talley Was False.

C.3 Priscilla "Pepsi" Greene Testified Falsely Regarding Her Drug Dealing Activities And The Hierarchy Of The Drug Dealing Enterprise In Richmond.

C.4 Jerry Gaiters Testified Falsely Regarding His Foreknowledge Of The Murder Of Dorothy Armstrong.

V.D. The Government Failed to Turn Over Exculpatory Evidence In Violation of Brady v. Maryland:

1. The Government Withheld Evidence that Tipton Could Have Used To Impeach The Testimony of Hussone Jones About The Murder Of Douglas Talley;

2. The Government Suppressed Evidence that Gave Tipton An Alibi For The Stoney Run Shooting Deaths of Linwood Chiles and Curt Thorne;

3. The Government Suppressed Evidence that Could Have Been Used To Impeach Priscilla GreenE Testimony That She Did Not Sell Drugs;

4. The Government Suppressed Evidence that Pointed to Co-Conspirator Lance Thomas As The Principal Of The Drug Activities Charged In The Indictment;

V.E. Prosecutorial Misconduct

1.&12. The Prosecution Improperly Discriminated Against Women.

2. The Prosecutors Made Inflammatory Arguments To The Jury, Unsupported By The Evidence, Regarding The Conditions Tipton Would Face If Given A Life Sentence.

3. The Prosecutors Misled The Jury By Vouching, In Inflammatory Terms, To Their Personal Belief Regarding Tipton's Guilt And The Veracity Of Witnesses.

4. The Prosecutors Introduced Inadmissible Evidence Through Which They Vouched That Tipton And The Other Defendants Were Threats To The Lives Of Witnesses

5. The Government Committed Misconduct When It Formulated And Produced Its Witness List.

6. The Prosecutors Misled The Jury Into Believing That It Had A Duty To Convict And Impose A Death Sentence.

7. The Prosecutors Misled The Jury By Improperly Emphasizing That Tipton And The Other Defendants Did Not Testify.

8. Prosecutors Suggested That A Government Witness Passed A Polygraph Test.

9. The Prosecutors Misled The Jury By Treating Tipton And The Other Defendants As A Group, Rather Than As Individuals.

10. The Prosecutors Improperly Argued That Sentencing Should Be Based On Deterrence.

11. The Prosecutors Presented Testimony Without Foundation.

13. The Prosecutors Committed Misconduct With Respect To The CCE Supervision

ii

Element.

14.    The Scope Of The Government's Misconduct Prejudiced Tipton And Requires The Court To Grant The Writ.

15.    Prosecutors Violated 18 U.S.C. § 201(c)(2) When Obtaining And Presenting The Testimony Of Several Cooperating Witnesses.

16.    The Government Improperly Manipulated Material Evidence Regarding The Alleged CCE By Presenting Two Different Accounts At Tipton's And Lance Thomas' Trial Through The Testimony Of Priscilla Greene.

V.F.    INEFFECTIVE ASSISTANCE OF COUNSEL

1.a    Counsel Failed to Move for a Change of Venue Despite Inflammatory Media Coverage.

1.b    Defense Counsel Failed to Request Voir Dire Pursuant to Morgan v. Illinois.

1.c    Defense Counsel Failed to Object to the Prosecution's Strikes Against Female Jurors.

1.d    Trial Counsel's Errors Resulted in Tipton's Exclusion From Voir Dire, and The Loss Of His Right To Participate In Jury Selection.

1.e    Defense Counsel Failed to Investigate Whether in Fact the CCE Existed in New York And New Jersey.

1.f    Defense Counsel Failed to Challenge the Government's Evidence that Tipton Was A Supervisor Of A CCE.

1.g    Ineffective Assistance of Counsel With Respect To Jury Instructions:

1    Defense Counsel Failed To Request An Unanimity Instruction On The CCE Elements.

2    Defense Counsel Failed To Object To And Ask For A Proper Jury Instruction On The RICO Enterprise Element.

3    Defense Counsel Failed to Object To And Ask For A Proper Jury Instruction On The Supervision Elements Of The CCE Charges.

4    Tipton's Counsel Were Ineffective When They Failed To Request An Instruction that the Jurors Must Unanimously Agree On The Violations That Make The Continuing Series Element Of A CCE.

1.h    Counsel Failed to Adequately Defend Tipton on the Charge That He Murdered Douglas Talley.

1.i    Defense Counsel Failed to Prepare an Adequate Defense To The Stoney Run Murders.

1.j.    Defense Counsel Failed to Object to the Improper and Highly Prejudicial Conduct and Arguments By The Prosecutors Throughout Tipton's Trial.

1.k.    Defense Counsel Failed to Object to the Testimony Of Several Cooperating Witnesses Pursuant to 18 U.S.C. § 201(c)(2).

2.a.    Counsel Failed to Investigate and Prepare an Adequate Mitigation Defense

2.b.    Counsel Failed to Present Evidence of Tipton's Prison Conditions If Sentenced To Life Without Parole And Effect On Question Of Future Dangerousness.

iii

3.a. Tipton's Appellate Counsel Was Ineffective Because He Failed to Demonstrate that the Government's Evidence, As A Matter of Law, Did Not Prove The CCE Supervision Element.

3.b. Tipton's Appellate Counsel Was Ineffective Because They Failed to Demonstrate that the Government's Evidence Was Not Sufficient As A Matter of Law to Prove That Tipton Murdered Talley.

4. The Cumulative Effect of Counsel's Errors Prejudiced Tipton.

V.G. THE UNBRIDLED DISCRETION TO FORMULATE NON-STATUTORY AGGRAVATING FACTORS GIVEN TO PROSECUTORS UNDER SECTION 848 REPRESENTS AN UNCONSTITUTIONAL DELEGATION OF LEGISLATIVE AUTHORITY.

V.H TIPTON WAS DENIED HIS STATUTORY AND CONSTITUTIONAL RIGHT TO JUSTICE WITHOUT DISCRIMINATION.

V.I TIPTON IS ACTUALLY INNOCENT OF THE CCE CONVICTIONS.

V.J TIPTON ADOPTS BY REFERENCE ANY CLAIMS RAISED BY JOHNSON AND ROANE TO THE EXTENT THAT THEY APPLY TO HIM.

V.K. THE DISTRICT COURT INCORRECTLY INSTRUCTED THE JURY ON THE ESSENTIAL ELEMENTS OF THE CCE STATUTE IN VIOLATION OF TIPTON'S SIXTH AMENDMENT RIGHT TO TRIAL BY A JURY.

V.L TIPTON IS ENTITLED TO RELIEF BECAUSE THE INDICTMENT FAILED TO CHARGE THE AGGRAVATING FACTORS IN THE INDICTMENT AS REQUIRED BY Apprendi v. New Jersey, 530 U.S. 466 (2000).

iv

1134a

APPENDIX B
JOHNSON'S GROUNDS FOR RELIEF[1]

I.    THE GOVERNMENT KNOWINGLY OR NEGLIGENTLY USED FALSE EVIDENCE TO CREATE THE ILLUSION THAT JOHNSON AND HIS CO-DEFENDANTS WERE LEADERS OF HIGHLY ORGANIZED CONTINUING CRIMINAL ENTERPRISE HAVING ITS ROOTS IN NEW YORK AND/OR NEW JERSEY.

    B.    Greg Scott's Trial Testimony Linking Johnson And His Co-Defendants To The New York Boyz Was False, And The Government Knew or Should Have Known That It Was False.

    C.    Maurice Saunder's Trial Testimony Linking Tipton to "Light" And To Large Sums Of Money Was False, And The Government Knew Or Should Have Known It Was False.

II.   THE EVIDENCE WAS LEGALLY INSUFFICIENT TO CONVICT JOHNSON AS A SUPERVISOR OF A CONTINUING CRIMINAL ENTERPRISE UNDER 21 U.S.C. SECTION 848.

    C.1    The Jury Was Not Properly Instructed As To The Supervision Element

        a.    The trial court failed to instruct the jury that a Buyer-Seller Relationship is insufficient to establish the organization, supervision, or management element;

        b.    The trial court failed to instruct the jury:

            (i)    that some persons alleged to be CCE supervisees were incapable of counting as supervisees as a matter of law;

            (ii)   failed to instruct the jury that it must unanimously agree to the identity of each of the five supervisees.

        c.    The trial court failed to instruct the jury that the government must prove the element of management as part of the element of supervision for a CCE organizer;

    C.2    There Was Insufficient Evidence To Support the Supervision Element.

    C.3    Prosecutorial Misconduct Relating To Supervision Element:

        a.    Improper use of unsupported ambigous testimony;

        b.    Improper argument concerning the supervision element;

    C.4    Ineffective Assitance of Counsel At Trial and Appeal:

        a.    Counsel should have shown that Johnson was incapable of being a supervisor or at least not likely to be a supervisor;

        b.    Counsel failed to object to repeated improper evidence;

        c.    Counsel failed to demonstrate that the proof against Johnson did not establish five supervisees;

        d.    Counsel failed to object to the prosecutor's closing argument on the

---

[1] Johnson's claims are identified by the letters and numerals used by Johnson in his index of claims.

i

supervision element;

e.   Counsel failed to request proper jury instructions on the supervision argument of the CCE statute;

f.   Trial counsel failed to stop the onslaught of prosecutorial misconduct;

g.   Counsel failed to seek relief available under Barona and Jerome.

III.   JOHNSON IS ACTUALLY INNOCENT OF THE CCE CONVICTIONS

IV.   TRIAL AND APPELLATE COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL

A.   Guilt Phase Ineffectiveness:

1.   Defense counsel failed to request the appointment of an investigator and failed to conduct an adequate investigation;

2.   Defense counsel failed to move for a change of venue;

3.   Defense counsel failed to request voir dire pursuant to Morgan v. Illinois 504 U.S. 719 (1992);

4.   Defense counsel failed to object to the prosecution's strikes against women jurors;

5.   Defense counsel failed to object to Johnson's absence from voir dire and Johnson lost his right to participate in jury selection;

6.   Defense counsel failed to challenge the Government's evidence that Johnson was a supervisor of a CCE;

7.   Defense counsel failed to object or ask for proper jury instructions on the substantive counts charged;

a.   Defense counsel failed to request a unanimity instruction on the CCE elements;

b.   The jury was not properly instructed as to the supervision element of the CCE charges.

8.   Defense counsel failed to object to improper and highly prejudicial conduct and arguments by the prosecutors throughout Johnson's capital trial;

B.   Counsel Provided Ineffective Assistance of Counsel At The Sentencing Phase

1.   Defense counsel failed to argue that Johnson's mental ability was not accurately reflected by his I.Q. test, and, in fact, was below 77;

2.   Defense counsel failed to present evidence of Johnson's prison conditions if sentenced to life;

C.   Ineffective Assistance of Counsel on Appeal;

D.   The Cumulative Effect of Counsel's Errors Prejudiced Johnson.

V.   PROSECUTORIAL MISCONDUCT DEPRIVED JOHNSON OF HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL

A.   The Prosecutors Misled the Jury By Vouching In Inflammatory terms, To Their Personal Belief In Johnson's Guilt And The Veracity of Their Witnesses.

B.   The Prosecutors Introduced Inadmissible Evidence Suggesting That Johnson And

ii

1136a

The Other Defendants Threatened The LiveS Of Witnesses.

C. The Prosecutors Misled The Jury Into Believing It Had A Duty To Convict And Impose A Death Sentence.

D. The Prosecutors Misled The Jury by Making Misleading And Inflammatory Arguments To The Jury, Unsupported by the Evidence Regarding The Conditions Johnson Would Likely Face If Given A Life Sentence.

E. The Prosecutors Improperly Emphasized That Johnson And The Other Defendants Did Not Testify.

F. The Prosecutors Suggested That A Government Witness Had Passed A Polygraph Test.

G. The Prosecutors Improperly Treated Johnson And The Other Defendants As A Group, Rather Than As Individuals.

H. The Prosecutors Improperly Argued That Sentencing Should Be Based On Deterrence.

I. Misconduct Relating To Testimony Without Foundation.

J. The Prosecutors Misled The Jury By Suggesting That They Had Not Influenced Witnesses To Use The Terms "Partner", "Worker", And "Employee".

K. The Government excluded Women From The Jury In Violation of J.E.B. v. Alabama, 114 S.Ct. 1419 (1994).

L. Misconduct Relating To The CCE Supervision Element.

M. The Prosecutors Violated 18 U.S.C. § 201(c)(2) By Obtaining And Presenting The Testimony Of Several Cooperating Witnesses.

N. The Prosecutors Presented The False Testimony Of Priscilla "Pepsi" Greene.

O. The Prosecution Engaged In Misconduct By Presenting Materially Different Accounts Of The CCE Supervision Activities At Co-Conspirator Thomas' Subsequent Trial.

P. The Prosecution Engaged In Misconduct By Presenting The False Testimony Of Jerry Gaiters.

VI. THE PROSECUTION IMPROPERLY DISCRIMINATED AGAINST WOMEN IN SELECTING THE JURY.

VII. JUROR MISCONDUCT VIOLATED JOHNSON'S RIGHTS TO AN IMPARTIAL JURY AND TO DUE PROCESS OF LAW.

VIII. JOHNSON WAS DENIED HIS STATUTORY AND CONSTITUTIONAL RIGHT TO JUSTICE WITHOUT DISCRIMINATION.

IX. SECTION 848'S DELEGATION OF AUTHORITY TO PROSECUTORS TO CREATE NON-STATUTORY AGGRAVATORS IS AN UNCONSTITUTIONAL DELEGATION OF AUTHORITY THAT VIOLATES THE SEPARATION OF POWERS.

X. JOHNSON ADOPTS THOSE CLAIMS OF TIPTON AND ROANE THAT ARE

iii

APPLICABLE TO HIM.

XI.    JOHNSON IS EXEMPT FROM EXECUTION UNDER 18 U.S.C. § 3596(C) AND 21 U.S.C. § 848(1) BY VIRTUE OF MENTAL RETARDATION.

XII.    THE DISTRICT COURT FAILED TO PROPERLY INSTRUCT THE JURY ON THE ESSENTIAL ELEMENTS OF THE CCE STATUTE IN VIOLATION OF PETITIONER'S SIXTH AMENDMENT RIGHT TO TRIAL BY JURY.

XIII.    JOHNSON IS ENTITLED TO RELIEF BECAUSE THE INDICTMENT FAILED TO CHARGE THE AGGRAVATING FACTORS IN THE INDICTMENT AS REQUIRED BY Apprendi v. New Jersey, 530 U.S. 466 (2000).

iv

1138a

APPENDIX C
JAMES ROANE'S GROUNDS FOR RELIEF

To the extent possible, Roane's claims are identified by the letters and numerals used by Roane in his index of claims.

I. PROSECUTORIAL MISCONDUCT
   a. The Prosecution Misled The Court As To Which Witnesses Were In The Witness Protection Program;
   b. The Prosecution Failed To Provide The Defendants With Exculpatory Information In Violation of Brady v. Maryland -The Government Withheld Evidence that Roane Could Have Used To Impeach The Testimony of Hussone Jones About The Murder Of Douglas Talley;
   c. The Prosecution Introduced Evidence That They Knew Or Should Have Known Was False:
      1. Greg Scott's Trial Testimony Linking the Defendants To The New York Boyz Was False, And The Government Knew Or Should Have Known That It Was False.
      2. Maurice Saunders' Trial Testimony Linking Tipton to "Light", And To Large Sums Of Money Was False, And The Government Knew Or Should Have Known It Was False;
      3. Priscilla Greene Testified Falsely Regarding:
         a. Her innocence in selling drugs;
         b. Regarding the Primacy of Johnson's role in the enterprise;
         c. Roane's role in the murdering Doug Moody.
      4. Hussone Jones' Description Of The Talley Murder.
   d. Prosecutors Violated 18 U.S.C. § 201(c)(2) When Obtaining And Presenting the Testimony Of Several Cooperating Witnesses.

II. THE PROSECUTION IMPROPERLY DISCRIMINATED AGAINST WOMEN IN THE SELECTION OF THE JURY

III. THE JURY WAS TAINTED BY OUTSIDE INFLUENCES

IV. INEFFECTIVE ASSISTANCE OF COUNSEL
   A. Trial Counsel Failed To Seek A Change of Venue.
   B. Defense Counsel Failed To Conduct An Adequate Investigation Of:
      1. The Events In New York/New Jersey;
      2. The Moody Murder.
   C. Defense Counsel Waived Roane's Right To Be Present During Voir Dire.
   D. Trial Counsel Failed To Challenge The Government's Evidence That Roane Supervised Or Managed Five Or More Persons.
   E. Trial Counsel Failed To Present An Adequate Penalty Phase Case.
      1. Counsel Failed To Investigate And Present Evidence Of Roane's Mental And Emotional Background.

2.    Counsel Failed To Present Testimony From Roane's family.

3.    Counsel Failed To Present Evidence Regarding The Conditions That Roane Would Face Prison In Prison.

4.    Counsel Failed To Address The Absence Of Evidence Of Substantial Planning

F.    Failed To Object To Prosecution's Purchasing Testimony From Cooperating Witnesses

V.    ROANE WAS DENIED HIS RIGHT TO JUSTICE WITHOUT DISCRIMINATION

VI.    THE TRIAL COURT FAILED TO INSTRUCT THE JURY ON THE ESSENTIAL ELEMENTS OF THE CCE STATUTE (As defined by Richardson v. United States 526 U.S. 813 (1999)

VII.    ROANE IS ENTITLED TO RELIEF BECAUSE THE INDICTMENT FAILED TO CHARGE THE AGGRAVATING FACTORS IN THE INDICTMENT AS REQUIRED BY Apprendi v. New Jersey, 530 U.S. 466 (2000).

VIII.    ROANE IS ACTUALLY INNOCENT OF THE CCE VIOLATIONS AND THE MURDER OF DOUG MOODY

IX.    ROANE ADOPTS BY REFERENCE ALL CLAIMS BY HIS CODEFENDANTS TO THE EXTENT THEY ARE APPLICABLE TO HIM

ii

1140a